# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA

### ALBANY DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION and THE STATE OF GEORGIA, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 1:11-cv-58 (WLS) |
| PHOEBE PUTNEY HEALTH SYSTEM, INC., PHOEBE PUTNEY MEMORIAL HOSPITAL, INC., PHOEBE NORTH, INC., HCA INC., PALMYRA PARK HOSPITAL INC., and HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, | ) ) ) ) ) ) ) ) ) ) | **REDACTED PUBLIC VERSION**  Filed at_____3:55___P_M _____4/26_____, 20_11_ _____BCL_____  Deputy Clerk, U.S. District Court Middle District of Georgia |
| Defendants. | ) ) | |

## COMPLAINT FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission") and the State of

Georgia, by their designated attorneys, petition the Court, pursuant to Section 13(b) of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton

Act, 15 U.S.C. § 26, for a temporary restraining order and preliminary injunction enjoining

Defendants Phoebe Putney Health System, Inc. ("PPHS"), Phoebe Putney Memorial Hospital,

Inc. ("PPMH"), Phoebe North, Inc. ("PNI") (collectively, "Phoebe Putney"); Defendants HCA

Inc. ("HCA") and Palmyra Park Hospital, Inc. ("Palmyra"); and Defendant Hospital Authority of

Albany-Dougherty County ("the Authority"), including their domestic and foreign agents,

divisions, parents, subsidiaries, affiliates, partnerships, or joint ventures, from taking any steps

toward consummating a proposed three-step transaction (the "Transaction") that transfers control

of Palmyra to Phoebe Putney: (1) the Authority purchases Palmyra's assets from HCA Inc.

("HCA") using PPHS's money; (2) the Authority immediately gives control of Palmyra to

Phoebe Putney under a management agreement; and (3) Phoebe Putney enters into a lease giving

it control of the Palmyra assets for 40 years. Plaintiffs require the aid of this Court to maintain

the *status quo* during the Commission's ongoing administrative proceeding, including a trial on

the merits scheduled for September 19, 2011, which the Commission initiated pursuant to

Section 7 of the Clayton Act, 15 U.S.C. § 18, and the Commission's Rules of Practice. The on-

going administrative proceeding will determine the legality of the Transaction, subject to judicial

review by a federal Court of Appeals, and will provide a forum for all parties to conduct full

discovery and present evidence regarding the likely effects of the Transaction and any

affirmative defenses raised.

## I.

## NATURE OF THE CASE

1.     The Transaction creates a virtual monopoly for inpatient general acute care services sold

to commercial health plans and their customers in Albany, Georgia and its surrounding

area. The Transaction will eliminate the robust competitive rivalry between Phoebe

Putney and Palmyra – the only two hospitals in Albany and in Dougherty County – that

has benefitted consumers for decades. The result will be significant increases in

healthcare costs for local residents, many of whom are already struggling to keep up with

rising medical expenses, and the stifling of beneficial quality improvements. Without

temporary and preliminary injunctive relief from this Court, Phoebe will gain full

economic and operational control over Palmyra and may eliminate Palmyra's staff, terminate or relocate its services, and raise rates for its services.

2.    Phoebe Putney and Palmyra knew that creating a virtual monopoly would not pass muster with the antitrust authorities; indeed, Palmyra conditioned the deal on " ███████ ████████████████████ " So Phoebe Putney – without even informing the Authority that it was doing so – structured the Transaction in hopes of using the state action doctrine to shield the Transaction from potential antitrust challenges.  The Transaction positions the Authority as a strawman to transfer control of Palmyra to Phoebe Putney in a three-step process: *first*, the Authority will purchase Palmyra's assets from HCA using PPHS's money; *second*, the Authority will immediately give control of Palmyra to Phoebe Putney under a management agreement; and *third*, Phoebe Putney will enter into a lease giving it control of the Palmyra assets for 40 years.  In a nutshell, the Authority, using Phoebe Putney's money, would buy Palmyra, and then upon closing, immediately turn it over to Phoebe Putney.

3.    Thus, the Authority is the acquirer of Palmyra on paper only.  By using the Authority as a strawman, Phoebe Putney sought to shield this overtly anticompetitive Transaction from antitrust scrutiny.  The Authority played no meaningful role in the Transaction.  Phoebe Putney initiated and negotiated the deal.  The Authority undertook no substantive analysis of the Transaction or its effect on the community and played no independent role in negotiating it.  The parties included the Authority at the eleventh hour solely in an effort to avoid antitrust enforcement by having the Authority rubber-stamp this sale from one private party to another.  Indeed, the entire Transaction is premised on the immediate

3

handover of Palmyra's assets to Phoebe Putney; the Authority has considered no other options.

4. So certain was Phoebe Putney that the Authority would rubber-stamp the Transaction, that it ███████████ with Palmyra. Before the Transaction was even presented to the Authority, Phoebe Putney agreed with Palmyra that if the Authority failed to ████████████████████████████████ ████████████████ Phoebe Putney would ███████████.

5. Phoebe Putney's confidence that the Authority would rubber-stamp the deal comes from years of operating without active supervision by the Authority under its long-term Lease and Management Agreement of the hospital's assets to Phoebe Putney's subsidiary, PPMH ("the Lease"). As the ████████████ explained to a new Authority member and to Phoebe Putney's CEO, "████████████████████████ ██████████████████ " The ██████████ has similarly expressed that he did not consider hospital oversight a function of the Authority.

6. Phoebe Putney, a private hospital system determined to increase its already dominant market share, acted alone when it sought out the Transaction. And Phoebe Putney alone will benefit from it at the expense of area businesses and residents. There is no *bona fide* state action whatsoever associated with the Transaction. Even under a new prospective lease arrangement, the ██████████████ expects it to be business as usual, as the Authority does not plan to engage in any meaningful additional oversight of the *de facto* monopoly, falling far short of the active state supervision required to satisfy the state action doctrine.

7.    Following the Transaction, Phoebe Putney will control 100% of the licensed general
      acute care hospital beds in Dougherty County. Even in an expansive geographic market
      encompassing the six counties surrounding Albany, Phoebe Putney's pre-Transaction
      market share based on commercial patient discharges nears 75%. With the Transaction,
      this will jump to approximately 86%. The hospital with the next-largest share (of less
      than 4%) is located 40 miles from Albany. The Transaction dramatically increases
      concentration in an already highly concentrated market, giving rise to a presumption of
      unlawfulness by a wide margin under the relevant case law and the U.S. Department of
      Justice and Federal Trade Commission Horizontal Merger Guidelines ("Merger
      Guidelines").

8.    Phoebe Putney and Palmyra are each other's closest competitors, and they are regarded
      as closest substitutes for one another by both health plans and their members. The two
      hospitals have battled fiercely for inclusion in health-plan networks and have gone to
      great lengths to increase their appeal to health-plan members. While Palmyra has ████
      ████████████████████ relative to Phoebe Putney, the latter has for years offered
      its deepest commercial payor discounts to health plans that exclude Palmyra from their
      networks.

9.    The Transaction will end that beneficial competition. The CEO of Phoebe Putney stated
      publicly that the Transaction affords the opportunity to "get the rivalry behind us." A
      requirement of the Transaction is that Palmyra drop its pending monopolization lawsuit
      against Phoebe Putney.

10.   Other southwest Georgia hospitals offer scant competition to Phoebe Putney and
      Palmyra. The nearest independent hospitals, located over 30 miles from Albany, are

5

small and serve only their own local communities. Given health-plan members' unwillingness to travel significant distances for inpatient general acute care services, these hospitals are simply too distant to serve as practical substitutes for residents of the Albany area, even in the event of a small but significant price increase at the Albany hospitals. Health plans and local employers have testified that their networks must include PPMH or Palmyra, or both, in order to be commercially viable for Albany-area employers and other groups.

11. The Transaction greatly enhances Phoebe Putney's bargaining position in negotiations with health plans, giving it the unfettered ability to raise reimbursement rates without fear of losing customers. Without Palmyra or any other independent competitive alternative to PPMH, health plans will be forced either to accept the higher rates or to exit the local marketplace. Higher hospital rates are ultimately borne by the health plans' customers – local employers that pay their employees' healthcare claims directly or pay premiums to health plans on their employees' behalf – and by the individual health-plan members themselves. Those increased costs impact local employers' ability to compete, expand, and remain vibrant.

12. The vigorous price and non-price competition eliminated by the Transaction will not be replaced by other hospitals in the next several years, if ever. Significant barriers to entry and expansion, including Certificate of Need ("CON") and funding requirements, prevent other hospitals from extending their reach into the Albany area. Even Palmyra has struggled mightily to expand into new service lines, such as obstetrics, due to stringent CON requirements and fierce opposition from Phoebe Putney. Phoebe Putney has stated it would take many years to construct a new facility comparable to Palmyra. Any

purported efficiencies associated with the Transaction are insufficient to offset the great anticompetitive harm almost certain to result from the Transaction.

13. On April 19, 2011, by a 5-0 vote, the Commission found reason to believe that the Transaction would violate Section 7 of the Clayton Act and Section 5 of the FTC Act by substantially reducing competition, and initiated an administrative proceeding under Part III of its Rules of Practice. Under the Commission's Rules, a plenary administrative trial on the merits of the planned Transaction will begin on September 19, 2011. After an initial decision by an administrative law judge, the Commission, upon the appeal of any party or upon its own initiative, may determine the legality of the Transaction, and should it find liability, issue appropriate remedial relief.

14. Absent an order of this Court, Defendants may consummate the Transaction on or after 12:01 AM on April 21, 2011. Temporary and preliminary injunctive relief is therefore imperative to preserve the competitive *status quo* during the proceedings in this Court and the Commission's pending administrative proceeding. Such relief is warranted when the Commission raises "questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for thorough investigation, study, deliberation, and determination by the Commission in the first instance, and ultimately by the Court of Appeals." Consummation of the Transaction would result in immediate and significant harm to the employers and residents of Albany and the surrounding local area, and will prevent the Commission's ability to remedy the anticompetitive effects of the Transaction if it is ultimately found unlawful following the full administrative trial on the merits and any subsequent appeals.

## II.

## BACKGROUND

### A.

### Jurisdiction and Venue

15. This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies and is brought by an agency of the United States authorized by an Act of Congress to bring this type of action.

16. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

    Whenever the Commission has reason to believe –

    > (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

    > (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public – the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond . . .

17. Defendants, and each of their relevant operating subsidiaries and parent entities are, and at all relevant times have been, engaged in activities in or affecting "commerce" as

8

defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

18. Defendants all transact business in the Middle District of Georgia and are subject to personal jurisdiction therein. Venue therefore is proper in this District under 28 U.S.C. § 1391 (b) and (c) and 15 U.S.C. § 53(b).

## B.

## The Parties

19. The Commission is an administrative agency of the U.S. Government established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18.

20. The State of Georgia is a sovereign state of the United States. This action is brought by and through its Attorney General, who is the chief law enforcement officer of the State, with the authority to bring this action on behalf of his state pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Office of the Attorney General of Georgia has its principal offices at 40 Capitol Square, SW, Atlanta, Ga 30334.

21. All Phoebe Putney Defendants are not-for-profit corporations under Internal Revenue Code § 501(c)(3) and the Georgia Nonprofit Corporate Code, with their principal places of business at 417 Third Avenue, Albany, Georgia 31701. Defendant PPMH, directly or indirectly, is a Georgia corporation wholly-owned or controlled by PPHS, a Georgia corporation. PPHS is responsible for the operation of all Phoebe Putney hospital facilities in Albany, Georgia as well as the hospital in Sylvester, Georgia (in the Albany

9

Metropolitan Area), where Phoebe Worth Medical Center, Inc. is located. Defendant Phoebe North, Inc. is an entity that was created by PPHS in connection with the Transaction, to manage and operate Palmyra, under the control of PPHS and PPMH.

22.    PPMH is a 443-bed hospital located at 417 Third Avenue, Albany, Georgia 31701. Opened in 1911 at its current site, the hospital offers a full range of general acute care hospital services, as well as emergency care services, tertiary care services, and outpatient services. PPMH serves its local community, but also draws tertiary-service referrals from a broader region.

23.    Total annual patient revenues for Phoebe Putney for all services, at all facilities, are over $1.16 billion. Total discharges for all services are over 19,000. Phoebe Putney's annual net income or surplus is over $19 million. General acute care hospital services account for the majority of its services and revenues.

24.    Phoebe Putney's reach extends beyond Dougherty County, operating, through its wholly-owned subsidiary Phoebe Worth Medical Center, Inc., a 25-bed critical access hospital located at 807 S. Isabella Street, Sylvester, Georgia 31791, and Phoebe Sumter Medical Center, a 76-bed general acute care hospital located in Americus, Georgia.

25.    Defendant HCA is a for-profit health system that owns or operates 164 hospitals in 20 states and Great Britain. Founded in 1968, HCA is one of the nation's largest health care service providers with almost 40,000 licensed beds. Total annual revenues for HCA for all services and facilities are over $30.68 billion. HCA is incorporated in the State of Delaware. Its offices are located at One Park Plaza, Nashville, Tennessee 37203.

26.    HCA owns and operates Defendant Palmyra Park Hospital, Inc., doing business as Palmyra Medical Center, a 248-bed acute care hospital incorporated in the State of

10

Georgia, and located at 2000 Palmyra Road, Albany Georgia 31701. Palmyra was built in 1971 in response to requests by local physicians and community leaders to broaden the healthcare options available to residents of Dougherty County and the surrounding counties. Palmyra provides general acute care services, including but not limited to services in non-invasive cardiology, gastroenterology, general surgery, gynecology, oncology, pulmonary care, and urology.

27.    Defendant Authority is organized and exists pursuant to the Georgia Hospital Authorities Law, O.C.G.A. §§ 31-7-70 *et seq.*, a statute which governs 159 counties over the entire state, where at least 92 hospital authorities currently exist. The Authority maintains its principal place of business at 417 Third Avenue, Albany, Georgia 31701, the same address as PPMH; it has no budget, no staff, and no employees. Phoebe Putney pays all the Authority's expenses. The Authority's nine unpaid/volunteer members are appointed to five-year terms by the Dougherty County Commission. The Authority holds title to the hospital's assets, but leased them in 1990 to PPMH for $1.00 per annum under the Lease, which has been extended several times and will expire in 2042. The Lease establishes certain contractual rights, duties, and responsibilities PPMH and the Authority owe with respect to one another. PPHS itself is not a party to the Lease and does not report to the Authority.

## C.

### Phoebe Putney's Private Interests

28.    Under the terms of the Lease, the relationship between the Authority and PPMH is defined as and limited to that of landlord and tenant. Section 10.18 reads in pertinent part that "no provisions in this Agreement nor any acts of the parties hereto shall be

deemed to create any relationship between Transferor and Transferor [sic] other than the relationship of landlord and tenant."

29.    The Lease (and the attachments incorporated into the Lease as stipulated in Sections 4.02(h) and 4.15) provides that PPHS, through its Board of Directors, controls the assets and operations of PPMH. Under the terms of the December 3, 1990, *Contract Between Dougherty County, Georgia and the Authority of Albany-Dougherty County*, an attachment to the Lease, the Authority and Dougherty County stipulate in paragraph no. 4, on page five, that PPMH "has the sole discretion to establish its rate structure."

30.    Since the Lease took effect in 1990, the Authority has not and does not countermand, approve, modify, revise, or in other respects actively supervise Phoebe Putney's actions regarding competitively significant matters. It is Phoebe Putney's executives, not the Authority, who control Phoebe Putney's revenues, expenditures, salaries, prices, contract negotiations with health insurance companies, available services, and other matters of competitive significance. At no time, from the date the Authority and PPMH entered into the Lease, has the Authority exercised management, control, or active supervision over the affairs of PPMH. Indeed, during all those years, the Authority never asked once for lower prices at PPMH.

31.    As if to illustrate its deference to Phoebe Putney, the Authority waived its right to acquire Palmyra or any other hospital in Albany as a term of the Lease. Section 4.21 of the Lease, at page 26, stipulates that "[d]uring the term of this Agreement, Transferor [Authority] shall not own, manage, operate or control or be connected in any manner with the ownership, management, operation or control of any hospital or other health care facility other than the [Phoebe Putney Memorial] Hospital in Albany, Georgia . . . ."

12

Once the Authority rubber-stamped the Transaction and the Management Agreement that would put Phoebe Putney in control of its only Dougherty County competitor, however, PPMH agreed to waive this condition.

**D.**

**The Transaction**

32.    In the Spring and Summer of 2010, two important events occurred: (1) in April, the Eleventh Circuit reinstated Palmyra's antitrust suit accusing Phoebe Putney of using its monopoly power in obstetrics, neonatal and cardiovascular care to foreclose competition; and (2) in July, Mr. Joel Wernick, PPHS's President and Chief Executive Officer, authorized Mr. Robert J. Baudino, a consultant and attorney engaged by PPHS, to begin discussions with HCA regarding the possible acquisition of Palmyra by Phoebe Putney.

33.    Mr. Baudino played a number of roles in the Transaction. Through his Baudino Law Group, he provides legal counsel to PPHS with regard to the deal and other matters. He is also a member of the Sovereign Group which was engaged by PPHS to represent it in the Transaction in a non-legal capacity. The Sovereign Group is charging PPHS a fee of ██ percent of the $██ million transaction value, plus expenses, the payment of which is contingent on closing the Transaction. More recently, Mr. Baudino has also claimed to represent the Authority as "special counsel" in the Transaction, although the Authority was unaware of his representation of PPHS or his nearly $██████ contingency fee.

34.    Mr. Baudino and his Sovereign Group began negotiations on behalf of PPHS to acquire Palmyra in August 2010. At this point, Phoebe Putney had not notified the Authority that it was considering buying its rival. HCA, Palmyra's owner, did not intend to sell the hospital and informed Mr. Baudino that '██████████████████.''

13

Palmyra's business was improving, and HCA executives expected its financial performance to continue improving; they also expected to be successful in the battle with Phoebe Putney in both the antitrust lawsuit and in obtaining Palmyra's obstetrics CON.

35. HCA was open to hearing an offer for Palmyra, but it expected "███████████████," "███████████," and "███████." PPHS set out to meet those requirements and to acquire Palmyra.

36. The ████████████ was the easiest condition. Although it is a non-profit, PPHS operates the very lucrative PPMH, leased from the Authority for $1 per year. Phoebe Putney has cash reserves of over a quarter of a billion dollars.

37. As the negotiations progressed, HCA made clear that an ██████ offer would have to meet or exceed ██ times Palmyra's annual net revenue. HCA's expectations were shared with PPHS's bankers who analyzed similar transactions and found that HCA's demand far exceeded ██████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████ HCA's demand presented an obvious obstacle: it would be difficult to find an independent investment bank to issue a fairness opinion to PPHS opining that the price to be paid for Palmyra is fair, as is often done in significant transactions. But Mr. Baudino had a ready solution: structure the deal so that the Authority would acquire Palmyra, likely eliminating the need for a fairness opinion. Mr. Baudino was right. When Phoebe Putney finally presented the Transaction and the sale price to the Authority, the Authority

neither sought a fairness opinion nor asked a single question about the price, despite never before having reviewed a transaction of this magnitude.

38.     Mr. Baudino believed he had an easy answer to the antitrust risk as well. In a purportedly "████" method, Phoebe Putney would not buy Palmyra directly. Rather, it would structure the Transaction so that the Authority would acquire Palmyra, with PPHS guaranteeing the purchase price and the Authority's performance under the purchase agreement. Once the Authority obtained title, it would simply lease Palmyra to PPHS for $1.00 per year for 40 years on terms similar to the PPMH lease. Subsequently, in an effort to head-off an antitrust enforcement action by the Commission and the State of Georgia, the Authority approved a term sheet prepared by Mr. Baudino for implementing the new lease with ostensibly more oversight than had been exercised in the past two decades under the original 1990 Lease. But ████████████ admitted that the term sheet is a wish list, to which Phoebe Putney has not agreed, and that the Authority's role after the Transaction will not differ meaningfully from its current one – *i.e.*, it will continue to let Phoebe Putney do "whatever it takes to make the wheels turn."

39.     HCA's demand that there not be any ████████████████ until the Transaction was signed also did not pose a problem. PPHS does not consider itself subject to Georgia's Open Meetings Act, and it strictly limited the knowledge of the Transaction to people with a "need to know." Although PPHS was negotiating an agreement that included the Authority as a key party, PPHS did not consider the Authority to be among those with a "need to know."

40.     Unlike PPHS, the Authority must comply with Georgia's Open Meetings Act. But PPHS sidestepped that problem by not presenting the Transaction to the Authority until all of its

15

terms were definitively determined and the vote was a '███████████' " The

Authority could then rubber-stamp the completed deal at an open meeting, thereby

addressing all of HCA's antitrust and confidentiality concerns.

41. On October 7, 2010, PPHS's board approved management's recommendation that it

make a formal offer to HCA for Palmyra.

42. PPHS's negotiations for Palmyra were well underway before PPHS even mentioned them

to any of the Authority's nine members. On October 21, Mr. Wernick and Tommy

Chambless, PPHS's General Counsel, held a 30-minute informational session with two of

the Authority's members, Ralph Rosenberg and Charles Lingle. The Authority had

neither delegated responsibility for the Transaction to them nor designated them to speak

on its behalf. Mr. Wernick informed them that PPHS intended to acquire Palmyra, but

gave them no documents explaining the acquisition or justifying the substantial premium

PPHS was contemplating. Rosenberg and Lingle signed confidentiality agreements,

which they understood prevented them from discussing the Transaction with other

Authority members.

43. Two weeks later, on November 4, 2010, the Authority had its regularly scheduled

quarterly meeting. There was no discussion of the Transaction at that meeting.

44. On November 10, 2010, Mr. Baudino, acting as "counsel to Phoebe Putney Health

System Inc.," explained to HCA in a six-page letter how PPHS would structure the

Transaction to eliminate antitrust risks. He believed that, under the state action doctrine,

having the Authority make the acquisition would insulate the deal from notice to, or

antitrust law enforcement by, the Commission and the United States Department of

Justice. Mr. Baudino went on to explain that "the Authority would acquire Palmyra and,

after the acquisition, lease Palmyra to a non-profit corporation controlled by PPHS. That lease would be on substantially the same terms as the Authority's existing lease of Phoebe Putney Memorial Hospital Inc."

45.     On November 16, 2010, PPHS made a formal offer to HCA for Palmyra for ▮ its net patient revenue for the prior 12 months. The Authority did not review or approve the offer.

46.     On December 2, the PPHS Board approved the final terms of the deal between PPHS and HCA. PPHS and HCA concluded their negotiations shortly thereafter. The Transaction had still not been presented to, or vetted by, the Authority. PPHS agreed to guarantee a $195 million payment, which according to reports generated by PPHS's advisors, was ████████████████████████████████████████████████ The Authority played no role in negotiating that price, and the ████████████████████ ██████ prepared by PPHS's advisors was not shared with the Authority.

47.     PPHS also agreed to pay a $▮ million break-up fee, representing nearly ▮% of the purchase price. In addition, under Section 10.1(a) of the Defendants' Asset Purchase Agreement, PPHS likewise agreed to pay HCA a $▮ million "rescission fee" if, after closing, there is a final court order rescinding the transaction. The Authority had no role in negotiating the break-up or rescission fees.

48.     With the negotiations between PPHS and HCA concluded, it was time to present the Transaction to the Authority. But first, on December 20, 2010, the eve of the meeting at which it would be presented to the Authority, PPHS ████████████████████ ██████ would approve the Transaction without any changes. ████████████████ ████████████████████████████████████████████████

██████████████████████████████████████

████████ If, once presented, the Authority failed to ████████████

██████████████████████████████████████

PPHS would pay ████████████████████ within two business days' time.

During the preceding week, Mr. Wernick had met in small groups with other Authority

members without the knowledge of the Authority Chairman.

49.   On December 21, 2010, at a special meeting, the Transaction was presented to the

Authority for the first time.  In a 94-minute meeting, PPHS's CEO and its advisor, Mr.

Baudino (who appeared as special counsel to the Authority without addressing his work

for Phoebe Putney or the Sovereign Group's financial interest in the Transaction),

presented the terms of the Transaction and the related transactions using a PowerPoint

presentation recycled from PPHS's December 2 Board meeting. ████████████

████████████████████ the Authority did just what PPHS

expected it would do.  The members did not seek to change a single term of the

Transaction.  Indeed, they asked no questions and sought no extra counsel or independent

analysis.  Having no reason to acquire Palmyra independent of PPHS's desire to do so,

the Authority rubber-stamped the Asset Purchase Agreement *exactly* as PPHS had

negotiated it.

50.   At that meeting, the Authority also approved a 17-page Management Agreement that will

give Phoebe Putney control over Palmyra's operations immediately upon closing the

Transaction.

51.   The Authority understood that the Transaction negotiated and entered into by PPHS was

an integrated transaction which included the expected lease of Palmyra to Phoebe Putney.

52. On April 4, 2011, the Authority approved a lease term sheet prepared by Mr. Baudino that makes abundantly clear that the Authority's plan remains to lease Palmyra's and PPMH's assets to Phoebe Putney under a single lease. The term sheet is a wish list that has not even been presented to Phoebe Putney, let alone agreed upon. But even assuming Phoebe Putney were to agree to every single proposed term, ███████████ ███████ does not expect the Authority to make significant changes from its current activities, such as hiring staff to oversee Phoebe Putney's *de facto* monopoly or involving itself in Phoebe Putney's pricing or arrangements with commercial health-plan providers. In other words, Phoebe Putney will have free rein, just as it has for the last 20 years, only now it will operate as a virtual monopolist.

## III.

## THE RELEVANT SERVICE MARKET

53. The Transaction threatens substantial harm to competition in the relevant market for inpatient general acute-care hospital services sold to commercial health plans.

54. Inpatient general acute care hospital services encompasses a broad cluster of basic medical and surgical diagnostic and treatment services that include an overnight hospital stay. It is appropriate to evaluate the Transaction's likely effects across this cluster of services, rather than analyzing effects as to each service independently, because the group of services in the market is offered by Phoebe Putney and Palmyra under very similar competitive conditions. There are no practical alternatives to the cluster of inpatient general acute care hospital services.

55. The inpatient general acute-care services market excludes outpatient services because health plans and patients cannot substitute them for inpatient care in response to a price

increase. Similarly, the general acute care hospital services market does not include highly specialized tertiary or quaternary hospital services, such as those involving major surgeries and organ transplants, because they too are not practical substitutes for general acute-care hospital services.

56. Phoebe Putney and Palmyra negotiate reimbursement-rate contracts with commercial health plans. These contracts set the reimbursement rates that the health plans (and their self-insured customers) will pay the hospital for the services provided to health-plan members.

## IV.

## THE RELEVANT GEOGRAPHIC MARKET

57. The relevant geographic market in which to analyze the effects of the Transaction is *no broader than* the six-county region consisting of Dougherty, Terrell, Lee, Worth, Baker, and Mitchell Counties in Georgia.

58. Health-plan members strongly prefer to obtain inpatient hospital services close to their homes. Members' physicians typically have admitting privileges at their local hospitals, but not more distant facilities. Close proximity provides convenience for patients and also their visiting family members. Members are generally unwilling to travel outside of their communities for inpatient general acute care services, unless a particular needed service is unavailable locally, or the quality offered by local facilities is perceived as insufficient.

59. The only hospitals available to health plans to serve residents of the Albany area are located in Dougherty County, in the City of Albany. Health plans *must have* either

Phoebe Putney or Palmyra, or both, in their networks in order to offer commercially viable insurance products to residents of Albany and the six-county area.

60. The nearest independently owned hospitals located outside of Albany are Mitchell County Hospital (31 miles away), Crisp Regional Hospital (39 miles away), and Calhoun Memorial Hospital (39 miles away). Health plans and their members do not view these hospitals, given their distance and limited service offerings, as practical substitutes for Phoebe Putney or Palmyra.

61. Health plans could not steer their members to hospitals outside the six-county area in response to a small but significant rate increase at the hospitals within the area. It would therefore be profitable for a hypothetical monopolist controlling all hospitals in the relevant geographic market to increase commercial reimbursement rates by a significant amount.

62. As reflected by their ordinary-course documents and their actions, Phoebe Putney and Palmyra focus their competitive efforts and attention on one another, to the exclusion of any hospitals located outside the six-county area. Phoebe Putney's longstanding contracting strategy was to require health plans to exclude Palmyra, *but no other hospitals*, from their provider networks.

63. Hospitals outside the six-county area do not regard themselves as, and are not, meaningful competitors of Phoebe Putney or Palmyra for inpatient general acute care services as defined herein.

## V.

## MARKET STRUCTURE AND PRESUMPTIVE HARM

64. The Transaction is for all practical purposes a merger to monopoly, by any measure.

65. In addition to Phoebe Putney and Palmyra, there is only one other independently owned hospital located within the expansive six-county region set forth above. That is 25-bed Mitchell County Hospital, a very small limited care facility about 31 miles away. In addition, there are two hospitals located *outside* the six-county area – Tift Regional Medical Center and John D. Archbold Medical Center – which account for a small but nontrivial share of discharges for health-plan members residing within the six-county area. The two other hospitals mentioned above, Crisp Regional and Calhoun Memorial, are also located outside the six-county area and account for an insignificant share of the relevant market.

66. Under relevant case law and the Merger Guidelines, the Transaction is presumptively unlawful. PPHS's post-Transaction market share, based on discharges for commercial patients residing in the six-county area, is approximately 86%. This extraordinarily high market share easily exceeds levels that the United States Supreme Court has found presumptively unlawful.

67. The Merger Guidelines measure market concentration using the Herfindahl-Hirschman Index ("HHI"). A merger or acquisition is presumptively likely to create or enhance market power (and presumed illegal) when the post-merger HHI exceeds 2,500 points and the transaction increases the HHI by more than 200 points.

68. The market concentration levels here exceed these thresholds by a wide margin. The post-Transaction HHI will increase by 1,675 points to 7,453, as shown in the following table:

| Hospital | Discharges | Pre-Transaction Share of Discharges | Post-Transaction Share of Discharges |
|---|---|---|---|
| PPHS | 6,662 | 74.9% | 86.1% |
| Palmyra | 1,000 | 11.2% | |
| Tift Regional Medical Center | 351 | 3.9% | 3.9% |
| John D. Archbold Memorial Hospital | 218 | 2.5% | 2.5% |
| Others (each 1% or less) | 659 | 7.4% | 7.4% |
| Total | 8,890 | | |
| Pre-Transaction HHI: | | | 5,778 |
| Delta: | | | 1,675 |
| Post-Transaction HHI: | | | 7,453 |

## VI.

## ANTICOMPETITIVE EFFECTS

### A.

### The Transaction Eliminates a Unique Pricing Constraint Upon Phoebe Putney

69.     By eliminating vigorous competition between Phoebe Putney and Palmyra, the

Transaction enhances Phoebe Putney's ability and incentive to increase reimbursement

rates for commercial health plans and their membership.

70.     In its actions, documents, testimony, and public statements, Phoebe Putney has

acknowledged the intense competition between it and Palmyra. For example, Phoebe

Putney had a longstanding contracting strategy in which it offered substantially more

attractive reimbursement rates to commercial health plans, including Blue Cross Blue

Shield of Georgia, that were willing to enter into an exclusive in-network relationship

with Phoebe Putney *but not Palmyra*. In essence, Phoebe Putney recognized that its financial success depended on keeping health-plan members away from Palmyra, its only true competitor.

71.  Cognizant of Palmyra's competitive threat, Phoebe Putney has repeatedly challenged Palmyra's efforts to obtain a CON for obstetrics. Palmyra was initially granted a CON to build an obstetrics department, after which Phoebe Putney appealed the decision twice, and lost. Phoebe Putney then sued in state court to block Palmyra from going forward with its plans and was successful. Palmyra's appeal of that decision is currently pending. Palmyra is also prosecuting an antitrust lawsuit against Phoebe Putney, alleging monopolization and illegal tying.

72.  Palmyra has demonstrated the ability to capture market share from Phoebe Putney. ██████████████████ testified that Palmyra's market share has increased during the last two years, while Phoebe Putney's share has declined by an equal amount. And Mr. Wernick's December 21, 2010 presentation to the Authority states that one of the strategic consequences to Phoebe Putney were it not to buy Palmyra is '██████████ ██████████ ''

73.  In a fact sheet prepared by Phoebe Putney, the Authority stated on December 21st:



74.  The overt competitive rivalry between Phoebe Putney and Palmyra has yielded price benefits to health plans and their members. While Phoebe Putney has ██████████

█████████████████████████████████████

██████ Palmyra's competitive strategy in the marketplace has been to ███████

████████████████████ versus Phoebe Putney. As the two hospitals will operate as a

single entity under one lease, the Transaction eliminates incentives for either hospital to

discount its rates in an effort to gain business from health plans and their members.

75.    Following the Transaction, the combined Phoebe Putney/Palmyra will become an

absolute "must-have" hospital for health plans, which will have no available practical

alternative hospitals to offer their members. This significant change in the negotiating

dynamic will enhance Phoebe Putney's ability and incentive to obtain rate increases for

its own services, as well as for Palmyra's services. Health plans anticipate that

Palmyra's rates will increase significantly, and that Phoebe Putney's rates will rise

incrementally as well, due to the elimination of its only significant competitor.

76.    Rate increases resulting from the Transaction ultimately will be shouldered by local

employers and their employees. A significant percentage of the commercial health-plan

membership in the Albany area is self-insured. Self-insured employers rely on health

plans to negotiate rates and provide administrative support, while directly paying the full

cost of their employees' healthcare claims. As a result, self-insured employers and

employees immediately and directly bear the full burden of higher rates, including higher

premiums, co-pays, and out-of-pocket costs. Fully-insured employers also are inevitably

harmed by higher rates, because health plans pass on at least a portion of hospital rate

increases to these customers through premium increases and administrative fees. To

avoid having to pay the higher prices, some Albany-area employers may opt no longer to

provide healthcare coverage for their employees, and some Albany area residents may be forced to forego or delay healthcare services because of the higher prices.

77. Non-profit hospitals such as Phoebe Putney are no less likely than their for-profit counterparts to negotiate aggressively with health plans over reimbursement rates and to exercise market power gained through acquisition of a competitor.

## C.

## The Loss of Quality Competition

78. The Transaction will reduce the quality and breadth of services available in the Albany area.

79. Absent the Transaction, Phoebe Putney and Palmyra would continue to be close rivals with differentiated competitive offerings in the market for general acute-care hospital services. Health plans perceive little quality difference between the two hospitals currently.

80. Competition between Phoebe Putney and Palmyra has spurred the two hospitals to offer additional services; it also has fostered other non-price benefits for residents of the Albany area. For example, in response to Palmyra advertising its real-time emergency room wait times on its website and electronic billboards, Phoebe Putney executives sought to improve their own services. After Palmyra was granted a CON for an obstetrics department, Phoebe Putney developed plans to increase the availability of private rooms to its obstetrics patients. If the Transaction moves forward, these benefits of competition will be lost.

# VII.

## ENTRY BARRIERS

81.  Entry by new hospitals will not deter or counteract the Transaction's likely harm to competition in the relevant service market.  There is little chance that other firms would be able to enter to counter Phoebe Putney's anticompetitive practices.

82.  The regulatory environment in which hospitals are permitted to operate prevents other institutions from entering.  Under Georgia law, GA. Code Ann. §§ 31-6-42 (a)(3), only specially licensed facilities are permitted to offer general acute care hospital services, and before they may do so, the State must issue a CON before a new facility may be built.

83.  Even if a CON were obtained, the construction of a new general acute-care hospital comparable to Palmyra would cost millions of dollars and take well over two years -- indeed, ▇ years according to Phoebe Putney's counsel -- from initial planning to opening doors to patients.

84.  The construction of Palmyra in 1971 was the last example of new hospital entry in the Albany area.  No other hospitals in southwest Georgia -- the most likely candidates for new entry or expansion -- have stated they will enter, or even are considering entering, the relevant geographic market.

# VIII.

## ANTICIPATED AFFIRMATIVE DEFENSES

### A.

### State Action

85.  The Transaction was motivated and planned exclusively by Phoebe Putney, which acts in its independent, private, and pecuniary interests.  Rather than acting in furtherance of the

public interest, or even evaluating those interests, the Authority served only as a strawman to permit Phoebe Putney to attempt to shield this overtly anticompetitive Transaction from antitrust scrutiny.

86. The Authority engaged in no independent analysis to determine whether the Transaction would be in the public's interest. Having no reasons for acquiring Palmyra other than those advanced by Phoebe Putney, it authorized a $195 million purchase of Palmyra – using Phoebe Putney's money – without even considering: (i) the adverse effect this virtual merger to monopoly would have on healthcare pricing in the community; (ii) the valuation of Palmyra; (iii) alternatives to leasing Palmyra's to Phoebe Putney; or (iv) who specifically from Phoebe Putney would run Palmyra immediately after the Transaction.

87. Just as it played no supervisory role in the Transaction, since at least 1990 when the Lease became effective, the Authority has not actively supervised Phoebe Putney in any sense, including with respect to strategic planning, pricing, and other competitively sensitive affairs. Rather, the Authority's oversight is limited to conducting quarterly breakfast meetings (the minimum required by statute) lasting approximately one hour. The ███████████ testified that he cannot remember an instance in which a vote was less than unanimous, and he had never seen a price list for the services provided by the hospital, despite serving on the Authority for over five years. The ██████ believes pricing is a function of the hospital board, not the Authority. Consistent with that belief, the Authority made no effort to challenge, or even evaluate, PPMH's most recent price increases. The ███████████ testified that he was not aware of PPMH's price changes

in the last several years or how much PPMH's prices have increased during his eight-plus years on the Authority. And, the Authority has no authority to oversee PPHS.

88.     By contract, beginning immediately after the Transaction, Phoebe Putney will assume responsibility for setting prices for the services furnished at Phoebe North, the hiring and firing of Phoebe North employees, and other competitively significant decisions necessary for the operation of a hospital or hospital annex. The ██████████ ██████ does not expect any of that to change when it officially leases Palmyra's assets to Phoebe Putney.

89.     In sum, there is no state action here. Rather, it is the private, self-interested Phoebe Putney that has agreed to purchase Palmyra and will exercise – unfettered and unchecked by the Authority or any hospital competitor -- the extraordinary market power gained through the Transaction.

## B.

## Efficiencies

90.     Extraordinary efficiencies that cannot be achieved absent the merger are necessary to justify the Transaction in light of its vast potential to harm competition. Such efficiencies are lacking here.

## IX.

## LIKELIHOOD OF SUCCESS ON THE MERITS AND NEED FOR RELIEF

91.     In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities, using a sliding scale. The principal equity in cases brought under Section 13(b) is the public's interest in

effective enforcement of the antitrust laws. Equities affecting only the Defendants cannot tip the scale.

92. The Commission's complaint raises questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance, and ultimately by the Court of Appeals.

93. The Commission staff is likely in administrative proceeding to succeed in demonstrating, among other things, that:

a.      The Transaction is likely to have anticompetitive effects in violation of Section 7 of the Clayton Act, in the inpatient general acute care hospital services market in the Albany, Georgia area;

b.      Substantial and effective entry or expansion into these markets is difficult, and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Transaction; and

c.      Any state action defense that Defendants may assert in an effort to justify the Transaction will fail as a matter of law and of fact; any efficiencies defense will fail as speculative and/or not merger-specific; and any assertion with respect to the perceived need for additional capacity at PPMH will fail, in addition to failing as an asserted efficiency, because it will have been caused by Defendant Phoebe Putney's own prior actions.

94. Should the Commission rule, after the full administrative trial, that the Transaction is unlawful, reestablishing the competitive *status quo ante* would be difficult, if not impossible, in the absence of temporary and preliminary injunctive relief. The

integration of Palmyra's operations into those of Phoebe Putney, which may include staff reductions, the elimination or transfer of service lines, the implementation of higher contract reimbursement rates, and the scrambling of Palmyra's assets with Phoebe Putney's, will significantly impede any remedial effort to restore Palmyra to its pre-Transaction role as an independent and viable competitor of Phoebe Putney. Moreover, absent temporary and preliminary relief from this Court, substantial harm to competition will occur in the interim, even if suitable divestiture remedies ultimately may be devised.

95.     Accordingly, the equitable relief requested here is in the public interest.

**WHEREFORE,** Plaintiffs respectfully request that, consistent with the proposed order, the Court:

a.      Temporarily restrain and preliminarily enjoin Defendant Authority from acquiring Palmyra;

b.      Temporarily restrain and preliminarily enjoin Phoebe Putney from acquiring, managing, or controlling the operations of Palmyra;

c.      Retain jurisdiction and require all Defendants to maintain the *status quo* until resolution of the administrative proceeding that the Commission has initiated; and

d.      Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: April 19, 2011                    Respectfully submitted,

SAMUEL S. OLENS    551540               EDWARD D. HASSI
Attorney General                        Chief Litigation Counsel
ISAAC BYRD    101150                    THOMAS H. BROCK
Deputy Attorney General                 JOSEPH S. BROWNMAN
SIDNEY R. BARRETT, JR.    039752        MARIA M. DIMOSCATO
Senior Assistant Attorney General       PETER C. HERRICK
ALEX F. SPONSELLER    672848            SCOTT REITER
Assistant Attorney General              W. STEPHEN SOCKWELL, JR.
Georgia Department of Law               MATTHEW TABAS
40 Capitol Square, SW                   PRIYA B. VISWANATH
Atlanta, GA 30334-1300                  OSCAR M. VOSS
Telephone: (404) 651-7675               GOLDIE V. WALKER
Facsimile: (404) 656-0677               Attorneys
Email: sbarrett@law.ga.gov              Federal Trade Commission
      asponseller@law.ga.gov          Bureau of Competition
                                        600 Pennsylvania Ave., N.W.
*Attorneys for Plaintiff State of Georgia*   Washington, DC 20580
                                        Telephone: (202) 326-2470
                                        Facsimile: (202) 326-2286
                                        Email: ehassi@ftc.gov

                                        RICHARD A. FEINSTEIN
                                        Director
                                        NORMAN A. ARMSTRONG, JR.
                                        Deputy Director
                                        MATTHEW J. REILLY
                                        Assistant Director
                                        SARA Y. RAZI
                                        Deputy Assistant Director
                                        Federal Trade Commission
                                        Bureau of Competition

                                        WILLARD K. TOM
                                        General Counsel
                                        Federal Trade Commission

                                        *Attorneys for Plaintiff Federal Trade*
                                        *Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 19th of April, 2011, I filed the foregoing with the clerk of the court.

        s/Stewart Brown
        Stewart Brown
        Assistant United States Attorney
        United States Attorney's Office
        P.O. Box 1702
        Macon, Georgia 31202-1702
        (478) 621-2690

I HEREBY CERTIFY that on the 19th of April, 2011, I served the foregoing on the following counsel via electronic mail:

Kevin J. Arquit
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
(212) 455-7680
*Counsel for HCA Inc.*

Robert J. Baudino
Baudino Law Group, PLC
2409 Westgate Drive
Albany, GA 31707
(229) 883-0051
*Counsel for the Hospital Authority of Albany-Dougherty County*

Lee Van Voorhis
Baker & McKenzie LLP
815 Connecticut Avenue, NW
Washington, DC 20006
(202) 835-6162
*Counsel for Phoebe Putney Health System, Inc.*

        s/Edward D. Hassi
        Edward D. Hassi
        Attorney for Plaintiff Federal Trade Commission