# EXHIBIT F

LEASE AND TRANSFER AGREEMENT

BETWEEN

HOSPITAL AUTHORITY OF ALBANY-
DOUGHERTY COUNTY, GEORGIA

AND

PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.

DATED AS OF DECEMBER 11, 1990

**EXHIBIT F - 1**

# TABLE OF CONTENTS

Background .......................................................... 1

## ARTICLE I

### DEFINITIONS ...................................................... 3

## ARTICLE II

### REPRESENTATIONS

| | | |
|---|---|---|
| SECTION 2.01 | Representations and Warranties by Transferor . . . . . . . . . . . . . . | 10<br>10 |
| SECTION 2.02 | Representations and Warranties by Transferee . . . . . . . . . . . . . . | 11 |

## ARTICLE III

### LEASING OF EXISTING FACILITIES; TRANSFER OF OPERATING ASSETS; ASSUMPTION OF LIABILITIES; TERM AND REQUIRED PAYMENTS

| | | |
|---|---|---|
| SECTION 3.01 | Leasing of Existing Facilities; Quiet Enjoyment . . . . . . . . . . . | 11<br>11 |
| SECTION 3.02 | Transfer of Operating Assets and Existing Operations . . . . . . . . . . | 13 |
| SECTION 3.03 | Assumption of Liabilities . . . . . . . | 13 |
| SECTION 3.04 | Transfer of the Existing Facilities and Existing Operations . . . . . . . . . . | 13 |
| SECTION 3.05 | Required Payments. . . . . . . . . . | 14 |
| SECTION 3.06 | Security Interest . . . . . . . . . . | 15 |
| SECTION 3.07 | Absolute Obligation to Pay Required Payments . . . . . . . . . . . . . | 15 |
| SECTION 3.08 | Bonds and Bond Indentures . . . . . . | 16 |

## ARTICLE IV

### COVENANTS OF TRANSFEROR AND TRANSFEREE

| | | |
|---|---|---|
| | | 16 |
| SECTION 4.01 | Maintenance of Existing Facilities . . . | 16 |
| SECTION 4.02 | Operation of Hospital . . . . . . . . | 17 |
| SECTION 4.03 | Compliance With Applicable Law . . . . . | 19 |
| SECTION 4.04 | Liens and Encumbrances . . . . . . . . | 19 |
| SECTION 4.05 | Payments of Other Obligations . . . . . | 20 |
| SECTION 4.06 | Transferor's Performance of Transferee's Obligations . . . . . . . . . . . . | 21 |
| SECTION 4.07 | Improvements . . . . . . . . . . . . | 21 |
| SECTION 4.08 | Tax-Exempt Status . . . . . . . . . . | 21 |
| SECTION 4.09 | Regulatory Controls . . . . . . . . . | 21 |
| SECTION 4.10 | License and Accreditation . . . . . . . | 22 |
| SECTION 4.11 | Medical Staff . . . . . . . . . . . . | 22 |

-i-

SECTION 4.12    Medicare/Medicaid Filings . . . . . . . .    22
SECTION 4.13    Transfer of Employees; Benefits . . . . .    23
SECTION 4.14    Participation and Reimbursement
                Agreements  . . . . . . . . . . . . . . .    23
SECTION 4.15    Articles and Bylaws of Transferee            23
SECTION 4.16    Inplementation of Parent Holding Company
                Structure . . . . . . . . . . . . . . . .    23
SECTION 4.17    Consents and Notices  . . . . . . . . . .    25
SECTION 4.18    Indigent Care . . . . . . . . . . . . . .    25
SECTION 4.19    Permitted Indebtedness  . . . . . . . . .    25
SECTION 4.20    Financial Books and Records . . . . . . .    26
SECTION 4.21    Competition with Hospital . . . . . . . .    26
SECTION 4.22    Eminent Domain  . . . . . . . . . . . . .    26
SECTION 4.23    Existing Certificates of Need . . . . . .    26
SECTION 4.24    Name of the Hospital  . . . . . . . . . .    26

## ARTICLE V

## IMPROVEMENTS; DISPOSITIONS OF PROPERTY; ALTERATIONS

SECTION 5.01    After-Acquired Property as Part of the       27
                Existing Facilities . . . . . . . . . . .    27
SECTION 5.02    Covenant Against Unauthorized
                Disposition . . . . . . . . . . . . . . .    27
SECTION 5.03    Dispositions of Property Without Notice .    27
SECTION 5.04    Dispositions of Property With Notice . .     28
SECTION 5.05    Transfers to Affiliates . . . . . . . . .    28
SECTION 5.06    Alterations . . . . . . . . . . . . . . .    28
SECTION 5.07    Compliance with Bonds. . . . . . . . . .     29

## ARTICLE VI

## INSURANCE

SECTION 6.01    Insurance . . . . . . . . . . . . . . . .    29
SECTION 6.02    Insurers and Policies . . . . . . . . . .    29
SECTION 6.03    Involuntary Loss; Use of Insurance           30
                Proceeds, Condemnation Awards and
                Sale Proceeds . . . . . . . . . . . . . .    31
SECTION 6.04    Failure to Carry Insurance  . . . . . . .    32

## ARTICLE VII

## INDEMNIFICATION

SECTION 7.01    Indemnification; No Liability; Damage        32
                Claims  . . . . . . . . . . . . . . . . .    32
SECTION 7.02    Reimbursement of Costs and Expenses . . .    33
SECTION 7.03    Continuation of Liability . . . . . . . .    33

**EXHIBIT F - 3**

ARTICLE VIII

ASSIGNMENTS; SUBLEASES; OPERATING ARRANGEMENTS

SECTION 8.01   Maintenance of Corporate Existence;
               Permitted Mergers, Consolidations
               and Sales . . . . . . . . . . . . . . . . .   33
SECTION 8.02   Subleases and Operating Contracts . . . .   33
SECTION 8.03   Prohibition on Other Assignments and
               Subleases . . . . . . . . . . . . . . . . .   34

ARTICLE IX

DEFAULT BY TRANSFEREE

SECTION 9.01   Events of Default . . . . . . . . . . .   34
SECTION 9.02   Termination . . . . . . . . . . . . . . .   34
SECTION 9.03   Repossession Without Termination . . . .   36
SECTION 9.04   Damages . . . . . . . . . . . . . . . . .   36
SECTION 9.05   Additional Remedies . . . . . . . . . . .   37
SECTION 9.06   No Waiver of Rights . . . . . . . . . . .   37
SECTION 9.07   Reversion of Assets . . . . . . . . . . .   38

ARTICLE X

MISCELLANEOUS

SECTION 10.01   Captions . . . . . . . . . . . . . . . .   38
SECTION 10.02   Covenants Considered Material . . . . .   38
SECTION 10.03   Amendment of Agreement . . . . . . . . .   38
SECTION 10.04   Georgia Law Controlling . . . . . . . .   38
SECTION 10.05   Consents and Approvals . . . . . . . . .   38
SECTION 10.06   Multiple Counterparts . . . . . . . . .   38
SECTION 10.07   Severability . . . . . . . . . . . . . .   38
SECTION 10.08   Transferee's Remedies . . . . . . . . .   38
SECTION 10.09   Assignments . . . . . . . . . . . . . . .   39
SECTION 10.10   Recording . . . . . . . . . . . . . . . .   39
SECTION 10.11   Notices; Demands; Requests . . . . . . .   39
SECTION 10.12   Validity of Pledge . . . . . . . . . . .   39
SECTION 10.13   No Personal Liability . . . . . . . . .   40
SECTION 10.14   Payments . . . . . . . . . . . . . . . .   40
SECTION 10.15   Survival of Covenants, Representations
                and Warranties . . . . . . . . . . . . .   40
SECTION 10.16   Entire Agreement . . . . . . . . . . . .   40
SECTION 10.17   Good Faith . . . . . . . . . . . . . . .   41
SECTION 10.18   Relationship of Parties . . . . . . . .   41
SECTION 10.19   Brokerage Commission . . . . . . . . . .   41
SECTION 10.20   Attorneys' Fees and Costs . . . . . . .   41
SECTION 10.21   Time is of the Essence . . . . . . . . .   41
SECTION 10.22   Specific Performance . . . . . . . . . .   41
SECTION 10.23   Termination . . . . . . . . . . . . . . .   42

-iii-

**EXHIBIT F - 4**

ARTICLE XI

<u>CONDITIONS</u>

CONDITIONS   42

SIGNATURES AND ACKNOWLEDGEMENTS   42

EXHIBITS A-I

-iv-

## LEASE AND TRANSFER AGREEMENT

THIS LEASE AND TRANSFER AGREEMENT (this "Agreement") is made as of the 11th day of December, 1990, between the HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA, a public body corporate and politic and an instrumentality of the State of Georgia (herein called "Transferor"), and PHOEBE PUTNEY MEMORIAL HOSPITAL, INC., a nonprofit corporation organized, existing and in good standing under the laws of the State of Georgia (herein called "Transferee").

### Background

Transferor owns and operates Phoebe Putney Memorial Hospital (the "Hospital"), a 450-bed multi-specialty, general medical and surgical hospital located in Albany, Dougherty County, Georgia. In recognition of the rapidly changing health care environment in which it operates, the Transferor retained a consulting firm in 1987 to prepare a management audit of Hospital operations and to make recommendations regarding how best to improve Hospital operations. The management audit report dated August, 1987, identified, among other things, corporate restructuring through a lease of the Hospital to a new nonprofit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code, and the creation of a parent holding company structure, as high priorities for consideration by the Transferor. Although the Transferor did not pursue restructuring in 1987, the subject continued to be discussed and gained increasing importance due to recent developments and opportunities affecting the ability of the Hospital to remain competitive and to enhance its position as the principal regional provider of specialty health care services in Southwest Georgia.

The plan of restructuring adopted by the Transferor provides the Hospital with a new, flexible structure which will remove various restrictions and limitations imposed upon the Transferor and will allow the Hospital to respond to existing competitive threats and to seize available opportunities both within and outside Dougherty County. The immediacy of both the competitive threats and the available opportunities within and outside Dougherty County compelled the Transferor to adopt a plan of restructuring to be implemented in a multi-phased approach, beginning with leasing of the Hospital by the Transferor to a single nonprofit corporation (the Transferee), with a subsequent adoption of a parent holding company structure to provide additional long-term flexibility for further ventures and activities of the Hospital. The Transferor's adoption of such a plan of restructuring has resulted in the preparation of this definitive agreement to implement such plan.

1

The restructuring plan adopted by the Transferor is authorized under Georgia law.  Georgia's Hospital Authorities Law (O.C.G.A. §§ 31-7-70 et seq.), as confirmed by the Georgia Supreme Court's decision in <u>Richmond County Hospital Authority v. Richmond County</u>, 255 Ga. 183, 336 S.E.2d 562 (1985), authorizes a corporate restructuring of a hospital authority through a lease and transfer of hospital assets to a new 501(c)(3), nonprofit corporation, and also authorizes the establishment of a parent holding company structure.  In addition, at least eleven other Georgia hospitals owned by hospital authorities have restructured during the past seven years in a manner similar to the plan adopted by the Transferor.

The restructuring plan adopted by the Transferor also retains such public control of the Hospital as is contemplated by the Hospital Authorities Law to ensure continued fulfillment of the Hospital's public mission of providing quality health care at a reasonable cost to the residents of Dougherty County.  A substantial inducement for Transferor's approval of the plan of restructuring, implementation of the restructuring of the Hospital and the execution of this Agreement is the promise of Transferee, on behalf of itself and any future affiliated entities including the contemplated parent corporation, that upon the expiration or earlier termination of this Agreement, all assets of Transferee and its parent affiliate, including the assets of their respective affiliates, shall be distributed to Transferor and become Transferor's property absolutely, and Transferee and its parent affiliate and other affiliates shall thereafter be dissolved.

## N O W,  W I T N E S S E T H:

WHEREAS, Transferor has determined that this Agreement will promote the public health needs of the community, by making additional facilities available in the community and by lowering the cost of health care in the community, and that this Agreement retains sufficient control by the Transferor over the Hospital as is contemplated by the "Act" (as hereinafter defined);

WHEREAS, Transferor believes that continuation of the high quality and level of health care services currently rendered at the Hospital can best be accomplished by transferring all of the operations, assets and liabilities of the Hospital to a nonprofit corporation;

WHEREAS, to accomplish this end, Transferor wishes to lease the assets of the Hospital, and to transfer all of the operations and liabilities of the Hospital, to Transferee, and Transferee wishes to assume all of the operations, assets and liabilities of

2

**EXHIBIT F - 7**

the Hospital, all on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises, covenants and agreements set forth herein, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

The following words, terms or phrases, when used in this Agreement, shall have the following meanings unless the context indicates a different meaning:

"Act" means the Georgia Hospital Authorities Act (O.C.G.A. §§ 31-7-70 et seq.) as amended.

"Affiliate" means a corporation, limited or general partnership, joint venture, association, business trust or similar entity organized under the laws of the State of Georgia or authorized to conduct affairs in the State of Georgia: (a) which controls, or which is controlled, directly or indirectly, by, Transferee; or (b) a majority of the members of the Directing Body of which are also members or directors of the Board of Directors of the Transferee and constitute a majority of the members or directors of the Board of Directors of the Transferee. For the purposes of this definition, control means with respect to: (a) a nonprofit corporation not having stock, the power to elect or appoint, directly or indirectly, a majority of the Directing Body of such corporation; (b) a corporation having stock, the ownership, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation; (c) a general or limited partnership, the ownership of a majority of the general partners' interest in the partnership; or (d) any other entity, the power to direct the management of such entity through the ownership of at least a majority of its voting securities or the right to designate or elect at least a majority of the members of its Directing Body, by contract or otherwise. For the purposes of this definition, "Directing Body" means: (a) with respect to a nonprofit corporation not having stock, such corporation's members if the members have complete discretion to elect the corporation's directors, or the corporation's directors if the corporation's members do not have such discretion; (b) with respect to a corporation having stock, such corporation's board of directors and the owners, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which

3

**EXHIBIT F - 8**

are ordinarily, in the absence of contingencies, entitled to elect a majority of the corporation's directors (both of which groups shall be considered a Directing Body); (c) with respect to a general or limited partnership, the holders of a majority of the general partners' interest in the partnership; and (d) with respect to any other entity, its governing board or body. For the purposes of this definition, all references to directors and members shall be deemed to include all entities performing the function of directors or members however denominated.

"Agreement" means this Lease and Transfer Agreement as from time to time amended or supplemented pursuant hereto.

"Assigned Contracts" means all agreements of Transferor assigned pursuant to this Agreement.

"Assumed Liabilities" means all of the liabilities and obligations of Transferor which (were) incurred or arose in connection with the Existing Operations, whether known or unknown, contingent or otherwise, including, without limitation, all obligations and liabilities of Transferor in connection with the Bonds, all obligations and liabilities of Transferor under the Assigned Contracts, and all obligations of Transferor to the Medicare and Medicaid programs.

"Bonds" means, collectively, the $9,775,000 Hospital Authority of Albany-Dougherty County, Georgia Refunding Revenue Anticipation Certificates Series 1990A, the $20,225,000 Hospital Authority of Albany-Dougherty County, Georgia Revenue Anticipation Certificates Series 1990B, and the $29,600,000 Hospital Authority of Albany-Dougherty County, Georgia Revenue Anticipation Certificates Series 1990C, issued by Transferor pursuant to the Bond Indentures.

"Bond Indentures" means that certain Trust Indenture dated as of October 1, 1990 between Transferor and Trust Company Bank, as Trustee, as supplemented by that certain Supplemental Trust Indenture dated as of November 1, 1990 between Transferor and Trust Company Bank, as Trustee.

"Book Value" means with respect to any Property the value thereof calculated on the basis of the book value of such assets shown on the asset side of the balance sheet in the financial statements for Transferee for the most recent Fiscal Year for which financial statements have been reported on by an Independent Accountant.

"Code" means the Internal Revenue Code of 1986, as amended, and all applicable existing and proposed regulations that may from time to time be issued thereunder.

"Commencement Date" shall have the meaning set forth in Section 3.01(c) hereof.

"<u>Employees</u>" means all of the employees of the Transferor employed in connection with Existing Operations on the Commencement Date hereof.

"<u>Entity</u>" means a corporation, general or limited partnership, joint venture, association, trust, person or other legal entity.

"<u>Equipment</u>" means all equipment, machinery and furniture owned by Transferor and used in connection with the Existing Operations as of the Commencement Date and all equipment, machinery and furniture acquired and installed in replacement thereof or in substitution therefor and further shall mean all tangible personal property which is owned by Transferor and leased to Transferee which is not included in the definition of Real Property.

"<u>Existing Facilities</u>" means the Hospital, the Real Property, the Equipment, and all Improvements which are leased by Transferor to Transferee hereunder.

"<u>Existing Operations</u>" means all of the hospital, health care, administrative and related activities conducted as of the Commencement Date hereof or in the past by Transferor in the ordinary course of owning and operating the Existing Facilities. Upon the transfer of the Existing Operations to Transferee pursuant to Section 3.02 hereof, the term "Existing Operations" shall mean all of the hospital, health care, administrative and related activities conducted by Transferee in the ordinary course of owning and operating the Existing Facilities.

"<u>Financial Statements</u>" means the audited financial statements of the Transferor as of July 31, 1990.

"<u>Fiscal Year</u>" means the fiscal year of Transferee which shall be August 1 of each year through July 31 of the following year, unless changed by Transferee.

"<u>Hospital</u>" means the facility and institution presently known as Phoebe Putney Memorial Hospital located in Albany, Dougherty County, Georgia and all licenses, permits and approvals, including certificate of need approvals, necessary or desirable for the use and operation thereof.

"<u>Improvements</u>" means any and all buildings, structures, improvements, furnishings, machinery, equipment and other personal property which shall be constructed, placed or installed in or upon the Real Property as a substitution for or in renewal or replacement of any buildings, structures, improvements, furnishings, machinery, equipment or other personal property constituting part of the Hospital, and any other additions, alterations and improvements to the Hospital placed or installed in or upon the Real Property.

5

"Independent Accountant" means a firm of regionally or nationally recognized, independent certified public accountants selected by Transferee.

"Insurance Consultant" means a person who is not a member of the Board of Directors of Transferee, an officer or employee of Transferor or an officer or employee of Transferee, or which is not a partnership, corporation or association having a partner, director, officer, member or substantial stockholder who is a member of the Board of Directors of Transferee, an officer or employee of Transferor or an officer or employee of Transferee, appointed by Transferee, qualified to survey, issue and to recommend insurance coverage for hospital facilities and services and organizations engaged in like operations having a favorable reputation for skill and experience in such surveys and such recommendations, and who may be a broker or agent with whom Transferee or Transferor transacts business.

"JCAHO" means the Joint Commission on Accreditation of Healthcare Organizations.

"Management Consultant" means a nationally recognized firm of independent professional management consultants knowledgeable in the operation of hospitals, which may include a firm of Independent Accountants.

"Operating Assets" means all assets which are owned by Transferor in connection with the operations of the Existing Facilities (including, without limitation, all assets reflected in the Financial Statements, with such changes as may have occurred after the date of the Financial Statements in the ordinary course of business) excluding the Existing Facilities, but including, without limitation:

(a) all cash, bank accounts, savings and loan accounts, certificates of deposit, money market accounts, treasury bills, other investments and revenues (including amounts held in any insurance trust) owned by Transferor in connection with the Existing Facilities;

(b) all accounts receivable and all other amounts owed to Transferor in connection with the Existing Facilities;

(c) all oral and written agreements of Transferor excepting only those listed in Exhibit "A" hereto which were entered into in connection with the Hospital (the "Assigned Contracts");

(d) all books, records and other information collected and maintained in connection with the Existing Facilities

6

including, without limitation, patient records and employee records;

(e) all judgments, choses in action and intangibles owned by Transferor and related to the Existing Facilities;

(f) the name "Phoebe Putney Memorial Hospital";

(g) all funded depreciation, board designated or board restricted assets and other similar reserves; and

(h) all assets not listed above and not otherwise classified as Existing Facilities.

Upon the transfer of the Operating Assets to Transferee pursuant to Section 3.02 hereof, the term "Operating Assets" shall mean all Operating Assets received by Transferee plus all accumulations and additions thereto, and less all deletions and deductions therefrom, as may have occurred in the ordinary course of business of Transferee or as otherwise may have been permitted by the terms of this Agreement.

"Operating Year" means the initial partial year (i) commencing on the Commencement Date hereof and (ii) ending on the last day of the Transferee's Fiscal Year during which the Commencement Date occurred; and thereafter "Operating Year" shall consist of a successive period of twelve calendar months.

"Permitted Encumbrances" means the Bond Indentures, this Agreement and, as of any particular time,

(a) liens for taxes and special assessments, if any, which are not then delinquent, or if then delinquent are being contested in accordance with the provisions of this Agreement;

(b) utility, access and other easements and rights-of-way, restrictions and exceptions which will not materially interfere with or materially impair the operation of the Hospital or facilities thereof (or, if they are not being then operated, the operation for which they were designed or last modified);

(c) any mechanic's, laborer's, materialman's, supplier's or vendor's lien or right in respect thereof, if any, if payment is not yet due under the contract in question or if such lien is being contested in accordance with the provisions of this Agreement;

(d) such minor defects and irregularities of title as normally exist with respect to properties similar in character to the land and which do not materially and adversely affect the value of the Hospital or materially impair the property

7

affected thereby for the purpose for which it was acquired or is held by Transferee;

(e) leases to other than Affiliates which relate to portions of the Hospital which are customarily the subject of such leases, such as office space for physicians and educational institutions, food service facilities, gift shops and radiology, pharmacy and similar departments to the extent that such leases will not adversely affect the exemption from federal income taxation of the Bonds, and to the extent the same are permitted by Article V hereof or Section 8.02 hereof;

(f) zoning laws and similar restrictions which are not violated by Transferee or which do not materially and adversely affect the value of the Hospital;

(g) statutory rights under Section 291, Title 42 of the United States Code, as a result of what are commonly known as Hill-Burton grants, and similar rights under other federal and state statutes;

(h) all right, title and interest of the State, municipalities and the public in and to access over, under or upon a public way;

(i) any instrument creating or securing Permitted Indebtedness;

(j) liens on and security interests in Property which secure Permitted Indebtedness to the extent permitted by this Agreement;

(k) interests, including leasehold and ownership interest, of any Affiliate in Property leased or transferred to such Affiliate in accordance with the provisions of Section 5.05 hereof;

(l) liens on and security interests in Property, including those existing on such Property at the time of acquisition thereof (including acquisition by gift, bequest or devise) by Transferee, which (i) either existed at the time of the acquisition of such property or which secure Permitted Indebtedness assumed or incurred by Transferee in connection with the acquisition of such Property, (ii) do not extend to any Property of Transferor other than that so acquired, and (iii) at the time the indebtedness secured thereby is or was issued or incurred by Transferee or in the case of Property acquired subject to an existing lien or security interest at the time of such acquisition, the aggregate amount remaining unpaid on the indebtedness secured thereby (whether or not assumed by Transferee) shall not exceed the lesser of the

8

acquisition price or the fair market value of the property as determined in good faith by Transferee;

(m) liens on and security interests in Property given, bequeathed or devised to Transferee existing at the time of such gift, bequest or devise, provided that (i) such liens or security interests attach solely to the Property which is the subject of such gift, bequest or devise, and (ii) the indebtedness incurred by such liens or security interests is not assumed by Transferee or, if assumed, is assumed on a nonrecourse basis;

(n) leases of Property entered into by Transferee in order to obtain the use of such Property and which constitute Permitted Indebtedness; and

(o) restrictions or other encumbrances which are either insured over by a reputable, solvent title insurance company which has been writing title insurance in Dougherty County, Georgia for at least five (5) years or which relate to properties which are not contiguous to the property on which the Hospital is situated and the loss of which would have no material adverse impact on the operations of the Hospital.

"Permitted Indebtedness" means the indebtedness or obligations of Transferee permitted under Section 4.19 hereof.

"Pledged Revenues" means accounts receivable, contract rights and general intangibles, and all proceeds of all of the foregoing whether cash or noncash, now existing or hereafter coming into being or now owned or hereafter acquired, of Transferee, excluding, however, (i) all right to receive any gifts, grants, bequests, devises, donations, contributions or pledges and earnings thereon, received or to be received and restricted as to use by the terms of such gift, grant, bequest, devise, donation, contribution or pledge in any way which would prevent its application to the Required Payments required hereunder, and (ii) the proceeds of any borrowing.

"Property" means any and all rights, title and interest in and to any and all property whether real or personal, tangible or intangible and wherever situated.

"Property, Plant and Equipment" means all Property of Transferee which is classified as property, plant and equipment under generally accepted accounting principles.

"Real Property" means the real property more particularly described in Exhibit "B" hereto including all buildings, fixtures, improvements, mechanical systems, drawings or parking areas located thereon and all rights, easements and appurtenances thereto.

9

"Required Payments" means any and all of the payments required to be made pursuant to Sections 3.05(a)(i) and 3.05(a)(ii) hereof.

"State" means the State of Georgia.

"Term of this Agreement" or the "term hereof" means the period commencing on the Commencement Date and ending on the last day of the 40th Operating Year hereunder, unless sooner terminated pursuant to the provisions hereof or unless extended pursuant to the provisions hereof.

"Trustee" means the Trustee serving from time to time under the Bond Indentures.

## ARTICLE II

### REPRESENTATIONS

SECTION 2.01.   Representations and Warranties by Transferor. Transferor makes the following representations and warranties to Transferee as the basis for the undertakings on Transferee's part herein contained:

(a)   Transferor is a public body corporate and politic and an instrumentality of the State of Georgia, duly organized, validly existing and in good standing under the laws of the State of Georgia;

(b)   Transferor has good and sufficient fee simple title for purposes of this Agreement in and to the Real Property, and good and valid title in and to the Equipment and the Operating Assets, free and clear of any lien, claim, encumbrance or security interest therein, except for those listed in Exhibit "C" attached hereto.

(c)   Transferor has full power and authority to enter into this Agreement, to carry out the transactions contemplated hereunder, and to carry out its obligations hereunder;

(d)   Transferor has duly authorized the execution, delivery and performance of this Agreement; and

(e)   Transferor is not subject to any claim or restriction or subject to any provision of any nature whatsoever contained in Transferor's enabling legislation, charter, ordinances or bylaws or in any evidence of indebtedness, indenture, commitment, agreement or contract to which Transferor is a party or by which it is bound, or subject to any existing judgment, order or decree binding upon Transferor, which in any way prevents Transferor from entering

10

into this Agreement or performing any of its obligations hereunder.

SECTION 2.02.  <u>Representations and Warranties by Transferee</u>. Transferee makes the following representations and warranties to Transferor as of the date of delivery hereof:

(a)  Transferee is a nonprofit corporation duly incorporated, validly existing and in good standing under the laws of the State of Georgia;

(b)  Transferee has full power and authority to enter into this Agreement, to carry out the transactions contemplated hereunder and to carry out its obligations hereunder;

(c)  Transferee is duly authorized to execute, deliver and perform this Agreement;

(d)  Transferee is, as of the Commencement Date, an organization described in Section 501(c)(3) of the Code exempt from federal income tax under Section 501(a) of the Code and not a private foundation as defined in Section 509(a) of the Code; and

(e)  Transferee is not subject to any limitation, restriction or provision of any nature whatsoever contained in Transferee's articles of incorporation or bylaws or in any evidence of indebtedness, indenture, commitment, agreement or contract to which Transferee is a party or by which it is bound, or subject to any existing judgment, order or decree binding upon Transferee, which in any way limits, restricts or prevents Transferee from entering into this Agreement or performing any of its obligations hereunder.

<div align="center">ARTICLE III</div>

<div align="center"><u>LEASING OF EXISTING FACILITIES; TRANSFER OF OPERATING ASSETS;<br>ASSUMPTION OF LIABILITIES; TERM AND REQUIRED PAYMENTS</u></div>

SECTION 3.01.  <u>Leasing of Existing Facilities; Quiet Enjoyment</u>.

(a)  Transferor, for and in consideration of the payment by Transferee of the Required Payments pursuant to Section 3.05 hereof and the performance by Transferee of the covenants and agreements set forth herein, leases the Existing Facilities to Transferee effective as of the Commencement Date, and Transferee effective as of the Commencement Date takes and accepts the Existing Facilities from Transferor, subject to the terms, covenants, conditions and provisions hereinafter stated and the following limitations,

<div align="center">11</div>

restrictions, reservations and encumbrances, to have and to hold for the term hereof. To the extent permitted under the Act, the term hereof may be extended by mutual agreement of Transferor and Transferee and may be extended by Transferor and Transferee to be co-extensive with the term of any outstanding bonds issued by Transferor. By issuing any bonds after the date hereof, however, Transferor is not obligating itself to agree to any extension of the term hereof.

(b) Effective as of the Commencement Date, Transferor grants to Transferee the right to lease and operate the Existing Facilities, and agrees that so long as Transferee shall pay the Required Payments as provided herein and shall duly observe and perform all the terms, covenants, conditions, provisions, stipulations and agreements of this Agreement obligatory upon Transferee and shall operate the Existing Facilities consistent with all obligations currently existing under the Act which are applicable to the Existing Facilities, then Transferee shall have, hold and enjoy, during the term hereof, peaceful, quiet and undisputed possession of the Existing Facilities, without hinderance or molestation by anyone claiming by or through Transferor, subject, however, to the provisions of this Agreement, and Transferor shall from time to time take all necessary or appropriate action to that end.

(c) For purposes of this Agreement, the term "Commencement Date" shall mean the day on which the "Commencement Certificate" (as defined herein) is delivered by the Transferee to the Transferor after the following have been received: (i) a written determination from the Internal Revenue Service recognizing Transferee as a charitable organization within the meaning of Section 501(c)(3) of the Code; (ii) a final written approval from Georgia's State Health Planning Agency ("SHPA") granting certificate of need approval to the leasing and restructuring of the Hospital pursuant to this Agreement; and (iii) all opinions, reports and approvals required by the Bond Indentures in order to affect the leasing and restructuring of the Hospital pursuant to this Agreement.

Transferor and Transferee shall diligently pursue the completion of items (i) through (iii) above and, if required to satisfy such conditions, shall modify this Lease in any reasonable manner. When the events described in items (i) through (iii) above shall have occurred, Transferee shall deliver a certificate to Transferor certifying as to the same (the "Commencement Certificate"). Transferee shall deliver the Commencement Certificate to the Transferor no later than the first day of the month immediately following the date of receipt of all items (i) through (iii) above.

12

**EXHIBIT F - 17**

SECTION 3.02. <u>Transfer of Operating Assets and Existing Operations</u>. Transferor, for and in consideration of the assumption by Transferee of the Assumed Liabilities pursuant to Section 3.03 hereof and the performance by Transferee of its other agreements hereunder, and effective as of the Commencement Date, assigns, transfers and conveys to Transferee all of Transferor's right, title and interest in and to the Operating Assets and Existing Operations. Transferee during the term hereof shall use the Operating Assets and Existing Operations so transferred to it in the operation of the Existing Facilities and in furtherance of Transferee's purposes as set forth in its Articles of Incorporation and as otherwise permitted by this Agreement. At the expiration or earlier termination of the term hereof, (a) Transferee shall assign and return to Transferor all of the Operating Assets and Existing Operations and (b) Transferor, to the extent allowed by law, shall assume in writing all the then current liabilities of Transferee and all other liabilities of Transferee incurred in the ordinary course of business; provided, that such liabilities shall constitute Permitted Indebtedness hereunder and provided further that such obligation of Transferor shall be payable only from the revenues of the Existing Facilities. Transferee guarantees that it shall return to Transferor at the expiration or earlier termination of the term hereof an amount of total assets (determined in accordance with then generally accepted accounting principles) which when netted against the amount of total liabilities (determined in accordance with generally accepted accounting principles) assumed by Transferor pursuant to (b) above shall be at least equal to the amount of total assets (determined in accordance with generally accepted accounting principles) transferred to Transferee hereunder less the amount of total liabilities (determined in accordance with generally accepted accounting principles) assumed by Transferee hereunder. In the event Transferor cannot at the expiration or earlier termination of the term hereof legally assume any liability of Transferee, Transferee shall cause such liability to be discharged. In the event Transferee is required by Transferor to satisfy a liability that Transferor cannot legally assume, Transferee may utilize the Operating Assets to obtain sufficient funds to discharge any such liability, and Transferee shall then transfer and assign to Transferor the remaining Operating Assets net of the funds required to satisfy any such liability.

SECTION 3.03. <u>Assumption of Liabilities</u>. Effective as of the Commencement Date, Transferee assumes, and agrees to perform and discharge, all of the Assumed Liabilities as of the Commencement Date.

SECTION 3.04. <u>Transfer of the Existing Facilities and Existing Operations</u>. The parties hereby agree and acknowledge that the purpose of this Agreement and other instruments contemplated hereby is to effect, as of the Commencement Date, pursuant and subject to the terms hereof, the transfer of control over all of

13

the Existing Facilities, the Existing Operations and the Operating Assets to Transferee and that the consideration therefor shall consist of the Required Payments made by Transferee pursuant to Section 3.05 hereof, the operation of the Hospital, the assumption or payment by Transferee of the Assumed Liabilities, and the performance of all other agreements and actions required of Transferee under this Agreement.

SECTION 3.05.  Required Payments.

(a)  In consideration of the leasing of the Existing Facilities to Transferee hereunder, effective as of the Commencement Date, Transferee agrees as follows:

(i)  Transferee shall pay Transferor the amount of $1.00 per year hereunder, which amount shall be payable on the Commencement Date and on the first day of each Operating Year thereafter; and

(ii) On the date that each payment of principal of, premium, if any, and interest on the Bonds shall be due until all the principal of, premium, if any, and interest on the Bonds shall have been paid in full, Transferee shall pay to the Trustee as a Required Payment hereunder an amount of money equal to the amount payable on the payment date as principal of (whether at stated maturity or by redemption or otherwise), premium, if any, and the interest on the Bonds as provided in the Bond Indentures.  Transferee shall also pay to the Trustee until the principal of, premium, if any, and interest on the Bonds shall have been paid in full an amount equal to all fees and expenses of the Trustee as and when the same shall become due pursuant to the terms of the Bond Indentures.

The foregoing payments shall be in addition to Transferee's obligations to pay or discharge the Assumed Liabilities as specified in Section 3.03 hereof and all liabilities incurred by the Transferee in connection with the Existing Facilities after the Commencement Date and during the term hereof.

(b)  In the event Transferee shall fail to make any Required Payment under Section 3.05(a)(ii) above when due, then in addition to any other remedies provided in Article IX, Transferor shall have the right (but not the obligation) to make such payment and to otherwise cure any default under the Bond Indentures caused by such failure by Transferee timely to make such Required Payment, and if Transferor does so elect to cure such failure, then the amounts paid by Transferor to effect such cure shall constitute a debt due from Transferee to Transferor, which debt shall be due on demand and which shall bear interest from the date so advanced by Transferor until repaid by Transferee at the rate equal to the publicly announced "prime" or "base" (or equivalent) lending rate

14

of the Trustee (or its successor), which rate shall be adjusted as and when adjusted by said Trustee.

SECTION 3.06.  Security Interest.

(a)  To secure the prompt payment of the Required Payments and to secure the performance by Transferee of its other obligations hereunder, Transferee, effective as of the Commencement Date, pledges to Transferor and grants to Transferor a security interest in Transferee's Pledged Revenues and in all equipment, machinery and furniture owned by Transferor and used in connection with the Existing Operations and all equipment, machinery and furniture acquired and installed in replacement therefor or in substitution therefor; provided, however, that such pledge and grant of security interest with respect to Pledged Revenues shall be subject and subordinate to Transferee's grant of a security interest in and pledge of the "Gross Revenues," as defined in the Bond Indentures, to Transferor in its capacity as issuer of the Bonds, which pledge and security interest have been assigned to the Trustee under the Bond Indentures.  This grant of a security interest shall remain in full force and effect until all payments required by this Agreement have been made.

(b)  Transferee (as Debtor) and Transferor (as Secured Party) will each execute a Form UCC-1 Financing Statement to be recorded in the public records of Dougherty County, Georgia designating as the "Collateral" the Pledged Revenues and all equipment, machinery and furniture owned by Transferor and used in connection with the Existing Operations and all equipment, machinery and furniture acquired and installed in replacement therefor in substitution therefor.  Transferee will cause the Form UCC-1 Financing Statement prepared for recording in the public records, as provided in this paragraph, to be recorded in the public records of Dougherty County, Georgia.  Transferor and Transferee hereby agree that they shall make, execute and record or file such continuation statements as may be necessary or advisable in order to perfect, preserve and maintain Transferor's title to, lien upon and security interest in the properties, right and interests referred to in this Section. Transferee shall be responsible for notifying Transferor as to the need to make, execute and record or file any of the foregoing. Transferor shall, from time to time, at the request of Transferee, execute such releases as may be necessary to permit the Transferee to dispose of Property in accordance with Article V hereof. Transferor's consent to a release of its security interest shall not be required except and to the same extent as required for a disposition of property pursuant to Article V.

SECTION 3.07.  Absolute Obligation to Pay Required Payments. The obligation of Transferee to make the Required Payments in accordance with Section 3.05 hereof shall be a general obligation of Transferee, shall be absolute and unconditional and shall not be abated, rebated, set off, reduced, abrogated, waived, diminished

15

or otherwise modified in any manner or to any extent whatsoever, regardless of any rights of set off, recoupment or counterclaim that Transferee might otherwise have against Transferor.  Failure to receive any prior notice of the due date of any Required Payment will not relieve Transferee of its obligation to pay such installment thereof, without notice or demand therefor, in such coin or currency of the United States of America as, at the time of payment, shall be legal tender for the payment of public and private debts.

SECTION 3.08.  <u>Bonds and Bond Indentures</u>.  For as long as any Bonds are outstanding, each party hereto covenants with each other party that it shall comply at all times with the term of the Bonds, the Bond Indentures, and the documents related thereto that are applicable to it.

## ARTICLE IV

## COVENANTS OF TRANSFEROR AND TRANSFEREE

The following covenants contained in this Article IV shall be effective from and after the Commencement Date.

SECTION 4.01.  <u>Maintenance of Existing Facilities</u>.  Transferee shall, at its sole cost and expense, at all times during the term of this Agreement, keep and maintain the Existing Facilities and all Improvements, both inside and outside, structural and nonstructural, in a good state of repair and preservation, ordinary wear and tear and acts of God excepted, and Transferee shall make all repairs and replacements that may be necessary to maintain the Existing Facilities and all Improvements (including without limitation all electrical, plumbing, HVAC systems and equipment and such equipment as shall be reasonably required to meet JCAHO or comparable accreditation standards and to comply in all material respects with all applicable codes) in such state of repair. Transferee covenants that it will not permit, commit or suffer any waste of the whole or any part of the Existing Facilities and the Improvements and shall not use or permit the use of the Existing Facilities, or any part thereof, for any unlawful purpose or permit any nuisance to exist thereon.  Transferee covenants and agrees that it shall provide at its own cost and expense, to the extent not financed with proceeds of the Bonds, current and modern equipment as generally used in accredited, comparable community hospitals, and shall provide all equipment, machinery, furnishings, supplies and other personal property required or necessary for the proper operation, repair and maintenance of the Hospital, consistent with standards of hospital organization and administration generally acceptable for fully accredited hospitals comparable to the Existing Facilities.

16

SECTION 4.02. <u>Operation of Hospital</u>. Transferee will <u>faithfully and efficiently administer</u>, maintain and operate the <u>Hospital as a charitable facility open to the general public, free</u> of discrimination based upon race, color, religion, creed, national origin or sex and will use, maintain and operate the Hospital on a revenue-producing basis, consistent with Transferee's obligations under this Agreement. Transferee further covenants and agrees that:

(a) it will at all times <u>use its best efforts to</u> maintain and operate the Hospital to meet the standards and requirements and provide health care of such quality and in such manner as shall enable the Hospital to participate in, and provide services in connection with, recognized medical insurance programs, and Transferee agrees that, so long as it shall remain a participating facility under such recognized programs, it will use its best efforts to comply with the standards and requirements for remaining a participating medical facility thereunder, unless Transferee shall determine, by resolution adopted by its Board of Directors, that it is not in the best interest of Transferee to comply therewith and that the financial condition of the Transferee will not be adversely and materially affected by noncompliance;

(b) it will comply with applicable federal and state laws prohibiting discrimination based on race, religion, creed, color, sex or national origin;

(c) it will use the Existing Facilities only in further-ance of the lawful purposes of Transferee;

(d) it will not use the Existing Facilities or any part thereof for <u>sectarian instruction nor will it use the Existing Facilities as a place of religious worship or as a facility</u> used as a part of a program of a school or department of divinity for any religious denomination or the religious training of ministers, priests, rabbis or other similar persons in the field of religion; provided, however, that the foregoing <u>restrictions shall not</u> be construed to prevent <u>Transferee</u> from (i) maintaining a chapel for the use of patients, employees and visitors as part of the Existing Facilities, (ii) conducting medical education programs on any subject with one or more institutions, whether or not sectarian, or seminars or meetings explaining the operating policies of Transferee with regard to abortions or other medical or surgical services or (iii) maintaining pastoral care programs of the kind provided by hospitals generally;

(e) it will not use the Existing Facilities or suffer or permit the Existing Facilities to be used by any person or in any manner which would result in the loss of tax exemption

17

of interest on the Bonds otherwise afforded under the Code and, further, it will not permit any of the proceeds of the Bonds to be used, directly or indirectly, in any manner which would result in the Bonds being classified as "arbitrage bonds" within the meaning of Section 148 of the Code;

(f) it will not be in material violation of any laws, ordinances, governmental rules or regulations to which it is subject and will not fail to obtain any licenses, permits, franchises or other governmental authorizations necessary to the ownership of the Existing Facilities or the conduct of its activities, which violation or failure to obtain might materially adversely affect the Hospital or the condition (financial or otherwise) of Transferee;

(g) no person in need of immediate or emergency medical treatment shall be denied admission because of inability to pay for services, charge or costs for which such person would ordinarily be responsible, provided, however admission may be denied when medical treatment is of a nature requiring services not offered at the Hospital; and

(h) it will continue to provide indigent care in accordance with all requirements of law and will irrevocably provide indigent care substantially in accordance with the present indigent care practices of the Hospital and at not less than the level provided when the leasehold interest of Transferor first took effect, provided that its services are funded by a substantial amount when compared to historic levels of prior payment in relationship to cost of services rendered pursuant to an indigent health care agreement, or like arrangement, between Transferor and Dougherty County, Georgia. (The existing Indigent Care Agreement between Transferor and Dougherty County, Georgia is attached hereto as Exhibit "D".) Transferor hereby assigns to Transferee all of Transferor's right, title and interest in and to any funds Transferor receives from Dougherty County, Georgia pursuant to such existing Indigent Care Agreement or any subsequent similar agreement or arrangement with Dougherty County, Georgia. During the term of this Agreement, Transferor and Transferee agree to uphold and honor all of Transferor's covenants, agreements and obligations set forth in the Indigent Care Agreement attached hereto as Exhibit "D" and in any subsequent similar agreement or arrangement with Dougherty County, Georgia.

So long as Transferee is not in default under this Agreement, Transferee shall have sole and exclusive charge of the operation of the Hospital including, but not limited to, the selection or retention of any or all employees or personnel of Transferee.

18

**EXHIBIT F - 23**

Transferee shall employ the Operating Assets in accordance with reasonably prudent practices in the health care field.

SECTION 4.03.  Compliance With Applicable Law.

(a)  Transferee shall not use or occupy, nor permit any use or occupancy of, the Hospital or any part thereof contrary to any material applicable law, ordinance or governmental regulation now or hereinafter in force.  Transferee covenants and agrees that throughout the term of this Agreement, at its sole cost and expense, it shall promptly comply with all such material applicable laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, and appropriate departments, commissions, boards and offices thereof, whether or not requiring structural repairs or alterations to the Hospital or relating to the use or occupancy or manner of use of the Hospital. Transferee shall also observe and comply with in all material respects the requirements respecting the Hospital of all policies of insurance or programs of self insurance at any time in force with respect to any of the buildings, improvements, machinery or equipment constituting a part of the Hospital.  Transferee will not use or occupy the Hospital or permit its use or occupancy in such manner as may be reasonably be deemed to prejudice Transferor's title to or interest in the Hospital, or any portion thereof, or as may provide a basis for claims of adverse use or possession by the public or implied dedication to public use of any part of the Hospital or as may in any way impair the efficient operation, use or control of the Hospital.

(b)  Transferee shall operate the Existing Facilities in a manner which will not contravene the intent of the Act, and Transferee will fix rates and charges for services by the Hospital and the Existing Facilities in accordance with the intent of and the policy established by the Act.  Subject to compliance with this subsection 4.03(h), Transferee shall have total control over the establishment of all rates and charges for services by the Hospital and the Existing Facilities.

(c)  Nothing in this Section 4.03 shall require Transferee to comply with any law, ordinance or governmental regulation so long as there is a substantial and legitimate question as to its applicability to Transferee or so long as the interpretation or validity of such law, ordinance or governmental regulation shall be contested in good faith and by appropriate legal proceedings, including securing any necessary injunctive relief which will stay enforcement of such law, ordinance or governmental regulation.

SECTION 4.04.  Liens and Encumbrances.  Except for Permitted Encumbrances or as set forth in Section 3.06 of this Agreement, Transferee covenants and agrees that it shall not create or suffer to be created any lien, encumbrance or charge upon the Hospital, the Operating Assets or the Pledged Revenues and that it will

19

satisfy or cause to be discharged or structure a settlement with respect to, or shall make adequate provision to satisfy and discharge, within sixty (60) days after the same shall be due, all lawful claims and demands for labor, materials, supplies or other items. Nothing in this Section shall require Transferee to satisfy or discharge any such charge, claim or demand so long as the validity thereof shall be contested in good faith and by appropriate legal proceedings if the Transferee shall have posted a bond or other security to avoid any such risk to Transferor's interest in the Hospital, the Operating Assets or the Pledged Revenues.

SECTION 4.05.  <u>Payments of Other Obligations</u>.

(a)  Transferee covenants and agrees to pay when due the Required Payments and all assessments, levies, taxes (ordinary or extraordinary, special or general) and insurance premiums and self insurance payments, of every kind and nature relating to the whole or any part of the Existing Facilities or this Agreement, or any interest therein and all sales, use or excise taxes, if any, levied upon the Required Payments and other payments due under this Agreement, and all costs, expenses, liabilities and charges of every kind and nature, including charges for gas, electricity, water, sewer and other utilities, relating to the maintenance, repair, replacement and improvement, if undertaken hereunder by Transferee, of the Hospital, or any part thereof, or the facilities, machinery or equipment thereon or in connection therewith which may arise or accrue during the term of this Agreement; provided, however, that with respect to special assessments or other governmental charges that may lawfully be paid in installments over a period of years, Transferee shall be obligated to pay only such installments as are required to be paid during the term of this Agreement.

(b)  Transferee shall not be required to pay any tax, charge, assessment or imposition, nor to remove any lien required to be removed under this Agreement, so long as Transferee shall contest or there shall be contested on Transferee's behalf, in good faith and at Transferee's own cost and expense, the amount or validity thereof, in an appropriate manner or by appropriate proceedings which shall operate during the pendency thereof to prevent the collection of or other realization upon the tax, assessment, levy, fee, rent, charge, lien or encumbrance so contested, and the sale, forfeiture, or loss of the Existing Facilities or any part thereof or interest therein, to satisfy the same; provided, that no such contest shall subject Transferor to the risk of any liability or loss or materially impair the obligations of Transferee under this Agreement. Each such contest shall be promptly prosecuted to final conclusion (subject to the right of Transferee to settle any such contest), and in any event Transferee will save Transferor harmless against all losses, judgments, decrees and costs (including attorneys' fees and expenses in connection therewith) and will,

20

promptly after the final determination of such contest or settlement thereof, enter into a structured payment agreement with respect to, or pay and discharge, the amounts which shall be levied, assessed or imposed or determined to be payable therein, together with all penalties, fines, interest, costs and expenses thereon or in connection therewith. Transferee shall give Transferor prompt written notice of any such contest. If in the reasonable opinion of counsel to Transferor, by nonpayment of any of the foregoing items, the Hospital, or any substantial part thereof, will be subject to imminent loss or forfeiture, then Transferor shall notify Transferee and Transferee shall promptly pay all such unpaid items and cause them to be satisfied and discharged.

SECTION 4.06. <u>Transferor's Performance of Transferee's Obligations</u>. In the event Transferee at any time neglects, refuses or fails to perform any of its obligations under this Agreement, Transferor, at its option and following at least thirty (30) days' written notice to Transferee, except where a shorter period of notice is necessary to avoid a default on the Bonds, or to prevent any loss or forfeiture thereof, or to prevent any material loss to the Existing Facilities or its operations, may (but is not obligated to) perform or cause to be performed such obligation, and all expenditures incurred by Transferor thereby shall be promptly paid or reimbursed, plus interest at the rate specified in Section 3.05(b) hereof, by Transferee to Transferor.

SECTION 4.07. <u>Improvements</u>. The parties hereto covenant and agree that in the event Improvements shall be provided to, on, within or above the Real Property, the provisions of this Agreement pertaining to the Existing Facilities shall automatically extend to such Improvements.

SECTION 4.08. <u>Tax-Exempt Status</u>. Transferee represents that, as of the Commencement Date: (i) it is an organization described in Section 501(c)(3) of the Code; (ii) the facts and circumstances which form the basis of the application for tax-exempt status as represented to the Internal Revenue Service continue to exist; and (iii) it is exempt from federal income taxes under Section 501(a) of the Code, and is not a "private foundation" as defined in Section 509(a) of the Code. <u>Transferee agrees that it shall not perform any act or enter into any agreement which shall adversely</u> affect the federal income tax status of Transferee and shall conduct its operations and the Hospital and the affairs of its Affiliates, if any, so as to maintain Transferee's status as a charitable organization within the meaning of Section 501(c)(3) of the Code which is exempt from Federal income taxes under Section 501(a) of the Code, or any successor provisions of federal income tax law.

SECTION 4.09 <u>Regulatory Controls</u>. Transferee covenants and agrees that it shall take all appropriate action to obtain such

21

consents, exceptions, exemptions or approvals of governmental authorities as may be necessary to permit it to comply fully with all of its covenants, stipulations, obligations and agreements contained in this Agreement. Transferor covenants to cooperate reasonably with Transferee in this regard.

SECTION 4.10. <u>License and Accreditation</u>. Transferee will procure and maintain in good standing a license from the State of Georgia to operate the Hospital as a hospital. Transferee will cause the Hospital to have JCAHO accreditation throughout the term of this Agreement, or in the event that such accreditation is superseded by comparable and federally recognized standards which provide for third party payor authorization, Transferee shall cause the Hospital to obtain in a reasonable period of time such other accreditation; provided, however, that Transferor may waive this requirement if the Board of Directors of Transferee shall have determined in good faith, evidenced by a resolution of said Board, that such compliance is not in Transferee's best interest and that lack of such compliance would not materially impair its ability to make the Required Payments hereunder.

SECTION 4.11. <u>Medical Staff</u>. Transferee will, effective as of the Commencement Date, adopt the bylaws of the Hospital's medical staff and will extend privileges to all present members of the Hospital's medical staff who are in good standing, on the same terms as they presently enjoy. During the term of this Agreement, Transferee (i) will maintain appropriate procedures for review and amendment of the medical staff bylaws of the Hospital, and for appointment, reappointment, suspension and termination of medical staff privileges, (ii) shall have the power and authority to grant temporary medical staff privileges to qualified new applicants, and (iii) shall take all other actions which it may deem necessary or appropriate with respect to medical staff bylaws and privileges, including, without limitation, all final action regarding the granting, denial, suspension or revocation of medical staff privileges.

SECTION 4.12. <u>Medicare/Medicaid Filings</u>. During the term hereof, Transferee shall be responsible for making all filings due to the Medicare and Medicaid programs and Transferor shall not file any reports or other documents or make any other filings in connection with Medicare and Medicaid reimbursement with respect to the Existing Facilities, including but not limited to any cost reports, without allowing Transferee at least thirty (30) business days to review any such filings and related documentation and obtaining Transferee's prior written approval of such filing. Transferee shall be responsible for taking all actions with respect to any liability to the Medicare or Medicaid program and Transferor shall, at Transferee's expense, execute such documents, respond to any audit or Notice of Program Reimbursement and pursue any appeal with respect thereto in the manner and at the time deemed appropriate by Transferee in its sole discretion.

22

SECTION 4.13. <u>Transfer of Employees; Benefits</u>. All Employees employed by Transferor immediately prior to the Commencement Date shall be offered employment by Transferee effective as of the Commencement Date; subject, however, to Transferee's right as employer to terminate the employment of any such employee thereafter and to vary the compensation, duties and benefits of any employee for any reason permitted under applicable state and federal employment laws and in accordance with Transferee's personnel policies, which policies may be amended by Transferee during the term hereof. Thus, management personnel of the Hospital will be substantially maintained despite the leasing of the Hospital hereunder, and accordingly this transaction qualifies as a lease of the Hospital pursuant to a reorganization as described in § 7.12(c) of the Bond Indenture dated as of October 1, 1990 between Transferor and the Trustee. As to retirement benefits, Transferee shall offer a retirement plan for such employees with benefits at least equal to Transferor's plan as of the Commencement Date. No employee shall be a third party beneficiary of the provisions of this Section.

SECTION 4.14. <u>Participation and Reimbursement Agreements</u>. Transferee will enter into such participation and reimbursement agreements as it may, from time to time, deem to be appropriate, with Medicare, Medicaid, Blue Cross, and other third-party payors and insurers.

SECTION 4.15. <u>Articles and Bylaws of Transferee</u>. The initial Articles of Incorporation and Bylaws of Transferee are in the forms attached hereto as <u>Exhibit "E"</u> and <u>Exhibit "F"</u>, respectively, and have been approved by Transferor.

SECTION 4.16. <u>Implementation of Parent Holding Company Structure</u>. Subsequent to the Commencement Date, and as soon as an appropriate private letter ruling can be obtained from the Internal Revenue Service, Transferee shall implement the creation of a parent holding company structure for its operations of the Hospital, including the creation of an Affiliate which controls Transferee (the "Parent Affiliate") and any other Affiliates controlled by the Parent Affiliate, provided that primary operations at the Hospital shall be retained by Transferee. Transferee must cause to be included and continuously maintained in the organizational document of any such Affiliate a provision stating that upon dissolution of such Affiliate all of Transferee's interest in such Affiliate shall revert to Transferee and that upon termination of this Agreement all of Transferee's interest in any Affiliate shall revert to Transferor. Prior to initial implementation of such parent holding company structure, the Parent Affiliate must execute an Agreement To Be Bound in the form of <u>Exhibit "G"</u> attached hereto. Also, prior to initial implementation of such parent holding company structure, Transferee shall obtain a private

23

letter ruling from the Internal Revenue Service that the implementation of such structure will not affect the tax-exempt status of Transferee.  The initial Articles of Incorporation and Bylaws of Transferee's Parent Affiliate are attached hereto as Exhibit "H" and Exhibit "I", respectively, and have been approved by Transferor.

To assure Transferor that the persons serving on the Board of Directors of Transferee as of the Commencement Date and on the Board of Directors of Transferee's Parent Affiliate on the date of implementation of such parent holding company structure as discussed in this Section 4.16 will be known to it, Transferee and Transferor agree to the conditions set forth in the Articles of Incorporation and Bylaws of both the Transferee and the Parent Affiliate, respectively, which are attached hereto and made a part hereof for determining such board memberships.

After formation of the Parent Affiliate and receipt of an appropriate private letter ruling from the Internal Revenue Service, the Articles of Incorporation and Bylaws of the Transferee shall be amended so as to provide that: (1) the Parent Affiliate shall be the sole member of the Transferee; (2) all vacancies on the Board of Directors of the Transferee shall be filled by the Board of Directors of the Parent Affiliate; and (3) the Transferee may not take any of the following actions without the prior approval of the Parent Affiliate:

(a)  Adopt a plan of dissolution of the Transferee;

(b)  Authorize the Transferee to engage in, or enter into, any transaction providing for the sale, mortgage or other disposition of all or substantially all of the assets of the Transferee;

(c)  Adopt a plan of merger or consolidation of the Transferee with another corporation;

(d)  Adopt any annual or long-term capital and operational budgets of the Transferee or approve any changes therein exceeding ten percent (10%) of any budgeted item;

(e)  Amend or take any action to terminate any lease between the Transferee and the Authority with respect to the Hospital;

(f)  Take any action which would, or reasonably could be expected to, cause the Transferee to exceed its annual budget for capital expenditures;

(g)  Incur an expenditure for any particular project or service of or for the Transferee in an amount in excess of $1,000,000;

24

(h) Take any action which would, or reasonably could be expected to, result in an adverse variance (on an annualized basis) of total expenses of greater than 2% of total annual budgeted expenses;

(i) Appoint or remove the independent auditors of the Transferee;

(j) Select or remove the President/Chief Executive Officer of the Transferee;

(k) Adopt or permit any changes to any long-term, strategic or master institutional plans of the Transferee; or

(l) Amend the Articles of Incorporation or Bylaws of Transferee.

SECTION 4.17. Consents and Notices. Transferor shall obtain all material consents and give all notices which may be required in connection with the transfer of the Assigned Contracts to Transferee and the assumption by Transferee of the Assumed Liabilities hereunder in accordance with the terms of such agreements and liabilities. Transferor shall provide Transferee with satisfactory evidence that all such consents have been obtained and notices have been given upon Transferee's written request.

SECTION 4.18. Indigent Care. The parties will cooperate to provide indigent care pursuant to the provisions of Section 4.02(h) herein.

In addition, Transferee shall annually allocate funds for the purpose of providing charity care. The funds allocated will be no less than 3% of the gross revenues of the Hospital after provisions for bad debt and Medicaid and Medicare adjustments have been deducted. The funds allocated will be based on the previous year's financial records, except that during the first year of operation during the term of this Lease the 3% will be based on the patient service revenues projected in the pro forma revenue and expense statement included in the Certificate of Need application for the transaction contemplated in this Lease.

The parties hereto agree that the provisions of O.C.G.A. § 31-7-75.1 are not applicable to the transaction contemplated herein.

SECTION 4.19. Permitted Indebtedness. Except as permitted or required by this Agreement, Transferee covenants that it will not create, guarantee, assume, permit to exist or become liable, directly or indirectly, in respect to any indebtedness of any kind or character for money borrowed or in connection with acquisition

25

of a capital asset (including, without limitation, any liability by way of endorsement, guarantee or agreement to repurchase or supply funds or any extension of its credit, directly or indirectly, in support of the obligations or undertakings of others) except that Transferee may incur "Permitted Indebtedness" as the same is described in Article XIII of the Bond Indenture dated as of October 1, 1990, which description (and all internal definitions used therein) is (and are) incorporated herein by this reference in this Section 4.19 and shall survive any termination of the Bond Indentures.

SECTION 4.20.  <u>Financial Books and Records</u>.  Transferee shall install and maintain proper books of record and account of all business and affairs of Transferee, in which full and correct entries shall be made in accordance with generally accepted accounting principles.  Transferee will deliver to Transferor, within one hundred twenty (120) days after the end of each Fiscal Year, a <u>financial report</u> for such Fiscal <u>Year containing a balance sheet of Transferee as of the end of such</u> Fiscal Year, a statement <u>of changes in financial position of Transferee for such Fiscal Year</u> and a statement of <u>revenues and expenses of Transferee for such Fiscal Year</u>.  Such report shall be audited by a firm of Independent Accountants and shall contain their opinion as to whether the report fairly presents the results of operations and was prepared in accordance with generally accepted accounting principles, applied on a consistent basis.

SECTION 4.21.  <u>Competition with Hospital</u>.  During the term of this Agreement, <u>Transferor</u> shall not own, manage, operate or control or be connected in any manner with the ownership, management, operation or control of any hospital or other health care facility other than the Hospital in Albany, Georgia and in Dougherty County, Georgia and in any other areas of operation of the Transferor as permitted under the Act.

SECTION 4.22  <u>Eminent Domain</u>.  During the term of this Agreement, Transferor shall not exercise its right of eminent domain, granted pursuant to O.C.G.A. § 31-7-75(12) or any other provision of law, to acquire any of the Existing Facilities.

SECTION 4.23  <u>Existing Certificates of Need</u>.  Transferee shall comply with the terms of all Certificates of Need granted to Transferor prior to the Commencement Date.  Transferor shall cooperate with Transferee in complying with all Certificate of Need requirements, including requirements relating to the implementation of any outstanding Certificates of Need.

SECTION 4.24  <u>Name of the Hospital</u>.  Transferee agrees that during the term of this Agreement the Hospital shall always be named "Phoebe Putney Memorial Hospital".

26

ARTICLE V

IMPROVEMENTS; DISPOSITIONS OF PROPERTY; ALTERATIONS

SECTION 5.01. After-Acquired Property as Part of the Existing Facilities. All buildings, structures, improvements, machinery, equipment and other property which shall be constructed, placed or installed in or upon the Real Property as an addition to, or as a substitute for or in renewal or replacement of, any buildings, structures, improvements, furnishings, equipment or other property constituting part of the Existing Facilities shall (unless Transferor and Transferee otherwise provide by signed written agreement directed to a specific item) become Improvements hereunder without any further act or deed. At the request of Transferee, Transferor shall cooperate in securing such permits and authorizations and shall join in the application for such municipal and other governmental permits and authorizations as may be deemed necessary or advisable to be obtained in connection with any such construction, acquisition or installation, provided that Transferee shall indemnify and hold Transferor harmless against and from all costs and expenses which may be incurred by Transferor in connection with any such joinder or application.

SECTION 5.02. Covenant Against Unauthorized Disposition. Except as otherwise provided in this Section 5.02 and elsewhere in this Agreement, Transferee shall not dispose of the Existing Facilities without the prior written consent of Transferor. Transferee shall maintain accurate records of the location of, and any transfers with respect to, the Existing Facilities. For purposes of this Article V, the term "dispose of" means to transfer, assign, sell, lease, or sublease.

SECTION 5.03. Dispositions of Property Without Notice. Transferee may, from time to time, at its cost and expense, without notice to and without obtaining the approval of Transferor and free of any obligation to make any replacement thereof, remove or dispose of:

(a) Property for fair market value in a transaction which qualifies as a transaction in the ordinary course of business of operating a hospital similar to the Hospital;

(b) Property that in the discretion of Transferee is obsolete or unusable for its intended purpose; or

(c) Property (i) for fair market value, and (ii) provided that during any consecutive twelve (12) calendar month period the aggregate Book Value thereof at the times of all such dispositions does not exceed five percent (5%) of the Book Value of the Property, Plant and Equipment of Transferee, and (iii) such dispositions will not impair the structural soundness or usefulness

27

of the Hospital nor adversely affect the Hospital operations or the purposes of this Agreement.

Such Property disposed of as aforesaid shall thereafter not constitute part of the Hospital or the Existing Facilities. Transferee shall file a report with Transferor at least annually within one hundred-twenty (120) days following the end of each Fiscal Year stating the type or character of Property removed or otherwise disposed of pursuant to Section 5.03(c) and a fair market value and book value thereof at the time or times of such removal or other disposition.

SECTION 5.04.  Dispositions of Property With Notice.  Except for transfers made pursuant to Sections 5.03, 5.05 or 8.02 hereof, Transferee may not in any consecutive twelve (12) month period, cause one or more dispositions of Property, if the Book Value of which at the times of all such dispositions of Property totals, in the aggregate, in excess of five percent (5%) of the book value of the Property, Plant and Equipment of Transferee, unless not less than thirty (30) days prior to the last of such dispositions which causes such excess to occur the written consent of Transferor is obtained with respect to said last such disposition.

SECTION 5.05.  Transfers to Affiliates.  Notwithstanding the other provisions of this Agreement, Transferee shall have the right to make dispositions of Property (including, without limitation, Real Property and nonrestricted gifts, grants and contributions) to an Affiliate so long as the organizational documents of such Affiliate provide that upon dissolution of such Affiliate or upon termination of this Agreement, all the interests of Transferee in the Affiliate shall be returned to Transferee, or Transferor, as the case may be, to become a part of the Existing Facilities. Transferee and Parent Affiliate shall cause any investment by Transferee or Parent Affiliate or any Affiliate in any joint venture, partnership or corporation to provide for an appropriate mechanism to liquidate, sell or redeem such investment upon the termination of this Agreement or upon the dissolution of Parent Affiliate or any such Affiliate.  Notwithstanding the foregoing, without the prior written consent of Transferor, the Transferee shall not dispose of to any person (whether or not an Affiliate) either: (i) all of the Operating Assets or the Existing Facilities; or (ii) so substantial a part of the Operating Assets or the Existing Facilities as would remove Transferee from direct involvement with the day to day operations of the Hospital.

SECTION 5.06.  Alterations.  Transferee shall not, without Transferor's written consent, demolish or structurally alter the Real Property in any material respect unless such demolition or alteration is in connection with a project by Transferee to repair, remodel or make additions to such Real Property.

28

SECTION 5.07.  <u>Compliance with Bonds</u>.  Any disposition of Property pursuant to this Article V must at all times be in full compliance with the requirements of the Bonds and the Bond Indentures.

ARTICLE VI

INSURANCE

SECTION 6.01.   <u>Insurance</u>.

(a)  Transferee covenants and agrees that it shall, during the term of this Agreement, keep and maintain at all times insurance (in such amounts and with such deductibles as shall be comparable to coverage carried by institutions similar to Transferee):

(1)   fire, with uniform standard extended coverage endorsements, flood and crime, vandalism and malicious mischief insurance, as may be approved for issuance in the State, including insurance against loss or damage from lightning, windstorm, civil commotion, aircraft vehicles and smoke, covering the Hospital at all times in an amount not less than the full insurable value thereof;

(2)   insurance coverage of boilers, pressure vessels, auxiliary piping and selected machinery objects (pumps and compressors);

(3)   comprehensive general and professional liability insurance protecting Transferee against liability for death, injury, loss or damage as a result or arising out of examination, diagnosis, treatment or care of (or failure to so examine, diagnose, treat or care for) any patient of the Hospital or any occupant of the same;

(4)   comprehensive automobile liability insurance;

(5)   worker's compensation and unemployment coverage as required or permitted by the State;

(6)   use and occupancy insurance;

(7)   fidelity bonds on all officers and employees of Transferee who have access to or have custody of revenues, receipts or income form the Hospital or any funds of Transferee; and

(8)  builder's risk insurance during the construction of any Improvements.

(b)  Transferee shall designate an Insurance Consultant, who may be an insurance broker or an insurance agent with whom

29

Transferee or Transferor transacts business.  Transferee may replace such Insurance Consultant and appoint a new Insurance Consultant.

(c)  Transferee may make modifications to the insurance coverage hereinabove provided, including self-insurance, insurance provided by or through an agency of the State or use of a captive insurance company in whole or in part for any such coverage, but only upon the following terms and conditions.  In making its decision whether to make such modifications Transferee shall consider the availability of commercial insurance, the terms upon which such insurance is available, the cost of such available insurance and the effect of such terms and such costs upon Transferee's costs and charges for its services.  No such modification shall be made unless (i) Transferee has received a written recommendation with respect to such modification from the Insurance Consultant, (ii) such modification shall not disqualify Transferee for reimbursement under Medicare or Medicaid programs or any governmental programs providing similar benefits and (iii) adequate reserves certified by the Insurance Consultant or an independent actuary certifying the adequacy of such reserves for any self-insurance program, insurance provided by or through a State agency or use of a captive insurance company are deposited and maintained with an independent corporate trustee.  Transferee shall give written notice to Transferor of any modifications made pursuant hereto, indicating in such notice the effective date of such modification and including the Insurance Consultant's written recommendation and the Certification of the Insurance Consultant (or actuary) certifying the adequacy of reserves as set forth above.

SECTION 6.02.  Insurers and Policies.  Transferee further agrees that each insurance policy required by Section 6.01 hereof (i) shall be by such insurer (or insurers) as is financially responsible, allowed to write the respective insurance in the State and of recognized standing, including Underwriters at Lloyds and insurers having at least a Best's "A" rating, (ii) shall be in such forms and with such provisions (including, without limitation, the loss payable clause, the waiver of subrogation clause, relieving the insurer of liability to the extent of minor claims, and the designation of the named assureds) as are generally considered standard provisions for the type of insurance involved and (iii) shall prohibit cancellation or substantial modification by the insurer without at least thirty (30) days, prior written notice to Transferor and Transferee.  Without limiting the generality of the foregoing, all insurance policies carried pursuant to Section 6.01 above shall name Transferor and Transferee as parties insured thereunder as the respective interest of each of such parties may appear, and loss thereunder shall be made payable and shall be applied as provided in Section 6.03 hereof.  Each such policy shall provide that losses thereunder shall be adjusted with the insurer by Transferee on behalf of the insured parties.

30

SECTION 6.03.  Involuntary Loss; Use of Insurance Proceeds
Condemnation Awards and Sale Proceeds.

(a)  If all or any part of the Hospital shall be damaged
or destroyed by whatever cause or shall be taken by any public
authority or entity in the exercise of, or acquired under the
threat of the exercise of, the power of eminent domain (for
purposes hereof, an "Involuntary Loss"), Transferee shall give
prompt notice of such Involuntary Loss to Transferor.  There
shall be no abatement or reduction in the Required Payments
as a result of any Involuntary Loss.

(b)  Transferee shall proceed promptly to repair, rebuild
or restore the Property damaged, destroyed or taken with such
changes,   alterations   and   modifications   (including   the
substitution and addition of other property) as may be desired
by it and Transferee may receive the insurance proceeds,
condemnation awards or sale proceeds resulting from such
Involuntary Loss and shall apply said proceeds for such
purpose together with any additional moneys necessary
therefor.

(c)  Transferee and Transferor shall cooperate fully with
one another in the handling and conduct of any prospective,
pending or threatened condemnation proceedings or with respect
to any settlement or negotiation proceedings involving
coverage provided under any policy of insurance.

(d)   Transferee and Transferor agree that Transferor
shall be entitled to the entire award attributable to any
taking of all or part of the Hospital and Transferee shall not
be entitled to any award by reason for the loss of its
leasehold estate; provided, however, Transferee shall be
entitled to claim compensation from the condemning authority
for business interruption as long as any award to Transferee
does not impair or diminish the award otherwise payable to
Transferor.

(e)   Any balance remaining after completion of the
repair, rebuilding or restoration of the Hospital shall be
considered part of the operating assets of Transferee, subject
to set-off for any sums then due and payable to Transferor.

(f)  In the event that it is determined by an independent
management consultant that the taking or other loss results
in Transferee's inability to generate revenues sufficient to
meet its obligations under the Bonds and the resolutions of
Transferor authorizing and securing said Bonds, all funds
contemplated by this Article will be paid to the Trustee to
be disposed of in accordance with the terms of the said
resolutions authorizing and securing said Bonds.

31

SECTION 6.04.  Failure to Carry Insurance.  In the event Transferee shall at any time neglect or refuse to procure or maintain insurance or self insurance as herein required, Transferor may at its option and following at least thirty (30) days' written notice to Transferee, except where a shorter period of written notice is necessary to avoid a default on the Bonds, or to prevent any loss or forfeiture thereof, procure and maintain such insurance and Transferee shall be obligated to reimburse promptly Transferor for all amounts expended in connection therewith.

## ARTICLE VII

### INDEMNIFICATION

SECTION 7.01.  Indemnification; No Liability; Damage Claims. Transferee shall protect, indemnify and save harmless Transferor and its present or future members, officers, employees or agents against and from any and all liabilities, suits, actions, claims, demands, damages, losses, expenses (including reasonable counsel fees) and costs of every kind and nature incurred by, or asserted or imposed against, Transferor and its present or future members, officers, agents or employees, or any of them, by reason of any matter relating to the financing, leasing, construction, opera-tion, management, maintenance or the existence of the Hospital or relating to the Assumed Liabilities, unless resulting from the gross negligence or willful misconduct or fraud of any such persons, during the term of this Agreement, and regardless of whether such liabilities, suits, actions, claims, demands, damages, losses, expenses and costs be against or be suffered or sustained by Transferor or by any of its respective present or future members, officers, agents or employees, or be against or be suffered or sustained by other persons, corporations or other legal entities to whom Transferor or any of its respective present or future members, officers, agents may become liable therefor. Neither Transferor nor any of its present or future members, officers, employees or agents shall be liable for any damage or injury occurring during the term of this Agreement to property of Transferee except as a result of an act constituting gross negligence or willful misconduct.  Transferee may, and if so requested by Transferor shall, undertake to defend at Transferee's sole cost and expense, any and all suits, actions or proceedings brought against Transferor or any of its respective present or future members, officers, agents or employees, in connection with any of the matters mentioned in this Section, provided that Transferor shall give Transferee timely notice of and shall forward to Transferee every demand, notice, summons or other process received with respect to any claim or legal proceeding within the preview thereof.  Notwithstanding the foregoing, Transferee shall not be liable to Transferor to the extent Transferor is protected against any liability by the doctrine of sovereign immunity.

32

SECTION 7.02.    Reimbursement of Costs and Expenses.
Transferee shall promptly pay any and all costs, expenses and
judgments which may be incurred by, or rendered against, Trans-
feror or any of its respective present or future members, officers,
employees or agents at any time or times during the term of this
Agreement (i) in enforcing any of the terms, covenants, conditions
or provisions of this Agreement or (ii) in obtaining possession of
the Hospital or taking any other action as a result of any default
by Transferee or (iii) in defending any action, suit or proceedings
brought by any person, other than Transferee or an Affiliate of
Transferee (but only in the event Transferee or its Affiliate
prevails), against Transferor or any of its respective present or
future members, officers, employees or agents as a result of the
violation of, or noncompliance with, any present or future federal,
state, county or municipal law, ordinance, regulation or order, or
as a result of any alleged failure, neglect, misfeasance,
malfeasance or default in any way connected with, arising from, or
growing out of this Agreement or the Hospital, or any operations
conducted in or any use or occupancy of the Hospital.

SECTION 7.03.    Continuation of Liability.    Each of the
foregoing provisions of this Article VII shall be severable from
and independent of and may be enforced without regard to the
enforcement of the other provisions of this Article VII and other
provisions of this Agreement, and the provisions of this Article
shall survive the termination of this Agreement with respect to
acts occurring prior to the termination of this Agreement.

## ARTICLE VIII

### ASSIGNMENTS; SUBLEASES; OPERATING ARRANGEMENTS

SECTION 8.01.    Maintenance of Corporate Existence; Permitted
Mergers, Consolidations and Sales.    During the term of this
Agreement, Transferee agrees that it will maintain its corporate
existence, will not dissolve or otherwise dispose of its assets
except as permitted elsewhere in this Agreement and in its Articles
of Incorporation and will not, without the approval of Transferor,
(i) consolidate with or merge into another corporation or other
entity or permit one or more corporations or other entities to
consolidate with or merge into it, or (ii) transfer all or
substantially all of its assets to any other person or Entity.

SECTION 8.02.    Subleases and Operating Contracts.    Transferee
may sublease any part, but not all or substantially all, of the
Existing Facilities (or all or substantially all of the Hospital)
or contract for the performance by others of operations or services
on or in connection with any part, but not all or substantially all
of the Existing Facilities (or all or substantially all of the
Hospital) for any lawful purpose, if (i) each such sublease or
contract is consistent with and subject to the provisions of this

33

Agreement, (ii) Transferee shall remain fully obligated and responsible under this Agreement to the same extent as if such sublease or contract had not been executed, and (iii) if any Bonds are issued and outstanding, an opinion of nationally recognized bond counsel that the lease or contract does not jeopardize the federal tax exempt status of the Bonds; provided, however, that no opinion of counsel need be rendered to enter into subleases or contracts for any specialty services related to the operation of the Hospital and including, but not limited to, activities conducted at any professional office building located on the Real Property or at any of the other Exisiting Facilities related to gift shop, doctors' office space, food service, electronic banking machines, parking and similar services.

SECTION 8.03. <u>Prohibition on Other Assignments and Subleases</u>. Transferee shall not assign or sublet all or any part of the Existing Facilities without Transferor's consent except as described in Sections 5.03, 5.04, 5.05, 8.01 and 8.02 of this Agreement.

ARTICLE IX

DEFAULT BY TRANSFEREE

SECTION 9.01. <u>Events of Default</u>. The following shall constitute events of default under this Agreement:

(a) if Transferee shall fail to pay, when due and payable, any Required Payment, and, for any such failure to pay other than a payment of the principal of, premium, if any, and interest on the Bonds, such failure shall continue for a period of fifteen (15) business days after written notice of failure of payment shall have been given to Transferee by Transferor;

(b) substantial failure by Transferee to observe and perform in any material respect any covenant, condition or agreement in this Agreement on Transferee's part to be observed or performed, other than as referred to in subsection (a) of this Section, with such failure continuing unremedied for a period of thirty (30) days after written notice (specifying such failure and requesting that it be remedied) has been given to Transferee by Transferor, unless Transferor shall agree in writing to an extension of such time prior to its expiration; provided, however that if such failure by Transferee is of the type that cannot be remedied within such thirty (30) day period and Transferee immediately commences and diligently pursues on a continuous basis appropriate actions to remedy such failure, and there shall be no risk of substantial economic loss or forfeiture to Transferee, the

34

agreement for a reasonable extension by Transferor shall not be withheld;

(c) the occurrence of an event of default under the Bond Indentures as a result of any action or inaction by Transferee, together with a declaration of default thereunder by the Trustee;

(d) if Transferee shall file a voluntary petition in bankruptcy, or shall be adjudicated a bankrupt or insolvent, or shall file any petition or other pleading seeking any reorganization, composition, readjustment, liquidation or similar relief for itself under any present or future law or regulation, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver or liquidator of it or of all or any substantial part of its assets or of the Hospital, or shall make a general assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due;

(e) if a petition or other pleading shall be filed against Transferee seeking an adjudication of bankruptcy, reorganization, composition, readjustment, liquidation or similar relief under any present or future law or regulation and shall remain undismissed or unstayed for sixty (60) days, or if, by an order or decree of a court of competent jurisdiction, Transferee shall be adjudicated a bankrupt or insolvent or relief shall be granted under or pursuant to any such petition or other pleading, or if by order or decree of such court, there shall be appointed without the consent or acquiescence of Transferee, a trustee in bankruptcy or reorganization or a receiver or liquidator of it or of all or any substantial part of its property or of the Hospital and any such order or decree shall have continued unvacated, or unstayed on appeal or otherwise and in effect for a period of sixty (60) days, or if Transferee shall be dissolved or liquidated;

(f) the abandonment by Transferee of the Hospital, or any substantial part thereof, and such abandonment shall continue for a period of thirty (30) days;

(g) loss of federal tax exempt status for the interest on the Bonds as a result of any action or inaction by Transferee;

(h) the entry of a final judgment or judgments from which no further appeals are available for the payment of money aggregating in excess of fifteen percent (15%) of operating revenues of Transferee for the most recent fiscal year for which audited financial statements are available against Transferee, for which there does not exist adequate

35

insurance, adequate self insurance reserves or appropriate bonds, any one of which remains outstanding for more than sixty (60) days from the date it shall become unappealable without having been discharged in full, structured so that no annual payment required thereunder is in excess of 5% of operating revenues of Transferee, stayed or superseded; or

(i) any material representation or warranty by Transferee in this Agreement, or as provided in any other certificate, document or agreement by Transferee as required by or in connection with this Agreement or the restructuring of the Hospital shall clearly have been untrue in any material respect at the time such representation or warranty was given or made and Transferee has been or is likely to be substantially damaged as a result of such untrue representation or warranty.

SECTION 9.02.  Termination.  Upon the occurrence of any one or more of the events of default specified in Section 9.01 hereof, Transferor may give to Transferee written notice that this Agreement shall terminate upon a date specified in such notice, which date shall be not less than twenty (20) days after the date of such notice.   Upon any such termination of this Agreement, Transferee shall peaceably vacate and surrender possession of the Existing Facilities and the Operating Assets, including such additional or renewal or replacement facilities, furnishings or equipment as Transferee may have placed on or in the Existing Facilities, and Transferor, or its designee, may reenter and take possession of any interest that Transferor may then have in the Existing Facilities and the Operating Assets, including such additional or renewal or replacement facilities, furnishings, equipment or Improvements as Transferee may have placed on or in the Existing Facilities.   If Transferor elects to exercise its remedies under this Section 9.02 and any of the Bonds are outstanding, Transferor shall take possession of the Existing Facilities and the Operating Assets subject and subordinate to the pledge of the Gross Revenues that has been granted to the Trustee pursuant to the Bond Indentures, and Transferor shall continue and maintain, or cause any lessee or operator of the Existing Facilities to continue and maintain, the pledge and grant of the security interest in the Gross Revenues of the Existing Facilities to the Trustee for the benefit of bondholders.

SECTION 9.03.  Repossession Without Termination.  Upon the occurrence of any one or more of the events of default specified in Section 9.01 above, in lieu of terminating this Agreement, at the option of Transferor, Transferee shall vacate and surrender possession of the Hospital including such additional or renewal or replacement facilities, furnishings or equipment as Transferee may have placed on or in the Hospital and Transferor or its designee may reenter and take possession for Transferee's account.   To protect its interest in the Hospital, Transferor upon such

36

repossession without termination may provide for the use and occupancy of all or any part of the Hospital from time to time in the name of Transferee or Transferor without further notice, for such term or terms, on such conditions and consideration and for such uses and purposes as Transferor, in its discretion, may determine, and (subject to the prior pledge of the Gross Revenues under the Bond Indentures) may collect and receive all revenues and rentals derived therefrom and apply the same, after deduction of all appropriate operating expenses, to the payment of the Required Payments payable hereunder by Transferee. Transferee shall remain liable for any deficiency in the Required Payments payable by it hereunder and all costs incurred by Transferor in connection with such reletting including without limitation all repairs, charges and attorneys' fees.

SECTION 9.04. <u>Damages</u>. Upon the termination of this Agreement pursuant to Section 9.02 hereof, Transferee shall be obligated to pay, and shall forthwith pay, as damages to Transferor:

(a) an amount equal to all unpaid Required Payments accrued through the effective date of termination; and

(b) an additional amount sufficient to pay and satisfy all other unpaid costs and obligations reasonably incurred by Transferor in connection with or as a result of Transferee's default under this Agreement, and the termination hereof.

SECTION 9.05. <u>Additional Remedies</u>. The rights and remedies of Transferor specified in this Agreement shall be cumulative. In addition thereto, Transferor shall have all of the rights and remedies now or hereafter conferred by law or in equity, including, among other remedies, receivership and injunctions to restrain violations or attempted violations of any provision of this Agreement by Transferee. Transferee agrees that a default under the terms of this Agreement is such a default that entitles Transferor to specific performance of this Agreement.

SECTION 9.06. <u>No Waiver of Rights</u>. No failure by Transferor to insist upon the strict performance of any term, covenant, condition or provision of this Agreement, or to exercise any right or remedy consequent upon an event of default hereunder, and no acceptance of Required Payments during the continuance of any such default shall constitute a waiver of any such default or of such term, covenant, condition or provision or a waiver or relinquishment for the future of the right to insist upon and to enforce by any appropriate legal remedy a strict compliance with all the terms, covenants, conditions and provisions of this Agreement, or of the right to exercise any such rights or remedies, if any default by Transferee be continued or repeated, or of the right to recover possession of the Existing Facilities by reason thereof. No term, covenant, condition or provision of this

37

Agreement binding upon Transferee, and no breach hereof or default hereunder, shall be waived, altered or modified, except as set forth in a written instrument executed by Transferor. No waiver of any breach shall affect or alter this Agreement but every term, covenant, condition and provision of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach hereof.

Section 9.07. <u>Reversion of Assets</u>. Upon the expiration or earlier termination of this Agreement, or upon a material breach of the terms of this Agreement by Transferee and such breach has not been cured if so allowed hereunder, or in the event this Agreement shall become void or unenforceable, all assets of the Transferee, including all of Transferee's interest in its Affiliates, shall become the property of the Transferor absolutely.

<center>ARTICLE X</center>

<center><u>MISCELLANEOUS</u></center>

SECTION 10.01 <u>Captions</u>. The captions of the Articles and Sections hereof have been inserted solely for convenience of reference and shall not constitute a part of this Agreement, nor shall they affect its meaning, construction or effect.

SECTION 10.02. <u>Covenants Considered Material</u>. All covenants made by Transferor or Transferee contained herein shall be considered to be material to the Agreement and the relationship between Transferor and Transferee.

SECTION 10.03. <u>Amendment of Agreement</u>. This Agreement may be amended by a written agreement duly executed by Transferee and Transferor.

SECTION 10.04. <u>Georgia Law Controlling</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Georgia.

SECTION 10.05. <u>Consents and Approvals</u>. Whenever the written consent or approval of Transferor or Transferee or any officer thereof shall be required under the provisions of this Agreement, such consent or approval shall not be unreasonably withheld.

SECTION 10.06. <u>Multiple Counterparts</u>. This Agreement may be executed in multiple counterparts, each of which shall be regarded for all purposes as an original constituting but one and the same instrument.

SECTION 10.07. <u>Severability</u>. If any one or more of the sentences, sections or other portions of this Agreement shall be determined by a court of competent jurisdiction to be invalid, the

<center>38</center>

invalidity of any such sentence, section or other portion of this Agreement shall in no way affect the validity or effectiveness of the remainder of this Agreement, and this Agreement shall continue in force to the fullest extent permitted by law.

SECTION 10.08. <u>Transferee's Remedies</u>. In the event Transferor shall fail to perform any of its obligations under this Agreement, Transferee may institute such action against Transferor as Transferee may deem necessary to compel performance. In addition, Transferee shall have all of the rights and remedies conferred in this Agreement or now or hereafter conferred at law or in equity, which rights and remedies are cumulative.

SECTION 10.09. <u>Assignments</u>. Except as otherwise provided herein, neither Transferor nor Transferee shall give, assign or pledge its rights under this Agreement without the consent of the other party.

SECTION 10.10. <u>Recording</u>. The parties agree that a short form memorandum of this Agreement in customary form may be recorded in such office in the State as may be at the time provided by law as the proper place for the recordation of a deed conveying the Existing Facilities.

SECTION 10.11. <u>Notices; Demands; Requests</u>. All notices, demands and requests to be given or made hereunder to or by Transferee or Transferor shall be in writing and shall be deemed to be properly given or made three business days after being properly deposited in the United States mail, certified or registered mail, return receipt requested, postage prepaid, addressed as follows:

    (a)  As to Transferee --

        Phoebe Putney Memorial Hospital, Inc.
        417 Third Avenue
        Albany, Georgia   31703
        Attention: Chief Executive Officer

    (b)  As to Transferor --

        Hospital Authority of Albany - Dougherty County, Georgia
        417 Third Avenue
        Albany, Georgia   31703
        Attention: Chairman

Any of such addressees and addresses may be changed at any time upon written notice of such changes sent by United States certified or registered mail, return receipt requested, postage prepaid, to the other party by the party effecting the change. Any time periods commencing with notice prescribed by the terms of this

39

Agreement shall commence with the date of receipt of written notice as evidenced by the return receipt required by this Section.

SECTION 10.12.  Validity of Pledge.  The Pledged Revenues are subject to the lien of the pledge hereunder without any physical delivery of the Pledged Revenues or further act, and (subject to the rights of the Trustee under the Bond Indentures) the lien of such pledge is valid and binding against all parties having claims of any kind against Transferor or Transferee or other operator or lessee of the Hospital (irrespective of whether such parties have notice of such pledge and create a perfected security interest) without the necessity for separation or delivery of the Required Payments or for the filing or recording of this Agreement or any other resolution or instrument by which such pledge is created or any certificate, statement or other document with respect to such pledge.  The pledge under this Agreement of the Pledged Revenues shall be effective and the moneys therefrom and thereof may be applied to the purposes for which pledged without necessity of any further act of appropriation.

SECTION 10.13.   No Personal Liability.   Notwithstanding anything to the contrary contained herein or in any other instrument or document executed by or on behalf of Transferor or Transferee in connection herewith, no stipulation, covenant, agreement or obligation contained herein or therein shall be deemed or construed to be a stipulation, covenant, agreement or obligation of any present or future member, director, trustee, affiliate, officer, employee or agent of Transferor or Transferee or of any incorporator, member, affiliate, director, trustee, officer, employee or agent of any successor to Transferor or Transferee, in any such person's individual capacity, and no such person, in his individual capacity, shall be liable personally for a breach or nonobservance of or for any failure to perform, fulfill or comply with any such stipulations, covenants, agreements or obligations, nor shall any recourse be had for the payment of any of the Required Payments due hereunder or for any claim based thereon or on any such stipulation, covenant, agreement or obligation, against any such person, in his individual capacity, either directly or through Transferor or Transferee or any successor to Transferor or Transferee, under any rule of law or equity, statute or constitution or by the enforcement of any assessment or penalty or otherwise, and all such liability of any such person, in his individual capacity, is hereby expressly waived and released.

SECTION 10.14.   Payments.   All payments to be made by Transferee hereunder shall be made in immediately available funds (by wire transfer or otherwise) on or before the day on which such payments are due.

SECTION 10.15.   Survival of Covenants, Representations and Warranties.   All covenants, representations and warranties set forth herein shall survive the execution of this Agreement.

40

SECTION 10.16. <u>Entire Agreement</u>. This Agreement, together with the attachments and exhibits attached hereto, contains the entire understanding of the parties with respect to the transactions contemplated hereby and supersedes all other agreements and undertakings, oral or written, between or among the parties.

SECTION 10.17. <u>Good Faith</u>. Good faith is the essence of this Agreement. Transferor and Transferee each agrees to exercise good faith and commercial reasonableness in the interpretation, performance and enforcement of this Agreement.

SECTION 10.18. <u>Relationship of Parties</u>. Nothing contained in this Agreement shall be construed or deemed by the parties hereto or by any third party to create a relationship of partnership or of joint venture or of any association whatsoever between Transferor or Transferee, it being expressly understood and agreed that no provisions in this Agreement nor any acts of the parties hereto shall be deemed to create any relationship between Transferor and Transferor other than the relationship of landlord and tenant.

SECTION 10.19. <u>Brokerage Commission</u>. Transferor and Transferee each hereby represents to each other that the negotiations relative to this Agreement and the transactions contemplated hereby do not give rise on account of either of their respective actions to any claim against any of the parties to this Agreement for a finder's fee, brokerage commission or other like payment.

SECTION 10.20. <u>Attorneys' Fees and Costs</u>. If any legal action is brought by any party hereto to enforce, defend or interpret its rights under this Agreement, the prevailing party in such action shall be entitled to receive as additional damages all court costs, all reasonable costs incurred in enforcing or defending its rights under this Agreement, and reasonable attorneys' fees incurred by the prevailing party, whether out of court, in the trial court, on appeal or in bankruptcy proceedings.

SECTION 10.21. <u>Time is of the Essence</u>. Time is of the essence in the performance by each party of its obligations hereunder.

SECTION 10.22. <u>Specific Performance</u>. This Agreement and each and every provision hereof shall be specifically enforceable. Each party hereto upon the introduction and presentation to the applicable court having jurisdiction over the matter of evidence showing a material breach by the other party hereto shall be entitled to injunctive relief mandating specific performance.

41

SECTION 10.23.  Termination.  Unless sooner terminated in accordance with the provisions hereof, this Agreement shall terminate on the last day of the fortieth (40th) Operating Year after the Commencement Date hereof.

### ARTICLE XI

#### CONDITIONS

The effectiveness of this Agreement and commencement of the Term of this Agreement is subject to and conditional upon receipt by Transferor and Transferee of the various determinations, approvals, opinions and reports referenced in Section 3.01(c) herein.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under seal as of the day and year first above written.

TRANSFEROR:

Signed, sealed and delivered in the presence of:

HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA

By: _W Harry W illson_

Title: _Chairman_

Unofficial Witness

Notary Public

(SEAL)

My Commission Expires:
MY COMMISSION EXPIRES JULY 22, 1991

Attest:

By: _a b m c Osuuach_

Title: _Asst Secretary_

[NOTARIAL SEAL]

[Signatures continued on the following page]

Signed, sealed and delivered
in the presence of:

_Jerri Palmer_

Unofficial Witness

_Naomi J. Williams_

Notary Public

My Commission Expires:
**MY COMMISSION EXPIRES JULY 22, 1991**

_____

[NOTARIAL SEAL]

DGC\Phoebe\006

TRANSFEREE:

PHOEBE PUTNEY MEMORIAL HOSPITAL,
INC.

By: _____

   Title: _Chairman_

(CORPORATE SEAL)

Attest:

By: _____

   Title: _Assistant Secretary_

43

**EXHIBIT F - 48**

EXHIBIT "A"

CONTRACTS NOT ASSIGNED

All contracts and agreements of Transferor which are not assignable to Transferee, a listing of which shall be provided to Transferee prior to the Commencement Date.

EXHIBIT "B"

<u>REAL PROPERTY</u>

All real property owned by Transferor, a legal description of which shall be provided to Transferee prior to the Commencement Date.

EXHIBIT "C"

EXISTING LIENS, CLAIMS AND ENCUMBRANCES

All existing liens, claims, encumbrances and security interests in and against the Real Property, Equipment and Operating Assets, a listing of which shall be provided to Transferee prior to the Commencement Date.

EXHIBIT "D"

EXISTING INDIGENT CARE AGREEMENT

STATE OF GEORGIA )
)
COUNTY OF DOUGHERTY )

### CONTRACT BETWEEN DOUGHERTY COUNTY, GEORGIA AND THE HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA

This Contract is made and entered into this 3rd day of
~~December~~ , 1990, in consideration of the promises and of the
mutual undertakings and agreements hereinafter provided, by and
between DOUGHERTY COUNTY, GEORGIA (hereinafter the "County"), a
public body corporate and politic of the State of Georgia, and the
HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA (hereinafter
the "Authority"), a public body organized and existing under the
laws of the State of Georgia.

### W I T N E S S E T H:

WHEREAS, the Authority owns Phoebe Putney Memorial Hospital
(the "Hospital") located in Albany, Dougherty County, Georgia; and

WHEREAS, the parties hereto agree that it is in the
community's best interest for the Hospital to continue to provide
quality facilities and services for medical care and hospitali-
zation for residents of the County, including its indigent sick;

NOW, THEREFORE, in consideration of the premises, and the
promises and undertakings hereinafter set forth, it is mutually
agreed between the County and the Authority, that:

1.  This Contract shall be effective and binding upon the
parties hereto and shall continue in full force and effect from the
date first above written through June 30, 2004.

**EXHIBIT F - 53**

2.    The Authority covenants and agrees that during the term of this Contract:

(a)  The Authority will continue to own the Hospital and will assure the availability of a medical facility whose objectives are to provide comprehensive, high quality and concerned health care and related educational programs, consistent with the dignity, welfare and needs of patients and the community.

(b)  The Authority will take reasonable action to assure that the Hospital will at all times maintain accreditation by the Joint Commission on Accreditation of Healthcare Organizations, as well as accreditation by all other state, regional and local health agencies having jurisdiction in such matters.

(c)  The medical care and hospitalization which the Authority shall cause the Hospital to provide to the indigent entitled to treatment hereunder or by subsequent agreements shall consist of the same standard of medical care rendered to all other hospital patients, including food, general (but not special ordered by a physician) nursing care and supervision, semi-private (but not private unless ordered by a physician) rooms, use of operating rooms and facilities, and other usual hospital care and services. Medicine, drugs, and services of the medical staff are included in medical care, and the necessity for and extent of medical treatment required for each patient shall be determined solely by the

2

attending physicians in their medical judgment. It is the intention of this Contract, however, for the medical staff of the Hospital to provide only services which are medically necessary and are not elective procedures in nature, and the Authority agrees to encourage the medical staff of the Hospital to provide only services which are medically necessary to the indigent.

(d) During the term hereof, the Authority, acting through the Hospital, will continue to act as agent of the County for the certification of indigents entitled to treatment unless otherwise notified in writing by the County. During this period, any determination of entitlement to treatment as a County indigent will be made on the basis of criteria established from time to time by a committee of the County and the Hospital. The current criteria for determination of entitlement to treatment as a County indigent are set forth in Exhibit "A", which is attached hereto by reference and incorporated herein. Until otherwise notified in writing by the County, the Hospital shall continue to make such determinations on the basis of the standards currently in place to identify indigent patients. It is understood that any change to this or any other method of determining indigency required by Federal or State law or other regulations shall be made automatically by the Hospital and written notice thereof provided to the County.

3

(e)  The Hospital shall retain a firm of certified public accountants to conduct an annual certified audit of the financial affairs, books, and records of the Hospital, said audit to be at the end of each fiscal year for the preceding year.  The complete and final report and audit shall be submitted by the Hospital not later than one hundred and twenty (120) days after the close of its fiscal year, and copies of each report shall be filed with or furnished to, as applicable, the Clerk of Dougherty County Superior Court, the Chairman of the Dougherty County Commission and the County Finance Director.  Said audit will be a certified audit performed under the Standards of Performance as set forth by the American Institute of Certified Public Accountants.

(f)  No funds provided by the County for indigent care shall be utilized in the direct care of indigents from other counties.

3.  Dougherty County covenants and agrees that:

(a)  For and during the term of this Contract, the County will send indigent sick entitled to have hospital care provided by the County to the Hospital for the rendering of such care and will pay for such services by taxation in the amounts and manner set forth herein during the term hereof, and thereafter in such amounts and in such manner as the parties shall agree upon, or if they cannot agree, then as shall be determined to be reasonable.

4

**EXHIBIT F - 56**

(b)  The County will pay to the Authority at least the following amounts necessary to provide adequate and necessary facilities and services for medical care and hospitalization of the County's indigent sick for each fiscal year: during the term hereof, 2.0 mills.

(c)  For and during each year of this Contract, Dougherty County shall pay the Authority every three months one-quarter of the total amount due for that year unless otherwise agreed between the parties.

(d)  Unless the County derives the required funds from other sources, the County shall levy an annual tax on all taxable property located within the boundaries of Dougherty County as now existing or as hereafter extended at such rate or rates established in Paragraph 3(b) of this Contract.

4.  The parties hereto acknowledge that the Hospital has the sole discretion to establish its rate structure, and any funding received (including that received from the County) may be appropriated for any purpose relating to the operation, maintenance, improvement and welfare of the Hospital including, but not limited to, the cost of operating and maintaining the Hospital, reserves, capital equipment, and capital improvements, subject only to the requirements of Georgia law.

5.  The County agrees to pay indigent debts on an itemized basis and limit it only to real cost incurred by the Hospital and not any inflated cost for the realization of profits or arbitrary costs for the consideration of overhead and expenses.

5

IN WITNESS WHEREOF, the parties hereto have caused this Contract to be executed under seal as of the day and year first above written.

DOUGHERTY COUNTY, GEORGIA

By: _____
    Chairman, Board of Commissioners
    of Dougherty County, Georgia

ATTEST: _____
      Clerk

         My Commission Expires March 20, 1994.
         [SEAL]

HOSPITAL AUTHORITY OF ALBANY-
DOUGHERTY COUNTY, GEORGIA

By: _____
    Chairman

ATTEST: _____
      Secretary
         [SEAL]

DGC\Phoebe\017

6

PHOEBE PUTNEY MEMORIAL HOSPITAL

GUIDELINES FOR THE
DOUGHERTY COUNTY FINANCIAL ASSISTANCE PROGRAM

I.   INTENT

The intent of these guidelines is to provide all affected parties with definitions, interpretations, and standards for uniform administration of entitlement to treatment as a Dougherty County indigent patient.

II.  DEFINITIONS

The following definitions shall apply in these guidelines:

A.   "Indigent patient" means a patient who is a resident of Dougherty County and whose annual family income does not exceed 150% of the Federal poverty level as established by the United States Department of Health and Human Services for 1990 and subsequent years.  In addition, "indigent patient" includes a patient whose hospital charges exceed 25% of the patient's annual family income. However, in no case shall a patient whose family income exceeds four (4) times 150% of the Federal poverty level for a family of four be considered an indigent patient.

B.   The medical care which the hospital shall provide to the indigent entitled to treatment shall consist of the same standard of medical care rendered to all other hospital patients, including food, general (but not special ordered by a physician) nursing care and supervision, semi-private (but not private unless ordered by a physician) rooms, use of operating rooms and facilities, and other usual hospital care and services.  Medicine, drugs, and services of medical staff are included in medical care, and the necessity for and extent of medical treatment required for each patient shall be determined solely by the attending physicians in their medical judgment.  The hospital shall only provide services which are medically necessary and are not elective procedures in nature.

C.   A patient must be a resident of Dougherty County six months to meet the residency requirements; however, if the patient can prove intent to remain a citizen of Dougherty County, this requirement will be waived.

Exhibit "A"

Evidence of intent may be supplied by one or more of the following:

1.  If receiving food stamps, show evidence of signing up in Dougherty County.

2.  If school is in session and family has children, evidence of enrollment.

3.  Proof they are eligible to vote in Dougherty County.

4.  Show telephone, gas, water, and light bill indicating current address in Dougherty County.

5.  If renting, show evidence of rent receipt in Dougherty County.

6.  If receiving Social Security check, show evidence of change of address.

7.  Furnish the name, address and telephone number of two neighbors who will be willing to verify that the patient or family lives at the address given.

8.  Have patient or family certify that they do live at a certain address in Dougherty County and it is their intention to live in Dougherty County as a permanent resident.

9.  Other appropriate evidence of residency may be considered in addition to or in lieu of what is specifically listed above.

D.  "Gross income" means the individual's federal adjusted gross income and includes income from wages, salaries, tips, etc.; interest and dividend income; unemployment compensation; and other taxable income.

III. REQUIREMENTS FOR CONSIDERATION

A.  Before any patient can be considered for Dougherty County assistance, the patient or responsible party must complete a determination of indigency worksheet.

B.  Social Services will require disclosure of all circumstances concerning insurance, third party coverage, assets, liabilities, guarantors, and any other factors necessary. Guarantors generally will include, but are not limited to, members of the immediate family, relatives, friends, boyfriends, other individuals

2

EXHIBIT F - 60

involved in accidents or liability coverage or the responsible party in case of pregnancy.

C.    If the responsible boyfriend of a pregnant woman is known, the hospital must obtain his obligation to pay the bill or the pregnant woman or family or the pregnant woman must seek and obtain, if possible, a court order for him to be responsible before any consideration can be given for assistance.

D.    If the patient is eligible for any type of state or federal program and has not applied for any assistance, he/she must apply before any consideration can be given for assistance.

E.    If a patient refuses to apply for assistance from a state or federal program and we think he/she might be eligible, he/she will not be considered for assistance.

IV.   INSTRUCTIONS AND PROCEDURES FOR COMPLETING A DETERMINATION OF INDIGENCY

These instructions and procedures should be used in making determinations of indigency under the Dougherty County Financial Assistance Program. The patient and/or responsible party are required to provide the necessary information to complete a determination.

A.    INCOME INFORMATION

Obtain from the applicant information on the patient's family income for the twelve (12) months preceding the determination of eligibility. Use the definition of income in the Federal Poverty Income Guidelines. Food stamps do not count as income. Multiply the three (3) months figure times four (4) and compare the result with the twelve (12) months figure. Use the lesser amount to determine eligibility.

1.    Any reasonable method to verify income information necessary to establish eligibility may be used. Examples of verification are:

a.    W-2 withholding forms

b.    Pay stubs

c.    Income tax returns

d.    Forms approving or denying unemployment compensation of workmen's compensation

3

e.   Oral verification of wage from employer

f.   Oral verification from public assistance agencies

g.   A witnessed statement signed by the patient or responsible party, such as provided for in Public Law 70-725, as amended, known as the Hill-Burton Act, except that such statement need not be obtained within 48 hours of the patient's admission to the hospital as required by the Hill-Burton Act.

h.   A Medicaid remittance voucher which reflects that the patient's Medicaid benefits for that Medicaid fiscal year have been exhausted.

B.   DETERMINATION OF INDIGENCY

The determination of the indigency of a patient shall be made based on the definition of an "indigent patient" under Section II. A. above.   See attachment 1 for the current federal poverty levels to be utilized in such determination of indigency.

DGC\Phoebe\039

4

**EXHIBIT F - 62**

ATTACHMENT 1

| Family Size Poverty Level* | 1990 | 1 Person ($6,280) | 2 Persons ($8,420) | 3 Persons ($10,560) | 4 Persons ($12,700) | 5 Persons ($14,840) | 6 Persons ($16,980) | 7 Persons ($19,120) | 8 Persons ($21,260) |
|---|---|---|---|---|---|---|---|---|---|

* Federal poverty level as effective 1990; add $2,140 for each additional family member

DGC\Phoebe\038

**EXHIBIT F - 63**

EXHIBIT "F"

BYLAWS OF TRANSFEREE

BYLAWS
OF
PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.
A GEORGIA NONPROFIT CORPORATION

## ARTICLE I

### Membership

The Members of Phoebe Putney Memorial Hospital, Inc., a Georgia nonprofit corporation under the Georgia Nonprofit Corporation Code (the "Corporation"), shall be those persons who, at any time of determination of the Members of the Corporation, are the members of the Board of Directors of the Corporation.

## ARTICLE II

### Board of Directors

Section 1. Initial Board. The initial Board of Directors of the Corporation shall be as set out in the Articles of Incorporation.

Section 2. Vacancies. All future vacancies on the Board of Directors (whether due to expiration of the term of a Director, death, resignation, removal or otherwise), subsequent to the appointment of the first eleven (11) Director Board in the Articles of Incorporation, shall be filled by majority vote of the remaining Directors.

Members elected to fill vacancies on the Board due to death, removal, or resignation shall hold office for the unexpired portion of the term.

Section 3. Composition of Board. The property, affairs, business and operation of the Corporation shall be managed by a Board of Directors, consisting of eleven (11) Directors. The initial members of the Board of Directors and their respective terms of office shall be set forth in the Articles of Incorporation.

Subsequent to the designation of the eleven (11) Director Board and the terms of office as set forth in the Articles of Incorporation, as updated by resolutions of the Board of Directors to fill any vacancies prior to the "Commencement Date" as defined in that certain Lease and Transfer Agreement dated as of December 11, 1990 by and between the Corporation and the Hospital Authority of Albany-Dougherty County, Georgia, all subsequent Directors shall serve for a term of five (5) years and until their respective successors are elected and qualified. Directors may serve for unlimited successive terms.

No person shall be eligible to serve as a Director who has been convicted of a felony or any crime involving moral turpitude. No Director's spouse shall serve at the same time on the Board of

Directors, nor shall any blood relative of a Director (closer than first cousin) serve at the same time on the Board of Directors.

Directors must exhibit the desire, time, interest and ability to support the Corporation and shall be selected based upon interest in and loyalty to the objectives and purposes of the Corporation as set forth in the Articles of Incorporation.

The Board of Directors shall carry out the purposes of the Corporation in compliance with the Articles of Incorporation and the Bylaws of the Corporation.

Section 4. Ex-Officio Board Members. The Chief of Medicine and the Chief of Surgery of the Medical Staff of Phoebe Putney Memorial Hospital, Albany, Dougherty County, Georgia (the "Hospital") shall serve as ex-officio members of the Board of Directors. In addition, the following persons are named as ex-officio members of the Board of Directors, until any such time that the members of the Board of Directors are replaced as the members of the Corporation: W. Harry Willson, Anna Louise McCormack, Elmer H. Bridges, Nathaniel Cross, and Bernard P. Scoggins, M.D. No ex-officio member of the Board of Directors shall have a vote, and no ex-officio member of the Board of Directors shall be counted as a Director for purposes of Article II, Section 3 hereof.

Section 5. Conflicts of Interest. Each Director and each ex-officio member of the Board shall file a "No Conflict of Interest and Loyalty" statement with the Chairman of the Board. Said statement shall certify that the Director or ex-officio member of the Board will not use his or her position on the Board for financial, political, or other self-interest that could be interpreted by the Board or the Corporation as not being in its best interests, and shall include a pledge that the Director or ex-officio member of the Board will maintain unselfish loyalty to the Board and will disclose to the entire Board the full particulars of his or her financial interest in any matter under consideration by the Board. If, in the view of the Director or ex-officio member of the Board or of the Board, such interest or any other interest may interfere with the exercise of his or her unselfish loyalty to the Corporation or may pose a conflict between duty and self-interest, the Director or ex-officio member of the Board shall neither vote on the issue nor participate in the discussion, but shall leave the room and the minutes shall so reflect that he or she left the room and neither voted nor participated in discussion on the issue (nevertheless his or her presence may be counted for purposes of establishing a quorum).

Section 6. Resignation; Removal. Any Director may resign at any time by giving written notice to the President/Chief Executive Officer of the Corporation or Chairman of the Board, and giving a copy of said notice to the Secretary of the Corporation. Such resignation, which may or may not be made contingent on formal acceptance, shall take effect on the date of receipt or at any later time specified therein.

Any director may be removed for cause by a vote of at least two-thirds (2/3) of the members of the Board of Directors. Any Director sought to be removed shall be given reasonable notice and, in the case of a Director removed for cause, an opportunity to be heard regarding the cause or causes stipulated for his removal.

## ARTICLE III

### Officers of the Board

Section 1.  Election.  The officers of the Board of Directors shall be a Chairman and a Vice Chairman, each of whom shall be elected by the Board of Directors from its own membership for a one-year term of office at the annual meeting of the Board of Directors.  Officers of the Board may serve unlimited terms in the same office.

Section 2.  Duties.  The Chairman shall preside at all meetings of the Board of Directors. Except as otherwise expressly provided herein, the Chairman shall appoint all committee members and all committee chairmen. He or she shall have such other duties and responsibilities hereinafter set forth in these Bylaws and delegated by the Board from time to time.

The Vice Chairman shall act in the absence of the Chairman, and when so acting shall have all the authority and powers of the Chairman.  The Vice Chairman shall perform such other duties as from time to time are assigned to him by the Chairman.

Section 3.  Successors.  Each officer shall deliver to his or her successor in office all official material of the Corporation not later than ten (10) days following the election of his or her successor.

## ARTICLE IV

### Regular and Special Meetings of the Board

Section 1.  Regular Meetings.  The Board of Directors shall hold a regular monthly meeting at the Hospital on the first Wednesday of each month, unless the Board of Directors shall otherwise designate another date for its regular monthly meetings.

Section 2.  Special Meetings.  Special meetings may be called by the Chairman and shall be called at the written request of at least one-third of the members of the Board of Directors.  Written notice of special meetings shall be considered duly given if mailed to each member of the Board at least three days before such special meeting or if personally delivered to the home or office of each Director at least 24 hours before such special meeting. The notice shall state the business or the transaction for which the meeting has been called and no other business shall be transacted at such meeting unless by unanimous consent of the members of the Board present and participating.  An emergency meeting of the Board of

3

Directors may be called without the necessity of any notice so long as the notice provisions are waived by at least two-thirds of the members of the Board of Directors.

Section 3. Quorum. A majority of the Board of Directors shall constitute a quorum for the transaction of business, and an act of the majority of the Directors present and voting at a meeting at which a quorum is present shall be the official act of the Board.

Section 4. Attendance. The members of the Board of Directors are expected to attend the regular monthly meetings of the Board. Any member, other than an ex-officio member, who shall fail to attend three regular meetings of the Board during the fiscal year without the Board excusing such absence shall create a vacancy of that person's membership on the Board.

Section 5. Cancellation or Change of Regular Meetings. The Board of Directors, by a vote of two-thirds of the members present, may dispense with or alter the date of a monthly meeting at the monthly meeting preceding the monthly meeting to be dispensed with or altered.

Section 6. Action by Written Consent. Any action required or permitted to be taken by the Board under any provision of law, the Articles of Incorporation, or these Bylaws may be taken without a meeting of the Board by the collective consent of all the Directors, in writing, setting forth the action so taken. Such written consents shall be filed with the proceedings of the Board and shall be made available for review at the next regular meeting of the Board of Directors. Such action by written consent shall have the same force and effect as the unanimous vote of the Directors. Any certificate or other document filed under law relating to action so taken shall state that the action was taken by unanimous written consent of the Board without a meeting and that the Bylaws authorized the Directors to so act.

Section 7. Telephonic Participation in Meetings. Members of the Board of Directors or any committee may participate in any meeting of the Board of Directors or Board Committee by means of a conference telephone or similar communication equipment by which means all persons participating in the meeting can hear one another at the same time. Participation with proper notice by such means shall constitute presence in person at a meeting.

Section 8. Voting. Each Director, except ex-officio Directors without a vote, shall be entitled to one vote on any matter before the Board. Voting by proxy shall not be permitted.

Section 9. Proper Officers. For the purposes of these Bylaws, the Chairman of the Board, the Vice Chairman of the Board and the President/Chief Executive Officer of the Corporation shall each be deemed a "proper officer". Whenever any resolution or action adopted by the Board or Board Committee shall authorize the "proper officer" of the Corporation to execute any note or other document or take any other action or shall generally authorize any

4

action without specifying the officer or officers authorized to take such action, any proper officer acting alone and without counter signatures may take such action on behalf of the Corporation.

## ARTICLE V

### Committees of the Board of Directors

Section 1.  General Provisions.  Committees of the Board of Directors shall be standing or special.  The following shall be Standing Committees:

        (a)   Executive Committee;
        (b)   Finance and Personnel Committee;
        (c)   Facilities Committee;
        (d)   Professional Affairs Committee; and
        (e)   Strategic Planning Committee.

Except as herein otherwise provided, the Chairman of the Board of Directors shall appoint the members of said committees, and the chairmen thereof.  Each committee chairman and each committee member shall serve in such capacity for a one-year period or until the next committee appointments are made by the Chairman of the Board.

All committees shall be subject to the control and general supervision of the Board.  Each committee shall meet as required and as set by policy of the Board.

Special ad hoc committees may be appointed for any special tasks, or as circumstances may warrant, at the discretion of the Board or the Chairman of the Board.  They shall limit their activities to that task for which the committee was organized and will have no authority to act except as specifically conferred upon them by the Board or Chairman of the Board.

One-half of the committee members shall constitute a quorum for the carrying out of the committee functions and actions.  Any vacancy on the committee may be filled by the Chairman of the Board.

The Chairman of the Board and the President/Chief Executive Officer of the Corporation shall each be an ex-officio member of all committees without vote except for those committees where the Chairman of the Board and/or the President/Chief Executive Officer of the Corporation is (are) required by these Bylaws to be a member in which case each such party shall have a vote.

Section 2.  Attendance.  Any committee chairman or committee member, except an ex-officio committee member, who fails to attend three committee meetings during the fiscal year without the committee excusing such absence shall create a vacancy of that person's membership on the committee.

5

**EXHIBIT F - 69**

Section 3. Committee Chairman's Duties. The chairman of each committee, who shall be a member of the Board of Directors, shall have the following general duties, responsibilities and powers, together with such others as may be designated from time to time by the Board of Directors:

(a) Coordinate committee activities through the designated management liaison;

(b) Prepare an agenda for each committee meeting;

(c) Preside or designate an alternate to preside at committee meetings;

(d) Provide for maintenance of official records of the committee and appoint a secretary of the committee for that purpose;

(e) Report committee activities and formal recommendations to the Board at its regular meetings;

(f) Delegate specific responsibilities among committee members; and

(g) Appoint members to subcommittees as necessary.

Section 4. Executive Committee. The Executive Committee shall consist of the Chairman of the Board, the President/Chief Executive Officer of the Corporation, and three other members of the Board of Directors appointed by the Chairman of the Board of Directors.

. The Executive Committee shall have the power to transact all regular business of the Corporation, and shall have and exercise all the powers of the Board during the interim between the regular monthly meetings of the Board of Directors, provided that any action taken shall not conflict with the policies established by the Board. The Executive Committee shall also have the duty and responsibility to develop and recommend to the Board necessary or desirable policies relating to the organization and operation of the Corporation. The Executive Committee shall from time to time: (i) formulate and recommend to the Board policies designed to promote and maintain the good will of patients in the Hospital; (ii) promote and maintain general public interest in and support of the Corporation; and (iii) develop and maintain adequate fund raising support in the community.

Section 5. Finance and Personnel Committee. The Finance and Personnel Committee shall consist of a minimum of three members of the Board of Directors appointed by the Chairman of the Board of Directors.

The Finance and Personnel Committee shall be responsible for devising ways and means to secure funds for the support of the Corporation, shall attend to all financial interests of the Corporation and shall report its actions to the Board of Directors.

6

The Finance and Personnel Committee shall examine the Corporation's monthly financial report and require an explanation from the President/ Chief Executive Officer or the Treasurer/Chief Financial Officer if there has been any material variation from the budget.

Prior to the beginning of the fiscal year, the Finance and Personnel Committee shall cause to be prepared a detailed budget for the operation of the Corporation for the ensuing fiscal year. This budget shall show the estimated revenue and estimated expenditures and shall be submitted for discussion and approval to the Board at its next regular monthly meeting.

The Finance and Personnel Committee shall recommend to the Board of Directors an independent firm of certified public accountants to conduct an annual audit, shall receive the audit, and shall report its findings to the Board.

The Finance and Personnel Committee shall be responsible for the management of all endowment and trust funds belonging to the Corporation.

The Finance and Personnel Committee shall be responsible for the formulation, budgeting and implementation of the Hospital's policies regarding provision of medical services to indigent residents of Doughtery County.

The Finance and Personnel Committee shall be responsible for the formulation of the personnel policies of the Corporation. The Finance and Personnel Committee shall recommend salaries and wage ranges and shall study workers' compensation, employment practices, fringe benefits, employee health services, human relations, pension plans and policies relative to personnel who work for the Corporation. The Finance and Personnel Committee shall work with the President/Chief Executive Officer of the Corporation in evaluating such personnel policies. In the event the Corporation shall become involved in collective bargaining, the Finance and Personnel Committee shall study the collective bargaining agreement and may serve as the negotiating party in collective bargaining agreements.

Section 6. Facilities Committee. The Facilities Committee shall consist of a minimum of three members of the Board of Directors appointed by the Chairman of the Board of Directors.

The Facilities Committee shall keep the Board of Directors informed as to the condition of the physical plant of the Hospital including all real and personal property of the Hospital. The Facilities Committee shall also study and recommend policies concerning major Hospital additions, alternatives, repairs and maintenance.

Section 7. Professional Affairs Committee. The Professional Affairs Committee shall consist of at least three members and shall include such members of the Board of Directors and such members of

7

**EXHIBIT F - 71**

the Medical Staff of the Hospital as shall be appointed by the
Chairman of the Board of Directors.

The Professional Affairs Committee shall:

(a) Act as a liaison group between the Board of
Directors, the President/Chief Executive Officer, and the
Medical Staff;

(b) Discuss matters of a medical-administrative nature
that may be brought to its attention; and

(c) Make such recommendations as it may deem in the best
interest of the Corporation.

Section 8. Strategic Planning Committee. The Strategic
Planning Committee shall consider future strategy for the
Corporation, and shall formulate written long range goals and
objectives. The Strategic Planning Committee shall attempt to be
aware of all developments in the health care field and trends in
society, and predict the effect of such developments and trends on
the Corporation. A principal function of the Strategic Planning
Committee shall be the development of a written statement
describing the Corporation's specific role in the community in
relation to all other health care facilities. The Strategic
Planning Committee shall recommend to the Board of Directors a
strategic plan which will enable the Corporation to adapt more
readily to future conditions, to prepare for changes, and to select
courses of action relative to the established goals. The Strategic
Planning Committee shall:

(a) Develop a framework for orderly decision making through
the development of plans through which: (i) areas of need
and opportunity are defined and analyzed; (ii) general
goals related to such needs are established; (iii)
alternative courses of action are identified and
selected; and (iv) provisions for implementation of the
plan of action and evaluation of the effect of the chosen
plan are made. The overall plan shall coordinate
services with other health care facilities and programs.
Plans to provide or expand a specific service should be
developed only when it has been determined that the
proposed program represents the most effective available
method for defining and meeting health care needs;

(b) Ensure that all recommendations coming from this and
other committees are consistent with the Corporation's
defined role; facilitate achievement of its goals and
objectives; and follow the strategic plan. It is the
continuing obligation of the Strategic Planning Committee
to assist the Corporation in maintaining its plan (or
strategy) and in changing the plan as new factors and
conditions dictate; and

(c) Develop a sense of priorities in its examination of
issues and projects so that the Corporation's resources

8

**EXHIBIT F - 72**

of time and money are spent on those projects which achieve the defined role of the Corporation in the community.

The Strategic Planning Committee shall consist of a minimum of three (3) members of the Board of Directors appointed by the Chairman of the Board of Directors.

Section 9. Special Committee. Special committees shall be appointed by the Chairman of the Board of Directors from the members of the Board from time to time as circumstances warrant. Special committees shall have no power to act unless such power is specifically set forth by action of the Board of Directors.

## ARTICLE VI

### Officers of the Corporation

Section 1. General Provisions. The Officers of the Corporation shall consist of a President/Chief Executive Officer, a Vice President or Vice Presidents, a Secretary and a Treasurer/Chief Financial Officer, each of whom shall be elected by, and shall serve at the pleasure of, the Board of Directors. Each Officer shall be elected or appointed for a term of office running until the next annual meeting of the Board of Directors or such shorter term as may be provided by (i) resolution of the Board of Directors or (ii) the appointment to office. Each Officer shall serve during the term of office for which he or she is elected or appointed and until his or her successor has been elected or appointed and has qualified, or until his or her earlier resignation, removal from office or death.

Any two offices may be held by the same person, except that the following pairs of offices may not be held by the same person: President and Vice President; President and Secretary; President and Treasurer.

Section 2. Removal. Any Officer may be removed from office, with or without cause, upon the majority vote of the Directors present at any meeting of the Board of Directors at which a quorum is present.

Section 3. President/Chief Executive Officer. The President/ Chief Executive Officer shall be given the necessary authority and be held responsible for supervision of the total administration of the Corporation in all its activities and departments, subject only to such policies as may be adopted or issued by the Board or by any of its committees to which the Board has delegated power for such action. He or she shall act as the duly authorized representative of the Board of Directors in all matters in which the Board of Directors has not formally designated some other person for that specific purpose. The President/Chief Executive Officer shall be a member of the Board of Directors and a member of the Executive Committee of the Board.

9

Section 4.   Duties of President/Chief Executive Officer.   The authority and duties of the President/Chief Executive Officer shall include among other things:

(a)   Carrying out all policies established by the Board of Directors and formulating and enforcing all rules and regulations necessary and desirable for the proper conduct of the Corporation;

(b)   Perfecting and submitting to the Board of Directors for approval a plan of organization of the personnel and others concerned with the operation of the Corporation;

(c)   Assisting the Secretary of the Corporation with all the duties assigned to the Secretary and assuring that all notices are given in accordance with these Bylaws or as required by law;

(d)   Selecting, employing, controlling and discharging all employees, and developing and maintaining personnel policies and practices for the Hospital;

(e)   Ensuring that all physical properties of the Corporation are kept in a good state of repair and operating condition;

(f)   Making and executing all contracts pertaining to the ordinary affairs and operations of the Corporation, except as to the execution of those contracts specifically reserved to the Board;

(g)   Supervising all business affairs; and ensuring that all funds are collected and expended to the best possible advantage of the Corporation;

(h)   Working with the Medical Staff and with all those concerned with the rendering of professional service to the end that the best possible care may be rendered to all the patients of the Hospital;

(i)   Serving as the liaison officer and channel of communication between the Board of Directors or any of its committees and the Medical Staff or all other organizations working on behalf of the Corporation;

(j)   Attending all meetings of the Board of Directors and the Executive Committee of the Board; and

(k)   Performing any other duty that may be necessary in the best interest of the Corporation or that the Board of Directors shall require.

Section 5.   Vice President(s).   The Vice President(s) shall have such authority, duties and responsibilities as the Board of Directors shall direct and assign to him or her (them) from time to time.

10
**EXHIBIT F - 74**

Section 6.  Secretary.  The Secretary shall attend all meetings of the Board of Directors; shall keep minutes of all meetings of the Board of Directors; shall have charge of the corporate books and seal of the Corporation; and shall perform such other duties and have such other powers as may from time to time be delegated to him or her by the Board of Directors.

Section 7.  Treasurer/Chief Financial Officer.  The Treasurer/ Chief Financial Officer shall be charged with the management of all financial affairs of the Corporation not delegated by these Bylaws to the Finance and Personnel Committee of the Board of Directors; shall have the power to recommend action concerning the Corporation's affairs to the Board of Directors and to the Finance and Personnel Committee of the Board of Directors; and shall perform such other duties and have such other powers as may from time to time be delegated to him or her by the Board of Directors.

In addition to the foregoing duties and without limitation thereof, the Treasurer/Chief Financial Officer shall:

(a)  Prepare an annual budget showing, but not limited to, anticipated revenue and expenditures; be responsible for all funds and securities of the Corporation; and receive and give receipts for monies due and payable to the Corporation from any source whatever and deposit all such monies in the name of the Corporation in such banks or other depository as shall be selected in accordance with the Bylaws;

(b)  Submit regularly to the Board of Directors, or its authorized committees, periodic reports showing the financial activities of the Corporation; and prepare and submit such special reports as may be required by the Board of Directors; and

(c)  Keep and maintain an up-to-date inventory of all property and equipment (including medical) owned or leased by the Corporation.

Section 8.  Assistant Officers.  Assistants to the Vice President(s), Secretary and Treasurer/Chief Financial Officer may be elected by the Board of Directors and shall perform such duties and have such powers as shall be delegated to them from time to time by the Board of Directors.

## ARTICLE VII

## Medical Staff

Section 1.  Acceptance of Current Medical Staff.  The staff of physicians practicing at the Hospital and the Bylaws and rules for such staff, as in effect at the time of adoption of these Bylaws, are hereby adopted as the Medical Staff and as the Bylaws

11

of such Medical Staff, subject to review, amendment and final approval by the Board.

Section 2. Subsequent Changes to the Medical Staff. The Board of Directors shall hereafter appoint the Medical Staff of the Hospital in accordance with the Bylaws and rules to be adopted by such Medical Staff and which Bylaws shall be in accordance with recommendations of the Joint Commission on Accreditation of Healthcare Organizations, which provide, among other things, for the method of appointing additional staff members and for the removal of staff members and which Bylaws and any amendments thereto shall be subject to approval by the Board of Directors.

## ARTICLE VIII

### Hospital Rules and Regulations

Such rules and regulations as are necessary for the efficient operation of the Hospital shall be adopted by the Board of Directors after receiving the recommendations of the Medical Staff and the President/Chief Executive Officer of the Corporation. The initial rules and regulations shall be the rules and regulations in effect at the Hospital on the date of the adoption of these Bylaws.

## ARTICLE IX

### Conflicting Regulations

No charters, constitutions, bylaws, rules, provisions or regulations of any organization operating as a part of the Corporation or as an agency thereof (including the Medical Staff, the Hospital, any nursing organization or related organizations), shall be in conflict with or repugnant or contrary to these Bylaws or to the Articles of Incorporation of the Corporation or to the laws of the State of Georgia or of the United States.

## ARTICLE X

### Amendments

These Bylaws shall be reviewed at least bi-annually and, if necessary, may be amended by an affirmative vote of a majority of the voting membership of the Board of Directors present at the regular monthly meeting or any special meeting of the Board of Directors.

12

**EXHIBIT F - 76**

## ARTICLE XI

### Indemnification by Corporation

Section 1. Indemnification. Any person (including the heirs, executors, administrators or estate of such person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Corporation), by reason of the fact that he or she is or was a Director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified by the Corporation against expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation (and with respect to any criminal action or proceeding, if he or she had no reasonable cause to believe his or her conduct was unlawful), to the maximum extent permitted by, and in the manner provided by, the Georgia Nonprofit Corporation Code.

Section 2. Insurance. The Corporation may purchase and maintain insurance at its expense, to protect itself and any such person against any such liability, cost, payment or expense, whether or not the Corporation would have the power to indemnify such person against such liability.

## ARTICLE XII

### Corporate Seal

The Corporation's Board may provide for a corporate seal in such form and with such inscription as it shall determine, provided such seal shall always contain the word "Non-profit".

## ARTICLE XIII

### Waiver of Notice

Whenever any notice is required to be given under the provisions of the Georgia Nonprofit Corporation Code, of the Articles of Incorporation, or of these Bylaws, a waiver thereof in writing signed by the person entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice where such waiver is permitted by State law. All waivers shall be filed with the corporate records, or shall be made a part of the minutes of the relevant meeting.

## SECRETARY'S CERTIFICATE

This is to certify that the foregoing Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation on the _____ day of December, 1990.

IN WITNESS WHEREOF, the undersigned, duly appointed and acting Secretary of the Corporation, has signed this Certificate and affixed the seal of the Corporation this _____ day of December, 1990.

_____
Secretary

[CORPORATE SEAL]

DGC\Phoebe\008

14

**EXHIBIT F - 78**

EXHIBIT "E"

ARTICLES OF INCORPORATION OF TRANSFEREE

ARTICLES OF INCORPORATION
OF
PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.

### ARTICLE I

#### Name

The name of the Corporation is Phoebe Putney Memorial Hospital, Inc.

### ARTICLE II

#### Organization

The Corporation is organized pursuant to the Georgia Nonprofit Corporation Code.

### ARTICLE III

#### Period of Duration

The period of duration of the Corporation shall be perpetual.

### ARTICLE IV

#### Purposes

The Corporation is organized and shall be operated exclusively for charitable, scientific and educational purposes, including:

(a)  To own, manage, control, operate, govern, reconstruct, repair and lease existing medical facilities, hospitals and related support facilities in Georgia; and to own, operate, construct, lease and joint venture other medical facilities, hospitals and related support facilities which may be constructed in Georgia.

(b)   To establish, operate and/or joint venture hospitals, extended care facilities, ambulatory surgery facilities, clinics, teachings units and any other health care services for the purpose of furnishing medical, surgical and psychiatric aid, nursing, medical and psychiatric care, food and any other necessary care for those suffering from illness, disease, injuries or disabilities and to operate an emergency room or rooms in such hospitals, extended care facilities, ambulatory surgery facilities and clinics; and to lend or advance money to or otherwise invest in such hospitals, extended care facilities, clinics, teaching units and health care services.

(c)   To carry on any education or other activities relating to the rendering of care to the sick and injured or to the promotion of the general health and welfare of the citizens of the State of Georgia and surrounding areas.

(d)   To participate in any activity designed and carried on to promote the general health of the citizens of the State of Georgia and surrounding areas.

(e)   To promote and carry on scientific research and educational activities related to the care of the sick and injured.

(f)   To solicit and receive funds, gifts, endowments, donations, devises and bequests.

(g)   To lease or purchase wherever located land or lands, building or buildings, and purchase and construct buildings for purposes in connection with the activities of the Corporation,

-2-

**EXHIBIT F - 81**

including, but not limited to, hospitals, doctors' offices, clinics, ambulatory surgical facilities, laboratories or any related medical activity.

(h) To exercise, without limitation, all the powers enumerated in the Georgia Nonprofit Corporation Code, as it now exists or is subsequently amended or superseded, and to do and perform such acts and to have such powers as shall be desirable and necessary in furtherance of any of the powers hereinabove enumerated which are not in derogation of the laws of the State of Georgia.

(i) To exercise any of the powers enumerated herein or in the Georgia Nonprofit Corporation Code, as it now exists or is subsequently amended or superseded, by the Corporation singly or by joint venture or partnership with any person or entity, whether or not said entity is for profit or not for profit, so long as the Corporation's participation in the joint venture or partnership is primarily in furtherance of the charitable, educational and scientific purposes for which the Corporation is organized.

(j) To form and own shares in affiliated or related corporations, whether said corporations are for profit or not for profit, so long as said formation and ownership is not inconsistent with the furtherance of the charitable, educational and scientific purposes for which the Corporation is organized.

-3-

(k)   To conduct and provide such other programs, activities and services as are necessary, incident or pertaining to the foregoing purposes of the Corporation.

## ARTICLE V

### Election of Directors

The affairs of the Corporation shall be managed by the Board of Directors which shall exercise all of the powers of the Corporation except to the extent that any such powers are reserved to members, if any, of the Corporation in the Bylaws.    The qualifications, minimum and maximum number and manner of election of the Directors shall be provided in the Bylaws of the Corporation.

## ARTICLE VI.

### Initial Board of Directors

The initial Board of Directors shall consist of eleven (11) members, whose names and addresses are set forth below.    Each member of the initial Board of Directors shall serve as a director for a term of the number of years appearing opposite his name or until his successor has been elected and has qualified.

-4-

**EXHIBIT F - 83**

| Director | Term |
|---|---|
| 1. Laurence Crimmins, M.D.<br>1111 Palmyra Road<br>Albany, Georgia | 4 years |
| 2. Willie D. Hampton<br>902 Dorsett Street<br>Albany, Georgia | 5 years |
| 3. John L. Brunson<br>801 Highland Avenue<br>Albany, Georgia | 5 years |
| 4. Dr. Billy C. Black<br>504 College Drive<br>Albany, Georgia | 5 years |
| 5. Lamar H. Moree, M.D.<br>2604 East Doublegate Drive<br>Albany, Georgia | During term as Chief of Medical Staff of Phoebe Putney Memorial Hospital |
| 6. William George, Jr., M.D.<br>5023 Gillionville Road<br>Albany, Georgia | 3 years |
| 7. Will Sims<br>6014 Old Dawson Road<br>Albany, Georgia | 4 years |
| 8. Wilhmenia Hall<br>512 Mercer Avenue<br>Albany, Georgia | 4 years |
| 9. Robert D. Jones<br>2512 East Alberson Drive<br>Albany, Georgia | Earlier of 3 years or election of successor |
| 10. Edwin J. Ollie<br>2530 Pheasant Drive<br>Albany, Georgia | Earlier of 3 years or election of successor |
| 11. Joel Wernick<br>417 Byron Plantation Road<br>Albany, Georgia | During tenure as President/ Chief Executive Officer of the Corporation |

-5-

**EXHIBIT F - 84**

The Board of Directors of the Corporation shall at all times include the Chief Executive Officer of the Corporation and the Chief of the Medical Staff of Phoebe Putney Memorial Hospital.

The Board of Directors of the Corporation shall at all times include at least three physician members who are members of the Medical Staff of Phoebe Putney Memorial Hospital.

In addition, the Chief of Medicine and Chief of Surgery of Phoebe Putney Memorial Hospital shall serve as ex-officio, non-voting members of the Board of Directors. Additional ex-officio members of the Board of Directors may be designated as set forth in the Bylaws of the Corporation.

## ARTICLE VII

### Membership in the Corporation

The members of the Corporation shall be the Board of Directors who shall be the sole voting members of the Corporation.

The Bylaws may provide for one or more classes of other members who shall be admitted in such manner and who shall have such rights and privileges as are set forth in the Bylaws but who shall not have the right to vote.

## ARTICLE VIII

### Powers

The Corporation shall have all powers enumerated herein and in the Georgia Nonprofit Corporation Code.

-6-

ARTICLE IX

Restrictions

The Corporation is organized exclusively for charitable, educational and scientific purposes, as a nonprofit corporation, within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and its activities shall be conducted for such purposes in such a manner that no part of its net earnings shall inure to the benefit of any member, director, officer or individual.  In addition, the Corporation shall be authorized to exercise the powers permitted nonprofit corporations under the Georgia Nonprofit Corporation Code; provided, however, that the Corporation while exercising any one or more powers shall do so in furtherance of the charitable, educational and scientific purposes for which it has been organized as described in Section 501(c)(3) of the Code.  All of the assets and earnings of the Corporation shall be used exclusively for the charitable, educational and scientific purposes hereinabove set forth, including the payment of expenses incidental thereto, and all of the powers of the Corporation shall be exercised exclusively for such purposes. No part of the Corporation's activities shall inure to the benefit of any individual, and no substantial part of its activities shall be for the carrying on of a program of propaganda or for influencing legislation, nor shall it participate in any political campaign on behalf of any candidate for public office. The Corporation shall not carry on any activities not permitted to

-7-

be carried on by an organization exempt from federal income taxation under Section 501(c)(3) of the Code, or any organization to which contributions are deductible under Section 170(c)(2) of the Code.

## ARTICLE X

### Dissolution

Upon dissolution of the Corporation, all of its assets remaining after the payment of all costs and expenses of such dissolution, and after adequate provision has been made for the discharge or assumption of its liabilities, shall be distributed to the Hospital Authority of Albany-Dougherty County, Georgia (the "Authority"), which is a public body corporate and politic and an instrumentality of the State of Georgia, to be used exclusively for a public purpose, and none of the assets will be distributed upon such dissolution to any member, officer or director of the Corporation. If the Corporation enters into an agreement with the Authority pursuant to which the Authority leases, transfers and assigns to the Corporation all of the assets, operations and liabilities of Phoebe Putney Memorial Hospital (the "Hospital"), then upon the termination of such lease, transfer or assignment agreement, or upon termination of any renewal or extension thereof, all of the assets of the Corporation (after adequate provision is made for the discharge or assumption of the Corporation's liabilities) shall be distributed to the Authority to be used

-8-

exclusively for a public purpose, and the Corporation shall be dissolved, and none of the assets will be distributed upon such termination to any member, officer or director of the Corporation. In the event the Authority is not then in existence or is for any reason unable to accept title to such assets, then all of the net assets of the Corporation shall in that event be distributed exclusively for the purposes of the Corporation, in such manner, and to such organization or organizations, organized and operated exclusively for charitable, scientific and educational purposes, as shall at the time qualify as an exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986, as amended (or the corresponding provision of any future United States internal revenue law), as the Board of Directors shall determine. Any of such assets not so disposed of shall be disposed of by the Superior Court of Dougherty County, exclusively for such purposes and to such organization or organizations, as such court shall determine. The Authority shall have the authority to compel the Corporation's compliance with this Article.

## ARTICLE XI

### Registered Office and Agent

The initial registered office of the Corporation shall be at 417 Third Avenue, Albany, Dougherty County, Georgia 31703. The initial registered agent at such address shall be Joel Wernick.

-9-

## ARTICLE XII

### Incorporator

The name and address of the Incorporator is:

John H. Parker, Jr.
Parker, Hudson, Rainer & Dobbs
1200 Carnegie Building
133 Carnegie Way
Atlanta, Georgia  30303

## ARTICLE XIII

### Amendments

These Articles of Incorporation may be amended at any time and from time to time by the affirmative vote of a majority of all of the Directors then in office.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Incorporation this _____ day of December, 1990.

_____
Incorporator

DGC\Phoebe\013

-10-

EXHIBIT "G"

AGREEMENT TO BE BOUND

For $10.00 and other valuable consideration and in order to induce Transferor to execute the foregoing Lease and Transfer Agreement, the undersigned Phoebe Putney Health Systems, Inc., a Georgia nonprofit corporation ("Parent Affiliate"), hereby agrees with Transferor as follows:

(a)  Parent Affiliate shall be bound by all the provisions of Section 4.16, Section 5.05, and any other section of the foregoing Lease and Transfer Agreement that are applicable to Parent Affiliate.

(b)  Upon the expiration or earlier termination of the Lease and Transfer Agreement, or in the event this Agreement or the foregoing Lease and Transfer Agreement shall become void or unenforceable, all assets of Parent Affiliate, including the Parent Affiliate's interests in its affiliates, shall become the property of the Transferor absolutely.

Dated: _____        PHOEBE PUTNEY HEALTH SYSTEMS,
                                     INC.
[CORPORATE SEAL]
                                     By: _____

Attest:                                  Title: _____

By: _____

    Title: _____

**EXHIBIT F - 90**

EXHIBIT "H"

ARTICLES OF INCORPORATION OF PARENT AFFILIATE

ARTICLES OF INCORPORATION
OF
PHOEBE PUTNEY HEALTH SYSTEMS, INC.

## ARTICLE I

### Name

The name of the Corporation is Phoebe Putney Health Systems, Inc.

## ARTICLE II

### Organization

The Corporation is organized pursuant to the Georgia Nonprofit Corporation Code.

## ARTICLE III

### Period of Duration

The period of duration of the Corporation shall be perpetual.

## ARTICLE IV

### Purposes

The Corporation is organized and shall be operated exclusively for charitable, scientific and educational purposes, including:

(a)   To support, promote, advance and stengthen, within the meaning of Section 509(a)(3) of the Internal Revenue Code of 1986, as amended (or corresponding provisions of any subsequent United States internal revenue law) (the "Code"), Phoebe Putney Memorial Hospital, Inc., a Georgia nonprofit corporation ("PPMH"), and, in the discretion of the Board of Directors of the Corporation, to support other nonprofit health care providers organized for

charitable and civic purposes; provided that each corporation is an organization described in Section 501(c)(3) of the Code and in Section 509(a)(1) or (2) of the Code; and, further provided that the Corporation shall be operated, supervised or controlled by or in connection with each additional supported corporation within the meaning of Section 509(a)(3) of the Code;

(b) To itself operate exclusively for charitable, educational and scientific purposes, and in furtherance of the charitable, educational and scientific purposes, causes and objects now or at any time hereafter fostered by said Phoebe Putney Memorial Hospital, Inc., a Georgia nonprofit corporation, and such other nonprofit and tax exempt health care providers as the Board of Directors of the Corporation elects to support.

(c) To participate in, form, own and operate joint ventures, partnerships, corporations or other entities, whether or not any such entity is for profit or not for profit, so long as this Corporation's participation therein is not inconsistent with the futherance of the charitable, educational and scientific purposes for which the Corporation is organized.

ARTICLE V

Election of Directors

The affairs of the Corporation shall be managed by the Board of Directors which shall exercise all of the powers of the Corporation except to the extent that any such powers are reserved to members, if any, of the Corporation in the Bylaws. The qualifications, minimum and maximum number and manner of election

2

of the Directors shall be provided in the Bylaws of the Corporation.

## ARTICLE VI

### Initial Board of Directors

The initial Board of Directors shall consist of nine (9) members, whose names and addresses are set forth below. Each member of the initial Board of Directors shall serve as a director for a term of the number of years appearing opposite his name or until his successor has been elected and has qualified.

| Director | Term |
|---|---|
| 1. W. Harry Willson<br>P.O. Box 1275<br>Albany, Georgia | 4 years |
| 2. Anna Louise McCormack<br>P.O. Box 3170<br>Albany, Georgia | 3 years |
| 3. Elmer H. Bridges<br>4917 Van Cise Lane<br>Albany, Georgia | 5 years |
| 4. Nathaniel Cross<br>1503 Lily Pond Road<br>Albany, Georgia | 5 years |
| 5. Bernard P. Scoggins, M.D.<br>1712 East Broad Avenue<br>Albany, Georgia | During term as immediate past Chief of Medical Staff of Phoebe Putney Memorial Hospital |
| 6. Alfredo Stokes<br>2405 Greenmount Drive<br>Albany, Georgia | 3 years |
| 7. Tom Law<br>711 7th Avenue<br>Albany, Georgia | 4 years |

3

8.  Walter Carl Gordon, Jr., M.D.        3 years
    3220 Jacqueline Drive
    Albany, Georgia

9.  Joel Wernick                   During tenure as President/
    417 Byron Plantation Road      Chief Executive Officer of
    Albany, Georgia                the Corporation

The Board of Directors of the Corporation shall at all times include the Chief Executive Officer of the Corporation and the Immediate Past Chief of the Medical Staff of Phoebe Putney Memorial Hospital.

The Board of Directors of the Corporation shall at all times include at least two physician members who are members of the Medical Staff of Phoebe Putney Memorial Hospital. If at any time any such physician member of the Board of Directors of the Corporation shall be named as the Chief of Staff of the Medical Staff of Phoebe Putney Memorial Hospital, such physician member shall resign from the Board of Directors of the Corporation and such vacancy shall be filled by another member of the Medical Staff of Phoebe Putney Memorial Hospital.

The Board of Directors of the Corporation shall at all times include at least one member of the board of directors of Phoebe Putney Memorial Hospital, Inc.

In addition, the Chairman of the Board of Directors of Phoebe Putney Memorial Hospital, Inc. shall serve as an ex-officio, non-voting member of the Board of Directors.

4

EXHIBIT F - 96

## ARTICLE VII

### Membership in the Corporation

The members of the Corporation shall be the Board of Directors who shall be the sole voting members of the Corporation.

The Bylaws may provide for one or more classes of other members who shall be admitted in such manner and who shall have such rights and privileges as are set forth in the Bylaws but who shall not have the right to vote.

## ARTICLE VIII

### Powers

The Corporation shall have all powers enumerated herein and in the Georgia Nonprofit Corporation Code.

## ARTICLE IX

### Restrictions

This Corporation is organized exclusively for charitable purposes, as a nonprofit corporation, within the meaning of Section 501(c)(3) of the Code, and its activities shall be conducted for such purposes in such a manner that no part of its net earnings shall inure to the benefit of any member, director, officer or individual. In addition, the Corporation shall be authorized to exercise the powers permitted nonprofit corporations under the Georgia Nonprofit Corporation Code, provided, however, that the Corporation while exercising any one or more powers shall do so in furtherance of the charitable, educational and scientific purposes for which it has been organized as described in Section 501(c)(3)

5

**EXHIBIT F - 97**

of the Code. All of the assets and earnings of the Corporation shall be used exclusively for the charitable, educational and scientific purposes hereinabove set forth, including the payment of expenses incidental thereto and all of the powers of the Corporation shall be exercised exclusively for such purposes. No part of its activities shall inure to the benefit of any individual and no substantial part of its activities shall be for the carrying on of a program of propaganda or for influencing legislation nor shall it participate in any political campaign on behalf of any candidate for public office. The Corporation shall not carry on any activities not permitted to be carried on by an organization exempt from federal income taxation under Section 501(c)(3) of the Code, or any organization to which contributions are deductible under Section 170(c)(2) of the Code.

## ARTICLE X

### Dissolution

Upon dissolution of the Corporation, all of its assets, including all its interests in any affiliated entities, remaining after the payment of all costs and expenses of such dissolution, and after adequate provision has been made for the discharge or assumption of its liabilities, shall be distributed to PPMH; provided that PPMH is then an organization exempt from federal income taxation pursuant to Section 501(c)(3) of the Code, and if not, then to the Hospital Authority of Albany-Dougherty County, Georgia (the "Authority"), which is a public body corporate and politic and an instrumentality of the State of Georgia, to be used exclusively for a public purpose, and none of the assets will be

6

distributed upon such dissolution to any member, officer or director of the Corporation. If PPMH enters into an agreement with the Authority pursuant to which the Authority leases, transfers and assigns to PPMH all of the assets, operations and liabilities of Phoebe Putney Memorial Hospital (the "Hospital"), then upon the termination of such lease, transfer or assignment agreement, or upon termination of any renewal or extension thereof, all of the assets of the Corporation, including all its interest in PPMH and any other affiliated entities (after adequate provision is made for the discharge or assumption of the Corporation's liabilities) shall be distributed to the Authority to be used exclusively for a public purpose, and the Corporation shall be dissolved, and none of the assets will be distributed upon such termination to any member, officer or director of the Corporation. In the event the Authority is not then in existence or is for any reason unable to accept title to such assets, then all of the net assets of the Corporation shall in that event be distributed exclusively for the purposes of the Corporation, in such manner, and to such organization or organizations, organized and operated exclusively for charitable, scientific and educational purposes, as shall at the time qualify as an exempt organization under section 501(c)(3) of the Code (or the corresponding provision of any future United States internal revenue law), as the Board of Directors shall determine. Any of such assets not so disposed of shall be disposed of by the Superior Court of Dougherty County, exclusively for such purposes and to such organization or organizations, as such court shall determine.

7

The Authority shall have the authority to compel the Corporation's compliance with this Article.

## ARTICLE XI

### Registered Office and Agent

The initial registered office of the Corporation shall be at 417 Third Avenue, Albany, Dougherty County, Georgia 31703.  The initial registered agent at such address shall be Joel Wernick.

## ARTICLE XII

### Incorporator

The name and address of the Incorporator is:

> John H. Parker, Jr.
> Parker, Hudson, Rainer & Dobbs
> 1200 Carnegie Building
> 133 Carnegie Way
> Atlanta, Georgia  30303

## ARTICLE XIII

### Amendments

These Articles of Incorporation may be amended at any time and from time to time by the affirmative vote of a majority of all of the Directors then in office.

IN WITNESS WHEREOF, the undersigned has executed these Articles of Incorporation this _____ day of December, 1990.

_____
Incorporator

DGC\Phoebe\007

8

EXHIBIT "I"

BYLAWS OF PARENT AFFILIATE

BYLAWS
OF
PHOEBE PUTNEY HEALTH SYSTEMS, INC.
A GEORGIA NONPROFIT CORPORATION

ARTICLE I

Membership

The Members of Phoebe Putney Health Systems, Inc., a Georgia nonprofit corporation under the Georgia Nonprofit Corporation Code (the "Corporation"), shall be those persons who, at any time of determination of the Members of the Corporation, are the members of the Board of Directors of the Corporation.

ARTICLE II

Board of Directors

Section 1.   Initial Board.   The initial Board of Directors of the Corporation shall be as set out in the Articles of Incorporation.

Section 2.   Vacancies.   All future vacancies on the Board of Directors (whether due to expiration of the term of a Director, death, resignation, removal or otherwise), subsequent to the appointment of the first nine (9) Director Board in the Articles of Incorporation, shall be filled by majority vote of the remaining Directors.

Members elected to fill vacancies on the Board due to death, removal, or resignation shall hold office for the unexpired portion of the term.

Section 3.   Composition of Board.   The property, affairs, business and operation of the Corporation shall be managed by a Board of Directors, consisting of nine (9) Directors. The initial members of the Board of Directors and their respective terms of office shall be set forth in the Articles of Incorporation.

Subsequent to the designation of the first nine (9) Director Board and the terms of office as set forth in the Articles of Incorporation, all subsequent Directors shall serve for a term of five (5) years and until their respective successors are elected and qualified. Directors may serve for unlimited successive terms.

No person shall be eligible to serve as a Director who has been convicted of a felony or any crime involving moral turpitude. No Director's spouse shall serve at the same time on the Board of Directors, nor shall any blood relative of a Director (closer than first cousin) serve at the same time on the Board of Directors.

Directors must exhibit the desire, time, interest and ability to support the Corporation and shall be selected based upon interest in and loyalty to the objectives and purposes of the Corporation as set forth in the Articles of Incorporation.

The Board of Directors shall carry out the purposes of the Corporation in compliance with the Articles of Incorporation and the Bylaws of the Corporation.

Section 4. <u>Ex-Officio Board Members</u>. The Chairman of the Board of Directors of Phoebe Putney Memorial Hospital, Inc. a Georgia nonprofit corporation, shall serve as an ex-officio member of the Board of Directors. No ex-officio member of the Board of Directors shall have a vote, and no ex-officio member of the Board of Directors shall be counted as a Director for purposes of Article II, Section 3 hereof.

Section 5. <u>Conflicts of Interest</u>. Each Director and each ex-officio member of the Board shall file a "No Conflict of Interest and Loyalty" statement with the Chairman of the Board. Said statement shall certify that the Director or ex-officio member of the Board will not use his or her position on the Board for financial, political, or other self-interest that could be interpreted by the Board or the Corporation as not being in its best interests, and shall include a pledge that the Director or ex-officio member of the Board will maintain unselfish loyalty to the Board and will disclose to the entire Board the full particulars of his or her financial interest in any matter under consideration by the Board. If, in the view of the Director or ex-officio member of the Board or of the Board, such interest or any other interest may interfere with the exercise of his or her unselfish loyalty to the Corporation or may pose a conflict between duty and self-interest, the Director or ex-officio member of the Board shall neither vote on the issue nor participate in the discussion, but shall leave the room and the minutes shall so reflect that he or she left the room and neither voted nor participated in discussion on the issue (nevertheless his or her presence may be counted for purposes of establishing a quorum).

Section 6. <u>Resignation; Removal</u>. Any Director may resign at any time by giving written notice to the President/Chief Executive Officer of the Corporation or Chairman of the Board, and giving a copy of said notice to the Secretary of the Corporation. Such resignation, which may or may not be made contingent on formal acceptance, shall take effect on the date of receipt or at any later time specified therein.

Any director may be removed for cause by a vote of at least two-thirds (2/3) of the members of the Board of Directors. Any Director sought to be removed shall be given reasonable notice and, in the case of a Director removed for cause, an opportunity to be heard regarding the cause or causes stipulated for his removal.

**EXHIBIT F - 103**

## ARTICLE III

### Officers of the Board

Section 1.  Election.  The officers of the Board of Directors shall be a Chairman and a Vice Chairman, each of whom shall be elected by the Board of Directors from its own membership for a one-year term of office at the annual meeting of the Board of Directors.  Officers of the Board may serve unlimited terms in the same office.

Section 2.  Duties.  The Chairman shall preside at all meetings of the Board of Directors.  Except as otherwise expressly provided herein, the Chairman shall appoint all committee members and all committee chairmen.  He or she shall have such other duties and responsibilities hereinafter set forth in these Bylaws and delegated by the Board from time to time.

The Vice Chairman shall act in the absence of the Chairman, and when so acting shall have all the authority and powers of the Chairman.  The Vice Chairman shall perform such other duties as from time to time are assigned to him by the Chairman.

Section 3.  Successors.  Each officer shall deliver to his or her successor in office all official material of the Corporation not later than ten (10) days following the election of his or her successor.

## ARTICLE IV

### Regular and Special Meetings of the Board

Section 1.  Regular Meetings.  The Board of Directors shall hold a regular quarterly meeting at the Hospital on the first Wednesday of January, the first Wednesday of April, the first Wednesday of July, and the first Wednesday of October, unless the Board of Directors shall otherwise designate other dates for its regular quarterly meetings.

Section 2.  Special Meetings.  Special meetings may be called by the Chairman and shall be called at the written request of at least one-third of the members of the Board of Directors.  Written notice of special meetings shall be considered duly given if mailed to each member of the Board at least three days before such special meeting or if personally delivered to the home or office of each Director at least 24 hours before such special meeting.  The notice shall state the business or the transaction for which the meeting has been called and no other business shall be transacted at such meeting unless by unanimous consent of the members of the Board present and participating.  An emergency meeting of the Board of Directors may be called without the necessity of any notice so long as the notice provisions are waived by at least two-thirds of the members of the Board of Directors.

3

Section 3.  Quorum.  A majority of the Board of Directors shall constitute a quorum for the transaction of business, and an act of the majority of the Directors present and voting at a meeting at which a quorum is present shall be the official act of the Board.

Section 4.  Attendance.  The members of the Board of Directors are expected to attend the regular quarterly meetings of the Board. Any member, other than an ex-officio member, who shall fail to attend two regular meetings of the Board during the fiscal year without the Board excusing such absence shall create a vacancy of that person's membership on the Board.

Section 5.  Cancellation or Change of Regular Meetings.  The Board of Directors, by a vote of two-thirds of the members present, may dispense with or alter the date of a quarterly meeting at the quarterly meeting preceding the quarterly meeting to be dispensed with or altered.

Section 6.  Action by Written Consent.  Any action required or permitted to be taken by the Board under any provision of law, the Articles of Incorporation, or these Bylaws may be taken without a meeting of the Board by the collective consent of all the Directors, in writing, setting forth the action so taken.  Such written consents shall be filed with the proceedings of the Board and shall be made available for review at the next regular meeting of the Board of Directors.  Such action by written consent shall have the same force and effect as the unanimous vote of the Directors.  Any certificate or other document filed under law relating to action so taken shall state that the action was taken by unanimous written consent of the Board without a meeting and that the Bylaws authorized the Directors to so act.

Section 7.  Telephonic Participation in Meetings.  Members of the Board of Directors or any committee may participate in any meeting of the Board of Directors or Board Committee by means of a conference telephone or similar communication equipment by which means all persons participating in the meeting can hear one another at the same time.  Participation with proper notice by such means shall constitute presence in person at a meeting.

Section 8.  Voting.  Each Director, except ex-officio Directors without a vote, shall be entitled to one vote on any matter before the Board.  Voting by proxy shall not be permitted.

Section 9.  Proper Officers.  For the purposes of these Bylaws, the Chairman of the Board, the Vice Chairman of the Board and the President/Chief Executive Officer of the Corporation shall each be deemed a "proper officer".  Whenever any resolution or action adopted by the Board or Board Committee shall authorize the "proper officer" of the Corporation to execute any note or other document or take any other action or shall generally authorize any action without specifying the officer or officers authorized to take such action, any proper officer acting alone and without counter signatures may take such action on behalf of the Corporation.

4

ARTICLE V

## Committees of the Board of Directors

Section 1. General Provisions. Committees of the Board of Directors shall be standing or special. The following shall be Standing Committees:

      (a)   Executive Committee;
      (b)   Finance and Personnel Committee; and
      (c)   Strategic Planning Committee.

Except as herein otherwise provided, the Chairman of the Board of Directors shall appoint the members of said committees, and the chairmen thereof. Each committee chairman and each committee member shall serve in such capacity for a one-year period or until the next committee appointments are made by the Chairman of the Board.

All committees shall be subject to the control and general supervision of the Board. Each committee shall meet as required and as set by policy of the Board.

Special ad hoc committees may be appointed for any special tasks, or as circumstances may warrant, at the discretion of the Board or the Chairman of the Board. They shall limit their activities to that task for which the committee was organized and will have no authority to act except as specifically conferred upon them by the Board or Chairman of the Board.

One-half of the committee members shall constitute a quorum for the carrying out of the committee functions and actions. Any vacancy on the committee may be filled by the Chairman of the Board.

The Chairman of the Board and the President/Chief Executive Officer of the Corporation shall each be an ex-officio member of all committees without vote except for those committees where the Chairman of the Board and/or the President/Chief Executive Officer of the Corporation is (are) required by these Bylaws to be a member in which case each such party shall have a vote.

Section 2. Attendance. Any committee chairman or committee member, except an ex-officio committee member, who fails to attend three committee meetings during the fiscal year without the committee excusing such absence shall create a vacancy of that person's membership on the committee.

Section 3. Committee Chairman's Duties. The chairman of each committee, who shall be a member of the Board of Directors, shall have the following general duties, responsibilities and powers, together with such others as may be designated from time to time by the Board of Directors:

5

**EXHIBIT F - 106**

(a)   Coordinate committee activities through the designated management liaison;

(b)   Prepare an agenda for each committee meeting;

(c)   Preside or designate an alternate to preside at committee meetings;

(d)   Provide for maintenance of official records of the committee and appoint a secretary of the committee for that purpose;

(e)   Report committee activities and formal recommendations to the Board at its regular meetings;

(f)   Delegate specific responsibilities among committee members; and

(g)   Appoint members to subcommittees as necessary.

Section 4.  Executive Committee.  The Executive Committee shall consist of the Chairman of the Board, the President/Chief Executive Officer of the Corporation, and three other members of the Board of Directors elected by the Board.

The Executive Committee shall have the power to transact all regular business of the Corporation, and shall have and exercise all the powers of the Board during the interim between the regular quarterly meetings of the Board of Directors, provided that any action taken shall not conflict with the policies established by the Board.  The Executive Committee shall also have the duty and responsibility to develop and recommend to the Board necessary or desirable policies relating to the organization and operation of the Corporation.  The Executive Committee shall from time to time: (i) formulate and recommend to the Board policies designed to promote and maintain the good will of patients in the Hospital; (ii) promote and maintain general public interest in and support of the Corporation; and (iii) develop and maintain adequate fund raising support in the community.

Section 5.  Finance and Personnel Committee.  The Finance and Personnel Committee shall consist of a minimum of three members of the Board of Directors appointed by the Chairman of the Board of Directors.

The Finance and Personnel Committee shall be responsible for devising ways and means to secure funds for the support of the Corporation, shall attend to all financial interests of the Corporation and shall report its actions to the Board of Directors.

The Finance and Personnel Committee shall examine the Corporation's monthly financial report and require an explanation from the President/Chief Executive Officer or the Treasurer/Chief Financial Officer if there has been any material variation from the budget.

6

**EXHIBIT F - 107**

Prior to the beginning of the fiscal year, the Finance and Personnel Committee shall cause to be prepared a detailed budget for the operation of the Corporation for the ensuing fiscal year. This budget shall show the estimated revenue and estimated expenditures and shall be submitted for discussion and approval to the Board at its next regular quarterly meeting.

The Finance and Personnel Committee shall recommend to the Board of Directors an independent firm of certified public accountants to conduct an annual audit, shall receive the audit, and shall report its findings to the Board.

The Finance and Personnel Committee shall be responsible for the management of all endowment and trust funds belonging to the Corporation.

The Finance and Personnel Committee shall be responsible for the formulation of the personnel policies of the Corporation. The Finance and Personnel Committee shall recommend salaries and wage ranges and shall study workers' compensation, employment practices, fringe benefits, employee health services, human relations, pension plans and policies relative to personnel who work for the Corporation. The Finance and Personnel Committee shall work with the President/Chief Executive Officer of the Corporation in evaluating such personnel policies. In the event the Corporation shall become involved in collective bargaining, the Finance and Personnel Committee shall study the collective bargaining agreement and may serve as the negotiating party in collective bargaining agreements.

Section 6.  Strategic Planning Committee.  The Strategic Planning Committee shall consider future strategy for the Corporation, and shall formulate written long range goals and objectives. The Strategic Planning Committee shall attempt to be aware of all developments in the health care field and trends in society, and predict the effect of such developments and trends on the Corporation. A principal function of the Strategic Planning Committee shall be the development of a written statement describing the Corporation's specific role in the community in relation to all other health care facilities. The Strategic Planning Committee shall recommend to the Board of Directors a strategic plan which will enable the Corporation to adapt more readily to future conditions, to prepare for changes, and to select courses of action relative to the established goals. The Strategic Planning Committee shall:

(a)  Develop a framework for orderly decision making through the development of plans through which: (i) areas of need and opportunity are defined and analyzed; (ii) general goals related to such needs are established; (iii) alternative courses of action are identified and selected; and (iv) provisions for implementation of the plan of action and evaluation of the effect of the chosen plan are made. The overall plan shall coordinate services with other health care facilities and programs. Plans to provide or expand a specific service should be

7

developed only when it has been determined that the proposed program represents the most effective available method for defining and meeting health care needs;

(b) Ensure that all recommendations coming from this and other committees are consistent with the Corporation's defined role; facilitate achievement of its goals and objectives; and follow the strategic plan. It is the continuing obligation of the Strategic Planning Committee to assist the Corporation in maintaining its plan (or strategy) and in changing the plan as new factors and conditions dictate;

(c) Develop a sense of priorities in its examination of issues and projects so that the Corporation's resources of time and money are spent on those projects which achieve the defined role of the Corporation in the community; and

(d) Review any long range plans of Phoebe Putney Memorial Hospital, Inc. and other affiliated corporations and make appropriate recommendations to the Board of Directors of the Corporation.

The Strategic Planning Committee shall consist of a minimum of three (3) members of the Board of Directors appointed by the Chairman of the Board of Directors.

Section 7. Special Committees. Special committees shall be appointed by the Chairman of the Board of Directors from the members of the Board from time to time as circumstances warrant. Special committees shall have no power to act unless such power is specifically set forth by action of the Board of Directors.

## ARTICLE VI

### Officers of the Corporation

Section 1. General Provisions. The Officers of the Corporation shall consist of a President/Chief Executive Officer, a Vice President or Vice Presidents, a Secretary and a Treasurer/Chief Financial Officer, each of whom shall be elected by, and shall serve at the pleasure of, the Board of Directors. Each Officer shall be elected or appointed for a term of office running until the next annual meeting of the Board of Directors or such shorter term as may be provided by (i) resolution of the Board of Directors or (ii) the appointment to office. Each Officer shall serve during the term of office for which he or she is elected or appointed and until his or her successor has been elected or appointed and has qualified, or until his or her earlier resignation, removal from office or death.

Any two offices may be held by the same person, except that the following pairs of offices may not be held by the same person:

EXHIBIT F - 109

President and Vice President; President and Secretary; President and Treasurer.

Section 2. Removal. Any Officer may be removed from office, with or without cause, upon the majority vote of the Directors present at any meeting of the Board of Directors at which a quorum is present.

Section 3. President/Chief Executive Officer. The President/ Chief Executive Officer shall be given the necessary authority and be held responsible for supervision of the total administration of the Corporation in all its activities and departments, subject only to such policies as may be adopted or issued by the Board or by any of its committees to which the Board has delegated power for such action. He or she shall act as the duly authorized representative of the Board of Directors in all matters in which the Board of Directors has not formally designated some other person for that specific purpose. The President/Chief Executive Officer shall be a member of the Board of Directors and a member of the Executive Committee of the Board.

Section 4. Duties of President/Chief Executive Officer. The authority and duties of the President/Chief Executive Officer shall include among other things:

(a) Carrying out all policies established by the Board of Directors and formulating and enforcing all rules and regulations necessary and desirable for the proper conduct of the Corporation;

(b) Perfecting and submitting to the Board of Directors for approval a plan of organization of the personnel and others concerned with the operation of the Corporation;

(c) Assisting the Secretary of the Corporation with all the duties assigned to the Secretary and assuring that all notices are given in accordance with these Bylaws or as required by law;

(d) Selecting, employing, controlling and discharging all employees, and developing and maintaining personnel policies and practices for the Corporation;

(e) Ensuring that all physical properties of the Corporation are kept in a good state of repair and operating condition;

(f) Making and executing all contracts pertaining to the ordinary affairs and operations of the Corporation, except as to the execution of those contracts specifically reserved to the Board;

(g) Supervising all business affairs; and ensuring that all funds are collected and expended to the best possible advantage of the Corporation;

9

(h)   Serving as the liaison officer and channel of communication between the Board of Directors or any of its committees and all other organizations working on behalf of the Corporation;

(i)   Attending all meetings of the Board of Directors and the Executive Committee of the Board; and

(j)   Performing any other duty that may be necessary in the best interest of the Corporation or that the Board of Directors shall require.

Section 5.   Vice President(s).   The Vice President(s) shall have such authority, duties and responsibilities as the Board of Directors shall direct and assign to him or her (them) from time to time.

Section 6.   Secretary.   The Secretary shall attend all meetings of the Board of Directors; shall keep minutes of all meetings of the Board of Directors; shall have charge of the corporate books and seal of the Corporation; and shall perform such other duties and have such other powers as may from time to time be delegated to him or her by the Board of Directors.

Section 7.   Treasurer/Chief Financial Officer.   The Treasurer/ Chief Financial Officer shall be charged with the management of all financial affairs of the Corporation not delegated by these Bylaws to the Finance and Personnel Committee of the Board of Directors; shall have the power to recommend action concerning the Corporation's affairs to the Board of Directors and to the Finance and Personnel Committee of the Board of Directors; and shall perform such other duties and have such other powers as may from time to time be delegated to him or her by the Board of Directors.

In addition to the foregoing duties and without limitation thereof, the Treasurer/Chief Financial Officer shall:

(a)   Prepare an annual budget showing, but not limited to, anticipated revenue and expenditures; be responsible for all funds and securities of the Corporation; and receive and give receipts for monies due and payable to the Corporation from any source whatever and deposit all such monies in the name of the Corporation in such banks or other depository as shall be selected in accordance with the Bylaws;

(b)   Submit regularly to the Board of Directors, or its authorized committees, periodic reports showing the financial activities of the Corporation; and prepare and submit such special reports as may be required by the Board of Directors;

(c)   Keep and maintain an up-to-date inventory of all property and equipment (including medical) owned or leased by the Corporation; and

10

**EXHIBIT F - 111**

(d) Review the annual budgets of Phoebe Putney Memorial Hospital, Inc. and other affiliated corporations and make appropriate recommendations to the Board of Directors of the Corporation concerning their approval.

Section 8. Assistant Officers. Assistants to the Vice President(s), Secretary and Treasurer/Chief Financial Officer may be elected by the Board of Directors and shall perform such duties and have such powers as shall be delegated to them from time to time by the Board of Directors.

## ARTICLE VII

### Conflicting Regulations

No charters, constitutions, bylaws, rules, provisions or regulations of any organization operating as a part of the Corporation or as an agency thereof shall be in conflict with or repugnant or contrary to these Bylaws or to the Articles of Incorporation of the Corporation or to the laws of the State of Georgia or of the United States.

## ARTICLE VIII

### Amendments

These Bylaws shall be reviewed at least bi-annually and, if necessary, may be amended by an affirmative vote of at least two-thirds (2/3) of the voting membership of the Board of Directors present at the regular quarterly meeting or any special meeting of the Board of Directors.

## ARTICLE IX

### Indemnification by Corporation

Section 1. Indemnification. Any person (including the heirs, executors, administrators or estate of such person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Corporation), by reason of the fact that he or she is or was a Director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified by the Corporation against expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation (and with respect to any criminal action or proceeding, if he or she had no reasonable cause to

11

believe his or her conduct was unlawful), to the maximum extent
permitted by, and in the manner provided by, the Georgia Nonprofit
Corporation Code.

Section 2. Insurance. The Corporation may purchase and
maintain insurance at its expense, to protect itself and any such
person against any such liability, cost, payment or expense,
whether or not the Corporation would have the power to indemnify
such person against such liability.

## ARTICLE X

### Corporate Seal

The Corporation's Board may provide for a corporate seal in
such form and with such inscription as it shall determine, provided
such seal shall always contain the word "Non-profit".

## ARTICLE XI

### Waiver of Notice

Whenever any notice is required to be given under the
provisions of the Georgia Nonprofit Corporation Code, of the
Articles of Incorporation, or of these Bylaws, a waiver thereof in
writing signed by the person entitled to such notice, whether
before or after the time stated therein, shall be deemed equivalent
to the giving of such notice where such waiver is permitted by
State law. All waivers shall be filed with the corporate records,
or shall be made a part of the minutes of the relevant meeting.

## ARTICLE XII

### Sole Member of Phoebe Putney Memorial Hospital, Inc.

After receipt of an appropriate private letter ruling from the
Internal Revenue Service, the Corporation shall become the sole
member of Phoebe Putney Memorial Hospital, Inc., a Georgia
nonprofit corporation ("PPMH"). At such time, all vacancies on the
board of directors of PPMH shall be filled by the Board of
Directors of the Corporation. Also, at such time the Corporation
shall reserve certain powers so that PPMH may not take any of the
following actions without the prior approval of the Corporation:

(a) Adopt a plan of dissolution of PPMH;

(b) Authorize PPMH to engage in, or enter into, any
transaction providing for the sale, mortgage or other
disposition of all or substantially all of the assets of the
PPMH;

(c) Adopt a plan of merger or consolidation of PPMH with
another corporation;

(d)  Adopt any annual or long-term capital and operational budgets of PPMH or approve any changes therein exceeding ten percent (10%) of any budgeted item;

(e)  Amend or take any action to terminate any lease between PPMH and the Hospital Authority of Albany-Dougherty County, Georgia with respect to Phoebe Putney Memorial Hospital;

(f)  Take any action which would, or reasonably could be expected to, cause PPMH to exceed its annual budget for capital expenditures;

(g)  Incur an expenditure for any particular project or service of or for PPMH in an amount in excess of $1,000,000;

(h)  Take any action which would, or reasonably could be expected to, result in an adverse variance (on an annualized basis) of total expenses of greater than 2% of total annual budgeted expenses;

(i)  Appoint or remove the independent auditors of PPMH;

(j)  Select or remove the President/Chief Executive Officer of PPMH;

(k)  Adopt or permit any changes to any long-term, strategic or master institutional plans of PPMH; or

(l)  Amend the Articles or Incorporation or Bylaws of PPMH.

AMENDED
BYLAWS
OF
PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.
A GEORGIA NONPROFIT CORPORATION

## ARTICLE I

### Membership

The sole member of Phoebe Putney Memorial Hospital, Inc., a Georgia nonprofit corporation under the Georgia Nonprofit Corporation Code (the "Corporation"), shall be Phoebe Putney Health Systems, Inc., a Georgia nonprofit corporation ("PPHS"), whose principal offices are located at 417 Third Avenue, Albany, Georgia 31703.

## ARTICLE II

### Board of Directors

Section 1.  Initial Board.  The initial Board of Directors of the Corporation shall be as set out in the Articles of Incorporation.

Section 2.  Vacancies.  All future vacancies on the Board of Directors (whether due to expiration of the term of a Director, death, resignation, removal or otherwise), subsequent to the appointment of the first eleven (11) Director Board in the Articles of Incorporation, shall be filled by majority vote of the Board of Directors of PPHS.

Members elected to fill vacancies on the Board due to death, removal, or resignation shall hold office for the unexpired portion of the term.

Section 3.  Composition of Board.  The property, affairs, business and operation of the Corporation shall be managed by a Board of Directors, consisting of eleven (11) Directors.  The initial members of the Board of Directors and their respective terms of office shall be set forth in the Articles of Incorporation.

Subsequent to the designation of the eleven (11) Director Board and the terms of office as set forth in the Articles of Incorporation, as updated by resolutions of the Board of Directors to fill any vacancies prior to the "Commencement Date" as defined in that certain Lease and Transfer Agreement dated as of December 11, 1990 by and between the Corporation and the Hospital Authority of Albany-Dougherty County, Georgia, all subsequent Directors shall serve for a term of five (5) years and until their respective successors are elected and qualified.  Directors may serve for unlimited successive terms.

No person shall be eligible to serve as a Director who has been convicted of a felony or any crime involving moral turpitude.

No Director's spouse shall serve at the same time on the Board of Directors, nor shall any blood relative of a Director (closer than first cousin) serve at the same time on the Board of Directors.

Directors must exhibit the desire, time, interest and ability to support the Corporation and shall be selected based upon interest in and loyalty to the objectives and purposes of the Corporation as set forth in the Articles of Incorporation.

The Board of Directors shall carry out the purposes of the Corporation in compliance with the Articles of Incorporation and the Bylaws of the Corporation.

Section 4. Ex-Officio Board Members. The Chief of Medicine and the Chief of Surgery of the Medical Staff of Phoebe Putney Memorial Hospital, Albany, Dougherty County, Georgia (the "Hospital") shall serve as ex-officio members of the Board of Directors. In addition, the following persons are named as ex-officio members of the Board of Directors, until any such time that the members of the Board of Directors are replaced as the members of the Corporation: W. Harry Willson, Anna Louise McCormack, Elmer H. Bridges, Nathaniel Cross, and Bernard P. Scoggins, M.D. No ex-officio member of the Board of Directors shall have a vote, and no ex-officio member of the Board of Directors shall be counted as a Director for purposes of Article II, Section 3 hereof.

Section 5. Conflicts of Interest. Each Director and each ex-officio member of the Board shall file a "No Conflict of Interest and Loyalty" statement with the Chairman of the Board. Said statement shall certify that the Director or ex-officio member of the Board will not use his or her position on the Board for financial, political, or other self-interest that could be interpreted by the Board or the Corporation as not being in its best interests, and shall include a pledge that the Director or ex-officio member of the Board will maintain unselfish loyalty to the Board and will disclose to the entire Board the full particulars of his or her financial interest in any matter under consideration by the Board. If, in the view of the Director or ex-officio member of the Board or of the Board, such interest or any other interest may interfere with the exercise of his or her unselfish loyalty to the Corporation or may pose a conflict between duty and self-interest, the Director or ex-officio member of the Board shall neither vote on the issue nor participate in the discussion, but shall leave the room and the minutes shall so reflect that he or she left the room and neither voted nor participated in discussion on the issue (nevertheless his or her presence may be counted for purposes of establishing a quorum). Said "No Conflict of Interest and Loyalty" statement shall also include a representation that such Director or ex-officio member of the Board is not a director or officer of, and does not control or have any ownership interest whatsoever in, any entity which provides hospital services which are competitive with the hospital services provided by Phoebe Putney Memorial Hospital.

Section 6. Resignation; Removal. Any Director may resign at any time by giving written notice to the President/Chief Executive

2

Officer of the Corporation or Chairman of the Board, and giving a copy of said notice to the Secretary of the Corporation. Such resignation, which may or may not be made contingent on formal acceptance, shall take effect on the date of receipt or at any later time specified therein.

Any director may be removed for cause by a vote of at least two-thirds (2/3) of the members of the Board of Directors. Any Director sought to be removed shall be given reasonable notice and, in the case of a Director removed for cause, an opportunity to be heard regarding the cause or causes stipulated for his removal.

## ARTICLE III

### Officers of the Board

Section 1. Election. The officers of the Board of Directors shall be a Chairman and a Vice Chairman, each of whom shall be elected by the Board of Directors from its own membership for a one-year term of office at the annual meeting of the Board of Directors. Officers of the Board may serve unlimited terms in the same office.

Section 2. Duties. The Chairman shall preside at all meetings of the Board of Directors. Except as otherwise expressly provided herein, the Chairman shall appoint all committee members and all committee chairmen. He or she shall have such other duties and responsibilities hereinafter set forth in these Bylaws and delegated by the Board from time to time.

The Vice Chairman shall act in the absence of the Chairman, and when so acting shall have all the authority and powers of the Chairman. The Vice Chairman shall perform such other duties as from time to time are assigned to him by the Chairman.

Section 3. Successors. Each officer shall deliver to his or her successor in office all official material of the Corporation not later than ten (10) days following the election of his or her successor.

## ARTICLE IV

### Regular and Special Meetings of the Board

Section 1. Regular Meetings. The Board of Directors shall hold a regular monthly meeting at the Hospital on the first Wednesday of each month, unless the Board of Directors shall otherwise designate another date for its regular monthly meetings.

Section 2. Special Meetings. Special meetings may be called by the Chairman and shall be called at the written request of at least one-third of the members of the Board of Directors. Written notice of special meetings shall be considered duly given if mailed to each member of the Board at least three days before such special

3

meeting or if personally delivered to the home or office of each
Director at least 24 hours before such special meeting. The notice
shall state the business or the transaction for which the meeting
has been called and no other business shall be transacted at such
meeting unless by unanimous consent of the members of the Board
present and participating. An emergency meeting of the Board of
Directors may be called without the necessity of any notice so long
as the notice provisions are waived by at least two-thirds of the
members of the Board of Directors.

Section 3. Quorum. A majority of the Board of Directors
shall constitute a quorum for the transaction of business, and an
act of the majority of the Directors present and voting at a
meeting at which a quorum is present shall be the official act of
the Board.

Section 4. Attendance. The members of the Board of Directors
are expected to attend the regular monthly meetings of the Board.
Any member, other than an ex-officio member, who shall fail to
attend three regular meetings of the Board during the fiscal year
without the Board excusing such absence shall create a vacancy of
that person's membership on the Board.

Section 5. Cancellation or Change of Regular Meetings. The
Board of Directors, by a vote of two-thirds of the members present,
may dispense with or alter the date of a monthly meeting at the
monthly meeting preceding the monthly meeting to be dispensed with
or altered.

Section 6. Action by Written Consent. Any action required or
permitted to be taken by the Board under any provision of law, the
Articles of Incorporation, or these Bylaws may be taken without a
meeting of the Board by the collective consent of all the
Directors, in writing, setting forth the action so taken. Such
written consents shall be filed with the proceedings of the Board
and shall be made available for review at the next regular meeting
of the Board of Directors. Such action by written consent shall
have the same force and effect as the unanimous vote of the
Directors. Any certificate or other document filed under law
relating to action so taken shall state that the action was taken
by unanimous written consent of the Board without a meeting and
that the Bylaws authorized the Directors to so act.

Section 7. Telephonic Participation in Meetings. Members of
the Board of Directors or any committee may participate in any
meeting of the Board of Directors or Board Committee by means of a
conference telephone or similar communication equipment by which
means all persons participating in the meeting can hear one another
at the same time. Participation with proper notice by such means
shall constitute presence in person at a meeting.

Section 8. Voting. Each Director, except ex-officio
Directors without a vote, shall be entitled to one vote on any
matter before the Board. Voting by proxy shall not be permitted.

4

Section 9.    Proper Officers.   For the purposes of these Bylaws, the Chairman of the Board, the Vice Chairman of the Board and the President/Chief Executive Officer of the Corporation shall each be deemed a "proper officer".   Whenever any resolution or action adopted by the Board or Board Committee shall authorize the "proper officer" of the Corporation to execute any note or other document or take any other action or shall generally authorize any action without specifying the officer or officers authorized to take such action, any proper officer acting alone and without counter signatures may take such action on behalf of the Corporation.

## ARTICLE V

## Committees of the Board of Directors

Section 1.    General Provisions.   Committees of the Board of Directors shall be standing or special.   The following shall be Standing Committees:

(a)   Executive Committee;
(b)   Finance and Personnel Committee;
(c)   Facilities Committee;
(d)   Professional Affairs Committee; and
(e)   Strategic Planning Committee.

Except as herein otherwise provided, the Chairman of the Board of Directors shall appoint the members of said committees, and the chairmen thereof.   Each committee chairman and each committee member shall serve in such capacity for a one-year period or until the next committee appointments are made by the Chairman of the Board.

All committees shall be subject to the control and general supervision of the Board.   Each committee shall meet as required and as set by policy of the Board.

Special ad hoc committees may be appointed for any special tasks, or as circumstances may warrant, at the discretion of the Board or the Chairman of the Board.   They shall limit their activities to that task for which the committee was organized and will have no authority to act except as specifically conferred upon them by the Board or Chairman of the Board.

One-half of the committee members shall constitute a quorum for the carrying out of the committee functions and actions.   Any vacancy on the committee may be filled by the Chairman of the Board.

The Chairman of the Board and the President/Chief Executive Officer of the Corporation shall each be an ex-officio member of all committees without vote except for those committees where the Chairman of the Board and/or the President/Chief Executive Officer of the Corporation is (are) required by these Bylaws to be a member in which case each such party shall have a vote.

5

Section 2.  Attendance.  Any committee chairman or committee member, except an ex-officio committee member, who fails to attend three committee meetings during the fiscal year without the committee excusing such absence shall create a vacancy of that person's membership on the committee.

Section 3.  Committee Chairman's Duties.  The chairman of each committee, who shall be a member of the Board of Directors, shall have the following general duties, responsibilities and powers, together with such others as may be designated from time to time by the Board of Directors:

(a)  Coordinate committee activities through the designated management liaison;

(b)  Prepare an agenda for each committee meeting;

(c)  Preside or designate an alternate to preside at committee meetings;

(d)  Provide for maintenance of official records of the committee and appoint a secretary of the committee for that purpose;

(e)  Report committee activities and formal recommendations to the Board at its regular meetings;

(f)  Delegate specific responsibilities among committee members; and

(g)  Appoint members to subcommittees as necessary.

Section 4.  Executive Committee.  The Executive Committee shall consist of the Chairman of the Board, the President/Chief Executive Officer of the Corporation, and three other members of the Board of Directors appointed by the Chairman of the Board of Directors.

The Executive Committee shall have the power to transact all regular business of the Corporation, and shall have and exercise all the powers of the Board during the interim between the regular monthly meetings of the Board of Directors, provided that any action taken shall not conflict with the policies established by the Board.  The Executive Committee shall also have the duty and responsibility to develop and recommend to the Board necessary or desirable policies relating to the organization and operation of the Corporation.  The Executive Committee shall from time to time: (i) formulate and recommend to the Board policies designed to promote and maintain the good will of patients in the Hospital; (ii) promote and maintain general public interest in and support of the Corporation; and (iii) develop and maintain adequate fund raising support in the community.

Section 5.  Finance and Personnel Committee.  The Finance and Personnel Committee shall consist of a minimum of three members of

6

the Board of Directors appointed by the Chairman of the Board of Directors.

The Finance and Personnel Committee shall be responsible for devising ways and means to secure funds for the support of the Corporation, shall attend to all financial interests of the Corporation and shall report its actions to the Board of Directors.

The Finance and Personnel Committee shall examine the Corporation's monthly financial report and require an explanation from the President/ Chief Executive Officer or the Treasurer/Chief Financial Officer if there has been any material variation from the budget.

Prior to the beginning of the fiscal year, the Finance and Personnel Committee shall cause to be prepared a detailed budget for the operation of the Corporation for the ensuing fiscal year. This budget shall show the estimated revenue and estimated expenditures and shall be submitted for discussion and approval to the Board at its next regular monthly meeting.

The Finance and Personnel Committee shall recommend to the Board of Directors an independent firm of certified public accountants to conduct an annual audit, shall receive the audit, and shall report its findings to the Board.

The Finance and Personnel Committee shall be responsible for the management of all endowment and trust funds belonging to the Corporation.

The Finance and Personnel Committee shall be responsible for the formulation, budgeting and implementation of the Hospital's policies regarding provision of medical services to indigent residents of Doughterty County.

The Finance and Personnel Committee shall be responsible for the formulation of the personnel policies of the Corporation. The Finance and Personnel Committee shall recommend salaries and wage ranges and shall study workers' compensation, employment practices, fringe benefits, employee health services, human relations, pension plans and policies relative to personnel who work for the Corporation. The Finance and Personnel Committee shall work with the President/Chief Executive Officer of the Corporation in evaluating such personnel policies. In the event the Corporation shall become involved in collective bargaining, the Finance and Personnel Committee shall study the collective bargaining agreement and may serve as the negotiating party in collective bargaining agreements.

Section 6. Facilities Committee. The Facilities Committee shall consist of a minimum of three members of the Board of Directors appointed by the Chairman of the Board of Directors.

The Facilities Committee shall keep the Board of Directors informed as to the condition of the physical plant of the Hospital including all real and personal property of the Hospital. The

7

Facilities Committee shall also study and recommend policies concerning major Hospital additions, alternatives, repairs and maintenance.

    Section 7. <u>Professional Affairs Committee</u>.  The Professional Affairs Committee shall consist of at least three members and shall include such members of the Board of Directors and such members of the Medical Staff of the Hospital as shall be appointed by the Chairman of the Board of Directors.

The Professional Affairs Committee shall:

    (a)  Act as a liaison group between the Board of Directors, the President/Chief Executive Officer, and the Medical Staff;

    (b)  Discuss matters of a medical-administrative nature that may be brought to its attention; and

    (c)  Make such recommendations as it may deem in the best interest of the Corporation.

    Section 8. <u>Strategic Planning Committee</u>.  The Strategic Planning Committee shall consider future strategy for the Corporation, and shall formulate written long range goals and objectives.  The Strategic Planning Committee shall attempt to be aware of all developments in the health care field and trends in society, and predict the effect of such developments and trends on the Corporation.  A principal function of the Strategic Planning Committee shall be the development of a written statement describing the Corporation's specific role in the community in relation to all other health care facilities.  The Strategic Planning Committee shall recommend to the Board of Directors a strategic plan which will enable the Corporation to adapt more readily to future conditions, to prepare for changes, and to select courses of action relative to the established goals.  The Strategic Planning Committee shall:

    (a)  Develop a framework for orderly decision making through the development of plans through which: (i) areas of need and opportunity are defined and analyzed; (ii) general goals related to such needs are established; (iii) alternative courses of action are identified and selected; and (iv) provisions for implementation of the plan of action and evaluation of the effect of the chosen plan are made.  The overall plan shall coordinate services with other health care facilities and programs.  Plans to provide or expand a specific service should be developed only when it has been determined that the proposed program represents the most effective available method for defining and meeting health care needs;

    (b)  Ensure that all recommendations coming from this and other committees are consistent with the Corporation's defined role; facilitate achievement of its goals and objectives; and follow the strategic plan.  It is the

8

continuing obligation of the Strategic Planning Committee to assist the Corporation in maintaining its plan (or strategy) and in changing the plan as new factors and conditions dictate; and

(c) Develop a sense of priorities in its examination of issues and projects so that the Corporation's resources of time and money are spent on those projects which achieve the defined role of the Corporation in the community.

The Strategic Planning Committee shall consist of a minimum of three (3) members of the Board of Directors appointed by the Chairman of the Board of Directors.

Section 9.  Special Committee.  Special committees shall be appointed by the Chairman of the Board of Directors from the members of the Board from time to time as circumstances warrant. Special committees shall have no power to act unless such power is specifically set forth by action of the Board of Directors.

## ARTICLE VI

### Officers of the Corporation

Section 1.  General Provisions.  The Officers of the Corporation shall consist of a President/Chief Executive Officer, a Vice President or Vice Presidents, a Secretary and a Treasurer/Chief Financial Officer, each of whom shall be elected by, and shall serve at the pleasure of, the Board of Directors. Each Officer shall be elected or appointed for a term of office running until the next annual meeting of the Board of Directors or such shorter term as may be provided by (i) resolution of the Board of Directors or (ii) the appointment to office.  Each Officer shall serve during the term of office for which he or she is elected or appointed and until his or her successor has been elected or appointed and has qualified, or until his or her earlier resignation, removal from office or death.

Any two offices may be held by the same person, except that the following pairs of offices may not be held by the same person: President and Vice President; President and Secretary; President and Treasurer.

Section 2.  Removal.  Any Officer may be removed from office, with or without cause, upon the majority vote of the Directors present at any meeting of the Board of Directors at which a quorum is present.

Section 3.  President/Chief Executive Officer.  The President/ Chief Executive Officer shall be given the necessary authority and be held responsible for supervision of the total administration of the Corporation in all its activities and departments, subject only to such policies as may be adopted or issued by the Board or by any of its committees to which the Board has delegated power for such

9

action.  He or she shall act as the duly authorized representative of the Board of Directors in all matters in which the Board of Directors has not formally designated some other person for that specific purpose.  The President/Chief Executive Officer shall be a member of the Board of Directors and a member of the Executive Committee of the Board.

Section 4.  Duties of President/Chief Executive Officer.  The authority and duties of the President/Chief Executive Officer shall include among other things:

(a)   Carrying out all policies established by the Board of Directors and formulating and enforcing all rules and regulations necessary and desirable for the proper conduct of the Corporation;

(b)   Perfecting and submitting to the Board of Directors for approval a plan of organization of the personnel and others concerned with the operation of the Corporation;

(c)   Assisting the Secretary of the Corporation with all the duties assigned to the Secretary and assuring that all notices are given in accordance with these Bylaws or as required by law;

(d)   Selecting, employing, controlling and discharging all employees, and developing and maintaining personnel policies and practices for the Hospital;

(e)   Ensuring that all physical properties of the Corporation are kept in a good state of repair and operating condition;

(f)   Making and executing all contracts pertaining to the ordinary affairs and operations of the Corporation, except as to the execution of those contracts specifically reserved to the Board;

(g)   Supervising all business affairs; and ensuring that all funds are collected and expended to the best possible advantage of the Corporation;

(h)   Working with the Medical Staff and with all those concerned with the rendering of professional service to the end that the best possible care may be rendered to all the patients of the Hospital;

(i)   Serving as the liaison officer and channel of communication between the Board of Directors or any of its committees and the Medical Staff or all other organizations working on behalf of the Corporation;

(j)   Attending all meetings of the Board of Directors and the Executive Committee of the Board; and

10

**EXHIBIT F - 124**

(k)  Performing any other duty that may be necessary in the best interest of the Corporation or that the Board of Directors shall require.

Section 5.  Vice President(s).  The Vice President(s) shall have such authority, duties and responsibilities as the Board of Directors shall direct and assign to him or her (them) from time to time.

Section 6.  Secretary.  The Secretary shall attend all meetings of the Board of Directors; shall keep minutes of all meetings of the Board of Directors; shall have charge of the corporate books and seal of the Corporation; and shall perform such other duties and have such other powers as may from time to time be delegated to him or her by the Board of Directors.

Section 7.  Treasurer/Chief Financial Officer.  The Treasurer/ Chief Financial Officer shall be charged with the management of all financial affairs of the Corporation not delegated by these Bylaws to the Finance and Personnel Committee of the Board of Directors; shall have the power to recommend action concerning the Corporation's affairs to the Board of Directors and to the Finance and Personnel Committee of the Board of Directors; and shall perform such other duties and have such other powers as may from time to time be delegated to him or her by the Board of Directors.

In addition to the foregoing duties and without limitation thereof, the Treasurer/Chief Financial Officer shall:

(a)  Prepare an annual budget showing, but not limited to, anticipated revenue and expenditures; be responsible for all funds and securities of the Corporation; and receive and give receipts for monies due and payable to the Corporation from any source whatever and deposit all such monies in the name of the Corporation in such banks or other depository as shall be selected in accordance with the Bylaws;

(b)  Submit regularly to the Board of Directors, or its authorized committees, periodic reports showing the financial activities of the Corporation; and prepare and submit such special reports as may be required by the Board of Directors; and

(c)  Keep and maintain an up-to-date inventory of all property and equipment (including medical) owned or leased by the Corporation.

Section 8.  Assistant Officers.  Assistants to the Vice President(s), Secretary and Treasurer/Chief Financial Officer may be elected by the Board of Directors and shall perform such duties and have such powers as shall be delegated to them from time to time by the Board of Directors.

11

EXHIBIT F - 125

## ARTICLE VII

### Medical Staff

Section 1. Acceptance of Current Medical Staff. The staff of
physicians practicing at the Hospital and the Bylaws and rules for
such staff, as in effect at the time of adoption of these Bylaws,
are hereby adopted as the Medical Staff and as the Bylaws of such
Medical Staff, subject to review, amendment and final approval by
the Board.

Section 2. Subsequent Changes to the Medical Staff. The
Board of Directors shall hereafter appoint the Medical Staff of the
Hospital in accordance with the Bylaws and rules to be adopted by
such Medical Staff and which Bylaws shall be in accordance with
recommendations of the Joint Commission on Accreditation of
Healthcare Organizations, which provide, among other things, for
the method of appointing additional staff members and for the
removal of staff members and which Bylaws and any amendments
thereto shall be subject to approval by the Board of Directors.

## ARTICLE VIII

### Hospital Rules and Regulations

Such rules and regulations as are necessary for the efficient
operation of the Hospital shall be adopted by the Board of
Directors after receiving the recommendations of the Medical Staff
and the President/Chief Executive Officer of the Corporation. The
initial rules and regulations shall be the rules and regulations in
effect at the Hospital on the date of the adoption of these Bylaws.

## ARTICLE IX

### Conflicting Regulations

No charters, constitutions, bylaws, rules, provisions or
regulations of any organization operating as a part of the
Corporation or as an agency thereof (including the Medical Staff,
the Hospital, any nursing organization or related organizations),
shall be in conflict with or repugnant or contrary to these Bylaws
or to the Articles of Incorporation of the Corporation or to the
laws of the State of Georgia or of the United States.

## ARTICLE X

### Amendments

These Bylaws shall be reviewed at least bi-annually and, if
necessary, may be amended, subject to the restrictions set forth in
Article XI of the Articles of Incorporation of the Corporation, by
an affirmative vote of a majority of the voting membership of the

12

**EXHIBIT F - 126**

Board of Directors present at the regular monthly meeting or any special meeting of the Board of Directors.

## ARTICLE XI

### Indemnification by Corporation

Section 1. Indemnification. Any person (including the heirs, executors, administrators or estate of such person) who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (including any action by or in the right of the Corporation), by reason of the fact that he or she is or was a Director or officer of the Corporation, or is or was serving at the request of the Corporation as a director or officer of another corporation, partnership, joint venture, trust or other enterprise, shall be indemnified by the Corporation against expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action, suit or proceeding, if he or she acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Corporation (and with respect to any criminal action or proceeding, if he or she had no reasonable cause to believe his or her conduct was unlawful), to the maximum extent permitted by, and in the manner provided by, the Georgia Nonprofit Corporation Code.

Section 2. Insurance. The Corporation may purchase and maintain insurance at its expense, to protect itself and any such person against any such liability, cost, payment or expense, whether or not the Corporation would have the power to indemnify such person against such liability.

## ARTICLE XII

### Corporate Seal

The Corporation's Board may provide for a corporate seal in such form and with such inscription as it shall determine, provided such seal shall always contain the word "Non-profit".

13

## SECRETARY'S CERTIFICATE

This is to certify that the foregoing Bylaws of the Corporation were duly adopted by the Board of Directors of the Corporation on the ＿＿ day of December, 1990.

IN WITNESS WHEREOF, the undersigned, duly appointed and acting Secretary of the Corporation, has signed this Certificate and affixed the seal of the Corporation this ＿＿ day of December, 1990.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Secretary

[CORPORATE SEAL]

DGC\Phoebe\009

14

## ARTICLE XIII

### Waiver of Notice

Whenever any notice is required to be given under the provisions of the Georgia Nonprofit Corporation Code, of the Articles of Incorporation, or of these Bylaws, a waiver thereof in writing signed by the person entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice where such waiver is permitted by State law. All waivers shall be filed with the corporate records, or shall be made a part of the minutes of the relevant meeting.

DGC\Phoebe\066.PPH

14

EXHIBIT F - 129

EXHIBIT "A"

## AMENDMENT TO LEASE AND TRANSFER AGREEMENT
## BETWEEN
## HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA
## AND
## PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.

THIS AMENDMENT (this "Amendment") amends the Lease and Transfer Agreement between the HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA (the "Hospital Authority" or "Transferor") and PHOEBE PUTNEY MEMORIAL HOSPITAL, INC. ("PPMH" or "Transferee") dated as of December 11, 1990.

### WITNESSETH:

WHEREAS, the parties hereto have mutually benefited from the provisions of the Lease and Transfer Agreement and therefore mutually desire to extend the length of such Agreement; and

WHEREAS, it is contemplated that the Hospital Authority, during the term of the Lease and Transfer Agreement, will find it necessary or beneficial to borrow funds for the operation of the Existing Facilities (as that term is defined in the Lease and Transfer Agreement), in addition to those borrowings which are referenced in the current definition of "Bonds" set forth in the Lease and Transfer Agreement;

NOW, THEREFORE, in consideration of the premises set forth herein and in the Lease and Transfer Agreement, it is agreed as follows:

1.    Section 10.23 of the Lease and Transfer Agreement entitled Termination is hereby amended to read as follows: "Unless sooner terminated in accordance with the provisions hereof, this Agreement shall terminate on July 31, 2041."

2.    The definition of the term Bonds in Article I of the Lease and Transfer Agreement is hereby amended to read as follows: "Bonds" means, collectively, the $9,775,000.00 Hospital Authority of Albany-Dougherty County, Georgia Refunding

Revenue Anticipation Certificates Series 1990B, the $29,600,000.00 Hospital Authority of Albany-Dougherty County, Georgia Revenue Anticipation Certificates Series 1990C, and any other Revenue Anticipation Certificates which may hereafter be issued by Transferor during the term of this Agreement, pursuant to the Bond Indentures."

3.     The definition of the term <u>Bond Indentures</u> in Article I of the Lease and Transfer Agreement is hereby amended to read as follows: "<u>Bond Indentures</u>" means that certain Trust Indenture dated as of October 1, 1990 between Transferor and Trust Company Bank, as Trustee, as supplemented by that certain Supplemental Trust Indenture dated as of November 1, 1990 between Transferor and Trust Company Bank, as Trustee, and any other Trust Indentures which may hereafter be executed by Transferor during the term of this Agreement.'

4.     All other provisions of the Lease and Transfer Agreement, to the extent not amended herein, shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed under seal as of the 14th day of March, 2002.

<div style="margin-left: 40%;">

HOSPITAL AUTHORITY OF ALBANY-
DOUGHERTY COUNTY, GEORGIA

By: _____ (SEAL)
Title: Vice Chairman

Attest: _____

</div>

Signed, sealed and delivered
in the presence of:

_____
Unofficial Witness

_____
Notary Public
My Commission expires: July 5, 2004
(NOTARY SEAL)

[Signatures continued on following page]

**EXHIBIT F - 131**

PHOEBE PUTNEY MEMORIAL
HOSPITAL, INC.

By: _____ (SEAL)
Title: _Chairman_

Attest: _____

Signed, sealed and delivered
in the presence of:

_____
Notary Public
My Commission expires: July 5, 2004
(NOTARY SEAL)

APR-10-02   14:40   FROM-administration                              12293124115        T-420  P.005/005  F-270

PHOEBE PUTNEY MEMORIAL
HOSPITAL, INC.

By:                                              (SEAL)
Title: Chairman

Attest:

Signed, sealed and delivered
in the presence of:

Notary Public
My Commission expires: July 5, 2004
(NOTARY SEAL)

11/04/2004 09:29 FAX                                                                          ☑001/004

### RESOLUTION OF THE HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA AUTHORIZING THE EXECUTION AND DELIVERY OF AN AMENDMENT TO LEASE AND TRANSFER AGREEMENT BETWEEN THE AUTHORITY AND PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.

WHEREAS, the Hospital Authority of Albany-Dougherty County, Georgia (the "Authority") is engaged in the issuance of new revenue anticipation bonds in connection with certain capital improvement projects being undertaken by Phoebe Putney Memorial Hospital, Inc. (the "Bond Financing"), all as is more particularly described in a separate Resolution of this Board of even date herewith; and

WHEREAS, the parties to that certain Lease and Transfer Agreement, dated as of December 11, 1990 (as same may have been subsequently amended, the "Lease") have determined to amend the Lease in order to accommodate the parameters of the Bond Financing; and

WHEREAS, the Authority has found that so amending the Lease in connection with the Bond Financing will further facilitate the provision of adequate and improved healthcare for the citizens of Albany-Dougherty County, Georgia and surrounding areas, and that it is necessary and appropriate for the Authority to provide for the amendment of the Lease.

NOW THEREFORE, BE IT RESOLVED BY THE HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA, AND IT IS HEREBY SO RESOLVED, AS FOLLOWS:

1.  Approval of Amendment to Lease. The execution and delivery of the Amendment to Lease and Transfer Agreement between Hospital Authority of Albany-Dougherty County, Georgia and Phoebe Putney Memorial Hospital, Inc. (the "Amendment"), which Amendment shall be substantially in the form attached hereto as Exhibit "A", subject to such minor changes, insertions, and omissions as may be approved by the Chairman or Vice-Chairman of the Authority, is hereby authorized, and the execution of said Amendment by the Chairman or Vice-Chairman and Secretary or Assistant Secretary of the Authority shall be conclusive evidence of such approval.

2.  Incidental Action. The Chairman or Vice-Chairman and Secretary or Assistant Secretary of the Authority are hereby authorized to take any and all further action and to execute and deliver any and all further documents as may be necessary or appropriate to carry out the purposes of the Amendment. Any actions previously taken in this regard by the above-referenced officers are hereby ratified and approved.

Adopted March 13, 2002

HOSPITAL AUTHORITY OF ALBANY-
DOUGHERTY COUNTY, GEORGIA

BY: _____ (SEAL)
Its Secretary

{SEAL}

**EXHIBIT F - 134**

SECOND AMENDMENT TO LEASE AND TRANSFER AGREEMENT
BETWEEN
HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA
AND
PHOEBE PUTNEY MEMORIAL HOSPITAL, INC.

THIS SECOND AMENDMENT (this "Second Amendment") amends the Lease and Transfer Agreement between the HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, GEORGIA (the "Hospital Authority" or "Transferor") and PHOEBE PUTNEY MEMORIAL HOSPITAL, INC. ("PPMH" or "Transferee") dated as of December 11, 1990 (hereinafter the "Lease").

WITNESSETH:

WHEREAS, the parties hereto have mutually benefited from the provisions of the Lease and therefore mutually desire to make certain limited modifications to provisions of the Lease concerning Affiliates and insurance, as well as to extend the length of the Lease; and

WHEREAS, Phoebe Putney Health System, Inc., ("PPHS" or "Parent Affiliate") is the sole member of Phoebe Sumter Medical Center, Inc., a Georgia nonprofit corporation ("PSMC") and PSMC intends to enter into a forty (40) year lease and transfer agreement with Americus and Sumter County Hospital Authority for PSMC to lease and operate what is as of the date of this Second Amendment known as "Sumter Regional Hospital", a licensed Georgia hospital, owned by the Americus and Sumter County Hospital Authority; and

WHEREAS, PPHS will contribute a minimum of $25,000,000.00 to PSMC for the construction of a new hospital in Sumter County, physician development for Sumter County and payment of certain liabilities of the Americus and Sumter County Hospital Authority and PPHS will guaranty PSMC's financial obligations and financial commitments under the lease and transfer agreement with the Americus and Sumter County Hospital Authority; and

WHEREAS, upon termination of the lease and transfer agreement with the Americus and Sumter County Hospital Authority all assets owned, leased or held by PSMC will revert to the Americus and Sumter County Hospital Authority; and

WHERAS, to avoid disruption and confusion, as well as for ease of administration it is desirable to have the term of the lease and transfer agreement between the Americus and Sumter County Hospital Authority and PSMC be as concurrent as possible with the term of the Lease, and regardless of the length of the term of the lease and transfer agreement between the Americus and Sumter County Hospital Authority and PSMC it is contemplated that the Hospital Authority, during the term of the Lease, will find it necessary or beneficial to borrow funds for the operation of the Existing Facilities (as that term is defined in the Lease), in addition to those borrowings which are referenced in the current definition of "Bonds" set forth in the Lease;

NOW, THEREFORE, in consideration of the premises set forth herein and in the Lease, it is agreed as follows:

1.    The fourth paragraph of the section of Lease entitled Background is hereby amended to read as follows:

The restructuring plan adopted by the Transferor also retains such public control of the Hospital as is contemplated by the Hospital Authorities Law to ensure continued fulfillment of the Hospital's public mission of providing quality health care at a reasonable cost to the residents of Dougherty County. A substantial inducement for Transferor's approval of the plan of restructuring, implementation of the restructuring of the Hospital and the execution of this Agreement is the promise of Transferee, on behalf of itself and any future affiliated entities including the contemplated parent corporation, that upon the expiration or earlier termination of this Agreement except as set forth in Section 5.05(b) of this Agreement, all assets of Transferee and its parent affiliate, including the assets of their respective affiliates, shall be distributed to

2

Transferor and become Transferor's property absolutely, and Transferee and its parent affiliate and other affiliates shall thereafter be dissolved.

    2.     The definition of the term "<u>Affiliate</u>" in Article I of the Lease is hereby amended to read as follows:

"<u>Affiliate</u>" means a corporation, limited or general partnership, joint venture, limited liability company, limited liability partnership, limited liability limited partnership, business trust or similar entity organized under the laws of the State of Georgia or any foreign jurisdiction: (a) which controls, or which is controlled, directly or indirectly, by, Transferee, Parent Affiliate (as defined in Section 4.16 hereof), or another Affiliate; or (b) a majority of the members of the Directing Body of which are also members or directors of the Board of Directors of the Transferee and constitute a majority of the members or directors of the Board of Directors of the Transferee. For the purposes of this definition, control means with respect to: (a) a nonprofit corporation not having stock whose board of directors is not self perpetuating, the power to elect or appoint, directly or indirectly, a majority of the Directing Body of such corporation ; (b) a nonprofit corporation not having stock with a self perpetuating board, that such nonprofit corporation was created through the action of Transferee, Parent Affiliate, or another Affiliate, or through the will or action of the Directing body of Transferee, Parent affiliate, or another Affiliate; (c) a corporation having stock, the ownership, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the directors of such corporation; (d) a general or limited partnership, the ownership of a majority of the general partners' interest in the partnership; (e) any other entity, the power to direct the management of such entity through the ownership of at least a majority of its voting securities or the right to designate or elect at least a majority of its Directing Body, by contract or otherwise. For the purposes of this definition, "Directing Body" means: (a) with respect to a nonprofit corporation not having stock, such corporation's members if members have complete

3

discretion to elect the corporation's directors, or the corporation's directors if the corporation's members do not have such discretion; (b) with respect to a corporation having stock, such corporation's board of directors and the owners, directly or indirectly, of more than 50% of the securities (as defined in Section 2(1) of the Securities Act of 1933, as amended) of any class or classes, the holders of which are ordinarily, in the absence of contingencies, entitled to elect a majority of the corporation's directors (both of which groups shall be considered a Directing Body); (c) with respect to a general or limited partnership, the holders of a majority of the general partners' interest in the partnership; and (d) with respect to any other entity, its governing board or body. For the purposes of this definition, all references to directors and members shall be deemed to include all entities performing the function of directors or members however denominated.

3.     The definition of the term "JCAHO" in Article I of the Lease is hereby amended to read as follows:

"Joint Commission" means the Joint Commission.

4.     Section 4.10 of the Lease entitled License and Accreditation is hereby amended to read as follows:

Transferee will procure and maintain in good standing a license from the State of Georgia to operate the Hospital as a hospital. Transferee will cause the Hospital to have Joint Commission accreditation or similar accreditation by another nationally approved and recognized accrediting body throughout the term of this Agreement, or in the event that such accreditation is superseded, accreditations by comparable and federally recognized standards which provide for third party payor authorization, Transferee shall cause the Hospital to obtain in a reasonable period of time such other accreditation; provided, however, that Transferor may waive this requirement if the Board of Directors of Transferee shall have determined in good

4

faith, evidence by a resolution of said Board, that such compliance is not in the Transferee's best interest and that lack of such compliance would not materially impair its ability to make the Requirement Payments hereunder.

5.    Section 4.16 of the Lease  entitled <u>Implementation of Parent Holding Company Structure</u> is hereby amended to read as follows:

Subsequent to the Commencement Date, and as soon as an appropriate private letter ruling can be obtained from the Internal Revenue Service, Transferee shall implement the creation of a parent holding company structure for its operations of the Hospital, including the creation of an Affiliate which controls Transferee (the "Parent Affiliate") and any other Affiliates controlled by the Transferee, the Parent Affiliate, or other Affiliates, provided that primary operations at the Hospital shall be retained by Transferee.  Except as set forth in Section 5.05 (b) of this Agreement, Transferee and/or Parent Affiliate must cause to be included and continuously maintained in the organizational document of any Affiliate a provision stating that: (A) upon the first to occur of either dissolution of such Affiliate or dissolution of Parent Affiliate all Interest in the Affiliate shall ultimately revert to Transferee, provided further such reversion may be provided for by reversion to one or more other Affiliates and/or the Parent Affiliate and (B) that upon the first to occur of either dissolution of Transferee or termination of this Agreement, all of Transferee's Interest in all such Affiliates (inclusive of the Parent Affiliate) shall revert to Transferor.    For the purposes hereof, the term "Interest" shall mean the right to receive assets in liquidation, the right to receive profits (if applicable), the right to appoint the membership and/or Board of Directors of the Affiliate (if any), and any and all ownership, equity, contractual, or other rights created or defined by the Affiliate's organizational documents or otherwise. Prior to initial implementation of such parent holding company structure, the Parent Affiliate must execute an Agreement To Be Bound in the form of <u>Exhibit "G"</u> attached hereto.  Also, prior to initial implementation of such parent holding company structure, Transferee shall obtain a private letter ruling from the Internal Revenue Service that the implementation of such structure

5

will not affect the tax-exempt status of Transferee. The initial Articles of Incorporation and Bylaws of Transferee's Parent Affiliate are attached hereto as Exhibit "H" and Exhibit "I", respectively, and have been approved by Transferor.

To assure Transferor that the persons serving on the Board of Directors of Transferee as of the Commencement Date and on the Board of Directors of Transferee's Parent Affiliate on the date of implementation of such parent holding company structure as discussed in this Section 4.16 will be known to it, Transferee and Transferor agree to the conditions set forth in the Articles of Incorporation and Bylaws of both the Transferee and the Parent Affiliate, respectively, which are attached hereto and made a part hereof for determining such board membership.

After formation of the Parent Affiliate and receipt of an appropriate private letter ruling from the Internal Revenue Service, the Articles of Incorporation and Bylaws of the Transferee shall be amended so as to provide that: (1) the Parent Affiliate shall be the sole member of the Transferee; (2) all vacancies on the Board of Directors of the Transferee shall be filled by the Board of Directors of the Parent Affiliate; and (3) the Transferee may not take any of the following actions without the prior approval of the Parent Affiliate:

(a)    Adopt a plan of dissolution of the Transferee;

(b)    Authorize the Transferee to engage in, or enter into, any transaction providing for the sale, mortgage or other disposition of all or substantially all of the assets of the Transferee;

(c)    Adopt a plan of merger or consolidation of the Transferee with another corporation;

(d)    Adopt any annual or long-term capital and operational budgets of the Transferee or approve any changes therein exceeding ten percent (10%) of any budgeted item;

6

(e)  Amend or take any action to terminate any lease between the Transferee and the Authority with respect to the Hospital;

(f)  Take any action which would, or reasonably could be expected to, cause the Transferee to exceed its annual budget for capital expenditures;

(g)  Incur an expenditure for any particular project or service of or for the Transferee in an amount in excess of $1,000,000;

(h)  Take any action which would, or reasonably could be expected to, result in an adverse variance (on an annualized basis) of total expenses of greater than 2% of total annual budgeted expenses;

(i)  Appoint or remove the independent auditors of the Transferee;

(j)  Select or remove the President/Chief Executive Officer of the Transferee;

(k)  Adopt or permit any changes to any long-term, strategic or master institutional plans of the Transferee; or

(l)  Amend the Articles of Incorporation or bylaws of Transferee.

6.    Section 4.20 of the Lease  entitled <u>Financial Books and Records</u> is hereby amended to read as follows:

Transferee shall install and maintain proper books of record and account of all business and affairs of Transferee, in which full and correct entries shall be made in accordance with generally accepted accounting principles.  Transferee will deliver to Transferor, within ninety (90) days after the end of each Fiscal Year, a financial report for such Fiscal Year, a statement of changes in financial position of Transferee for such Fiscal Year and a statement of revenues and expenses of Transferee for such Fiscal Year.  Such report shall be audited by a firm of Independent Accountants and shall contain their opinion as to whether the report fairly presents the results of operations and was prepared in accordance with generally accepted accounting principles, applied on a consistent basis.

7

7.    Section 5.02 of the Lease entitled <u>Covenant Against Unauthorized Disposition</u> is hereby amended to read as follows:

Except as otherwise provided in this Article V or elsewhere in this Agreement, neither the Existing Facilities, nor the Operating assets, nor any Property may be disposed of by Transferee, Parent Affiliate, or any other Affiliate unless such disposition is either in the ordinary course of business or the prior written consent of Transferor has been obtained.  Transferee shall maintain accurate records of the location of, and any transfers with respect to, the Existing Facilities, the Operating Assets or Property.  For the purposes of this Article V, the term "dispose of" means to transfer, assign, contribute, sell, lease, or sublease.

8.    Section 5.05 of the Lease  entitled <u>Transfers to Affiliates</u> is hereby amended to read as follows:

(a)    Notwithstanding the other provisions of this Agreement and except as set forth ins Section 5.05 (b) below, Transferee, Parent Affiliate, and any other Affiliate shall have the right to make dispositions of Property (including, without limitation, Real Property and nonrestricted gifts, grants and contributions) to an Affiliate so long as the organizational documents of such Affiliate provide that: (A) upon the first to occur of either dissolution of such Affiliate or dissolution of Parent Affiliate all Interest in the Affiliate shall ultimately revert to Transferee, provided further such reversion may be provided for by reversion to one or more other Affiliates and/or the Parent Affiliate and (B) that upon the first to occur of either dissolution of Transferee or termination of this Agreement, all of Transferee's Interest in all such Affiliates (inclusive of the Parent Affiliate) shall revert to Transferor.    For the purposes hereof, the term "Interest" shall mean the right to receive assets in liquidation, the right to receive profits (if applicable), the right to appoint the membership and/or Board of Directors of the Affiliate (if any), and any and all ownership, equity, contractual, or other rights created or defined by the Affiliate's

8

organizational documents or otherwise. Except as set forth in Section 5.05(b) below Transferee and Parent Affiliate shall cause any investment by Transferee or Parent Affiliate or any Affiliate in any corporation, limited or general partnership, joint venture, limited liability company, limited liability partnership, limited liability limited partnership, business trust or similar entity that does not otherwise meet the definition of an Affiliate to provide for an appropriate mechanism to liquidate, sell or redeem such investment upon the termination of this Agreement or upon the dissolution of Transferee, Parent Affiliate or the Investing Affiliate.    Notwithstanding the foregoing, without the prior written consent of Transferor, the Transferee shall not dispose of to any person (whether or not an Affiliate) either: (i) all of the Operating Assets or the Existing Facilities; or (ii) so substantial a part of the Operating Assets or the Existing Facilities as would remove Transferee from direct involvement with the day to day operations of the Hospital.

(b)    Notwithstanding any other provision of this Agreement, in the event an Affiliate of Parent Affiliate (other than Transferee) enters into a lease or other agreement with a public body corporate and politic which is an instrumentality of the State of Georgia, organized and existing under the Georgia Hospital Authorities Act, O.C.G.A. §§ 31-7-70 *et seq.* as amended, (other than Transferor), then Transferee or Parent Affiliate shall have the right to: (A) make investments in or dispositions of Property to, excluding, however, from Property that may be transferred to such Affiliate any Real Property of Transferee, Parent Affiliate or an Affiliate located in Dougherty County, Georgia or Worth County, Georgia, but including within Property that may be transferred to such Affiliate, without limitation, nonrestricted gifts, grants and contributions and (B)Transferee or Parent Affiliate may enter into any other agreements, including financial

9

guaranties, necessary to enable such Affiliate to perform the terms of its agreements provided: (i) Transferor has been given prior written notice of the intention of such Affiliate to enter into such lease or other agreement; (ii) Transferor has been given a copy of the proposed lease or other agreement in substantially final form together with written description of the general terms of the lease or other agreement prior to its execution; (iii) the organizational documents of such Affiliate provide that upon dissolution of such Affiliate or upon termination of the lease or other agreement, all the assets owned or held by such Affiliate shall be returned to such other public body corporate and politic which is an instrumentality of the State of Georgia, organized and existing under the Georgia Hospital Authorities Act, O.C.G.A. §§ 31-7-70 *et seq.* as amended, and (iv) Transferor approves such Affiliate's execution of the lease or other agreement by a duly adopted resolution setting forth therein Transferor's basis and reasons for such approval. Provided items (i) through (iv) above occur, then the governing documents of such Affiliate shall not contain provisions requiring such Affiliate to liquidate, sell or redeem such dispositions or investments upon the termination of this Agreement or upon the dissolution of Parent Affiliate or any other Affiliate of Transferee  and upon termination of this Agreement the interests of Transferee or Parent Affiliate in such Affiliate shall not revert to Transferor and Transferor shall have no right, title, claim or interest in and to such Affiliate or the assets owned or held by such Affiliate and  Transferee and Parent Affiliate shall not be in violation of Section 5.05(a) of this Agreement nor any other similar provision of this Agreement with regard to such Affiliate.  In the event Affiliate shall enter into an amendment of the lease or other agreement previously provided Transferor under (ii) above, then a copy of the proposed amendment and the rationale for same shall be filed with Transferor no later than

10

10 days before its execution and Transferor after reviewing same shall determine if any further action on the part of Transferor is necessary before said amendment becomes effective. Notwithstanding anything to the contrary in the foregoing, without the prior written consent of Transferor, the Transferee shall not dispose of to any person (whether or not an Affiliate) either: (i) all of the Operating Assets or the Existing Facilities; or (ii) so substantial a part of the Operating Assets or the Existing Facilities as would remove Transferee from direct involvement with the day to day operations of the Hospital.

9.    Section 6.01(a) of the Lease  entitled _Insurance_ is hereby amended to read as follows:

(a)    Transferee covenants and agrees that it shall, during the term of this Agreement, keep and maintain at all times insurance (in such amounts and with such deductibles as shall be comparable to coverage carried by institutions similar to Transferee:

(1)    fire, with uniform standard extended coverage endorsements, flood and crime, vandalism and malicious mischief insurance, as may be approved for issuance in the State, including insurance against loss or damage from lightning, windstorm, civil commotion, aircraft vehicles and smoke, covering the Hospital at all times in an amount not less than the full insurance value thereof;

(2)    insurance coverage of boilers, pressure vessels, auxiliary piping and selected machinery objects (pumps and compressors);

(3)    comprehensive general  liability insurance including but not limited to use and occupancy, and professional liability insurance protecting Transferee against liability for death, injury, loss or damage as a result or arising out of examination, diagnosis, treatment or care of (or failure to so examine,

11

diagnose, treat or care for) any patient of the Hospital or any occupant of the same;

(4)   comprehensive automobile liability insurance;

(5)   worker's compensation and unemployment coverage as required or permitted by the State;

(6)   business interruption insurance;

(7)   fidelity bonds on all officers and employees of Transferee who have access to or have custody of revenues, receipts or income from the Hospital or any funds of Transferee;

(8)   builder's risk insurance during the construction of any improvements; and

(9)   directors' and officers liability insurance.

10.   Section 9.07 of the Lease entitled Reversion of Assets is hereby amended to read as follows:

Except as set forth in Section 5.05(b) of this Agreement, upon the expiration or earlier termination of this Agreement, or upon a material breach of the terms of this Agreement, or upon a material breach of the terms of this Agreement by Transferee and such breach has not been cured if so allowed hereunder, or in the event this Agreement shall become void or unenforceable, all assets of the Transferee, including all of Transferee's interest in its Affiliates, shall become the property of the Transferor absolutely.

11.   Section 10.23 of the Lease entitled Termination is hereby amended to read as follows:

Unless sooner terminated in accordance with the provisions hereof, this Agreement shall terminate on July 31, 2048.

12.   All other provisions of the Lease, to the extent not amended herein, shall remain in full force and effect.

12

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed under seal as of the _14th_ day of _MAY_, 2009.

HOSPITAL AUTHORITY OF ALBANY-
DOUGHERTY COUNTY, GEORGIA

By: _Ralph S. Rosenberg_

Title: _CHAIRMAN_

(SEAL)

Attest: _Eugene D. Sherman Jr. Sect._

Signed, sealed and delivered
in the presence of:

Unofficial Witness

Notary Public
My commission Expires:_____
(NOTARY SEAL)

Annette M. Allen
Notary Public – State of Georgia
Qualified in Dougherty County
My Commission Expires January 28, 2013

PHOEBE PUTNEY MEMORIAL
HOSPITAL, INC.

By:_____

Title:_____

(SEAL)

Attest:_____
Secretary

Signed, sealed and delivered
in the presence of:

Unofficial Witness

Notary Public
My commission Expires:_____
(NOTARY SEAL)

Annette M. Allen
Notary Public – State of Georgia
Qualified in Dougherty County
My Commission Expires January 28, 2013

13

**EXHIBIT F - 147**