# EXHIBIT J

ASSET PURCHASE AGREEMENT

BY

AND

AMONG

THE HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY

PHOEBE PUTNEY HEALTH SYSTEM, INC.

PHOEBE NORTH, INC.

AND

PALMYRA PARK HOSPITAL, INC.

Dated as of December 21, 2010

4016376.6

**EXHIBIT J - 1**

## TABLE OF CONTENTS

Page

1. DEFINITIONS ........................................................................................................ 1
    1.1    Definitions ...................................................................................................... 1
    1.2    Interpretation ................................................................................................ 10

2. SALE OF ASSETS AND CERTAIN RELATED MATTERS. ................................... 10
    2.1    Sale of Purchased Assets ............................................................................. 10
    2.2    Excluded Assets ........................................................................................... 11
    2.3    Assumed Liabilities ...................................................................................... 13
    2.4    Excluded Liabilities ..................................................................................... 13
    2.5    Purchase Price .............................................................................................. 15
    2.6    Determination of the Price Adjustment Amounts ....................................... 15
    2.7    Post-Closing Determinations of Price Adjustment Amounts ...................... 17
    2.8    Proration ....................................................................................................... 18

3. CLOSING .............................................................................................................. 19
    3.1    Closing .......................................................................................................... 19
    3.2    Actions of Seller at Closing ......................................................................... 19
    3.3    Actions of Buyer at Closing ........................................................................ 20
    3.4    Additional Acts ............................................................................................ 21

4. REPRESENTATIONS AND WARRANTIES OF SELLER ...................................... 21
    4.1    Incorporation; Qualification and Capacity .................................................. 21
    4.2    Corporate Powers; Consents; Absence of Conflicts With Other Agreements, Etc. ......... 22
    4.3    No Outstanding Rights ................................................................................. 22
    4.4    Purchased Assets .......................................................................................... 22
    4.5    Binding Agreement ...................................................................................... 22
    4.6    Financial Information ................................................................................... 23
    4.7    Permits and Approvals ................................................................................. 23
    4.8    Intellectual Property ..................................................................................... 24
    4.9    Medicare Participation/Accreditation ......................................................... 24
    4.10   Regulatory Compliance ................................................................................ 25
    4.11   Assumed Contracts ....................................................................................... 25
    4.12   Real Property ................................................................................................ 25
    4.13   Personal Property ......................................................................................... 26
    4.14   Insurance ...................................................................................................... 26
    4.15   Employee Benefit Plans ............................................................................... 26
    4.16   Employees and Employee Relations ............................................................ 27
    4.17   Litigation or Proceedings ............................................................................. 27
    4.18   Tax Matters .................................................................................................. 28
    4.19   Environmental Matters ................................................................................. 29
    4.20   Immigration Act ........................................................................................... 29
    4.21   WARN Act .................................................................................................... 30
    4.22   OSHA ........................................................................................................... 30
    4.23   Inventory ...................................................................................................... 30
    4.24   Absence of Changes ..................................................................................... 30
    4.25   Solvency ....................................................................................................... 31
    4.26   Statements True and Correct ....................................................................... 31

**EXHIBIT J - 2**

|       | 4.27  | Medical Staff................................................................................... 31 |

5. REPRESENTATIONS AND WARRANTIES OF BUYER ........................................ 31
   5.1 Authority Capacity; Corporate Capacity. ............................................... 31
   5.2 Powers; Consents; Absence of Conflicts With Other Agreements, Etc............ 32
   5.3 Binding Effect................................................................................... 32
   5.4 Litigation........................................................................................ 32
   5.5 Buyer Acknowledgements................................................................... 33
   5.6 Availability of Funds; Solvency. .......................................................... 33
   5.7 Antitrust Matters ............................................................................. 33
   5.8 Statements True and Correct................................................................ 33

6. COVENANTS OF SELLER AND BUYER .......................................................... 34
   6.1 Completion of Schedules; Information; Assumed Contracts and Rejected
       Contracts. ...................................................................................... 34
   6.2 Operations...................................................................................... 36
   6.3 Negative Covenants .......................................................................... 37
   6.4 Notification of Certain Matters. ........................................................... 38
   6.5 HSR Notification .............................................................................. 39
   6.6 Approvals; Consented Assignment........................................................ 39
   6.7 Additional Financial Information ......................................................... 40
   6.8 Books and Records ........................................................................... 40
   6.9 Non-Solicitation............................................................................... 40

7. CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER ............................... 41
   7.1 Compliance With Covenants ............................................................... 41
   7.2 Opinion of Counsel........................................................................... 41
   7.3 Pre-Closing Confirmations ................................................................. 41
   7.4 Action/Proceeding ........................................................................... 42
   7.5 Title Policies and Surveys.................................................................. 42
   7.6 Representations and Warranties............................................................ 43

8. CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER ............................. 44
   8.1 Compliance With Covenants ............................................................... 44
   8.2 Opinion of Counsel........................................................................... 44
   8.3 Action/Proceeding ........................................................................... 44
   8.4 Pre-Closing Confirmations ................................................................. 44
   8.5 Representations and Warranties............................................................ 45

9. TRANSITIONAL ARRANGEMENTS ............................................................... 45
   9.1 PIP; Transition Patients; Government Patient Receivables; and Misdirected
       Payments......................................................................................... 45
   9.2 Seller's Cost Reports ........................................................................ 46
   9.3 Employees....................................................................................... 47

10. ADDITIONAL AGREEMENTS...................................................................... 49
    10.1 Break-Up Fee; Rescission Fee. ............................................................ 49
    10.2 Allocation of Purchase Price............................................................... 49
    10.3 Termination Prior to Closing. ............................................................. 50
    10.4 Post-Closing Access to Information ...................................................... 51
    10.5 Preservation and Access to Records After the Closing................................ 51

ii

**EXHIBIT J - 3**

|       |       |                                                          |     |
|-------|-------|----------------------------------------------------------|-----|
|       | 10.6  | Capital Expenditures                                     | 52  |
|       | 10.7  | Reproduction of Documents                                | 52  |
|       | 10.8  | Cooperation on Tax Matters                               | 52  |
|       | 10.9  | Litigation Support                                       | 52  |
|       | 10.10 | HCA Post-Closing Services to be Provided Buyer           | 52  |
|       | 10.11 | No-Shop                                                  | 53  |
|       | 10.12 | Post-Closing Operations                                  | 53  |
|       | 10.13 | Maintenance of Programs                                  | 53  |
|       | 10.14 | Provision of Certain Employees                           | 53  |
|       | 10.15 | Non-Competition.                                         | 53  |
|       | 10.16 | Settlement and Release.                                  | 54  |
| 11.   | INDEMNIFICATION.                                                  |     | 55  |
|       | 11.1  | Indemnification by Seller                                | 55  |
|       | 11.2  | Indemnification by Buyer                                 | 56  |
|       | 11.3  | Limitation.                                              | 56  |
|       | 11.4  | Notice and Control of Litigation                         | 57  |
|       | 11.5  | Survival.                                                | 57  |
|       | 11.6  | Materiality; De Minimis Claims                           | 58  |
|       | 11.7  | Exclusive Remedy                                         | 58  |
|       | 11.8  | Mitigation.                                              | 58  |
|       | 11.9  | Limitation on Damages.                                   | 58  |
|       | 11.10 | Treatment of Payments                                    | 58  |
| 12.   | GENERAL.                                                          |     | 58  |
|       | 12.1  | Consents, Approvals and Discretion.                      | 58  |
|       | 12.2  | Legal Fees and Costs                                     | 59  |
|       | 12.3  | Governing Law; Arbitration                               | 59  |
|       | 12.4  | Benefit; Assignment                                      | 60  |
|       | 12.5  | Accounting Date                                          | 61  |
|       | 12.6  | No Brokerage.                                            | 61  |
|       | 12.7  | Cost of Transaction                                      | 61  |
|       | 12.8  | Public Announcements; Confidentiality.                   | 61  |
|       | 12.9  | Waiver of Breach                                         | 62  |
|       | 12.10 | Notice.                                                  | 62  |
|       | 12.11 | Severability                                             | 63  |
|       | 12.12 | No Inferences.                                           | 63  |
|       | 12.13 | Divisions and Headings                                   | 64  |
|       | 12.14 | No Third-Party Beneficiaries                             | 64  |
|       | 12.15 | Tax and Medicare Advice and Reliance                     | 64  |
|       | 12.16 | Entire Agreement; Amendment                              | 64  |
|       | 12.17 | Knowledge                                                | 64  |
|       | 12.18 | FIRPTA Withholding                                       | 64  |
|       | 12.19 | Other Owners of Purchased Assets                         | 64  |
|       | 12.20 | Disclaimer of Warranties                                 | 65  |
|       | 12.21 | Guarantee.                                               | 65  |
|       | 12.22 | Schedules                                                | 66  |

**EXHIBIT J - 4**

## EXHIBITS

Exhibit A                Form of Assignment and Assumption Agreement
Exhibit B                Form of Partial Assignment and Assumption Agreement
Exhibit C                Form of General Bill of Sale and Assignment
Exhibit D-1              Owned Real Property
Exhibit D-2              Leased Real Property
Exhibit E                Other Receivables
Exhibit F                Prepaid Expenses and Excluded Prepaid Expenses
Exhibit G                Plaintiff's Motion for Order of Dismissal Without Prejudice
Exhibit H                Appellant Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center's Motion
                         for Permission to Withdraw Appeal
Exhibit I                Appellant Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center's Motion
                         for Permission to Withdraw Appeal
Exhibit J                Letter withdrawing Certificate of Need application # 2008-081

**EXHIBIT J - 5**

## SCHEDULES

| | |
|---|---|
| Schedule 2.2 | Excluded Assets |
| Schedule 4.3 | No Outstanding Rights |
| Schedule 4.6 | Historical Financial Information |
| Schedule 4.9 | Medicare Participation/Accreditation |
| Schedule 4.10 | Regulatory Compliance |
| Schedule 4.11 | Defaults Under Assumed Contracts |
| Schedule 4.14 | Insurance |
| Schedule 4.15 | Employee Benefit Plans |
| Schedule 4.16 | Employees and Employee Relations |
| Schedule 4.17(a) | Litigation or Proceedings |
| Schedule 4.17(c) | Outstanding Judgments, Orders or Decrees |
| Schedule 4.18 | Tax Matters |
| Schedule 4.19 | Environmental Matters |
| Schedule 4.21 | WARN Act |
| Schedule 4.24 | Absence of Changes |
| Schedule 4.24(d) | Capital Expenditures |
| Schedule 5.2 | Permits and Approvals |
| Schedule 6.1(e) | Contracts to be Partially Assigned or Modified |
| Schedule 6.2 | Exceptions to Affirmative Operating Covenants |
| Schedule 6.3 | Exceptions to Negative Covenants |
| Schedule 7.5 | Title Insurance |
| Schedule 10.2 | Allocation of Purchase Price |

**EXHIBIT J - 6**

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of December 21, 2010 by and among the HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, a hospital authority organized and existing pursuant to Georgia Code Annotated §§ 31-7-70 *et seq.* ("Buyer"), and PALMYRA PARK HOSPITAL, INC., a Georgia corporation ("Seller"). PHOEBE PUTNEY HEALTH SYSTEM, INC., a Georgia nonprofit corporation ("PPHS"), joins in this Agreement solely for the purposes set forth in Section 6.9, Section 10.1 and Section 12.21. PHOEBE NORTH, INC., a Georgia nonprofit corporation ("PNI"), joins this Agreement solely for the purposes set forth in Section 6.9 and Section 9.3(b).

### WITNESSETH:

A.      Seller owns the assets and operations of Palmyra Medical Center, Albany, Georgia (the "Hospital") and the other Facilities (as defined below).

B.      Buyer desires to acquire substantially all of the assets used exclusively in the operation of the Hospital and the other Facilities, and assume certain liabilities relating to the Hospital and the other Facilities, all in accordance with the terms and conditions set forth herein.

C.      PPHS has formed PNI as its wholly controlled affiliate corporation. PNI will manage the Hospital and the other Facilities for Buyer pursuant to a written management agreement between Buyer and PNI. Pursuant to that management agreement and Section 9.3 of this Agreement, PNI will employ at Closing substantially all of Seller's employees employed at the Facilities as of Closing. Seller and PPHS as experienced operators of hospitals recognize the risks and financial undertaking required of Buyer to acquire and own and of PNI to operate the Hospital for Buyer. As a material inducement to Seller to enter into this Agreement, pursuant to Section 10.1, and subject to the terms and provisions of Section 10.1, PPHS will compensate Seller in the event the transactions contemplated by this Agreement are not consummated or if the parties are required to rescind the transactions contemplated by this Agreement after the consummation of such transactions. As a further material inducement to Seller to enter into this Agreement, PPHS will guarantee the financial obligations of Buyer and PNI under this Agreement and any ancillary documents hereto pursuant to the terms of Section 12.21, and PNI will offer employment to Seller's employees as contemplated by Section 9.3 of this Agreement. PPHS acknowledges that Seller would not enter into this Agreement but for PPHS's obligations under Section 10.1 and PPHS' financial guarantee of Buyer's obligations under this Agreement and any ancillary documents hereto. PNI acknowledges that Seller would not enter into this Agreement but for PNI's offer of employment to Seller's employees as contemplated by this Agreement.

NOW, THEREFORE, for and in consideration of the premises, and the agreements, covenants, representations and warranties hereinafter set forth, and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, the parties hereto agree as follows:

## 1.      DEFINITIONS

**1.1      Definitions**. As used herein the terms below shall have the following meanings:

"AAA" has the meaning set forth in Section 12.3.

"AAA Rules" has the meaning set forth in Section 12.3(b).

4016376.6                                          1

"Accrued EIB" has the meaning set forth in Section 2.3(b).

"Accrued PTO" means Seller's liability as of the Closing Date for "paid time off" with respect to the employees of Seller and its Affiliates who are employed at the Facilities, but excluding Seller's liability for "paid time off" in respect of employees of Seller and its Affiliates who are not offered employment or who do not accept offers of employment by PNI as of Closing as contemplated by Section 9.3.

"Accrued PTO Amount" means the amount of Seller's liability as of the Closing Date for Accrued PTO, as determined (or agreed upon by Buyer and Seller) in accordance with Section 2.6 or Section 2.7.

"ADA Liabilities" means (a) any obligation or requirement to modify, repair, replace or otherwise alter any portion of the Facilities in order to cause the Facilities to be compliant with the Americans with Disabilities Act, as amended, (b) any liabilities and obligations related to claims, actions, suits, audits, proceedings or investigations brought after the Closing against any Person that owns, leases, operates or manages any of the Facilities after the Closing or any Affiliate of any such Person (including Buyer, PPHS and PNI) that seek to require, or require, modification, repair, replacement or alteration of any portion of the Facilities so that the Facilities are compliant with the Americans with Disabilities Act, as amended, (c) any judgments, orders or decrees entered with respect to any of the claims, actions, suits, audits, proceedings or investigations described in clause (b), above, and/or (d) any obligation or requirement to modify, repair, replace or otherwise alter any portion of the Facilities pursuant to any settlement agreement, judgment, decree or order listed in Schedule 4.17(c) with respect to the "Access Now Litigation" (as defined in Schedule 4.17(a) ).

"Additional Adjustment Amount" has the meaning set forth in Section 2.6(e).

"Affiliate" means, as to the Person in question, any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question and any successors or assigns of such Person; and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities or membership interests, the right to appoint the Person's directors or trustees, by contract or otherwise; provided that "Affiliate" shall not include (a) officers or directors of the Authority, PPHS, PNI, Seller or its Affiliates or (b) shareholders of HCA. The Authority is not an Affiliate of PNI or PPHS. PPHS and PNI are Affiliates of one another.

"Agency Receivables" means rights to settlement and retroactive adjustments, if any, for open cost reporting periods ending on or prior to the Closing (whether open or closed) arising from or against the U.S. Government under the terms of the Medicare program or TRICARE and against any state under its Medicaid program and against any third-party payor programs that settle on a cost report basis.

"Agreement" means this Agreement as amended or supplemented together with the Exhibits and Schedules hereto.

"Antitrust Claim" has the meaning set forth in Section 10.16(a)(i).

"Applicable Rate" means the "prime rate" as quoted in the "Money Rates" section of The Wall Street Journal on the Closing Date.

"Approval" means any approval, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice,

**EXHIBIT J - 8**

statement, filing or other communication to be filed with or delivered to, any Governmental Entity (other than Buyer or its Affiliates).

"Arbitration Notice" has the meaning set forth in Section 12.3(b).

"Arbitrators" has the meaning set forth in Section 12.3(b).

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement attached hereto as Exhibit A.

"Assumed Contract" means (a) any Contract that is not an Excluded Contract and (b) to the extent partially assigned as contemplated by Section 6.1(e), any agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness, or other contract that is partially assigned to Buyer.

"Assumed Indebtedness" means Seller's liability for any indebtedness for borrowed money or capitalized lease obligations assumed or paid by Buyer, if any, including the current liability portion thereof.

"Assumed Indebtedness Amount" means (a) the amount of Seller's liability as of the Closing Date for the Assumed Indebtedness, if any, as determined (or agreed upon by Buyer and Seller) in accordance with Section 2.6 or Section 2.7, plus (b) the Accrued PTO Amount.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Authority" has the same meaning as Buyer as set forth in the Preamble.

"Balance Sheet Date" means November 30, 2010.

"Base Purchase Price" has the meaning set forth in Section 2.5.

"Basket Amount" has the meaning set forth in Section 11.3(b).

"Break-Up Fee" has the meaning set forth in Section 10.1(a).

"Buyer" has the meaning set forth in the Preamble.

"Buyer Indemnified Parties" has the meaning set forth in Section 11.1.

"Buyer Losses" has the meaning set forth in Section 11.3(c).

"Capital Expenditures Amount" means the amount of capital expenditures that Seller or any of its Affiliates incurs with respect to the Facilities or the Purchased Assets between March 1, 2011 and the Closing Date for routine capital expenditures incurred in the ordinary course of business; provided, however, that the Capital Expenditures Amount shall not exceed $170,000.00 multiplied by the number of months between March 1, 2011 and the Closing Date (prorated for any partial month) except to the extent that Buyer shall have approved any capital expenditures in excess of such amount.

"CERCLA" has the meaning set forth in the definition of Environmental Laws.

"Closing" has the meaning set forth in Section 3.1.

"Closing Balance Sheet" has the meaning set forth in Section 2.7(b).

**EXHIBIT J - 9**

"Closing Date" has the meaning set forth in Section 3.1.

"Code" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"Collateral" has the meaning set forth in Section 12.21(b)(iv).

"Competing Business" has the meaning set forth in Section 10.15(f).

"Contract" means any agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness, or other contract, to which Seller or one of its Affiliates is a party or by which assets of the Facilities are bound which relates exclusively to the Facilities, the Purchased Assets or the operation thereof.

"Deletions" has the meaning set forth in Section 7.5.

"EEOC" means the Equal Employment Opportunity Commission.

"Employee" has the meaning set forth in Section 9.3.

"Employment Loss" has the meaning set forth in Section 4.21.

"Encumbrance" means any claim, charge, easement, restrictive covenant, encumbrance, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by agreement, understanding, Law, equity or otherwise.

"Endorsements" has the meaning set forth in Section 7.5.

"Environmental Condition" means any event, circumstance or conditions related in any manner whatsoever to (i) the current or past presence or spill, emission, discharge, disposal, release or threatened release of any hazardous, infectious or toxic substance or waste (as defined by any applicable Environmental Laws) or any chemicals, pollutants, petroleum, petroleum products or oil ("Hazardous Materials"), into the environment; or (ii) the on-site or off-site treatment, storage, disposal or other handling of any Hazardous Material originating on or from the Real Property; or (iii) the placement of structures, materials or substances into waters of the United States; or (iv) the presence of any Hazardous Substance, including friable asbestos, in any building, structure or workplace or on any portion of the Real Property; or (v) any violation of Environmental Laws at or on any part of the Real Property or arising from the activities of Seller at the Facilities involving Hazardous Materials or the presence of any underground storage container on or in any part of the Real Property.

"Environmental Laws" means all Laws relating to pollution or the environment, including the Comprehensive Environmental Recovery, Compensation, and Liability Act, as amended, 42 U.S.C. §9601, *et seq.* ("CERCLA"); the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §9601, *et seq.* ("RCRA"), the Clean Air Act, 42 U.S.C. §7401, the Occupational Safety and Health Act, 29 U.S.C. §600, *et seq.* ("OSHA"), the Georgia Air Quality Act, as amended, O.C.G.A. §§ 12-9-1, *et seq.*, the Georgia Groundwater Use Act, as amended, O.C.G.A. §§ 12-5-90, *et seq.*, the Georgia Safe Drinking Water Act of 1977, as amended, O.C.G.A. §§ 12-5-170, *et seq.*, the Georgia Water Supply Act, as amended, O.C.G.A. §§ 12-5-470, *et seq.*, the Georgia Water Well Standards Act, as amended, O.C.G.A. §§ 12-5-120, *et seq.*, the Georgia Hazardous Waste Management Act, as amended, O.C.G.A. §§ 12-8-60, *et seq.*, the Georgia Underground Storage Act, as amended, O.C.G.A. §§ 12-13-1, *et seq.*, the Georgia Radiation Control Act, as amended, O.C.G.A. §§ 31-13-1, *et seq.*, the Georgia Environmental Protection

**EXHIBIT J - 10**

Division ("GEDP") Air Quality Control Rules and Regulations, Official Compilation Rules and Regulations of the State of Georgia ("Georgia Rules") rr. 391-3-1, *et seq.*, GEPD Groundwater Use Rules and Regulations, Georgia Rules rr. 391-3-2, *et seq.*, GEPD Safe Drinking Water Rules and Regulations, Georgia Rules rr. 391-3-5, *et seq.*, GEPD Hazardous Waste Management Rules and Regulations, Georgia Rules rr. 391-3-11, *et seq.*, GEPD Underground Storage Tank Management Rules and Regulations, Georgia Rules rr. 391-3-15, *et seq.*, GEPD Radioactive Materials Rules and Regulations, Georgia Rules rr. 391-3-17, *et seq.*, and all other Laws relating to emissions, discharges, releases, or threatened releases of pollutants, contaminants, chemicals, pesticides, or industrial, infectious, toxic or hazardous substances or wastes into the environment (including ambient air, surface water, groundwater, land surface or subsurface strata) or otherwise relating to the processing, generation, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants, chemicals, or industrial, infectious, toxic, or hazardous substances or wastes.

"ERISA" has the meaning set forth in Section 4.15(a).

"ERISA Controlled Group" has the meaning set forth in Section 4.15(b).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means (a) the Rejected Contracts, (b) the Plans, (c) any Contracts which are only available to Seller and its Affiliates, and (d) all rights and obligations existing under any agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness, or other contract that relates to both the Facilities or the Purchased Assets (or the operations thereof) and to one or more hospitals or healthcare facilities owned or operated by Affiliates of Seller and located outside the Territory (or the assets or operations thereof) that are not expressly assigned to Buyer pursuant to Section 6.1(e).

"Excluded Inventory" means the inventory, supplies, food, pharmaceuticals, janitorial and office supplies and other disposables of Seller and its Affiliates at the Facilities that (a) are not current and usable, or (b) are not included in the determination of the Inventory Amount.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Prepaid Expenses" means Seller's prepaid expenses, claims for refunds and rights to offset in respect thereof relating to the Facilities that (a) are not assumable or useable by Buyer, or (b) are not included in the determination of the Prepaid Expenses Amount. Exhibit F indicates the types of such assets that would be classified as Excluded Prepaid Expenses if the Closing took place as of November 30, 2010.

"Excluded Receivables" means all accounts receivable of the Seller and the Facilities (including all Agency Receivables and Government Patient Receivables) other than the Other Receivables and, subject to the provisions of Section 9.1, the Transition Patient Receivables.

"Facilities" means (a) the Hospital, (b) all medical office buildings owned or leased by Seller or its Affiliates and located in the Territory, and (c) all such property of every description listed in Exhibit D-1 or D-2 (as supplemented or amended in accordance with Section 6.1(a)).

"First Arbitrator" has the meaning set forth in Section 12.3(b).

"FTC" means the United States Federal Trade Commission.

**EXHIBIT J - 11**

"Furniture and Equipment" means all equipment (including movable equipment), vehicles, medical instruments, machines, machinery, and furniture or furnishings, wherever located, that are held or used by Seller exclusively in connection with the business or operation of the Facilities, whether or not reflected in the Reference Balance Sheet, including all such equipment, vehicles, medical instruments, machines, machinery, furniture or furnishings that have been fully depreciated for accounting purposes and any such items that were acquired for use exclusively in the business or operation of the Facilities since the Balance Sheet Date, but excluding the Excluded Assets.

"GAAP" means, subject to the exceptions and modifications described in Schedule 4.6, United States generally accepted accounting principles and practices as in effect from time to time applied consistently by Seller in connection with the Facilities throughout the periods involved.

"General Bill of Sale and Assignment" means the General Bill of Sale and Assignment attached hereto as Exhibit C.

"Government Patient Receivables" means all accounts receivable arising from the rendering of services and provision of medicine, drugs and supplies to patients at the Facilities through the Closing Date and relating to Medicare, Medicaid, TRICARE and other third party patient claims due from beneficiaries or governmental third party payors; provided, however, that subject to the provisions of Section 9.1, Transition Patient Receivables are not within the definition of Government Patient Receivables.

"Government Programs" has the meaning set forth in Section 4.9(a).

"Governmental Entity" means any government or any agency, bureau, board, directorate, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"Hazardous Materials" has the meaning set forth in the definition of Environmental Condition.

"HCA" means HCA Inc., a Delaware corporation.

"Historical Financial Information" has the meaning set forth in Section 4.6.

"Hospital" has the meaning set forth in the Recitals.

"Hospital Authorities Law" means the Hospital Authorities Law, Georgia Code Annotated §§ 31-7-70 et seq.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the related regulations and published interpretations.

"Immigration Act" means the Immigration Reform and Control Act of 1986.

"Indemnifiable Losses" means all losses, liabilities, damages, costs (including court costs and costs of appeal) and expenses (including reasonable attorneys' fees) actually incurred by an Indemnified Party.

"Indemnified Party" has the meaning set forth in Section 11.4(a).

"Indemnifying Party" has the meaning set forth in Section 11.4(a).

"Insurable Leaseholds" has the meaning set forth in Section 7.5.

"Intellectual Property" means, to the extent held or used in or ancillary to the business or operation of the Facilities, patents, trademarks, trade names (including Seller's interest in the names "Palmyra Medical Center" and "Palmyra Park Hospital" insofar as any of such names is used within 50 miles of the Hospital), service marks, copyrights and any applications therefor, mask works, net lists, schematics, technology, know-how, trade secrets, ideas, algorithms, processes, computer software programs and applications (in both source code and object code form), and tangible or intangible proprietary information or material, except as set forth on Schedule 2.2.

"Interim Balance Sheet" has the meaning set forth in Section 2.6(c).

"Inventory" means all inventory, supplies, food, pharmaceuticals, janitorial and office supplies and other disposables on hand or under order for use exclusively in the business or operation of Seller and its Affiliates at the Facilities, but excluding the Excluded Inventory.

"Inventory Amount" means the value of the Inventory as of the Closing Date, as determined (or agreed upon by Buyer and Seller) in accordance with Section 2.6 or Section 2.7.

"Justice Department" means the United States Department of Justice.

"Law" means any constitutional provision, statute, ordinance or other law, rule, regulation, interpretation, judgment, decree or order of any Governmental Entity (other than Buyer or its Affiliates) or any settlement agreement or compliance agreement with any Governmental Entity (other than Buyer or its Affiliates).

"Leased Real Property" means real property owned by a third party which is subject to a leasehold or subleasehold estate in favor of Seller, described on Exhibit D-2 (as supplemented or amended in accordance with Section 6.1(a)).

"Medicaid" has the meaning set forth in Section 4.9(a).

"Medicare" has the meaning set forth in Section 4.9(a).

"Obligations" has the meaning set forth in Section 12.21(a).

"OSHA" has the meaning set forth in the definition of Environmental Laws.

"Other Receivables" means Seller's promissory notes and accounts receivable made or generated in connection with the operation of the Facilities through at the Closing that are accounted for as "Other Receivables" in the Facilities' financial statements and included in the determination of the Other Receivables Amount. Exhibit E indicates the types of notes and accounts receivable that would be classified as Other Receivables (and the Other Receivables Amount) if the Closing took place as of November 30, 2010.

"Other Receivables Amount" means the value of the Other Receivables as of the Closing Date, as determined (or agreed upon by Buyer and Seller) in accordance with Section 2.6 or Section 2.7.

"Owned Real Property" means the real property described on Exhibit D-1 (as supplemented or amended in accordance with Section 6.1(a)), together with all leases and subleases therein, improvements, buildings or fixtures located thereon or therein, all easements, rights of way, and other appurtenances

thereto (including appurtenant rights in and to public streets), and all claims and recorded or unrecorded interests therein, including any and all options to acquire such real property.

"PNI" has the meaning set forth in the Preamble.

"PPHS" has the meaning set forth in the Preamble.

"Palmyra Medical Center Plans" has the meaning set forth in Section 9.3(b)

"Partial Assignment and Assumption Agreement" means the Partial Assignment and Assumption Agreement attached hereto as Exhibit B.

"Payable Tax Items" has the meaning set forth in Section 4.18(b).

"Permit" means any license, permit or certificate of need required to be issued by any Governmental Entity (other than Buyer or its Affiliates).

"Permitted Encumbrances" means the following: (a)(i) liens for current ad valorem taxes not yet due and payable, (ii) all existing utility, access or other easements and rights of way of record provided that, unless otherwise deemed a Permitted Encumbrance, for example under clause (vii) or clause (viii) below, no encroachment of any such easement or right of way shall be considered a Permitted Encumbrance, (iii) Laws regulating the use or enjoyment of the Owned Real Property or Leased Real Property provided that, unless otherwise deemed a Permitted Encumbrance, for example under clause (vii) or clause (viii), no violation of any such Laws that would constitute an Encumbrance shall be considered a Permitted Encumbrance, (iv) all leases and subleases to third party tenants of space in or portions of the Owned Real Property or Leased Real Property, (v) liens securing obligations which are Assumed Liabilities, (vi) those matters set forth in those title commitments issued by Old Republic National Title Insurance Company to the Authority pursuant to Section 7.5 and on such surveys as are prepared in accordance with Section 7.5 that are either accepted or waived by Buyer pursuant to Section 7.5 (or insured over by the title insurance company or indemnified against by Seller as contemplated by Section 7.5) or that would not have the result of Buyer being unable to operate the Hospital and any other material Facilities in a manner consistent with the current use thereof by Seller or its Affiliates, (vii) any other Encumbrances which, either individually or in the aggregate, do not interfere with the use of the Purchased Assets in a manner consistent with the current use thereof by Seller or its Affiliates, and (viii) with respect to Leased Real Property, Encumbrances which encumber the fee interest in such property or, in the case of subleased Leased Real Property, any leasehold estate superior to that of the Seller; and (b) such other matters set forth in the title commitments and Survey contemplated by Section 7.5 that are either accepted or waived by Buyer in accordance with Section 7.5 or insured over by the title insurance company or indemnified against by Seller as contemplated by Section 7.5.

"Person" means an association, a corporation, a limited liability company, an individual, a partnership, a limited liability partnership, a trust, a hospital authority organized and existing under the Hospital Authorities Act, or any other entity or organization, including a Governmental Entity.

"Petitioner" has the meaning set forth in Section 12.3(b).

"PIP" has the meaning set forth in Section 9.1(a).

"Plans" has the meaning set forth in Section 4.15(a).

4016376.6

8

"Prepaid Expenses" means Seller's prepaid expenses, claims for refunds and rights to offset in respect thereof relating to the Facilities, but excluding the Excluded Prepaid Expenses. Exhibit F indicates the types of such assets that would be classified as Prepaid Expenses and Excluded Prepaid Expenses (and the Prepaid Expense Amount) if the Closing took place as of November 30, 2010.

"Prepaid Expense Amount" means the value of the Prepaid Expenses as of the Closing Date, as determined (or agreed upon by Buyer and Seller) in accordance with Section 2.6 or Section 2.7.

"Price Adjustment Amount" has the meaning set forth in Section 2.5.

"Price Adjustment Statement" has the meaning set forth in Section 2.6(c).

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1.

"RCRA" has the meaning set forth in the definition of Environmental Laws.

"Real Property" means the Owned Real Property and the Leased Real Property.

"Reference Balance Sheet" has the meaning set forth in Section 4.6(a)(ii).

"Rejected Contract" has the meaning set forth in Section 6.1(c).

"Rescission Fee" has the meaning set forth in Section 10.1(b).

"Respondent" has the meaning set forth in Section 12.3(b).

"Retirement Plans" has the meaning set forth in Section 4.15(g).

"Returns" has the meaning set forth in Section 4.18(a).

"Second Arbitrator" has the meaning set forth in Section 12.3(b).

"Seller Cost Reports" has the meaning set forth in Section 9.2.

"Seller Indemnified Parties" has the meaning set forth in Section 11.2.

"Seller" has the meaning set forth in the Preamble.

"Senior Management" means the persons holding the following titles with respect to the Hospital: Chief Executive Officer, Chief Financial Officer, Chief Operating Officer and Chief Nursing Officer.

"Survey" has the meaning set forth in Section 7.5.

"Survival Period" has the meaning set forth in Section 11.5.

"TJC" has the meaning set forth in Section 4.9(c).

"Territory" has the meaning set forth in Section 10.15(e).

"Third Arbitrator" has the meaning set forth in Section 12.3(b).

**EXHIBIT J - 15**

"Transition Patient Receivables" has the meaning set forth in Section 9.1(b).

"Transition Patients" means patients admitted to the Hospital prior to the Closing but not yet discharged as of the Closing.

"Transition Services" means the rendering of services and provision of medicine, drugs and supplies by the Hospital to Transition Patients whose care is reimbursed by Medicare, Medicaid, TRICARE or other third party programs on a prospective payment system, including the Medicare diagnostic related groups.

"TRICARE" means the Department of Defense's managed healthcare program for active duty military, active duty service families, retirees and their families and other beneficiaries.

**1.2    Interpretation.** In this Agreement, unless the context otherwise requires: (a) references to this Agreement are references to this Agreement and to the Exhibits and Schedules to this Agreement; (b) references to Sections are references to sections of this Agreement; (c) references to schedules and/or exhibits are references to the Schedules and/or Exhibits to this Agreement; (d) references to any party to this Agreement shall include references to its respective successors and permitted assigns; (e) references to a judgment shall include references to any order, writ, injunction, decree, determination or award of any court or tribunal; (f) the terms "hereof," "herein," "hereby," and derivative or similar words will refer to this entire Agreement; (g) references to any document (including this Agreement and the Exhibits and Schedules to this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced by the parties from time to time; (h) unless the context requires otherwise, references to any Law are references to that Law as of the Closing Date, and shall also refer to all rules and regulations promulgated thereunder; (i) the word "including" means including without limitation; (j) references to time are references to Eastern Standard or Daylight time (as in effect on the applicable day) unless otherwise specified herein; (k) the gender of all words herein include the masculine, feminine and neuter, and the number of all words herein include the singular and plural; (l) provisions of this Agreement shall be interpreted in such a manner so as not to inequitably benefit or burden any party through "double counting" of assets or liabilities or failing to recognize benefits that may result from any matters that impose losses or burdens on any party, including in connection with the determination the Price Adjustment Amounts and the calculation of losses on casualty claims, and (m) the terms "date hereof", "date of this Agreement" or similar terms shall mean the date of this Agreement as indicated in the Preamble to this Agreement.

## 2.    SALE OF ASSETS AND CERTAIN RELATED MATTERS.

**2.1    Sale of Purchased Assets.** Subject to the terms and conditions of this Agreement, Seller agrees to sell, convey, transfer and deliver to Buyer and Buyer agrees to purchase at Closing, all assets of every description, and whether real, personal or mixed, tangible or intangible, other than the Excluded Assets, owned or leased by Seller on the Closing Date and held or used exclusively for the business or operation of the Facilities, including the following items (collectively, the "Purchased Assets"):

(a)    fee simple title to the Owned Real Property, and, to the extent permitted by Law, any rights of Seller or any of its Affiliates against third parties under general or limited warranty deeds related to any such Owned Real Property;

(b)    leasehold title to the Leased Real Property;

(c)    all Furniture and Equipment;

(d)     all Inventory;

(e)     all Prepaid Expenses;

(f)     to the extent assignable under applicable Law, all good will and current financial, patient, medical staff records, employee records as of the Closing and any other records held or used by Seller exclusively for the business or operation of the Facilities;

(g)     all of the interest of Seller in all Assumed Contracts;

(h)     all Permits and Approvals issued or granted by Governmental Entities to the extent assignable and which are held or used by Seller and relate exclusively to the ownership, development and business or operation of the Purchased Assets (including any pending Permits and Approvals that relate exclusively to any Purchased Assets);

(i)     all Intellectual Property;

(j)     all computers and other data processing equipment held or used exclusively in the business or operation of the Facilities;

(k)     any insurance proceeds to the extent provided in Section 2.6(e);

(l)     the Other Receivables;

(m)     to the extent assignable by Seller, the telephone numbers used by Seller at the Facilities as of the Closing Date;

(n)     all rights to and all the interest of Seller in any causes of action, claims, demands, damages, debts, dues or any and all other rights set forth in or arising out of or related to a pending legal action entitled Palmyra Park Hospital, Inc., d/b/a Palmyra Medical Center v. Phoebe Putney Memorial Hospital, Inc. and Phoebe Putney Health System, Inc., Civil Action File No. 1:08-CV-00102-WLS, pending in the United States District Court for the Middle District of Georgia, Albany Division; and

(o)     to the extent not included in any of the foregoing, (A) any current assets included in the determination of the Price Adjustment Amounts or any non-current assets reflected on the Reference Balance Sheet, except for assets used, consumed, or disposed of in the ordinary course of business since the Balance Sheet Date, (B) any assets purchased or otherwise acquired since the Balance Sheet Date which are not reflected on the Reference Balance Sheet but which are held or used exclusively in the business or operation of the Facilities and (C) the Facilities. Seller shall be permitted, at its expense, to retain copies of all records that it reasonably determines may be required by Seller or its Affiliates in the future. Subject to the conditions set forth in this Agreement, at Closing, Seller will sell, convey, transfer, assign and deliver good and marketable title to the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances. Buyer shall not be obligated to assume, and the term "Assumed Contracts" shall be deemed to exclude, any Contracts relating to the business or operation of the Facilities to the extent that any such Contract is an Excluded Contract.

**2.2    Excluded Assets.** Notwithstanding anything herein to the contrary, the following assets are not intended by the parties to be a part of the sale and purchase contemplated hereunder and are excluded from the Purchased Assets (the "Excluded Assets"):

(a)     restricted and unrestricted cash and cash equivalents, including investments in marketable securities, certificates of deposit, bank accounts and promissory notes, except to the extent the value of such assets are reflected in the Price Adjustment Amounts;

(b)     all Excluded Receivables;

(c)     all Excluded Prepaid Expenses;

(d)     all Excluded Inventory;

(e)     all names and symbols used in connection with the Facilities and the Purchased Assets which include the name "HCA" or any variants thereof, or any other names which are proprietary to HCA or its Affiliates, unless exclusively used in connection with the business and operation of the Facilities;

(f)     all computer software and programs which are proprietary to HCA or its Affiliates;

(g)     all documents, records, operating manuals film and video pertaining to the Hospital proprietary to HCA or its Affiliates or which Seller is required by law to retain;

(h)     to the extent permitted by Sections 6.2 and 6.3, all assets disposed of or exhausted prior to Closing in the ordinary course of business, including Inventory, Prepaid Expenses, and Furniture and Equipment, except to the extent the value of such assets are included in the Price Adjustment Amounts;

(i)     all amounts included in the entry (or line item) on the Closing Balance Sheet entitled "Intercompany Debt";

(j)     all insurance proceeds arising in connection with the operation of the Facilities or the Purchased Assets prior to Closing, except to the extent provided in Section 2.6(e);

(k)     any claims or rights related to the Purchased Assets (including the Assumed Contracts), contractual or otherwise, accruing or arising prior to the Closing, except to the extent (A) included in the determination of the Price Adjustment Amounts, (B) such claim or right would also relate to a period after Closing, but only to the extent such right or claim relates to periods after Closing or (C) such claim or right is described at Section 2.1(n) of this Agreement;

(l)     all corporate or partnership records and stock books of Seller and its Affiliates;

(m)     all assets used by HCA and its Affiliates in rendering corporate services to the Seller or the Facilities that are located outside the Facilities, except to the extent such assets are reflected on the Reference Balance Sheet or are included in the Purchase Price;

(n)     all Excluded Contracts;

(o)     any assets of HCA or its Affiliates not used exclusively in connection with the Facilities, including (i) assets used on a company-wide or region-wide basis, and (ii) assets of HCA and its Affiliates used at other hospitals and health care facilities owned or operated by HCA or its Affiliates, unless such assets are reflected on the Reference Balance Sheet or included in the Price Adjustment Amounts;

**EXHIBIT J - 18**

and

(p)     rights to refunds of taxes and all other tax assets for periods prior to the Closing;

(q)     assets listed on Schedule 2.2.

**2.3     Assumed Liabilities**. As of Closing, Buyer agrees to assume the future payment and performance of the following liabilities of Seller and its Affiliates (collectively, the "Assumed Liabilities"):

(a)     other than obligations and liabilities accruing, arising out of, or relating to acts or omissions of Seller and its Affiliates, all obligations and liabilities accruing, arising out of, or relating to the period after the Closing in connection with (i) the Assumed Contracts, (ii) the Facilities and (iii) the Purchased Assets;

(b)     obligations and liabilities as of the Closing in respect of (i) Accrued PTO (but only to the extent the liability for such Accrued PTO is reflected in the Accrued PTO Amount), (ii) accrued employee benefits for sick leave, extended illness and similar benefits (the "Accrued EIB") of employees of Seller and its Affiliates at each Facility as of the Closing Date, but excluding the accrued employee benefits for sick leave, extended illness and similar benefits of employees of Seller and its Affiliates who are not offered employment or who do not accept offers of employment by PNI as of Closing as contemplated by Section 9.3, (iii) obligations and liabilities assumed by Buyer under Section 9.3, and (iv) any payroll taxes related to the Assumed Liabilities described in clauses (i) through (iii) above;

(c)     any state and local transfer, sales and recording fees, documentary stamps and taxes which may arise upon the consummation of the transactions contemplated herein;

(d)     all obligations and liabilities accruing, arising out of or relating to acts or omissions of Buyer, PPHS, PNI or their respective Affiliates, before or after the Closing;

(e)     the Permitted Encumbrances;

(f)     the ADA Liabilities; and

(g)     the Assumed Indebtedness, but only to the extent such Assumed Indebtedness is reflected in the Assumed Indebtedness Amount.

**2.4     Excluded Liabilities**. Except as expressly provided to the contrary in Section 2.3, Buyer is not obligated to pay or assume, and none of the Purchased Assets shall be or become liable for or subject to, any liability of Seller and its Affiliates, including the following, whether fixed or contingent, recorded or unrecorded, known or unknown and whether or not set forth on Schedules hereto (collectively, the "Excluded Liabilities"):

(a)     any obligation or liability accruing, arising out of, or relating to acts or omissions prior to Closing, including any acts or omissions in connection with (i) any Assumed Contract, (ii) the business or operation of the Facilities, or (iii) the Purchased Assets;

(b)     any obligation or liability accruing, arising out of, or relating to any act or omission by Seller or its Affiliates after Closing;

(c)     any obligation or liability accruing, arising out of, or relating to any Excluded Contract;

(d)     any liability or obligation for severance with respect to those members of Senior Management who are not employed by Buyer on the Closing Date;

(e)     any obligation or liability accruing, arising out of, or relating to any federal, state or local investigations of, or claims or actions against, Seller or any of its Affiliates or any of their employees, medical staff, agents, vendors or representatives with respect to acts or omissions prior to the Closing;

(f)     any civil or criminal obligation or liability accruing, arising out of, or relating to any acts or omissions of Seller, its Affiliates or their directors, officers, employees and agents claimed to violate any Laws;

(g)     any liabilities or obligations existing on the Closing Date which are required to be reflected on a balance sheet prepared in accordance with GAAP and which were not reflected on the Reference Balance Sheet, except for Assumed Liabilities;

(h)     indebtedness and other obligations or guarantees of Seller, other than with respect to Assumed Liabilities;

(i)     liabilities or obligations of Seller of every kind and nature, known and unknown, in respect of periods prior to and up to Closing arising under the terms of the Medicare, Medicaid, TRICARE or any other third party payor programs or health insurers, and any liability arising pursuant to the Medicare, Medicaid, TRICARE or any other third party payor program as a result of the consummation of the transactions contemplated herein, including, without limitation, recapture of excess depreciation arising from or relating to services rendered or failed to be rendered at or by, or reimbursement claims relating to such services submitted by or on behalf of Seller prior to the Closing Date, including claims for overpayments or other excessive reimbursement or non-covered services; and any liability of Seller under or arising prior to the Closing Date from any risk pools and other risk sharing agreements established in connection with any managed care and payor contract assumed by the Buyer hereunder;

(j)     federal, state or local tax liabilities or obligations of or assessments against Seller in respect of periods prior to Closing or resulting from the consummation of the transactions contemplated herein, including, without limitation, any income tax, any franchise tax, any tax recapture, real estate, ad valorem tax, any indigent care tax, and any FICA, FUTA, workers' compensation taxes and any and all other taxes or amounts due and payable by Seller;

(k)     liability for any and all claims by or on behalf of Seller's employees relating to periods prior to Closing, including, without limitation, liability for any compensation, benefits, pension, profit sharing, deferred compensation, or any other employee health and welfare benefit plans, liability for any EEOC claim, wage and hour claim, unemployment compensation claim or workers' compensation claim or personnel policy, including those relating to any termination of employment, and all employee wages and benefits, including, without limitation, accrued vacation, sick leave, extended illness benefits, holiday pay, severance pay and related taxes or other liability related thereto;

(l)     any obligation or liability attributable to periods prior to or as of Closing and asserted under the federal Hill-Burton program or other restricted grant and loan programs with respect to the ownership or operation of the Assets;

(m)     contracts and agreements between Seller and one or more of Seller's Affiliates with respect to insurance, management services, information services or systems, or cash management services;

(n)     any debt, obligation, expense or liability of Seller arising out of or incurred solely as a result of any transaction of Seller occurring after Closing;

(o)     liability arising out of the assignment at Closing of any contract due to breach by Seller prior to Closing;

(p)     liabilities for expenses incurred by Seller incidental to the preparation of this Agreement, preparation or delivery of materials or information requested by Buyer, or the consummation of the transactions contemplated hereby, including all broker, counsel and accounting fees or any account payable which is attributable to legal and accounting fees and similar costs incurred by Seller which are directly related to the sale of any of the Purchased Assets of Seller;

(q)     liabilities for the unpaid taxes of any Person under U.S. Treasury Regulation §1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by contract or otherwise;

(r)     liabilities arising from or in connection with (i) any administrative ruling or other order, stipulation or decree of any federal, state or local agency or (ii) the violation of any federal, state or local act, statute, rule or regulation, decree or ordinance, Medicare or Medicaid program integrity or compliance agreement either involving Seller, or relating to or arising in connection with the use, operation, ownership or possession of the Facilities or Hospital or the use, operation, ownership or possession of any of the other Purchased Assets prior to the Closing Date;

(s)     liabilities attributable to any assets, properties or contracts which are not among the Purchased Assets; and

(t)     any other liability, fixed or contingent, relating to the Facilities or Purchased Assets occurring prior to the Closing and not expressly assumed by Buyer pursuant to Section 2.3.

**2.5     Purchase Price**. The consideration to be paid by Buyer (the "Purchase Price") shall be an amount equal to (a) $195,000,000.00 (the "Base Purchase Price"); plus (b) the Inventory Amount, the Other Receivables Amount and the Prepaid Expenses Amount, plus (c) the Capital Expenditure Amount, minus (d) the Assumed Indebtedness Amount. The Inventory Amount, the Other Receivables Amount, the Prepaid Expenses Amount, the Capital Expenditure Amount and the Assumed Indebtedness Amount are referred to collectively as the "Price Adjustment Amounts," and each of them is referred to individually as a "Price Adjustment Amount".

**2.6     Determination of the Price Adjustment Amounts**.

(a)     In the absence of an agreement by Buyer and Seller to the contrary (including an agreement as contemplated by Sections 2.6(b) - (d)):

(i)     the Inventory Amount, the Other Receivables Amount and the Prepaid Expenses Amount will be the value of the Inventory, the Other Receivables and the Prepaid Expenses as of the Closing Date as determined in accordance with GAAP, applied on a basis consistent with the Reference Balance Sheet;

(ii)     the Assumed Indebtedness Amount (including the Accrued PTO Amount) will be the amount of the liability for the Assumed Indebtedness (including the Accrued PTO) as of the Closing Date as determined in accordance with GAAP, applied on a basis consistent with the Reference Balance Sheet; and

(iii)     each of the Price Adjustment Amounts described in clauses (i) and (ii), above, will be the amounts of the relevant assets and liabilities as reflected on the Closing Balance Sheet, except to the extent that the Closing Balance Sheet includes the value of Excluded Inventory, Excluded Prepaid Expenses or Excluded Receivables or the amount of a liability that is not Assumed Indebtedness or Accrued PTO (e.g. the amount of Seller's liability for "paid time off" with respect to employees of Seller to whom PNI does not offer employment in accordance with Section 9.3 or who do not accept PNI's offer of employment) in which case the value of Excluded Inventory, Excluded Prepaid Expenses or Excluded Receivables or the amount of a liability that is not Assumed Indebtedness or Accrued PTO will be excluded from the applicable Price Adjustment Amounts.

(b)     Notwithstanding the provisions of Section 2.6(a), Buyer and Seller acknowledge that it is their mutual desire and intent to determine the final Purchase Price at or prior to the Closing, even though the Closing Balance Sheet and all relevant data regarding the Capital Expenditure Amount will not be available until after the Closing. Consequently, Buyer and Seller agree to use commercially reasonable efforts to determine and agree upon the Price Adjustment Amounts at or prior to the Closing in accordance with Sections 2.6(c) and (d).

(c)     Not less than three (3) days prior to the Closing Date, Seller shall deliver to Buyer (i) the combined balance sheet of the Facilities as of the last day of the month immediately preceding the Closing Date, which balance sheet will be prepared in accordance with GAAP, applied on a basis consistent with the Reference Balance Sheet (the "Interim Balance Sheet"), (ii) the portions of the trial balance for the Interim Balance Sheet relating to the Price Adjustment Amounts, and (iii) a statement setting forth (A) Seller's proposed Purchase Price, (B) each of Seller's proposed Price Adjustment Amounts, (C) calculations showing the adjustments that Seller made to the applicable amounts shown on the Interim Balance Sheet to derive Seller's proposed Price Adjustment Amounts, and (D) a schedule of capital expenditures supporting the Capital Expenditure Amount (the "Price Adjustment Statement"). The Price Adjustment Statement will include (to the extent applicable) (1) Seller's designation of the prepaid expenses, claims for refunds and rights to offset that are Prepaid Expenses and Excluded Prepaid Expenses, respectively; (2) Seller's description of inventory, supplies, food, pharmaceuticals, janitorial and office supplies and other disposals that are Excluded Inventory; (3) Seller's list of employees whose "paid time off" liability is being excluded from the calculation of the Accrued PTO Amount; (4) Seller's adjustment to the relevant amounts as shown on the Interim Balance Sheet to reflect the exclusion of any such assets or liabilities from Seller's calculation of the Price Adjustment Amounts; (5) Seller's adjustment to the relevant amounts as shown on the Interim Balance Sheet to reflect the estimated change in the value of the relevant Purchased Assets or the amount of the Assumed Indebtedness between the date of the Interim Balance Sheet and the Closing Date; and (6) such other information regarding Seller's proposed Price Adjustment Amounts as Seller deems necessary or appropriate.

(d)     Seller shall (i) consult with Buyer and its representatives with respect to the Interim Balance Sheet and the Price Adjustment Statement, and (ii) permit Buyer and its representatives to review Seller's books and records relating thereto. Buyer and Seller will use commercially reasonable efforts to resolve any objections or proposed adjustments raised or proposed by Buyer with respect to the Interim Balance Sheet or the Price Adjustment Statement and will modify the Interim Balance Sheet and/or the Price Adjustment Statement as necessary to reflect the resolution of any such objections or proposed adjustments. As and to the extent Buyer and Seller agree in writing upon any of the Price

Adjustment Amounts at or prior to the Closing, (A) such agreed upon amount will be used to determine the amount of cash to be paid by Buyer at Closing under Section 3.3(a) with respect to such Price Adjustment Amount, and (B) the parties will not be required to determine or adjust such Price Adjustment Amount post-Closing as contemplated by Section 2.7. As and to the extent Buyer and Seller are unable to agree in writing upon any Price Adjustment Amount at or prior to the Closing, then, (1) for purposes of determining the amount of cash to be paid by Buyer at Closing under Section 3.3(a) with respect to such Price Adjustment Amount, the parties will use the amount set forth in Seller's Price Adjustment Statement, and (2) such unresolved Price Adjustment Amount will be resolved following the Closing in accordance with Section 2.7.

(e)     If any material part of the Purchased Assets is damaged, lost or destroyed (whether by fire, theft, or other casualty event) prior to the Closing, Buyer may, at its option, either (i) reduce the Purchase Price by the (A) fair market value of the Purchased Assets damaged, lost or destroyed, such value to be determined as of the date immediately prior to such damage, loss or destruction or (B) by the estimated cost to replace or restore the damaged, lost or destroyed Purchased Assets, or (ii) require Seller upon the Closing to transfer to Buyer the proceeds (or the right to the proceeds) of any applicable insurance, including any business interruption insurance relating to periods after the Closing. Any determination of the fair market value of any Purchased Assets which are damaged, lost or destroyed shall be made in good faith jointly by Buyer and Seller prior to Closing. In the event that Buyer and Seller cannot reach a resolution regarding the fair market value of any such damaged, lost or destroyed Purchased Assets, the Closing shall occur and (x) the Purchase Price shall be subject to subsequent adjustment to reflect such damage, loss or destruction after the Closing Date (the amount of such adjustment, the "Additional Adjustment Amount") in accordance with the dispute resolution procedures in Section 12.3(c) and (y) Seller shall be obligated to pay to Buyer interest on the Additional Adjustment Amount from the Closing Date to the date of payment of the Additional Adjustment Amount at the Applicable Rate.

(f)     The amount of any liability under this Agreement that is owing from Buyer to Seller or Seller to Buyer and that has been agreed, resolved or liquidated prior to the Closing shall be treated appropriately as a further adjustment to the Purchase Price to be paid at Closing. The payment of any such amount that has not been so agreed, resolved or liquidated shall be made when agreed, resolved or liquidated; provided that the foregoing shall not affect Buyer's obligation to pay the entire amount of the Purchase Price at Closing.

**2.7     Post-Closing Determinations of Price Adjustment Amounts**. If Buyer and Seller have not agreed in writing upon any of the Price Adjustment Amounts at or before the Closing, the amount of such Price Adjustment Amount (and any adjustments to the amount of the Purchase Price paid pursuant to Section 3.3(a) at Closing) will be determined in accordance with this Section 2.7.

(a)     Following the Closing, Buyer and Seller will continue to use commercially reasonable efforts to determine and agree upon any unresolved Price Adjustment Amount in the manner described in Sections 2.6(c) and (d).

(b)     If Buyer and Seller have not agreed in writing upon any such Price Adjustment Amount within forty-five (45) days following the Closing, Seller shall deliver to Buyer (i) the combined balance sheet of the Facilities as of the Closing Date (the "Closing Balance Sheet"), which Closing Balance Sheet will be prepared in accordance with GAAP, applied on a basis consistent with the Reference Balance Sheet, except that as it relates to any unresolved Price Adjustment Amount, the Closing Balance Sheet will exclude the value (or amount) of (A) any Excluded Inventory, (B) any Excluded Prepaid Expenses, (C) any accrued liability for "paid time off" that is not within the definition of "Accrued PTO," and (D) any liability for indebtedness for borrowed money or capitalized lease

obligations that are not within the definition of "Assumed Indebtedness," (ii) the portions of the trial balance for the Closing Balance Sheet relating to the unresolved Price Adjustment Amounts, and (iii) a statement setting forth (A) Seller's proposed Purchase Price, (B) each of Seller's proposed Price Adjustment Amounts (for the unresolved Price Adjustment Amounts), (C) calculations showing the adjustments, if any, that Seller made to the applicable amounts shown on the Closing Balance Sheet to derive such proposed Price Adjustment Amount and (D) a schedule of capital expenditures supporting the Capital Expenditure Amount. Such statement will include (to the extent applicable) (1) Seller's designation of the prepaid expenses, claims for refunds and rights to offset that are Prepaid Expenses and Excluded Prepaid Expenses, respectively; (2) Seller's description of inventory, supplies, food, pharmaceuticals, janitorial and office supplies and other disposals that are Excluded Inventory; (3) Seller's list of employees whose "paid time off" liability is being excluded from the calculation of the Accrued PTO Amount; (4) the list of any indebtedness for borrowed money or capitalized lease obligations that are "Assumed Indebtedness," and (5) such other information regarding Seller's proposed Price Adjustment Amounts as Seller deems necessary or appropriate.

(c)     Within thirty (30) days after Seller's delivery of the Closing Balance Sheet and other information contemplated by Section 2.7(b), Buyer shall, in a written notice to Seller, either accept or describe in reasonable detail any proposed adjustments to the Closing Balance Sheet and Seller's proposed Price Adjustment Amounts and the reasons therefor, and shall include pertinent calculations. At all reasonable times following delivery by Seller to Buyer of the proposed Closing Balance Sheet and other information contemplated by Section 2.7(b), Seller shall make available to Buyer and its agents all books and records of Seller included in Excluded Assets that relate to the determination of the unresolved Price Adjustment Amounts. If Buyer fails to deliver notice of acceptance or objection to the Closing Balance Sheet and the Price Adjustment Amounts within such thirty (30) day period, Buyer shall be deemed to have accepted the Closing Balance Sheet and Seller's proposed Price Adjustment Amounts. In the event that Seller and Buyer are not able to agree on the Price Adjustment Amounts within thirty (30) days from and after the receipt by Seller of any objections raised by Buyer, Seller and Buyer shall each have the right to require that such disputed determination be submitted to such independent certified public accounting firm as Seller and Buyer may then mutually agree upon in writing for computation or verification in accordance with the provisions of this Agreement. Any such independent certified public accounting firm shall not have been engaged by either party in the preceding three years. The results of such accounting firm's report shall be binding upon Seller and Buyer, and such accounting firm's fees and expenses for each such disputed determination shall be borne equally by the parties. Appropriate payment of the difference between the amount of the Purchase Price paid pursuant to Section 3.3(a) at Closing and the amount of the Purchase Price as finally determined pursuant to this Section 2.7 shall be made by Buyer or Seller, as applicable, in immediately available funds promptly upon agreement of Buyer and Seller on the amount of the unresolved Price Adjustment Amounts (or upon the determination of the amount of such Price Adjustment Amounts in accordance with this Section 2.7). Any amounts due under this Section 2.7 shall bear interest from the Closing Date until paid at a rate equal to the Applicable Rate.

2.8     **Proration**. Within ninety (90) days after the Closing Date, Seller and Buyer shall prorate as of the Closing Date any amounts which become due and payable after the Closing Date with respect to (i) the Assumed Contracts, (ii) ad valorem taxes, if any, on the Purchased Assets, (iii) property taxes on the Purchased Assets and (iv) all utilities servicing any of the Purchased Assets, including water, sewer, telephone, electricity and gas service, in each case to the extent not included in Assumed Liabilities. Any such amounts which are not available within ninety (90) days after the Closing Date shall be similarly prorated as soon as practicable thereafter.

**3.    CLOSING**

**3.1    Closing.** Subject to the satisfaction or waiver by the appropriate party of all the conditions precedent to Closing specified in <u>Sections 7</u> and <u>8</u> hereof, the consummation of the sale and purchase of the Purchased Assets and the other transactions contemplated by and described in this Agreement (the "<u>Closing</u>") shall take place at the offices of the Authority at 10:00 a.m. not later than the fifth business day after the conditions set forth in <u>Sections 7</u> and <u>8</u> have been satisfied or waived or at such other date and/or at such other location as the parties hereto may mutually designate in writing (the "<u>Closing Date</u>"). The parties shall use commercially reasonable efforts to cause the conditions set forth in <u>Sections 7</u> and <u>8</u> to be satisfied so that the Closing will occur on January 31, 2011.

**3.2    Actions of Seller at Closing.** At the Closing and unless otherwise waived in writing by Buyer, Seller shall deliver to Buyer the following:

(a)    Subject only to the Permitted Encumbrances, (i) limited warranty deeds containing special warranty of title, duly executed by Seller, or by its applicable Affiliate, in recordable form, conveying to Buyer, or to such Person as designated by Buyer, good and marketable fee simple title to the Owned Real Property and/or (ii) Assignment and Assumption Agreements, fully executed by Seller, or its applicable Affiliate, in recordable form assigning to Buyer leasehold title to any Leased Real Property;

(b)    a certificate executed by a duly authorized officer of Seller certifying that the conditions set forth in <u>Sections 7.1 and 7.6</u> have been satisfied;

(c)    (i) an affidavit to the effect that, other than as specified therein, no improvements or repairs have been made by, or for the account of, or at the instance of, Seller to or on the Property within ninety-five (95) days preceding the Closing Date for which payment in full has not been made; (ii) a FIRPTA certificate; (iii) a residency affidavit (if required by the title company or applicable Law); and (iv) the information to enable the closing agent to file a 1099 to report the sale;

(d)    The General Bill of Sale and Assignment, duly executed by Seller, conveying to Buyer or to such Affiliate of Buyer which is designated by Buyer valid title to all tangible assets which are a part of the Purchased Assets and valid title to all intangible assets which are a part of the Purchased Assets, free and clear of all Encumbrances other than the Assumed Liabilities and Permitted Encumbrances;

(e)    The Assignment and Assumption Agreement (and, if applicable, the Partial Assignment and Assumption Agreement), duly executed by Seller, conveying Seller's interest in the Assumed Contracts to Buyer or to such Affiliate of Buyer which is designated by Buyer;

(f)    A certificate of Seller certifying that the conditions set forth in <u>Section 7.1</u> have been satisfied;

(g)    A certificate of incumbency for the officers of Seller executing this Agreement and any other agreements or instruments contemplated herein dated as of the Closing Date;

(h)    A certificate of existence and good standing of Seller from the State of Georgia, dated the most recent practical date prior to Closing;

(i)    The opinion of Seller's counsel as described in and provided by <u>Section 7.2</u> hereof;

**EXHIBIT J - 25**

(j)     Possession of the Purchased Assets, subject only to Permitted Encumbrances, to Buyer or such Affiliate of Buyer which is designated by Buyer; and

(k)     Copy of the resolution duly adopted by the board of directors of Seller authorizing and approving Seller's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and of full force and effect as of Closing, by the appropriate officers of Seller;

(l)     Seller shall deliver an executed Plaintiff's Motion for Order of Dismissal Without Prejudice of Palmyra Park Hospital, Inc., d/b/a Palmyra Medical Center v. Phoebe Putney Memorial Hospital, Inc. and Phoebe Putney Health System, Inc., Civil Action File No. 1:08-CV-00102-WLS, pending in the United States District Court for the Middle District of Georgia, Albany Division in the form attached hereto as Exhibit G;

(m)     Seller shall deliver an executed Appellant Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center's Motion for Permission to Withdraw Appeal of the matter pending before the Court of Appeals for the State of Georgia appealing the decision rendered by the Superior Court of Sumter County, Georgia, in Phoebe Sumter Medical Center v. Ga. Department of Community Health and Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center, Case Number 10CV-30-P and an executed Appellant Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center's Motion For Permission to Withdraw Appeal of the matter pending before the Court of Appeals for the State of Georgia appealing the decision rendered by the Superior Court of Dougherty County, Georgia, in Phoebe Putney Memorial Hospital v. Ga. Department of Community Health and Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center, Case Number 10CV-097-1 in the forms attached hereto as Exhibits H and I, respectively;

(n)     Seller shall deliver an executed copy of the document in the form attached hereto as Exhibit J pursuant to which Seller will withdraw all pending applications for Certificates of Need in Dougherty County, Georgia including, but not limited to, Certificate of Need application # 2008-081; and

(o)     Such other instruments and documents as are reasonably necessary to satisfy the conditions precedent to Buyer's obligations hereunder and the consummation of the transactions described in this Agreement.

**3.3**     **Actions of Buyer at Closing**. At the Closing and unless otherwise waived in writing by Seller, Buyer shall deliver to Seller the following:

(a)     an amount equal to the Purchase Price by wire transfer in immediately available federal funds to an account of Seller's designation;

(b)     the Assignment and Assumption Agreements (and, if applicable, the Partial Assignment and Assumption Agreement), described in Sections 3.2(a)(iii) and 3.2(c), duly executed by Buyer, pursuant to which Buyer shall assume the future payment and performance of (i) the leases and other Assumed Contracts assigned thereby, and (ii) the Assumed Liabilities as herein provided;

(c)     a copy of the General Bill of Sale and Assignment, duly executed by Buyer;

(d)     a certificate of Buyer certifying that the conditions set forth in Section 8.1 have been satisfied;

(e)     certificates of incumbency for the respective officers of Buyer, PPHS and PNI executing this Agreement and any other agreements or instruments contemplated herein dated as of the Closing Date;

(f)     certificates of existence and good standing of PPHS and PNI from the State of Georgia, dated the most recent practical date prior to Closing;

(g)     the opinion of Buyer's counsel as described in and provided by Section 8.2;

(h)     copies of resolutions duly adopted by the members of the Authority and the boards of directors of PPHS and PNI, authorizing and approving each such entity's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein, certified as true and in full force as of Closing by an appropriate officer of Buyer, PPHS and PNI;

(i)     a certificate executed by a duly authorized officer of Buyer certifying that the conditions set forth in Sections 8.1 and 8.5 have been satisfied; and

(j)     such other instruments and documents as are reasonably necessary to satisfy the conditions precedent to Seller's obligations hereunder and the consummation of the transactions described in this Agreement.

**3.4     Additional Acts**. From time to time after Closing, Seller and its Affiliates shall execute and deliver such other instruments of conveyance and transfer, and take such other actions as Buyer reasonably may request, to convey and transfer full right, title and interest to, vest in, and place Buyer in legal and actual possession of, any and all of the Purchased Assets. In the case of Assumed Contracts and rights which cannot be transferred effectively without the consent of third parties, Seller with Buyer's assistance shall use commercially reasonable efforts to obtain such consents prior to the Closing and, if not so obtained, then promptly thereafter. Seller shall also furnish Buyer with such information and documents in its possession or under its control, or which Seller can execute or cause to be executed, as will enable Buyer to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Purchased Assets. To the extent reasonably necessary, and subject to such limitations as Seller shall reasonably establish, (including limitations consistent with the provisions of Sections 6.1(b)(i), (ii) and (iii)), Seller and its Affiliates shall provide to Buyer access to (i) Seller's risk management information concerning the Hospital or the Facilities, and (ii) those policies or procedures of Seller pertaining to the pre-Closing operation of the Hospital or the Facilities (including employment policies, procedures, manuals and training aids) which Buyer needs to operate either the Hospital or the Facilities.

## 4.     REPRESENTATIONS AND WARRANTIES OF SELLER

As of the date hereof and as of the Closing Date, Seller represents and warrants to Buyer the following (except (a) to the extent any of the following speaks as of a specific date, in which case Seller makes such representations and warranties as of the date specified, and (b) to the extent provided in any Schedules that Seller delivers, supplements or amends in accordance with Section 6.1(a), each of which shall have the same force and effect under this Agreement as though delivered simultaneously with the parties' execution and delivery of this Agreement):

**4.1     Incorporation; Qualification and Capacity**. Seller is a corporation validly existing, duly organized and in good standing under the Laws of the State of Georgia. Seller has the requisite power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its

**EXHIBIT J - 27**

businesses as now being conducted. The execution and delivery by Seller of the Agreement and documents described herein, the performance by Seller of its obligations under the Agreement and documents described herein and the consummation by Seller of the transactions contemplated by the Agreement and documents described herein have been duly and validly authorized and approved by all necessary corporate actions on the part of Seller, none of which actions have been modified or rescinded and all of which actions remain in full force and effect.

      **4.2**    **Corporate Powers; Consents; Absence of Conflicts With Other Agreements, Etc.** The execution, delivery and performance of the Agreement and documents described herein by Seller and the consummation by Seller of the transactions contemplated by the Agreement and documents described herein, as applicable:

          (a)    are not in contravention or violation of the terms of the articles or certificate of incorporation or bylaws of Seller;

          (b)    except for Approvals and Permits required for Buyer's operation of the Purchased Assets after Closing, do not require any material Approval or Permit of, or filing or registration with, or other action by, any Governmental Entity (other than Buyer or its Affiliates) to be made or sought by Seller or any of its Affiliates; provided that Seller makes no representation regarding any requirements of the HSR Act or any other state or federal antitrust regulations in connection with transactions contemplated hereby; and

          (c)    assuming the Approvals and Permits described in Section 4.2(b) are obtained, will not conflict in any material respect with, or result in any violation of or default under (with or without notice or lapse of time or both), or give rise to a right of termination, cancellation, acceleration or augmentation of any obligation or to loss of a material benefit under, or result in the creation of any material Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets under (A) any Contract or (B) any Law applicable to any of the Purchased Assets; provided that no representation or warranty is given with respect to consents required to assign any of the Assumed Contracts; and provided further that Seller makes no representation regarding any requirements of the HSR Act or any other state or federal antitrust regulations in connection with transactions contemplated hereby.

      **4.3**    **No Outstanding Rights**. Except as set forth on Schedule 4.3, there are no outstanding rights (including any right of first refusal), options, Contracts made on behalf of Seller giving any Person any current or future right to require Seller or any of its Affiliates or, following the Closing Date, Buyer, to sell or transfer to such Person or to any third party any material interest in any of the Purchased Assets.

      **4.4**    **Purchased Assets**. The Purchased Assets and the Excluded Assets (a) constitute all assets which are held or used by the Seller or any of its Affiliates exclusively for use by and necessary for the conduct of the business and operation of the Facilities in the manner conducted as of the date of this Agreement other than assets related to other services normally provided by the HCA corporate, division and regional offices (including group purchasing, supply chain services, revenue cycle services, information technology services and other corporate or centrally provided services), and (b) are sufficient to permit Buyer to carry on such business as currently conducted. There are no hospitals, medical office buildings or other health care related facilities reflected on the Reference Balance Sheet other than the Facilities and all of the Facilities are reflected on the Reference Balance Sheet.

      **4.5**    **Binding Agreement**. This Agreement and all Contracts to which Seller or any of its Affiliates will become a party hereunder are and will constitute the valid and legally binding obligations of Seller and/or such Affiliates and are and will be enforceable against them in accordance with the

respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

**4.6    Financial Information.**

(a)    Schedule 4.6 contains the following financial statements and financial information (collectively, the "Historical Financial Information"):

(i)    unaudited combined balance sheet of the Facilities dated as of December 31, 2009;

(ii)    unaudited combined balance sheet of the Facilities dated as of the Balance Sheet Date (the "Reference Balance Sheet");

(iii)    unaudited combined income statement of the Facilities for the twelve-month period ended on December 31, 2009; and

(iv)    unaudited combined income statement of the Facilities for the ten (10) month period ended on the Balance Sheet Date.

The financial statements included in the Historical Financial Information have been prepared in accordance with GAAP, applied on a consistent basis throughout the periods indicated, and Seller has not changed any accounting policy or methodology in determining the obsolescence of inventory or in calculating reserves (including reserves for uncollected accounts receivable) throughout all periods presented. Subject to the exceptions to generally accepted accounting principles set forth in Schedule 4.6, such financial statements have been prepared from and (in all material respects) in accordance with the books and records of Seller with respect to the Facilities. Except as provided in Schedule 4.6, the balance sheets contained in the Historical Financial Information present fairly in all material respects the financial condition of the Facilities as of the dates indicated thereon. The income statements contained in the Historical Financial Information present fairly in all material respects the results of operations of the Facilities for the periods covered.

(b)    Except for (i) liabilities that are disclosed in this Agreement, Contracts entered into in connection herewith and schedules and exhibits hereto and thereto, and (ii) liabilities that were incurred after the Balance Sheet Date in the ordinary course of business, as of the date hereof, there are no material liabilities of any nature of Seller or any of its Affiliates relating to the Facilities or the other Purchased Assets and Assumed Liabilities required in accordance with GAAP to be disclosed on the financial statements of Seller.

**4.7    Permits and Approvals.**

(a)    Seller holds all material Permits and Approvals necessary for the conduct of the business and operation of the Facilities as currently conducted and the use of the Purchased Assets by the Seller as currently used. All such Permits and Approvals are in full force and effect and unimpaired. Each Facility's pharmacies, laboratories and all other material ancillary departments located at such Facility or operated for the benefit of such Facility and included within the Purchased Assets, which are required to be specially licensed or to have Permits and Approvals, are licensed by the appropriate Governmental Entity or have such Permits and Approval issued by the appropriate Governmental Entity. Not later than January 7, 2011, Seller shall provide to Buyer a complete list of (i) all healthcare, controlled substance or similar Permits and Approvals necessary for the conduct of the business and operation of the Facilities as

23

currently conducted and the use of the Purchased Assets by Seller as currently used, and (ii) all other material Permits and Approvals necessary for the conduct of the business and operation of the Facilities as currently conducted and the use of the Purchased Assets by Seller as currently used.

(b)     Each Facility is in compliance in all material respects with all Permits and Approvals required by Law. There are no provisions in, or Contracts relating to, any such Permits and Approvals which precludes or limits in any material respect Seller from operating any of the Facilities as they are currently operated. There is not now pending nor, to the knowledge of Seller, threatened, any action by or before any Governmental Entity (other than Buyer or its Affiliates) to revoke, cancel, rescind, modify or refuse to renew any of the Permits and Approvals (and as of the date of this Agreement, there is not pending nor, to the knowledge of Seller, threatened, any such action by or before Buyer or any of its Affiliates), and all of the material Permits or Approvals are and shall be in good standing now and as of the Closing.

**4.8     Intellectual Property**. Except for Intellectual Property constituting Excluded Assets:

(a)     Seller owns or will own, or is licensed or will be licensed or otherwise possesses or will possess all necessary rights to use, all Intellectual Property used in the Facilities owned by Seller.

(b)     To the knowledge of Seller, there is no unauthorized use, disclosure, infringement or misappropriation of any Intellectual Property rights of Seller or any of its Affiliates, any trade secret material to Seller or any of its Affiliates, or any Intellectual Property right of any third party to the extent licensed by or through Seller or any of its Affiliates, by any third party, including any employee or former employee of Seller or any of its Affiliates, relating in any way to any of the Purchased Assets. Other than in the ordinary course of business or otherwise reflected in the Historical Financial Information, there are no royalties, fees or other payments payable by Seller or any of its Affiliates, to any Person by reason of the ownership, use, sale or disposition of Intellectual Property related to any of the Purchased Assets.

(c)     Seller is not nor will be as a result of the execution and delivery of this Agreement or any of the documents described herein or the performance of its obligations under this Agreement or any of the documents described herein, in material breach of any license, sublicense or other agreement relating to the Intellectual Property or the Intellectual Property rights of any third party related to any of the Purchased Assets.

**4.9     Medicare Participation/Accreditation**.

(a)     The Hospital is eligible to receive payment without restriction under Title XVIII of the Social Security Act ("Medicare") and Title XIX of the Social Security Act ("Medicaid") and is a "provider" with one or more valid and current provider agreements and with one or more provider numbers with the federal Medicare, all applicable state Medicaid and successor programs (the "Government Programs") through intermediaries or contract administrators. Except as set forth on Schedule 4.9 each of the other Facilities (other than physician practices) that have historically received Medicare or Medicaid reimbursement is eligible to receive payment without restriction under Medicare and Medicaid and is a "provider" with valid and current provider agreements and with one or more provider numbers with the Government Programs through intermediaries or contract administrators. Except as set forth on Schedule 4.9 the Hospital and each of the other Facilities that have historically received payments under TRICARE and successor programs is a "provider" with valid and current provider agreements and with one or more provider numbers with TRICARE and successor programs through intermediaries or contract administrators. The Hospital and the other Facilities referred to above are in compliance with the conditions of participation for the Government Programs in all material

respects and have received all Approvals necessary for capital reimbursement on the Purchased Assets. Except as set forth on <u>Schedule 4.9</u>, there is not pending, nor to the knowledge of Seller threatened, any proceeding or investigation under the Government Programs involving Seller or any of the Purchased Assets. The cost reports of Seller and the Hospital and the other Facilities referred to above for the Government Programs and for payment or reimbursement of any other Agency Receivables for the fiscal years through December 31, 2009 required to be filed on or before the date hereof have been properly filed and are complete and correct in all material respects. Not later than January 7, 2011, Seller shall provide Buyer with (i) a complete copy of the last three years' filed cost reports for the Hospital and the other Facilities, (ii) a list of all provider numbers and provider agreements currently utilized by the Hospital or any of the other Facilities, (iii) the identity of all fiscal intermediaries or contract administrators for each such provider number or provider agreement, and (iv) a list of all material claims, actions or appeals pending before any fiscal intermediary or contract administrator or Governmental Entity with respect to any of the last five years' filed cost reports for the Hospital or any of the other Facilities. Except as disclosed on <u>Schedule 4.9</u>, Seller is in material compliance with filing requirements with respect to cost reports of the Hospital and the other Facilities referred to above and such reports do not claim, and neither the Hospital nor any of the other Facilities referred to above has received payment or reimbursement in excess of, the amount provided by Law or any applicable agreement, except where excess reimbursement was noted on the cost report. Seller is in compliance in all material respects with any and all Medicare, Medicaid or other third party corporate integrity or compliance agreements or consent orders applicable to the Facilities.

(b)    All billing practices of Seller with respect to the Facilities to all third party payors, including the Government Programs and private insurance companies, have been and are in compliance with all applicable Laws, regulations and polices of such third party payors and Government Programs in all material respects. Neither Seller nor the Facilities have billed or received any payment or reimbursement in excess of amounts allowed by Law.

(c)    The Hospital is duly accredited by The Joint Commission ("<u>TJC</u>"). Seller will provide by January 14, 2011 copies of the Hospital's TJC accreditation survey report and deficiency list, if any, and the Hospital's plan of correction, if any.

**4.10    Regulatory Compliance**. Except as set forth on <u>Schedule 4.10</u>, Seller is in compliance in all material respects with all applicable statutes, rules, regulations and requirements of, and all agreements and orders with, Governmental Entities having jurisdiction over each Facility and the Purchased Assets and the business operation of each Facility and the Purchased Assets; provided, however, that no representation is made with respect to the Facilities' compliance with the Americans with Disabilities Act, as amended. Seller has timely filed all material forms, applications, reports, statements, data and other information required to be filed with Government Entities.

**4.11    Assumed Contracts**. Each Assumed Contract (i) is valid and existing, and Seller has duly performed in all material respects its obligations under each Assumed Contract to which it is a party to the extent that such obligations to perform have accrued and (ii) no material breach or default, alleged material breach or default, or event which would (with the passage of time, notice or both) constitute a material breach or default under any Assumed Contract by Seller or, to the knowledge of Seller, and except as set forth on <u>Schedule 4.11</u>, any other party or obligor with respect thereto, has occurred.

**4.12    Real Property**.

(a)    Neither Seller nor any Affiliate of Seller has created any Encumbrance (other than Permitted Encumbrances) which will materially interfere with Buyer's use of the Purchased Assets in a manner consistent with the current use by Seller and its Affiliates. Except for medical office leases

(including the ground lease of approximately 0.5 acres of the Main Hospital Parcel, as defined in Exhibit D-1, by Seller, as ground lessor, to Kanan Albany, LLC with respect to the Kanan Albany, LLC medical office building located on such property) and food services agreements, neither Seller nor any of Seller's Affiliates has leased all or any material portion of the Facilities to any other Person that is not a Seller. Seller or one of its Affiliates owns and will convey fee simple interest in the Owned Real Property subject only to Permitted Encumbrances, and Seller or its applicable Affiliate will assign or cause the applicable Seller to assign its leasehold interest in the Leased Real Property to Buyer subject only to Permitted Encumbrances. Seller agrees that title to the Real Property shall not be altered or encumbered between the date of this Agreement and Closing except to the extent not restricted by Sections 6.2 and 6.3.

(b)     The Leased Real Property and the Owned Real Property collectively constitutes all real property necessary for or used by Seller in the operation of the Facilities.

**4.13     Personal Property**. Seller or its Affiliates will hold on the Closing Date good and marketable title to all tangible personal property assets and valid title to all intangible assets included in the Purchased Assets free and clear of all Encumbrances, except Permitted Encumbrances and rights of owners under Assumed Contracts or under leases or licenses of assets leased or licensed in the ordinary course of business.

**4.14     Insurance**. Schedule 4.14 sets forth a true and complete list of all insurance policies or self insurance funds maintained by Seller as of the date of this Agreement covering the ownership and operation of the Purchased Assets or any of the Facilities, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles). Seller has one or more "business interruption" insurance policies in customary form and amount covering the Facilities. All of such policies are now and will be until the Closing in full force and effect on an occurrence basis with no premium arrearages. Such policies of insurance shall not be assigned to Buyer as part of the Purchased Assets and Buyer acknowledges that all of the coverages listed on Schedule 4.14 with respect to the Purchased Assets will cease on the Closing Date.

**4.15     Employee Benefit Plans**.

(a)     Schedule 4.15 contains a true and complete list of all the following agreements, plans or other arrangements, covering any employee of the Facilities, which are presently in effect: (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (ii) any other employee benefit plan, program, policy, or arrangement, whether written or unwritten, formal or informal, which Seller currently sponsors, or to which it has any outstanding present or future obligations to contribute or other liability, whether voluntary, contingent or otherwise (collectively, the "Plans").

(b)     The Purchased Assets are not, and Seller does not reasonably expect them to become, subject to a lien imposed under the Code or under Title I or Title IV of ERISA including liens arising by virtue of Seller considered to be aggregated with another entity pursuant to Section 414 of the Code ("ERISA Controlled Group").

(c)     Except as set forth in Schedule 4.15, neither Seller nor any member of Seller's ERISA Controlled Group has sponsored, contributed to or had an "obligation to contribute" (as defined in ERISA Section 4212) to a "multiemployer plan" (as defined in ERISA Sections 4001(a)(3) or 3(37)(A)) on or after September 26, 1980 on behalf of any employees of the Facilities.

(d)     Neither Seller nor any member of Seller's ERISA Controlled Group has at any time sponsored or contributed to a "single employer plan" (as defined in ERISA Section 4001(a)(14)) to

which at least two or more of the "contributing sponsors" (as defined in ERISA Section 4001(a)(13)) are not part of the same ERISA Controlled Group.

(e)     Except as set forth on <u>Schedule 4.15</u>, there are no material actions, audits or claims pending or, to Seller's knowledge, threatened against Seller with respect to Seller's maintenance of the Plans, other than routine claims for benefits and other claims that are not material.

(f)     Seller and Seller's ERISA Controlled Group have complied with all of the continuation coverage requirements of Section 1001 of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and ERISA Sections 601 through 608 and with the requirements of Section 5000 of the Code.

(g)     All of Seller's Plans that are intended to satisfy Section 401 of the Code ("<u>Retirement Plans</u>") from which assets may be involved in a "direct rollover" (as defined in Section 401(a)(31) of the Code) or other transfer to Buyer's Retirement Plans have complied with the requirements of Section 401(a) of the Code.

(h)     All IRS Form 5500's due to have been filed with respect to the Plans have been filed.

### 4.16     <u>Employees and Employee Relations</u>.

(a)     No changes in the basis for remuneration of employees of the Facilities have been made, promised or authorized by Seller since the Balance Sheet Date, except in the ordinary and usual course. Seller has no written employment Contracts, and no Contract of any nature that provides for employment for any particular period of time or that provides any restrictions upon Seller's right to terminate employment without any post-termination payment obligation, with any Person whomsoever relating to the Facilities. Other than in the ordinary course of business, no binding agreements have been made or entered into between Seller and any employee involved in any of the Facilities regarding changes in compensation, promotion or any other change in status.

(b)     (i) Except as set forth on <u>Schedule 4.16</u>, there is no pending or, to the best of Seller's knowledge, threatened employee strike, work stoppage or labor dispute, (ii) to the best of Seller's knowledge, no union representation question exists respecting any employees of Seller, no demand has been made for recognition by a labor organization by or with respect to any employees of Seller, no union organizing activities by or with respect to any employees of Seller are taking place, and none of the employees of Seller are represented by any labor union or organization, (iii) no collective bargaining agreement exists or is currently being negotiated by Seller, (iv) there is no unfair practice claim against Seller before the National Labor Relations Board, or any strike, dispute, slowdown, or stoppage pending or, to the best of Seller's knowledge, threatened against or involving the Facilities and none has occurred, (v) Seller is in compliance in all material respects with all Laws and Contracts respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours, (vi) Seller is not engaged in any unfair labor practices, (vii) there are no pending or, to the best of Seller's knowledge, threatened complaints or charges before any Governmental Entity regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like and (viii) except as otherwise provided in this Agreement, neither Buyer nor PNI will be subject to any claim or liability for severance pay as a result of the consummation of the transactions contemplated by this Agreement through the Closing.

### 4.17     <u>Litigation or Proceedings</u>.

(a)     Schedule 4.17(a) contains an accurate list and summary description of all litigation and proceedings with respect to the Facilities and the Purchased Assets (including litigation and proceedings with respect to the Facilities' employees and the Hospital's medical staff) to which Seller or any of its Affiliates are a party, as well as settlements and conciliation agreements under which Seller or any of its Affiliates have current or future obligations with respect to the Facilities or Purchased Assets. Except to the extent set forth on Schedule 4.17(a), there are no claims, actions, suits, audits, compliance reports or information requests, proceedings or investigations pending, or to the knowledge of Seller, threatened against or affecting (i) Seller or any of its Affiliates with respect to the Facilities or the Purchased Assets, or (ii) any employee who is employed at any of the Facilities, at law or in equity, or before or by any Governmental Entity (other than Buyer or its Affiliates) wherever located. Neither the representations and warranties set forth in this Section 4.17(a) nor the disclosure in Schedule 4.17(a) is intended to address PRO information, National Data Bank reports, quality review information and other physician specific confidential information.

(b)     Neither Seller nor any of its Affiliates nor any of the Facilities are in violation in any material respect under any Law relating to the operation of the Facilities (provided, however, that no representation is made with respect to the Facilities' compliance with the Americans with Disabilities Act, as amended), or under any order of any court or federal, state, municipal or other Governmental Entity (other than Buyer or its Affiliates) wherever located.

(c)     Other than as set forth on Schedule 4.17(c), Seller is not subject to any outstanding judgment, order or decree with respect to the Purchased Assets.

(d)     Seller has not engaged in any transaction that would reasonably be expected to subject Seller (or any successors in interest) to any avoidance action with respect to the Purchased Assets. Without limiting the generality of the foregoing, Seller has not with respect to the Purchased Assets (i) received any material payments from its or their account debtors outside the ordinary and usual course, (ii) acquired or sold any asset other than for reasonably equivalent value or (iii) conducted any business with any debtor-in-possession or bankrupt estate other than in the ordinary and usual course.

**4.18     Tax Matters**. Except as set forth on Schedule 4.18:

(a)     All tax returns, including income tax returns, sales tax returns, employee payroll tax returns, employee unemployment tax returns and franchise tax returns, for periods prior to and including Closing which are required to be filed by Seller (collectively "Returns") have been filed or will be filed within the time (including any valid extensions thereof) and in the manner provided by Law, and all Returns are or will be true and correct and accurately reflect the tax liabilities of Seller in all material respects, and all amounts shown due on such Tax Returns have been or will be paid on a timely basis;

(b)     All federal, state, county and local income, franchise, payroll, withholding, property, sales, use and all other taxes, penalties, interest, and any other statutory additions which have become or are due with respect to the Purchased Assets and any assessments received by Seller (collectively "Payable Tax Items"), have been or by the Closing Date will be paid regarding any period ended on or prior to the Closing Date or adequately reflected on the Closing Balance Sheet (or otherwise reserved for by a Seller or its Affiliates), whether shown on such returns or not;

(c)     There are no tax liens on any of the Purchased Assets;

(d)     Proper and accurate amounts have been withheld by Seller for all periods prior to the Closing in compliance with the payroll tax and other withholding provisions of all applicable Laws, and all of such amounts have been duly and validly remitted to the proper taxing authority; and

(e)     No notice of a claim or pending investigation has been received, or to the knowledge of Seller, has been threatened, by any state, local or other jurisdiction, alleging that Seller has a duty to file tax returns and pay taxes or is otherwise subject to the taxing authority of any jurisdiction, nor has Seller received any notice or questionnaire from any jurisdiction which suggests or asserts that Seller may have a duty to file such returns and pay such taxes, or otherwise is subject to the taxing authority of such jurisdiction.

**4.19     Environmental Matters.** Except as set forth on Schedule 4.19 or in any environmental report listed therein:

(a)     Seller has materially complied and is in material compliance (with respect to each of the Facilities) with, and the Real Property and all improvements on the Real Property are in material compliance with, all Environmental Laws.

(b)     Seller has no liability under any Environmental Law with respect to any of the Facilities or the Real Property, nor is Seller responsible for any liability of any other Person under any Environmental Law with respect to any of the Facilities or the Real Property. There are no pending or, to the knowledge of Seller, threatened actions, suits, orders, claims, legal proceedings or other proceedings based on, and neither Seller nor any of its Affiliates have received any formal or informal written notice of any complaint, order, directive, citation, notice of responsibility, notice of potential responsibility, or information request from any Governmental Entity or any other Person or knows or suspects any fact(s) which would reasonably be expected to form the basis for any such actions or notices arising out of or attributable to any Environmental Condition.

(c)     Seller has been duly issued, and currently has and will maintain through the Closing Date, all material Approvals and Permits required under any Environmental Law with respect to any of the Facilities. A true and complete list of such Permits, all of which are valid and in full force and effect, is set forth in Schedule 4.19. Seller is in material compliance (with respect to each Facility) with, and the Real Property and all improvements on the Real Property are in material compliance with, all Approvals and Permits. Except in accordance with such Approvals and Permits, there has been no release of material regulated by such Approvals and Permits at, on, under, or from the Real Property in violation of Environmental Laws.

(d)     The Real Property contains no underground improvements, including treatment or storage tanks, or underground piping associated with such tanks, used currently or in the past for the management of Hazardous Materials, and Seller has not used any portion of the Real Property as a dump or landfill.

(e)     Seller will promptly furnish to Buyer written notice of any material Environmental Condition or of any actions or notices described in this Section 4.19.

(f)     Except to the extent permitted under Environmental Laws, neither PCBs, lead paint, nor asbestos-containing materials are present on or in the Real Property.

(g)     No Encumbrance in favor of any Person relating to or in connection with any claim under any Environmental Law has been filed or has attached to the Real Property, other than Permitted Encumbrances.

**4.20     Immigration Act.** Seller is in compliance in all material respects with the terms and provisions of the Immigration Act in all material respects with respect to each of the Facilities. For each employee of Seller employed in any of the Facilities for whom compliance with the Immigration Act by

Seller is required, Seller has obtained and retained a complete and true copy of each such employee's Form I9 (Employment Eligibility Verification Form) and all other records or documents prepared, procured or retained by Seller pursuant to the Immigration Act to the extent Seller is required to do so under the Immigration Act. Seller has not been cited, fined, served with a Notice of Intent to Fine or with a Cease and Desist Order (as such terms are defined in the Immigration Act) at any of the Facilities, nor, to the knowledge of Seller, has any action or administrative proceeding been initiated or threatened against Seller in connection with any of the Facilities, by reason of any actual or alleged failure to comply with the Immigration Act.

**4.21    WARN Act**. Schedule 4.21 lists the full name, job title, job site and unit, date of Employment Loss, and type of Employment Loss (termination, layoff or reduction in work hours) of each employee of Seller and its Affiliates employed in any of the Facilities who has experienced an Employment Loss in the ninety (90) days preceding the date of this Agreement. Except as set forth in this Agreement, Seller does not presently intend to take any action that would result in an Employment Loss by any employee of Seller employed in any of the Facilities between the date of this Agreement and the Closing Date. "Employment Loss" for this purpose shall mean (i) an employment termination, other than a discharge for cause, voluntary departure, or retirement, (ii) a layoff exceeding six (6) months or (iii) a reduction in hours of work of more than fifty percent (50%), and "employee" shall mean any employee, including officers, managers and supervisors, but excluding employees who are employed for an average of fewer than 20 hours per week or who have been employed for fewer than six of the preceding 12 months.

**4.22    OSHA**. Seller has complied with all applicable Laws relating to employee health and safety in all material respects, and Seller has not received any written notice from any Governmental Entity (other than Buyer or its Affiliates) that past or present conditions of the Facilities or Purchased Assets violate any applicable legal requirements or otherwise will be made the basis of any claim, proceeding, or investigation, based on OSHA violations or otherwise related to employee health and safety.

**4.23    Inventory**. All of the Inventory existing on the date hereof will exist on the Closing Date, except for (i) Inventory exhausted or added in the ordinary course of business between the date of this Agreement and the Closing Date, and (ii) any Excluded Inventory. Except to the extent of reserves reflected in the Facilities' financial statements as of the applicable date, all of the Inventory on hand on the date of this Agreement and to be on hand on the Closing Date, consists and will consist in all material respects of items of a quality usable or saleable for the services currently being offered through the Hospital or the Facilities. The quantities of all Inventory are reasonable and justified under the normal operations of each of the Facilities.

**4.24    Absence of Changes**. Except as set forth in Schedule 4.24, between the Balance Sheet Date and the date hereof, there has not been any transaction or occurrence in which Seller or any of its Affiliates, in connection with the Facilities and Purchased Assets, has:

(a)      suffered any material damage, destruction or loss with respect to or affecting any of the Purchased Assets;

(b)      written down or written up in any material amount the value of any Inventory (including write-downs by reason of shrinkage or markdowns), determined as collectible any material Other Receivable or any portion thereof which was previously considered uncollectible, or written off as uncollectible any material Other Receivable or any portion thereof, except for write-downs, write-ups, and write-offs in the ordinary course of business;

(c)    disposed of or permitted to lapse any right to the use of any Intellectual Property;

(d)    made any material capital expenditure or commitment for additions to property, plant, equipment, intangible or capital assets or for any other purpose, other than for emergency repairs or replacement, and except for the capital expenditures disclosed on Schedule 4.24(d);

(e)    sold, transferred or otherwise disposed of any of the Purchased Assets except in the ordinary course of business;

(f)    granted or incurred any obligation for any increase in the compensation of any employee who is employed at the Facilities (including any increase pursuant to any bonus, pension, profit-sharing, retirement, or other plan or commitment) except in the ordinary course of business;

(g)    made any change in any method of accounting or accounting principle, practice, or policy;

(h)    taken any other action neither in the ordinary course of business nor provided for in this Agreement; or

(i)    agreed, so as to legally bind Buyer or affect the Purchased Assets, whether in writing or otherwise, to take any of the actions set forth in this Section 4.24 and not otherwise permitted by this Agreement.

**4.25**   **Solvency**. Seller is not insolvent and Seller will not be rendered insolvent as a result of any of the transactions contemplated by this Agreement. For purposes hereof, the term "solvent" means that: (a) the fair salable value of Seller's tangible assets is in excess of the total amount of their liabilities (including for purposes of this definition all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (b) Seller is able to pay its debts or obligations in the ordinary course as they mature; and (c) Seller has capital sufficient to carry on its businesses and all businesses in which it is about to engage.

**4.26**   **Statements True and Correct**. This Agreement and the Schedules hereto do not include, as of the date hereof, any untrue statement of a material fact or omit to state any material fact necessary to make the statements made in this Agreement with respect to the Seller and the Purchased Assets not misleading.

**4.27**   **Medical Staff**. Seller has provided to Buyer true, correct and complete copies of the by-laws, rules and regulations of the medical staff of the Hospital. Not later than January 7, 2011, Seller will provide to Buyer the names of all medical staff members, including allied health practitioners.

## 5.   REPRESENTATIONS AND WARRANTIES OF BUYER

As of the date hereof and as of the Closing Date, Buyer represents and warrants to Seller the following (except to the extent any of the following speaks as of a specific date, in which case Buyer makes such representations and warranties as of the date specified):

### 5.1   Authority Capacity; Corporate Capacity.

(a)    Buyer is a hospital authority validly existing, duly organized and in good standing under the Laws of the State of Georgia. Buyer has the requisite power and authority to enter into

this Agreement, perform its obligations hereunder and to conduct its businesses as now being conducted. The execution and delivery by Buyer of the Agreement and the documents described herein, the performance by Buyer of its obligations under the Agreement and the documents described herein and the consummation by Buyer of the transactions contemplated by the Agreement and the documents described herein have been duly and validly authorized and approved by all necessary hospital authority actions on the part of Buyer, none of which actions have been modified or rescinded and all of which actions remain in full force and effect. Buyer is and will be at the Closing the lessor or owner, directly or indirectly, of the hospitals owned, operated or managed by Buyer, PPHS, PNI and their respective Affiliates.

(b)      PPHS and PNI each is a not-for-profit corporation validly existing, duly organized and in good standing under the Laws of the State of Georgia. PPHS and PNI each has the requisite power and authority to enter into this Agreement, perform its obligations hereunder and to conduct its business as now being conducted. The execution and delivery by PPHS and PNI of the Agreement and the documents described herein, the performance by PPHS and PNI of their respective obligations under the Agreement and the documents described herein and the consummation by PPHS and PNI of the transactions contemplated by the Agreement and the documents described herein have been duly and validly authorized and approved by all necessary corporate actions on the part of PPHS and PNI, none of which actions have been modified or rescinded and all of which actions remain in full force and effect.

   **5.2**      **Powers; Consents; Absence of Conflicts With Other Agreements, Etc**. The execution, delivery and performance of this Agreement by Buyer, PPHS or PNI and all other agreements referenced in or ancillary hereto to which Buyer, PPHS or PNI are parties and the consummation of the transactions contemplated herein by Buyer, PPHS and PNI:

(a)      are within the powers of Buyer conferred by the Hospital Authorities Law and have been approved by all requisite authority action;

(b)      are within the corporate powers of PPHS and PNI and are not in contravention of the terms of PPHS's or PNI's certificate of incorporation, bylaws, or other governing documents and have been approved by all requisite corporate action;

(c)      except as described in <u>Schedule 5.2</u>, do not require any Approval or Permit of, or filing with, any Governmental Entity bearing on the validity of this Agreement which is required by Law; and

(d)      will neither conflict with nor result in any material breach or contravention of, or the creation of any Encumbrance under, any indenture, agreement, lease, instrument or understanding to which Buyer, PPHS or PNI are parties or by which Buyer, PPHS or PNI are bound.

   **5.3**      **Binding Effect**. This Agreement and all other agreements to which Buyer, PPHS, PNI and their respective Affiliates will become parties hereunder are and will constitute the valid and legally binding obligations of Buyer, PPHS, PNI and their respective Affiliates and are and will be enforceable against them in accordance with the respective terms hereof and thereof, except as enforceability against Buyer, PPHS, and PNI may be restricted, limited or delayed by applicable bankruptcy or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

   **5.4**      **Litigation**. There is no claim, action, suit, proceeding or investigation pending or, to the knowledge of Buyer, PPHS, or PNI, threatened against or affecting Buyer, PPHS or PNI that has or

would reasonably be expected to have a material adverse effect on Buyer's, PPHS's, or PNI's ability to perform this Agreement or any aspect of the transactions contemplated hereby.

**5.5** **Buyer Acknowledgements.**

(a) Buyer has: (i) such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the transactions contemplated by this Agreement, including the purchase of the Facilities and the Purchased Assets and the assumption of the Assumed Liabilities; (ii) the ability to bear the economic risk in connection with the consummation of the transactions contemplated by this Agreement, including a complete loss of future revenue, income or profits related to the Facilities and the Purchased Assets and (iii) been furnished with and has had access to such information as it has considered necessary to make a determination as to the purchase of the Facilities and the Purchased Assets and the assumption of the Assumed Liabilities.

(b) Buyer's decision to purchase the Facilities and the Purchased Assets and to assume the Assumed Liabilities, has been (i) made voluntarily and of its own accord, based upon, Buyer's (A) extensive knowledge and experience in financial and business matters relating to owning and operating general acute care hospitals, (B) consultations with its advisors and (C) investigation of the business, assets, risks and prospects of the Facilities and Purchased Assets and (ii) made without relying on any statement (whether oral or written), or any representation or warranty of Seller or any affiliate, officer or director of Seller, other than the representations and warranties expressly contained in this Agreement and the other Contracts executed in connection herewith.

**5.6** **Availability of Funds; Solvency.**

(a) Buyer has the ability to obtain funds in cash in amounts equal to the Purchase Price and will at the Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transactions contemplated by this Agreement.

(b) Neither Buyer, PPHS nor PNI is insolvent and neither Buyer, PPHS nor PNI will be rendered insolvent as a result of any of the transactions contemplated by this Agreement. For purposes hereof, the term "solvent" means that: (a) the fair salable value of Buyer's tangible assets is in excess of the total amount of its liabilities (including for purposes of this definition all liabilities, whether or not reflected on a balance sheet prepared in accordance with generally accepted accounting principles, and whether direct or indirect, fixed or contingent, secured or unsecured, and disputed or undisputed); (b) Buyer is able to pay its debts or obligations in the ordinary course as they mature; and (c) Buyer has capital sufficient to carry on its businesses and all businesses which Buyer is about to engage.

**5.7** **Antitrust Matters.** (a) Neither the execution and delivery of this Agreement nor the consummation or Closing of the transactions contemplated hereby will violate any applicable state or federal antitrust or similar laws, and (b) the closing of the transaction does not require the filing of a pre-merger notification and report form pursuant to the HSR Act.

**5.8** **Statements True and Correct.** This Agreement and the Schedules do not include, as of the date hereof, any untrue statement of a material fact or omit to state any material fact necessary to make the statements made in this Agreement with respect to Buyer and the Purchased Assets not misleading.

33

6.   **COVENANTS OF SELLER AND BUYER**

   6.1   <u>Completion of Schedules; Information; Assumed Contracts and Rejected Contracts</u>.

      (a)   (i)  Any Schedule required to be delivered by Seller under this Agreement shall be delivered by Seller to Buyer as promptly as practicable but in no event later than January 14, 2011.  Seller shall have the right to supplement or amend any such Schedule until January 14, 2011.  Additionally, Seller shall have the right to supplement or amend <u>Exhibits D-1 and D-2</u> until January 7, 2011, in order to reflect (A) the addition of any Owned Real Property or Leased Real Property not reflected on such exhibits as of the date of this Agreement, (B) the deletion of any property (other than the Main Hospital Parcel, as identified in <u>Exhibit D-1</u>) from <u>Exhibit D-1</u> that Seller or its applicable Affiliate shall have conveyed prior to the date hereof, or (C) the deletion of any property from <u>Exhibit D-2</u> if the lease or sublease with respect to such property shall have terminated or expired as of the date hereof (or to reflect the fact that the lease or sublease applicable to any such property will terminate or expire in accordance with its terms before the anticipated Closing Date).

      (ii)  Seller shall deliver to Buyer by no later than January 7, 2011 its proposed form of <u>Exhibits E</u> and <u>F</u>.  The parties will use good faith efforts to agree upon <u>Exhibits E</u> and <u>F</u> by January 14, 2011 (and in any event by the Closing Date).  If the parties are unable to agree upon <u>Exhibit E</u> or <u>F</u> by the Closing, the parties will resolve any such matter in accordance with <u>Sections 2.6</u> and <u>2.7</u>.

      (iii)  Buyer shall have the right to supplement or amend <u>Schedule 5.2</u> until January 14, 2011, to the extent any such supplement or amendment is required as a result of (or in response to) Seller's delivery of Approvals or Permits to Buyer as contemplated by <u>Section 4.7(a)</u>.

      (iv)  The parties will use good faith efforts to agree upon <u>Schedule 10.2</u> by January 14, 2011 (and in any event by the Closing Date).

      (v)  Schedules that Seller or Buyer delivers, supplements or amends in accordance with this <u>Section 6.1(a)</u> (or, with respect to <u>Schedule 10.2</u>, upon which Buyer and seller agree in accordance with this <u>Section 6.1(a)</u> ) shall have the same force and effect under this Agreement as though delivered simultaneously with the parties' execution and delivery of this Agreement.

      (vi)  Buyer and Seller agree that the right of the parties to deliver, supplement or amend the schedules and exhibits to this Agreement following the execution and delivery hereof does not limit or impact the binding nature of this Agreement or the respective representations and warranties of Buyer at <u>Section 5.3</u> and Seller at <u>Section 4.5</u>.

      (b)   In addition to Buyer's receipt of the financial statements and financial information contained on <u>Schedule 4.6</u> hereto, by December 28, 2010, Buyer will furnish a list of financial and operating data and other information pertaining to the business and properties of Seller relating to the Purchased Assets which Buyer requires in order to have an effective transition of ownership and operations at Closing.  Not later than January 14, 2011, Seller shall use its best efforts to provide the requested information, subject to the restrictions set forth below in this <u>Section 6.1(b)</u>.  Between the date of this Agreement and the Closing Date, to the extent permitted by Law, Seller shall afford to the authorized representatives and agents of Buyer fair and reasonable access to and the right to inspect the plants, properties, books and records of Seller relating to the Purchased Assets, and will

furnish Buyer with such additional financial and operating data and other information as to the business and properties of Seller relating to the Purchased Assets as Buyer may from time to time reasonably request including all items set forth on any of Seller's Schedules, Exhibits or deliveries under this Agreement. Buyer's right of access and inspection shall be made in such a manner as not to interfere unreasonably with the operation of the Purchased Assets. In this regard, Buyer agrees that such inspection shall not take place, and no employees or other personnel at any Facility shall be contacted by Buyer's representatives, without first coordinating such contact or inspection with Gregg Gerken or his designee at least 24 hours prior to such requested inspection or contact. Notwithstanding the foregoing, Buyer understands that (i) with respect to documents and information deemed by Seller in good faith to be market sensitive or competitive in nature, (A) Seller will identify such documents and information to Buyer, (B) if requested by Buyer, Seller will provide such documents and information to Buyer's outside attorneys and accountants (who will be bound by confidentiality agreements) for their review, and (C) any report by such attorneys and accountants to Buyer with respect to such documents and information will be in writing and subject to prior review and reasonable approval by Seller to confirm that any market sensitive or competitive information is not made available to Buyer, (ii) litigation and other materials (including internal/external legal audit letters or reviews, PRO information, National Data Bank reports, quality review information and other physician specific confidential information, and information subject to the confidentiality requirements of HIPAA) that are deemed privileged or confidential by Seller will not be made available to Buyer, and (iii) Seller shall not be obligated to generate or produce information in any prescribed format not customarily produced by Seller.

(c)     Not later than January 14, 2011, Seller will deliver to Buyer a list of all material Contracts. Except as provided in the last sentence of Section 6.1(b), all items set forth on such lists will be made available to Buyer pursuant to Section 6.1(b). Buyer may reject any Contract (i) that violates applicable federal or state Law, (ii) if the assumption of the contract or lease would cause Buyer to violate applicable Georgia law, including, without limitation, the Hospital Authorities Law, (iii) if the assumption of the Contract would cause PPHS to lose its tax exempt status, (iv) that imposes material and adverse limitations on Buyer's ability to operate the Purchased Assets in the same manner as they were operated by Seller and its Affiliates, (v) if the Contract contains exclusivity provisions, covenants not to compete or similar types of contractual terms that would, by its terms, limit Buyer's activities at its other health care facilities to any material and adverse extent, and (vi) that contains material and adverse obligations (either monetary or non-monetary) after the Closing that are extraordinary relative to the obligations of Seller and its Affiliates prior to the Closing (i.e. "balloon payments" or "balloon obligations"), but only to the extent that such future obligations are not reflected in the Historical Financial Information (any of the foregoing Contracts ultimately not assumed by Buyer in accordance with provisions of this Section 6.1(c) (after the final resolution of the arbitration procedures) are collectively referred to as "Rejected Contracts"). If Buyer seeks to reject any Contract, not later than January 26, 2011, Buyer shall notify Seller in writing of its intention to reject one or more Contracts and its reasons therefor. For two (2) business days after receipt of such notice, Buyer and Seller shall consult in good faith as to what action, if any, should be taken with respect to any such Contract to address concerns raised by Buyer. If Buyer and Seller do not jointly agree on whether any contract falls within the rejection criteria set forth in this Section 6.1(c) within such two (2) business day period, such Contract shall be deemed an Assumed Contract and not a Rejected Contract and the matter will be submitted to arbitration pursuant to the provisions of Section 12.3(b); provided that, if the Contract in question is one that Buyer reasonably believes violates applicable Law or would likely result in the revocation of Buyer's tax exempt status, then such Contract shall be deemed a Rejected Contract not an Assumed Contract and the matter will be submitted to arbitration pursuant to the provisions of Section 12.3(b). Notwithstanding the foregoing, if Buyer seeks to reject any Contract, Seller has the right to address any concerns that Buyer has raised with respect to such Contract by negotiating a related amendment or modification of such Contract with the other party to such Contract or, where applicable, by providing a legal opinion that the Contract in question is compliant with applicable Law or will not result in the revocation of Buyer's tax exempt

status, as the case may be, and if such amendment or modification remedies the basis for rejection or such opinion is obtained, then such Contract shall be an Assumed Contract and shall not be subject to arbitration hereunder.

(d)     With respect to physician agreements that are Contracts, the parties agree as follows: (i) if (A) any such Contract contains an exclusivity provision that conflicts with a physician agreement at another health care facility owned by Buyer and (B) the physician agreement at such other health care facility does not contain an exclusivity provision that conflicts with the physician agreement that is a Contract, Seller shall assume and be responsible for any liability incurred by Seller and Buyer in connection with the resulting breach or the termination of such other agreement, (ii) if (A) any such Contract contains an exclusivity provision that conflicts with a physician agreement at another health care facility owned by Buyer and (B) the physician agreement at such other health care facility also contains an exclusivity provision that conflicts with the physician agreement that is a Contract, Seller (collectively) and Buyer shall each assume and be responsible for one-half of any liability incurred by Buyer and Seller in connection with the resulting breach or termination of such Contract or, at Buyer's option, such agreement, and (iii) if (A) Buyer has a physician agreement at another health care facility owned by Buyer that conflicts with the physician agreement that is a Contract and (y) the physician agreement that is a Contract does not contain an exclusivity provision that conflicts with the physician agreement at Buyer's other health care facility, Buyer shall assume and be responsible for any liability incurred by Seller and Buyer in connection with the resulting breach or the termination of such other agreement or, at Buyer's option, such Contract.

(e)     With respect to any Contract set forth on Schedule 6.1(e), Seller has the right to cause such Contract to be partially assigned, amended, modified or replicated so as to result in Buyer being a party to a Contract with such third-party containing terms substantially similar, in the aggregate, to the terms of such Contract as they presently exist with respect to the Facilities; provided, however, that no such partial assignment, amendment, modification or replication of any such Contract is a condition to the Closing.

6.2     **Operations**. From the date hereof until the Closing Date, except as set forth in Schedule 6.2, Seller shall, with respect to the Purchased Assets (unless prior written consent of Buyer is received, which will not be unreasonably withheld):

(a)     carry on its business related to the Purchased Assets in substantially the same manner as it has heretofore and not make any material change in personnel, operations, finance, accounting policies, or the Purchased Assets other than in the ordinary course of business;

(b)     use its commercially reasonable efforts to maintain the Purchased Assets and all parts thereof in as good working order and condition as at present, ordinary wear and tear excepted;

(c)     use its commercially reasonable efforts to perform in all material respects all of its obligations under Assumed Contracts or Excluded Contracts relating to or affecting the Purchased Assets and the Facilities' business and operation;

(d)     use its commercially reasonable efforts to keep in full force and effect present insurance policies or other comparable insurance on the Purchased Assets;

(e)     use its commercially reasonable efforts to maintain and preserve its business organization with respect to the Facilities intact, retain its present employees at the Facilities and maintain its relationship with physicians, medical staff, suppliers, customers and others having business relations with the Facilities;

(f)     permit and allow reasonable access by Buyer to make offers of post-Closing employment to any of Seller's personnel, which personnel shall be allowed to accept such offers without penalty, competing offer or interference, and to establish relationships with physicians, medical staff and others having business relations with Seller; provided that Seller shall have complied with the terms of Section 6.1(a) in connection with such access;

(g)     use its commercially reasonable efforts to render title to the Purchased Assets free and clear of all Encumbrances (except for the Permitted Encumbrances), and to obtain appropriate consents from all Persons and Governmental Entities (other than Buyer or its Affiliates) necessary for the assignment to Purchaser of the Purchased Assets and consummation of the transactions contemplated by this Agreement;

(h)     use its commercially reasonable efforts to cure any deficiencies cited by any Governmental Entity (other than Buyer or its Affiliates) or TJC in the most recent surveys conducted by each or develop and timely implement a plan of correction that is acceptable to any Governmental Entity (other than Buyer or its Affiliates) or TJC;

(i)     use its commercially reasonable efforts to keep available for Buyer the services of the present officers, employees, medical staff, consultants, sales agents and representatives of the Facilities;

(j)     comply in all material respects with all Laws applicable to the conduct of the business and operation of the Facilities;

(k)     maintain the levels and quality of Inventory existing on the date hereof;

(l)     continue to collect accounts receivable and pay accounts payable with respect to the Facilities in the ordinary course of business;

(m)     use its commercially reasonable efforts to maintain all Approvals and Permits relating to the Facilities, Purchased Assets and Assumed Liabilities in good standing; and

(n)     promptly notify Buyer of any material and adverse change to the Purchased Assets.

**6.3     Negative Covenants.** From the date hereof to the Closing Date, except as set forth in Schedule 6.3, Seller will not, with respect to the business or operation of the Facilities or otherwise regarding the Purchased Assets, without the prior written consent of Buyer, which will not be unreasonably withheld:

(a)     enter into any contract or commitment, or incur or agree to incur any liability, except where such contract or commitment or other matter (i) is in the ordinary course of business, and (ii) is either (A) terminable without cause or penalty within ninety (90) days following Closing, (B) would not result in a payment or penalty in excess of $50,000 if terminated following Closing, or (C) in the event the Closing occurs after January 31, 2011, either (1) if such Contract must have a minimum term, renewal term or extension period without optional termination rights under Applicable Law, is a Contract that includes such minimum term or period, or (2) is a renewal in the ordinary course of business of a Contract that exists as of the date of this Agreement, including the exercise of an optional extension or renewal thereof;

(b)     increase compensation payable or to become payable or make a bonus payment to or otherwise enter into one or more bonus agreements with any employee (other than members of Senior Management) or agent or under any personal services contract, except in the ordinary course of business in accordance with existing personnel policies or to induce employees to remain through the Closing; provided, however, that notwithstanding the foregoing Seller may not generally increase rates of compensation in order to induce employees to remain through Closing;

(c)     sell, assign or otherwise transfer or dispose of any Purchased Assets, except in the ordinary course of business;

(d)     except in the ordinary course of business (i) materially amend, modify or terminate any Assumed Contract; (ii) by action or inaction, abandon, terminate, cancel, forfeit, waive or release Seller's material rights, in whole or in part, with respect to the Purchased Assets, or encumber any of the Purchased Assets, except for Permitted Encumbrances; (iii) effect any corporate merger, business combination, reorganization or similar transaction or take any other action, corporate or otherwise, which could reasonably be expected to affect adversely Seller's ability to perform in accordance with this Agreement; (iv) cancel or permit the cancellation or lapse of insurance coverage on the Purchased Assets or the Facilities; or (v) settle any dispute or threatened dispute with any Governmental Entity regarding the Purchased Assets in a manner that materially and adversely affects Buyer;

(e)     except Permitted Encumbrances, create, assume or permit to exist any new Encumbrance upon any of the Purchased Assets;

(f)     take any other action materially outside the ordinary course of business except as otherwise permitted hereunder; or

(g)     make any capital expenditure commitment that would require a payment by Buyer following the Closing in excess of $50,000.00 for additions to property, plant, equipment, intangible, or capital assets or for any other purpose, other than for emergency repairs or replacement (the parties acknowledge that this clause (g) does not limit Seller's right to make capital expenditures or commitments for capital expenditures that could result in the Purchase Price being increased by the Capital Expenditures Amount or to make capital expenditures or commitments for capital expenditures for which Seller shall be economically responsible).

### 6.4     **Notification of Certain Matters**.

(a)     At any time from the date of this Agreement to the Closing Date, Seller shall give prompt written notice to Buyer of (i) the occurrence, or failure to occur, of any event that has caused any representation or warranty of Seller contained in this Agreement to be untrue in any material respect and (ii) any failure of Seller to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement. Such notice shall provide a reasonably detailed description of the relevant circumstances and shall include the amount which Seller believes, based on facts known to it, would be payable by Seller pursuant to the indemnification provisions hereof.

(b)     At any time from the date of this Agreement to the Closing Date, Buyer shall give prompt notice to Seller of (i) the occurrence, or failure to occur, of any event that has caused any representation or warranty of Buyer contained in this Agreement to be untrue in any material respect and (ii) any failure of Buyer to comply with or satisfy, in any material respect, any covenant, condition or agreement to be complied with or satisfied by it under this Agreement. Such notice shall provide a reasonably detailed description of the relevant circumstances and shall include the amount which Buyer

believes, based on facts known to it, would be payable by Buyer pursuant to the indemnification provisions hereof.

**6.5     HSR Notification**. Notwithstanding Buyer's representations and warranties regarding the HSR Act and other antitrust laws in Article 5, if the parties hereafter agree that the consummation of the transactions contemplated hereby requires the parties to file premerger notification reports with the FTC and the Justice Department (or filings or notifications with a state agency under any applicable state antitrust Law), the provisions of Section 6.5(a) and (b) will apply to the parties' obligations.

(a)     Within 15 business days following the parties' agreement that the consummation of the transactions contemplated hereby requires the parties to file premerger notification reports with the FTC and the Justice Department (or filings or reports with a state agency under any applicable state antitrust Law), Seller and Buyer shall each file, as applicable, a premerger notification with the FTC and the Justice Department or the necessary filings or notifications with the applicable state agency. From the date of such filing until the Closing Date, Seller and Buyer shall file all reports or other documents required or requested by the FTC or the Justice Department (or such state agency) under the HSR Act or otherwise, and will comply promptly with any requests by the FTC or the Justice Department (or such state agency) for additional information concerning such transactions, so that the waiting period specified in the HSR Act (or the applicable state Law) will expire as soon as reasonably possible after the execution and delivery of this Agreement. Buyer agrees to pay all application fees required in connection with any filing required under the HSR Act (or any such state Law), and Buyer and Seller agree to take all commercially reasonable actions necessary to assure that the waiting period imposed under the HSR Act (or such state Law) terminates or expires as soon as commercially practicable, but in no event later than the date specified in Section 10.3(a)(ii). Without limiting the foregoing, Seller and Buyer agree to use commercially reasonable efforts to cooperate and oppose any preliminary injunction sought by any Governmental Entity (other than Buyer or its Affiliates) preventing the consummation of the transactions contemplated by this Agreement.

(b)     Seller and Buyer shall cause their respective counsel to furnish each other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of necessary filings or submissions under the provisions of the HSR Act or any applicable state Law. Seller and Buyer will cause their respective counsel to supply to each other copies of all correspondence, filings or written communications by such party or its Affiliates with any Governmental Entity or staff members thereof, with respect to the transactions contemplated by this Agreement and any related or contemplated transactions, except for documents filed pursuant to Item 4(c) of the Hart-Scott-Rodino Notification and Report Form (or the applicable state Law), or communications regarding the same documents or information submitted in response to any request for additional information or documents pursuant to the HSR Act (or the applicable state Law) which reveal Seller's or Buyer's negotiating objectives or strategies or purchase price expectations.

**6.6     Approvals; Consented Assignment**.

(a)     Between the date of this Agreement and the Closing Date, each of Buyer and Seller will (i) cooperate with one another and take all reasonable steps to obtain, as promptly as practicable, all Approvals and Permits of any Governmental Entities required of either party to consummate the transactions contemplated by this Agreement and (ii) provide such other information and communications to any Governmental Entity as may be reasonably requested. The parties acknowledge and agree that Seller shall be responsible for obtaining all Approvals and Permits required for Seller to transfer the Purchased Assets to Buyer, that Buyer shall be responsible for obtaining all Approvals and Permits required for Buyer to acquire the Purchased Assets from Seller and to operate the Purchased Assets following the Closing (e.g., hospital licenses for the Hospital), and that, upon request, Seller and

Buyer each will cooperate with the other party in all reasonable respects in such party's efforts to obtain the Approvals and Permits for which such party is responsible. Additionally, between the date of this Agreement and the Closing Date, Seller and Buyer agree to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement and to cooperate with the other in connection with the foregoing, including using commercially reasonable efforts (x) to prevent entry of, or lift or rescind any order, decree, ruling issued by (or any other action taken by) any court or other Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the transactions contemplated hereby or the consummation of such transactions, and (y) to fulfill all conditions to this Agreement. Buyer and Seller shall notify and keep the other advised as to any material communication from any Governmental Authority regarding any of the transactions contemplated hereby and any proceeding or investigation pending and known to such party or, to its knowledge, threatened, which challenges the transactions contemplated hereby.

(b)        To the extent that any consent of a third party with respect to any Assumed Contract is required in connection with the transactions contemplated by this Agreement, Seller shall use commercially reasonable efforts to obtain such consent with the assistance of Buyer. Buyer shall use commercially reasonable efforts to cooperate with Seller to obtain such consent prior to the Closing Date. Buyer shall have no liability to Seller for losses, liabilities, damages, costs (including court costs and costs of appeal) and expenses (including attorney's fees) incurred as the result of any action, proceeding, claim or demand brought by any third party to an Assumed Contract relating to the failure of Seller to obtain any consent to assign an Assumed Contract in connection with the transactions contemplated by this Agreement. In the event that any such consent is not obtained as of the Closing, (i) such Assumed Contract will be assigned to and assumed by Buyer under this Agreement effective on the Closing Date, and (ii) at the request of Buyer, Seller will use commercially reasonable efforts to cooperate with Buyer to obtain for Buyer the benefits of such Assumed Contract; provided, however, that Seller will not be responsible to Buyer for any loss of benefit or similar damages that Buyer may suffer if Buyer is not able to obtain the benefits of such Assumed Contract.

**6.7        Additional Financial Information**. Within thirty (30) days following the end of each calendar month prior to the Closing Date, Seller will deliver to Buyer, copies of the unaudited balance sheets and the related unaudited income statements relating to the Facilities for each month then ended. Such financial statements shall have been prepared in accordance with GAAP and the books and records of the Facilities, the balance sheets contained therein shall fairly present in all material respects the financial position of the Facilities at the date of such balance sheet and the income statements contained therein shall present fairly in all material respects the results of operations of the Facilities for the period indicated.

**6.8        Books and Records**. Until the later to occur of (i) the final adjudication of any dispute or investigation involving liabilities, federal, state or local taxes or under the Medicare or Medicaid programs arising out of the business, operations or affairs of Seller relating to the Purchased Assets before the Closing Date, or (ii) the running of applicable statutes of limitations, Buyer will maintain in the ordinary course of business all books and records of Seller and its Affiliates constituting a part of the Purchased Assets which are maintained at or by the Facilities and which relate to the pre-Closing business, operations and affairs of Seller relating to the Purchased Assets to the extent reasonably necessary in connection with any tax, Medicare or Medicaid liability or other matter reasonably relating to the Purchased Assets for any period ending at or before the Closing Date.

**6.9        Non-Solicitation**. If the transactions contemplated by this Agreement are not consummated, neither Buyer, PPHS, PNI nor their respective Affiliates will, directly or indirectly, solicit for employment or hire any employee of Seller or the Facilities for a period of one year from and after

termination of this Agreement; provided, however, that with respect to employees other than officers or department heads, this clause will not prohibit Buyer, PPHS, PNI or their respective Affiliates from hiring any such person who (a) initiates discussions with Buyer, PPHS, PNI and their respective Affiliates regarding employment without any direct or indirect solicitation by or on behalf of Buyer, PPHS, PNI or their respective Affiliates, (b) responds to any public advertisement or general solicitation placed by or on behalf of Buyer, PPHS, PNI or their respective Affiliates, or (c) has been terminated by Seller or resigned from the Facilities prior to commencing employment discussion with Buyer, PPHS, PNI or their respective Affiliates.

## 7.   CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Buyer:

**7.1   Compliance With Covenants**. Seller shall have in all material respects performed all obligations and complied with all covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing Date; provided that this condition will be deemed to be satisfied unless both (a) Seller was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within thirty (30) days after receipt of such notice and (b) the respects in which such covenants and obligations have not been performed have had, or will likely have, a material adverse effect on the business, financial condition or results of operations of the Purchased Assets, taken as a whole.

**7.2   Opinion of Counsel**. Buyer shall have received from counsel to Seller an opinion or opinions dated as of the Closing Date and addressed to Buyer, in form and substance satisfactory to Buyer, to the effect that: (i) Seller is a corporation duly organized and validly existing in good standing under the laws of the state of its organization; (ii) Seller has full power and authority to execute, deliver and perform this Agreement; (iii) that all corporate proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement, and to sell, convey, assign, transfer and deliver the Purchased Assets as herein contemplated, have all been taken; and (iv) this Agreement constitutes the valid and binding obligation of Seller, enforceable in accordance with its terms. Such opinion shall contain usual and customary qualifications and assumptions.

**7.3   Pre-Closing Confirmations**.   Buyer shall have obtained documentation or other evidence reasonably satisfactory to Buyer that Buyer has:

(a)   received all required Approvals and Permits from all Governmental Entities whose approval is required (or received reasonable assurance from the applicable Governmental Entity that such Approvals and Permits shall be issued promptly following the Closing and be effective as of the Closing Date) that (i) are necessary for Buyer to (A) consummate the transactions herein contemplated or (B) operate or use the Purchased Assets or Facilities as currently operated or used by Seller, and (ii) are described in Schedule 5.2, except for any such Approvals and Permits the failure of which to obtain would not have a material adverse effect on the business, financial condition or results of operations of the Purchased Assets, taken as a whole; and

(b)   complied with all waiting periods under the HSR Act and any similar state Law, (i) if applicable, and (ii) if the parties have agreed that the consummation of the transactions contemplated hereby requires the parties to file premerger notification reports with the FTC and the Justice Department (for filings or notifications with a state agency under any applicable state antitrust Law).

**7.4** **Action/Proceeding**. No court or other Governmental Entity of competent jurisdiction (other than Buyer or its Affiliates) shall have issued an order, decree or ruling or taken any other action enjoining, restraining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that remains outstanding and effective as of the Closing Date.

**7.5** **Title Policies and Surveys**.

(a)     Buyer shall have received from an agent of its choice a commitment from Old Republic National Title Insurance Company to issue as of the Closing Date a standard ALTA 06-17-06 owner's policy of title insurance, in the customary form prescribed for use in the State of Georgia, with standard exceptions deleted and with the following endorsements: ALTA 3 Zoning, ALTA 9 Comprehensive, ALTA 17 Access, ALTA 18 Single Tax Parcel, CLTA 116 Same as Survey and CLTA 116.4 Contiguity (the "Endorsements"), for the Main Hospital Parcel (as defined in Exhibit D-1 attached hereto), together with improvements, buildings and fixtures thereon, in an amount equal to the reasonable value assigned to and agreed upon for such Main Hospital Parcel by Buyer and Seller and in the customary form prescribed for use in the State of Georgia, but with any mandatory arbitration provision deleted therefrom (the "Deletions"). The commitment shall provide for the issuance of such policy (or policies) to Buyer as of Closing and shall insure fee simple title to that portion of the Main Hospital Parcel owned by Seller with the required Endorsements and Deletions subject only to Permitted Encumbrances. Buyer shall cause the title agent and the surveyor described below to deliver the title commitment and the Survey contemplated by this Section 7.5(a) by January 13, 2011. Buyer shall, within seven (7) days from the date Buyer receives the later of (i) the title commitment for the Main Hospital Parcel or (ii) the Survey (as defined below) for the Main Hospital Parcel, notify Seller in writing of any title exceptions or defects pertaining to the Main Hospital Parcel which are not Permitted Encumbrances (as defined in clause (a) of the definition of the term "Permitted Encumbrance") and which would result in the inability of Buyer to receive a title policy sufficient to satisfy this Section 7.5. Not less than six (6) days after receiving Buyer's notice, Seller shall notify Buyer in writing of any such exceptions to title or defects in title which Seller is unable or unwilling to cause to be removed, insured against by the title insurance company or indemnified over by Seller at or prior to or at Closing. If any such exceptions or defects which Seller is unable or unwilling to cause to be removed, insured against by the title insurance company or indemnified over by Seller at or prior to or at Closing would have the result of Buyer being unable to operate the Hospital in a manner consistent with the current use thereof by Seller or its Affiliates, then Buyer shall elect, by giving written notice to Seller within two (2) business days thereafter, whether to (1) terminate this Agreement or (2) consummate the Closing with respect to all Purchased Assets and Assumed Liabilities without waiving any rights to indemnification with respect to such exceptions and defects. Seller agrees to deliver any information, consistent with a limited warranty of title as to the Main Hospital Parcel and the Permitted Encumbrances, as may be reasonably required by the title insurance company under the requirements section of the title insurance commitment or otherwise in connection with the issuance of Buyer's title insurance policy. Seller also agrees to provide an affidavit of title and/or such other information, consistent with a limited warranty of title as to the Main Hospital Parcel and the Permitted Encumbrances, as the title insurance company may reasonably require in order for the title insurance company to insure title to such Main Hospital Parcel and cause the title insurance company to delete all standard exceptions from the final title insurance policy. Buyer shall also have received from Seller a current survey of the Main Hospital Parcel (the "Survey") reasonably acceptable to Buyer from Lanier Engineering Company, a surveying company licensed under the laws of the State of Georgia, or other Georgia licensed surveyor selected by Seller and reasonably acceptable to Buyer, in standard ALTA format so as to enable the issuance of the required Endorsements and reflecting all boundaries and improvements visible on the grounds, and all easements and rights of way of record or on the grounds, and indicating whether or not the property appears on any U.S. Department of H.U.D. Flood Insurance Boundary Map and, if so, further indicating the map number and whether the property appears in the "Flood Hazard" shown on the map. Any exceptions or encroachments shown on the Survey other

than Permitted Encumbrances (as defined in clause (a) of the definition of the term "Permitted Encumbrance") to which Buyer objects in writing as set forth above shall be treated as exceptions to title or defects as above described in this Section 7.5. The Survey shall be certified to Buyer and to the title insurance company. The costs of such title policy (including without limitation, costs of the Deletions and Endorsements) and Survey shall be borne by Buyer. It is the intent of the parties that Buyer take the lead role in satisfying this condition, with the cooperation and assistance of Seller.

(b)     With respect to all Real Property other than the Main Hospital Parcel, Buyer may elect to (i) obtain from an agent of its choice commitments from Old Republic National Title Insurance Company to issue as of the Closing Date a standard ALTA 06-17-06 owner's policy of title insurance, in the customary form prescribed for use in the State of Georgia, with standard exceptions deleted and with the Endorsements, for such Real Property (including leasehold policies with respect to those portions of the Real Property leased by Seller that are ground leases, leases of entire buildings or condominium units for which short forms or memoranda of leases have been recorded (such portions of the Leased Real Property being referred to herein as the "Insurable Leaseholds")) and (b) a Survey for such Real Property; provided, however, obtaining such title commitment or issuance of a policy of title insurance for such Real Property or obtaining a Survey for such Real Property shall not be a condition precedent to Buyer's obligation to purchase the Main Hospital Parcel or any other Real Property. Should Buyer elect to secure title commitments for such Real Property, Seller agrees to deliver any information, consistent with a limited warranty of title as to such Real Property, as may be reasonably required by the title insurance company under the requirements section of the title insurance commitment or otherwise in connection with the issuance of Buyer's title insurance policy. Seller also agrees to provide an affidavit of title and/or such other information, consistent with a limited warranty of title as to such Real Property as the title insurance company may reasonably require in order for the title insurance company to insure title to such Real Property and cause the title insurance company to delete all standard exceptions from the final title insurance policy. The costs of such title policy (including without limitation, costs of the Deletions and Endorsements) and Survey shall be borne by Buyer. It is the intent of the parties that Buyer take the lead role in satisfying this condition, with the cooperation and assistance of Seller. Buyer's failure or inability to obtain a title commitment with respect to any Real Property other than the Main Hospital Parcel as contemplated by this Section 7.5(b) shall not limit Buyer's right to seek indemnification following the Closing for a breach by Seller of any of the representations or warranties with respect to Seller's title to such Real Property. Additionally, to the extent Buyer seeks a title commitment with respect to any Real Property other than the Main Hospital Parcel but is either unable to obtain such title commitment or such title commitment includes an Encumbrance other than a Permitted Encumbrance (including any such Encumbrance not insured over by the title insurance company or indemnified by Buyer), Seller agrees that the Basket Amount under Section 11.3(b) will not apply to Buyer's right to indemnification for such Encumbrances.

7.6     **Representations and Warranties**. Seller's representations and warranties contained in the following sections of this Agreement (or the following specified portions thereof) shall be true and correct in all material respects on the Closing Date: (i) the first sentence of Section 4.7(a) (but only to the extent that the accuracy of such representation is relevant to Buyer's ability to obtain all material Permits and Approvals necessary for Buyer to conduct the business and operation of the Hospital following the Closing as currently conducted by Seller or Buyer's use of the Hospital following the Closing as currently used by Seller), (ii) the first sentence of Section 4.9(a), and (iii) Section 4.12(a) (but solely with respect to the Main Hospital Parcel, as identified in Exhibit D-1). For the avoidance of doubt, except as provided above with respect to the first sentence of Section 4.7(a), the first sentence of Section 4.9(a) and Section 4.12(a), Buyer agrees that (A) Buyer shall not be excused from consummating the transactions contemplated by this Agreement based on the failure or alleged failure of any representation or warranty made by Seller to be true, (B) Buyer will not assert the failure or alleged failure of any representation or warranty made by Seller to be true as a basis for not consummating the transactions contemplated by this

Agreement and (C) the sole remedy of Buyer for any failure of a representation and warranty made by Seller to be true is to be indemnified as and to the extent set forth in <u>Section 11</u>. In no event shall any dispute over a reduction in the Purchase Price based on the failure or alleged failure of any representation and warranty (except to the extent that any of the representations and warranties identified above in this <u>Section 7.6</u> is not true and correct in all material respects) made by Seller to be true delay or postpone the Closing.

## 8.   <u>CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER</u>

The obligations of Seller hereunder are subject to the satisfaction, on or prior to the Closing Date, of the following conditions unless waived in writing by Seller:

**8.1**   <u>Compliance With Covenants</u>. Buyer shall have in all material respects performed all obligations and complied with all covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing Date; provided that, except for Buyer's obligation to pay the Purchase Price at Closing, this condition will be deemed to be satisfied unless both (a) Buyer was given written notice of such failure to perform or comply and did not or could not cure such failure to perform or comply within thirty (30) days after receipt of such notice and (b) the respects in which such covenants have not been performed have had a material adverse effect on Buyer's ability to perform this Agreement or any aspect of the transactions contemplated hereby.

**8.2**   <u>Opinion of Counsel</u>. Seller shall have received from counsel to Buyer, PPHS and PNI an opinion or opinions dated as of the Closing Date and addressed to Seller, in form and substance satisfactory to Seller, to the effect that: (i) Buyer is a hospital authority duly organized and validly existing under the laws of Georgia and PPHS and PNI are each nonprofit corporations duly organized and validly existing in good standing under the laws of Georgia; (ii) Buyer, PPHS and PNI each have full power and authority to execute, deliver and perform this Agreement; (iii) that hospital authority proceedings and corporate proceedings required to be taken by each of Buyer PPHS and PNI, respectively, to authorize the execution, delivery and performance of this Agreement, and the acquisition of the Purchased Assets by Buyer as herein contemplated, have all been taken; and (iv) this Agreement constitutes the valid and binding obligation of Buyer, PPHS and PNI, in each case enforceable in accordance with its terms. Such opinion shall contain usual and customary qualifications and assumptions.

**8.3**   <u>Action/Proceeding</u>. No court or other Governmental Entity of competent jurisdiction (other than Buyer or its Affiliates) shall have issued an order, decree or ruling or taken any other action enjoining, restraining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that remains outstanding and effective as of the Closing Date.

**8.4**   <u>Pre-Closing Confirmations</u>. Seller shall have obtained documentation or other evidence reasonably satisfactory to Seller that Seller has:

(a)   received all required Approvals and Permits from all Governmental Entities whose approval is required to consummate the transactions herein contemplated, except for any such Approvals and Permits the failure to obtain would not have a material adverse effect on the business, financial condition or results of operations of the Purchased Assets, taken as a whole; and

(b)   complied with all waiting periods under the HSR Act and any similar state Law, if applicable.

**EXHIBIT J - 50**

**8.5** <u>Representations and Warranties</u>. Buyer's representations and warranties shall be true and correct in all material respects on the Closing Date.

## 9. TRANSITIONAL ARRANGEMENTS

### 9.1 <u>PIP; Transition Patients; Government Patient Receivables; and Misdirected Payments</u>.

(a) <u>PIP Payments</u>. The Hospital is reimbursed on an interim basis under the Medicare program on a periodic interim payment ("<u>PIP</u>") basis. If Buyer or any of its Affiliates receives any PIP payments from the Medicare program associated with the operations of the Facilities relating solely to periods ending at or prior to the Closing, Buyer will pay Seller an amount equal to such PIP payments received by Buyer or its Affiliates. If Buyer or any of its Affiliates receives any PIP payments from the Medicare program associated with the operations of the Facilities relating to periods both prior to and after the Closing, Buyer will pay Seller an amount equal to the PIP payments actually received by Buyer or its Affiliates for such period multiplied by a fraction, the numerator of which shall be the total number of days prior to the Closing attributable to such PIP payments and the denominator of which shall be the total number of days attributable to such PIP payments. Likewise, if Seller or any of its Affiliates receive or received any PIP payments from the Medicare program associated with the operations of the Facilities relating solely to periods ending after the Closing, Seller will pay Buyer an amount equal to such PIP payments received by Seller or its Affiliates. If Seller or any of its Affiliates receive any PIP payments from the Medicare program associated with the operations of the Facilities relating to periods both prior to and after the Closing, Seller will pay Buyer an amount equal to the PIP payments actually received by Seller or its Affiliates for such period multiplied by a fraction, the numerator of which shall be the total number of days after the Closing attributable to such PIP payments and the denominator of which shall be the total number of days attributable to such PIP payments. It is the intent of the parties that Buyer and Seller are entitled to the portion of PIP payments applicable to the period of time the Facilities are owned by such party. Buyer and Seller will make all payments they are required to make under this <u>Section 9.1(a)</u> promptly, and in any event within five business days of receipt of the applicable PIP payments.

(b) <u>Transition Patient Receivables</u>. To appropriately allocate payments received by Buyer or its Affiliates with respect to Transition Services provided to Transition Patients, Buyer will prepare claims (the accounts receivable resulting from such claims, the "<u>Transition Patient Receivables</u>") for the Transition Patients following their discharge from the Hospital. If Buyer or any of its Affiliates receives any payments on any Transition Patient Receivable, Buyer will pay Seller an amount equal to (x) the payments (including deposits, deductibles and co-payments paid, whether received by Buyer or Seller) with respect to the applicable Transition Patient Receivable multiplied by a fraction, the numerator of which shall be the total charges for the Transition Services provided to the applicable Transition Patient prior to the Closing Date, and the denominator of which shall be the sum of the total charges of the Transition Services provided to the applicable Transition Patient prior to and after the Closing Date (including charges for medicine, drugs and supplies), minus (y) any deposits, deductibles or co-payments paid by the applicable Transition Patient prior to the Closing Date and included in the Excluded Assets. Buyer will make all payments it is required to make under this <u>Section 9.1(b)</u> promptly, and in any event within five business days of receipt of the applicable payments.

(c) <u>Split Bill Transition Patients</u>. Notwithstanding the provisions of <u>Section 9.1(b)</u>, to the extent a third party payor requires the parties to submit split bills for Transition Patients (i.e., a bill for the portion of the Transition Services provided prior to the Closing and a separate bill for the portion of the Transition Services provided after the Closing), (i) the provisions of <u>Section 9.1(b)</u> will not apply to billing and collection for such Transition Services, (ii) Seller will be responsible for billing and collection

**EXHIBIT J - 51**

for all such pre-Closing Transition Services (and the accounts receivable for such Transition Services will be Excluded Receivables), and (iii) Buyer will be responsible for billing and collection for all such post-Closing Transition Services (and the accounts receivable for such Transition Services will not be Excluded Receivables).

(d)    Government Patient Receivables. Seller hereby appoints Buyer, and Buyer agrees to act, as Seller's collection agent with respect to the Government Patient Receivables that are unpaid as of the Closing. After the Closing, Buyer will pay Seller all amounts received by Buyer or its Affiliates as payments with respect to any of the Government Patient Receivables. Buyer will make all payments that it is required to make under this Section 9.1(d) promptly, and in any event within five business days of receipt of the applicable payments.

(e)    Misdirected Payments. In addition to the other payments contemplated by this Section 9.1 (or elsewhere in this Agreement), (i) if Seller or any of its Affiliates receive any amount from patients or third-party payors which relate to services rendered by the Facilities after the Closing, Seller will remit such amount to Buyer within five business days of receiving such amount; and (ii) if Buyer or any of its Affiliates receives any amount from patients or third-party payors which relate to services rendered by the Facilities prior to the Closing, Buyer will remit such amount to Seller within five days of receiving such amount.

9.2    **Seller's Cost Reports.** Seller will timely prepare all cost reports relating to Seller for periods ending on or prior to the Closing Date or required as a result of the consummation of the transactions set forth herein, including terminating cost reports for the Medicare, Medicaid and TRICARE programs (the "Seller Cost Reports"). Buyer shall fully cooperate with Seller in the preparation of Seller Cost Reports, including making available to Seller all information and records necessary for the preparation of Seller Cost Reports, providing the services of Buyer's employees as required to prepare such reports, coordinating with Seller in regards to Medicare and Medicaid exit conferences or meetings, and providing to appropriate parties (including the Provider Reimbursement Review Board), as determined to be reasonably necessary by Seller, a letter acknowledging that Seller has retained all rights to such appeals and that Buyer agrees that Seller has the right to pursue such appeals, either on Seller's behalf or, to the extent required by law, as Buyer's representative. In the event that Buyer provides personnel pursuant to this section, it shall be entitled to reimbursement from the requesting party for all reasonably incurred out-of-pocket costs and expenses, but not including internal time charges. Buyer shall forward to Seller any and all correspondence relating to Seller Cost Reports and the Excluded Receivables within three business days after receipt by Buyer. Buyer shall remit any receipts of funds relating to Seller Cost Reports or Excluded Receivables within five business days after receipt by Buyer and shall forward to Seller any demand for payments with respect to Seller Cost Reports and the Excluded Receivables within three business days after receipt by Buyer. Seller shall retain all rights to Agency Receivables and to Seller Cost Reports including any amounts receivable or payable in respect of such reports or reserves relating to such reports; provided, however, that if Buyer is unable to collect Medicare deductibles and coinsurance for amounts included in the Purchased Assets, Seller agrees to include, if necessary, such Medicare bad debts in the cost reports for periods ended on or prior to the Closing Date and to remit to Buyer an amount equal to any reimbursement received for such bad debts. Such rights shall include the right to appeal any Medicare determinations relating to Agency Receivables and Seller Cost Reports. Seller shall retain the originals of Seller Cost Reports, correspondence, work papers and other documents relating to Seller Cost Reports and the Agency Receivables. Buyer acknowledges and agrees that any accounts receivable relating to Medicare deductibles and coinsurance pertaining to services rendered prior to Closing that, based on the balance sheets of Seller in respect of the Facility for the period ending as of Closing, have been (i) recorded to Account 110-156 and/or Account 110-058 (which are general ledger accounts for patient accounts receivable that have been written off and sent to a secondary collection agency for collection) in respect of the Facility and (ii) sent to a secondary

collection agency for collection (the "Written-Off Receivables") are not included within the Assets that Buyer is acquiring hereunder. Buyer further agrees, that upon request by Seller, which request may be made at any time and from time to time after Closing, but will only be made after a secondary collection agency has determined that all or any portion of the Written-Off Receivables are not collectible and has returned same to Seller (any of such returned Written-Off Receivables are referred to herein as the "Uncollectible Receivables"), Buyer shall include the Uncollectible Receivables in the applicable cost report covering periods after the Closing Date. Buyer shall remit to Seller an amount equal to any reimbursement received for such Uncollectible Receivables within ten (10) days after receipt of any such reimbursement. Seller shall have the sole right to appeal any Medicare determinations relating to the Uncollectible Receivables. Buyer herby appoints Seller as the authorized representative to pursue appeal rights on the Uncollectible Receivables.

### 9.3    Employees.

(a)    As of the Closing Date, Seller shall terminate or cause its Affiliates to terminate all employees of Seller or its Affiliates at the Facilities (other than any member of Senior Management that has elected to remain with Seller), and PNI shall offer employment to all of the employees of Seller and its Affiliates at the Facilities (other than members of Senior Management) as of the Closing Date as employees-at-will (except as provided in Section 9.3(b)) at compensation and benefit levels comparable to those paid by Affiliates of PNI to their employees who work in similar positions and who have similar seniority as the applicable employee of Seller, provided that such employees (i) meet PNI's employment qualifications, which shall not differ from those qualifications in effect at those facilities operated by Buyer, PPHS or their respective Affiliates, (ii) meet all federal and State of Georgia laws governing the hiring of employees, and (iii) have not been previously discharged by PNI or any of its Affiliates. Not later than January 4, 2011, Seller shall provide PNI the names of Seller's (and its Affiliates') employees employed at the Hospital or the other Facilities. Not later than January 14, 2011, PNI shall provide Seller the names of any employee to whom PNI will not offer employment. PNI shall not be required to hire any member of Senior Management. In the event that PNI does desire to hire any member of Senior Management, an offer of employment shall be extended to such individual not later than January 14, 2011. Except with respect to Senior Management, until January 17, 2011, Seller shall not, directly or indirectly, (A) make an offer to any such employee to remain employed, or become re-employed, by Seller after the Closing Date or (B) transfer any such employee to a position at any facility owned or operated by Seller or any of its Affiliates. Except for any employee of Seller who fails to meet the documentation and verification obligations required by Law, PNI shall be responsible for, and hereby assumes, any and all liabilities and obligations resulting from (x) the termination of any such employee as set forth in this Section 9.3(a) (other than a member of Senior Management) and (y) any claims by any employee of Seller who was not offered employment with PNI based on allegations that the failure to be offered employment violated applicable Law, including labor Laws.

(b)    The term "Employee" as used in this Agreement means an employee of Seller or any of its Affiliates who accepts employment with PNI as of the Closing Date. All Employees will be retained as employees-at-will (except to the extent that such Employees are parties to contracts providing for other employment terms, in which case such Employees shall be retained in accordance with the terms of such contracts) and PNI shall provide such Employees with the same customary employee benefits as PNI or its Affiliates provide to their employees who work in similar positions and who have similar seniority as the applicable Employee under benefit plans and arrangements that are maintained by PNI or its Affiliates ("Palmyra Medical Center Plans"). The terms of all such Employees' employment with PNI shall (i) be in accordance with PNI's usual and customary practices for its own employees, which shall not differ from those practices in effect at those facilities operated by Buyer, PPHS or their Affiliates, and (ii) include recognition of the existing seniority of all such Employees in determining eligibility for benefits under the Palmyra Medical Center Plans, except as provided below. PNI shall provide credit for

eligibility, benefit accrual and vesting purposes for all such Employees' periods of service with Seller (or any Affiliate of Seller) as provided under the ERISA and non-ERISA plans of Seller and its Affiliates for purposes of any Palmyra Hospital Plan; provided that, with respect to Palmyra Medical Center Plans that are active defined benefit pension plans, the existing seniority of such Employees shall only be recognized for eligibility and vesting purposes and not for benefit accrual purposes; and provided further that such Employees shall not participate in any Palmyra Medical Center Plan that is an inactive defined benefit plan. Any future Palmyra Medical Center Plans that provide for benefit and vesting service to employees of PNI or its Affiliates from their original date of hire shall (to the extent permitted by applicable Law) include all vesting and benefit service credit as would be included by recognizing such Employees' original date of hire as recognized by Seller or one of its Affiliates. The service credited under Palmyra Medical Center Plans that are welfare and other benefit plans will include all service credited under the welfare and other benefit plans of Seller and its Affiliates, respectively. Deductibles and out-of-pocket limits met and applied under Seller's medical plans during the year in which the Closing takes place shall be applied to any Palmyra Medical Center Plans that are medical plans following the Closing Date. Participation shall begin as of the Closing Date for participating Employees (and eligible dependents) and for all other Employees who, given their Seller service, have met the age and service requirements for participation under the respective Palmyra Medical Center Plans. Additionally, all Accrued PTO Banks for employees (to the extent the liability for such Accrued PTO is reflected in the Accrued PTO Amount) and all Accrued EIB Banks for employees will be assumed by PNI upon the Closing Date. PNI will, to the extent lawful, waive all pre-existing condition limitations in the applicable Palmyra Medical Center Plans that are employee welfare benefit plans for any Employees and their eligible dependents. PNI shall be liable and responsible for any notification required under the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101 et. seq. (or under any similar state or local Law) (collectively, the "WARN Act"). In the event that the chief executive officer, chief financial officer, chief operating officer or chief nursing officer of any Facility is employed by PNI and terminated by PNI within twelve months following the Closing Date, PNI agrees to pay such individual severance benefits not less than the severance benefits to which such individual would have been entitled under the severance policies, practices, programs or plan of Seller in effect as of the date hereof, as previously disclosed to PNI.

(c)     PNI shall through the applicable Palmyra Medical Center Plans assume responsibility for COBRA coverage for any applicable employee of Seller and their Affiliates identified as a current participant (and any eligible dependent thereof) who is eligible to receive continuation coverage (within the meaning of Code Section 4980B and Part 6 of Subtitle B of Title I of ERISA) and who meets each of the following criteria: (i) such employee is employed at the Facilities on the date hereof (or is hired at the Facilities after the date hereof); (ii) such employee's employment is terminated at the Closing as contemplated by Section 9.3(a); and (iii) such employee either is offered employment as of the Closing Date by PNI or is identified by PNI to Seller not later than January 14, 2011, as an employee to whom PNI will not offer employment; provided, however, that PNI shall not assume responsibility for COBRA coverage for any employee of Seller who PNI does not employ because such employee fails to meet the documentation and verification obligations required by Law. Immediately following the Closing Date and as a result of the transactions contemplated by this Agreement, Seller shall cease to offer COBRA benefits for any applicable group health plan to former employees (and their dependents) who are employed by PNI at any Facility following the Closing Date or to any of the other employees (and their dependants) who meet each of the criteria set forth in clauses (i), (ii) and (iii) of this Section 9.3(c). Seller will thereby be released of COBRA responsibility and liability for such employees (and their dependents).

(d)     As of the Closing Date, Seller will, at its expense or at the expense of the applicable Plan, (i) terminate all Plans, if any, relating solely to employees at any Facility, (ii) terminate the participation of all employees employed at any Facility from all other Plans, (iii) take such actions as

are necessary to make, or cause such Plans to make, timely appropriate distributions to such employees to the extent required or permitted by, and in accordance with, such Plans and applicable Law, as determined by Seller and/or its counsel, and (iv) comply with all applicable Laws in connection with the foregoing. Seller shall indemnify and hold harmless Buyer and PNI from and against any and all liabilities and obligations whatsoever with respect to the Plans or the acts or omissions of Seller under this Section 9.3.

## 10.  ADDITIONAL AGREEMENTS

### 10.1  Break-Up Fee; Rescission Fee.

(a)  *Break-Up Fee.*

(i)  PPHS shall pay Seller thirty-five million dollars ($35,000,000.00) (the "Break-Up Fee") in the event that either Buyer or Seller terminates this Agreement prior to the Closing in accordance with Section 10.3(a)(ii), (iii), (iv) or (v); provided, however, that if Buyer terminates this Agreement in accordance with Section 10.3(a)(ii) or (iii) because one or more of the conditions set forth in Section 7.1, 7.2, 7.5 or 7.6 are not satisfied as of June 1, 2011 (or, if the optional termination date provided for in Section 10.3(a)(ii) shall have been extended to October 1, 2011 in accordance with Section 10.3(a)(ii), as of October 1, 2011), PPHS shall not be required to pay Seller the Break-Up Fee pursuant to this Section 10.1(a).

(ii)  PPHS shall make any payment required to be paid pursuant to this Section 10.1(a) by wire transfer of immediately available funds no later than two business days following the termination of this Agreement that results in PPHS' obligation to make such payment.

(b)  *Rescission Fee.*  If the purchase and sale of the Purchased Assets shall have been consummated and any court or other Governmental Authority of competent jurisdiction (other than Buyer or its Affiliates) shall have issued an order, decree or ruling or taken any other action rescinding such transaction and requiring the parties to cause all or substantially all of the Facilities to be re-conveyed to Seller and such order, decree, ruling or other action shall have become final and non-appealable, PPHS shall pay Buyer thirty-five million dollars ($35,000,000.00) (the "Rescission Fee") at the closing of such rescission transaction (or, if PPHS fails or refuses to pay such Rescission Fee, Seller shall be entitled to retain thirty-five million dollars ($35,000,000.00) of the amount that Seller otherwise would be required to pay to Buyer at the closing of such rescission transaction).

(c)  *Other Provisions.*

(i)  The parties expressly acknowledge and mutually agree that the Break-Up Fee and the Rescission Fee are based on a reasonable determination of damages that would be incurred by Seller in the event that this Agreement is terminated under the circumstances contemplated by Section 10.1(a)(i) or the parties are required to rescind the transactions contemplated hereby as contemplated by Section 10.1(b).  The parties also expressly acknowledge that this Section 10.1 is a specifically bargained for provision of this Agreement and Buyer acknowledges that Seller would not have entered into this Agreement without the provisions contained in this Section 10.1.

(ii)  In the event that PPHS pays to Seller the Break-Up Fee or the Rescission Fee (or Seller retains the Rescission Fee pursuant to Section 10.1(b)) such payment of the Break-Up Fee or the Rescission Fee (or such retention of the Rescission Fee, as applicable) shall be the exclusive remedy available to Seller against Buyer, PPHS, PNI or any of their Affiliates under the applicable circumstances described in Section 10.1(a) or Section 10.1(b).  Notwithstanding the foregoing, nothing in

**EXHIBIT J - 55**

this Section 10.1 is intended to limit Buyer's obligations under (A) Section 12.7 to pay all fees and expenses incurred by Seller in relation to any investigation or challenge of the transactions contemplated hereby described in such Section 12.7 (including any such investigation that results in PPHS' obligation to pay the Break-Up Fee or the Rescission Fee or Seller's right to retain the Rescission Fee), (B) Section 11.2(f) with respect to indemnification for Indemnifiable Losses incurred by any Seller Indemnified Party consisting of fees and expenses relating to any investigation, request for information, subpoena, claim, demand, action, suit or other action as contemplated by Section 11.2(f) (whether initiated by the FTC, the Justice Department, the Attorney General of the State of Georgia or any other Person) or consisting of fines, penalties, judgments or other amounts that a Seller Indemnified Party is obligated to pay as a result of any such matter, or (C) under Section 11.2(b) with respect to a breach by Buyer of its obligations under Section 6.6(a)(x) to defend and oppose any claim, action or proceeding which results in Buyer's obligation to pay the Break-Up Fee or the Rescission Fee.

(iii)    In the event of any legal action brought by the Justice Department, the FTC, the Attorney General of the State of Georgia or any other Person seeking to restrain or prohibit the consummation of the transactions contemplated hereby, impose material damages or penalties in connection therewith or rescind the transaction following the Closing under (in the case of any such proceedings) state or federal antitrust Laws, PPHS shall have the sole right to control said litigation in the manner set forth in Section 11.4 of this Agreement.

**10.2    Allocation of Purchase Price.**

(a)    The Purchase Price for the Facilities will be allocated among the Purchased Assets in the manner required by Section 1060 of the Code and as set forth in Schedule 10.2. In the event the parties are unable to agree upon the form and substance of Schedule 10.2 within 60 days following the Closing, then any disputed matters will be finally and conclusively determined by an independent certified accounting firm or independent certified appraisal firm (the "Allocation Arbiter"), which firm shall be mutually agreed by Buyer and Seller. Promptly, but not later than 15 days after its acceptance of appointment hereunder, the Allocation Arbiter will determine (based solely on presentations by Seller and Buyer and not by independent review) only those matters in dispute and will render a written report as to the disputed matters and the resulting allocation of the Purchase Price, which report shall be conclusive and binding upon the parties. Such Allocation Arbiter's fees and expenses shall be borne equally by the parties.

(b)    Seller will provide to Buyer copies of Internal Revenue Service Form 8594 and any required exhibits thereto, consistent with the allocations in Section 10.2(a). In this regard, the parties agree that, to the extent required, all tax returns or other tax information they may file or cause to be filed with any Governmental Entity shall be prepared and filed consistently with such allocation.

**10.3    Termination Prior to Closing.**

(a)    Notwithstanding anything in this Agreement to the contrary, this Agreement and the transactions contemplated by this Agreement may not be terminated, except prior to the Closing as follows: (i) by mutual consent in writing of Buyer and Seller; (ii) by Seller or Buyer at any time after June 1, 2011 if the Closing shall not have occurred by such date; provided, that the right to terminate this Agreement under this Section 10.3(a)(ii) shall not be available to any party whose failure to fulfill any obligation under this Agreement or whose failure to use commercially reasonable efforts to cause the satisfaction of the conditions under Sections 7 and 8 prior to the date of such intended termination has been the cause of, or resulted in, the failure of the Closing to occur by such date; and provided further, that if a court or other Governmental Entity of competent jurisdiction (other than Buyer or its Affiliates) shall have issued an order, decree or ruling or taken any other action enjoining, restraining or otherwise

prohibiting the consummation of the transactions contemplated by this Agreement that remains outstanding and effective as June 1, 2011, the date provided for in this Section 10.3(a)(ii) shall be extended to October 1, 2011; (iii) by Buyer by written notice to Seller if any event occurs or condition exists which causes Seller to be unable to satisfy one or more obligations of Seller that is a condition to the obligation of Buyer to consummate the transactions contemplated by this Agreement as set forth in Section 7; (iv) by Seller by written notice to Buyer if any event occurs or condition exists which causes Buyer to be unable to satisfy one or more obligations of Buyer that is a condition to the obligation of Seller to consummate the transactions contemplated by this Agreement as set forth in Section 8; or (v) by Buyer or Seller in the event that any court or other Governmental Authority of competent jurisdiction (other than Buyer or its Affiliates) shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and non-appealable.

(b)     In the event that this Agreement shall be terminated pursuant to Section 10.3(a) and except as otherwise provided in this Section 10.3(b), all further obligations of the parties under this Agreement shall terminate without further liability of any party to another; provided that the obligations of PPHS contained in Section 10.1, and the parties in this Section 10.3(b), Section 6.9, Section 11.2(f) and Article 12 shall survive any such termination. Except as set forth in Section 10.1 above, a termination under Section 10.3(a) shall not relieve any party of any liability for a breach of, or for any misrepresentation under this Agreement, or be deemed to constitute a waiver of any available remedy (including specific performance if available) for any such breach or misrepresentation.

**10.4     Post-Closing Access to Information**. Buyer and Seller acknowledge that, subsequent to the Closing, Buyer and Seller may each need access to information, documents or computer data in the control or possession of the other, and Seller may need access to the Purchased Assets or the Facilities for purposes of concluding the transactions contemplated herein and for audits, investigations, compliance with governmental requirements, regulations and requests, and the prosecution or defense of third party claims. Accordingly, Buyer agrees that, at the sole cost and expense of Seller, it will make available to Seller and its agents, independent auditors and/or Governmental Entities such documents and information as may be available relating to the Purchased Assets and Facilities in respect of periods prior to Closing and will permit Seller to make copies of such documents and information. Seller agrees that, at the sole cost and expense of Buyer, Seller will make available to Buyer and its agents, independent auditors and/or Governmental Entities such documents and information as may be in the possession of Seller relating to the Purchased Assets and Facilities in respect of periods prior to the Closing and will permit Buyer to make copies of such documents and information. The parties agree that Buyer and its agents and independent auditors may review Seller's cost report work papers with respect to the pre-Closing operations of the Facilities, but that neither Buyer nor such agents or auditors may remove copies of such work papers.

**10.5     Preservation and Access to Records After the Closing**. After the Closing, Buyer shall for that period of time required by Law keep and preserve in their original form or in an electronic format all medical and other records of the Facilities existing as of the Closing. For purposes of this Agreement, the term "records" includes all documents, electronic data and other compilations of information in any form. Buyer acknowledges that as a result of entering into this Agreement and managing the Facilities it and its Affiliates will gain access to patient and other information which is subject to rules and regulations regarding confidentiality. Buyer shall abide by any such rules and regulations relating to the confidential information that it acquires. Buyer shall maintain the patient records held at each Facility or delivered to Buyer at Closing at the Facilities after Closing in accordance with applicable Law (including, if applicable, Section 1861(v)(i)(I) of the Social Security Act (42 U.S.C. § 1395(V)(1)(i)), and requirements of relevant insurance carriers, all in a manner consistent with the maintenance of patient records generated at the Facilities after Closing. Upon reasonable notice, during normal business hours and upon Buyer's

receipt of appropriate consents and authorizations, Buyer shall afford to representatives of Seller, including its counsel and accountants, full and complete access to, and the right to make copies of, the records transferred to Buyer at the Closing (including, without limitation, access to patient records in respect of patients treated by Affiliates of Seller at the Facilities). In addition, Seller shall be entitled to remove from the Facilities any such patient records, but only for purposes of pending litigation involving a patient to whom such records refer, as certified in writing prior to removal by counsel retained by Seller in connection with such litigation. Any patient records so removed from the Facilities shall be promptly returned to Buyer following its use by Seller. Pending return, Seller will provide a copy of the removed records to Buyer.

**10.6    Capital Expenditures**. This Agreement shall not be deemed to be an acquisition or obligation of a capital expenditure or of funds within the meaning of the certificate of need statute of any state, until the appropriate Governmental Entities shall have granted a certificate of need or the appropriate approval or ruled that no certificate of need or other approval is required.

**10.7    Reproduction of Documents**. This Agreement and all documents relating hereto, including (a) consents, waivers and modifications which may hereafter be executed, (b) the documents delivered at the Closing, and (c) financial statements, certificates and other information previously or hereafter furnished to Seller or to Buyer, may, subject to the provisions of Section 12.8, be reproduced by Seller and by Buyer by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and, unless required by Law or this Agreement otherwise, Seller and Buyer may destroy any original documents so reproduced. Seller and Buyer agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by Seller or Buyer in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**10.8    Cooperation on Tax Matters**. Following the Closing, the parties shall cooperate fully with each other and shall make available to the other, as reasonably requested and at the expense of the requesting party, and to any taxing authority, all information, records or documents relating to tax liabilities or potential tax liabilities of Seller for all periods on or prior to the Closing and any information which may be relevant to determining the amount payable under this Agreement, and shall preserve all such information, records and documents (to the extent a part of the Purchased Assets delivered to Buyer at Closing) at least until the expiration of any applicable statute of limitations or extensions thereof.

**10.9    Litigation Support**. Following the Closing, Buyer shall make available to Seller, at no charge to Seller, Buyer's personnel, to the extent reasonably required by Seller in connection with any litigation, investigation or other judicial or administrative proceedings attributable to the ownership or operation of the Facility on or prior to Closing.

**10.10    HCA Post-Closing Services to be Provided Buyer**. If requested by Buyer, the parties shall negotiate in good faith the terms of applicable transition services agreements covering any of the following categories of services as may be reasonably required by Buyer to operate the Purchased Assets after the Closing: computer and data processing, supply chain services, revenue cycle services, and group purchasing.  The parties agree that (i) the terms of such transition services agreements shall be only for such length of time as may be reasonably required to transfer such functions to Buyer and will include optional termination provisions that permit Buyer to terminate such agreements as and when Buyer no longer needs the applicable services (upon not less than 90 days prior written notice to Seller), (ii) the charges for services rendered by Seller or its Affiliates under such transition services agreements will be substantially similar to those historically charged by Seller (or its applicable Affiliate) in connection with the provision of such services to Seller Affiliates or to third parties in divestiture situations, (iii) the costs

of establishing the systems, adopting the systems for Buyer's purposes and unwinding the systems upon termination (including one-time set up charges substantially similar to those historically charged by Seller (or its applicable Affiliate) to third parties in divestiture situations) will be borne by Buyer, (iv) except as contemplated by this Section 10.10 (including as contemplated in this Section 10.10 regarding the term and termination provisions of such agreements), the form and substance of such transition services agreements (including the provisions limiting the liability of Seller or its applicable Affiliate under such agreements) will be substantially similar to the forms of the applicable transition services agreements that Seller (or its applicable Affiliates) are currently utilizing with third parties in divestiture situations, copies of which have been made available to Buyer prior to the execution of this Agreement.  The parties shall endeavor to finalize any such transition services agreements by January 15, 2011.

      **10.11**  **No-Shop**. Except for the sale of Inventory and other assets in the ordinary course, Seller agrees that, from the date hereof through the date of consummation or earlier termination of this Agreement, it shall not, and shall not permit any of its subsidiaries or employees or any investment banker, attorney, adviser or other representative of Seller to, directly or indirectly (i) offer to sell the Purchased Assets (or any material portion thereof) or any ownership interest in any entity owning any of the Purchased Assets to any third party other than Buyer, (ii) solicit offers to buy all or any material portion of the Purchased Assets or any ownership interest in any entity owning any of the Purchased Assets, or (iii) enter into any agreement with any party other than Buyer with respect to the sale or other disposition of the Purchased Assets (or any material portion thereof) or the sale, merger, consolidation or similar transaction with respect to any ownership interest in any entity owning any of the Purchased Assets.

      **10.12**  **Post-Closing Operations**. Buyer acknowledges that it is an experienced and knowledgeable owner and operator of facilities and assets similar to the Purchased Assets and will rely on its own expertise and the expertise of PNI in operating the Purchased Assets from and after the Closing. Buyer covenants for the benefit of Seller to operate the Purchased Assets in material compliance with all applicable Laws, including Laws relating to the regulation of the Facilities and operation of the Purchased Assets and all Environmental Laws, from and after the Closing.

      **10.13**  **Maintenance of Programs**. Buyer represents and agrees that, as of Closing, it has or will implement and maintain an effective program to prevent and detect violations of legal requirements applicable to the delivery of goods and services in connection with any health care benefits and that such a program will comply with the provisions of the U.S. Sentencing Guidelines relating to corporate compliance programs and will be mindful of any applicable guidance issued by the U.S. Department of Health and Human Services. Buyer agrees that it will maintain such program for no less than five years following the date of Closing.

      **10.14**  **Provision of Certain Employees**. After the Closing Date, Buyer agrees to make available to Seller such of Buyer's employees who were Seller's employees prior to the Closing Date as Seller shall reasonably request for the purpose of closing Seller's books, preparing the Closing Balance Sheet and otherwise complying with Article 2 hereof as well as preparing and providing information in relation to Seller Cost Reports pursuant to Section 9.2 and other similar transitional matters. Seller agrees to reimburse Buyer for direct costs associated with such provision of Buyer's employees to Seller.

      **10.15**  **Non-Competition.**

          (a)    This Section 10.15 is a specifically bargained for provision of this Agreement and Seller acknowledges that Buyer would not have entered into this Agreement without the provisions contained in this Section 10.15.

**EXHIBIT J - 59**

(b)     Except as permitted in this Section 10.15, during the period commencing on the Closing Date and ending on the third anniversary of the Closing Date, Seller agrees that it shall not, and shall cause each of its Affiliates not to, acquire, construct, lease, own or be a controlling shareholder, controlling partner, controlling member or controlling equity holder of, exercise management control over, provide consulting services for, or acquire or maintain a controlling interest in, a Competing Business located in the Territory.

(c)     If HCA is acquired by another Person that owns or operates five or more general acute care hospitals (whether such acquisition is by stock purchase, merger, purchase of all or substantially all of its assets or otherwise), the prohibition included in Section 10.15(b) shall continue to apply to Seller and its Affiliates following such acquisition, but shall not apply to any Competing Business located within the Territory owned, leased, operated, managed or being built by such Person at the time it acquires HCA (or to the Person's ownership, leasing, operation, management or continued construction of such Competing Business) or to any expansion, addition, alteration or improvement of or to such Competing Business. If HCA acquires, directly or indirectly, another Person (by stock purchase, merger, purchase of all or substantially all of its assets or otherwise) that owns or operates five or more general acute care hospitals, and such Person owns, leases, operates, manages or is building a Competing Business within the Territory at the time of such acquisition, this Section 10.15 shall not prohibit HCA's acquisition of such Competing Business or its subsequent ownership, leasing, operation or management or such Competing Business of its completion of the construction of such Competing Business, or to any expansion, addition, alteration or improvement of or to such Competing Business.

(d)     The covenants in Section 10.15(b) will not apply to (i) any Persons (including Seller) or health care assets, facilities or operations that cease to be owned or controlled, directly or indirectly, by HCA, including any Person, health care assets, facilities or operations that may be divested or spun-off by HCA or its Affiliates, or (ii) any services (including consulting services; information systems services; billing, collection or other revenue cycles services; purchasing or distribution services (including participation in group purchasing organizations), but excluding management services) provided by or on behalf of any Affiliate of HCA to (A) any such Person or assets or facilities referred to in clause (i) above or (B) any Persons in which HCA or its Affiliates have, directly or indirectly, any minority ownership interest.

(e)     For purposes of this Section 10.15, (i) the term "Competing Business" means the business of owning, operating, leasing or managing general or tertiary acute care hospitals, including any general or tertiary acute care hospital currently within the Territory or hereafter constructed within the Territory; (ii) the term "control" has the meaning set forth in the definition of "Affiliate;" (iii) the term "controlling" means having "control" over the applicable Person; and (iv) the term "Territory" means the territory within 20 miles of the Hospital.

### 10.16   Settlement and Release.

(a)     Effective upon the Closing, Seller, on behalf of itself and its Affiliates, HCA shareholders, directors, officers, agents, representatives, successors, assigns, heirs, administrators, employees and attorneys, hereby accepts the terms and conditions of this Agreement in full settlement, satisfaction and accord of any and all claims, rights, liens or causes of action it has or could have, whether directly, derivatively, or otherwise known or unknown, against Buyer, PPHS, or their Affiliates, successors, assigns or any officer, director, employee, agent, attorney or representative of Buyer, PPHS or their Affiliates which arise out of, relate to, or otherwise concern the claims in (i) Palmyra Park Hospital, Inc., d/b/a Palmyra Medical Center v. Phoebe Putney Memorial Hospital, Inc. and Phoebe Putney Health System, Inc., Civil Action File No. 1:08-CV-00102-WLS, pending in the United States District Court for the Middle District of Georgia, Albany Division (the "Antitrust Claim"); (ii) the decision rendered by the

Superior Court of Sumter County, Georgia, in <u>Phoebe Sumter Medical Center v. Ga. Department of Community Health and Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center</u>, Case Number 10CV-30-P, on appeal in the Court of Appeals for the State of Georgia, regarding CON Application # 2008-081; and (iii) the decision rendered by the Superior Court of Dougherty County, Georgia, in <u>Phoebe Putney Memorial Hospital v. Ga. Department of Community Health and Palmyra Park Hospital, Inc. d/b/a Palmyra Medical Center</u>, Case Number 10CV-097-1, on appeal in the Court of Appeals for the State of Georgia, regarding CON Application # 2008-081.

(b)     Seller and its Affiliates, HCA shareholders, directors, officers, agents, representatives, successors, assigns, heirs, administrators, employees and attorneys, shall not reassert the Antitrust Claim in any adjudicative body unless the conditions precedent to PPHS' payment of the Rescission Fee described at <u>Section 10.1(b)</u> above have occurred.

(c)     Upon the occurrence of the conditions precedent to PPHS' payment of the Rescission Fee described at <u>Section 10.(b)</u> above, Seller and its Affiliates, HCA shareholders, directors, officers, agents, representatives, successors, assigns, heirs, administrators, employees and attorneys shall be entitled to reassert the Antitrust Claim in any manner permitted by the courts in which the Antitrust Claim was originally filed. Buyer, PPHS, and their Affiliates, successors, assigns or any officer, director, employee, agent, attorney or representative of Buyer, PPHS or their Affiliates shall not oppose such reassertion of the Antitrust Claim based on the Antitrust Claim's initial dismissal without prejudice or reassertion. By this <u>Section 10.16(c)</u>, Buyer, PPHS, and their Affiliates, successors, assigns or any officer, director, employee, agent, attorney and representative of Buyer, PPHS or their Affiliates waive no objection, defense or immunity to the Antitrust Claim they may have existing as of any time prior to Closing and may reassert same should the Antitrust Claim be reasserted.

(d)     The parties agree that they shall preserve all evidence relevant to the Antitrust Claim until the later of: (i) five years from the Closing or (ii) the entry of a final, non-appealable judgment in any action taken by the FTC, the Justice Department, the Attorney General of the State of Georgia, or any other Person in connection with the transactions contemplated hereby under state or federal antitrust Law that is pending on the fifth anniversary of the Closing Date.

## 11.   <u>INDEMNIFICATION</u>

**11.1    <u>Indemnification by Seller</u>.** From and after the Closing Date, Seller shall indemnify and hold harmless Buyer, its subsidiaries and Affiliates, and its and their respective officers, directors, principals, attorneys, agents, employees or other representatives (collectively, "<u>Buyer Indemnified Parties</u>") from and against any and all Indemnifiable Losses that such Buyer Indemnified Party incurs as a result of, or with respect to:

(a)     any inaccuracy in any of the representations or warranties made by Seller in this Agreement;

(b)     any material breach or nonfulfillment of any covenants or other agreements made by Seller in this Agreement;

(c)     any of the Excluded Liabilities; and

(d)     except as contemplated in clause (d) of the definition of the term "ADA Liabilities," any of the claims, actions, suits, audits, compliance reports or information requests, proceedings, investigations, judgments, orders or decrees listed in <u>Schedule 4.17(a)</u> or <u>Schedule 4.17(c)</u>, or any breach of the representations provided in <u>Section 4.17(a)</u> or <u>Section 4.17(c)</u>.

Buyer acknowledges that any representations and warranties made by Seller as of the Closing Date that address the operation of the Purchased Assets by Seller shall be deemed to be made immediately prior to the sale of the Purchased Assets (except to the extent any of such representations and warranties speaks as of a specific date, in which case such representation and warranty shall be made as of the date specified).

**11.2    Indemnification by Buyer**. From and after the Closing Date, Buyer shall indemnify and hold harmless Seller, its subsidiaries and Affiliates, and its and their respective officers, directors, principals, attorneys, agents, employees or other representatives (collectively, "Seller Indemnified Parties") from and against any and all Indemnifiable Losses that such Seller Indemnified Party incurs as a result of, or with respect to:

(a)    any inaccuracy in any of the representations or warranties made by Buyer in this Agreement;

(b)    any material breach or non-fulfillment of any of the covenants or other agreements made by Buyer in this Agreement;

(c)    any of the Assumed Liabilities;

(d)    the use, operation or ownership of any of the Purchased Assets after the Closing;

(e)    any notification required under the WARN Act in connection with the transactions contemplated hereby, including any such losses, liabilities, damages, judgments, claims, costs and expenses that such Seller Indemnified Party incurs as a result of PNI's failure to employ a sufficient number of employees at each Facility as of the Closing Date and to continue to employ such persons for a sufficient period following the Closing Date so as not to constitute a "plant closing" or "mass lay-off" under the WARN Act at any of the Facilities in the absence of pre-Closing notice to the employees of the Facilities under the WARN Act; and

(f)    any pre- or post-Closing investigation, request for information, subpoena or other action taken by the FTC, the Justice Department, the Attorney General of the State of Georgia, or any other state or federal agency in connection with the transactions contemplated hereby under state or federal antitrust Laws; or any claim, demand, action or suit by any Person claiming injury in its trade or business under state or federal antitrust Laws in connection with the transaction contemplated by this Agreement.

**11.3    Limitation**.

(a)    The liability of Seller and Buyer for indemnification under Section 11.1(a) or 11.2(a), respectively, shall be limited to an amount equal to the Purchase Price.

(b)    Neither Seller nor Buyer shall be required to make any indemnification payment pursuant to Section 11.1(a) or 11.2(a), respectively, unless the aggregate of all amounts for which indemnity would be payable by such party exceeds $3,000,000.00 (the "Basket Amount"), and in such event, such party shall be responsible for only the amount in excess of the Basket Amount, provided, however, that the limitation on the liability of (i) Seller provided for in this paragraph shall not apply to any Excluded Liability and (ii) Buyer provided for in this paragraph shall not apply to any Assumed Liability.

(c)     The amount of any Indemnifiable Losses that may be imposed on or otherwise incurred or suffered by Buyer ("Buyer Losses") shall be reduced or reimbursed, as the case may be, by any amount received by Buyer Indemnified Parties with respect thereto under any insurance coverage or for any other party alleged to be responsible therefor. Buyer Indemnified Parties shall use reasonable efforts to collect any amounts available under such insurance coverage and from such other party alleged to have responsibility. If a Buyer Indemnified Party receives an amount under insurance coverage or from such other party with respect to Buyer Losses at any time subsequent to any indemnification provided by Seller pursuant to Section 11.1, then such Buyer Indemnified Party shall promptly reimburse Seller for any payment made or expense incurred by Seller in connection with providing such indemnification up to such amount received by Buyer Indemnified Party.

(d)     Any indemnification payments required to be made hereunder with respect to any matter shall be reduced by the amount of any benefits that can be proven to have been received by the indemnified party as a result of such matter.

**11.4    Notice and Control of Litigation**.

(a)     If any claim or liability is asserted in writing against a Person entitled to indemnification under this Section 11 (the "Indemnified Party") which would give rise to a claim under this Section 11 or Section 10.1, the Indemnified Party shall notify the Person giving the indemnity ("Indemnifying Party") in writing of the same within ten (10) business days of receipt of such written assertion of a claim or liability, provided, however, that the failure to provide such notice as so indicated shall not affect the Indemnifying Party's obligation to indemnify and the Indemnifying Party shall have no remedy by reason of such failure except to the extent of any actual prejudice resulting from such delay. The Indemnifying Party shall have the right to defend any such claim, select the counsel and control the defense, settlement and prosecution of any litigation. If the Indemnifying Party, within ten (10) business days after notice of such claim, fails to provide the Indemnified Party with notice of its intent to defend such claim, or thereafter fails to take action to defend such claim, the Indemnified Party will (upon further notice to the Indemnifying Party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk of the Indemnifying Party; provided however that such claim shall not be compromised or settled without the consent of the Indemnifying Party, which consent shall not be unreasonably withheld.

(b)     The Indemnified Party shall cooperate in all reasonable respects with the Indemnifying Party in the investigation, trial and defense of any lawsuit or action that may be subject to this Section 11 and any appeal arising therefrom; provided however that the Indemnified Party may, at its own cost, participate in the investigation, trial and defense of such lawsuit or action any appeal arising therefrom. The parties shall cooperate with each other in any notifications to insurers.

**11.5    Survival**. The representations and warranties contained in or made pursuant to this Agreement (other than those set forth in Sections 4.1 and 5.1, which shall survive indefinitely, and those set forth in Sections 4.17 and 4.18, which shall survive until the expiration of the statute of limitations) shall survive the Closing until twenty-one (21) months after the Closing (the "Survival Period") but shall not survive any termination of this Agreement. The parties intend to shorten the statute of limitations and agree that no claims or causes of action may be brought against Seller or Buyer based upon, directly or indirectly, any of the representations or warranties contained in this Agreement or any agreements contained in Section 6 after the Survival Period or any termination of this Agreement (except as provided in Section 10.3(b)). For the avoidance of doubt, this Section 11.5 shall not affect any rights to bring claims after the Survival Period based on (i) any covenant or agreement of the parties which contemplates performance after the Survival Period, (ii) the obligations of Seller under Section 11.1(c) or 11.1(d), or (iii) the obligations of Buyer under Section 11.2(c), 11.2(d), 11.2(e) or 11.2(f).

**11.6**   **Materiality; De Minimis Claims**. For purposes of the parties' indemnification obligations under this <u>Article 11</u>, (a) the words "material," "materiality," and "material adverse effect" (and similar words or phrases) which modify any representation, warranty, covenant or agreement shall be disregarded for purposes of determining the amount of indemnifiable losses, liabilities, damages, costs and expenses resulting from a breach of the applicable representation, warranty, covenant or agreement, but will not be disregarded for purposes of determining whether the applicable representation, warranty, covenant or agreement has been breached, and (b) any individual claim or matter involving losses, liabilities, damages, judgments, claims, costs and expenses of less than $20,000 based on <u>Section 11.1(a)</u> and <u>Section 11.2(a)</u>, respectively, shall be disregarded, except in the determination of the Basket Amount.

**11.7**   **Exclusive Remedy**. The representations and warranties contained in or made pursuant to this Agreement shall be terminated and extinguished upon the earlier of the end of the Survival Period or any <u>Section 10.3</u> termination of this Agreement. Thereafter, none of Seller, Buyer or any shareholder, partner, officer, director, principal or Affiliate of any of the preceding shall be subject to any liability of any nature whatsoever with respect to any such representation or warranty. Moreover, each party's sole and exclusive remedy for any claim by it for Indemnifiable Losses arising under this Agreement or in connection with or as a result of the transactions contemplated by this Agreement shall be the remedies provided by this <u>Section 11</u>.

**11.8**   **Mitigation**. The Indemnified Party shall take all reasonable steps to mitigate all liabilities and claims, including availing itself as reasonably directed by the Indemnifying Party of any defenses, limitations, rights of contribution, claims against third parties and other rights at law, and shall provide such evidence and documentation of the nature and extent of any liability as may be reasonably requested by the Indemnifying Party. Each party shall act in a commercially reasonable manner in addressing any liabilities that may provide the basis for an indemnifiable claim (that is, each party shall respond to such liability in the same manner that it would respond to such liability in the absence of the indemnification provided for in this Agreement). Any request for indemnification of specific costs shall include invoices and supporting documents containing reasonably detailed information about the costs and/or damages for which indemnification is being sought.

**11.9**   **Limitation on Damages**. NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE IN THIS AGREEMENT, NO PARTY TO THIS AGREEMENT (OR ANY OF ITS AFFILIATES) SHALL, IN ANY EVENT, BE LIABLE TO ANY OTHER PARTY (OR ANY OF ITS AFFILIATES) FOR SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY, INCIDENTAL OR INDIRECT DAMAGES, COSTS, EXPENSES, CHARGES OR CLAIMS, PURSUANT TO THIS <u>SECTION 11</u> except to the extent that Indemnifiable Losses resulting from a third party claim include special, consequential, punitive, exemplary, incidental or indirect damages, costs, expenses, charges or claims of the third party and then, only to the extent of such Indemnifiable Losses, subject however, to all of the limitations set forth in this Agreement.

**11.10**   **Treatment of Payments**. All payments made pursuant to this <u>Section 11</u> shall be treated as adjustments to the purchase price for the Purchased Assets.

**12.**   **GENERAL**

**12.1**   **Consents, Approvals and Discretion**. Except as herein expressly provided to the contrary, whenever this Agreement requires any consent or approval to be given by either party or either party must or may exercise discretion, the parties agree that such consent or approval shall not be unreasonably withheld or delayed and such discretion shall be reasonably exercised.

**12.2     Legal Fees and Costs**. In the event either party elects to incur legal expenses to enforce or interpret any provision of this Agreement, the prevailing party will be entitled to recover such legal expenses, including reasonable attorney's fees actually incurred, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

**12.3     Governing Law; Arbitration**.

(a)     The parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without giving effect to any choice or conflict of law provision or rule thereof that would cause the application of the laws of any other jurisdiction.

(b)     All disputes between the parties arising out of or in any way connected with the execution, interpretation and performance of this Agreement (including the validity, scope and enforceability of this arbitration provision) or the relationship created thereby shall, except as provided herein, be solely and finally settled by a single arbitrator; provided, however, in the event the amount in controversy, whether to an individual claim or dispute or in the aggregate as to multiple claims or disputes between the parties, is five hundred thousand dollars ($500,000.00) or more, the parties agree to submit such claims or disputes to a board of arbitrators consisting of three arbitrators, as set forth below (the term "Arbitrators" shall refer to the board of arbitrators or the single arbitrator, as applicable). The arbitration proceedings shall be held in Atlanta, Georgia, and except as otherwise may be provided in this Section 12.3(b), the arbitration proceedings shall be conducted in accordance with the Commercial Arbitration Rules (the "AAA Rules") of the American Arbitration Association (the "AAA"). If any Person determines to submit a dispute for arbitration pursuant to this Section 12.3(b), such Person shall furnish the other parties to the dispute with a dated, written statement (the "Arbitration Notice") indicating (i) such Person's intent to commence arbitration proceedings, (ii) the nature, with reasonable detail, of the dispute and (iii) the remedy or remedies such Person will seek. Where the parties use a single arbitrator, within twenty (20) days of the Arbitration Notice, the parties shall select a single arbitrator from a list of members of the AAA's National Panel of Commercial Arbitrators. If the parties use a single arbitrator, that arbitrator must be "neutral." A "neutral" arbitrator shall be a Person who would not be subject to disqualification under rule No. 17 of the AAA Rules. If the parties do not reach agreement on the selection of a single arbitrator within the twenty (20) day period, the AAA shall have the right to make such selection upon the request of any party to the arbitration proceedings. Where the parties use a board of arbitrators, within twenty (20) days of the date of the Arbitration Notice, the Person commencing the arbitration (collectively, the "Petitioner") and the party with whom the Petitioner has its dispute (collectively, the "Respondent") shall each select one qualifying arbitrator (and provide written notice of such selection to the Respondent and Petitioner). A "qualifying" arbitrator is a Person who is not (i) an Affiliate of either the Petitioner or Respondent or (ii) counsel to any such Person at such time. If either the Petitioner or Respondent fails to select a qualifying arbitrator or provide such notice within the twenty (20) day period, the AAA shall have the right to make such selection upon the request of any party to the arbitration proceedings. (Such qualifying arbitrators hereafter may be referred to, respectively, as the "First Arbitrator" and the "Second Arbitrator"). Within ten (10) days following their selection, the First and Second Arbitrator shall select (and provide written notice to the Respondent and the Petitioner of such selection) a third arbitrator (the "Third Arbitrator") from a list of members of the AAA's National Panel of Commercial Arbitrators. The Third Arbitrator must be "neutral." A "neutral" arbitrator shall be a Person who would not be subject to disqualification under rule No. 17 of the AAA Rules. At any time within fifty (50) days after the date of the Arbitration Notice, the Petitioner and Respondent can make discovery requests of the other (including, but not limited to, requests for delivery of documents, production of witnesses for deposition testimony and delivery of interrogatory responses). The recipient of a discovery request shall have twenty (20) days after the receipt of such request to object to any or all portions of such request and make an application to the Arbitrators to limit the scope of such discovery request, and shall respond to any portions of such request not so objected to within twenty (20) days of

the receipt of such request. All objections shall be in writing and shall indicate the reasons for such objections. Within five (5) business days after the end of the period for the submission by the requested party of an application to limit the discovery request, the Arbitrators shall grant or deny such discovery request, in whole or in part, to the extent the Arbitrators determine such discovery is or is not, as the case may be, reasonably necessary to enable the requesting party to obtain information relevant to the dispute without unreasonably burdening the requested party. The requested party shall comply with a discovery request granted by the Arbitrators within twelve (12) business days after such discovery request is granted, or within such longer period as the Arbitrators may determine upon application of the requested party for extension thereof for reasonable cause. Neither party shall be permitted to make more than one application for discovery to the Arbitrators. All depositions shall be taken in the city in which the Person being deposed resides or has its principal place of business, unless otherwise agreed by the parties. The Arbitrators are not authorized to subpoena documents or perform independent investigations. Hearings must commence no later than ninety (90) days following the date of the Arbitration Notice and such hearings shall be conducted for no more than five (5) business days. Each of the Petitioner and the Respondent shall submit a brief, outlining such party's claim for relief or defense to any claim, to the other and to the Arbitrators on or before the tenth (10th) day before the date of the first hearing. Reply briefs must be exchanged and submitted to the Arbitrators on or before the third (3rd) day before the date of the first hearing. The Respondent and Petitioner shall each submit to the Arbitrators within twenty (20) days following the hearing a proposed order for disposing of the claims(s) presented. The final decision of the Arbitrators is due on or before the thirtieth (30th) day following the date of the last hearing. The Arbitrators shall issue a final decision that, in their judgment, is consistent with the terms of this Agreement, applicable Law, and the intent of the parties, as supported by evidence presented by the Petitioner and Respondent in the arbitration proceeding or, if the subject matter of the dispute is not clearly addressed in or determinable under this Agreement, that, in their opinion, would be most fair to the Petitioner and Respondent under the arbitration. The Arbitrators shall have no authority to award any of the types of damages excluded by Section 11.9. The Arbitrators shall be required to provide reasons for their decision. The foregoing time periods and procedural steps may be modified or extended by the Arbitrators in their discretion to the extent they deem necessary to prevent fundamental unfairness; provided that at all times the Arbitrators shall be mindful of the parties' desire for the most expeditious possible resolution of disputes; and provided, further, that a final decision of the Arbitrators shall be rendered within 120 days of the Arbitration Notice. To the extent permissible under applicable Law, the parties agree that the award of the Arbitrators shall be final and shall not be subject to judicial review. Judgment on the arbitration award may be entered and enforced in any court having jurisdiction over the parties or their assets. It is the intent of the parties that the arbitration provisions hereof be enforced to the fullest extent permitted by applicable law, including the Federal Arbitration Act, 9 U.S.C. § 2. Nothing contained in this Exhibit shall prevent the parties from seeking injunctive relief or require arbitration of any issue for which injunctive relief is sought by either party hereto.

(c)     In the event of a breach of any party's obligation to consummate this Agreement or breach of any covenant by any party to this Agreement, the non-breaching party shall be entitled to enforce this Agreement as to such matters by injunctive relief and by specific performance, such relief to be without the necessity of posting a bond, cash or otherwise (unless required by applicable Law).

**12.4     Benefit; Assignment**. Subject to provisions herein to the contrary, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. No party may assign this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld; provided, however, that a party hereto may assign its interest in this Agreement to an Affiliate, but in such event, the assignor shall be required to remain obligated hereunder in the same manner as if such assignment had not been effected.

**12.5**    **Accounting Date**. The Closing of the transactions contemplated hereby shall be deemed to be effective for accounting purposes as of 12:01 a.m. on the calendar day immediately following the Closing Date, unless otherwise agreed in writing by Seller and Buyer. The parties will use commercially reasonable efforts to cause the Closing to be effective as of a month end, with equitable adjustments made to the Purchase Price necessary to give effect to the foregoing. For purposes of allocating and prorating the liabilities, revenues, benefits and burdens associated with the Purchased Assets hereunder (including, by way of illustration and not limitation, the determination of the Price Adjustment Amounts, the preparation of the Closing Balance Sheet, the allocation of PIP payments, Transition Patient Receivables and other revenues under Section 9.1 and the determination of responsibility for a potentially indemnifiable act), all references to the "Closing" and the "Closing Date" shall be deemed to refer to the effective time of the Closing and not the time at which the Closing takes place or the day on which the Closing takes place.

**12.6**    **No Brokerage**.

(a)    Seller represents to Buyer that neither Seller nor any of its Affiliates have contracted in any way with any broker in connection with the transactions contemplated hereby. Seller agrees to indemnify Buyer and its Affiliates from and against all loss, cost, damage or expense arising out of claims for fees or commissions of brokers employed or alleged to have been employed by Seller or its Affiliates.

(b)    Buyer represents to Seller that neither Buyer, PPHS, PNI nor their respective Affiliates have contracted in any way with any broker in connection with the transactions contemplated hereby. Buyer agrees to indemnify Seller and its Affiliates from and against all loss, cost, damage or expense arising out of claims for fees or commissions of brokers employed or alleged to have been employed by Buyer, PPHS, PNI and their respective Affiliates.

**12.7**    **Cost of Transaction**. Whether or not the transactions contemplated hereby shall be consummated and except as otherwise provided herein, the parties agree as follows:

(a)    Except as provided otherwise elsewhere herein, Seller will pay the fees, expenses and disbursements of Seller and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto;

(b)    Except as provided otherwise elsewhere herein, Buyer shall pay the fees, expenses and disbursements of Buyer and its agents, representatives, accountants, and counsel incurred in connection with the subject matter hereof and any amendments hereto, including the fees and expenses of Sovereign Group, LLC;

(c)    Buyer shall pay all fees and expenses incurred by Seller in relation to any investigation or challenge of the transactions contemplated hereby initiated by the FTC, the Justice Department or the Attorney General of any state on, prior to or after the Closing under antitrust or similar Laws, including all fees and expenses of all parties with respect to filings under the HSR Act (or any other applicable antitrust Law) and all costs and expenses resulting from or relating to any "second request" (or other request or demand for information) issued in connection with any such HSR Act filings (or other filings under any applicable antitrust Law); and

(d)    Buyer will pay the cost of surveys, title insurance, environmental and other inspections, documentary stamps, transfer taxes, recording fees and regulatory approvals.

**12.8**    **Public Announcements; Confidentiality**.

(a)     It is understood by the parties hereto that the information, documents and instruments delivered to Buyer by Seller or Seller's agents and the information, documents and instruments delivered to Seller by Buyer or Buyer's agents are of a confidential and proprietary nature. Each of the parties hereto agrees that both prior and subsequent to Closing they will maintain the confidentiality of all such confidential information, documents or instruments delivered to them by each of the other parties hereto or their agents in connection with the negotiation of this Agreement or in compliance with the terms, conditions and covenants hereof and only disclose such information, documents and instruments to their duly authorized officers, directors, representatives and agents. Each of the parties hereto further agrees that if the transactions contemplated hereby are not consummated, they will return all such documents and instruments and all copies thereof in their possession to the other party to this Agreement. Each of the parties hereto recognizes that any breach of this Section would result in irreparable harm to the other parties to this Agreement and their Affiliates and that therefore either Seller or Buyer shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash or otherwise, in addition to all of their other legal and equitable remedies. Nothing in this Section, however, shall prohibit the use of such confidential information, documents or information for the purpose of: (i) Buyer complying with the Hospital Authorities Law; (ii) complying with Georgia open records laws under Georgia Code Annotated §§ 50-18-70 et seq. and the Georgia Open and Public Meetings Law, Georgia Code Annotated §§ 50-14-1, et seq.; or (iii) such governmental filings as in the mutual opinion of Buyer's counsel and Seller's counsel are (A) required by Law or (B) otherwise appropriate. Also, this Section shall not prohibit the disclosure by Buyer or Seller of any information, instruments or documents that are required to be filed with Governmental Entities by Seller or Buyer under applicable securities Laws.

(b)     The parties shall mutually agree upon the date and content of the public announcement of the transactions contemplated by this Agreement. Seller shall participate with Buyer in the initial public announcement of the transactions contemplated by this Agreement.

**12.9     Waiver of Breach**. The waiver by either party of breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or other provision hereof.

**12.10     Notice**. Any notice, demand or communication required, permitted, or desired to be given under this Agreement shall be in writing and sent by United States mail, with postage prepaid thereon, certified or registered mail, return receipt requested, or delivered by reputable express delivery service, or personally delivered by private courier and followed by such mailing or express delivery, addressed as follows:

| Seller: | Palmyra Park Hospital, Inc. |
| | c/o HCA Inc. |
| | One Park Plaza |
| | Nashville, TN 37203 |
| | Attention: Senior Vice President and Chief Development Officer |
| | |
| with copies to: | HCA Inc. |
| | One Park Plaza |
| | Nashville, TN 37203 |
| | Attention: General Counsel |

and

Waller, Lansden, Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN  37219-8966
Attn:  G. Scott Rayson, Esq.

Buyer:   Hospital Authority of Albany-Dougherty County
417 Third Avenue
P.O. Box 1828
Albany, GA 31702

with copies to: Perry & Walters, LLP
212 North Westover Blvd
Post Office Box 71209
Albany, GA  31708-1209
Attn:  James E. Reynolds, Jr., Esq.

and

Phoebe Putney Health System, Inc.
P.O. Box 1828
417 Third Avenue
Albany, GA 31702-1828
Attention:  Thomas S. Chambless, Esq., General Counsel

and

Baudino Law Group, PLC
2600 Grand Avenue, Suite 300
Des Moines, IA 50312
Attention:  Robert J. Baudino, Jr., Esq.

or to such other address, and to the attention of such other person or officer, as any party may designate. Any party may change the person and address to which notices or other communications are to be sent to it by giving written notice of any such change in the manner provided herein. Any notice given in accordance with this Section 12.10 by any party to another party shall be deemed to have been given on the earlier of (a) the date on which it is personally received, (b) four (4) days after it is deposited in the United States mail, or (c) the date it is delivered by reputable express delivery service.

   **12.11**   **Severability**. In the event any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality, or unenforceability shall in no event affect, prejudice or disturb the validity of the remainder of this Agreement, unless doing so would result in an interpretation of this Agreement that is manifestly unjust.

   **12.12**   **No Inferences**. Inasmuch as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, no inference in favor of, or against, either party shall be drawn from the fact that any portion of this Agreement has been drafted by or on behalf of such party.

**12.13** **Divisions and Headings**. The divisions of this Agreement into sections and subsections and the use of captions and headings in connection therewith are solely for convenience and shall have no legal effect in construing the provisions of this Agreement.

**12.14** **No Third-Party Beneficiaries**. The terms and provisions of this Agreement are intended solely for the benefit of Buyer, PPHS, PNI, Seller and their respective permitted successors or assigns, and it is not the intention of the parties to confer, and this Agreement shall not confer, third-party beneficiary rights upon any other Person.

**12.15** **Tax and Medicare Advice and Reliance**. Except as expressly provided in this Agreement, none of the parties (nor any of the parties' respective counsel, accountants or other representatives) has made or is making any representations to any other party (or to any other party's counsel, accountants or other representatives) concerning the consequences of the transactions contemplated hereby under applicable tax Laws or under the Laws governing the Medicare program. Each party has relied solely upon the tax and Medicare advice of its own employees or of representatives engaged by such party and not on any such advice provided by any other party.

**12.16** **Entire Agreement; Amendment**. This Agreement supersedes all previous contracts and constitutes the entire agreement of whatsoever kind or nature existing between or among the parties representing the within subject matter and no party shall be entitled to benefits other than those specified herein. As between or among the parties, no oral statement or prior written material not specifically incorporated herein shall be of any force and effect. The parties specifically acknowledge that in entering into and executing this Agreement, the parties rely solely upon the representations and agreements contained in this Agreement and no others. All prior representations or agreements, whether written or verbal, not expressly incorporated herein are superseded unless and until made in writing and signed by all parties hereto. This Agreement may be executed in two or more counterparts each and all of which shall be deemed an original and all of which together shall constitute but one and the same instrument.

**12.17** **Knowledge**. Whenever any statement herein or in any schedule, exhibit, certificate or other documents delivered to any party pursuant to this Agreement is made "to its knowledge" or words of similar intent or effect of any party or its representative, such person shall make such statement only if such facts and other information which, as of the date the representation is given, are actually known to the party making such statement, which, with respect to Persons that are corporations, means the knowledge of its executive officers.

**12.18** **FIRPTA Withholding**. Seller shall provide Buyer on or prior to the Closing Date a certification pursuant to United States Treasury Department regulation section 1.1445-2 to the effect that Seller is not a foreign person.

**12.19** **Other Owners of Purchased Assets**. The parties acknowledge that certain Purchased Assets may be owned by Affiliates of Seller and not Seller. Notwithstanding the foregoing, and for purposes of all representations, warranties, covenants and agreements contained herein, Seller agrees that (i) its obligations with respect to any Purchased Assets shall be joint and several with any Affiliate which owns or controls such Purchased Assets, (ii) the representations and warranties herein, to the extent applicable, shall be deemed to have been made by, on behalf of and with respect to, such Affiliates in their ownership capacity, and (iii) Seller has the legal capacity to cause, and it shall cause, any Affiliate which owns or controls any Purchased Assets to meet all of Seller's obligations under this Agreement with respect to such Purchased Assets. Seller hereby waives any defense to a claim made by Buyer under this Agreement based on the failure of any Person who owns or controls the Purchased Assets to be a party to this Agreement.

**EXHIBIT J - 70**

**12.20  Disclaimer of Warranties**. Except as expressly set forth in Article 4 hereof, the Facilities and Purchased Assets transferred to Buyer will be sold by Seller and purchased by Buyer in their physical condition as of the Closing Date, "AS IS, WHERE IS AND WITH ALL FAULTS, DEFECTS, IMPERFECTIONS, LIABILITIES AND NONCOMPLIANCE WITH LAWS" WITH NO WARRANTY OF HABITABILITY OR FITNESS FOR HABITATION, with respect to the Real Property, and WITH NO WARRANTIES, INCLUDING, THE WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, with respect to any personal property which is among the Purchased Assets, any and all of which warranties (both express and implied) Seller hereby disclaim. All of the real and personal property included as Purchased Assets shall be further subject to normal wear and tear on the land, improvements and equipment in the ordinary course of business up to the Closing Date.

**12.21  Guarantee**.

(a)  Absolute and Unconditional Guarantee. PPHS hereby unconditionally and absolutely guarantees the prompt payment by Buyer and PNI (and by any assignee by, through or under Buyer or PNI) of each and every financial obligation, Assumed Liability and agreement requiring financial performance by Buyer or PNI (or any such assignee) arising out of, connected with, or related to, this Agreement or any ancillary documents hereto and any assignment, extension, renewal and/or modification thereof (the "Obligations"). The obligation of PPHS under this Section 12.21 is a continuing financial guaranty and shall remain in effect, and the obligations of PPHS shall not be affected, modified or impaired upon the happening from time to time of any of the following events, whether or not with notice or consent of PPHS:

(i)  The compromise, settlement, release, change, modification or amendment (except to the extent of such compromise, settlement, release, change, modification or amendment) of any or all of the obligations, duties, covenants, or agreements of any party under this Agreement or any ancillary documents hereto;

(ii)  The extension of the time for performance or payment of any of the Obligations or the extension or the renewal thereof; or

(iii)  The assignment of any of the Obligations.

(b)  PPHS Obligations. Without limiting the foregoing, the validity of this payment guarantee and PPHS's obligations hereunder shall not be impaired by any event whatsoever, including without limitation any of the following, whether or not with notice or consent of PPHS:

(i)  any claim of immunity, defense, set-off or counterclaim (other than full and final payment of the Obligations) on behalf of Buyer or PNI, any other guarantor or any other Person liable for the Obligations;

(ii)  any change in the time, place or manner of payment or performance, or any release, waiver, indulgence, compromise, settlement, increase, decrease, extension, renewal, acceleration, impairment or termination (voluntary or otherwise) with respect to any or all of the Obligations;

(iii)  any release, addition, exchange, waiver, indulgence, compromise, or settlement with respect to Buyer or PNI, any other guarantor, any other Person liable for the Obligations, or any of the properties, rights and assets securing the Obligations at any time, if any

65

(the "Collateral"), or any failure to take, perfect or protect any lien or interest intended as Collateral, if any;

(iv)     any modification, amendment, restatement or replacement (in whole or in part) of any documents, agreements or instruments evidencing, comprising, securing, guaranteeing or otherwise relating to, or executed or delivered in connection with, the Obligations or of any covenants, obligations or terms set forth in such documents, agreements or instruments;

(v)     the voluntary or involuntary liquidation of, sale or other disposition of all or substantially all the assets of, cessation of business of, marshalling of assets and liabilities of, receivership of, financial decline of, insolvency of, bankruptcy of, assignment for the benefit of creditors of, reorganization of, arrangement of, composition with creditors or readjustment of, or other similar proceedings affecting, Buyer, PNI or any of their respective Affiliates or their assets or any allegation or contest of the validity of the Obligations or this guarantee, or the disaffirmance or attempted disaffirmance of the Obligations or this guarantee, in any such proceedings; and/or

(vi)     Seller's failure to notify PPHS of the breach of any provisions under this guarantee, the occurrence of any event of default or breach of any of the Obligations, acceleration of any of the Obligations, the foreclosure or sale of any Collateral, any other action by or on behalf of Seller with respect to the Obligations, or any of the events or circumstances listed in this Section 12.21.

(c)     Primary Liability of PPHS. This guarantee constitutes a guarantee of payment and not of collection. Accordingly, Seller may enforce this guarantee against PPHS without first making demand on Buyer, PNI or any other Person, or taking action against any Collateral, or instituting collection proceedings upon the Obligations. PPHS's liability for the Obligations is hereby declared to be primary, and not secondary, and each document presently or hereafter executed by Buyer or PNI to evidence or secure the Obligations to Seller is incorporated herein by reference and shall be fully enforceable against PPHS.

(d)     Waivers by PPHS. PPHS hereby knowingly, willingly, and irrevocably waives the following rights, defenses and benefits of law or equity with respect to this guarantee and the Obligations:

(i)     the issuance of instruments evidencing the Obligations, acceptance of this guarantee, presentment, protest, demand, notice and proof of reliance on this guarantee, and the filing of claims with a court in the event of bankruptcy of Buyer or PNI, any other guarantor or any other Person liable for the Obligations; and

(ii)     any right to require Seller to marshal assets or proceed first against Buyer or PNI, the Collateral, any other guarantor or any other Person liable for the Obligations.

**12.22    Schedules**. Each Schedule, certificate provided hereunder and written disclosure required hereby is incorporated by reference into this Agreement and will be considered a part hereof as if set forth herein in full. Each Schedule annexed hereto on the date hereof or to be annexed hereto after the date hereof may be updated as necessary or, if Buyer consents (not to be unreasonably withheld), amended on or before the Closing Date. The disclosures in the Schedules of any information shall not be deemed to constitute an acknowledgment that such information is required to be disclosed in connection with the representations and warranties made by Seller in this Agreement or that it is material, nor shall such information be deemed to establish a level or standard of materiality for purposes of this Agreement. The disclosures in the Schedules and in this Agreement set for exceptions to the representations, warranties

and other agreements made by Seller in this Agreement and are intended to qualify such representations, warranties and other agreements. The information set forth in the Schedules with respect to any Section of this Agreement shall also be deemed to qualify each other Section of this Agreement to which such information is applicable (regardless of whether or not such other Section is qualified by reference to a Schedule).

**EXHIBIT J - 73**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in multiple originals by their authorized officers, all as of the date and year first above written.

**BUYER:**

HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY

By: _____
    Ralph Rosenberg
    Chairman

**PPHS:**

PHOEBE PUTNEY HEALTH SYSTEM, INC.

By: _____
    Lemuel V. Griffin
    Chairman

**PHOEBE NORTH, INC. :**

PHOEBE NORTH, INC.

By: _____
    Joel Wernick
    President and CEO

**SELLER:**

PALMYRA PARK HOSPITAL, INC.

By: _____
    Gregg Gerken
    Vice President

**EXHIBIT J - 74**