IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION and THE STATE OF GEORGIA,<br><br>Plaintiffs,<br>v.<br><br>PHOEBE PUTNEY HEALTH SYSTEM, INC., PHOEBE PUTNEY MEMORIAL HOSPITAL, INC., PHOEBE NORTH, INC., HCA INC., PALMYRA PARK HOSPITAL, INC., and HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY,<br><br>Defendants. | CIVIL ACTION FILE NO:<br>1:11-CV-58-WLS |

## DECLARATION OF RALPH S. ROSENBERG

Pursuant to 28 U.S.C. § 1746, under penalty of perjury, I declare that the following is true and correct:

1.

My name is Ralph S. Rosenberg. I am over twenty-one (21) years of age, competent to make and to give this Declaration, and do so from personal knowledge.

2.

I am seventy-nine (79) years of age. I hold an undergraduate degree from Vanderbilt University. After graduating college, I serviced in the military for three (3) years. I lived in Atlanta, Georgia for twelve (12) years after which I moved to Albany, Georgia where I have lived for the past forty-four (44) years. I was the third generation owner of my family's retail business in Albany, Georgia, until it closed in 1991.

1

3.

The Authority is a Georgia hospital authority organized under the Georgia Hospital Authorities Law (O.C.G.A. §§ 31-7-70 *et seq.*). The Authority was activated by resolutions of the Board of Commissioners of Roads and Revenues of Dougherty County adopted on July 22, 1941 and which the City Commission of Albany, Georgia adopted on August 4, 1941.

4.

From 1941 until 1990, the Hospital Authority of Albany-Dougherty County ("Authority") directly operated Phoebe Putney Memorial Hospital ("PPMH"). In 1990, the Authority underwent a corporate reorganization pursuant to which it entered into a Lease and Transfer Agreement with Phoebe Putney Memorial Hospital, Inc. ("PPMH Lease") on December 11, 1990.

5.

The affairs of the Authority are governed in all respects by its Board of Directors. The Authority's Board consists of not less than five (5) members and no more than nine (9) members who serve a term of five (5) years. The members of the Authority are appointed by the County Commissioners of Dougherty County, Georgia. All Authority members are volunteers of the community and do not receive compensation for their services.

6.

I have served as a member of the Authority Board since January of 2006. I was appointed to the Authority Board by the Dougherty County Commission after I submitted my name for consideration upon seeing a notice in the local newspaper regarding an opening. I am carrying on my family's tradition of serving the community by being a member of the Authority Board, and my role as an Authority member is very important to me.

7.

I am currently the Chairman of the Authority Board and have served in that capacity since May of 2009. As the Chairman, I am responsible for conducting the Authority meetings, reviewing anything that may come before the Board that has any bearing on the PPMH Lease and ensuring that PPMH, Inc. is in compliance with the PPMH Lease requirements. Additionally, as Chairman, I ensure that the mission of the Authority - to provide the citizens of Dougherty County and the surrounding areas, indigent and otherwise, with medical care at a reasonable cost – is continuously fulfilled. Like my father did as past Chairman of the Authority Board, I take my role as Chairman very seriously, and I am offended by the claims of the Federal Trade Commission ("FTC") and the Attorney General of Georgia ("Attorney General") that I and the other Authority members have failed to fulfill our responsibilities.

8.

The Authority Board meets quarterly to consider various matters related to the operations of PPMH, not simply to eat breakfast as the FTC and Attorney General imply in their Complaint. These meetings are open to the general public. We also conduct specially called meetings to consider particular matters, as convened by me as the Chairman or in my absence, the Vice Chairman, Dr. Charles Lingle. Since I was appointed to the Authority Board, I and the other Authority members have stayed well informed about the state of the hospital so that we can properly oversee the hospital under the PPMH Lease and Hospital Authorities Law. We are kept apprised of hospital matters in a number of ways, including, but not limited to, receiving oral and power point presentations by hospital executives, consultants and legal counsel at our regular and special meetings. Attached as Exhibit A is an example of a power point presentation by Joel Wernick, CEO of PPMH, Inc. Hospital executives, consultants and legal counsel are also

at our disposal outside of scheduled meetings in the event that Authority members have any questions or concerns. I have personally sought such counsel outside of regularly scheduled meetings over my tenure on the Authority Board and have always been satisfied with the responsiveness to my inquires.

Before any Authority vote, the Board carefully considers all relevant issues and any questions related to the matter at issue. I understand that the FTC and Attorney General seek to use my testimony that I could not remember an instance where the vote was less than unanimous against the Authority as evidence that the Authority does not properly consider its decisions. It is unfortunate that they confuse consensus with lack of care. Based on my personal observations and interactions with the other Authority members during meetings and otherwise, including the questions they pose about the matters before the Board, I believe that *all* of the Authority members take their roles very seriously and perform their duties quite well.

9.

I am also offended that the FTC and Attorney General have interpreted my testimony as saying that the Authority has no role in running PPMH. Under the PPMH Lease, the Authority has delegated the *day-to-day* operations of PPMH to PPMH, Inc.; however, in all respects, we retain ultimate control over the operations of the PPMH. The primary purpose of the PPMH Lease is to lease the assets of the hospital to PPMH, Inc. so that medical care is provided to everyone in the community irrespective of their ability to pay. The Authority, however, has the power to overrule any decision regarding the operations of PPMH. If the Authority believes that the decisions made by PPMH, Inc., as lessee of PPMH, are in violation of the PPMH Lease or the Hospital Authorities Law, it is within the Authority's power to obtain remediation or terminate the PPMH Lease.

10.

The Authority's main function is to ensure that the requirements of the law and the provisions of the PPMH Lease are adhered to by PPMH, Inc. and that the Authority's mission is carried out. The Authority fulfills its responsibilities in a variety of ways. For example, to ensure that the prices charged by PPMH were reasonable compared to similarly situated hospitals, the Authority engaged an independent agency to perform an analysis of the prices. The studies have concluded that the prices were reasonable. Because I have reviewed these studies, I have not found it necessary to review individual price lists or to challenge particular prices being charged.

11.

Additionally, as required by the Hospital Authorities Law (O.C.G.A. § 31-7-90.1), the Authority files an annual report regarding the operations of PPMH, Inc. We also review PPMH, Inc.'s financial information, which is submitted to the Authority within ninety (90) days of the end of PPMH, Inc.'s fiscal year. We use these financial reports and the services of independent consultants to ensure that the rates and operations of PPMH, Inc. meet the requirements of the Hospital Authorities Law (O.C.G.A. § 31-7-77). PPMH, Inc. also submits an annual Community Benefit Report as required under O.C.G.A. § 14-3-305 (d) which the Authority also reviews to ensure that any unmet health needs of the community are addressed.

12.

The allegations that the Authority played no independent role in evaluating its acquisition of Palmyra, that it did not evaluate the community interests, and that it had no independent interests in this acquisition are completely false. These allegations are especially offensive given the fact that all of the members of the Authority have been part of this community for years and

have volunteered their time for the purpose of serving the community. Simply put, we understand the healthcare needs of this community better than anyone who works and lives in Atlanta or Washington, D.C.

13.

In particular, I, and the Authority members, have been aware of the longstanding capacity shortfall faced by PPMH over the years. For over twenty (20) years, the Authority has sought to solve this capacity issue by either building a new facility or purchasing Palmyra. The purchase of Palmyra therefore has been under consideration as one of the Authority's potential solutions to the capacity challenges faced by the hospital well before the existence of Phoebe Putney Health System, Inc. ("PPHS, Inc.") or PPMH, Inc.

14.

On September 21, 2010, I along with the Vice Chairman of the Authority attended a meeting with senior management of PPHS, Inc. to discuss the possibility of the Authority acquiring Palmyra. Since Dr. Lingle was out of town, he attended the meeting by phone. At this meeting, the senior management of PPHS, Inc. sought my permission to pursue negotiations (once again) for the purchase of Palmyra. They presented me with an analysis of the costs of purchasing Palmyra versus building a new facility to solve our capacity issues. I was also fully apprised of the potential issues that we would face in obtaining a Certificate of Need if we sought to build a new facility. I believe that purchasing Palmyra at the specified price is a bargain because the cost to build a new facility would not only be substantially higher, but would also disrupt services currently being provided to the community. Given that the Authority had sought to purchase Palmyra for over twenty (20) years and that acquiring Palmyra would be less expensive, faster, less disruptive and more certain in light of state CON requirements, I was and

continue to be delighted by the Authority's opportunity to purchase Palmyra. I truly believed and continue to believe that the acquisition would be extremely beneficial to the community.

15.

I was fully informed that the proposed transaction could potentially include not only the acquisition of Palmyra, but also the execution of a management agreement with PPMH, Inc. and possible lease of Palmyra to PPMH, Inc. I received copies of pertinent transaction documents, including the Asset Purchase Agreement and Management Agreement. I reviewed these documents with the Authority's general counsel, James E. Reynolds, Jr. I also was able to ask and have answered all my questions regarding the proposed transaction. I understood prior to casting my vote on December 21, 2010 in favor of the acquisition of Palmyra that after the acquisition, the Authority would enter into a management agreement with PPMH, Inc. for the management of the operations of Palmyra while the Authority considered whether or not it would lease the assets of Palmyra to PPMH, Inc. as it has done with PPMH. I also understood prior to casting my vote that if the Authority voted to enter into a lease agreement with PPMH, Inc. as lessee of both PPMH and Palmyra, the Authority would first have to determine that the lease would promote the health care needs of the community by making additional health care facilities available or lower the cost of health care and provide the public with notice and hold a public hearing on the lease in accordance with the Hospital Authorities Law.

Knowing that the transaction would best serve the community, would support the mission of the Authority and that the final decision to purchase Palmyra and the specific terms surrounding that purchase would ultimately be put before the entire Authority Board for a vote, I gave my authorization to pursue negotiations of an acquisition of Palmyra on behalf of the Authority.

16.

Prior to the December 21, 2010 vote by the Authority Board to approve this transaction, I had been meeting on a regular basis with PPHS, Inc. senior management to obtain updates on the status of the negotiations.

17.

Additionally, prior to the Authority Board's final vote on December 21, 2010, all Authority members met individually or in small groups with PPHS, Inc. senior management to discuss the proposed transaction. The Authority members were given the opportunity to ask and have answered all of their questions regarding the proposed transaction. Because I was not available to personally participate in most of those meetings, I simply did not remember that they had occurred when asked about them several hours into my deposition. It is my understanding that I was unable to correct my testimony in this regard when reviewing my deposition due to Federal Trade Commission rules. I want to be clear that these meetings did not occur without my knowledge or consent.

18.

On December 21, 2010, the Authority Board was given a fact sheet that anticipated many questions anyone may have had remaining prior to casting their final vote. After full consideration, the Authority Board unanimously voted to approve the transaction. I voted to approve the transaction because I concluded that, after review of the alternatives to purchase versus build new space and the benefits that would result from the acquisition, the Authority would best serve the community by the acquisition of Palmyra. I carefully considered the mission of the Authority and the benefits that would accrue to the community as a result of this transaction particularly in light of the fact that my family has been part of this community for

generations. My purpose in being an Authority member as well as serving as the Chairman is to serve this community and my decision to vote in favor of this acquisition was made for no other reason than to promote the best interests of the community.

19.

On March 25, 2011, I requested that Robert J. Baudino, Jr., who was acting as special counsel to the Authority, prepare a memorandum containing terms that would be included in a revised lease between the Authority and PPMH, Inc., as lessee of both PPMH and Palmyra ("Term Sheet"). The Term Sheet contained provisions that would strengthen and make more explicit the already existing provisions ensuring the Authority's power to supervise the operations of PPMH, Inc. The Term Sheet was reviewed and revised by me, the Vice Chairman of the Authority and the Authority's general counsel prior to being presented to the Authority for consideration. The terms would be mandatory and would be included in any future lease agreement entered into by the Authority.

20.

After a full review and discussion, on April 4, 2011, the Authority Board voted to approve the Term Sheet.

21.

On May 5, 2011, the Authority Board passed a resolution to reaffirm its decision to purchase Palmyra despite the Complaint by the FTC and Attorney General seeking to prevent the Authority from acquiring Palmyra. After reviewing the allegations by the FTC and Attorney General filed against the Authority, the Authority Board resolved that it would continue to

purse the acquisition of Palmyra because it believes that the acquisition would materially further the mission and purpose of the Authority for the benefit of the community it serves.

FURTHER AFFIANT SAYETH NOT.

Dated this 12th day of May, 2011.

_____
RALPH S. ROSENBERG

Sworn to and subscribed before me
this 12th day of May, 2011.

_____
Notary Public

My Commission Expires: 9/19/2014