**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA**

**ALBANY DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION and<br>THE STATE OF GEORGIA, by and through<br>SAMUEL S. OLENS, ATTORNEY<br>GENERAL,<br><br>                        Plaintiffs,<br><br>      v.<br><br>PHOEBE PUTNEY HEALTH SYSTEM, INC.,<br>PHOEBE PUTNEY MEMORIAL HOSPITAL,<br>INC., PHOEBE NORTH, INC., HCA, INC.,<br>PALMYRA PARK HOSPITAL, INC., and<br>THE HOSPITAL AUTHORITY OF ALBANY-<br>DOUGHERTY COUNTY,<br>                      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 11-CV-00058 (WLS) |

**DECLARATION OF JOEL WERNICK**

Pursuant to 28 U.S.C. § 1746, under penalty of perjury, I declare that the following is true and correct:

      1.    My name is Joel Wernick. I am over twenty-one (21) years of age, competent to make and to give this Declaration, and do so from personal knowledge.

      2.    I am the President and Chief Executive Officer of Phoebe Putney Health System, Inc. ("PPHS"), my employer. I am also the President and Chief Executive Officer of various PPHS subsidiary entities, including Phoebe Putney Memorial Hospital, Inc. ("PPMH"). I also serve on the board of directors for both entities.

      3.    My responsibilities include guiding the governing bodies as they set the strategic direction for PPHS and its various subsidiaries. I have ultimate responsibility for all

operational aspects of PPHS and its subsidiaries. I have overall responsibility for the formulation of management teams as well as responsibility for employment matters generally. In total, PPHS has approximately 4,300 employees spread out over various counties in Southwest Georgia.

4.      I first became affiliated with the Hospital Authority of Albany-Dougherty County (the "Authority") in 1988 when I was hired by the Authority as its Administrator. The Authority at that time directly employed all hospital staff. My initial responsibilities were limited to a single hospital, Phoebe Putney Memorial Hospital, which had approximately 1,500 employees. I reported to the Authority in much the same manner as a CEO would report to the board of a private corporation. In that role I was expected to initiate, study, and present to the Authority strategic proposals for its consideration. The Authority would then act on such proposals. I also made day-to-day operational decisions, including pricing recomendations. The Authority required that I report to them on a regular basis in order to allow them to exercise ultimate control over all strategic and operational matters.

## 1990 Reorganization and Restructuring of the Authority

5.      Early in my tenure as Administrator, I became aware that the structure of the Authority limited Phoebe Putney Memorial Hospital's ability to serve its mission. As then structured, statutory limitations prevented the Authority from operating hospitals or owning property 12 miles beyond the boundaries of Dougherty County. That geographic limitation as well as certain limitations on the business operations (such as the inability to enter into equity joint ventures with physicians and other independent health care providers) limited the competitive viability of Phoebe Putney Memorial Hospital. To develop new facilities and recruit the diverse medical staff of primary and specialized physicians necessary to provide a broad array of health care services to the residents of Albany and Dougherty County, a larger patient

2

population was needed to support the expense of such operations. Consequently, in order to better serve its constituents, the Authority decided to reorganize following a model that had been previously adopted by a number of other Georgia hospital authorities.

6.  A parent holding company arrangement was established with newly-created PPHS as the non-profit parent entity. PPMH was created as a non-profit subsidiary of PPHS. The Authority entered into a 40-year lease with PPMH regarding the operation of Phoebe Putney Memorial Hospital. *See* Allen Decl., Exhibit F ("Lease").

7.  In effect, PPMH acts as the operating arm of the Authority, and is the vehicle through which the Authority carries out its official responsibilities, which include implementing the policy interests of the Authority, which exists to implement the policy interests of the State of Georgia. PPMH is dissolved "upon the expiration or earlier termination" of the Lease. (Lease, p. 2; Lease, Ex. E Article X; Lease, Ex. H Article X). In the Lease, PPMH is responsible to provide medical services for the benefit of the Albany-Dougherty County community to help carry out the mission of the Authority. The Authority has the sole reversionary interest in all money and property of PPMH, PPHS, and affiliates of each. (Lease, p. 2, § 3.02, § 4.16, § 9.07). All projects of PPMH must be operated on a non-profit basis, as the statute requires of the Authority, and its rates and charges must be set only in amounts sufficient to cover the four statutorily enumerated categories of expenses Georgia law authorizes the Authority to consider. (Lease §§ 4.02, 4.03(b)). All revenue after expenses is reinvested in the Authority's mission to care for the citizens of our community – into clinical care, health programs, state-of-the-art technology and facilities, research, and teaching and training of medical professionals now and in the future. (Lease, Ex. E Article IX; Lease, Ex. H Article IX). Rent due the Authority under the lease is $1 per year, although additional consideration for the

3

lease also exists in the form of PPMH's agreement to pay all of the Authority's financial liabilities, obligations and expenses, and assume the Authority's indigent care responsibilities. (Lease § 3.05(a)(i)).

8.      The Authority retains ultimate control of the hospital as is contemplated by the Hospital Authorities Law. The Authority has a unilateral right to terminate the lease if PPMH ever fails to perform any one of the lease's key obligations. Among those obligations are those put upon the Authority by state statute: making facilities available, providing public service and indigent care, keeping costs low, and strictly adhering to the letter and spirit of Georgia law.

9.      The 40-year term is the result of the need to ensure that the Authority's 30-year bonds are sufficiently attractive to potential bondholders. The original 40-year lease term was renewed in 2002 and 2009.

## The Authority's Relationship With Phoebe Putney

10.     The reorganization did not alter the fundamental relationship between me, as operational head of Phoebe Putney Memorial Hospital, and the Authority. I am now President and Chief Executive Officer of PPHS. Although my title has changed, and although I am no longer a direct employee of the Authority, I continue to report to the Authority in much the same manner as a CEO would report to the board of a private corporation. I continue to oversee the day-to-day operational decisions for PPMH, including the setting of salaries, expenditures, contract negotiations, and pricing decisions. And, under the lease, I am obligated to report to the Authority on a regular basis in order to allow the Authority to perform its oversight responsibilities.

11.     As part of my duties, I act as the primary representative of PPHS and PPMH to the Authority. I know that the Authority holds at least quarterly meetings, as I attend them and present information as requested by the Authority both in verbal reports and written

4

presentations. I also attend all special Authority meetings, which are called from time to time by the Authority Chairman when events require. I respond to various questions and concerns as raised by Authority members. Prior to Authority meetings, I respond to any questions from the Authority's agenda committee regarding potential agenda items.

12.     As an example of the type of report I give to the Authority, at the Authority's November 2007 meeting, I gave a detailed presentation on the current status of operations at Phoebe Putney Memorial Hospital. *See* Rosenberg Decl., Ex. A. As a part of this presentation, I provided detailed financial statistics and a detailed analysis of PPMH's strategic future plans. Among other things, I reviewed and discussed with Authority members the details concerning PPMH's patient population, rate of growth, gross revenues, rate of growth of revenues, net worth, operating margins of insurers, health care spending, the amount of county funds used as compared to other counties, relative statistics concerning community health, and future strategic plans. *Id.* PPMH was meeting the Authority's indigent care goals without imposing any burden on taxpayers, unlike some authority-owned hospitals in other counties, such as Grady Hospital, which had drawn some $80 million in funding from Fulton and DeKalb Counties. *Id.* To address the Authority's fast-growing demand and resulting capacity shortage, I discussed at that November 2007 meeting a potential expansion of Phoebe Putney Hospital in 2010, including the building of a new medical tower, new south patient tower, future specialty tower, and expanded parking deck. *Id.* I provide this type of report to the Authority on an annual basis, though not always with a PowerPoint presentation.

13.     I interact with Authority members during the interim time between Authority meetings. I respond to questions, provide information and otherwise address Authority member issues. The voluntary and unpaid Authority members are each active

members and leaders in our community. I believe they act as diligent and thorough representatives for their constituency. They aggressively monitor community perceptions and concerns regarding the hospital, including as it relates to medical costs. Frequent discussions on these and other topics relevant to the management of Phoebe Putney Memorial Hospital take place between Authority members and me on both an informal basis between the Authority's meetings, consistent with Georgia's open meeting laws, as well as during regular Authority meetings.

14.      The lease requires me, or one of the other members of hospital senior management, to make various periodic reports to the Authority – the same reports we would be making if we were employees of the Authority – as required by the Hospital Authorities Law. For example, PPMH must attest to its compliance with O.C.G.A. § 31-7-77, which requires rates and charges be set "only in amounts sufficient, together with all other funds of the authority" to service its debt, provide for maintenance and operation of the hospital, to create a reserve that can cover debt service for one year, and to create a reserve for improvement of its facilities or services. In addition, we share a report by an outside consultant that compares our rates and charges with those of other Georgia hospitals and hospitals nationally. At the end of each fiscal year, PPMH must provide the Authority its complete and detailed audited financial statements, including a balance sheet, statements of operations, changes in net assets, and statements of cash flow. This same annual audit assesses PPMH's work at providing benefits to our community, including the provision of indigent care and other tangible and intangible work at serving the area's health needs as Southwest Georgia's safety net hospital.

15.      Though the Authority has no full-time staff, it does have its own independent General Counsel, the Albany law firm of Perry & Walters, LLP. I interact often

with lawyers from that firm regarding the Authority's oversight of Phoebe Putney Memorial
Hospital.

16.     Given the reversionary interest the Authority has in all Phoebe Putney
property, Perry & Walters works to ensure the Authority's property interest is protected. Section
5.05 of the lease requires that any affiliate of PPHS or PPMH have provisions in its particular
organizational documents providing for the ultimate reversion to the Authority through PPMH or
PPHS upon the dissolution of that affiliate or termination of the lease.

17.     I do not nominate Authority candidates or otherwise play any role in the
selection of Authority members. Similarly, I play no role in the selection of the Authority's
officers. Dougherty County Commissioners have from time-to-time asked my opinion of
Authority candidates and I have provided my opinion.

## The Benefits of Reorganizing the Authority

18.     The reorganization has yielded substantial and cognizable benefits for the
local community and for Southwest Georgians. Over the last two decades, the reach of PPHS
has expanded to improve access, increase the availability of specialty services, and improve
health care services quality to some of the most medically underserved populations anywhere in
the nation.

19.     One recent example occurred when a tornado devastated the community of
Americus, Georgia on March 1, 2007, and destroyed parts of Sumter Regional Hospital. The
reorganized structure allowed our Authority to provide critically needed health care services in
that community. With the Authority's initial informal encouragement, and later express formal
Authority approval, PPHS has spent $25 million dollars rebuilding that hospital, built a women's
and family health center, an oncology and surgery center, and a wellness and education center.
Similar to the management arrangement of Phoebe Putney Memorial Hospital, PPHS and its

subsidiary are partners with the Americus and Sumter County Hospital Authority and the people of that community.

20.    PPHS now serves patients in at least 35 counties.  The supporting network has provided a sufficiently large patient base to allow PPMH to provide advanced, highly specialized care in areas like cancer, cardiac medicine, and neonatal intensive care to the Albany and Dougherty County citizens.  These types of services are among the most expensive to maintain generally, but especially in regions with relatively small populations.  The reorganization has allowed PPHS to provide these services so citizens of our community do not have to travel to larger metropolitan areas, such as Atlanta, to receive care.  These types of services would not have been successfully established and expanded prior to the reorganization in 1990.

21.    In addition, prior to the reorganization in 1990, Dougherty County transferred roughly $2 million annually for funding indigent care provided to qualifying Dougherty County citizens receiving  care at Phoebe Putney Memorial Hospital.  By mutual agreement with the Dougherty County Commission, the Authority no longer receives any indigent care funding from Dougherty County taxpayers.  Notwithstanding the fact that no patient is ever turned away because they cannot pay, PPMH, and hence the Authority, is now financially self-sufficient.  For comparison, in Atlanta, the citizens of Fulton and DeKalb Counties annually subsidize the Fulton-DeKalb Hospital Authority in amounts that have recently ranged from $75-$100 million  per year.

22.    In addition to absorbing the cost of  all Dougherty County indigents presenting at the hospital, the Authority assumes financial responsibility for all inpatient care

8

costs for the 900+ inmates of the Dougherty County Jail. This annual cost historically has exceeded $1.5 million.

23.     The payroll of PPHS is now more than $225,000,000 a year, providing economic growth and job opportunities to the local community. Allen Decl., Ex. Q. As of 2009, estimates put the total economic impact of PPHS at nearly $1 billion. Allen Decl., Ex. L.

## The Authority's 25+ Year Desire to Acquire Palmyra

24.     Efforts by the Authority to acquire Palmyra Park Hospital ("Palmyra") preceded my affiliation with the Authority. I am aware that discussions of such an acquisition go back at least as far as 1986, pre-dating the reorganization by at least four years.

### *The 1980s*

25.     At the time I was hired by the Authority in 1988, I was informed by the Authority that acquiring Palmyra was to be one of my objectives. I was told by the then Authority Chairman, Harry Willson, and Vice Chairman, Anna Louise McCormack, of the Authority's interest in acquiring Palmyra under reasonable terms because of capacity constraints. I was told that at that time Phoebe Putney Memorial Hospital was "a size 12 foot being rammed into a size 6 shoe." The Authority Chairman and Vice Chairman shared with me their belief that an acquisition could immediately add physical plant capacity at a cost in money and time that would be less than building equivalent capacity on the existing campus.

26.     In order to address capacity needs, early in my tenure I facilitated the development of (a) a strategic master plan regarding growth of Phoebe Putney Memorial Hospital in terms of services and quality, and (b) a facilities master plan that tied planed growth of the campus facilities to the strategic master plan. These two plans made it clear that additional space was needed, either through purchase or construction. Palmyra was and is an attractive

acquisition target because of the medical space it provides that does not require extensive renovation.

27.    In my experience, many of the attempts to negotiate an acquisition of Palmyra by the Authority were related to specific capacity needs. Over my more than 20 years affiliated with the Authority, each time we have considered a major expansion, we considered whether it would be cheaper to build or buy, and whether a renewed approach to HCA made sense at that time.

28.    Over my more than 20 years affiliated with the Authority, I am aware of no time in which the Authority was not interested in acquiring Palmyra.

29.    Prior to the start of my affiliation with the Authority, the Authority had begun negotiations with HCA for the acquisition of Palmyra. The February 1988 minutes of the Authority reflect that it had been in negotiations with HCA, Inc. to purchase Palmyra some 18 months before. Allen Decl., Ex. D. As part of this effort the Authority had retained the services of FirstBoston, Credit Suisse and the law firm of Sutherland, Asbill & Brennan. In approximately the summer of 1988, an analysis was presented to the Authority regarding whether to build or buy additional capacity. In approximately October 1988, the Authority retained attorney Robert J. Baudino to assist with the possible acquisition.

30.    I was advised by Mr. Baudino that HCA had three conditions for any possible sale of Palmyra to the Authority, which were:

> a)    Absolute confidentiality regarding HCA's interest and
> participation in negotiations to sell Palmyra until HCA agreed to public
> disclosure, so as to avoid harm to its business in the event negotiations failed;

10

b)      The Authority must meet HCA's purchase price requirements and agree to other terms and conditions for the sale that would be standard and reasonable within the industry; and

c)      Acceptable or no risk of antitrust issues that would prevent the timely consummation of the transaction, due to HCA's concerns that a delay in closing would cause harm to Palmyra's on-going business.

31.     Though the personnel at HCA who evaluated the terms of a potential sale of Palmyra have changed over the last 23 years, my understanding is HCA's basic requirements for a potential transaction with the Authority have not changed; I understand these to be the same basic prerequisites HCA imposed on PPHS and the Authority before it resumed negotiations in 2010.

32.     Regarding HCA's requirement of absolute confidentiality, I understood that the HCA representatives were aware that the Authority was subject to Georgia's open meetings and open records laws.  As a result, my understanding is that HCA requested that discussions of HCA's interest in selling Palmyra and the negotiation of the terms of the sale could not be shared with the Authority as a collective body before terms could be agreed to, even if contingent upon Authority approval, out of a concern by HCA about the effect that disclosure would have on its on-going business if the negotiations failed.

33.     To comply with this requirement, Mr. Baudino was directed to report on the negotiations and obtain instructions from the Chairman of the Authority with participation by the Vice Chairman of the Authority and myself, so that a complete transaction including definitive agreements could be brought to the Authority at a duly-called public meeting for approval or disapproval.

11

34.     Necessary due diligence took place and a full asset purchase agreement was negotiated by approximately late 1988. The law firm of King & Spalding was retained in approximately January 1989 to assist the Authority with the potential acquisition. Merely days before the asset purchase agreement was to be formally considered by the Authority in approximately January 1989, the Authority was informed that HCA was no longer interested in selling Palmyra. HCA did not clearly state the reason for its decision to withdraw from negotiations.

35.     On approximately February 1, 1989, I asked Mr. Baudino to be present at an Executive Session of the Authority to report on and answer any Authority member's questions regarding the proposed acquisition of Palmyra and why the transaction was not completed. The February 1989 Authority minutes reflect that the Authority continued to be interested in acquiring Palmyra if the opportunity presented. Allen Decl., Ex. E.

36.     The Authority continued to express clear interest in Palmyra. Following the conclusion of the Authority meeting on approximately February 1, 1989, the Chairman of the Authority and I instructed Mr. Baudino to monitor developments at HCA on behalf of the Authority that might indicate a renewed interest on HCA's part to sell Palmyra .

37.     Without the additional capacity that an acquisition of Palmyra would have provided, the Authority undertook a major capital improvement project in approximately the summer of 1989, constructing a major replacement and expansion of Phoebe Putney Memorial Hospital's surgical facility, a medical tower including a cancer center, a parking garage, and other campus reorientation. Construction on these facilities concluded by February 1993. I believe this project took longer to complete and at a higher financial cost to the Authority than would have occurred had a purchase of Palmyra taken place at that time.

### *The 1990s*

38.    The Authority remained interested in Palmyra even as it reorganized in 1990. My instructions from the Authority to acquire Palmyra, contingent on Authority approval, did not change, even as my employer technically did; I became an employee of PPHS following the completion of the reorganization.

39.    I recall meetings with the Authority Chairman and our attorney, Mr. Baudino, regarding the possibility of acquiring Palmyra, contingent on Authority approval, in 1991 and 1992. I was aware that Mr. Baudino around this time contacted the Federal Trade Commission regarding possible antitrust issues related to any potential acquisition of Palmyra by the Authority.

40.    In 1994, Phoebe Putney Memorial Hospital again faced capacity and realignment issues that needed to be addressed by creating additional facilities either through construction or purchase. I again asked Mr. Baudino to initiate contact with HCA to determine if it had an interest in selling Palmyra, contingent on Authority approval. However, after several conversations with HCA representatives, we learned HCA had no interest in selling Palmyra at that time.

41.    As a result of the Authority not being able to acquire Palmyra in 1994, PPMH undertook a major construction project to address facility issues. A replacement space for the labor and delivery unit was built as well as a regional trauma center. Construction on these facilities concluded in 1997. I believe these facilities took longer to complete and at a higher financial cost to the Authority than would have occurred had a purchase of Palmyra taken place at that time.

42.    In 1998, Mr. Baudino advised me that HCA was in the process of selling a large number of hospitals. I asked him to initiate contact with HCA to determine if it had an

interest in selling Palmyra, contingent on Authority approval.  Mr. Baudino contacted HCA and had discussions, but those discussions did not lead to negotiations with HCA or an agreement for the Authority to purchase the facility.

### *The 2000s*

43.     In 2003, Phoebe Putney Memorial Hospital again faced capacity problems and PPHS was once again considering a major expansion.  I again contacted Mr. Baudino, and asked him to initiate contact with HCA to see if a less expensive alternative of acquiring Palmyra existed.  I learned Mr. Baudino had formed the Sovereign Group along with a former HCA executive, Douglas Lewis.  Board leadership and I agreed that Mr. Lewis would be the right person to initiate contact with HCA given his prior relationships.

44.     Around March of 2004, I learned from Mr. Lewis that HCA would enter into negotiations to sell Palmyra.  However, due to a change in senior leadership at HCA soon after, these negotiations were put on hold.  Later that year, we were advised that HCA would be unwilling to sell.

45.     As was the case previously, without the additional capacity that a Palmyra acquisition would have provided, PPHS soon undertook another major construction project adding a second medical tower and another parking garage.  I believe this project took longer to complete and at a higher financial cost to the Authority than would have occurred had a purchase of Palmyra taken place at that time.

46.     In approximately January 2007, we were one of several parties to hear that HCA was considering the sale of certain of its hospitals in Georgia.  A group of reorganized hospital authorities similar to the Authority formed a consortium to approach HCA to determine whether and what HCA was willing to sell.  Mr. Baudino and Mr. Lewis handled the approach to HCA on behalf of the consortium.  Though our consortium was initially told HCA was unwilling

14

to sell anything, HCA agreed to sell two hospitals in Georgia in 2008, but not Palmyra. Both sales were made to a reorganized hospital authority and to my knowledge neither transaction was subject to any antitrust review.

### 2010

47.     During the summer of 2010, PPMH and PPHS again began to think about how to address capacity constraints, especially for certain of our units such as intensive care and rehabilitation. Significant diversion of some patients from Phoebe Putney Memorial Hospital to other medical facilities had taken place since at least 2006, but such diversion had grown more consistent since at least 2009. Some patient care areas on our main campus are over 60 years old, significantly limiting the types of services that can be provided due to physical constraints imposed by older construction such as ceiling height. We once again faced a build or buy decision.

48.     In June and July of 2010, Mr. Baudino and I discussed the possibility of reinitiating contact with HCA to discuss a possible Authority acquisition of Palmyra. Following those discussions, I understand that Mr. Lewis contacted HCA in late August 2010.

49.     On September 13, 2010, I was advised that HCA might be open to an offer to acquire Palmyra. No negotiations had occurred at this point. I understood HCA's position to be only a willingness to hear the proposal.

### The Authority's Direction and Involvement in the Transaction

50.     As with the previous attempts to acquire Palmyra, the efforts that led to the proposed transaction were undertaken at the direction of the Authority, and the Authority and/or its counsel were involved in or informed of every significant step in the transaction.

51.     Approximately eight days after learning that HCA might be willing to re-open negotiations, on September 21, 2010, I met with the Chairman of the Authority, Ralph

15

Rosenberg, and Vice Chairman of the Authority, Dr. Charles Lingle. The goal of this meeting was to inform them of the development, respond to their questions, and generally seek guidance. At that time, Mr. Rosenberg and Dr. Lingle directed PPHS to proceed with negotiations on the Authority's behalf out of the belief that the Authority would wish to consider the acquisition of Palmyra as a solution to its need to add capacity.

52.     As stated above, I understand that HCA's demand for confidentiality was no different in 2010 than it was in 1988. At the behest of HCA, Mr. Rosenberg and Dr. Lingle each signed a confidentiality agreement when they met with me on September 21, 2010. I understood HCA believed this was necessary out of a concern that if news leaked they were considering selling Palmyra, it would damage their existing business. It is my understanding that the agreement prohibited them from discussing the possible acquisition with those who had not yet signed the confidentiality agreement, but certainly did not prevent them from discussing the possible transaction with each other and others who were signatories.

53.     As with each attempt to acquire Palmyra since my initial affiliation with the Authority in 1988, the only contemplated transaction structure had the Authority as the acquiring party. No other structure for the transaction was ever considered. There are many reasons for this, including that the Authority must be the hospital owner in order for Palmyra to be eligible as a recipient from both the Medicare Upper Payment Limit program and the Georgia Indigent Care Trust Fund, both critical sources of funds that allow the Authority to meet its mission and fulfill statutory requirements; in fiscal year 2010 PPMH received approximately $9,344,188 from these two programs.

54.     The PPHS board, which included Authority member Wilhelmina Hall, was told HCA might be willing to sell Palmyra on October 7, 2010, about two weeks after my

16

meeting with the Authority Chairman and Vice Chairman. The members of the PPHS board had signed confidentiality agreements, per HCA's requirement.

55.     The Chairman and Vice Chairman of the Authority were consulted again and their guidance again sought before a formal offer for Palmyra was transmitted to HCA, with the understanding that ultimate approval of any transaction was contingent on Authority approval. Mr. Baudino and Mr. Lewis delivered to PPHS a proposed written offer for the Authority to acquire Palmyra on November 9, 2010. The next day, I reviewed the proposed written offer with the Chairman and Vice Chairman of the Authority, together with the Authority's General Counsel, James E. Reynolds, Esq. of Perry & Walters. I answered questions regarding the reasons for the offer amount and why I believed it was a fair price under the circumstances. Mr. Baudino and Thomas Chambless, the PPHS General Counsel, were also on hand to answer additional questions at this meeting.

56.     At that meeting, the Chairman and Vice Chairman of the Authority approved the submission of the proposed offer to HCA. It was also discussed at this meeting that Mr. Baudino and his law firm would serve as special transaction counsel for both the Authority and PPHS and he was instructed to report to both the Authority's General Counsel and the General Counsel for PPHS.

57.     At this meeting, plans were made for meetings with the individual Authority members to inform them of the reasons for and terms of a possible transaction for the Authority to acquire Palmyra if HCA responded to the offer. Chairman Rosenberg helped arrange a number of these meetings.

58.     I understand that the offer was communicated to HCA on November 16, 2010.

59.    I understand that it was after the offer was communicated to HCA that Mr. Lewis actually began negotiations with HCA on behalf of PPHS and the Authority, on or about November 29, 2010.

60.    As negotiations proceeded in late November and December 2010, I made certain that the final terms of the deal were developed with input and review by the Authority's General Counsel, Perry & Walters. After negotiations were underway and actual drafts of the asset purchase agreement were produced, the Authority's general counsel was given copies and updated regularly on issues, either by Mr. Baudino, Mr. Chambless, or by me. I understand that some, if not all, of these interim drafts were shared with Chairman Rosenberg and Vice Chairman Lingle.

61.    The negotiated purchase price of $195 million was driven by HCA. During my meetings with various Authority members, I discussed why I believed the purchase price to be reasonable, particularly when compared to building new facilities. The $195 million price is a somewhat deceptively high figure because in addition to the Palmyra assets being acquired, the Authority is buying out service agreements valued at approximately $40 million. It was not possible to share specific analysis regarding valuation of comparable hospitals because no reasonable comparables were known given that additional component of the services agreement buyout. In any event, I believe it is unquestionably cheaper for the Authority to buy than build. We have calculated that the cost per bed to acquire Palmyra is approximately $786,290 while we are experiencing a cost of approximately $1,644,000 per bed to build the Americus/Sumter County campus. *See, e.g.*, Allen Decl., Ex. Q.

62.    In December 2010, as negotiations advanced and it looked like a deal with HCA might be reached, I met with each Authority member to discuss the contemplated

18

transaction. Joining me at these meetings was the Authority's General Counsel, Mr. Reynolds, and the PPHS General Counsel, Mr. Chambless. Each Authority member had the opportunity to ask questions, raise concerns, and otherwise state their reaction to the contemplated transaction. At these meetings, questions were raised. I recall that Authority members asked for more information on the price and why our team believed it was reasonable, whether that price was something the Authority could really afford, whether there would be layoffs at Palmyra, whether there would be tax implications for Dougherty County, what might be done with the Palmyra facility in the future, and ultimately what this transaction would mean for the provision of medical care in Southwest Georgia. During these meetings, every Authority member indicated their tentative support of the acquisition.

63.    As noted above, HCA was concerned with confidentiality. We believed that at least part of the Authority's consideration of the transaction at the formal meeting might have to occur in open session. While I was sure the Authority's support for the transaction was as strong in 2010 as it was in 1988, HCA did not have the benefit of meetings with each Authority member. Were the Authority to vote no, the transaction would not be consummated, and HCA would still own Palmyra. HCA believed the public admission that it was interested in selling Palmyra would harm its on-going business. As a result, it requested a fee as a transaction condition to remedy damages it might sustain in the event its interest in selling Palmyra was disclosed, but the Authority declined to purchase. At that time this termination fee agreement was reached, Authority members had already indicated to me their tentative approval of the transaction.

64.    At a special meeting called the morning of December 21, 2010, the Authority approved the purchase of Palmyra. I gave a presentation detailing the rationale for

19

transaction and its likely benefits to the Authority and region. Allen Decl., Ex. L. As I had with individual Authority members, I again presented information regarding the utilization issues facing PPMH. I shared information regarding diversion of patients to other hospitals because of various units of PPMH often are operating at full capacity. I shared analyses as to whether it was more economical to build new facilities or buy Palmyra. Besides issues related to cost of new construction, I shared concerns about the length of time it could take to receive any necessary certificates of need to build additional facilities, as well as the logistical limitations of continuing to operate the various hospital units during construction of expanded facilities.

65.     Following my presentation at that meeting, copies of the asset purchase agreement were made available to each member of the Authority and Mr. Baudino took them through the agreement's key provisions. Authority members were also provided with a fact sheet which provided answers to anticipated questions.

66.     The members of the Authority asked questions during the December 21, 2010 meeting about the terms of the transaction and its implications on care in the community. For example, I specifically remember questions ranging from employment issues to what the Authority's rights would be against HCA should asbestos be found in the Palmyra facility in the future.

67.     The Authority sought extra counsel during the December 21, 2010 meeting. Once I finished presenting the business reasons for the transaction and Mr. Baudino finished presenting the asset purchase agreement, we were dismissed from the meeting. The Authority then met alone with its General Counsel and reviewed the transaction, and Mr. Baudino and I left the room.

20

68.     After that period of counsel and deliberation, the Authority returned for a
public session at which time the Authority voted unanimously to enter into this agreement.

69.     Following the acquisition by the Authority, but prior to the
commencement of any potential lease regarding Palmyra, a statutory period totaling at least 120
days is required in order to allow for a public hearing.

70.     If the Authority and PPMH were to modify their existing lease or enter
into a new lease regarding Palmyra, incorporating the Authority term sheet of which I have been
made aware, PPMH would be required to provide prospective pricing information to the
Authority annually in connection with the budget process.

71.     PPMH fully intends to adhere to all terms of its exiting lease with the
Authority and any future modifications or any new leases, as we have done with pride over the
last 20 years.

72.     At no time did I, or anyone at PPMH or PPHS to my knowledge, consider
the Authority as any kind of "strawman" or "rubber stamp." There is only one event which is
occurring - the acquisition of Palmyra by the Authority. And the proposed acquisition was
never part of any scheme for me, PPHS or PPMH to "get control" of Palmyra, contrary to the
Plaintiffs' assertions. Our role is to fulfill the Authority's mission and we take that mission, and
the Authority itself, with the utmost seriousness. All of the actions of PPHS and PPMH were
aimed at placing the strategic option of an acquisition of Palmyra before the Authority so that the
Authority could make a determination as to whether such an acquisition would further its
statutory mission. As detailed above, I did not pursue this strategic option for the Authority in a
vacuum – I was aware that the Authority had long considered the acquisition of Palmyra, if it
could be achieved on reasonable terms, as the most cost efficient means of meeting the ever

expanding healthcare needs of the community. I made sure to consult with Authority members from the very beginning of this most recent purchase process. The Authority members provided me with substantive input and guidance throughout the process. Especially in light of their longstanding leadership in the community, and the Authority's longstanding interest in acquiring Palmyra, it would simply not be possible to expect them to be a "rubber stamp." Instead, I value their input and advice, and indeed, I respect their fiduciary responsibilities as owner. The Authority members were actively involved in this acquisition process, including reviewing information I provided them and asking me many questions over a period of weeks, months, and years, as detailed above. All of the actions of PPHS and PPMH were aimed at having the Authority acquire Palmyra just as the Authority acquired Phoebe Putney Memorial Hospital in 1941 and as the Authority wanted to do in 1988-1989 as that is the only step which can occur now. What will occur after the Authority acquires Palmyra remains to be thought through, developed, and decided by the Authority.

FURTHER AFFIANT SAYETH NOT.

Dated this **16th** day of May, 2011.

JOEL WERNICK

Sworn to and subscribed before me
this **16th** day of May, 2011.

Notary Public

My Commission Expires: **1-18-13**

LYNDA ROSSER
NOTARY
My Comm. Expires
Jan. 18, 2013
PUBLIC
WORTH COUNTY, GEORGIA

22