**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION and THE STATE OF GEORGIA, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | No. 1:11CV58 (WLS) |
| PHOEBE PUTNEY HEALTH SYSTEM, INC., PHOEBE PUTNEY MEMORIAL HOSPITAL, INC., PHOEBE NORTH, INC., HCA INC., PALMYRA PARK HOSPITAL INC., and HOSPITAL AUTHORITY OF ALBANY-DOUGHERTY COUNTY, | ) ) ) ) ) ) ) ) ) ) | **REDACTED PUBLIC VERSION** |
| Defendants. | ) | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S BRIEF IN FURTHER
SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND
IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS OR FOR SUMMARY JUDGMENT AND
MOTIONS TO VACATE THE TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 4

I.     DEFENDANTS FAIL TO SATISFY THEIR BURDENS ON A MOTION TO
DISMISS OR A MOTION FOR SUMMARY JUDGMENT ...................................... 4

II.    THIS COURT HAS JURISDICTION OVER THIS MATTER AND OVER ALL
DEFENDANTS ........................................................................................... 6

     A.     Phoebe Cannot Avoid the Clayton Act by Arguing It Is Not an Acquirer ....... 7

     B.     Plaintiffs' Complaint and the Underlying Facts Easily Satisfy the Article III
"Case or Controversy" Requirement .............................................................. 7

III.   THE TRANSACTION IS NOT THE PRODUCT OF STATE ACTION ................... 9

     A.     Phoebe Putney – Not the Authority – Is the True Acquirer of Palmyra ........... 9

     B.     Even If State Action Could Apply Here, Georgia Has Not Clearly Articulated
a State Policy to Immunize This Transaction ................................................... 12

          i.     Defendants misconstrue the Georgia Hospital Authorities Law to
support their proposed merger to monopoly ...................................... 12

          ii.    The facts of this case are unprecedented in this Circuit...................... 14

     C.     The Hospital Authority Must Actively Supervise Phoebe Putney, But Has Not
Done So In the Past and Will Not Do So In the Future ................................. 17

          i.     Active supervision is required where the anticompetitive conduct is
engaged in by private parties .............................................................. 17

          ii.    Defendants will not actively supervise Phoebe Putney post-
Transaction......................................................................................... 20

     D.     Defendants Mistakenly Suggest That Plaintiffs Seek a Conspiracy Exception
to the State Action Defense............................................................................ 23

CONCLUSION................................................................................................. 25

# TABLE OF AUTHORITIES

## Cases

*Askew v. DCH Reg. Health Care Auth.*, 995 F.2d 1033 (11th Cir. 1993) ................................... 16

*Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*,
    155 F.3d 59 (2d Cir. 1998).................................................................................... 19

*Bates v. United States*, 522 U.S. 23 (1997)................................................................. 13

*Bolt v. Halifax Hospital Medical Center,* 980 F.2d 1381 (11th Cir. 1993) ..................... 23, 24, 25

*Cal. ex rel. Lockyer v. Mirant Corp.*, 266 F. Supp. 2d 1046 (N.D. Cal. 2003) ............................ 12

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) ....................... 12

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*,
    810 F.2d 869 (9th Cir. 1987). ......................................................................... 19, 20

*Cine 42nd St. Theater Corp. v. The Nederlander Org., Inc.*, 790 F.2d 1032 (2d Cir. 1986)........ 19

*City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365 (1991) .......................... 23-25

*City of Lafayette, La. v. La. Power & Light Co.*, 435 U.S. 389 (1978) .................................. 12, 13

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)........................................ 20

*Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937 (9th Cir. 1996)........................ 19

*Cox v. Athens Reg'l Med. Ctr.*, 279 Ga. App. 586 (Ga. Ct. App. 2006)....................................... 13

*Crosby v. Hosp. Auth.*, 93 F.3d 1515 (11th Cir. 1996) ........................................................... 12, 16

*Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110 (2d Cir. 2002)........................................ 18

*First Am. Title Co. v. DeVaugh*, 480 F.3d 438 (6th Cir. 2007) .................................................... 12

*FTC v. Hosp. Bd. of Dirs.*, 38 F.3d 1184 (11th Cir. 1994) .......................................................... 15

*FTC v. Ticor Title Ins.*, 504 U.S. 621 (1992)......................................................................... 12, 17

*FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)......................................................... 18

*Glover v. Liggett Group, Inc.*, 459 F.3d 1304 (11th Cir. 2006)...................................................... 5

*Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975) ............................................................ 12

*Greene v. United States*, 13 F.3d 577 (2d Cir. 1994) ...................................................... 6

*H.G. Brown Family Ltd. P'ship v. City of Villa Rica*, 278 Ga. 819 (2005) ................................. 11

*Horsely v. Feldt*, 304 F.3d. 1125 (11th Cir. 2002) ........................................................... 5

*Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986) ........................................... 7

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397 (9th Cir. 1991) ............... 13

*Latimer v. Roaring Toyz*, 601 F.3d 1224 (11th Cir. 2010) ............................................... 5

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...................................................... 8

*McTamney v. Stolt Tankers & Terminals (Holdings), S.A.*,
    678 F. Supp. 118 (E.D. Pa. 1987) ...................................................................... 7, 8

*N.C. ex rel. Edmisten v. P.I.A. Asheville, Inc.*, 740 F.2d 274 (4th Cir. 1984) ........................ 17

*Nat'l Union Elec. Corp. v. Emerson Elec. Co.*,
    1981 U.S. Dist LEXIS 14709 (D. Ill. July 23, 1981) .................................................. 6

*Nelson v. Pac. Sw. Airlines*, 399 F. Supp. 1025 (S.D. Cal. 1975) .................................... 7

*Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*,
    No. 1:08-CV-00102-WLS (M.D. Ga. Jul. 3, 2008) ................................................... 21

*Parker v. Brown*, 317 U.S. 341 (1943) ...................................................................... 12

*Patrick v. Burget*, 486 U.S. 94 (1988) ................................................................. 12, 17

*Surgical Care Ctr. of Hammond v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*,
    171 F.3d 231 (5th Cir. 1999) .......................................................................... 15

*TEC Cogeneration Inc. v. Florida Power & Light Co.*, 76 F.3d 1560 (11th Cir. 1996) ............. 17

*Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1993) ............................................ 19

*Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985) .............................................. 25

*United States v. Archer-Daniels-Midland Co.*, 584 F. Supp. 1134 (S.D. Iowa 1984) ................. 7

*United States v. Columbia Pictures Corp.*, 189 F. Supp. 153 (S.D.N.Y. 1960) ..................... 7, 8

iii

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ......................................... 8

*United States v. Penn-Olin Chem. Co*., 378 U.S. 158 (1964) ...................................................... 20

*Warshauer v. Solis*, 577 F.3d 1330 (11th Cir. 2009) ................................................................ 13

*White v. Lemacks*, 183 F.3d 1253 (11th Cir. 1999) ................................................................... 5

*Yeager's Fuel v. Penn. Power & Light, Co*., 22 F.3d 1260 (3d Cir. 1994) ................................. 12

## Statutes

Clayton Act, 15 U.S.C. § 7 (2006)................................................................................. *passim*

Ga. Const. art. III, § VI (c) (V) ................................................................................... 13

O.C.G.A. § 31-7-72.1(e) ............................................................................................. 13

O.C.G.A. § 31-7-77................................................................................................... 22

O.C.G.A. § 36-65-1, 2............................................................................................... 14

O.C.G.A. §§ 31-7-70................................................................................................. 16

O.C.G.A. §§ 31-7-72(a), 72.1(a), 73(a) ....................................................................... 13

Sherman Act, 15 U.S.C. §§ 1, 2 (1982) ....................................................................... *passim*

## Rules

Fed. R. Civ. P. 12(d) .............................................................................................. *passim*

Fed. R. Civ. P. 56(d)............................................................................................... *passim*

Fed. R. Evid. 801(d)(2) .............................................................................................. 11

## Other Authorities

S. Rep. No. 63-698 (1914)............................................................................................ 8

# INTRODUCTION

The stakes for the citizens of Albany are extraordinarily high.  It is undisputed that Defendants' proposed Transaction will:

- Eliminate all competition between the self-proclaimed dominant Phoebe Putney and Palmyra, the only two general acute care hospitals in Dougherty County;

- Produce a *de facto* monopoly for inpatient general acute care services, even in a broadly defined six-county geographic market;

- Increase healthcare costs – including higher premiums, co-pays, and out-of-pocket costs – on top of already high costs for local employers and residents, as health plans will have no choice but to contract with the combined entity, at any price;

- Decrease the quality of care and pace of innovation and service enhancement at Phoebe Putney and Palmyra, without the addition of any new facilities or a single new bed at either hospital; and

- Generate few, if any, overall benefits to the community.[1]

Indeed, Defendants concede that Plaintiffs have made a *prima facie* case that the Transaction will "substantially lessen competition, or to tend to create a monopoly," and have chosen not to defend the Transaction's merits.  Thus, unless Defendants can persuade this Court that the Transaction should escape *all* antitrust scrutiny, the Transaction should be enjoined.

Defendants primarily style their motions as motions to dismiss.  But they do not accept the Complaint's facts as true, as they must to prevail on a motion to dismiss.  And Defendants do not attempt to show how—accepting the Complaint's allegations—the state action doctrine applies or entitles them to judgment as a matter of law.  Rather, Defendants attempt to contradict Plaintiffs' factual allegations, submitting five declarations, twenty-four exhibits, and a twelve-page statement of purportedly "undisputed facts," many of which are not only disputed, but directly contradict Defendants' sworn testimony and ordinary course business documents.

---

[1] Defined terms in this brief have the same meaning as in Plaintiffs' opening brief and the Complaint unless otherwise indicated.

Defendants' motions to dismiss must be denied.

The Authority's suggestion that its motion can be converted to a motion for summary judgment is likewise doomed.  Rule 56 requires that there be "no genuine dispute as to any material fact."  The disputed facts here are legion, and they are material.  Chief among them is the true nature of the Transaction, which Plaintiffs allege is an acquisition by Phoebe Putney, using the Hospital Authority as a strawman in a transparent attempt to avail itself of state action immunity.  In contrast, Defendants would have the Court deem the Authority the acquirer and ignore that Phoebe Putney will control Palmyra from day one.

Defendants' jurisdictional arguments also fail.  First, they claim that there is no Article III "claim or controversy" involving Phoebe Putney because the Authority's lease of Palmyra's assets to Phoebe Putney is too ephemeral.  Second, they similarly argue that this Court lacks jurisdiction under § 7 of the Clayton Act because Phoebe Putney is not truly acquiring Palmyra.  Both of Defendants' arguments disregard the mountain of evidence before the Court.  As Defendants' conduct has consistently shown, the Transaction is a sale of Palmyra to Phoebe Putney, immediately eliminating all competition between them while momentarily masquerading as state action to evade antitrust enforcement:

- Phoebe Putney's counsel and the Transaction's architect, Mr. Baudino, and his Sovereign Group described themselves as "the exclusive representative of, and adviser to, Phoebe Putney Health System, Inc. . . . with regard to negotiations surrounding the potential acquisition by Phoebe from HCA . . . of Palmyra."

- As Mr. Baudino explained to HCA, "[s]hould HCA agree to sell Palmyra Medical Center to PPHS, the transaction would be structured as an acquisition by the Hospital Authority . . . to prevent an antitrust enforcement action."  According to Mr. Baudino, "[l]ater, Phoebe will lease Palmyra from the Authority."

- Unbeknownst to the Authority, Phoebe Putney conceived of the Transaction and initiated negotiations with HCA to acquire Palmyra, and Phoebe Putney directed those negotiations from start to finish, made the offers to purchase Palmyra, and withheld all Transaction-related documents from the Authority until the meeting in

2

which the Authority voted to approve the Transaction.

- PPHS's board – not the Authority – authorized the significant premium it would pay for Palmyra, ███████████████████████ and the Authority was not even aware that a significant premium would be paid.

- Phoebe Putney drafted the Asset Purchase Agreement ("APA"), the Termination Agreement, the Management Agreement – which gives it immediate control over Palmyra – and the lease terms under which Phoebe Putney will control Palmyra for the next 40 years.

- The Authority has no reason to acquire Palmyra independent of Phoebe Putney's reasons for doing so.

- Phoebe Putney commissioned work by consultants to integrate the two Albany hospitals, drafted talking points and press releases, including one for the Authority, and launched a public relations campaign touting the ostensible benefits of the merger between Phoebe Putney and Palmyra.

- Even after the purported state action authorizing the Transaction, Phoebe Putney lists Palmyra among its "Successful New Acquisitions."

Based on these facts alone, any suggestion that the Court lacks jurisdiction under either § 7 of the Clayton Act or Article III strains credulity.

Defendants would also have this Court believe that the Transaction is an act of the state undertaken in furtherance of a clearly articulated and affirmatively expressed state policy to displace competition. Again, Defendants' position is untenable. No Georgia policy encourages monopolization. Georgia's Constitution favors competition, and the Georgia Assembly has enacted statutes specifically promoting competition among hospitals. And Defendants' reading of the Hospital Authorities Law not only would lead to absurd results, but also contradicts basic rules of statutory construction. Far from being reasonably anticipated by the Georgia Legislature, the Transaction flies in the face of Georgia's stated policies, establishing a *de facto* monopoly and raising Albany's exorbitant healthcare costs, solely for a private actor's benefit.

Even assuming, *arguendo*, that the Legislature clearly articulated a policy authorizing

this Transaction, Defendants' arguments that the Authority need not actively supervise Phoebe Putney rely on a woefully incomplete picture of the Transaction.  The Transaction serves Phoebe Putney's private interests and will grant Phoebe Putney a *de facto* monopoly; therefore, active supervision is required.  But there is little reason to believe the Authority will engage in any meaningful oversight of the combined hospitals.  The Authority has never actively supervised Phoebe Putney, and as its Chairman explained, "the Authority has no authority."  The Authority's leadership is not aware of how prices are set, whether they have risen in the last several years, or that, according to local employers and Palmyra, Phoebe Putney's rates are among Georgia's highest.  Its Vice-Chairman has not once in his eight years as a member seen the Authority disagree with Phoebe Putney.[2]  To wit, the Authority conducted no independent analysis of the Transaction, made no attempt to determine its effect on hospital prices and services, and never questioned the impact it would have on a community that needs more – not less – hospital competition.  Going forward, the Authority lacks the expertise, the resources, or the intention of overseeing the monopoly in any meaningful way.

Defendants' motions should be denied and the Transaction enjoined to preserve the status quo until the parties' September 19th merits trial is resolved.

## ARGUMENT

## I.    DEFENDANTS FAIL TO SATISFY THEIR BURDENS ON A MOTION TO DISMISS OR A MOTION FOR SUMMARY JUDGMENT

Defendants label their papers as motions to dismiss under Rule 12 or alternatively a motion for summary judgment under Rule 56.  But nowhere in their 60-plus pages of briefing do they discuss the legal standards applicable to their motions or make any effort to meet either

---

[2] The one disagreement among Authority members he recalls was when PPMH's Chief of Staff wanted the Authority to review the hospital's prices.  The Authority declined to do so.   PX0422 at 29-30 (Lingle Tr. 107:15-110:1).

Rule's requirements.  In considering a motion to dismiss, the Court must assume that Plaintiffs' allegations are true, and make all reasonable inferences in Plaintiffs' favor.[3]  Defendants cannot seriously expect the Court to grant their self-styled motions to dismiss when they contradict the Complaint's allegations and introduce two dozen new exhibits and five new declarations with a host of disputed facts.[4]

Likewise, Defendants' motions fail to meet Rule 56's standard for summary judgment.[5] Rule 56(a) requires the moving party to show both that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[6]  Defendants' briefs fall far short of that burden.  The genuinely disputed facts in this case could not be more material to its outcome, and Defendants fail to explain how they could be entitled to judgment as a matter of law based on any set of undisputed facts.[7]  Accordingly, whether cast as a motion to dismiss or one for summary judgment, Defendants cannot meet the standard under either Rule 12 or 56, and

---

[3] *See Glover v. Liggett Group, Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (per curiam); *White v. Lemacks*, 183 F.3d 1253, 1255 (11th Cir. 1999). As set forth in Plaintiffs' Statement of Undisputed Facts ("SUF"), Defendants are not entitled to judgment as a matter of law under any set of facts.

[4] *See* Pls.' Resp. to Defs.' Undisputed Facts; Pls.' SUF.  In addition to Plaintiffs' SUF and Response to Defendants' Statement of Undisputed Facts, Plaintiff Federal Trade Commission also submits a separate Statement of Disputed Facts pursuant to Local Rule 56.  *See* App. C.  Plaintiff Federal Trade Commission's Statement of Disputed Facts focuses on Defendants' attempt to invoke the state action defense because Defendants have conceded the merits of Plaintiffs' claims for purposes of these proceedings.

[5] FED. R. CIV. P. 12(d).  The Hospital Authority cites *Horsely v. Feldt*, 304 F.3d. 1125, 1134 (11th Cir. 2002), for the novel proposition that it is entitled to introduce virtually any affidavit and authenticated exhibit in support of its motion to dismiss.  But as the court noted in *Horsely*, this Circuit's "'incorporation by reference' doctrine . . . , under which a document attached to a motion to dismiss may be considered by the court without converting the motion into one for summary judgment [applies] only if the attached document is: (1) central to the plaintiff's claim; and (2) undisputed."  *Id.*  Defendants' declarations and exhibits – which are neither central to Plaintiffs' claims nor undisputed – fail to meet that standard.

[6] *Latimer v. Roaring Toyz*, 601 F.3d 1224, 1232 (11th Cir. 2010).  For purposes of Defendants' motions, Plaintiff Federal Trade Commission does not object to the Court's consideration of Defendants' Exhibits A, B, C, F, H, and J, which appear to be authentic.  By contrast, Defendants' new declarations and Exhibits D, E, G, I, and K through S are inappropriate bases for Defendants' motions because they contain not only disputed facts, but also hearsay and contradictions with Defendants' prior sworn testimony and business documents.

[7] For example, Defendants attempt to contradict Plaintiffs' evidence that Phoebe Putney and Robert J. Baudino, without the Authority's knowledge or approval, initiated negotiations in August 2010 with HCA to buy Palmyra. *See, e.g.*, Auth. Br. at 4, 10; Phoebe Br. at 1, 7.

their motions must be denied.[8]

## II.    THIS COURT HAS JURISDICTION OVER THIS MATTER AND OVER ALL DEFENDANTS

Defendants' jurisdiction arguments call for the Court to ignore the Transaction's realities and its undisputed purpose.[9]  Setting aside the facts and the law, Defendants attempt to argue that Phoebe Putney is not acquiring anything in the Transaction.  But the Transaction – including the purchase of Palmyra with Phoebe Putney's money, the Management Agreement, and the lease – is a single integrated acquisition that gives Phoebe Putney control over Palmyra.[10]  Before this litigation, Phoebe Putney made no bones about the Transaction's purpose and intended result, and HCA understood that the Transaction was a transfer of Palmyra's assets and employees to Phoebe Putney.[11]  Even now, Defendants have not deviated from their stated intent to combine the two hospitals.[12]  The Transaction's "steps" are and have always been "prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result" of transferring control of Palmyra to Phoebe Putney.[13]  Accordingly, Defendants' suggestion that this is anything other than a single transaction should be rejected.

---

[8] If the Court is inclined to grant Defendants' Motions for Summary Judgment, Plaintiffs request the time and an opportunity to obtain and present materials in support of their opposition.  *See* FED. R. CIV. P. 56(d); Hassi Rule 56(d) Decl.

[9] *See* HCA Br. at 2; Phoebe Br. at 8.

[10] *See, e.g., Nat'l Union Elec. Corp. v. Emerson Elec. Co.*, 1981 U.S. Dist LEXIS 14709, at **8, 16 (D. Ill. July 23, 1981) (denying motion to dismiss § 7 claim where plaintiffs adequately pled "that the entire sequence of events should be viewed as one integrated transaction the net effect of which was to produce an emergent entity with an untoward share of the [product] market").

[11] *See, e.g.*, PX0058 (indicating that HCA would entertain offers from PPHS to purchase Palmyra and requiring any offer for Palmyra to include Phoebe's commitment to hire Palmyra's employees).

[12] Auth. Br. at 9.  *See also* Phoebe Br. at 5; Wernick Decl. ¶ 47; PX0057 (July 19, 2010) (representing transaction as one for "the sale to PPHS of Palmyra"); PX0008 at 7 ("Why is the Authority purchasing PMC?").

[13] *Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994); *see also Nat'l Union Elec. Corp.*, 1981 U.S. Dist LEXIS 14709, at *15 (holding that "an integrated view of the entire sequence of events would become appropriate" in a Clayton Act § 7 case, where the end result was "intended from the start").

### A.      Phoebe Cannot Avoid the Clayton Act by Arguing It Is Not an Acquirer

Phoebe Putney's argument that the Court lacks jurisdiction under § 7 of the Clayton Act

requires turning a blind eye to the Complaint and the facts.  Under § 7 of the Clayton Act, a

transaction is an "acquisition" where, as here, it has "the end result of a transfer of a sufficient

part of the bundle of legal rights and privileges from the transferring person [Palmyra] to the

acquiring person [Phoebe Putney] to give the transfer economic significance and the proscribed

adverse effect."[14]  The Transaction is an "acquisition" under § 7 because it results in a transfer of

legal and economic control over Palmyra to Phoebe Putney.[15]  Indeed, Plaintiffs allege – and

Defendants do not dispute – that all Dougherty County hospital competition will cease the

moment the acquisition is consummated, and Phoebe Putney will be able to immediately exercise

its newly acquired monopoly power – and control over Palmyra's assets – under the

Management Agreement, and then the lease.[16]  That is more than enough to constitute an

acquisition under § 7 of the Clayton Act.[17]

### B.      Plaintiffs' Complaint and the Underlying Facts Easily Satisfy the Article III "Case or Controversy" Requirement

Defendants' Article III argument likewise ignores reality.  They argue that the lease of

---

[14] *United States v. Columbia Pictures Corp.*, 189 F. Supp. 153, 182 (S.D.N.Y. 1960).

[15] *See id.* at 182; *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1387 (7th Cir. 1986), *cert. denied*, 481 U.S. 1038 (1987).  Specifically, "Phoebe will gain full economic and operational control over Palmyra."  Compl. at 1-2, ¶ 1; *see also* Pls.' SUF ¶¶ 35-71, 77-90, 114-15, 121-34. The Complaint does not limit Phoebe Putney's conduct with respect to the Transaction to its petitioning the Authority to purchase Palmyra.  Phoebe's First Amendment argument lacks any merit.

[16] Compl. ¶¶ 1, 2, 7, 9, 50.

[17] *United States v. Archer-Daniels-Midland Co.*, 584 F. Supp. 1134, 1139 (S.D. Iowa 1984) (holding that "an operating lease is an 'acquisition' for purposes of Section 7, because if an operating lease [ ] is not an acquisition within the meaning of section 7 of the Clayton Act, then the precompetitive purpose of section 7 can be frustrated by the adroit use of leases"); *see also Nelson v. Pac. Sw. Airlines*, 399 F. Supp. 1025, 1029 (S.D. Cal. 1975) (holding that defendant airlines' agreement could constitute § 7 "acquisition" if one airline "achieved significant control over the decision making processes or the property" of other airline); *McTamney v. Stolt Tankers & Terminals (Holdings), S.A.*, 678 F. Supp. 118, 120-21 (E.D. Pa. 1987) (holding that plaintiffs' allegations that defendants controlled another business were sufficient to allege a § 7 "acquisition").

Palmyra to Phoebe Putney, and its "required terms" as approved by the Authority, are "conjectural" and thus do not constitute an active case or controversy.[18]  But that ignores § 7's very purpose – *i.e.*, to "arrest the creation of trusts, conspiracies, and monopolies *in their incipiency and before consummation.*"[19]  Indeed, the Transaction's impact is indisputably incipient, as Phoebe Putney will gain management control of Palmyra's operations immediately upon consummation of the APA, pursuant to the Management Agreement.

Under established Supreme Court precedent, to satisfy the Article III "case or controversy" requirement, Plaintiffs must allege:  (i) an "injury in fact;" (ii) that the alleged injury is "fairly traceable" to Defendants' conduct, and not the result of the independent action of some third party; and (iii) redressability (*i.e.*, a likelihood that the requested relief will redress that injury).[20]  Plaintiffs' Complaint and the underlying facts easily satisfy this standard.  First, Plaintiffs' allegations – unrefuted by any Defendant – that the Transaction will significantly lessen competition, lead to a near monopoly in general acute care services, and dramatically increase healthcare costs for Albany employers, residents, and health plans easily satisfy the "injury in fact" requirement.[21]

Second, the antitrust injuries resulting from the Transaction are more than "fairly traceable" to Defendants' actions.  Phoebe Putney's claim that it only "engaged in constitutionally protected petitioning of a governmental entity" is farcical.[22]  Phoebe Putney

---

[18] Auth. Br. at 38; Phoebe Br. at 8-9.

[19] S. Rep. No. 63-698, at 1 (1914) (emphasis added); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 589 (1957). *See also McTamney*, 678 F. Supp. at 120 (applying the broad, flexible construction of "acquire" in section 7 to reach transactions that fall short of consummated acquisitions); *Columbia Pictures Corp.*, 189 F. Supp. at 181-83 (same).

[20] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

[21] Pls.' SUF ¶¶ 3-15.  As noted previously, the Authority itself concedes that the Transaction will eliminate competition, and it declines to defend the Transaction on its merits.  Auth. Br. at 13 n.3.

[22] Phoebe Br. at 7-8.

conceived of, structured, and negotiated the Transaction to gain control of Palmyra, which will occur immediately upon closing under the Management Agreement it drafted.[23]  Phoebe Putney's attorney also prepared the lease terms, which the Authority adopted.[24]  PPHS executed the APA and agreed to hire all of Palmyra's employees, guarantee all of the financial obligations under the APA, and the $17.5 million termination fee.[25]  Third, the redressability requirement is plainly satisfied here as well, as the requested preliminary injunction maintaining the status quo until the FTC's administrative proceedings are resolved would prevent the competitive harm flowing from the Transaction.  Accordingly, Phoebe Putney cannot escape antitrust scrutiny on Article III jurisdictional grounds.

## III.    THE TRANSACTION IS NOT THE PRODUCT OF STATE ACTION

### a.        Phoebe Putney – Not the Authority – Is the True Acquirer of Palmyra

Phoebe Putney, a self-described "450-pound hulk,"[26] unabashedly structured the Transaction to avoid antitrust scrutiny and enforcement.  While Phoebe Putney has undertaken several recent acquisitions without involving the Authority,[27] here, it used Mr. Baudino's "proven" method for avoiding the antitrust laws, involving the Authority in the Transaction for the express purpose of avoiding antitrust review.[28]  As Mr. Baudino's Sovereign Group

---

[23] Phoebe's claim that the Authority must be the acquirer to be eligible for certain Medicare and Georgia Indigent Care funds lacks support in the Transaction's contemporaneous documents.

[24] *See* PX0057; PX0082.

[25] PX008 at 2, 16, 62, 64, 80; *see also* PX0207 at 5 ("Should HCA agree to sell Palmyra Medical Center to PPHS, the transaction would be structured as an acquisition by the Hospital Authority . . . to prevent an antitrust enforcement action.").

[26] PX0343 (Jennifer Maddox Parks, *Litigation committee formed*, ALB. HERALD, May 6, 2011, *available at* http://www.albanyherald.com/news/headlines/Litigation_committee_formed_121366779 html?ref=779 (last visited May 10, 2011)).

[27] *See* PX0012 at 10.

[28] PX0207 at 2. The Authority would take title to "Palmyra at closing so that the doctrine of state action immunity from antitrust law compliance attaches to HCA's sale of Palmyra."  *Id.*

explained to HCA when conveying Phoebe Putney's offer, Phoebe Putney would not buy Palmyra directly; rather, Phoebe Putney would structure the Transaction with the Authority acquiring title to Palmyra.[29]  After the acquisition, the Authority would "lease Palmyra to a non-profit corporation controlled by PPHS.  That lease would be on substantially the same terms as the Authority's existing lease of Phoebe Putney Memorial Hospital Inc."[30]

The State's interests were never a factor in the Transaction.  As the Authority describes it, the "business case" for the acquisition was an "easy one."[31]  But that business case failed to include either the State's or the local community's interests, as the Authority had no reason to acquire Palmyra independent of PPHS's desire to do so. [32]  That desire arose from Phoebe Putney's need to eliminate Palmyra as a competitive threat – or as Mr. Wernick described it, "a wounded animal [that] will do about anything to gain market share" – not the public's interest in affordable healthcare.[33]  As a result, the Authority was never in the driver's seat; instead, Phoebe Putney:  (i) directed the deal negotiations from start to finish; (ii) made the offers to purchase Palmyra; (iii) elected not to share key Transaction documents (*e.g.*, the Asset Purchase Agreement governing the acquisition) with the Authority until the December 21 meeting during

---

[29] *Id.*

[30] *Id.* at 5.  When Mr. Baudino's plan came to fruition at the December 21, 2010 Authority meeting, the Authority understood that this was an integrated transaction that necessarily included the lease of Palmyra to Phoebe Putney and the Management Agreement.  PX0422 at 61 (Lingle Tr. 236:16-237:14); PX0008 at 2-5.

[31] Auth. Br. at 21.

[32] *See* PX0422 at 61 (Lingle Tr. 237:7-14).  To justify the Transaction, the Authority's Chairman, Mr. Rosenberg, now claims that purchasing Palmyra would solve PPMH's purported "capacity challenges."  Rosenberg Decl. ¶ 13.  Of course, those capacity challenges are dubious at best.  *See generally* PX0136 at 30-51◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼◼ PX0131 (same).  But even if that were not the case, Mr. Rosenberg never identifies a *public* benefit from the Transaction, and admits that the Authority has yet to "determine that the lease [of Palmyra's assets to PPMH] would promote the health care needs of the community."  Rosenberg Decl. ¶ 15.

[33] PX0130 at 1.  As Phoebe Putney's COO succinctly summarized, the Transaction would benefit Phoebe Putney in numerous ways, including: "[a]void anti-trust lawsuit;" "[c]ontrol all hospital beds in county;" "[s]implify all future CON application processes;" and "[i]ncrease negotiation power with all payors."  PX0021.

which the Authority approved the Transaction;[34] and (iv) withheld significant Transaction

analyses altogether.[35]  Indeed, in contrast with the repeated give-and-take and oversight by

PPHS's board of directors, Phoebe Putney did not even present the Transaction to the Authority

until that December 21 meeting.[36]  The Authority undertook no independent analysis or review;

sought no fairness opinion before voting to approve the Transaction; and its purported "ultimate

control" over PPMH after the Transaction was not part of the equation.[37]  Plainly, the

Transaction is the product of private interests, with the express goal of avoiding the antitrust laws

while giving Phoebe Putney a *de facto* monopoly.

Accordingly, the central question before the Court is whether the Authority need only

provide a perfunctory vote in favor of the Transaction to invoke the state action defense and

shield the Transaction completely from antitrust scrutiny.  The answer is no.  The state action

---

[34] *See* App. A, *infra*.  Defendants' reliance on purported meetings between Messrs. Wernick, Rosenberg, and Lingle is misplaced.  *See* Auth. Br. at 9-11.  Absent a majority of Authority members – *i.e.*, a quorum – the Authority cannot act.  Auth. Br. Ex. H at 5.  Defendants do not claim that the Authority ever had a quorum consider the Transaction before December 21, 2010, or that the Authority ever delegated responsibility for the Transaction to Messrs. Rosenberg and Lingle to act on the Authority's behalf.  PX0422 at 15, 42 (Lingle Tr. 51:2-5, 160:21-161:19).  So Messrs. Rosenberg and Lingle were not empowered to direct Mr. Wernick or Mr. Baudino to do *anything* on the Authority's behalf, let alone proceed with negotiations on a $195 million acquisition of PPMH's sole meaningful competitor, and any such direction would have been *ultra vires*.  *See, e.g.*, Rosenberg Decl. ¶ 15; *see also H.G. Brown Family Ltd. P'ship v. City of Villa Rica*, 278 Ga. 819, 821 (2005) (holding that contract signed by Mayor was "*ultra vires*, null and void" because it was not authorized by quorum of city council and "the individual members acting singly have no authority to bind the municipality.").  Accordingly, Mr. Wernick's meetings with individual Authority members are of no moment for purposes of determining whether the Authority participated in the decision to pursue the Transaction or the negotiation of its terms.

[35] PX0015 (Morgan Keegan Analysis); PX0402 at 38-39 (Rosenberg Tr. 145:14-146:4); PX0404 at 52 (Wernick Tr 201:11-14).

[36] PX0226 (Termination Agreement).  The Authority's made-for-litigation May 5, 2011 meeting to purportedly re-approve the Transaction does not change the underlying facts, and in any event, Plaintiffs have had no opportunity to take discovery on that meeting.  Hassi Rule 56(d) Decl. ¶ 14.

[37] The Authority claims that "[u]nder the Lease, PPMH is required to (and does) present strategic proposals to the Authority, and the Authority exercises ultimate control over all strategic and operational matters."  Auth. Br. at 7-8.  This is squarely at odds with Defendant HCA's prior admission before this Court that the "Hospital Authority cannot countermand, approve or revise PPMH's decisions in these and other management areas during the term of the Lease.  PPMH, in short, controls all assets and operations at Phoebe Putney."  PX0007 at 4; *see also* FED. R. EVID. 801(d)(2) (admission by party-opponent).  Notably, the Authority relied on that admission in its motion to dismiss in that action.  PX0083 at 3.

defense is a narrow exception to the antitrust laws for anticompetitive conduct that is "an act of government."[38]  The Authority "may not confer antitrust immunity on private persons by fiat" as it seeks to do here.[39]  Nor can Defendants merely apply a "gauzy cloak of state involvement" and "rubber stamp" to their anticompetitive acts and expect to avoid antitrust review.[40]  No matter how Defendants attempt to re-cast the Transaction with new, malleable, and disputed "facts," that is precisely what is before the Court.  Their disregard for the State of Georgia's interests – and the antitrust laws – through purported state action should be rejected.[41]

### A.    Even If State Action Could Apply Here, Georgia Has Not Clearly Articulated a State Policy to Immunize This Transaction

#### i.    Defendants misconstrue the Georgia Hospital Authorities Law to support their proposed merger to monopoly

Even assuming the state action defense could apply to the Transaction, Defendants have failed to show that the Georgia Legislature "clearly articulated" a policy authorizing it.  When the Legislature enacted the Hospital Authorities Law, it could not have "reasonably anticipated" the anticompetitive conduct here – *i.e.*, the events surrounding and including the Transaction and culminating in a *de facto* merger to monopoly – or that a court would insert an immunity for such a merger into the Hospital Authorities Law.  First, Defendants do not dispute that their reading of the Hospital Authorities Law would permit the absurd result of a single hospital authority acquiring every hospital in the State and handing over control of that statewide monopoly to a

---

[38] *Parker v. Brown*, 317 U.S. 341, 352 (1943); *see also FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992); *City of Lafayette, La. v. La. Power & Light Co.*, 435 U.S. 389, 408 (1978); *First Am. Title Ins. Co. v. DeVaugh*, 480 F.3d 438, 445 (6th Cir. 2007); *Yeager's Fuel v. Penn. Power & Light, Co*., 22 F.3d 1260, 1265 (3d Cir. 1994).

[39] *Ticor*, 504 U.S. at 633.

[40] *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106 (1980); *see also Crosby v. Hosp. Auth.*, 93 F.3d 1515, 1531 (11th Cir. 1996); *cf. Cal. ex rel. Lockyer v. Mirant Corp.*, 266 F. Supp. 2d 1046, 1056 (N.D. Cal. 2003).

[41] *Goldfarb v. Va. State Bar*, 421 U.S. 773, 791 (1975); *see also Patrick v. Burget*, 486 U.S. 94, 100-01 (1988).

private actor, without any state supervision.[42]  Such an outcome would be not only absurd, but also unprecedented.  The Court should not lightly accept Defendants' reading of the Hospital Authorities Law.

Second, Defendants' reading of the statute ignores basic tenets of statutory construction. Where a statute includes "particular language in one section . . . but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally and purposely in the disparate inclusion or exclusion."[43]  In 1993, the Georgia Legislature added § 31-7-72.1 to the Hospital Authorities Law to allow mergers between a hospital authority created under § 31-7-73 and a hospital authority created under § 31-7-72 within the same county.[44]  In so doing, the Legislature explicitly granted antitrust immunity to hospital authorities acting pursuant to that section (*i.e.*, merging with other hospital authorities within their own counties):

> It is declared by the General Assembly of Georgia that in the exercise of the power specifically granted to them by this Code *section*, hospital authorities are acting pursuant to state policy and shall be immune from antitrust liability to the same degree and extent as enjoyed by the State of Georgia.[45]

When the Legislature added § 31-7-72.1 to the Hospital Authorities Law, it clearly recognized Georgia's strong policy in favor of competition[46] and understood how to insulate entities from

---

[42] Auth. Br. at 20.  As previously noted, courts do not interpret statutes to achieve absurd results.  Pls' Opening Br. at 16-17.

[43] *Warshauer v. Solis*, 577 F.3d 1330, 1335-36 (11th Cir. 2009); *see also Bates v. United States*, 522 U.S. 23, 29-30 (1997).

[44] *See* O.C.G.A. §§ 31-7-72(a), 72.1(a), 73(a).

[45] O.C.G.A. § 31-7-72.1(e)

[46] For example, the Georgia Constitution provides that the General Assembly "shall not have the power to authorize any contract or agreement which may have the effect of or which is intended to have the effect of defeating or lessening competition."  GA. CONST. art. III, § VI (c) (V); *see also City of Lafayette*, 435 U.S. at 398; *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 403 (9th Cir. 1991) (stating "a mere statutory authorization to engage in business will not be so readily viewed as a displacement of competition."); *Cox v. Athens Reg'l Med. Ctr.*, 279 Ga. App. 586, 591 (Ga. Ct. App. 2006) (noting "the Georgia General Assembly's decision to let market forces control health care costs in Georgia" and that "[i]t is outside of the role of this Court to question the merits of this policy").  While the Georgia Constitution and these cases alone do not preclude the state action immunity defense, they demonstrate that the Georgia Legislature did not reasonably anticipate that the courts would

13

antitrust review. [47]  And when the Legislature decided to grant antitrust immunity to mergers between hospital authorities within the same county in § 31-7-72.1, it chose not to extend antitrust immunity to any other mergers or acquisitions under the Hospital Authorities Law. That decision speaks volumes.

If the Legislature intended – or reasonably anticipated – that antitrust immunity would apply to other types of mergers under the Hospital Authorities Law, it could have taken a wide range of simple steps to extend that immunity beyond § 31-7-72.1.  For example, the Legislature could have used the term "chapter," rather than "section," which would have applied the immunity to all actions taken by a hospital authority pursuant to the Hospital Authorities Law (arguably including the Transaction).  Instead, the Legislature chose to limit the immunity to *section* 72.1, immunizing only mergers between two hospital authorities in the same county. Defendants nevertheless claim that the Legislature should have reasonably anticipated that, decades later, a court would read into the statute a wide-ranging antitrust immunity for any hospital merger, even one that eliminates all competition and results in a monopoly.  While the Legislature need not explicitly grant antitrust immunity for state action to apply, it is clear that here the Legislature had a very different vision from Defendants of the kinds of mergers under the Hospital Authorities Law that should be immune from antitrust scrutiny.[48]

### ii.    The facts of this case are unprecedented in this Circuit

Defendants rely primarily on three Eleventh Circuit state action opinions – *Lee County*, *Askew*, and *Crosby* – to justify their claim that the Legislature should have reasonably

---

ignore its policy in favor of competition and its decision to grant limited antitrust immunity to mergers between certain hospital authorities under the Hospital Authorities Law.

[47] *See, e.g.*, O.C.G.A. § 36-65-1, 2 (granting antitrust immunity to county and city governments).

[48] Plaintiff Federal Trade Commission takes no position on whether other, non-merger conduct is immune under the state action doctrine.

anticipated the Transaction.  Each of those cases is meaningfully distinguished from the instant one.  First, Defendants argue that there is no significant difference between the statute in *Lee County* and Georgia's Hospital Authorities Law.  In so doing, Defendants overlook the state action defense's requirement that the legislature *reasonably* anticipate the conduct in question.  In *Lee County*, the Florida Legislature amended a "Special Law" to expand the powers of a specific county's hospital board, after that same county-specific statute had previously created a local hospital monopoly in the hands of the same hospital board.[49]  The Florida Legislature therefore could not help but reasonably anticipate that its statute expressly authorizing operation of "additional hospitals" in Lee County would significantly diminish competition.

That is a far cry from the situation here.  The Georgia Hospital Authorities Law governs an entire state.  One hundred fifty-nine counties – with at least 92 separate hospital authorities, none of which owned a hospital at the time the statute was enacted.[50]  Nevertheless, Defendants ask this Court to assume that when the Legislature enacted the Hospital Authorities Law, it reasonably anticipated mergers to monopolies in any county, or even across counties.[51]  This case bears little resemblance to the facts and legislation in *Lee County*.

Defendants also rely on *Askew*, arguing that the Hospital Authorities Law need not explicitly grant antitrust immunity for state action to apply.[52]  There, the Alabama legislature

---

[49] *FTC v. Hosp. Bd. of Dirs.*, 38 F.3d 1184, 1186, 1192 (11th Cir. 1994) ("*Lee County*") (noting that Lee County was at less than 75% capacity and contemporaneous C.O.N. legislation precluded Lee Memorial from further expansion, thereby making acquisition of one of three competing hospitals "a foreseeable result of the Florida Legislature's granting the Board the authority to add new facilities").

[50] *See* PX0329 (Georgia Dep't of Cmty. Affairs, Directory of Registered Local Gov't Auths., *available at* http://www.dca.state.ga.us/development/research/programs/RASearchResults.asp (last visited Mar. 29, 2011)).

[51] *See Surgical Care Ctr. of Hammond v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 171 F.3d 231, 235 (5th Cir. 1999) (en banc) (stating that since "[n]ot all joint ventures are anticompetitive . . . it is not the foreseeable result of allowing a hospital service district to form joint ventures that it will engage in anticompetitive conduct."), *cert. denied*, 528 U.S. 964 (1999).

[52] Auth. Br. at 15.

explicitly granted broad antitrust immunity to hospital authorities, in contrast with the Georgia

Hospital Authorities Law, which is silent on immunity for mergers between hospitals.[53]  While

the Court of Appeals noted that the Alabama legislature went "well beyond" what was necessary

to confer that immunity, the Georgia Legislature's grant of limited immunity to certain mergers

between hospital authorities stands in stark contrast with the wide-ranging immunity envisioned

in Alabama.[54]

Finally, *Crosby* is distinguishable because it involved a statute that governs peer review

of doctors and has nothing to do with mergers or the Hospital Authorities Law itself.[55]

Substantively, the court focused on the "control exercised by the Authority over all staff

credentialing decisions," which was "strong evidence that it is the Authority and not its staff

members acting."[56]  The court concluded that the "Authority does not merely 'rubber stamp' the

committee recommendations; instead it conducts an independent, meaningful review."[57]  In

contrast with the Authority here – which abdicated its responsibility over PPMH, reducing its

role to that of a mere landlord twenty years ago, and was a non-factor in the Transaction – the

authority in *Crosby* retained direct responsibility and "independent, meaningful" oversight over

the conduct at issue.[58]

---

[53] *Askew v. DCH Reg. Health Care Auth.*, 995 F.2d 1033, 1040 (11th Cir. 1993).

[54] *Askew*, 995 F.2d at 1040; *see also Crosby*, 93 F.3d at 1523.

[55] *Crosby*, 93 F.3d at 1531.  The Authority misleadingly claims that the statute in *Crosby* was "part of the same general legislation."  Auth. Br. at 19.  As the *Crosby* court explained, § 31-7-15 governs peer review in Georgia and directs public and private hospitals "to evaluate the qualifications and professional competence of persons seeking to perform medical and health care services."  *Crosby*, 93 F.3d at 1531.  And the court found "clear articulation" in § 31-7-7.  *Id.* at 1534.  Neither of those statutes is part of the Hospital Authorities Law, §§ 31-7-70 *et seq*.

[56] *Crosby*, 93 F.3d at 1530-31.

[57] *Id.* at 1531.

[58] *Id.*

**B.      The Hospital Authority Must Actively Supervise Phoebe Putney, But Has Not Done So In the Past and Will Not Do So In the Future**

      **i.      Active supervision is required where the anticompetitive conduct is engaged in by private parties**

Even if Defendants could satisfy the state action defense's first prong, they cannot satisfy the second. The need for active supervision here stems from the Transaction's goal of placing Palmyra under Phoebe Putney's control.[59] Where, as here, "a private party is engaging in the anticompetitive activity, there is a real danger that a private party acts to further his or her own interest rather than the governmental interests of the State."[60] In the merger context, active supervision must be "ongoing" because the transaction's anticompetitive effects linger long after the transaction is consummated.[61] That need is particularly strong where, as here, "there is an apparent devious design to abdicate or obstruct control."[62]

Defendants concede that the Transaction will eliminate competition between Phoebe Putney and Palmyra and do not dispute the merits of Plaintiffs' motion for a preliminary injunction under § 7 of the Clayton Act.[63] Yet, they seek to avoid the active supervision requirement by arguing that Phoebe Putney's conduct would not violate the antitrust laws. As discussed above, Defendants' claim that the antitrust laws do not apply to the integrated Transaction – and therefore Phoebe Putney – is baseless.[64] The Transaction's entire purpose has

---

[59] *See* Section II, A, *supra*; *see also* Auth. Br. at 28-33.

[60] *Patrick*, 486 U.S. at 100 (quotations omitted).

[61] *See Ticor*, 504 U.S. at 633 ("Immunity is conferred out of respect for *ongoing* regulation by the State . . . ." (emphasis added)); *N.C. ex rel. Edmisten v. P.I.A. Asheville, Inc.*, 740 F.2d 274, 279 (4th Cir. 1984) (concluding that state action defense did not apply because state failed to provide *ongoing* active supervision post-merger).

[62] *See TEC Cogeneration Inc. v. Florida Power & Light Co.*, 76 F.3d 1560, 1570 (11th Cir. 1996) (concluding that no such design existed where "the record [was] clear that the [political subdivision] actively supervised all aspects of [the private actor's] alleged anti-competitive conduct").

[63] Auth. Br. at 3, 13 n.3. Defendants' attempts to distinguish *Ticor*, *Midcal*, and *Edmisten* are unavailing. They ignore that the Transaction violates § 7 of the Clayton Act.

[64] *See* Section II, *supra*.

17

been to put Palmyra in Phoebe Putney's hands, which will happen the moment the acquisition is consummated.[65]

Nor do Defendants dispute that the state action defense immunizes private conduct only if there is active supervision.  Instead, Defendants advance a series of arguments that are variations on the same theme:  the Court should bless the Transaction without any active supervision because Phoebe Putney included the Authority as a strawman.[66]  For example, Defendants claim that merely by signing a contract with a political subdivision of the state, state action immunity automatically extends to any private actor, eliminating any need for active supervision.[67]  Similarly, Defendants argue that because PPMH is a non-profit affiliated with the Authority, active supervision is not required.[68]  That is simply not the law, as Defendants' purported exceptions to the active supervision requirement would threaten to swallow the second prong altogether.  In *FTC v. University Health, Inc*., the Eleventh Circuit rejected as "meritless" these same arguments.[69]  And in one of the cases cited by the Authority, the court discredited the notion that a mere contract with a state actor could immunize private conduct, explaining that other cases cited by the Authority "do not stand for the proposition that private parties who contract with governmental agencies are always immune from antitrust liability."[70]

Defendants also overlook glaring distinctions in the cases on which they rely.  As an initial matter, in each of those cases, the court found that there was legitimate state action that

---

[65] *See, e.g.*, PX0012 at 10 (App. B) (listing Palmyra among Phoebe Putney's "Successful New Acquisitions").

[66] *See generally* Auth. Br. at 28-39.

[67] *Id.* at 33-36.

[68] *Id.* at 36-37.

[69] *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1213 n.13 (11th Cir. 1991) (rejecting argument that "since the state's policy is exercised by local governmental authorities, here the . . . Hospital Authority, which has delegated its power to [a non-profit hospital], active supervision by the state is not required").

[70] *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 126 (2d Cir. 2002).

simply does not exist here.  For example, in *Cine 42nd Street Theater Corp. v. The Nederlander Organization, Inc.*,[71] the private defendants participated in a legislative scheme specifically aimed at fostering re-development in urban areas and "attract[ing] private investors and developers" for that purpose.[72]  The real estate leases at issue resulted from (i) the state agency's avowed goals for the project (as articulated in advance, rather than after litigation commenced); (ii) extensive planning by the state agency; and (iii) an open request for proposal process that was entirely consistent with the legislature's clear intent.[73]  Here, none of those facts exist, as the State's goals have played no role in the Transaction.  Specifically, the Authority (i) has no reason to pursue the Transaction other than Phoebe Putney's interest in doing so (notwithstanding any *ex post facto* attempts to justify the deal); (ii) engaged in zero independent analysis or review and never sought a fairness opinion; (iii) was kept in the dark about how the $195 million price was arrived at and how comparable transactions were priced;[74] and (iv) had one 94-minute meeting with Phoebe Putney about the Transaction.[75]

Defendants likewise overstate the relevance of *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*[76]  In that case, the court was silent on active state supervision, including whether or not it was necessary or how rigorous the state's supervision of the private defendant actually was.  Meanwhile, the court rejected "artful pleading" to circumvent state action through

---

[71] *Cine 42nd St. Theater Corp. v. The Nederlander Org., Inc.*, 790 F.2d 1032, 1048 (2d Cir. 1986).

[72] *Id.*

[73] *Id.* at 1037.

[74] Withholding key information from the party providing supervision may preclude a finding of active supervision. *See Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937 (9th Cir. 1996); *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1993) (on remand).

[75] *See also Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 71-72 (2d Cir. 1998) (holding that settlement of lawsuit between statewide agency plaintiff and private defendant was pursuant to state's clearly articulated policy "to limit competition in the waste-to-energy market in order to protect [the statewide agency plaintiff's] financial integrity").

[76] 810 F.2d 869 (9th Cir. 1987).

suits against "*regulated* private parties," which would constitute a level of oversight simply not present here.[77]

The Authority's arguments against active supervision also ignore the very nature of Plaintiffs' claim. The Authority, citing *Copperweld*, argues that combining Palmyra and PPMH does not require supervision because "[o]nce commonly owned . . . the federal antitrust laws no longer expect Phoebe and Palmyra hospitals to compete."[78]  But this action was brought under § 7 of the Clayton Act "to arrest incipient threats to competition which the Sherman Act did not ordinarily reach."[79]  Or as the Supreme Court in its *Copperweld* decision explicitly stated: "A corporation's initial acquisition of control will always be subject to scrutiny under . . . § 7 of the Clayton Act."[80]

### ii. Defendants will not actively supervise Phoebe Putney post-Transaction

Alternatively, Defendants argue that the Authority *will* actively supervise Phoebe Putney post-Transaction. But the Court need look no further than the Authority's history of inaction to predict the "supervision" it plans to undertake in the future. While Defendants compare the Authority to a board of directors overseeing Phoebe Putney's activities,[81] the 1990 Lease between the Authority and PPMH defines their relationship as – and limits their relationship to –

---

[77] *Id.* at 878.  It should also be noted that here, Plaintiffs seek only preliminary relief to maintain the status quo pending a merits trial, as opposed to the treble damages sought in *Charley's Taxi*.

[78] Auth. Br. at 3.

[79] *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 170-71 (1964).

[80] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984).

[81] Mr. Wernick claims he treats the Authority as he would a board of directors (Wernick Decl. ¶¶ 4, 10), but one need only compare the copious information he shared with the PPHS board to the sparse information shared with the Authority to dismiss that claim.  *See* App. A.

that of *landlord and tenant*.[82]  Defendants do not dispute that the Authority has no budget and no

employees and no intention to hire any.  Nor do they dispute that twenty years ago, the Authority

surrendered some of its most essential powers to PPMH when it yielded "total control over the

establishment of all rates and charges" to PPMH[83] and waived its right to acquire any other

hospital in Albany, including Palmyra.[84]  Since signing that document, the Authority has

demonstrated little interest in keeping tabs on PPMH, despite PPMH's dominant market position

and notoriously high prices.[85]  As the Authority chairman admits, "the Authority really has no

authority as far as running [PPMH]."[86]

As evidence of the Authority's ostensibly "active" involvement in PPMH's operations,

Defendants point to a six-year-old study, quarterly one-hour breakfast meetings, the occasional

special meeting, and the receipt of certain annual reports.  But even if those functions presented

real opportunities for the Authority to oversee PPMH, the reality is that the Authority lacks any

interest or desire to do so.[87]  For example, the Chairman believes pricing is the exclusive

province of the hospital board, not the Authority.[88]  Similarly, the Vice-Chairman does not see a

link between hospital prices and the local community:  "I don't think hospital charges flow out in

the community.  I think there are – other retail sales might, but I don't see the hospital having

---

[82] Section 10.18 reads in pertinent part that "no provisions in this Agreement nor any acts of the parties hereto shall be deemed to create any relationship between Transferor and Transferor [sic] other than the relationship of landlord and tenant."  PX002 at 46.

[83] *Id.* at 24 (§ 4.03(b)), 57.

[84] *Id.* at 31.

[85] PX0016; PX0007 (Complaint, *Palmyra Park Hosp. v. Phoebe Putney Mem'l Hosp.*  (M.D. Ga. Jul. 3, 2008) (1:08-vc-00102-WLS)) at ¶ 8.  The Authority's Vice-Chairman admitted he did not even bother to read the complaint when PPMH was accused of illegally exerting that market power.  PX0422 at 41 (Lingle Tr. 157:13-158:1).

[86] PX0040.

[87] PX0402 at 11 (Rosenberg Tr. 34:1-15).

[88] *Id.* at 10 (Rosenberg Tr. 33:15-25).

that dramatic effect on the whole community."[89]  In fact, the Vice-Chairman was unaware of PPMH's price changes in the last several years or how much PPMH's prices have increased during his eight-year tenure.[90]

Going forward, there is little reason to expect a sea change in the Authority's behavior, as the Authority's "wish list" of terms for a new lease will have little effect on this dynamic.[91]  The wish list of "required" lease terms – which Phoebe Putney's counsel, Mr. Baudino, drafted – includes few that do not appear in the current lease with PPMH or are not already required by statute.[92]  For example, the new lease term sheet does not require PPMH to pay any rent or the Authority to hire employees or maintain a budget.[93]  Although they are required by statute to limit PPMH's financial reserves, the Authority has never reviewed what an appropriate reserve is for PPMH and will rely on Phoebe Putney to set the reserve in the future.[94]  And, perhaps more importantly, the Vice-Chairman acknowledged that the Authority's role after the Transaction will not differ meaningfully from its current one as the Authority plans to continue to let Phoebe Putney do "whatever it takes to make the wheels turn."[95]

The Authority also makes the curious argument that the term sheet is evidence of its intent to actively supervise Phoebe Putney post-Transaction, while also claiming that the term sheet is too ephemeral to warrant injunctive relief (or constitute evidence of an integrated

---

[89] PX0422 at 55 (Lingle Tr. 213:16-23).

[90] *Id.* at 46 (Lingle Tr. 174:4-17).

[91] *See generally* PX0082 (listing terms Authority would purportedly require in lease with PPMH); *see also* PX0422 at 17 (Lingle Tr. 60:9-61:9).

[92] Mr. Rosenberg asserts that he "requested" that Mr. Baudino draft the term sheet.  Rosenberg Decl. ¶ 19.  Mr. Lingle's sworn testimony tells a different story.  PX0422 at 14 (Lingle Tr. 49:7-10 ("Q:  Whose idea was the term sheet?  A:  Consultants.  Q:  And what consultants specifically?  A:  Mr. Baudino and his law group.")).

[93] PX0082 at 7.

[94] O.C.G.A. § 31-7-77; PX0422 at 27 (Lingle Tr. 98:5-99:22).

[95] PX0422 at 51 (Lingle Tr. 195:24-196:5).

transaction).[96]  This is simply not credible.  The Authority has no reason to acquire Palmyra if it will not lease Palmyra's assets to Phoebe Putney, and under the Management Agreement, Phoebe Putney will control Palmyra from day one.[97]  But even putting aside that inconsistency, if one assumes that Phoebe Putney will agree to the term sheet without alteration, the Authority still does not expect to make significant changes from its current activities, such as hiring staff to oversee PPMH/Palmyra, involving itself in Phoebe Putney's pricing decisions, or reviewing Phoebe Putney's arrangements with commercial health plans.[98]  Given that the Authority has shown no interest in actively supervising PPMH to date, the Court should have little confidence that any meaningful changes will occur once PPMH takes control over Palmyra.[99]

### C. Defendants Mistakenly Suggest That Plaintiffs Seek a Conspiracy Exception to the State Action Defense

Defendants attempt to excuse the lack of state action here by mistakenly suggesting that Plaintiffs seek to apply a conspiracy exception to the state action defense.  In so doing, they principally rely on *City of Columbia v. Omni Outdoor Advertising, Inc.*[100] and *Bolt v. Halifax Hospital Medical Center* ("*Bolt IV*").[101]  Neither of those cases supports Defendants' claim of state action immunity.[102]

In *City of Columbia*, a private billboard advertising company, Omni, sued a local government and a competing advertising company, COA, because the local government's

---

[96] Auth. Br. at 11-12, 37-39.

[97] PX0422 at 12, 42 (Lingle Tr. 38:1-6, 159:10-13).

[98] *Id.* at 25, 39, 40 (Lingle Tr. 90:15-23, 148:5-15, 152:25-153:11).

[99] PX0082 at 3.

[100] 499 U.S. 365 (1991).

[101] 980 F.2d 1381 (11th Cir. 1993) ("*Bolt IV*").

[102] Auth. Br. at 2-3.

billboard zoning ordinance put Omni at a competitive disadvantage vis-à-vis COA.[103]  Pursuant

to lobbying by COA, the city council approved the ordinance "after a series of public hearings

and numerous meetings involving city officials, Omni, and COA."[104]  Omni alleged, among

other things, that the ordinance resulted from "an anticompetitive conspiracy between city

officials and COA" in violation of §§ 1 and 2 of the Sherman Act.[105]  The Court held that the

state action defense applied to the city's actions and rejected Omni's "conspiracy exception" to

that defense.[106]

   In *Bolt IV*, the plaintiff, Dr. Bolt, had applied for staff privileges at three Florida

hospitals.[107]  The "peer review committee at each hospital considered [Dr.] Bolt's application,

and each committee recommended that his application be denied based upon his unprofessional

conduct during [his] previous two-year appointment."[108]  Previously, in "*Bolt III*," the Eleventh

Circuit had held that while the defendant satisfied the "clear articulation" test under *Town of*

*Hallie*, the defendant also "*conspired* with [the peer review] committee to deny his privileges on

pretextual grounds."[109]  The *Bolt III* court went on to conclude that "a municipality that 'enters

into an unauthorized conspiracy to restrain competition may not claim the protection of'" the

state action defense, and therefore the state action defense could not apply.[110]  After the Supreme

---

[103] *City of Columbia*, 499 U.S. at 367-69.

[104] *Id.* at 368.

[105] *Id.* at 369.

[106] *Id.* at 374.  Phoebe Putney's *Noerr-Pennington* argument is a red herring because Plaintiffs do not allege that Phoebe Putney's solicitation of the Authority violated the antitrust laws.  *See* Auth. Br. at 23, 32.  And, Phoebe Putney is transferring $195 million to the Authority to finance the Transaction, an action which, to Plaintiffs' knowledge, has never been protected by the First Amendment.

[107] *Bolt IV*, 980 F.2d at 1383.

[108] *Id.*

[109] *Id.* at 1386.

[110] *Id.*

Court's decision in *City of Columbia*, however, the Eleventh Circuit revisited *Bolt III* and held that its prior reliance on a conspiracy exception to the state action defense was inappropriate.[111]

Here, unlike the series of public meetings in *City of Columbia* and the extensive peer review in *Bolt*, the Authority met once for 94 minutes to consider the Transaction.[112]  While the Authority blames HCA for keeping the meetings with individual Authority members private, it is undisputed that the secrecy allowed the Authority to sidestep public scrutiny of the Transaction. But even if that were not the case, Plaintiffs do not suggest that any conspiracy exception need be applied here.  Nor do Plaintiffs question the Authority members' subjective intent in casting their votes in favor of the Transaction.  Rather, in rejecting a conspiracy exception, the *City of Columbia* Court did not suggest "that States may exempt *private* action from the scope of" the antitrust laws, as Defendants attempt to do here.[113]  In other words, Defendants' attempt to "'cast[] . . . a gauzy cloak of state involvement'" over private anticompetitive acts should be rejected, not as a conspiracy, but simply as a lack of state action.[114]

## CONCLUSION

Plaintiffs have demonstrated a strong likelihood that the Transaction violates § 7 of the Clayton Act by substantially reducing important hospital competition in Albany and the surrounding counties in Georgia, thereby significantly harming consumers.  Plaintiff Federal Trade Commission respectfully request that the Court deny Defendants' motions and grant injunctive relief as the Court deems just and proper.

---

[111] *Id.* at 1387.

[112] *See* note 34, *supra*.  In addition, the Supreme Court in *City of Columbia* acknowledged the distinction between a municipality acting as a regulator and one acting as a "commercial participant in a given market."  *City of Columbia*, 499 U.S. at 374-75, 379.  Here, the Transaction is not a regulatory act, and the Authority is a commercial participant through its ownership of PPMH's assets.

[113] *Id.* at 379 (emphasis added).

[114] *Bolt IV*, 980 F.2d at 1385 n.4 (quoting *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 46-47 (1985)).

Respectfully submitted this 25th day of May, 2011.

MICHAEL J. MOORE, III
UNITED STATES ATTORNEY

 s/Stewart R. Brown
STEWART R. BROWN
Assistant United States Attorney
Georgia Bar No. 089650
United States Attorney's Office
Middle District of Georgia
P.O. Box 1702
Macon, Georgia  31202-1702
Telephone: (478) 621-2690
Fax: (478) 621-2737

*Attorneys for Plaintiff Federal Trade Commission*

  s/Edward D. Hassi
EDWARD D. HASSI
Chief Litigation Counsel
THOMAS H. BROCK
PETER C. HERRICK
MATTHEW TABAS
PRIYA B. VISWANATH
Attorneys
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Ave., N.W.
Washington, DC 20580
Telephone: (202) 326-2470
Facsimile: (202) 326-2286
Email: ehassi@ftc.gov

RICHARD A. FEINSTEIN
Director
NORMAN A. ARMSTRONG, JR.
Deputy Director
MATTHEW J. REILLY
Assistant Director
SARA Y. RAZI
Deputy Assistant Director
Federal Trade Commission
Bureau of Competition

WILLARD K. TOM
General Counsel
Federal Trade Commission

*Attorneys for Plaintiff Federal Trade Commission*

**Appendix A**

**Undisputed Timeline of Transaction-Related Events[115]**

| Date | Event |
|------|-------|
| July 2010 | ▪ Phoebe Putney's Joel Wernick authorizes Mr. Baudino to negotiate with HCA to acquire Palmyra.[116] |
| Aug. 2010 | ▪ Phoebe Putney retains Mr. Baudino and his Sovereign Group to begin negotiations with HCA to acquire Palmyra, on behalf of Phoebe Putney.[117] |
| Sept. 13, 2010 | ▪ Mr. Baudino relays HCA's requirements to Phoebe Putney, including that the transaction must have "[n]o risk of antitrust enforcement activity – meaning that the Albany-Dougherty County Hospital Authority must be the purchaser to trigger State Action Immunity from antitrust enforcement."[118] |
| Oct. 6, 2010 | ▪ PPMH management updates PPHS's Finance Committee on the status of negotiations for acquiring Palmyra, explaining the "Strategic Options" of purchasing Palmyra, expanding PPMH, and maintaining the status quo.[119] |
| Oct. 7, 2010 | ▪ PPMH management updates PPHS's Board of Directors on the status of negotiations for acquiring Palmyra, again explaining the "Strategic Options" of purchasing Palmyra, expanding PPMH, and maintaining the status quo.[120] <br><br> ▪ PPHS's Board of Directors authorizes an ██████████ offer to HCA for Palmyra, ████████████████████████████ ██████ plus Mr. Baudino's ████ sales commission and expenses.[121] |

---

[115] For a more detailed description of these events, see Plaintiffs' SUF ¶¶ 43-106, 112. For ease of reference, events shaded in green are those that do not include the Authority or its members, and events shaded in blue do not include the Authority, but include Authority members in their individual capacities. Events including the Authority are unshaded.

[116] PX0057. Mr. Baudino's representation at times has been unclear. But it appears that Phoebe Putney is paying every attorney, including Mr. Baudino, representing the Authority in the proceedings here, before the FTC, and in the Authority's lease negotiations with Phoebe Putney.

[117] *See* PX0222; PX0058; PX0135 *see also* PX0207 at 4; PX0057.

[118] PX0058 at 2.

[119] PX0010 at 2-3, 6-9. As a condition of the deal, Palmyra would drop its antitrust suit against Phoebe Putney in this Court. *Id.* at 7. The Authority's Chairman, Mr. Rosenberg, never saw this PPHS board presentation until FTC staff showed it to him during an investigational hearing. PX0402 at 40 (Rosenberg Tr. 153:12-13).

[120] PX0010 at 2-3, 6-9.

[121] PX0084.

| Date | Event |
|---|---|
| Oct. 21, 2010[122] | ▪ Phoebe Putney's Joel Wernick and PPHS's General Counsel, Tommy Chambless, disclose the negotiations for the first time to two Authority members, Ralph Rosenberg and Charles Lingle, in a 30-minute information session.[123]  During the meeting, Mr. Wernick informs them that Phoebe Putney intends to acquire Palmyra, but gives them no documents explaining the acquisition or the premium Phoebe Putney was contemplating.[124]<br><br>▪ At the meeting or shortly thereafter, Mr. Rosenberg and Mr. Lingle sign confidentiality agreements, preventing them from discussing the Transaction with any other Authority members.[125] |
| Nov. 4, 2010 | ▪ The Authority holds its regularly scheduled quarterly meeting, but does not discuss the Transaction.[126] |
| Nov. 4, 2010 | ▪ Meanwhile, Mr. Wernick updates PPHS's Board of Directors on the status of negotiations with HCA and proposes to increase Phoebe Putney's offer for Palmyra from ▇▇▇▇▇▇▇ to ▇▇▇▇▇▇▇.[127]<br><br>▪ Hours later, PPHS's Board of Directors approves this request.[128] |
| Nov. 16, 2010 | ▪ In a letter from the Sovereign Group to HCA, Phoebe Putney raises its offer to ▇▇▇▇▇▇▇ and describes Mr. Baudino's "proven" method to avoid antitrust scrutiny and enforcement by including the Authority in the Transaction.[129] |
| Dec. 2, 2010 | ▪ PPHS's Board of Directors approves the final deal terms between PPHS and HCA, agreeing to guarantee a $195 million payment.[130] |
| Dec. 14-20, 2010 | ▪ Phoebe Putney holds private meetings with individual Authority members (to avoid Georgia's Open Records Act).[131] |

---

[122] The Authority contends that the date of this meeting was September 21, 2010, contrary to Mr. Rosenberg's sworn testimony.  Auth. Br. at 9.

[123] PX0402 at 21 (Rosenberg Tr. 74:5-75:20).

[124] *Id.* at 22 (Rosenberg Tr. 78:7-20).

[125] *Id.* at 22, 24 (Rosenberg Tr. 79:16-80:12; 87:16-89-1); PX0422 at 64 (Lingle Tr. 249:9-17).

[126] PX0086.

[127] PX0059.

[128] *Id.*

[129] PX0207 at 2.

[130] PX0013 at 55; *see also* PX0092.  The APA calls for PPHS to pay HCA a $35 million "rescission fee" if, after closing, a final court order rescinded the acquisition and a $35 million "breakup fee" that would apply under certain other conditions.  PX0013 at 55.  Each $35 million fee represents nearly 18% of the purchase price.

[131] PX0422 at 6 (Lingle Tr. 16:8-17:14), PX0404 at 54 (Wernick Tr. 208:4-209:14); *see also* PX0228 at 4.  The Authority's rationale for secrecy makes little sense in light of the Hospital Authorities Law's express exemption for authorities from the Open Records Act and any requirement "to disclose or make public any potentially

| Date | Event |
|------|-------|
| Dec. 20, 2010 | ▪ Phoebe Putney bets $17.5 million that the Authority – despite never having reviewed or discussed the APA – will approve it *without any changes*.[132]<br><br>▪ Mr. Baudino assures HCA that a favorable Authority vote is a foregone conclusion.[133] |
| Dec. 21, 2010 | ▪ The Authority meets for the first time to discuss the Transaction, reviewing the APA and the Management Agreement for the first time.[134]<br><br>▪ In a 94-minute meeting, the Authority members vote unanimously to approve the Transaction.[135]<br><br>▪ The Authority does not seek a fairness opinion, despite never before having reviewed a transaction of this magnitude.[136] |
| Dec. 22, 2010 | ▪ The day after the December 21 meeting, Phoebe Putney waives a provision in its lease with the Authority that forbade the Authority from purchasing or operating any hospital other than PPMH in Dougherty County.[137] |
| Feb. 14, 2011 | ▪ Nearly two months *after* the Authority's purported state action, Phoebe Putney lists Palmyra among its "Successful New Acquisitions."[138] |

---

commercially valuable plan, proposal, or strategy that may be of competitive advantage in the operation of the corporation or authority or its medical facilities and which has not been made public." O.C.G.A. § 31-7-75.2. So if the Authority had wanted to take any action with respect to the Transaction, while still maintaining confidentiality, it could have easily done so in a variety of ways. For example, the Hospital Authority had the opportunity to discuss and consider the Transaction in closed executive session, and therefore outside the public's purview, at its meeting on November 4, 2010, but did not do so. PX0086; PX0422 at 64 (Lingle Tr. 248:20-249:1). One can only conclude that the secrecy was maintained for other reasons.

[132] PX0226 at 5.

[133] PX0227.

[134] PX0054, PX0078. During the December 21, 2010, Mr. Baudino appeared as special counsel to the Authority but did not disclose his work for Phoebe Putney or the Sovereign Group's financial interest in the Transaction. PX0422 at 44-45 (Lingle Tr. 167:14-22, 169:19-170:13). Phoebe Putney never provided the Authority with other key Transaction-related documents, such as the comparable transaction analysis prepared by Phoebe Putney's consultant, Morgan Keegan. *Id.* at 7 (Lingle Tr. 20: 7-21), PX0402 at 35 (Rosenberg Tr. 130: 7-14).

[135] PX0054.

[136] *See* PX0402 at 27-29, 44 (Rosenberg Tr. 101:19-102:15, 106:8-21, 168:8-16).

[137] PX0044 at 8 ("Phoebe Memorial resolves that it waives the provisions of Section 4.21 of the Lease as respects the Authority's operation of the purchased assets.").

[138] PX0012 at 10 (App. B).

Appendix B[139]





PX0012-010

---

[139] Excerpt from PX0012 (Phoebe Putney Health System PowerPoint (Feb. 14, 2011)) (emphasis added).

4

**Appendix C**

**Plaintiff Federal Trade Commission's Statement of Disputed
Facts Pursuant to Local Rule 56**

The Hospital Authority's Role in the Transaction

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 1. | The acquisition was undertaken at the direction of the Hospital Authority.  Wernick Decl. ¶ 50. | According to the testimony of the Chairman of the Hospital Authority, the idea for the acquisition originated with Phoebe. PX0402 at 21 (Rosenberg Tr. 74:23-75:1).<br><br>The Hospital Authority acts by a majority of a quorum of its members.  Dkt. # 45-9 at 5, PX0422 at 27 (Lingle Tr. 100:24-101:6).  The first time that the concept of the Transaction was presented to a quorum of the Hospital Authority was on December 21, 2010.  PX0422 at 64 (Lingle Tr. 248:13-249:1), PX0226 at 1.  As such, the Hospital Authority had never previously delegated any authority to act to Messrs. Rosenberg and Lingle regarding the Transaction.  PX0422 at 42 (Lingle Tr. 160:21-161:19).  Any "direction" that Messrs. Rosenberg and Lingle might have given to any third party regarding the transaction would have been ultra vires. |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 2. | The Hospital Authority and/or its counsel were involved in or informed of every significant step in the transaction.  Wernick Decl. ¶ 50. | As the recitals to the Termination Agreement acknowledge, as late as December 20, 2010, "neither the form of the Asset Purchase Agreement nor the transactions contemplated thereby *has been presented to*, or approved by, the Authority."  PX0226 at 1 (emphasis added).<br><br>On July 19, 2010, Mr. Baudino sent an email to Mr. Chambless, PPHS's Senior Vice President and General Counsel, stating that he and Mr. Wernick had been discussing whether HCA might be interested in selling Palmyra to PPMH.  PX0057.  No members of the Hospital Authority, or its counsel, were copied on that email.  There is no mention in this contemporaneous email that the Hospital Authority would be the acquiring entity or that the Hospital Authority had been involved in these discussions.  *See* PX0057.<br><br>When Mr. Baudino made a written offer on behalf of PPHS to HCA almost four months later, on November 10, 2010, he explained:  "Should HCA agree to sell Palmyra Medical Center to PPHS, the transaction would be similarly structured as an acquisition by the Hospital Authority of Albany-Dougherty County . . . to prevent an antitrust enforcement action."  PX0207 at 5.  No member of the Hospital Authority was copied on PPHS's offer letter.<br><br>Quite simply, there is no evidence that the Hospital Authority was involved in the negotiations.<br><br>The first time majority of the Hospital Authority learned about the existence of the proposed transaction was during the week of December 13, 2010.  PX0404 at 54 (Wernick Tr. 208:4-210:3).<br><br>The Transaction was not presented to the Hospital Authority as a governing body until December 21, 2010 – the very same day the Hospital Authority approved the Asset Purchase Agreement.  PX0422 at 64 (Lingle Tr. 248:13-249:1); PX0226 at 1.  And even on December 21, 2010, the Hospital Authority as a whole was not informed about the Termination Fee Agreement (*see* disputed fact #8).  PX0402 at 35 (Rosenberg Tr. 130:7-131:3).  In further contrast to PPHS's active role in negotiations and evaluations, the Hospital Authority was not involved in the asset purchase agreement negotiations and never even saw the Morgan Keegan analysis of comparable transactions.  PX0404 at 52 (Wernick Tr. 201:11-14); PX0402 at 23-24 (Rosenberg Tr. 85:21-86:14). |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 3. | Before any Hospital Authority vote, the Board carefully considers all relevant issues.  The Hospital Authority exercised its independent judgment to determine that the acquisition of the Palmyra assets will further its statutory mission.  Rosenberg Decl. ¶¶ 8, 12-18; Auth. Br. at 21; Ghiglieri Decl. ¶¶ 16-19; Hayes Decl. ¶¶ 4-6; Lingle Decl. ¶¶ 5-8. | The Hospital Authority played no independent role in evaluating the acquisition of Palmyra, according to the Vice-Chairman of the Hospital Authority.  PX0422 at 32 (Lingle Tr. 120:10-23).<br><br>The Vice-Chairman also admits that the Hospital Authority did not evaluate the impact on access to health care or cost reduction. PX0422 at 5, 61 (Lingle Tr. 10:22-11:3; 236:14-237:3).  The Hospital Authority also did not conduct an independent analysis of the purchase price.  PX0422 at 7 (Lingle Tr. 19:2-15).<br><br>The Hospital Authority did not receive or have the opportunity to review the Morgan Keegan revenue multiple analysis report commissioned by Phoebe executives to evaluate the purchase price.  PX0404 at 52 (Wernick Tr. 201:11-14). The Chairman of the Hospital Authority, after reviewing the Morgan Keegan report for the first time in an investigational hearing on March 9, 2011, said "I don't understand it."  PX0402 at 38, 39 (Rosenberg Tr. 145:14-25; 146:1-11).<br><br>The Hospital Authority did not ask for and did not receive a fairness opinion.<br><br>The Hospital Authority was advised by its "special counsel," Mr. Baudino, but it was not informed that his advice was hopelessly conflicted.  *See* PX0402 at 4 (Rosenberg Tr. 6:8-10); PX0078 at 1; PX0422 at 45 (Lingle Tr. 170:6-9). |
| 4. | On October 7, 2010, the PPHS board voted to recommend the acquisition of Palmyra to the Hospital Authority.  Wernick Decl. ¶ 54; Auth. Br. at 10. | PPHS's board did not vote on October 7, 2010 to recommend the acquisition.  As reflected in the minutes from PPHS's October 7, 2010 meeting, PPHS's board voted to approve the PPHS finance committee's specific recommendation to offer up to ▮▮▮▮▮ to HCA to acquire Palmyra.  PX0084.  There is no evidence that anyone from the Hospital Authority other than Wilhelmina Hall (who served on both the Hospital Authority and the PPHS board) was informed of this vote and no evidence of any recommendation made to the Hospital Authority.  The majority of the Hospital Authority's members were first informed of the Transaction in secret meetings with Mr. Wernick between December 14, 2010 and December 21, 2010.  PX0404 at 54 (Wernick Tr. 208:4-210:3); PX0422 at 6 (Lingle Tr. 16:8-17:18). |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 5. | Only after obtaining the approval of Mr. Rosenberg, Mr. Lingle, and the Hospital Authority's outside general counsel on November 10, 2010, was an offer transmitted to HCA on November 16.  Auth. Br. at 10; Wernick Decl. ¶¶ 56-58. | Neither of Messrs. Rosenberg or Lingle recalled a November 10, 2010 meeting with Mr. Wernick, and neither the Hospital Authority nor PPHS has produced the draft offer that was purportedly reviewed at that meeting.  In addition, there is no evidence to suggest that Mr. Rosenberg and Mr. Lingle ever gave approval to any formal offer made on November 16, 2010.  According to Mr. Rosenberg's declaration, when he met with PPHS, it was "to obtain updates on the status of the negotiations."  Rosenberg Decl. ¶ 16.  Mr. Rosenberg does not indicate that he was ever requested to approve an offer.<br><br>Between October 21, 2010 and the week of December 13, 2010, Mr. Lingle did not meet with Phoebe executives or anyone related to the transaction.  PX0422 at 15, 64 (Lingle Tr. 53:1-23; 248:20-249:1).<br><br>Further, any such approval provided by Mr. Rosenberg and Mr. Lingle would have exceeded their authority.  As Mr. Lingle testified, the Hospital Authority had neither delegated responsibility for such a transaction to Mr. Rosenberg or Mr. Lingle nor designated them to speak on its behalf.  PX0422 at 42 (Lingle Tr. 160:21-24; 161:17-19).  That is only logical since the Hospital Authority acts by a majority of a quorum of its members, PX0422 at 27, (Lingle Tr. 100:24-101:6), and did not meet to discuss the Transaction until December 21, 2010.  PX0226 at 1; PX0422 at 64 (Lingle Tr. 248:13-249:1).  There would have been no opportunity prior to that date for the Hospital Authority to have even considered delegating any authority to them. |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 6. | After the offer was communicated on November 29, 2010 to HCA, the Sovereign Group began negotiations with HCA on behalf of PPHS and the Hospital Authority.  Wernick Decl. ¶ 59. | The Sovereign Group opened negotiations with HCA in August 2010.  PX0222.  By November 4, 2010, Mr. Wernick had contacted PPHS Board members to seek approval to raise the purchase price for Palmyra from ▮▮▮▮▮ to ▮▮▮▮▮ to reflect HCA's updated figures on Palmyra's 2009 net revenues, based on Sovereign Group negotiations with HCA.  PX0059.  The majority of the Hospital Authority was not aware of the Transaction until over one month later, during the week of December 14, 2010.

The Sovereign Group was hired on August 3, 2010 to be the exclusive representative of PPHS for the transaction (PX0135).  It never received authority to negotiate on behalf of the Hospital Authority.  In fact, neither the Sovereign Group nor the Baudino Law Group has been hired by the Hospital Authority (PX0422 at 15, Lingle Tr. 50:2-23).  As of the date of his April 2011 deposition, Mr. Lingle had never even heard of the Sovereign Group.  PX0422 at (Lingle Tr. 166:14-25).

Mr. Wernick's statement is contradicted by contractual language signed by Mr. Wernick himself:  According to the Termination Fee Agreement signed on December 20, 2010 by Mr Wernick, among others, "The parties acknowledge that neither PPHS nor PNI has the authority to negotiate on behalf of the Hospital Authority."  PX0226 at 1. |

|   | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 7. | "No Phoebe Putney defendant is the buyer of the assets underlying Plaintiffs' preliminary injunction motion, nor was any Phoebe Putney defendant ever contemplated as a buyer."  Phoebe Br. at 1, 7. | The nature of PPMH and PPHS's role in the acquisition is set forth in the contractual obligations of PPHS, the context of the negotiations, and the nature of the relationship between the Hospital Authority and Phoebe regarding the Transaction.<br><br>For example, the Asset Purchase Agreement states that "PPHS hereby unconditionally and absolutely guarantees the prompt payment by Buyer and PNI (and by any assignee by, through or under Buyer or PNI) of each and every financial obligation, Assumed Liability and agreement requiring financial performance by Buyer or PNI (or any such assignee) arising out of, connected with, or related to, this Agreement or any ancillary documents hereto and any assignment, extension, renewal and/or modification thereof (the 'Obligations')."  Further, "[HCA] may enforce this guarantee against PPHS without first making demand on Buyer[.] . . . PPHS's liability for the Obligations is hereby declared to be primary, and not secondary, and each document presently or hereafter executed by Buyer or PNI to evidence or secure the Obligations to [HCA] is incorporated herein by reference and shall be fully enforceable against PPHS." PX0013 at 71-72 (Section 12.21 (a) and (c)).<br><br>In addition, the purpose of the Transaction was to give Phoebe control of Palmyra, PX0422 at 61 (Lingle Tr. 237: 7-14), and it is Phoebe's money being used to purchase Palmyra. PX0422 at 54 (Lingle Tr. 208: 18-25).  As stipulated by the Asset Purchase Agreement, Phoebe will immediately gain control of Palmyra's employees at the time of closing.  PX0013 at 7. |
| 8. | Mr. Reynolds explained during the closed portion of the December 21, 2010 meeting of the Hospital Authority that "prior to the Authority's meeting, Phoebe Putney Health System, Inc. and HCA, Inc. had entered into a 'Termination Fee Agreement' which required Phoebe Putney Health System, Inc. to pay HCA, Inc. $17.5 million dollars in the event that the Authority did not approve the acquisition and, consequently, HCA's offer to sell Palmyra became public. … Mr. Reynolds stated that he had taken the poll before disclosing the Termination Fee Agreement because he did not want the Termination Fee Agreement to influence each Hospital Authority member's analysis as to whether or not to vote for the acquisition. After some discussion about the Termination Fee Agreement, all Hospital Authority members who were present indicated that we were still in favor of approving the acquisition of Palmyra by the Hospital Authority."  Ghiglieri Decl. ¶ 14. | Mr. Rosenberg testified on March 9, 2011 that he had never heard of the Termination Fee Agreement.  PX0402 at 35 (Rosenberg Tr. 130:7-131:3). |

**Rationale for Acquisition**

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 9. | "All of the actions of PPHS and PPMH were aimed at placing the strategic option of an acquisition of Palmyra before the Authority so that the Authority could make a determination as to whether such an acquisition would further its statutory mission." Phoebe Br. at 6; *see also* Wernick Decl. ¶ 72.<br><br>"The proposed acquisition was never part of any scheme for [Wernick], PPHS or PPMH to 'get control' of Palmyra [.]"  Wernick Decl. ¶ 72; *see also* Phoebe Br. at 6. | The purpose of the Transaction, as Defendants state elsewhere, is "to accomplish a needed expansion of Phoebe's facilities." Auth. Br. at 9; Wernick Decl. ¶ 47.  In February of 2011, Phoebe engaged PricewaterhouseCoopers LLP (PWC) to support Phoebe's overall facility planning process.  PWC's engagement letter states: "Phoebe Putney plans to become the sole corporate member of Palmyra Medical Centers. . . .  We understand that . . . management's primary goal for the deal is to achieve greater market scale and growth opportunities. . . ."  PX0344.<br><br>The Termination Fee Agreement alone belies the notion that Mr. Wernick and Phoebe were "placing the strategic option of an acquisition of Palmyra before the Authority."  By the time the Hospital Authority voted on the transaction, a failure to approve would have triggered the $17.5 million termination fee (PX0226 at 1-13) despite the fact that "neither the form of the Asset Purchase Agreement nor the transactions contemplated thereby has been presented to, or approved by, the Authority."  PX0226 at 1.<br><br>One of the critical elements of the Hospital Authority's statutory mission is spelled out in O.C.G.A. § 31-7-75.  That section addresses a Hospital Authority's functions and powers.  Before entering into a long-term lease, "the authority shall have first determined that such lease will promote the public health needs of the community by making additional facilities available in the community or by lowering the cost of healthcare in the community . . . ."  In an integrated transaction whose sole purpose was to give Phoebe control over Palmyra under a long-term lease, PX0422 at 61 (Lingle Tr. 237: 7-14), the Hospital Authority should have considered whether the Transaction would lower the cost of healthcare in the community or make additional facilities available.  It did not.  If "all of the action of PPHS and PPMH were aimed at placing the strategic option of an acquisition of Palmyra before the Authority so that the Authority could make a determination as to whether such an acquisition would further its statutory mission," one would expect PPHS to have presented an analysis showing how the Transaction would lower the cost of healthcare or make additional facilities available in the community.  They did not present any such analysis.  PX0422 at 5, 61 (Lingle Tr. 10:22-11:3; 236:16-237:3). |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 10. | "During the summer of 2010, PPMH and PPHS again began to think about how to address capacity constraints, especially for certain of our units such as intensive care and rehabilitation.  Significant diversion of some patients from Phoebe Putney Memorial Hospital to other medical facilities had taken place since at least 2006, but such diversion had grown more consistent since at least 2009. … We once again faced a build or buy decision."  Wernick  Decl. ¶ 47. | Mr. Wernick characterizes the decision to acquire Palmyra as hinging on the build versus buy cost analysis.  But, as stated by Phoebe's COO, the transaction's benefits for Phoebe included "[a]void antitrust lawsuit;" "[c]ontrol all hospital beds in county;" "[s]implify all future CON application processes;" and "[i]ncrease negotiation power with all payors."  (PX0021 at 1).  In justifying its recommendation to acquire Palmyra, PPHS's finance committee listed strategic benefits that included "OB Con becomes non-issue," "antitrust lawsuit goes away," and "simplify all future CON application processes."  PX0010 at 7.<br><br>Moreover, Phoebe's contemporaneous documents and other evidence suggest that capacity constraints in its Intensive Care Unit ("ICU"), Neonatal Intensive Care Unit ("NICU"), and rehabilitation ("rehab") unit may have been created or the remedies exaggerated.  PX0012 at 45, PX0402 at 32 (Rosenberg Tr. 118:24-119:14), PX0019 at 16.<br><br>Regarding the NICU, Phoebe had already applied for and received Certificates of Need for renovations of its neonatal intensive care unit at a total cost of approximately ▮▮▮▮▮ dollars prior to the summer of 2010.  PX0132 at 1-394; PX0133 at 1-389. |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 11. | Wernick was "aware that the Authority had long considered the acquisition of Palmyra, if it could be achieved on reasonable terms, as the most cost efficient means of meeting" the healthcare needs of the community.  Wernick Decl. ¶ 72; Phoebe Br. at 6. | The word "reasonable" here is subjective and vague, but to the extent that it conveys the idea that the transaction as a whole was standard business procedure at common market value, Plaintiffs dispute.  The acquisition price was not evaluated for reasonableness or fairness, and substantial evidence indicates that Phoebe paid a significant premium for the acquisition of Palmyra.  Even PPHS's board called the purchase price "high." PX0092 at 2.<br><br>PPHS executives were concerned about obtaining a fairness opinion on this high premium (before they realized they could avoid the need to obtain one because the Transaction was structured as an acquisition by the Hospital Authority).  PX0123 at 3.  HCA similarly considered the sale price to be "wildly accretive from any way you might look at it."  PX0219 at 1. Additionally, a revenue multiple analysis commissioned by PPHS, but notably not shared with the Hospital Authority, found that only ███████████████ transactions had a higher revenue multiple than that demanded by HCA.  PX0015 at 6-8; PX0404 at 52 (Wernick Tr. 201:11-14). |
| 12. | "For over twenty (20) years, the Authority has sought to solve [a] capacity issue by either building a new facility or purchasing Palmyra."  Rosenberg Decl. ¶ 13; *see also* Wernick Decl. ¶¶ 26-28, 36; Auth Br. at 9. | It is apparent from Mr. Wernick's declaration that he and Mr. Baudino were repeatedly interested in acquiring Palmyra, but Defendants have not produced any competent evidence showing that the Hospital Authority expressed a similar interest or was even informed of Mr. Wernick's continued interest.  For example, Mr. Wernick identifies at least four occasions – in 1994, 1998, 2003, and 2007 – when he and Mr. Baudino approached HCA without the Hospital Authority's knowledge. Wernick Decl. ¶¶ 40-46.  According to Mr. Wernick, he asked Mr. Baudino on multiple occasions "to initiate contact with HCA to determine if it had an interest in selling Palmyra, *contingent on Authority approval*."  Wernick Decl. ¶¶ 40, 42 (emphasis added).  This caveat suggests that the Hospital Authority had not expressed an interest in acquiring Palmyra to Mr. Wernick in advance of these discussions. |

13

**The Landlord Tenant Relationship**

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 13. | The Hospital Authority "aggressively monitor[s] community perceptions and concerns regarding the hospital, including as it relates to medical costs." Wernick Decl. ¶ 13. | Mr. Lingle, the Vice-Chairman of the Hospital Authority, testified that he was unaware of any price changes implemented by PPHS during his eight years with the Hospital Authority, and he was similarly unaware of community perceptions surrounding the prices charged to commercially insured patients at PPMH.  PX0422 at 40, 58 (Lingle Tr. 153:1-11; 224:17-225:8).  The Chairman of the Hospital Authority testified that he did not view commercial payor pricing as relevant to the Hospital Authority's mission and, therefore, did not stay informed of Phoebe's prices charged to commercial payors.  He did not even know how Phoebe's prices compared to Palmyra's. PX0402 at 10, 34 (Rosenberg Tr. 33:15-21; 126:9-127:7).

The Hospital Authority has not exercised oversight regarding pricing, contracting, and related key issues in the past, and it cannot be expected to do so in the future.  For example, the Vice-Chairman testified that he does not view payer contracts as something relevant to effective oversight:  "Q. Does the Authority expect to give any guidance to Phoebe in respect to how it negotiates with third-party payers? A. No, sir. Q. You mentioned Tift Hospital as a choice. If Phoebe decides that in its negotiations with third-party payers it wants to have an exclusive and say that people who -- that if you want to be in-network, if you want Phoebe to be in-network, you can't have Tift in your network, would the Authority be okay with that? A. Whatever it takes to make the wheels turn." PX0422 at 51 (Lingle Tr. 195:20-196:5).

According to Mr. Lingle's testimony:  "Q.[I]f, for example, Phoebe informs you that in the year 2012, they are going to be renegotiating their contract with Blue Cross/Blue Shield. Other than the fact that they are going to be renegotiating their contract with that entity, what other information would you as the Authority like to have?  A. What the outcome was. Q. This is prospective. A. Oh. I wouldn't want to know anything. That's their -- that's their bailiwick. They handle that… Q. You wouldn't want to know what discount rate they were going to propose? A. No. Q. You wouldn't want to know what the actual prices will be? A. No. … Q. Do you want the actual price information in the future? A. I don't see that as an important issue." PX0422 at 64 (Lingle Tr. 246:4-247:17). |

14

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 14. | "[T]he Authority exercises ultimate control over all strategic and operational matters." Wernick Decl. ¶¶ 10-14; Rosenberg Decl. ¶ 9; Auth. Br. at 8. | The Hospital Authority has ceded control over key business aspects such as payor contracting and pricing.  PX0422 at 64 (Lingle Tr. 246:4-247:19).  The Hospital Authority admits in its brief in support of a motion to dismiss before this court in the *Palmyra v. Phoebe Putney* antitrust case (Docket no. 1:08-cv-00102-WLS) that "The Hospital Authority cannot countermand, approve or revise PPMH's decisions in these and other management areas during the term of the Lease. PPMH, in short, controls all assets and operations at Phoebe Putney." Hospital Authority Brief in Support of Motion to Dismiss in *Palmyra v. Phoebe Putney*. Def. Hosp. Authority of Albany/Dougherty County's Br. in Supp. of Mot. to Dismiss at 3, *Palmyra Park Hospital, Inc. v. Phoebe Putney Memorial Hospital, Inc.*, 688 F. Supp. 2d 1356 (M.D. Ga. 2010) (No. 1:08-CV-102).  PX0083. |
| | | As the Hospital Authority Chairman told Mr. Wernick, "I have met with [new Hospital Authority member] Fred Ghiglieri.  I will give you a heads up on him.  We had to convince him that the Authority really has no authority as far as running the hospital and meeting more often than quarterly was not necessary except in a rare case of emergency.  He had read the lease and expressed his opinion that according to the lease PPMH was to provide affordable health care and they were not doing so.  He cited a case where two friends had exactly the same procedure with the same physician and one was through Phoebe and the other through a PPO and the PPO was 30% less and Phoebe would not work with that particular PPO. Additionally, he felt that periodically, the hospital (I suspect you) should give the Authority a report card on how and what they are doing.  You might think about beating him to the punch on this.  I explained to him that when I was initially placed on the Authority Board I basically kept my mouth shut and listened and that is how I learned (and hoped he would do the same) what the Authority was all about.  He stated he had no agenda but I am skeptical." PX0040 at 1. |
| | | Mr. Lingle, the Vice-Chairman of the Hospital Authority, testified that the Hospital Authority trusts Phoebe "implicitly." PX0422 at 34 (Lingle Tr. 128:19-129:6).  He cannot remember a time when the Hospital Authority disagreed with Phoebe during his eight years with the Hospital Authority.  PX0422 at 12 (Lingle Tr. 41:1-8). |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 15. | "[T]he Authority retained independent counsel and an independent auditor, PricewaterhouseCoopers, 'for the purpose of assisting [the Authority] in evaluating [PPMH's] obligations under the Lease Agreement,' including a comparison of PPMH's rates and charges to those of peer hospitals." Auth. Br. at 8; *see also* Rosenberg Decl. ¶ 10.<br><br>The Hospital Authority "uses these financial reports and the services of independent consultants to" "evaluate the prices rather than reviewing individual price listings" and to "ensure that the rates and operations of PPMH, Inc. meet the requirements of the Hospital Authorities Law (OCGA. § 31-7-77)." Rosenberg Decl. ¶ 11. | Hospital Authority members have stated that they have no interest in regulating prices or commercial payor rates and that they are unaware of basic details such as general price increases. PX0422 at 56 (Lingle Tr. 216:2-18); PX0402 at 10 (Rosenberg Tr. 33:15-25).  The Vice-Chairman was even unaware that Phoebe had a long standing exclusivity contract with the largest regional payor.  PX0422 at 56 (Lingle Tr. 216:19-25)<br><br>Plaintiffs also dispute the independent status of the auditor.  Mr. Lingle testified that it was a Phoebe representative, and not someone from the Hospital Authority, who managed the relationship with Pricewaterhouse Coopers.  PX0422 at 9 (Lingle Tr. 28:4-14).<br><br>According to Mr. Lingle, the PricewaterhouseCoopers pricing study (along with a concurrent report from Cleverley) was commissioned "to justify the prices that we charge and put that issue to rest" as a response to CACH in order to quiet the complaints of the community that Phoebe's prices were too high.  PX0422 at 29 (Lingle Tr. 109:6-17).<br><br>A pricing defensibility report might explain why there is evidence indicating that PPMH instituted selective price increases that would significantly increase the prices charged to certain patients and payers and increase its total revenues, but leave its widely reported average rates unchanged or reduced. *See* PX0340; *see also* PX0341; PX0108; PX0091; PX0062; PX0342.  Plaintiffs have sought discovery of the worksheets and other backup materials supporting Pricewaterhouse Coopers' findings to determine the methodology it used to reach its conclusions, but without further discovery it is impossible to assess the accuracy of its findings. |

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 16. | "PPMH has no 'private' interests – akin to the profit motive of a private business – that are separate from the Authority's interests in serving the healthcare needs of local citizens."  Auth. Br. at 37. | PPMH has amassed a reserve exceeding a quarter of a billion dollars, a significantly greater sum than many for-profit companies.  *See* PX00207 (Nov. 5, 2010 Shattuck Hammond letter confirming PPMH has cash and cash equivalents exceeding $255,000,000).<br><br>The Hospital Authority, in its brief in support of a motion to dismiss before this court in the *Palmyra v. Phoebe Putney* antitrust case (Docket no. 1:08-cv-00102-WLS), argued that Phoebe Putney could indeed have separate private interests beyond those of the Hospital Authority.  Specifically, the Hospital Authority stated that "the Hospital Authority's alleged conduct is limited to '*not* exercis[ing] its right to terminate the Lease or otherwise take over Phoebe Putney's management.'  Because Palmyra's own allegations make it clear that the Hospital Authority did not and could not participate in the activity on which Palmyra's tortious interference claim is based, Count V must fail."  PX0083 at 16.  The Hospital Authority continued, arguing that "Palmyra's own allegations unequivocally establish that the 'Hospital Authority *cannot* countermand, approve or revise PPMH's decisions' to 'negotiate[ ] all relationships with managed-care organizations' because "*PPMH* . . . controls *all assets and operations* at Phoebe Putney' and agent 'Phoebe Health Partners . . . negotiate[s] and execute[s] managed-care contracts for hospital services with commercial insurers and claim administrators.' In short, the claims in Count VI of Palmyra's Complaint are based on purported 'illegal activity' that Palmyra unequivocally admits the Hospital Authority had no authority or control over or participation in."  PX0083 at 16 (internal citations omitted). |

**The Integrated Nature of the Transaction**

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 17. | "What will occur after the Authority acquires Palmyra remains to be thought through, developed, and decided by the Authority."  Phoebe Br. at 6.<br><br>"The only executed agreement related to this transaction underlying this litigation is the asset purchase agreement between the Authority and the Seller."  Phoebe Br. at 8.<br><br>"In no way is the acquisition subject to, limited by, or contingent on how the Authority chooses to operate Palmyra after the acquisition is consummated."  Phoebe Br. at 8. | The Transaction's purpose is to give Phoebe control over Palmyra; the Hospital Authority did not consider any other options, and has not thought about what it might do if it cannot achieve the terms it wants in a lease with Phoebe.  PX0422 at 61 (Lingle Tr. 237: 7-14).<br><br>Mr. Lingle testified that the sole purpose of the transaction is to lease the assets to Phoebe.  PX0422 at 61 (Lingle Tr. 237: 7-14).<br><br>The Termination Fee Agreement, PPMH's resolution waiving section 4.21 of the 1990 lease, and the Asset Purchase Agreement, are all examples of *executed* agreements that show that the Transaction's purpose and intent is for PPHS to control Palmyra.  For instance, the Hospital Authority approved the Management Agreement, which will give PPHS control of Palmyra upon closing, at the same time it approved the Asset Purchase Agreement.  PPHS is also required by the terms of the Asset Purchase Agreement to hire all of Palmyra's employees immediately upon execution of the APA. PX0013 at 7.  The existing PPMH lease and the draft lease term sheet are further evidence of this plan.<br><br>Plaintiffs object to the notion that this fact has "to be thought through" after Phoebe committed to spending $195 million on the acquisition.  PX0422 at 54 (Lingle Tr. 208: 18-25). |
| 18. | "PPHS and PPMH are parties to the asset purchase agreement for limited technical purposes which do not alter the fact that only the Authority will purchase and own Palmyra."<br><br>"PPMH is a party merely to agree not to solicit Palmyra employees if the transaction is not completed, and as the interim employer of Palmyra employees if the transaction is completed. PPHS is a party merely to agree not to solicit Palmyra employees if the transaction is not completed, to the possible payment of a break-up or recession fee, and to guarantee the Authority's payment and performance. In that regard, under the Phoebe Putney Memorial Hospital lease, PPHS and PPMH are responsible for all debts incurred by the Authority."  Phoebe Br. at 5. | This statement of fact is self contradictory.  PPHS cannot be characterized as a party to the transaction "for limited technical purposes" when it has guaranteed the Hospital Authority's $195 million payment and its performance.  Not only is PPHS guaranteeing the Hospital Authority's performance and payment, but it is also contractually obligated for a break-up fee or recession fee, a termination fee, and the employment of Palmyra's employees.  It also retains the "sole right to control" any litigation in the event of legal action brought by the FTC or the Attorney General of the State of Georgia.  PX0013 at 55 (APA Section 10.1(c)(iii)).<br><br>PPHS is also the party to the transaction with final approval because of the Hospital Authority's non-compete agreement with Phoebe.  Specifically, on December 22, 2010, even after the Hospital Authority had approved the Asset Purchase Agreement, the PPMH board still had to waive the provision of section 4.21 of its lease with the Hospital Authority to allow the Hospital Authority to acquire Palmyra.  PX0061 at 8.  There is no logical reason for PPMH to agree to this waiver absent its parent company, PPHS, controlling its rival. |

**Term Sheet**

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 19. | "The Complaint falsely states that I referred to the Term Sheet as a 'wish list' and that I did not believe that the Authority would engage in any meaningful additional oversight over the operations of PPMH despite the fact that in my testimony, I clearly stated that the Term Sheet contains mandatory provisions that will be enforced by the Authority." Lingle Decl. ¶ 8. | Mr. Lingle's testimony here contradicts his prior testimony: "Q. Well, is it -- is it your understanding, then, that right now, what we have is a -- you could call it a wish list from the Authority? This is what the Authority would like in a lease? A. I think that would basically say it all, plus the fact that it's exactly what we want." PX0422 at 17 (Lingle Tr. 61:1-6). Mr. Lingle also testified that he hopes the oversight role of the Authority will, in fact, diminish in the future – noting its volunteer status. PX0422 at 25 (Lingle Tr. 92:22-93:10).<br><br>It is impossible to state with certainty what terms will be included in a final lease of Palmyra to PPHS since, as conceded by Mr. Lingle, PPHS has not even considered these terms yet or indicated its willingness to agree to them. PX0422 at 64-65 (Lingle Tr. 249:18-250:4). |
| 20. | "On March 25, 2011, [Mr. Rosenberg] requested that Robert J. Baudino, Jr. who was acting as special counsel to the Authority, prepare a memorandum containing terms that would be included in a revised lease between the Authority and PPMH, Inc., as lessee of both PPMH and Palmyra ('Term Sheet')." Rosenberg Decl. ¶ 19; *see also* Auth. Br. at 12; Lingle Decl. ¶ 8. | Mr. Lingle previously testified that the idea to draft these lease terms was proposed by the Baudino Law Group and that the Hospital Authority gave no instructions to the Baudino Law Group on drafting the Term Sheet. PX0422 at 14, 16 (Lingle Tr. 49:7-10, 54:15-17).<br><br>Plaintiffs also question Mr. Baudino's independence as counsel to the Hospital Authority. At the start of negotiations with HCA in 2010, the Hospital Authority clearly had not voted to engage the Baudino Law Group to serve as its special counsel for the negotiations with HCA. PX0422 at 15, 45 (Lingle Tr. 50:2-23, 173:4-17).<br><br>The Baudino Law Group did not inform the Hospital Authority that it was representing both Phoebe and the Hospital Authority in connection with the Transaction, and Mr. Baudino did not disclose that his Sovereign Group stands to gain nearly two million dollars if the Transaction closes. PX0135; PX0422 at 20 (Lingle Tr. 72:6-19); PX0057.<br><br>The Baudino Law Group did not obtain a waiver of any conflicts from the Hospital Authority. PX0422 at 45 (Lingle Tr. 170:6-9). Further complicating Mr. Baudino's conflict is that the Hospital Authority must look to Phoebe to pay its expenses, including its legal expenses. PX0402 at 11 (Rosenberg Tr. 34:8-24). |

**Other**

| | Defendants' Contention | Countervailing Facts |
|---|---|---|
| 21. | "[T]he only contemplated transaction structure had the Authority as the acquiring party. No other structure for the transaction was ever considered. There are many reasons for this, including that the Authority must be the hospital owner in order for Palmyra to be eligible as a recipient from both the Medicare Upper Payment Limit program and the Georgia Indigent Care Trust Fund, both critical sources of funds that allow the Authority to meet its mission and fulfill statutory requirements; in fiscal year 2010 PPMH received approximately $9,344,188 from these two programs." Wernick Decl. ¶ 53. | The contemporaneous documents, including those drafted by the Transaction's architect, Mr. Baudino, make clear that the reason the transaction was structured with the Hospital Authority as the acquirer was to avoid "the need to file a Hart-Scott-Rodino Pre-Merger Notification filing ("HSR filing") or risk of antitrust law enforcement action by the Federal Trade Commission or the United States Department of Justice." PX0207 at 4. <br><br> None of the contemporaneous documents address the claim that "the Authority must be the hospital owner in order for Palmyra to be eligible as a recipient from both the Medicare Upper Payment Limit program and the Georgia Indigent Care Trust Fund." Nor did any of the witnesses who testified in the FTC's investigation, including Mr. Wernick, Mr. Rosenberg, and Mr. Lingle, claim that as a reason for the Hospital Authority's involvement in the Transaction. |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 16th of June, 2011, I filed the foregoing with the Clerk

of Court through the CM/ECF system which will automatically send electronic mail notification

of such filing to the CM/ECF registered participants as identified on the Electronic Mail Notice

List.

   s/Priya Viswanath

Priya B. Viswanath

Federal Trade Commission