```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF GEORGIA
2                        ALBANY DIVISION

3                _____

     FEDERAL TRADE COMMISSION and    :  Case No. 1:11-CV-58(WLS)
4    THE STATE OF GEORGIA,           :
                        Plaintiffs   :    June 13, 2011
5    v.                              :    Albany, Georgia
     HOSPITAL AUTHORITY OF           :
6    ALBANY-DOUGHERTY COUNTY, ET AL. :    ORAL ARGUMENT
     PHOEBE PUTNEY HEALTH SYSTEM, INC.,:
7    PHOEBE PUTNEY MEMORIAL HOSPITAL  :
     INC., PHOEBE NORTH, INC.         :
8    HCA, INC., and                   :
     PALMYRA PARK HOSPITAL,           :
9                        Defendants   :
     _____

10
              BEFORE THE HONORABLE W. LOUIS SANDS,
11            UNITED STATES DISTRICT JUDGE, PRESIDING

12   APPEARANCES:
     FOR THE PLAINTIFFS:       EDWARD D. HASSI
13                             MATTHEW K. REILLY
                               FEDERAL TRADE COMMISSION
14                             600 PENNSYLVANIA AVE NW
                               WASHINGTON DC 20580
15
                               ALEX F. SPONSELLER
16                             40 CAPITOL SQ SW
                               ATLANTA GA 30334
17
     FOR THE DEFENDANTS:       EMMET J. BONDURANT, II
18                             FRANK M. LOWREY, IV
     PAUL C. GLUCKOW           1201 WEST PEACHTREE ST NEW
19   425 LEXINGTON AVE         3900 ONE ATLANTIC CENTER
     NEW YORK NY 10017         ATLANTA GA 30309
20
     JAMES C. EGAN, JR          LEE KAVEL VAN VOORHIS
21   1300 EYE ST NW STE 900     815 CONNECTICUT AVE NW
     WASHINGTON DC 20005        WASHINGTON DC 20006
22

23                     TRANSCRIBED BY:

24   _____
                    SALLY L. GRAY, CCR, RPR, USCR
25                       P.O. BOX 875
                    MACON, GA 31202-0875
                      (478)752-3497
```

*INDEX TO PROCEEDINGS*
*JUNE 13, 2011*
*ORAL ARGUMENTS*

*PRELIMINARY REMARKS*                           *3*

*MR. BONDURANT*                                *13*

*MR. VAN VOORHIS*                              *74*

*MR. GLUCKOW*                                  *95*

*MR. HASSI*                                    *96*

*MR. SPONSELLER*                              *174*

*MR. REILLY*                                  *207*

*MR. LOWREY*                                  *257*

*MR. REILLY*                                  *280*

*Certificate of Transcriber*                 *287*

1      **P R O C E E D I N G S**

2    June 13, 2011

3          **THE COURT:**  All right, good morning.

4          **COUNSEL COLLECTIVELY:**  Good morning, Your Honor,

5          **THE COURT:**  Well, I see things have not changed very

6    much.  In the old days you worried about whether the overhead

7    projector was going to work or not.  You brought extra bulbs,

8    hope the plug worked, and if it didn't, of course, you went to

9    your back up.  So it's good to see everyone is still prepared

10   to go with that back up, the old tried and true.

11         We do apologize.  This is supposed to be the status of

12   the electronics for federal courts, this and the courtroom

13   down the hall in Judge Langstaff's courtroom, but as you see,

14   it's still vulnerable to some problems.  So hopefully we'll

15   find out very soon what the problem might be and maybe get it

16   corrected, but we'll proceed nonetheless.

17         This matter was set down this morning in the case of

18   number 1:11-CV-58(WLS), the Federal Trade Commission and the

19   State of Georgia as plaintiffs, versus Phoebe Putney Health

20   System, Inc., Phoebe Putney Memorial Hospital, Inc., Phoebe

21   North, Inc., Palmyra Park Hospital, Inc, and Hospital

22   Authority of Albany, Dougherty County as defendants.

23         Now, I think there are two broad matters that we are here

24   to discuss this morning, the plaintiffs' motion for

25   preliminary injunction and the defendants' motions to dismiss

1    and/or for summary judgment.

2        I had you all notified on Friday that I thought the first

3    thing we should do would be to take care of any evidence that

4    either party needed to address so that we would have a

5    complete record.  That is, if there was anything in addition

6    to what has already been presented by the plaintiffs on the

7    preliminary injunction issue, I thought we should do that

8    first, likewise, for the defendant.

9        I guess on the motion to dismiss, the evidence is a

10   slightly different question since there wouldn't be,

11   generally, a matter of evidence, but I thought there may be

12   matters of stipulation or exhibits that might be agreed to by

13   the parties that might be identified for that purpose, but

14   otherwise, after that, we would proceed with the arguments.

15   Yes, sir?

16       **MR. REILLY:**  Good morning, Your Honor.  Matt Reilly,

17   Federal Trade Commission.  We don't have any additional

18   evidence that you do not have, but based on your order and the

19   e-mail on Friday, if it would be helpful for the Court, we

20   would be happy to walk through some of the evidence, put it in

21   some context, put some of it on the screen to explain how it

22   fits into our theory into how the evidence supports that this

23   transaction will harm consumers in the six-county area through

24   higher prices and other competitive harm.

25       So it's totally up to the Court, we are prepared to walk

1    through the evidence, go through the standard, what 13(b) is

2    now, but it is not any additional evidence, or do that later.

3    We're prepared whatever, Your Honor.

4         **THE COURT:**  Okay.  I think we can do that later.  I

5    think the idea was I wanted to make sure that the record was

6    complete as far as what was before the Court in making its

7    decision, but you are welcome to do that at the time you make

8    your arguments on the motion.

9         **MR. REILLY:**  Thank you, Your Honor.

10        **THE COURT:**  All right.  For the defense?

11        **MR. BONDURANT:**  Your Honor, I am Emmet Bondurant, and I

12   represent the Hospital Authority.  We have separately marked

13   as defendants' exhibits essentially the same documents that

14   are in in support of various motions, and I would propose to

15   offer them now.  There are only seven in number.

16        **THE COURT:**  Is that something you all can stipulate to,

17   or is there a difference in the --

18        **MR. BONDURANT:**  These are affidavits that would be

19   offered in opposition to their motion for a preliminary

20   injunction, as well as documents which are authenticated as

21   business records which would be relevant to rebut their

22   preliminary injunction motion, and they have said in response

23   to the motion to dismiss that there are certain of those

24   documents that were previously offered as exhibits to which

25   they had no objection.

1    So our documents are admissible in opposition to the

2    preliminary injunction and are, to the extent un-objected to

3    or otherwise referred to in their complaint, are relevant to

4    the motion to dismiss.  So I would propose to offer them at

5    this time.

6         THE COURT:  All right.  Mr. Reilly?

7         MR. REILLY:  Thank you.  Your Honor, it's not clear to

8    us -- maybe we could get some clarification whether these are

9    new affidavits or documents that we already have in our

10   possession.  To the extent that we already have them and they

11   are filed with this court, we have no objection to them coming

12   into this 13(b) proceeding.  The new affidavits that are being

13   handed in right now, we would have an objection to that, Your

14   Honor.

15        THE COURT:  Would you all identify, Mr. Bondurant,

16   those that existed previously, that there's no objection to,

17   if you would identify those, and then we'll know which ones

18   that need to be discussed.

19        MR. BONDURANT:  I'll be pleased to do that, Your Honor.

20   Can I have the originals?

21        THE COURT:  It's stipulated to and agreed that those

22   matters that were earlier attached and identified are admitted

23   without objection?

24        MR. BONDURANT:  There are no new affidavits.

25        THE COURT:  There are no new affidavits?

1      MR. BONDURANT:  Which is the simple answer to the

2  question.

3      MR. REILLY:  And I have a simple response, we have no

4  objection to the affidavits coming in.

5      THE COURT:  All right.  If you would just identify

6  those items for the record, and they are admitted without

7  objection as stipulated to.

8      MR. BONDURANT:  We're tendering as Defendant's Exhibit

9  1, the affidavit previously served of Annette Miller Allen, to

10  which the documents authenticated have been attached.

11      THE COURT:  What were they marked?  What was the

12  exhibit number?

13      MR. BONDURANT:  That would be Hospital Authority

14  Exhibit 1.

15      THE COURT:  All right.

16      MR. BONDURANT:  Hospital Authority Exhibit 2 is the

17  previously served declaration of Dr. Charles Lingle, the vice

18  chair of the Hospital Authority Board and a former member of

19  the County Commission.

20      Defendant's Exhibit 3 is the previously served

21  declaration of Mr. Fred Ghiglieri, who is a member of the

22  Hospital Authority Board and is the former production manager

23  for Proctor & Gamble here.

24      Hospital Authority Exhibit 4 is a declaration of

25  Mr. Johns Hayes, who is a member of the Hospital Authority

1    Board and a member of the Dougherty County Commission,

2    currently serving.

3        Defendant's Exhibit 5 is the declaration of Mr. Ralph

4    Rosenberg, who is the chair of the Hospital Authority Board.

5        Hospital Authority 6 is the declaration of Mr. Joel

6    Wernick, who is the general manager for Phoebe Putney Memorial

7    Hospital and was a former employee of the Hospital Authority

8    before Phoebe Putney Health Systems was even formed in 1991.

9        The only new exhibit we have is a press release of an

10   intervening event issued by the Hospital Authority of Valdosta

11   and Lowndes County, doing business as the Southern Regional

12   Medical Center, announcing their acquisition of a competing

13   hospital for 55 million dollars, which translates into a price

14   of about 1.2 million dollars a bed.  That transaction was only

15   announced on May 13th after the filing of the complaint.

16       We have subpoenaed the original documents, but they have

17   objected, and rather than delay the hearing while we fight

18   over the objection, we simply offer that press release and the

19   attachments which explain the transaction.  The press release

20   is of the Hospital Authority from Valdosta.

21       **THE COURT:**  All right.  Well, first of all, as to the

22   exhibits of, the Hospital Authority Exhibits 1 through 6,

23   inclusive, they are admitted without objection.  Mr. Reilly,

24   you wanted to speak to Number 7?

25       **MR. REILLY:**  Yes, I do, Your Honor, thank you.  We

1   fully realize in a 13(b) proceeding of the FTC Act, Your

2   Honor, that evidence should come in.  It is a bench

3   preliminary injunction hearing, and, of course, any evidence

4   that you consider, you consider the weight rather than the

5   admissibility, and that's the law in every circuit.

6        In terms of Exhibit 7, Your Honor, we don't see what the

7   relevance is.  We have a burden under 13(b) to present to this

8   Court and to meet our burden on why the consumers and

9   residents and employers will be harmed of the six surrounding

10  counties, including Dougherty County, from this transaction.

11       Putting in a press release about an acquisition or some

12  deal that doesn't involve any of the counties at issue here,

13  we just don't see where it goes to relevance at all, and so we

14  object on relevance grounds.

15           **THE COURT:**  Mr. Bondurant?

16       **MR. BONDURANT:**  I'd be happy to explain the relevance.

17  The relevance is that the core theory of the FTC in this case

18  in an effort to try to get around controlling decisions of the

19  circuits, specifically in *Lee County*, is to make a collateral

20  attack on the integrity, the intelligence, the good faith, the

21  judgment of the Board of the Authority.

22       It is our view that that attack is impermissible and

23  inadmissible under City of Columbia against Omni Outdoor

24  Advertising Co. in 499 U.S.  But having said that, one way we

25  intend to rebut that is to show that a nearby housing

1    authority, a housing authority under state law, just like this
2    one --

3         THE COURT:  You mean hospital authority?

4         MR. BONDURANT:  Yes, sir.

5         THE COURT:  You said housing authority.

6         MR. BONDURANT:  I apologize.  A hospital authority that
7    was, after all, the defendant in the *Crosby* case, which Your
8    Honor is familiar with, has done precisely the thing of which
9    the FTC complains in this case without being under the
10   influence of Phoebe Putney, as the government claims in this
11   case, and producing a cost that to them per bed, that is far
12   greater than ours.

13        One of the FTC's arguments in their briefs are that the
14   Hospital Authority here before entering into the decision
15   should have hired a pen-striped suit with a handkerchief in
16   his pocket, investment banker from New York, to advise them on
17   comparables.

18        Well, here is a comparable transaction entered into
19   within 60 miles after our transaction was entered into in
20   South Georgia that shows that another hospital authority made
21   a similar decision, but they're paying 1.2 million a bed,
22   versus almost roughly 800,000, and it is comparable to rebut
23   the comparables which they have cited in their papers.

24        So it's plainly relevant for all of those purposes,
25   although, candidly, I will say we are rebutting irrelevant

1    evidence which is sort of in some sense a silly thing to do.

2    But if they want to put their evidence to which we object, we

3    are going to respond to it by saying, it's irrelevant, but we

4    can rebut it on its facts as well.

5         **THE COURT:**  All right.  Well, the Court is not

6    satisfied that Number 7 is relevant.  Obviously, the details

7    of that transaction that's referred to may or may not be the

8    same as this.  I think as you noted to the Court, the subpoena

9    for certain documents were objected to, so I am not stating

10   that it would never be relevant or that it won't ultimately

11   be, but I think for our purposes today we may get off target

12   by trying to compare a transaction that is already in contest

13   with what might be the nature of one that's relatively nearby

14   that has not been developed, so I don't know what that might

15   be.

16        So if and when this were to proceed with the jurisdiction

17   before FTC, and, of course, the Court has not made any

18   determination, it doesn't mean that it may not be ultimately,

19   I guess, a comparable in a sense, but I think for today's

20   purposes, particularly without the actual transaction before

21   the Court, it would not be sufficiently relevant, and I don't

22   know that a news release really gives us any matter of

23   substance other than someone's representation of what was said

24   by whoever may have participated in providing that

25   information.

1    So for that reason, the Court would find it as not being

2    sufficiently relevant or established for it to be admissible

3    today and without prejudice.

4    All right.  I think what I said earlier was that we'll

5    then proceed with the arguments.  I think the appropriate way

6    to proceed is on the issue of the motion to dismiss.  I think

7    the argument essentially is if that there's no basis for the

8    FTC to have jurisdiction of this particular transaction, for

9    the reasons stated, I guess, for state action basis, then in

10   effect, there might not be any matter to be heard, either by

11   this Court or by the FTC.  So I think we'll start there and

12   take up that motion, and then we'll hear you further on the

13   preliminary injunction question.

14       MR. BONDURANT:  We're prepared to proceed, and we're

15   the party with the burden.  Would Your Honor give us a moment?

16   We brought the projector and put the FTC's stuff on it first.

17       THE COURT:  All right.

18       MR. REILLY:  If Mr. Bondurant wants to proceed with my

19   slides, Your Honor, we do not object.

20       THE COURT:  Okay.  Did you all need a moment or so to

21   get set up?

22       MR. BONDURANT:  If you will give us a moment to do

23   that, I would appreciate it.

24       THE COURT:  That's fine.  Okay, we'll take a short

25   recess.  Let me know when you all are ready, and we'll proceed

1    immediately.

2    *(RECONVENED; ALL PARTIES PRESENT)*

3         THE COURT:  All right.

4         MR. BONDURANT:  Thank you, Your Honor.  Before I begin,

5    let me inquire and ask your indulgence, since we are not able

6    to use the court system and spectators can see, would Your

7    Honor object to the members of the Authority and the lawyers

8    moving around and sitting in the jury box so they can see?

9         THE COURT:  Does either side have an objection to that?

10        MR. HASSI:  No, sir.

11        THE COURT:  I see no problem with it.  They can have a

12   seat in the jury box to be able to see, yes.

13        MR. BONDURANT:  If you all would like to sit over here

14   so you can see, you're surely welcome to do that.  And may I

15   approach the bench?  We have copies of PowerPoint

16   presentations for the Court and Your Honor's law clerk, so

17   given the accommodations, if you have trouble seeing at a

18   distance.

19        THE COURT:  All right.  Well, I've got my favorite

20   reading glasses on.  I've yet to give up and get the real ones

21   that I need.

22        MR. BONDURANT:  I can't see without my glasses, and

23   sometimes not very well with them.

24        THE COURT:  All right, you may proceed.

25        MR. BONDURANT:  Thank you, Your Honor.  May it please

1    the Court, we're here on essentially two motions by the

2    Federal Trade Commission and the State for an injunction.

3    There are separate injunctions which they seek, and they

4    really need to be addressed separately, though they have some

5    issues in common.

6        Their first motion is to enjoin the Hospital Authority

7    from acquiring Palmyra.  Their second injunction is one to

8    enjoin the Hospital Authority from leasing Palmyra to Phoebe

9    Putney, or allowing Phoebe Putney to manage Palmyra on the

10   Authority's behalf.

11       The legal standard for dismissing their complaint is

12   simply stated.  The Court must accept as true the well-pleaded

13   factual allegations, but the Court need not accept as true

14   legal conclusions and arguments with which the FTC's brief and

15   their complaint is replete.

16       Thus, when they use pejorative terms and uncomplimentary

17   terms, such as accusing the members of the Authority of being

18   straw men and of being rubber stamps, those are classic legal

19   conclusions of lawyers in overzealous pleading which can be

20   disregarded in ruling on a motion to dismiss and should be.

21       The leading case on that subject, of course, is *Ashcroft*

22   *against Iqbal,* which we quote on the slide before you.

23       Our argument is a very simple and direct one, and Your

24   Honor has put your finger on it already.  The FTC's motion to

25   enjoin the Authority and agency instrumentality or political

1    subdivision of the State of Georgia from exercising a power

2    expressly granted to it by state law to acquire another

3    hospital in the same county is protected absolutely and

4    unqualifiedly by the state action immunity defense under

5    Parker against Brown, FTC against the Board of Directors of

6    the Hospital in Lee County, and Crosby versus Hospital

7    Authority in Valdosta and Lowndes County.

8         Moreover, the FTC wants to re-characterize the

9    transaction.  They're entitled to make arguments, but they are

10   not entitled to make up facts, and the facts are that the

11   Hospital Authority is buying Palmyra from HCA.  That's

12   apparent on the face of the contract which we have put on the

13   board.

14        The FTC in their brief, however, says the Court should

15   disregard that and should treat this as an acquisition by

16   Phoebe Putney.  They cite no precedent in the antitrust field

17   that has ever allowed a court to disregard a state action

18   defense of a state agency by ignoring the legal documents --

19        **THE COURT:**  Are there any cases, Mr. Bondurant, though,

20   that ever suggested the Court can't look at the substance of a

21   transaction simply because there is a state subdivision or

22   agency involved?  I don't think there's any real debate here

23   but that the Hospital Authority is a state entity, so to

24   speak.

25        **MR. BONDURANT:**  Your Honor, our research has shown that

1   there is no such case, and as I will show you during this

2   argument, <u>Parker against Brown</u>, the seminal Supreme Court case

3   from 1941, rejected that very argument because the argument in

4   that case was that the restraint of trade of which the

5   plaintiffs were there complaining was initiated by the raisin

6   growers and could not go into effect without the raisin

7   growers' approval, and therefore it was the raisin growers'

8   action, not state action, and the Supreme Court rejected it,

9   and I will address that directly.

10          THE COURT:  All right.

11      MR. BONDURANT:  The other side has cited no case, and

12   there are none so far as we are aware in which a court has

13   ever been allowed to go behind the official action.  That was

14   not allowed in *City of Columbia.*

15      The way the plaintiffs tried to go around the state

16   action defense in *City of Columbia* was to say the reality was

17   that the local advertising company had bribed members of the

18   Columbia City Council, that they had great political influence

19   on the city council, that the city council had essentially

20   delegated to them decision-making authority about whether or

21   not a competing billboard company would be allowed to expand

22   and enter the market in Columbia, and the Supreme Court --

23          THE COURT:  I understand, but plaintiff points out in

24   their arguments, though, that -- as I understand their

25   pleading, that they are arguing here that this is not simply

1   an issue where a private entity involved itself with a state

2   actor and the state actor adopts the suggestion or the idea

3   from the private actor.  But as I understand their argument,

4   that essentially the transaction itself was fully and totally

5   created by the private actor and simply adopted by the State

6   actor.

7        **MR. BONDURANT:**  That is their argument.

8        **THE COURT:**  Is that distinguishable under *Parker* or the

9   other cases that you mentioned?

10       **MR. BONDURANT:**  They have no case that has ever so held

11  in the state action context, and we have cases which have

12  rejected it.  And as I suggest, I believe *Parker* and *City of*

13  *Columbia*, themselves controlling Supreme Court cases, are

14  clear, unequivocal rejections of that proposition.

15       **THE COURT:**  What I am getting at, though,

16  Mr. Bondurant, and I think you are correct as a general

17  principle, but have any of those cases been cases where the

18  facts were mirrored by the facts here?  In other words, I know

19  you are arguing that the facts of this case are consistent

20  with the theories you're arguing, but have any facts been

21  where the private actor has been substantial as the plaintiffs

22  allege they are here?

23       **MR. BONDURANT:**  I would suggest, Your Honor, that in

24  *Parker* the private actors were even more in control.  Phoebe

25  was not in control here.  The Hospital Authority was in

1   control.  But let me get to *Parker*, and I will demonstrate it.

2          **THE COURT:**  I apologize to you --

3       **MR. BONDURANT:**  No.

4       **THE COURT:**  -- in advance, and to everybody, I just

5   have a habit of asking a question when it comes in my mind,

6   and I hope it doesn't disrupt your planned argument.

7          **MR. BONDURANT:**  You're not disrupting me.  I am here to

8   answer your questions, and I welcome your questions at any

9   time you want to ask them.

10      The effort which they make to get around the state action

11  defense is to change the facts into something they are not.

12  That is utterly unprecedented in this area.  The only thing

13  they could cite, and they have to reach for that, are tax

14  cases in which you have been able to collapse simultaneous

15  transactions for tax purposes to look at the economic reality,

16  but that has nothing do with the state action defense which is

17  grounded on three things.

18      It is grounded on that Congress never intended the

19  Sherman Act to reach the actions of a state or any competitive

20  restraints imposed by states.  It is grounded on principles of

21  federalism, that the federal courts can't use the antitrust

22  laws to prevent a state agency from carrying out a lawful

23  function under state law under the guise of preventing

24  competition or something of that sort.

25      And it is under guise -- under the third leg of deferring

1    to state governments as to whether or not their policies

2    should govern rather than those of the Federal Trade

3    Commission or the antitrust laws in this area.

4        **THE COURT:**  Of course, Mr. Bondurant, we have an

5    unusual situation here, I think, when we had our first phone

6    conference back right after the action was filed, and I put

7    this out to both sides then.  Of course, the matter of state

8    action immunity, that defense is, of course, clearly

9    established.

10       But here we have the unusual circumstance where the

11   Attorney General of the State of Georgia is taking the

12   opposite position with it and basically arguing that there is

13   not state action here, but it was the action of private

14   parties.  So how do we get a situation where the authority in

15   Georgia disagree about what is a state action?

16       **MR. BONDURANT:**  I love it.  I'm delighted you asked the

17   question.

18       **THE COURT:**  I want to hear that answer.

19       **MR. BONDURANT:**  And let me give you the answer.  It's

20   further in the PowerPoint, but I'll give it to you right now.

21       **THE COURT:**  All right.

22       **MR. BONDURANT:**  Under the State Constitution, the

23   Attorney General is not, as they allege in the complaint, the

24   chief law enforcement officer of the state.  He is, under our

25   State Constitution, merely, quote, the legal advisor to the

1    executive department.  He is no more than that.

2        The state action defense, the state action immunity, is

3    conferred on the Hospital Authority by statute, by the General

4    Assembly.  The Attorney General does not argue and cannot

5    argue that that statute is unconstitutional.  And the Attorney

6    General cannot repeal, modify, fold, spindle, or mutilate an

7    immunity conferred on the Hospital Authority by the General

8    Assembly of Georgia.

9        And in this case, this immunity was conferred on the

10   Hospital Authority -- after all, this particular Hospital

11   Authority was the first created in Georgia.  It was created in

12   1941 under a statute that was passed in 1941 before the

13   Attorney General and every member of his office were even

14   born.

15       **THE COURT:**  Well, I'm not giving, you know, a lot of

16   credence to his personal power, so to speak, but he

17   essentially is arguing a different -- that the Authority is

18   misinterpreting immunity as laid to the facts of this case.

19       **MR. BONDURANT:**  But the Attorney General, the

20   interesting thing in this case, is really window dressing.  He

21   was brought in here at the FTC's request.  But he does not

22   point -- and I invite you to look at his brief, and I invite

23   you to look at this complaint.  He nowhere says that the

24   Hospital Authority has taken any step in violation of state

25   law.  Nowhere does he say that.

1    What he is doing is arguing and parroting the same

2    argument the Federal Trade Commission makes is that they both

3    do not like the ruling in *Lee County* interpreting a Florida

4    Statute that was less specific than our own.

5    If you look at his brief he spends all his time talking

6    about federal cases, not state law, and he has not pointed to

7    a single provision of state law that the Hospital Authority

8    has violated.

9    **THE COURT:**  What was your argument, Mr. Bondurant, is

10    the limitation as far as anticompetitive conduct by a state

11    authority?

12    **MR. BONDURANT:**  As far as the limitation?

13    **THE COURT:**  Yes.  Is there any limitation on

14    anticompetitive conduct?  In other words, could the Hospital

15    Authority in its area having to do with hospitals, is there

16    any end to its effect on the public?  In other words, it could

17    be anticompetitive, destructive of the public's interest, is

18    there any limit under the law to their ability to do so?

19    **MR. BONDURANT:**  The limits of the law are those set

20    forth in *Lee County*, a three-part test.  Are you a state

21    agency?  That is uncontested in this case.

22    **THE COURT:**  Yes.

23    **MR. BONDURANT:**  Secondly, are you authorized by state

24    law to make this acquisition?  That is uncontested in this

25    case.  The authority in Georgia is even clearer than it was in

1    *Lee County*.  That is, it is expressed in 31-7-75-4, which says

2    Hospital Authorities may acquire projects.  And then you go

3    back to 75-1, Subsection 5, and it defines projects as

4    including the acquisition of hospitals and hospital facilities

5    and the leasing of those hospital facilities to third parties.

6    So we clearly meet the second test.

7        The third test is whether or not the legislature could

8    have foreseen or whether or not as a result of the action of

9    the power which they granted it was possible for the Hospital

10   Authority to create an anticompetitive condition.

11       And the Eleventh Circuit cases are utterly clear in our

12   favor on that, that is, it does not have to be foreseeable.

13   It does not have to be inevitable.  All it has to be is

14   reasonably possible or anticipated, but not guaranteed.

15       And in this particular case, remember the context of the

16   1941 law.  The 1941 law says, "There is hereby created in

17   every county and every municipality in this state a Hospital

18   Authority that is a public body carrying out public duties

19   that are given all the powers necessary to carry out the

20   function" and so forth.  And then you get down in the body of

21   the statute, and then there is the specific authority to make

22   acquisitions.

23       Now, you and I know, you grew up in Georgia, I grew up in

24   Athens, out of 159 counties, the counties that had a hospital,

25   a public hospital had maybe one competitor in 1941.  In Athens

1    where I grew up, it was Saint Mary's Hospital owned by the

2    Catholic Church.  It competed with the Athens General

3    Hospital, where I happened to have been born.

4         Under that '41 law, a legislator from Athens or anywhere

5    else and in every other county in the state would know if you

6    authorized the Hospital Authority to acquire other hospitals

7    -- only in the same county; they can't go outside the

8    county -- that the result would be the elimination of

9    competition from two competitors to one.

10        Or, if there were three other hospitals operating,

11   inevitably any acquisition would reduce the number from three

12   to two.  Or if there were four operating, it would reduce them

13   from four to three.  That is the inevitability that was in *Lee*

14   *County*, and that is the inevitability here.

15        And remember, in Georgia, they also authorized the

16   creation of hospital authorities for every municipality.  So

17   if you lived, as I did in Athens, which was different from the

18   county, the Athens General Hospital was an Athens Hospital,

19   not a county hospital, and the area of competition was even

20   smaller.

21        And if you acquired another hospital in Athens -- and, of

22   course, Athens General and Saints Mary's were within a mile of

23   each other.  They were within walking distance of my home.

24   Athens General could have acquired Saint Mary's as a municipal

25   hospital under that, and the elimination of competition was

1    inevitable, and that is precisely the *Lee County* case,

2    acquiring --

3         **THE COURT:**  Wouldn't that mean, though, that -- every

4    elimination of competition is not necessarily injurious to the

5    public interest, I would think.  But on the other hand, would

6    it be reasonable to believe that the purpose of an authority,

7    which is to benefit the public, would have no limitation as to

8    any of its acts that might, in effect, be injurious to the

9    public's interest?

10        In other words, I don't see how the anticipation of this

11   anticompetitive authority given by Georgia law avoids those

12   circumstances were there might not be actions in the interests

13   of the public for which the authority was created.

14        **MR. BONDURANT:**  Let me answer Your Honor a couple of

15   ways.  In Richmond County versus Richmond County Hospital

16   Authority, 1986, Richmond County Hospital Authority decided to

17   lease the county hospital there, owned by the authority to a

18   nonprofit, just as this Hospital Authority made the same

19   decision five or six years later in 1991.

20        That was challenged by the Richmond County Commission,

21   elected representatives of the county, on the grounds that it

22   was not in the public interest to do that.  The lease was at a

23   dollar a year.  And what did the Georgia Supreme Court say?

24   "The decision whether to lease is a decision for the authority

25   alone."  I will cite you that passage later in this

1    PowerPoint.  And that:  The elected representatives do not get

2    to second guess the authority in exercising a power granted by

3    state law -- the power to lease, in this case -- the power to

4    acquire and potentially future lease on -- because they

5    disagree with the public interest judgment.

6        Let me give you the second answer to that question.

7    Georgia law has a provision for dealing with the question, if

8    members of the Hospital Authority failed to carry out their

9    public duties.  We cite that in our brief, and I can almost

10   cite it off the top of my head.  31-7-76 A and B.

11       That says that the Attorney General -- It says:  The only

12   people who have standing to bring an action against a local

13   Hospital Authority claiming that you have not performed your

14   public duties are the appointing authority, the County

15   Commission, or local citizens on a petition of five thousand

16   local citizens to bring that action.

17       What that statute doesn't say is that the Georgia

18   Attorney General has any such standing.

19       What that statute doesn't say is that the Federal Trade

20   Commission has any such standing.  What that statute does say

21   is:  And jurisdiction of any such action shall be vested

22   exclusively in the superior court of the county in which it

23   was created.

24       So any issues that anybody has over whether or not this

25   is a smart decision or a dumb decision, this isn't any

1    different in many respects than ordinary corporate law.  If

2    you are a shareholder of a corporation that decides to acquire

3    another corporation, you can't just challenge that because you

4    want to, you have to go to the board of directors and demand

5    an action.  And if it is turned down, you can bring a

6    derivative action under Federal Rule of Civil Procedure 24 --

7            THE COURT:  I'll take your word or it.

8            MR. BONDURANT:  But in that case, the shareholder loses

9    almost 100 out of 100 times, unless he can show that the board

10   of directors had a personal conflict of interest, that is,

11   they were selling an asset to themselves or buying an asset

12   from themselves at an inflated price.  Otherwise those

13   decisions are governed by what is called the "business

14   judgment rule," which means that the board of directors

15   manages the corporation and makes decisions.

16   Our Hospital Authorities Act does precisely the same

17   thing.  It creates a citizen board of citizens who must live

18   in the community, they are selected by elected officials, they

19   received no compensation for their services, their duties are

20   prescribed by statute, and they are authorized to acquire and

21   manage hospitals in the same county.  And remember, under

22   Georgia law, a hospital authority is a public body.  It is tax

23   exempt.  It exercises powers of imminent domain.

24   In this case the Hospital Authority of Dougherty County

25   could have condemned and acquired Palmyra under its imminent

1    domain power.  It didn't even need consent.  You would have a

2    litigation over the price, but like every other imminent

3    domain case, the question of power would not be there.  That

4    makes this Authority different.

5        But what the Georgia Supreme Court has said is:

6    Decisions about the management of a hospital authority --

7    that's what was held in the Richmond County case -- are for

8    the authority, and if you claim -- which is not claimed here.

9    Nobody has claimed a single violation of a single statutory

10   duty on the part of the members of the Authority.

11       There, instead, is this shotgun slander of the members of

12   the Authority that you're rubber stamps, that you're not as

13   smart as the FTC, that if you were a more sophisticated

14   businessman, you would have gotten a fairness opinion from an

15   investment banker in New York -- and I might add

16   parenthetically, the people who brought us the financial

17   crisis from which the country has not recovered -- and that we

18   can manage this Authority better than you do.

19       Well, that's not the function of this Court.  That's not

20   the function of any other court.  That's not a claim that the

21   Attorney General has standing to make.  That's not a claim

22   that the Federal Trade Commission has standing to make.  That

23   is a decision the Georgia General Assembly has put in one

24   place and one place only and in one group of complaining

25   plaintiffs and one group only, the County Commissioners who

1    appointed them and the people of Dougherty County.

2         THE COURT:  With all due respect, though, they really

3    argue here, though, that the actual action, that is, the

4    initiation of the transaction, the negotiation of the details

5    of the transaction, all were made by the private parties, and

6    not by the Authority.  They're not questioning that the -- I

7    think they allege that the Authority did not act, as opposed

8    to just saying that somebody else could have done it better.

9    And I know it's argued also in the briefs that the Phoebe -- I

10   know they'll argue this when they get up -- that they are not

11   participants, but if a party is putting forth the cash for a

12   transaction and/or if they are guaranteeing a transaction, how

13   can they in good faith be argued not to be a participant?

14        MR. BONDURANT:  It's not a question of whether they are

15   participants, Your Honor.

16        THE COURT:  Well, we're going to say the technical

17   position is that they either are technically a title taker or

18   not.  That's what it turns on?

19        MR. BONDURANT:  It is not technical.  Let me jump ahead

20   and go to a slide that I think will answer your question, and

21   then I'll come back in a minute.

22        THE COURT:  Which number is it in the book, because it

23   might be easier, at least, for me to see it in there, as to

24   what page that is?

25        MR. BONDURANT:  I'm on Page 8 at the moment.

1        THE COURT:  All right.

2        MR. BONDURANT:  But I'm going to go ahead to Slide 7,

3   and then I'll come back, if you will indulge me.

4        THE COURT:  Is it Page 7?

5        MR. BONDURANT:  I'm on Page 11, Your Honor.

6        THE COURT:  All right, I'm with you.

7        MR. BONDURANT:  And this addresses the very question

8   you asked.  Parker versus Brown, which is the leading case

9   from which state action doctrine derives.

10       Let me go back a step.  What *Parker* holds is:  The

11  Sherman Act was never intended by Congress to deal with or

12  limit the power of a state, either directly or through

13  political subdivisions or agencies to restrain competition.

14  It is a statutory interpretation.

15       So the *Parker v Brown* doctrine, the state action defense,

16  although it's called a state action immunity, it starts

17  fundamentally with an interpretation of the Sherman Act, but

18  the Sherman Act just doesn't go that far, and that's true of

19  the Clayton Act and that's true of the FTC's jurisdiction.

20       Now, what did you have involved in *Parker*?  You had a

21  state statute that created an agency, just as we have a state

22  statute that created an agency, namely, hospital authorities

23  in every county in the state.

24       In the California scheme, that was regulating

25  agricultural products.  The state agency could not take action

1    on its own.  That action had to be initiated by a petition

2    from a majority vote of the producers of the particular

3    agricultural product, the competitors who were to be

4    regulated.

5        In this case, it was initiated by the raisin producers

6    who wanted production limitations to prevent others from over

7    producing or driving down prices and so forth, all of which

8    was claimed to be anticompetitive.  So they had to petition

9    the agency, just as Phoebe petitions the Hospital Authority to

10   buy Palmyra.

11       The second step in *Parker* is, however, that when the

12   agency, the California Agricultural Prorate Commission,

13   decides these people may be right, and they propose

14   regulations, those regulations could not take effect of their

15   own force.  They had to be then submitted to a referendum of

16   the competitors who had sought them in the first place, and if

17   the competitors didn't approve it, it did not go into effect.

18       So the industry there was the decision maker in many

19   respects.  They are the people who could initiate the action,

20   the state agency could not, and they are people who could

21   accept or reject the state agencies' regulations after they

22   were proposed.

23       And what does the Supreme Court say on the next page?

24       "Although the organization of a prorate zone is proposed

25   by producers and the prorate program approved by the state

commission must also be approved by a referendum of the

producers, it is the state, acting through the commission,

which adopts the program and enforces it."

"The state itself exercises it's legislative authority in

making the regulation and in prescribing the conditions of its

application.  The restraint on raising prices is an act of

government which the Sherman Act did not prohibit."

What does that tell us in this case?  When the state

decides to vest this power to acquire another hospital in the

citizen board, the state is acting as a state government.  The

fact that Phoebe may ask the Board to take this action does

not take it out of state action immunity.

The fact that Phoebe may desperately want it does it not

take it out of state action immunity.  The fact Phoebe may get

down on its knees and pray and beg the Authority to do it,

does not take it out of state action immunity.

The decision to acquire is a decision made in the way the

state law has said it shall be made, which is by the Authority

which voted to acquire, and the Authority takes title, the

contract reflects that the Authority is the buyer, not Phoebe.

The fact that the money is coming from Phoebe is irrelevant.

**THE COURT:**  That's a question I had for you.  The idea

of petitioning, I think, as argued by the defendants on the

First Amendment law, is that the mere asking, presenting an

idea, such as acquisition of Palmyra by the Authority, or is

1    that narrower than what's alleged to have occurred here, where

2    not just an idea is being presented, but all of the details,

3    all of the ultimate, I guess, construction of whatever the

4    transaction is as alleged by the plaintiff has been done by

5    Phoebe, and, in effect, it's been taken to the Authority, and

6    the Authority says yay or nay.  In other words, you are

7    arguing then that under your interpretation of *Parker* the only

8    thing that has to happen is that a vote take place by the

9    Authority.

10        MR. BONDURANT:  That is precisely our position.  Now,

11   that's not to reject in any respect the other side of this

12   proposition, which is Phoebe is protected under *Noerr and*

13   *Pennington*, the First Amendment right to petition a government

14   agency for action.  In seeking it, even if they have bad

15   motives, the *Noerr and Pennington* cases are classic examples

16   in which in the railroad industry, the Eastern Conference of

17   Railroad Presidents to try to eliminate competition and raise

18   prices, went to Congress to get legislation that was intended

19   to hurt competitors.

20        That was the intent, that was the specific objective, and

21   they succeeded.  And they got sued, and the Supreme Court held

22   in an opinion written by Justice Black, who after all had

23   served in the U.S. Senate and knew more about politics than

24   most members of the Supreme Court, that people petition

25   government for selfish reasons, but that is protected by our

1    Constitution and is outside the scope of the Sherman Act.  And

2    he says, if you interpreted the Sherman Act to prohibit that

3    kind of conduct, you would run head on into the First

4    Amendment.

5        **THE COURT:**  But the plaintiffs argue here, whether you

6    agree with them or not, that they are not alleging conspiracy

7    or bad motive.  They are just saying, you know, that this is

8    -- the transaction was intended to have a resultant

9    transaction that would have an anticompetitive against the

10   public interest effect.

11       **MR. BONDURANT:**  Well, the simple answer to that is, it

12   makes no difference, but they are also wrong.  The affidavits

13   which we have submitted will show to you that in 1986, before

14   there was a Phoebe Putney Subsidiary, before this

15   reorganization in 1991, the Hospital Authority, under its then

16   management negotiated with Hospital Corporation of America to

17   acquire Palmyra in 1986.  And they negotiated for 18 months.

18   The minutes of February 2nd, 1988 reflect that, and that at

19   that point, HCA did not want to sell.

20       And the minutes of February 1989 reflect that the Board

21   wanted to continue those efforts.  In Mr. Wernick's

22   affidavit -- Mr. Wernick was hired in 1988.  He was not there

23   in 1986.  The Board was already trying do this in 1986.  And

24   when he came on board to manage the Authority, at that point

25   he was the manager.  He was an employee of the Authority.  The

1    Authority wanted to do it then.  If HCA had wanted to sell

2    then, we'd have exactly the same case we have today, and

3    there'd be no Phoebe Putney.  It originated with the

4    Authority.

5        In 1991, the hospital was leased under the *Richmond*

6    *County* case to a nonprofit entity, and Mr. Wernick became the

7    president and CEO of that entity, but as he has attested in

8    his affidavit, he continues to report to the Board of

9    Authority, just as he did when he worked for them directly

10   because these are one entity.

11       And under that lease, at the end of the lease, everything

12   that Phoebe Putney, the subsidiary, the lessee, has reverts to

13   the Authority.  Title to the current Phoebe Putney Hospital,

14   title to Palmyra will revert.  They belong to the Authority

15   and will belong to the Authority again, which is exactly what

16   state law contemplates would happen.

17       And Mr. Wernick goes on to describe that throughout the

18   '90s and up to the current date, the Authority Board continued

19   to be interested in acquiring Palmyra, but like many suitors

20   got turned down until they learned in the early fall that

21   maybe HCA would be interested in a deal, and, yes, Phoebe

22   Putney took the lead in trying to negotiate that deal for some

23   very practical reasons which Mr. Wernick describes.

24       One of the things that HCA had established is a condition

25   back in the pre-reorganization days was that this transaction

1    had to be super confidential, because they were afraid if word

2    ever got out that they were trying to sell the hospital to the

3    Authority, they would lose employees, they would lose

4    patients, they would lose all kinds of things that would hurt

5    their reputation, even if the deal fell through.

6        And so they were interested in dealing with someone who

7    could deal with them confidentially, which the Authority

8    cannot in an Open Meetings Act context.  If you get a group, a

9    majority of the Authority together, you are subject to the

10   Open Meetings Act and all the confidentiality that HCA wanted

11   is immediately destroyed, and that was utterly unacceptable in

12   1986, 7, 8, all the way through and unacceptable in 2010 and

13   2011 to HCA.

14       So Mr. Wernick went, and the affidavits attest,

15   Mr. Wernick's affidavit, Mr. Rosenberg's affidavit,

16   Mr. Lingle's affidavit, all attest that he came to them in

17   September and said, we have discovered that HCA, after all

18   these years, is interested.  Are you still interested in our

19   proceeding?  And the answer was, yes, that had never changed.

20       I might digress and say, remember, Mr. Rosenberg's father

21   had been a member of this Authority as well in the earlier

22   years.  And so, speaking to the chair and vice-chair, he got

23   an informal go ahead, and as those negotiations proceeded,

24   when they reached a deal, as the affidavits attest, they then

25   met individually with members of the Authority.  They met

1    individually with Mr. Ghiglieri.  They met individually with

2    all the other members of the Authority who were required

3    individually to sign confidentiality agreements because at

4    that point the Authority had not yet taken a vote.

5        But in that individual contact, what was happening was

6    they were taking an informal straw pole.  The practical

7    question is:  Is there opposition in this Authority?  If this

8    comes up for a formal vote, are you still interested in

9    buying?

10       The terms were explained in these informal discussions,

11   and uniformly every member of the Authority said, we think

12   it's a good idea, bring forward formally.

13       The Authority met and voted to proceed with the

14   transaction and held a formal meeting on December 21, at which

15   the documents which had been informally consulted with members

16   of the Authority, including their lawyers, Mr. Jay Reynolds of

17   Perry and Walters who represents them, had reviewed all of

18   those documents beforehand.

19       Everybody was of one mind on the Authority that this was

20   good, and when it comes to a formal meeting, it was approved

21   unanimously and passed.  And I will show you some of the

22   documents that were seen there in that process.

23       But let me skip ahead, and I'm getting ahead of myself

24   slightly, but I want to make --

25           THE COURT:  I apologize, I've interrupted you on a few

1    occasions, and I'll get around to Mr. Reilly and his crowd

2    equally, I assure you.

3         MR. BONDURANT:  No.  Your Honor, you and I are here to

4    talk about this case, and when you've got a question, I hope

5    I've got an answer, and if I haven't got an answer, I haven't

6    done my homework.

7         THE COURT:  All right.

8         MR. BONDURANT:  But let me skip ahead, and I will show

9    you the documents on this in a minute.

10        Not only was this transaction approved on December 21st

11   by the then members of the Authority by a unanimous vote,

12   after a great deal of study and care by those members of the

13   Authority, contrary to what the FTC alleges, but after this

14   lawsuit was filed in April, after they made all of these

15   allegations about being straw men and rubber stamps and

16   ignorant and not doing this and not doing that, another

17   meeting of the Authority was convened on May 5th.

18        I attended that meeting, and I'm not going to talk about

19   privileged things at the meeting.  But as the minutes reflect

20   and as the resolution reflect, the members of the Authority

21   each were given copies of the public version -- we couldn't

22   give them the confidential version of the FTC's complaint --

23   and so forth, and reviewed all of those allegations in detail

24   that alleged all of these bad things about the members of the

25   Authority and all the things they supposedly didn't look at

and didn't do and weren't smart enough to do or should have
done, and all this other stuff, and the members of the
Authority were given an opportunity to reconsider.

They reviewed the things the FTC said they weren't told.
Well, by then they knew of those things, if they had not known
about them before.  In knowing about them, the vote again was
unanimous.

And one of the new voting members was Mr. Hayes, who is a
member of the Dougherty County Commission who had not been a
member of the Authority back in December who had come onboard
in January and was taking a fresh look at this through fresh
eyes as an elected official in the county appointed by the
County Commission to the Authority, and he also voted for it.

So the suggestion that this was not a decision of the
Authority, that they did not act on adequate information or
full information, they acted on all the information the FTC
claimed that they should have known on May 5th, and they had
known all of this back in December.

But however that is, the beginning, middle, and end of
that argument is, it is not up to an antitrust court to decide
whether or not they were diligent or not.  That is put in
another court.  And exactly what *Columbia* holds, the holding
of *City of Columbia* is that we do not allow antitrust
plaintiffs to deconstruct or second guess or inquire into the
intent of members of a public body in taking an official

1    action.  The official action speaks for itself.

2         If the official action is authorized under state law, it

3    is immune from antitrust law, and it doesn't make two hoots

4    and a holler whether that official action was as alleged and

5    found by a jury in that case to be the product of conspiracy.

6         Now, you ask, you say, well, the FTC says, well, that's a

7    conspiracy case.  That argument proves too much.  Conspiracy

8    and bribery are felonies.  Conspiracy to violate the antitrust

9    laws is a felony under the Sherman Act if it's not immune.  It

10   carries corporate fines, and I'm forgetting the fine numbers.

11   They're well in excess of ten million dollars, jail sentences,

12   the whole thing.

13        If conspiracy doesn't invalidate the state action

14   immunity of the *City of Columbia* and the people who've sought

15   the restrictions on the plaintiff's ability to compete in

16   *Columbia*, then it is absolutely certain that supposed

17   inattention to public duties would not deprive an agency of

18   state action defense.

19        That issue, in fact, was considered in various ways in

20   both *Crosby* and in *Lee County,* particularly in *Crosby*.  The

21   arguments were made, well, this might not be authorized in

22   this way or might not be authorized in that way.  *Crosby*

23   rejected that.  And likewise, in *City of Columbia*, Justice

24   Scalia says:  You cannot allow a plaintiff in an antitrust

25   case, or the FTC in this case, to turn the question into a

1    debate about whether or not you were sufficiently authorized

2    in some technical sense because you were not acting in the

3    public interest, that you weren't diligent enough, you weren't

4    paying attention enough.

5          He considers all of those arguments, and says:  Those are

6    not arguments for a federal court under the antitrust laws.

7    They are not decisions to be made by juries.  That would break

8    down the Brightline Defense of the state action defense, and

9    would have profound questions of interference with state

10   sovereignty and state jurisdiction to have the federal courts

11   under the antitrust laws second guessing those decisions.

12         So, if Your Honor will permit me, I'll go back to where I

13   left off, and I'll try not to be terribly repetitious.

14             **THE COURT:**  That will be fine.

15         **MR. BONDURANT:**  Let me go back simply to the -- I want

16   to go back one more step.  We haven't really talked about the

17   lease claim.

18             **THE COURT:**  All right.

19         **MR. BONDURANT:**  But the simple answer is the plaintiffs

20   don't even have standing on the lease claim.  Why do I say

21   that?  Because there is no lease.  And the very case which

22   they cite in their brief for standing, <u>Loujan against</u>

23   <u>Defenders of Wildlife</u>, holds this:

24         "To have standing under Article III, a plaintiff must

25   have a direct and concrete injury to a particularized legal

1    interest that is not conjectural or hypothetical."

2        Not conjectural or hypothetical.  The arguments about the

3    lease are conjectural and hypothetical because there's no

4    lease.  There is no lawyer with the FTC who can get up and

5    tell you today what the terms of that lease are going to be.

6        **THE COURT:**  What do you think supports their allegation

7    or contention that Phoebe will have immediate control of

8    Palmyra upon the completion of the acquisition by the

9    Authority?  What is that based on?

10       **MR. BONDURANT:**  Upon completion of the acquisition, the

11   Authority is going to have Phoebe manage because we cannot

12   lease currently under state law for 120 days even if we close

13   the transaction today.  That is, we've got to go -- A, we've

14   got to negotiate a lease, and if the lease is not

15   satisfactory, the Authority won't approve it.

16       Secondly, once the lease is negotiated, it has got to be

17   submitted to a public hearing here in Dougherty County on 60

18   days notice, and after that public hearing, if the Authority

19   is still satisfied with the lease, it cannot go into effect

20   for another 160 days -- for another 60 days, a total of 120

21   days in that process.

22       During the interim the Authority is going to own Palmyra,

23   and the Authority is going to control Palmyra, and the

24   Authority can either have Phoebe Putney manage it, or they can

25   have someone else manage it.

1      Let's assume that Phoebe Putney does manage it.  That is

2   the current plan.  In managing Phoebe Putney -- excuse me,

3   managing Palmyra for the Hospital Authority, Phoebe Putney

4   will be acting as an agent of the Hospital Authority.  An

5   agent, which is the same as the Hospital Authority itself and

6   will be entitled as an agent to a state action immunity and

7   defense from any criticism.

8      Why do I say that?  I refer you specifically to the

9   *Crosby* case, *Crosby* against Hospital Authority of Valdosta and

10  Lowndes County.  The peer review committee, the doctors who

11  served in peer review were not employees of the hospital.

12  They were held by the Eleventh Circuit to be agents of the

13  hospital in exercising the peer review function, and as agents

14  of the hospital they were held to be immune from the

15  plaintiff's antitrust complaints that they were engaged in a

16  conspiracy to keep this doctor off the staff --

17      **THE COURT:**  Didn't the court, though, kind of make it

18  pretty clear that they felt that the Authority itself was

19  actively supervising or involved with the peer review?

20      **MR. BONDURANT:**  No, Your Honor.  The holding is the

21  contrary, both -- In *Crosby*, the holding is where the

22  authority is doing something directly or through its agent,

23  there is no active supervision requirement.

24      **THE COURT:**  I understand.  That's what I am saying.

25  Here it was apparently apparent that the authority was acting,

1    so the court didn't go further to see, I guess, the quality of

2    that action or the quantity of the activity.

3         MR. BONDURANT:  I think we may not be communicating.

4    The authority -- The authority owned the hospital.  The

5    hospital staff selected the people who were engaged in peer

6    review.  The plaintiff's very point was that these people were

7    engaged in a conspiracy and the authority hadn't supervised it

8    and hadn't prevented them from engaging --

9         THE COURT:  I recall that, and I'll go back and look

10   at.  We don't need to -- We won't split hairs over that, but I

11   thought there was something about the overall facts and

12   circumstances that give an indication that there was some

13   involvement by the authority itself in the process, whether it

14   was ultimately making the day-to-day determinations of it or

15   not was maybe different, but there was something I thought in

16   the case that made the court just take it pretty much at face

17   value that there was activity clearly by the authority so they

18   need not look at it any further is what I'm getting at.

19        MR. BONDURANT:  Under the management agreement that is

20   contemplated, the authority retains total control and

21   supervision far beyond what is required in *Crosby* over the

22   actions of the manager who is its agent.  So --

23        THE COURT:  I get your point that you are making.  I

24   understand what you're saying.

25        MR. BONDURANT:  The transaction contemplated here, the

1    Authority is the owner.  It is as a matter of law got to have

2    somebody to manage it.  You can either hire people who are

3    your agents to manage it or you can hire a management company

4    who are your agents to manage, but under the contemplated

5    contract the language itself expressly says the Authority

6    reserves control, operational and so forth over --

7        THE COURT:  I'll wait and hear from Phoebe on this.  I

8    guess I've asked you everybody's position, and you very

9    cooperatively responded no matter what I asked about it.  I'll

10   ask the Phoebe lawyers about this, but what the plaintiffs are

11   alleging essentially is that it's Phoebe that's really the

12   actor here, and it is therefore not exempt from the antitrust

13   laws and would have absolute control and possession of Palmyra

14   upon the completion of the transaction if it goes through by

15   the Authority and will have what it wants, so to speak, as

16   opposed to simply being an agent of the Authority.

17       And as I think Phoebe argues, that they are not under the

18   Authority or subject to the jurisdiction of antitrust or FTC

19   as alleged with their conduct prior to the transaction, but in

20   effect are arguing that they become, I guess, immune once they

21   act as agents after the transaction has taken place, is that

22   right?  Is that a fair --

23       MR. BONDURANT:  I think I will let them speak for

24   themselves, but I'll speak for them too in some respect.

25       THE COURT:  I want to kind of get everybody's

1    opinions.

2         MR. BONDURANT:  I'm not bashful.  But I think Phoebe's

3    position accurately stated is twofold.  The Authority has a

4    state action exemption.  Phoebe, because they initiated the

5    transaction -- this is up to the closing -- are immune as

6    matter of law under *Noerr-Pennington.*

7         THE COURT:  That's under the petition.

8         MR. BONDURANT:  Then if the Authority enters into a

9    contract with Phoebe to manage the Authority -- to manage

10   Palmyra, the Authority has absolute state action immunity to

11   enter into that contract for the same reason that it has the

12   same immunity to acquire the property in the first instance.

13        THE COURT:  So in effect there is no defendant that can

14   be properly reached under any of the theories alleged by the

15   FTC?

16        MR. BONDURANT:  That is correct.  The cases, *Charley's*

17   *Taxi*, the other cases that we cite, hold precisely that if the

18   Authority has the power under the antitrust laws to enter into

19   the contract, as we plainly do to hire a manager, whoever we

20   enter into the contract with has state action immunity,

21   because if you ruled any other way, the state actor couldn't

22   carry out its functions by a contract.

23        And that is *Charley's Taxi*, that is the seminal case,

24   that is the whole series of cases to which the other side

25   can't cite anything.

1    My second proposition is, however, that under *Crosby*, in

2    dealing with the management contract, Phoebe Putney would be

3    an agent, and *Crosby* squarely holds that the agent of a state

4    action immunity entity, a hospital authority, is entitled to

5    the same immunity as the authority itself as an agent.  That's

6    sort of two ways of saying the same thing because you get to

7    be an agent by a contract.

8    But that is clearly established law.  So in the before

9    part of the transaction, before December 21 and before this is

10   allowed to close, everything Phoebe does is immune under the

11   antitrust laws as a part of the *Noerr-Pennington* defense.

12   After the transaction closes, and we, the Authority, own

13   the property, what we do with it has no antitrust implications

14   whatsoever.  Phoebe is protected because a contract with a

15   protected agency is also protected or an agent of a protected

16   agency is also protected.

17   So, let me take you a little further down the road on the

18   lease claim, and that is, once the Authority acquires Palmyra,

19   what the Authority does with Palmyra thereafter, as long as

20   it's authorized by state law, has no antitrust significance.

21   That is, once the Authority acquires Palmyra, the same entity

22   that owns Phoebe Putney, which it has leased, will own

23   Palmyra, and the Authority could, if it chose, tear down

24   Palmyra entirely.  It would be eliminated as a competitor, the

25   effects on competition would be what they are, but as an owner

1    of the property, we, the Authority, could do that.

2        We're not doing that.  Instead our intention is to

3    operate it as a coordinated entity with Phoebe Putney, which

4    we already own, in order to expand health services available

5    to people in Albany and Dougherty County and to do so at a

6    cheaper price than we can fulfill those needs in any other

7    way.  But the effects on competition --

8        **THE COURT:**  So you are arguing that a single provider,

9    otherwise described as a monopoly, is a means to reduce

10   prices?

11       **MR. BONDURANT:**  Well, I'll get to that at the right

12   point, but --

13       **THE COURT:**  All right.

14       **MR. BONDURANT:**  -- what I am saying in simple terms is

15   that this is an extraordinary bargain.  The opportunity to buy

16   for about $785,000 a room, a bed, a hospital that this

17   Authority has some experience with of having helped Sumter

18   County after the tornado rebuild a hospital and it cost about

19   1.6 million a room -- a bed.  And this Hospital Authority has

20   capacity problems.  They're having to divert patients.  They

21   have shortage of neonatal problems, they have shortages of

22   operating rooms and other things, and so you need additional

23   facilities.  You can either build them or you can buy them.

24   They chose to buy them.

25       Now, if they're not allowed to buy them, and the other

1    side can cite no case where a court has ever prevented a

2    public body from buying where a purchase was authorized by

3    state law, the choices are then to continue in a shortage

4    position, which hurts the healthcare of the people of this

5    community, which it is the mission of the Hospital Authority

6    to serve, to build a facility, to meet those needs at greater

7    expense than we could buy the same facility.

8         Okay.  Let's assume we build it at greater expense.  What

9    do you do if you've got to pay 1.6 million for something that

10   the community needs?  You've got to get the money from

11   somewhere.  You can't print it.  So what are you going to do?

12        You're either going to pass the added cost on to

13   consumers, use of the hospital in the form of hospital

14   charges, you're going to lay off people to save money

15   somewhere else in order to pay for it and reduce service when

16   your mission under the Hospital Authority's law is to expand

17   service, make additional facilities available to the

18   community, or you're going to ask Dougherty County for a

19   taxpayer subsidy to enable you to do it so you don't have to

20   raise prices, and you don't have to cut service.

21        I don't think there are any fourth alternatives, and I

22   happen to live in Atlanta where there is a hospital authority

23   for Fulton-DeKalb County that gets a 80 million dollar subsidy

24   a year from Fulton and DeKalb County to operate.

25   This Hospital Authority for years has carried the whole

1    indigent care load for Albany and Dougherty County and has

2    never gotten a dime of subsidy from the taxpayers of this

3    county.

4         **THE COURT:**  That, in effect, is a merits argument.  In

5    other words, that the FTC brings an action, doesn't mean they

6    win an action, necessarily.

7         **MR. BONDURANT:**  No, Your Honor, it is explaining, I

8    believe, the good faith, the business rationale, the judgment

9    of the members of the Hospital Authority when given a choice,

10   do you buy Palmyra or not buy Palmyra, what would be your

11   thought process if you were in those positions.

12        Do I buy at an economical price to meet my capacity needs

13   to provide additional services, which is after all under the

14   statute the mission of the Hospital Authority is to provide

15   hospital care and health services to the community, to provide

16   additional services that it does not have, and to try to the

17   extent you can to do so at the lowest possible cost.

18        The purchase of Palmyra fulfills each of those three

19   missions, and when these people come in and try to second

20   guess that decision of a citizen board and tell them they're

21   straw men and rubber stamps and dumb and stupid for doing it

22   and that they have evil, anticompetitive motives or that

23   they're being used and manipulated by Phoebe Putney or by Joel

24   Wernick or some other Rasputin in this process, they do not

25   give these people the justice which they deserve, and they

1    should be ashamed for making those allegations.  They are

2    totally baseless as we have in these affidavits demonstrated,

3    and as I can demonstrate in the PowerPoints that were

4    considered at both meetings.

5        So running a hospital authority is not a piece of cake.

6    It requires judgment, and the State of Georgia has decided to

7    vest that judgment in a citizen board.  They're not

8    compensated, they serve as public service, they are appointed

9    by local elected officials, and that is the mechanism the

10    State of Georgia has chosen.

11        That's why I think *Parker versus Brown* is so important,

12    because the criticism here in *Parker* was, you are really

13    letting the raisin producers decide this.  They initiate it.

14    They have to approve it at the end.  And the Supreme Court's

15    answer to that was the State of California has chosen the

16    mechanism.

17        The State of California has told you how state action

18    shall be exercised, and when it is exercised by the mechanism

19    they have chosen, it has the force of law, and it is

20    absolutely immune from the antitrust laws.  That is precisely

21    what I'm saying about the State of Georgia when they vest this

22    power in a citizen board.

23        Let me go ahead and so we will proceed.  To go back to

24    the fundamentals.  The establishing proposition of everything

25    comes out of the *City of Columbia* case, but out of many others

1  is simply that the Sherman Act does not apply to

2  anticompetitive restraints imposed by the states, and that

3  means imposed by the state directly by legislation.  It means

4  imposed by the state by authorizing an agency instrumentality

5  or political subdivision of the state to take action that has

6  anticompetitive effect.  The Sherman Act is not intended to

7  apply.

8       Again, pick another case, Eastern Railroad Presidents

9  Conference versus Noerr, the case from which the

10  Noerr-Pennington immunity arises, where restraint upon trade

11  or monopolization is the result of governmental action, no

12  violation of the Sherman Act is made out.

13       And then Parker which we've already discussed, and I

14  won't repeat that again.

15       THE COURT:  Do you disagree with the position of the

16  Attorney General which suggest, I think, in the general

17  argument, that the state's immunity and the immunity of a

18  subdivision or agency of the government are not exact in terms

19  of their parameters?

20       MR. BONDURANT:  I don't think he can make a valid

21  distinction.  If the legislature had passed a statute that

22  said, acquire Palmyra and vested it in the Hospital Authority,

23  that would have eliminated competition, and that would have

24  been immune under Parker.  The fact that the state has

25  delegated to hospital authorities the power to make those

1     decisions and local communities whether to acquire or not

2     acquire does not change the situation.  The latter is entitled

3     to *Parker* immunity as much as if the state did it itself.

4          **THE COURT:**  All right.

5          **MR. BONDURANT:**  And it's *Lee County*, *Crosby*, *Askew*, the

6     Alabama case, *Citrus County*, the earlier Florida case cited in

7     *Crosby*, all hold that instrumentalities to whom a state had

8     delegated powers that resulted in eliminations of competition

9     were immune.  So, I don't think the state could delegate any

10    power broader than theirs, but when they have delegated the

11    power, they have defined in giving you that power the state

12    action that makes it immune.

13         I've already dealt with the Attorney General, that he's

14    the legal advisor to the executive department.  The one point

15    I did not mention is everything you've seen from the Attorney

16    General is not in a formal brief -- I mean, is not in a formal

17    opinion.  This is not one of these attorney general's opinions

18    that you see --

19         **THE COURT:**  I understand it's a legal brief.

20         **MR. BONDURANT:**  It's just an argument here.  In the

21    case that we cite Bowen against Georgetown University,

22    deference to what appears to be nothing more than a agency's

23    convenient litigating position would be entirely

24    inappropriate, and that is the law.

25         So the Attorney General, with all deference to the

1    Attorney General and his staff, what he says in this case is

2    entitled to no more or any less deference than what I say or

3    what any other lawyer says.  They're advocates.  They are free

4    to advocate their position, but it carries no greater weight

5    because they claim to be the Attorney General and wrap

6    themselves in the flag of the state.

7        The point I had made earlier, it is irrelevant that this

8    acquisition was initiated by Phoebe Putney.  Why is it

9    irrelevant?  Because under *Parker v Brown*, the

10   regulations there were initiated by the raisin producers.

11   That's the way the state law allowed it, and there the

12   regulations could not go into effect without a referendum of

13   the raisin producers.  Here, the position of Palmyra depended

14   on the vote of the Board of a Hospital Authority, not a

15   referendum of Palmyra or anybody else.

16       The quote in *Parker* we have seen before.  *Lee County*,

17   with which Your Honor is familiar, I could be copying your

18   opinion in the earlier litigation between Palmyra and Phoebe

19   Putney.  The three standards that must be met in order to have

20   state action immunity for a hospital authority is that it's

21   got to be a political subdivision of the state, the state has

22   to, through statute, authorize the particular action, and the

23   state through statute has to have a clearly articulated state

24   policy.

25       The argument here is that the Attorney General and the

1    FTC concede the first two points, which are obvious.  The

2    third point, however, is the one which they choose to debate,

3    but what the FTC is seeking to do in this case is to have you

4    overturn *Lee County* which they lost.  They are challenging

5    into the very teeth of the *Lee County* ruling.

6        In *Lee County*, the Eleventh Circuit rejected the FTC's

7    narrow definition of the term "foreseeable," which would have

8    required that the displacement of competition be inevitable,

9    ordinary and a routine outcome of the statute, or inherently

10   likely to occur.

11       The Court said:  Clear articulation merely requires that

12   anticompetitive conduct is the foreseeable result of the

13   legislation.  And then the court says -- adopts its own test,

14   not the test advocated by the FTC.  The test is whether the

15   anticompetitive conduct was within the range of possibility as

16   contemplated by the legislature, even if not routine, ordinary

17   or inevitable.

18       As I have said before, you could not authorize a hospital

19   authority in Georgia to acquire another hospital only in its

20   own county without being able to foresee and know that the

21   inevitable effect of that transaction would be to eliminate

22   competition by at least one competitor.  If there were two

23   hospitals, there would then be one.  If there were three

24   hospitals, there would then be two.  If there were four

25   hospitals, there would then be three.  That would meet even

1   the FTC's inevitability tests.

2        But look at the language of the statutes.  In *Lee County*,

3   the Court goes through the process of comparing.  The language

4   of the Alabama statute in *Askew,* the DCH Hospital Authority in

5   Alabama was authorized to acquire, construct, reconstruct,

6   enlarge, expand, and so forth, hospital facilities.

7        In Florida, in *Lee County*, the Florida Legislature did

8   not mention acquisition.  It simply gave the board the power

9   to establish and provide for operation and maintenance of

10  additional hospitals.

11       The Court in *Lee County* ruled that even though the word

12  "acquisition" wasn't mentioned, the county had implicit

13  authority to acquire a competing hospital in a county in which

14  there were only three others.  The power of acquisition would

15  necessarily increase Lee County's market share, and, in fact,

16  it increased it from 49 percent to 67 percent, which under the

17  FTC's definition of monopoly power is right on the edge of

18  monopoly power, 67 percent or more is deemed to be monopoly

19  power.

20       Florida, also, like Georgia, had a CON statute that

21  restricted the supply of hospitals or the availability of

22  entry and was anticompetitive.  *Askew*, in contradistinction,

23  was explicit, and the Court goes on to say, and this rejects

24  an argument that the FTC or the Attorney General make, that in

25  Alabama, the Alabama Legislature had gone further to say that

1   this statute was to displace competition.  And the Eleventh

2   Circuit said that made no difference to distinguish it from

3   the situation in Florida where there was no such language

4   because the Alabama Legislature went further than was

5   necessary.  It is the language of the statute, not that

6   statement of intent which really controlled.

7       In Georgia, we have all of those factors favoring us and

8   more.  The Hospital Authority is expressly authorized to make

9   acquisitions, not merely in one statute, but in two.  In 75-4

10  they are expressly authorized to make acquisitions to acquire

11  projects, and in 75 -- excuse me, in 71-5, projects are

12  expressly defined to include the acquisition of hospitals,

13  plural, for use under the supervision and control of the

14  authority and the leasing by the Hospital Authority for

15  operation by others.

16      So the very two things we are talking about here, buying

17  a hospital and leasing it, are expressly authorized in Georgia

18  law, and leasing is, again, authorized in another Section, in

19  31-7-75(7)

20      And the use of the plural makes it clearer than ever that

21  they thought that hospital authorities could be acquiring more

22  than one hospital, but they could only acquire them in the

23  same county.

24      So as in *Lee County*, the hospital authority in Georgia is

25  restricted to acquiring in the same county.  As in *Lee County*,

1    the power of acquisition was granted.

2        And let me rephrase that, unlike *Lee County*, instead of

3    just granting it to one little hospital and one county,

4    Georgia granted it in 1941 to every hospital authority in

5    every county.  That is, any effects on competition were

6    clearly recognized to be statewide, pervasive, and likely

7    given the demographics of Georgia and the number of counties

8    and the number of cities to whom that same power was granted.

9        As in *Lee County*, Georgia has a certificate of need

10   process which the court looked on as reinforcing the idea that

11   the legislature could expect a reduction in competition.

12       So the net of all of this is that under *Lee County*, which

13   is a controlling decision, the Authority is a political

14   subdivision, it has express power to acquire Palmyra, its

15   acquisitions are in the same county, Georgia has a CON Rule,

16   displacement of competition was both foreseeable and

17   inevitable, and state action immunity applies.

18       Let me step back, because I think the FTC ignores an

19   important point.  In Georgia, and I'm quoting the Georgia

20   Supreme Court in *Bradfield* in this slide, <u>Bradfield against</u>

21   <u>Hospital Authority against Muscogee County</u>:

22       "The obligation to provide for the health of the people

23   is a governmental obligation."

24       So we're talking about a governmental function, according

25   to the Georgia Supreme Court.  The Hospital Authority's law

1   was adopted to carry out this governmental obligation.  The

2   code section says specifically it was adopted, quote, "to

3   provide a mechanism for the operation and maintenance of

4   needed healthcare facilities in the several counties and

5   municipalities of the state."

6        And the quote from *Bradfield* is very instructive, and

7   we're talking about Georgia public policy with which the

8   Attorney General cannot disagree:  Hospitals, whether owned

9   directly by a county or city -- that was Athens when I grew up

10   before the hospital law was passed -- or by an authority --

11   that is the situation here -- are designed and intended to

12   serve identical purposes of discharging the governmental

13   obligation to provide for the health of the people.

14        Under the Hospital Authorities Law, the government

15   obligation can be discharged in three ways:  By the

16   acquisition of existing hospital facilities.  That's what this

17   Hospital Authority did when it was created in 1941 when it

18   bought Phoebe Putney that had been constructed in 1911 with

19   charitable funds.  It can do so by the construction of

20   completely new hospitals, which is the build option which the

21   Hospital Authority members considered, or by the sale or lease

22   of the hospital to others.

23        So you can acquire, you can build, you can sell, or you

24   can lease to meet what the Georgia Supreme Court has said is

25   the public obligation under the Hospital Authorities Law.

1   I'll try to cover this quickly, but, again, the FTC's

2   attack in this case is to try to impeach the transaction by

3   attacking the members of the Hospital Authority.  But I would

4   remind the Court that they are appointed by duly elected

5   officials, and that is a state decision made by the General

6   Assembly and the Hospital Authorities Law.  They are not

7   compensated and are not full-time employees.  That was a

8   decision made by the General Assembly.

9   The General Assembly could have decided to have hospitals

10  run by professional managers and full-time employees.  It

11  chose instead to vest this in local people appointed by local

12  elected officials who serve as a public service.  They take an

13  oath to faithfully and fairly discharge all the duties and

14  responsibilities of their office, and these people have done

15  precisely that, and there is no evidence that they haven't.

16  They are similar to directors of a corporation in that

17  they are not expected to do the day-to-day management and

18  micromanage the hospital, or when they lease it to a

19  third-party entity, to interfere with that management.  That

20  would be contrary to the leasing provision.

21  The role is to take care of the public health of the

22  community, to expand services, and try to reduce costs.  And

23  the members of the Hospital Authority, seven out of nine of

24  whom happen to be here, are respected members of this

25  community.  I expect Your Honor knows some of them.  Others,

1   some of the members, like Mr. Reese, has been a former

2   chairman of the Dougherty County Commission.  He's been a

3   former chairman of the School Board, has a long history of

4   public service.

5       Mr. Hayes, who is currently a county commissioner.  Vice-

6   Chair of the Authority, Mr. Lingle, formerly served for many

7   years on the Dougherty County Commission.  Dr. Wolinsky is the

8   chief of the medical staff at Phoebe Putney.  Dr. Inman is a

9   former obstetrician.  Mr. Rosenberg is a retired businessman

10  here whose father was a member of this Authority before him.

11      Mr. Ghiglieri was the production manager at Proctor &

12  Gamble for 35 years, and himself, has built many facilities as

13  he attests in his affidavit and evaluated this transaction

14  from the point of view of somebody whose been there and done

15  that and thought it was a good idea.

16      It is unfair and, frankly, reprehensible that they're

17  trying to collaterally attack the decision-making by these

18  public officials as a way to get around *Lee County*.  They

19  cannot cite a single case that has ever so held, not a single

20  case.

21      And as we have repeatedly said in our briefs, *City of

22  Columbia* rejects as an attack on state action a jury finding

23  that there had been a conspiracy between members of the city

24  council and the competitor to eliminate competition on

25  billboards from Omni and Columbia, South Carolina, holding

1    that you cannot go behind the official decision of those

2    people.  And if you can't go behind for a felony or alleged

3    bribery, you darn well can't go behind based on any of the

4    stuff that the FTC has thrown at the members of the Authority.

5         To get around *Lee County* they try two tactics.  One is to

6    simply change the facts.  They say in their brief, this is not

7    an acquisition by the Authority, this is an acquisition by

8    Phoebe Putney.  Well, the contract shows quite the contrary.

9    And, secondly, they say -- they try to second guess the

10   decision of the Authority.

11        The actual language of the contract controls over

12   contrary allegations of the complaint.  Just to pick one

13   Eleventh Circuit decision, Crenshaw against Lister.  It is the

14   law of this Circuit that when the exhibits contradict the

15   general conclusory allegations of the proceeding, the exhibits

16   control.

17        Thus, the allegations in the complaint that the members

18   of the Authority were straw men, that, in the briefs, that

19   this was an acquisition by Phoebe Putney and not by the

20   Authority, are argumentative legal conclusions that have no

21   weight whatsoever on a motion to dismiss, and what controls is

22   the contract document itself.

23        Phoebe's effort -- The plaintiffs' effort to rewrite the

24   contract is also foreclosed by the parole evidence rule.  Your

25   Honor knows, and you were a state common law judge before you

1    were on the federal bench, the rule of contract law, that a

2    party cannot come in and contradict the plain and unambiguous

3    terms of a contract.

4         But that evidence is excluded by the parole evidence

5    rule.  It is also excluded by the best evidence rule where the

6    contract speaks for itself and not what the lawyers say the

7    contract means.

8         So the allegations about rubber stamps and straw men and

9    so forth made great press and got the FTC a lot of headlines

10   in various newspapers, but are totally irrelevant to this

11   case.

12        I mentioned earlier that I would talk a little bit about

13   the meeting on December 21.  I have given you the background

14   as shown by the affidavits that the members of the Authority

15   when they came to the meeting had been consulted from

16   September forward about this transaction and had authorized

17   it.

18        But this PowerPoint, which is one of the exhibits that we

19   have put in, it is an attachment to Exhibit 1, was

20   demonstrated to the members of the Authority at the December

21   meeting:  Capacity challenges.  It was laid out for them.  The

22   intensive care, diversion of patients, rehabilitation beds

23   were short, and neonatal facilities, in particular, were

24   short, and were overutilized.

25        The members of the Authority were given two choices about

1    how do you address the capacity challenges:  Recognizing that

2    your statutory responsibility is to meet the healthcare needs

3    of this community.

4         Strategic consequences were laid out for them on the next

5    slide:  Buying would give you immediate access to 250 beds.

6    It would avoid costly disruption of construction.  It would

7    allow you by bringing these beds on line to create additional

8    revenue.  It would create economies of scale.  It would reform

9    the infrastructure.  And, it would allow you to create a

10   center for excellence for trauma.

11        And, if you don't buy, then what are your choices?

12   Unless you're going to leave these needs unmet, you're going

13   to have to invest heavily in existing campus without any

14   assurance of timely approval of CONs for beds.  That could

15   take years.  What happens to the patients in this period of

16   delay?  They continue to be diverted.  They continue to be

17   deprived of facilities because of the shortage of facilities

18   at Phoebe.

19        Thus, the Authority made a strategic decision.  They had

20   authorized previously management to approach HCA.  HCA agreed

21   to sell, the transaction structure is the same essentially as

22   in the past.  The transaction has been negotiated subject to

23   the approval of the Authority and a public vote.  If the

24   members of the Authority had voted five to four, there being

25   nine members, to reject this on December 21, it would have

1   been a dead bird, and we wouldn't be here.  Instead they voted

2   unanimously to go forward.

3       And given the things the FTC said they did not know, here

4   is the slide from December 21:  The purchase price of 195

5   million, a break-up fee of 35 million, which was insisted by

6   HCA, a closing of as soon as possible, and the asset purchase

7   agreement, which is on the board over here and attached as an

8   exhibit, that is the approval of that particular contract.

9        So the assertion that the members of the Authority

10  didn't know about the break-up fee is contradicted by written

11  documents in the record and by the affidavits of the members

12  of the Authority.

13      And why was there a break-up fee?  Now, the FTC says that

14  that was terrible judgment, terrible judgment.  In the AT&T

15  acquisition of Verizon, the break-up fee, I believe is

16  something like 6 billion dollars.  Because the acquiring

17  company knows that when it becomes public, that they are on

18  the auction block and for sale, if the deal doesn't go

19  through, their business suffers and suffers greatly, and that

20  is precisely why HCA insisted on that provision.

21      And the Authority agreed to it, believing correctly that

22  their transaction is immune from state law, that they're going

23  to be allowed to close, and that this is going to be a moot

24  question.  They'll never have to pay it.

25      So on December 21 the vote was unanimous, and as I

1   mentioned earlier after the FTC filed its complaint, after the

2   FTC made all of the charges about rubber stamps and straw men,

3   after the articles appeared in the Albany paper parroting all

4   of these charges, the members of the Authority held another

5   meeting on May 5th.

6        By this time Mr. Hayes had joined the Authority.  And

7   this is the PowerPoint which is attached as an exhibit to

8   Defendant's Exhibit 1, that was presented to them at the

9   meeting.  This is only part of it.

10       Again, outlining the unmet needs of the Authority:  Not

11  enough intensive care beds.  They've been on a divert status

12  for an average of six times monthly.

13        A divert status means people needing intensive care have

14  got to be sent to other hospitals outside the county.  That

15  does not serve the citizens of this county.

16       Not enough rehab beds.  Neonatal intensive care at

17  capacity and beyond.  Premature babies cannot be accommodated.

18  They need a robotic surgical area.  They need a growing

19  medical education center and space for students, and patients

20  here want more private rooms.

21       The choice, again, is laid out, to buy or build, and the

22  options again discussed is strategic consequences.  The

23  strategic decision:  HCA is a willing seller, HCA requires

24  strict confidentiality during the appraisal and negotiating

25  process.  The Authority is a willing buyer, and so forth.  The

1    Authority voted at the public meeting.  The buy or build

2    option is laid out, and this time the numbers from the

3    construction up in Sumter County were presented to the

4    Authority:  1.6 million per bed to replace the hospital up in

5    Sumter County that was destroyed by the tornado two or three

6    years ago, compared to the price under this agreement of 786

7    thousand.

8        The benefits of consolidation were laid out:  Future

9    immediate growth, expedite trauma center, more room for

10   medical training and nursing, job creation, more private

11   rooms, local ownership and governance under a not-for-profit

12   strategy.  That is, HCA is a proprietary corporation that

13   tries to make a profit for its shareholders.  We have no such

14   incentives.

15       Again the Authority voted unanimously, knowing everything

16   the FTC had said, to reaffirm the transaction as being in the

17   best interest of the people of the community.  The resolution

18   is attached -- I apologize, I can't read it from here.  My

19   glasses are not any better than yours.

20       But the resolution says:  "After reviewing the

21   allegations of the complaints of the plaintiffs, the members

22   of the Authority expressly reaffirm and ratify the previous

23   decisions contained and reflected in the prior resolutions it

24   being the Authority's judgment in determining such acquisition

25   continues to be in the best interest of the citizens of

 1    Dougherty County and will further the Authority's principal

 2    mission to provide citizens quality healthcare at reasonable

 3    costs."

 4        The FTC is not entitled to second guess that decision.  I

 5    alluded earlier to *Richmond County* in response to your earlier

 6    questions, but here is the exact citation.  Under Georgia law

 7    a decision to purchase or lease a hospital is under --

 8    according to the Georgia Supreme Court -- quote, a decision to

 9    be made by the Authority alone.

10        How clear can one be as to what Georgia law is.  The

11    attacks on the integrity and competence of the members are

12    barred by *City of Columbia*.  The exclusive remedy if there is

13    failure by the members of the Authority to carry out official

14    duties, is in the Superior Court of Dougherty County, under

15    31-7-76(B).

16        The only people with standing are residents of the county

17    after getting a petition signed by five thousand or by the

18    county governing authority.  It's not too much to say that no

19    one has ever even thought of bringing such a proceeding over

20    this transaction.

21        The FTC and the Attorney General have no standing to

22    raise any of those issues, and the federal courts can't review

23    the process or the rationale for a public decision by a public

24    body.

25        *Omni* holds the federal court can't deconstruct a

government action or go behind to probe the basis of the

official intent.  That's precisely what is intended to be done

here.

The allegation that a public hospital is a mere pretext,

or in the words here, they avoided pretext, they call it a

strawman, to protect private interest from competition is

irrelevant as a matter of law.  That was the holding in Bolt

versus Halifax Hospital.

And the point of the *City of Columbia*, and this quotation

is really worth focusing on:  "Few governmental actions are

immune from the charge that they are not in the public

interest or in some sense corrupt.  The fact is that virtually

all regulation benefits some segments of society and harms

others.  *Parker* was not written in ignorance of the reality of

that determination of the public interest entails not merely

economic analysis, which is all the Federal Trade Commission

is interested in, but value judgment, and it was not meant to

shift the judgment from elected officials to judges and

juries.  This would require the sort of deconstruction of

governmental process that we have consistently sought to

avoid."

So their tactic to try to say this was the decision by

Phoebe, you rubber-stamp Phoebe and so forth is squarely

foreclosed by *Columbia*.

Finally, let me go through quickly the lease issue, Your

1  Honor.  As I have tried to say previously, that's a bridge we

2  haven't gotten to yet.  The cart is way ahead of the horse,

3  because there is currently no lease and can't be a lease until

4  we go through the procedures set forth under Georgia law which

5  require a public hearing on 60 days notice and so forth.

6      But insofar as they want to question whether the

7  authority has the power to lease, that authority has been

8  repeatedly upheld under Georgia law.  In the *Bradfield* case,

9  from 1971, in *Richmond County* in 1986.  And *Bradfield* is

10  interesting, and let me just pause for a second and talk about

11  it.

12      Bradfield is the Hospital Authority in Columbus.

13  Bradfield acquired the private hospital run by the Catholic

14  sisters in Columbus under the Hospital Authorities Law

15  unchallenged.  They spent 5 million dollars, in 1971 dollars,

16  to rehabilitate that hospital, and when they had completed it,

17  -- this was public money -- they then leased it back to the

18  sisters to operate, and they were challenged.

19      And the Georgia Supreme Court said what they did was

20  entirely within their authority under Georgia law.  They were

21  authorized to acquire, they were authorized to use public

22  money to improve that hospital, and they were authorized to

23  lease it back to the Catholic sisters to operate, just as the

24  Hospital Authority here has leased the hospital to Phoebe

25  Putney.

1    *Richmond County*, we've talked about previously.  That was

2    a lease at a dollar a year and challenged by the county

3    commission and upheld as being within the powers of the

4    hospital authority and one that the county commission could

5    not even second guess.

6        The only limitations on the power to lease are those set

7    forth by Georgia law in 31-7-75(7).  The Authority -- and let

8    me pause -- not the Attorney General, not the FTC, not the

9    County Commission, not the Superior Court in Dougherty County,

10   and with all deference to, Your Honor, not Your Honor, must

11   first determine that lease will promote the public health

12   needs of the community in one of two ways; by making

13   additional facilities available, or by lowering the cost of

14   healthcare in the community.  The Authority found both, and it

15   is their decision that governs there.

16       Moreover, to the extent the FTC seems to be concerned

17   that the lease may not be all they would like it to be, in the

18   *Bradfield* case, the Georgia Supreme Court said:

19       "The Hospital Authorities Law is replete with safeguards

20   and controls for the operation of its hospital by the lessee

21   to ensure that the public interest in the hospital, including

22   care of indigents, is protected."  And those requirements are

23   set forth repeatedly, but particularly in 31-7-75(7).

24       Just to list some of the limitations:  Neither the

25   Hospital Authority nor the lessee, Phoebe Putney or manager

1   Phoebe Putney, can operate for a profit.  The Hospital

2   Authority as a matter of statute retains, quote, "control over

3   any hospital so leased to ensure that the lessee will not

4   obtain more than a reasonable rate of return and shall not

5   contravene the mandate that no authority shall operate a

6   project for a profit."

7       That one section says that the Hospital Authority, if

8   Phoebe Putney were to try to charge too much or to make a

9   profit, the Hospital Authority could prevent either one under

10  the terms of the lease.  All assets that are leased remain the

11  property of the Authority.  The Hospital Authority can

12  delegate specific pricing matters to the lessee.

13      In a case involving the Athens Regional Medical Hospital

14  that I happened to have represented at the time, the Court of

15  Appeals held that Athens Regional Medical Center, which is the

16  lessee from the Hospital Authority in Athens and Clarke

17  County, quote, "sets rates for hospital services under the

18  authority delegated to it by the Hospital Authority of Clarke

19  County under the lease agreement."

20      So rate setting, they are an agent acting under the

21  direction of the Authority subject to the control of the

22  Authority and are immune under *Crosby*, which holds that agents

23  are immune.  But as I tried to say earlier, we hadn't gotten

24  to this bridge, we've got the cart way ahead of the horse.  No

25  lease has been drafted, negotiated, executed, or approved.

1    The terms of what that future lease will contain are

2    hypothetical and conjectural.  Precisely what *Loujan* says will

3    not be sufficient to give a complaining party, case, or

4    controversy, jurisdiction or Article III standing.  The state

5    law would preclude any such lease for 120 days.

6        And this final case, *Electric Inspectors:*  To allow suits

7    against private parties who contract -- this is one of the

8    contracting cases, Your Honor -- with governmental entities

9    who are themselves authorized to contract with private parties

10   would effectively undermine the government's ability to

11   contract.

12       The private parties are necessarily counterparts to

13   government's acts and authorization of the government's

14   contracting therefore necessitates authorization of the

15   private parties contracting.

16       In extending immunity from government entities to private

17   parties where the only alleged antitrust violation is entering

18   into a contract -- and that fits either the management

19   agreement or the lease with the government -- these decisions,

20   citing *Klein* and *Wheelabrator*, which we also cited -- do not

21   go through a separate *Midcal* active supervision analysis.

22   Active supervision doesn't apply, but we don't have to deal

23   with those issues because we don't know what the lease is

24   going to say.  It may have more supervision than the FTC even

25   wants, but at this point that is completely hypothetical and

1    unknown.

2        The cases that hold that active supervision does not

3    apply to a contract with a state body that has immunity are

4    those listed on Slide 64, *Charley's Taxi*, *Automated Salvage*,

5    *Cine 42nd Theater Corp*, which is a case in which an authority

6    acquired five theaters and conveyed them to a single operator

7    and created a monopoly in New York and was held to be immune.

8    This is a stronger case than *Lee County.*

9        But more important, the FTC can cite no case, the

10   Attorney General can cite no case that has ever enjoined a

11   state agency from carrying out a lawful power using the

12   antitrust laws as an excuse.  The relief which they have

13   requested, both as to the acquisition and as to the lease is

14   utterly unprecedented and is foreclosed by, we believe,

15   controlling decisions of this Circuit.

16       *Lee County*, as far as the acquisition is concerned,

17   *Crosby*, *Askew*.  The *Citrus County, Florida* case, which is

18   cited in *Crosby*, which was a District Court opinion, which

19   resulted in -- which was a hospital authority that decided

20   that it would monopolize in Citrus County all of the

21   outpatient services of a particular type, even though the

22   state statute didn't even mention outpatient services.

23       The District Court held that was within the state action

24   immunity, and the Eleventh Circuit affirmed without even

25   writing an opinion, indicating that they thought that the

proposition was so clearly established that they did not feel

they could add anything to the well-written opinion of the

district judge.

Your Honor, I have taken a lot of time.  I'll be

delighted to answer any other questions.

THE COURT:  I think I've asked you all along, so I

don't think I have one at this point.

MR. BONDURANT:  I appreciate your patience and

indulgence.  This is sort of interesting material.  And I'll

yield the floor to my -- I presume at this point -- my friends

at Phoebe want to make their arguments for themselves better

than I made for them.

THE COURT:  They get a chance to adopt or reject

whatever representation you may have made.

MR. BONDURANT:  I've been both adopted and rejected.

Thank you, Your Honor.

THE COURT:  All right.

MR. VAN VOORHIS:  Thank you, Your Honor.  My name is

Lee Van Voorhis, and I rise on behalf of the Phoebe

defendants, Phoebe Putney defendants named in the complaint.

However, there is no basis for the Phoebe defendants being

named in the complaint.  They are not proper parties here.

The fundamental point, of course, is that state action

immunity applies here.  Two critical points are undisputed and

indisputable, as Mr. Bondurant mentioned.  First, the Hospital

 1    Authority is a political subdivision of the State of Georgia,

 2    and I don't think we need to dwell on that.

 3        Second, however, in the proposed acquisition the Hospital

 4    Authority will acquire the title to Palmyra as authorized by

 5    the Georgia Hospital Authorities Law.  And as is explained by

 6    the Authority's counsel, under the controlling Eleventh

 7    Circuit cases of *Lee County* and *Crosby*, which also makes clear

 8    that Georgia has clearly articulated a policy to displace

 9    competition, these two undisputed points mandate that the case

10    be dismissed because of state action immunity.

11        Now, the FTC knows this.  We didn't deal with the State

12    AG a whole lot, but we dealt with the FTC throughout this for

13    the last several months.  We cooperated with their

14    investigation.  We presented all these arguments.  So they

15    knew what the case was going to be.

16        So when the complaint came, they came up with a new

17    theory and asked His Honor to take one of two unprecedented

18    legal steps.  In the face of the Supreme Court precedent to

19    the contrary in *City of Columbia*, they asked Your Honor to

20    create a strawman exemption to state action immunity, or

21    failing that, they asked Your Honor to dramatically extend the

22    state action analysis and other jurisdictional analysis so as

23    to include Phoebe Putney solely because of a purely

24    hypothetical event.

25        **THE COURT:**  I asked prior counsel, Mr. Bondurant, and

1  now I'll ask you.  Is there any case -- I know it's been said

2  that the FTC has no case that they can point to that fits this

3  case, and I'll ask them when their turn comes.  Is there any

4  set of circumstances that you think mirror or at least, I

5  guess, in detail as the FTC alleges the conduct of the Phoebe

6  defendants have been in this case?

7      MR. VAN VOORHIS:  Well, Your Honor, I think *City of*

8  *Columbia* is far beyond what happened here.

9      THE COURT:  What Mr. Bondurant seems to say if

10  conspiracy is covered, then anything less than that --

11      MR. VAN VOORHIS:  And so subsequently there's no need

12  to bring any of these cases that were less than what would

13  happened in *City of Columbus*.  So it's not a surprise there

14  aren't any cases that aren't squarely on these facts when

15  you've already got a precedent out there that's so far beyond

16  what has been done here.

17      THE COURT:  What do you say about the idea of the

18  Phoebe defendants, their conduct prior to the Authority's

19  approval was private conduct and not the conduct of the

20  Authority?

21      MR. VAN VOORHIS:  Sure.  So that's what we are talking

22  about with plaintiffs first claim, that the Authority was

23  actually a strawman, Phoebe Putney put this deal together, and

24  therefore the Court should create the strawman exemption.

25  But, as Mr. Bondurant said, any efforts by Phoebe Putney to

1    persuade the Authority to take this action are, first of all,

2    irrelevant to state action immunity under *City of Columbia*,

3    and second of all, under *City of Columbia* and the

4    *Noerr-Pennington* doctrine, immune from the antitrust laws.

5         As he said, it's undisputed that the Authority met on

6    December 21st, they had before it a proposal to Palmyra.  They

7    voted to acquire Palmyra pursuant to the proposed asset

8    purchase agreement.  It's not relevant to state action whether

9    it was Phoebe Putney that put that forward or a member of the

10   community that brought that proposal to them or some

11   investment banker from New York who put that proposal in front

12   of them.  The fact was they had a proposal, and they voted on

13   it.  They took action --

14        **THE COURT:**  I totally forgot to ask Mr. Bondurant this

15   question.

16        **MR. VAN VOORHIS:**  Please, like him, I invite all

17   questions all the time.

18        **THE COURT:**  Okay.  Be careful what you ask for.  If it

19   is so clear that the action of the Authority to decide by vote

20   to accept this deal put together by whomever, by Phoebe, what

21   would be -- would it not be then a kind of a lessening of that

22   or a weakening of that position by having a second review?  In

23   other words, what's the purpose of the Authority looking at it

24   again since their look the first time was absolutely without

25   question clearly within its authority?  What's the --

1     **MR. VAN VOORHIS:**  Well, now, I get to speak for the

2  Authority since he got to speak for us.

3     **THE COURT:**  That's exactly right.

4     **MR. VAN VOORHIS:**  I'll let them speak -- you know, they

5  should probably speak to that in their own terms, but from my

6  point of view they had different facts in front of them.  At

7  that point they had some allegations about what they had done

8  before to look at and so they were able to take those into

9  consideration, see if anything new had developed in the

10  intervening months, and decided to do as they decided

11  before.

12     **THE COURT:**  But would not that be irrelevant under the

13  theory that all it takes is a vote of the --

14     **MR. VAN VOORHIS:**  I think legally it's irrelevant,

15  yeah, but I think there's some reasons why they might have

16  wanted to reevaluate, but I'll let them speak to their reasons

17  for doing so.

18     **THE COURT:**  All right.  That's basically what I was --

19  all right.

20     **MR. VAN VOORHIS:**  So once the Authority acted, and

21  acted pursuant to Georgia state law with a reasonably

22  foreseeable -- that law precedes "a reasonable foreseeable

23  anticompetitive effect," the analysis ends.  That's it.  State

24  action immunity applies, and you don't need to look behind

25  that, and, in fact, you're not allowed to look behind that for

1    the reasons.  However, plaintiffs want to look behind it

2    because they want to include the Phoebe entities and they know

3    on those basic grounds, state action analysis -- state action

4    immunity, excuse me, applies.

5         So even if it were factually correct that the Authority

6    didn't do anything, which it's not, but for the motion to

7    dismiss standard, let's assume that the Authority didn't do

8    anything else than what's on here, that's irrelevant under the

9    *City of Columbia.*

10        I don't know how much more you want to go into it, but

11   when you've got a governmental entity that actually was found

12   by the jury to conspire with the private actor, that seems a

13   lot more than when an Authority had a proposal in front of it,

14   could look at it, and vote on it.

15        Now, it's one thing for the FTC to say 94 minutes wasn't

16   enough, or they didn't do this, they didn't do that, but at

17   least they weren't conspiring.  I mean, it seems far, far less

18   than taking a blatantly illegal action to have done perhaps

19   something that isn't sufficient for the FTC.

20        The Supreme Court has squarely rejected the notion, and

21   Mr. Bondurant read the language, but, and specifically, they

22   are, a government entity, the Court should not look at the

23   decision of a government entity or engage in a deconstruction

24   of a governmental process to see if that state entity has

25   abandoned public responsibilities to private interests.

1     And, moreover, as far as the Phoebe entities are

2     concerned, the *Noerr-Pennington* doctrine protects our

3     petitioning to the Authority for doing what they've done.

4     *Noerr-Pennington* holds that even if what the private actor is

5     looking for is a blatantly anticompetitive action, even if

6     it's a conspiracy or price fixing or anything else subject to

7     the per se rules of the antitrust authority -- or antitrust

8     laws, let alone a rule of reason case like this would be, it's

9     absolutely protected.

10          **THE COURT:**  But here, under these facts, isn't putting

11    up 195 million dollars more than just petitioning?  I mean,

12    I'm just asking --

13          **MR. VAN VOORHIS:**  Sure.

14          **THE COURT:**  In other words, the idea, as you say, of

15    going to a public authority and say, look, we think this is a

16    great idea, and we think you ought it to do it, and here are

17    the general parameters of how we think it can be done, and the

18    agency, the authority accepts that and moves with it, no

19    problem.  But if the involvement is more than simply

20    presenting an idea, but being intricately involved as far as

21    being the guarantor -- I think I asked this question earlier

22    of Mr. Bondurant -- the guarantor, I mean, is it reasonable to

23    argue that all that's being done here by the Phoebe defendants

24    is to be a petitioner?  Isn't there more than that going on,

25    the idea of a place of substantial funds, guarantees, and that

1    sort of matter as a part of a transaction that's ultimately

2    adopted by the Authority?  No debate about whether the

3    Authority adopted it or not, but doesn't that make the

4    defendants, Phoebe defendants, more than just the petitioners,

5    that this is a great idea, I think you guys should go for it,

6    and this will be the result?

7         MR. VAN VOORHIS:  Well, the direct answer to your

8    question is, no, Your Honor.  This is all within the scope of

9    what petitioning the government would be, but you do raise an

10   interesting question for some --

11        THE COURT:  Are there cases where a nongovernmental

12   petitioner provides substantial funds or guarantees?

13        MR. VAN VOORHIS:  Well, that's where we need to do some

14   clarification of what's going on here, Your Honor.  And if

15   you'll bear with me for a minute and let me explain who the

16   Phoebe Putney entities are because that needs a bit of

17   explanation.

18        In 1990, the Authority created PPMH, Phoebe Putney

19   Memorial Hospital, Inc, as a nonprofit, charitable institution

20   to fulfill the Authority's mission.  At the same time it

21   created the parent entity to PPMH, Phoebe Putney Health

22   Systems, Inc., PPHS, to serve in support of PPMH and also in

23   support of the charitable mission of the Authority.

24        At that time, in 1990, the Authority then leased the

25   existing hospital, Phoebe Putney Hospital, to PPMH for its

1   operation.  Under that lease, specifically, Phoebe Putney must

2   abide by the statutorily mandated public interest mission of

3   the Authority.  If they do not, the Authority may terminate

4   the lease.  If the lease is terminated or the Phoebe Putney

5   entities creased to exist for any other reason, all assets,

6   every bit of everything they own goes back to the Authority.

7        So it's not like this is Phoebe Putney money that's

8   paying this.  This is the Authority's money.  These entities

9   are the Authority's entities, and if -- they're liable under

10  the lease to pay the Authority's debts, which is what this is,

11  this is an Authority debt.

12       These entities only exist because of the Authority's

13  setting them up and because of the lease.  If the lease

14  terminates, expires, and if it does that because the Phoebe

15  entities aren't fulfilling the public interest, State mission

16  of the Authority, all the money, all the buildings,

17  everything, goes back to the Authority.

18       **THE COURT:**  But does the Authority have the ability to

19  direct the expenditure of those monetary funds during the

20  lease?

21       **MR. VAN VOORHIS:**  Yes.  Yes.  The Phoebe Putney

22  entities are liable for the debts of the Authority.  So if the

23  Authority takes on a debt, like, for example, the acquisition

24  here, the Phoebe entities must pay it for them.  The money

25  sits in an account that says Phoebe Putney, but for all

1  intents and purposes this is Authority money.

2  **THE COURT:**  That was my question.  All right.

3  **MR. VAN VOORHIS:**  So for all those reasons, I mean,

4  just to conclude on the state action, I'll get to -- because

5  Mr. Bondurant has covered it pretty well, unless you've got

6  other questions on it.

7  So it is PPMH that conducts the day-to-day operations of

8  the hospital.  So it made perfect sense for them to be the

9  ones, and, in fact, it's the mandate of the Authority that

10  they be the ones to do those things.  It made perfect sense

11  for them to go out and investigate an acquisition that the

12  Authority has considered for over 20 years and to put the

13  technical aspects of that deal together, to put together a

14  proposed asset purchase agreement, to put together an

15  acquisition proposal, and then to put it in front of the

16  Authority and say, do you want to take this acquisition, and

17  the Authority voted that they did.

18  So putting aside state action, it brings me to the second

19  alternative, unprecedented step the plaintiffs ask Your Honor

20  to take to dramatically extend the scope of the state action

21  analysis and also of jurisdiction under Section 7 of the

22  Clayton Act.

23  Plaintiffs incorrectly assert that the Phoebe Putney

24  defendants should be included in this case in three other

25  ways.

1    One, that some potential future lease of Palmyra to a

2    Phoebe entity means that active supervision should now be

3    included as a condition of the state action immunity.

4    Two, that a potential future lease of Palmyra to a Phoebe

5    entity conveys jurisdiction over the Phoebe defendants under

6    Section 7 of the Clayton Act.

7    Or, three, that the intended management agreement that

8    Your Honor referenced by which the Authority will operate

9    Palmyra from the time the acquisition is consummated until

10   such time as the Authority might enter a lease, also conveys

11   jurisdiction over the Phoebe defendants under Section 7 of the

12   Clayton Act.

13   All three assertions are incorrect as a matter of law.

14   First, plaintiffs ask that if Your Honor follows the Supreme

15   Court precedent and correctly rejects the proffered straw man

16   exemption that Your Honor should instead consider some future

17   lease of Palmyra to a Phoebe entity and decide whether the

18   Authority will actively supervise that hypothetical lease as

19   part of the state action analysis.

20   Your Honor, should reject that request for several

21   reasons.  First, there is no lease.  There's nothing to look

22   at.  How do we know whether it's being actively supervised or

23   not.  Yes, it is contemplated that after acquiring Palmyra the

24   Authority may lease it to PPMH.  However, as Mr. Bondurant

25   said, to do that requires negotiating lease terms, which we

1    don't have to look at right now, a public hearing with 60 days

2    notice prior, and then another 60 day waiting period after

3    that hearing.

4        But as of now, there are no lease terms, and so it kind

5    of strains the imagination to think about whether nonexistent

6    lease terms qualify as active supervision.

7        **THE COURT:**  But isn't part of the theory of an

8    injunctive proceeding and financial antitrust circumstances

9    all about some expected future matter?  The whole idea is to

10   prevent the future in a sense from coming into reality because

11   of certain alleged dangerous injuries.  I understand what

12   you're saying, ultimately here maybe there are too many facts

13   that are unknown such that that shouldn't be considered, but

14   just merely because it's a future matter, otherwise we would

15   always have to wait to see -- wait until the thing was done.

16       **MR. VAN VOORHIS:**  So what's happening here is perhaps

17   the most confusing of the distractions they put in their

18   complaint, and that is, plaintiffs' attempt to transport the

19   incipiency standard from Clayton Act Section 7 analysis over

20   into the state action analysis.

21       We know of no case, and they certainly cited no case

22   where you can take that incipiency standard and bring it over

23   into the state action immunity standard.  Now, it makes sense

24   under that standard in Section 7 of the Clayton Act, but even

25   there, you've got to realize it's not about -- it's about

1    evaluating the incipient effects, the potential effects that a

2    transaction will have going forward -- an acquisition, rather,

3    will have going forward, otherwise you would, as you said,

4    have to wait until an acquisition actually occurred and then

5    see if it had anticompetitive effects to stop it.

6        And that's not the law.  The law is if you've got a

7    proposed transaction in front of you, you can look at its

8    terms and figure out if the effect of that will be

9    anticompetitive or not.  But even within Section 7 that

10   doesn't mean you can block a purely hypothetical transaction,

11   otherwise we might be here trying to argue whether Apple can

12   acquire Microsoft or not, and who knows, we don't have

13   anything to look at.

14       So that's the first step removed that we are here.  And

15   second, that is all Section 7 analysis.  It doesn't apply to

16   whether state action analysis should look at some future

17   hypothetical potential transaction.  It's simply apples and

18   oranges here that they're trying to confuse.

19       And then, even if there were a lease, there would be no

20   requirement for active supervision.  First, the Eleventh

21   Circuit in *Crosby* held that Georgia hospital authorities need

22   not actively supervise.  Moreover, the Supreme Court added an

23   active supervision requirement to the state action analysis

24   "only when the conduct is by a private party whose interests

25   are at risk of diverging from the state's."

1    And this goes back to what we just talked about before.

2  Here, there really isn't any opportunity for the Phoebe

3  defendants' interests to diverge from the Authority's

4  interests.  They were created by the Authority.  They are

5  legally obligated to fulfill its statutory mission, and all

6  their assets go back to the Authority at the end.  What's the

7  private interest?

8    **THE COURT:**  Isn't active supervision being basically

9  directed at two different things, one, at the stage of the --

10 prior to the acquisition, and then the other with regard to

11 the lease as to what the projected lack of or alleged lack of

12 supervision would be?

13   **MR. VAN VOORHIS:**  Well, as to the acquisition since

14 it's the Authority making the acquisition, it would be really

15 hard to understand how the Authority could actively supervise

16 itself.  But after the acquisition it would only be about some

17 other action they take, and as of yet, there isn't one

18 proposed.

19   **THE COURT:**  Well, I guess they are asserting that

20 there's no active supervision of the ultimate act in their

21 view, the Phoebe defendants, as part of the prior to

22 acquisition?

23   **MR. VAN VOORHIS:**  Sure.  As I said, the Phoebe

24 defendants haven't done anything over which there should be

25 active supervision or jurisdiction.

1    **THE COURT:**  I'm just saying there are two different

2    elements as I see it where this issue of active supervision is

3    being asserted to the -- whether you agree with it or not, its

4    application -- the acquisition stage and a purported lack of

5    supervision after there's an acquisition?

6    **MR. VAN VOORHIS:**  So, as I said, before the acquisition

7    on the pre-acquisition stage, if it were a Phoebe entity or

8    some other private entity making an acquisition, then perhaps

9    active supervision would matter.  But here it doesn't matter,

10   where there's no private entity, there is no active

11   supervision requirement to the state action immunity analysis.

12   And, lastly, as Mr. Bondurant also said, several circuits

13   have held that where a state actor enters a contract with a

14   private actor and state action immunity applies to the state

15   actor, it must logically apply to the private actor as well,

16   otherwise state action immunity becomes meaningless.  How can

17   you it apply to a state actor in a contract and then have the

18   other party to the contract not immune for the same behavior?

19   In the words of the *Charley's Taxi* case, *Parker* immunity

20   exempts state action, not merely state actors.  To hold

21   otherwise would allow the *Parker* immunity to be circumvented

22   by artful pleading.  And it's just such artful pleading that

23   the plaintiffs are trying here.  If somehow a potential lease

24   of Palmyra were relevant to this analysis, which it's not,

25   PPMH as a possible lessee in this instance would nevertheless

1    be entitled to state action immunity without an inquiry into

2    active supervision.

3        So the second other basis on which they tried to bring

4    the Phoebe defendants into this case is to extend Section 7 of

5    the Clayton Act jurisdiction beyond acquisitions that would

6    substantially lessen competition so as to include a

7    hypothetical leasing of Palmyra to the Authority -- by the

8    Authority to some Phoebe entity.

9        Again, as Mr. Bondurant made clear in the *Loujan* case, a

10   hypothetical lease does not even meet the minimum requirement

11   for a case or controversy involving a Phoebe defendant here.

12   We've got nothing to look at.  There simply is no case or

13   controversy.  Until there is a lease or its oversight terms

14   are agreed to and until the Authority actually supervises the

15   lease, plaintiffs have nothing to allege but their own

16   speculation, and that's insufficient under *Iqbal* and *Loujan* to

17   create a case or controversy.

18       But, second, Section 7 only applies to acquisitions that

19   substantially lessen competition and the only acquisition here

20   is by the Authority.  The defendant -- we are aware of no case

21   where a hypothetical lease has been found to be an acquisition

22   for the purpose of Section 7.  Plaintiffs have not cited one.

23       In any case, plaintiffs cannot allege that a hypothetical

24   lease in some way lessens competition.  There's simply, again,

25   nothing to evaluate of whether it does or doesn't.

1    **THE COURT:**  Isn't that really a material -- I hear it

2    now, and I think I'm going to hear the opposite argument

3    obviously when the plaintiffs argue -- that we have a material

4    issue of fact that's in dispute as to what this acquisition

5    was?  Obviously, the defendants are arguing that the

6    acquisition was when the Authority voted and decided to

7    acquire the assets of Palmyra.  That's the acquisition.

8    But the plaintiffs, as I understand it, are arguing that

9    the acquisition is really the Phoebe defendants wanting

10   acquisition of Palmyra, that they acquire through the actions

11   of the Authority, which they argue was without supervision or

12   whatever.  And I know what the Authority's position is about

13   that and I know what your position is about that.  But that

14   ultimately and immediately after the acquisition Phoebe will

15   have control of Palmyra.  That is what they are saying, as I

16   understand it, is the gravamen of what they consider

17   acquisition.

18   So if there's a difference in terms of what acquisition

19   means here, isn't that a material issue that basically keeps

20   the Court at least from resolving it on a summary judgment

21   basis, and might, if the Court accepts the plaintiffs'

22   well-pled allegations, as opposed to all the allegations,

23   those that may not be supported, I understand under *Iqbal* and

24   *Ashcroft*, are not necessarily accepted by the Court, but don't

25   we have a real -- the division here between the parties as to

1    what the acquisition itself is?

2        MR. VAN VOORHIS:  Your Honor has hit upon it exactly

3    with the "well-pleaded" allegations of the complaint.

4    Because, no, there is no factual dispute between what is going

5    on here.  They cannot and have not alleged that this

6    acquisition is by anyone other than the Authority.  It's right

7    on the face of the complaint, and by the parole evidence rule,

8    you have to look at that.

9        All they are actually -- when you look behind -- or look

10   at what they are actually saying, they are not saying the

11   Authority is not acquiring Palmyra, and they can't say that

12   because the Authority clearly is.  What they are saying is,

13   the way in which they acquired it, the way in which they are

14   doing it, their decision-making process was insufficient as a

15   matter of law, and then they throw a bunch of mud in the water

16   about what else went on and what happened.

17       But if you strain that out and you look clearly at the

18   simple facts of what happened here, I don't think there is any

19   dispute as to the material issue -- or any dispute as to the

20   issue of fact here, on the law you could decide our case on

21   the motion to dismiss.

22       THE COURT:  All right.

23       MR. VAN VOORHIS:  Okay.  So, there's also no

24   jurisdiction under the Clayton Act Section 7 over a lease that

25   we might enter.

1     Lastly, there's a management agreement, and there is

2  actually one we can look at.  So they also allege jurisdiction

3  over the Phoebe defendants because of the management

4  agreement.  However, the important thing here, again, is that

5  it is not the management agreement that lessens competition.

6  It is axiomatic antitrust law that what unites -- the uniting

7  of ownership is what has an anticompetitive effect.  How those

8  assets united are operated does not have any additional

9  anticompetitive effect.

10     You look at it coming from the other direction and it's

11  the *Copperweld* doctrine and all its progeny.  Two entities

12  owned by an ultimate parent entity cannot conspire with each

13  other and or price fix with each other, and the courts found

14  that because the unity of interest is up at the parent.

15  They're making money for the same parent.  So the ones below

16  can't do anything.

17     So it doesn't make any difference once an entity owns

18  assets whether it leases them to somebody or does an

19  management agreement with them or anyone else.  That adds

20  nothing to the actual anticompetitive behavior.  It is only

21  unification through an acquisition that does that.

22     In any case, even if that weren't the case, the

23  management agreement does not actually control -- confer

24  control on to Phoebe Putney.  The management agreement states

25  that:  "The Authority shall at all times during the operating

1    period have ultimate control over the assets and operations of

2    Palmyra.  Phoebe Putney shall perform its duties pursuant to

3    the policies, procedures, rules, and directives adopted and

4    amended from time to time by the Authority."

5         It also contains numerous provisions that legal and

6    economic control will remain in the hands of the Authority and

7    not Phoebe Putney.  For example, "Phoebe Putney must operate

8    Palmyra according to the instructions of the Authority."

9         "Phoebe Putney may not take any action of economic

10   significance without the prior consent or approval of the

11   Authority."  They can't do anything for over $10,000 without

12   prior approval of the Authority.  And "the Authority may at

13   any time revoke the management agreement and Phoebe Putney's

14   authority under it."

15        So with these, not only is it irrelevant, but it doesn't

16   convey any control onto Phoebe Putney anyway.  It's just a way

17   of keeping the hospital going while the Authority decides what

18   it's going to do after that.

19        So, Your Honor, in conclusion, for all these reasons the

20   Phoebe Putney defendants are not proper parties.  Phoebe

21   Putney acted properly in assisting the Authority in its

22   pursuit of the acquisition of Palmyra, but its conduct, Phoebe

23   Putney's conduct in that regard is constitutionally protected

24   in that event, and, moreover, it's irrelevant to the state

25   action immunity doctrine.  Active supervision of a potential

1    lease is not required under any circumstance, and certainly

2    not required when it is not alleged that any antitrust claim

3    arises from the potential lease, and it's all entirely

4    speculative anyway.

5         And, lastly, no antitrust claim is alleged to arise from

6    any management contract and control never passes to Phoebe

7    Putney anyway.  Of course, the fact that plaintiffs have to

8    stretch so far to try and even bring the Phoebe defendants

9    into this case, just shows -- it just underscores the ultimate

10   fact, and that is, that it is the Authority making this

11   acquisition, and therefore the state action immunity analysis

12   is really pretty cut and dried.

13        It's pretty straightforward, as you made it.  They have

14   to go through a lot of gyrations to try and bring the Phoebe

15   Putney defendants in as some ghost in the machine that is

16   actually making things run here.  I'll take any other

17   questions you've got, but that's it.

18        **THE COURT:**  All right.

19        **MR. VAN VOORHIS:**  Thank you, Your Honor.

20        **THE COURT:**  I think there's at least one other

21   defendant entity to be heard from; is that right?  Hold on

22   just one minute, I think, one, my Court Reporter is probably

23   going to rebel on me pretty quickly.  We've been going a

24   pretty good while, and I think also since it's about 12:30

25   it's an appropriate time to take lunch, I think, although we

1   lost almost an hour this morning because of equipment.  But we

2   are going to take a break at this time from 12:30 until 2:00,

3   and we'll return, and we'll begin with further argument by the

4   last defendant, and then hear from the FTC.

5          MR. GLUCKOW:  Your Honor, this may not change your view

6   at all, but I'm not going to actually have anything

7   substantive to say, I'm just going to join in the arguments by

8   the other defendants.

9          THE COURT:  Without objection from the Court.

10          MR. GLUCKOW:  Thank you, Your Honor.  It's Paul Gluckow

11   from Simpson Thatcher on behalf of HCA and Palmyra, and I rise

12   simply to join in the arguments of the Hospital Authority and

13   the Phoebe entities, and we have nothing further at this time.

14          THE COURT:  I believe that was essentially the way that

15   it was approached in the briefing also, was it not?

16          MR. GLUCKOW:  That's correct, Your Honor.

17          THE COURT:  Thank you.  That's noted for the record and

18   accepted by the Court.  So that means we start back at 2:00

19   with the FTC's response on the argument for the motions to

20   dismiss.  We'll be in recess until 2:00.

21   *(RECONVENED; ALL PARTIES PRESENT)*

22          THE COURT:  All right.  I believe we heard the

23   defendants this morning on their motion, and we are now ready

24   to hear the government's response.

25          MR. HASSI:  Yes, Your Honor, Ted Hassi on behalf of the

1    Federal Trade Commission.  I, too, have a presentation, and

2    I'd like to hand up copies and try our hand at putting it out

3    on the screen.

4        **THE COURT:**  All right.  Thank you.

5        **MR. HASSI:**  Your Honor, as Your Honor correctly

6    recognized this morning, and as Mr. Reilly will address later

7    afternoon in greater detail, this is a merger to monopoly.

8    Phoebe Putney and Palmyra will be combined in one hospital.

9    The effect of that, the effect of this transaction, will

10   result in higher healthcare prices in this community.

11       Higher healthcare prices to individuals who pay for

12   healthcare, higher healthcare prices for employers who pay for

13   healthcare, and higher healthcare prices for the insurers that

14   now have to deal with that one entity, that only have one

15   choice of hospital in this town.  As Your Honor referred to,

16   it will be injurious to the public interest.

17       Now, Phoebe Putney --

18       **THE COURT?**  Of course, they argue that it really

19   doesn't matter.

20       **MR. HASSI:**  And, Your Honor, I will address that.  We

21   think under the antitrust law and in particularly under the

22   Clayton Act Section 7, it does matter, and this is after all a

23   Clayton Act Section 7 case.  What the Clayton Act Section 7

24   addresses is acquisitions that tend to lessen competition.

25       What the defendants here agree will happen is this

1  transaction will eliminate competition.  Forget about

2  lessening.  It eliminates it.  There will be no longer

3  competition in this town and in the six surrounding counties.

4      Now, Your Honor, we allege in our complaint that Phoebe

5  Putney used the Hospital Authority as a strawman.  And I want

6  to set out at the outset, I felt a little bit this morning

7  like we're ships passing in the night, and I think Your Honor

8  asked some good questions this morning.  But I think the

9  defendants in characterizing the plaintiffs' case have gotten

10  it wrong.

11      And so let me set the record straight.  This is not an

12  attack on the Hospital Authority.  This is -- No one has ever

13  called the Hospital Authority stupid or dumb.  We've never

14  used those words.  We've used some pretty strong language.  We

15  used the term "strawman" and we used the term "rubber-stamp."

16      And let me start with "strawman."  I want to explain why

17  we used that term, and I want to demonstrate to you this

18  afternoon why we think it applies in this case.  The strawman

19  is often used in cases -- in cases involving an illegal gun

20  purchase.

21      A convicted felon wants to buy a gun, and a convicted

22  felon knows that if they walk in a gun store, they're not

23  going to walk out with a gun.  So they take their money, and

24  they go to somebody else, and they give that money to somebody

25  else, and they say, go in and buy me a gun, go buy me a .357

1    magnum.

2         And that person goes into the gun store.  And they go in

3    with that convicted felon's money, they go into the gun store

4    and they buy a gun, and they sign whatever paperwork is

5    necessary, and they come out and they hand the gun over to the

6    person who gave them the money, to the convicted felon.

7         That person who went into the gun store, who took title

8    to that gun is a strawman, Your Honor.  And we believe the

9    Hospital Authority in this case was used as a strawman.  And I

10   think we can demonstrate that through the facts, Your Honor.

11        So this case, this is not about, however, what you heard

12   -- you heard the term this morning deconstructing the process.

13   You heard their motives and intent.  That's not what this case

14   is about.  We don't think this case fits under *Omni*, but we'll

15   talk about *Omni*, and we'll address the concerns related to

16   that.

17        This case is about Phoebe Putney.  Phoebe Putney, a

18   private actor, obtaining control over Palmyra.  The Clayton

19   Act looks to economic power, economic control, and it is

20   Phoebe Putney, not the Hospital Authority who is the effective

21   decision maker here.

22        It is when this transaction closes, it is Phoebe Putney

23   who will have control.  And Phoebe Putney can't use what the

24   Supreme Court referred to in the *Midcal* case.  The *Midcal*

25   case, I didn't hear that about that this morning.  It came

1    after the *Parker* case, but it's also a Supreme Court case on

2    state action.

3        And what the Supreme Court said in *Midcal* is, you can't

4    use a gauzy cloak, a gauzy cloak of state action to cover over

5    private acts.  That's what's happening here, Your Honor.

6        Now, the Clayton Act, as I said --

7        **THE COURT:**  Of course, they are arguing that the

8    private acts that you described here are really citizens

9    petitioning their government for action.  You heard me ask the

10   question earlier, I believe, where do you draw the line with

11   what is considered potentially, which is protected obviously

12   under the Constitution, and something that is not within that

13   purview?  How does the Court figure out where that line is, if

14   there is a line?

15       **MR. HASSI:**  It's a very good question, Your Honor, and I

16   think where we draw the line is what our concern is here is

17   not with whatever petitioning happened, and we'll talk a

18   little bit about that, about those events prior to December

19   21st.  Our concern, as I said, under the Clayton Act, it's

20   what's going to happen when this transaction closes, what are

21   the realities of this transaction, and it's that lessening of

22   competition.

23       Now, we talked a lot about what happened here.  We talked

24   a lot about the events that led up to the December 21st vote,

25   and I will talk some more about those this afternoon, but we

1    talk about those facts for three principal reasons.

2         The first reason, Your Honor, is because the defense is

3    claiming state action here.  And we think the first thing that

4    Your Honor has to decide in a state action case is, was this

5    state action.  Was the state actor the actor here, or was it

6    the private party, Phoebe Putney.  We think it was the private

7    party Phoebe Putney, and we think we can show that.

8         The second question is, Your Honor has to determine, when

9    Your Honor determines whether it was a state actor or a

10   private party, there is also this question of active

11   supervision.  If it's a private party acting, what the Supreme

12   Court in *Midcal* tells us is that private party has to be

13   actively supervised.

14        And as Your Honor correctly pointed out in a question

15   this morning, we do take issue with the lack of supervision

16   over this transaction.  We take issue with it to demonstrate

17   that there has not been active supervision in the past, and

18   there's no reason to believe that there's going to be active

19   supervision in the future.

20        **THE COURT:**  Whose action is it that the Commission

21   directs its suit against?  I know everybody is named, but

22   whose action is it that's really the central part of this,

23   because I think that makes a difference in how the Court

24   evaluates this, doesn't it?

25        **MR. HASSI:**  Yes, Your Honor.  Your Honor, we named all

1    of the parties.  We named Phoebe Putney Health Services.  We

2    named Phoebe Putney Memorial.  We named Phoebe Putney North.

3        The real concern is that when this transaction is

4    complete -- and I should explain what transaction is.  But

5    when this transaction is complete that Phoebe Putney Memorial

6    Hospital's assets will be combined with the Palmyra assets,

7    and they will be in the control of Phoebe Putney, a private

8    actor.

9        And as is done in the present and as is expected to be

10   done in the future, control will be exercised by Phoebe Putney

11   with no real supervision by the Hospital Authority.  They got

12   out of the supervising business 20 years ago when they leased

13   this hospital away, and they meet four times a year to hear

14   this.  But the real party in interest here is Phoebe Putney,

15   Your Honor.

16       And I think -- I'm happy to address questions about this

17   Article III case in controversy, but I'm frankly a little bit

18   shocked that's even an issue here, because there is no

19   question, and we'll demonstrate that through the documents,

20   there is no question here that this -- the control is going to

21   be vested in the hands of Phoebe Putney if Your Honor doesn't

22   act and if we don't have an opportunity to take this back to

23   Washington before an administrative law judge and address on

24   merits whatever merits there may be for this transaction.  And

25   we haven't heard about those.  We're not sure what they are.

1    Because, as Your Honor points out, it's a monopoly.

2        But, Your Honor, what the defendants have tried to do is

3    to escape antitrust review entirely by claiming state action.

4    Now, this comes before Your Honor on a motion to dismiss, and

5    the idea that the defendants here have accepted the

6    allegations in the complaint is somewhat of a farce.  They

7    really haven't.

8        I mean, you heard this morning, you saw slides from a May

9    5th presentation.  That's after the complaint was filed.

10   Those weren't alleged in the complaint.  There's no reasonable

11   basis to bring that in on a motion to dismiss and even on

12   summary judgment, as we told Your Honor in a Rule 56 affidavit

13   that I signed.  We've had no discovery on that.

14       So we think that should be put to the side.  But we think

15   on a motion to dismiss the defendants have to accept our

16   allegations.

17       Now, whether or not we can meet what we said in terms of

18   straw man, in terms of rubber-stamp, that will be for Your

19   Honor to decide, but we think we've pled adequate facts to

20   meet that, and we think we'll demonstrate those facts this

21   afternoon so that whether Your Honor applies a motion to

22   dismiss standard, where they have to accept our facts, and

23   clearly they haven't, or a summary judgment standard, where

24   there can be no material issues of fact and any tie goes to

25   the non-movants, that's the plaintiffs, we don't think they

1    can meet that standard either, Your Honor, and I'll try to

2    demonstrate that to Your Honor this afternoon.

3         Your Honor, I keep using the term transaction, and as I

4    think Your Honor knows and we pled it this way in our

5    complaint, we think the transaction includes three things.  It

6    includes the asset purchase agreement, and that asset purchase

7    agreement was approved by the Hospital Authority on December

8    21st.  It includes the management agreement.  That's the

9    17-page agreement, and it's PX-9.  That was approved by the

10   Hospital Authority on the same day.

11        In that management agreement, whatever you may say about

12   this lease that the defendants seem to suggest is perhaps

13   ephemeral, the Hospital Authority approved that management

14   agreement, and that management agreement on the day of closing

15   gives control to Phoebe Putney.

16        Now, we said this is a claim under Section 7 of the

17   Clayton Act, and what we claim is is that the transaction

18   steps are, and I quote here, "prearranged parts of what was a

19   single transaction cast from the outset to achieve the

20   ultimate result of transferring legal rights and privileges of

21   all Palmyra's assets to Phoebe Putney."

22        Now, what we're saying -- and I think Your Honor used the

23   term substance over form.  That's what we want Your Honor to

24   do.  The defendants take issue with the case I've just cited,

25   Your Honor, because it was tax case.

1     As I'm sure Your Honor is aware, in lots of area of the

2     law courts look pass the form to the substance.  You do it in

3     antitrust.  You do it in securities.  You do it in successor

4     liability.  You do it in jurisdiction.

5     Courts shouldn't be bamboozled by a document that says,

6     oh, well, its title is passing to the Hospital Authority,

7     never mind the fact that on that same document that asset

8     purchase agreement in that same first recital paragraph Phoebe

9     Putney Health Systems is there.

10     Phoebe Putney Health Systems executed that document.

11     Phoebe Putney Health Systems guaranteed - guaranteed the

12     purchase price.  The idea that there's no Article III case in

13     controversy when they're spending $195 million, I am not sure

14     where that comes from, Your Honor.

15     **THE COURT:**  What is, though, the central part of the

16     defendant's argument is that the Authority, for whatever

17     reason, approved this, and therefore that ends it.  So how

18     does the government make a -- I guess, a precedent-based or a

19     prior case sort of suggestion to the Court that indicates that

20     the Court can look at something beyond the fact of state

21     action?  In other words, nobody argues seriously here that the

22     Authority is not a state actor in the sense of it being an

23     authority, and there's some authorization in the state law

24     that allows it to take certain actions which arguably include

25     this action.

1      So I think where the argument is, is in that third area

2  which I'm kind of concerned about.  So what brings this in the

3  Court's purview where on its face, I guess, as a facial

4  showing, is that this is an action by an authority where the

5  Court doesn't get itself into reviewing every action taken by

6  an authority?

7      I think that's an argument I think the defendants are

8  making, and, frankly, it rings.  You know, what -- and I guess

9  I'm asking this in a lot of different ways.  Where does the

10  Court draw the line, I asked them, for purposes of, is there

11  anything they can't do, that the Court has to stay out of

12  everything, and I guess on your end is, what is it that

13  prevents the Court from getting itself involved in every

14  discreet decision made by an authority that's authorized to

15  act under the state law?

16      **MR. HASSI:**  And it's a good question, Your Honor, because

17  I'm not so sure it's as bright a line as the defendants would

18  like to portray it.  I didn't hear the defendants answer your

19  question in the sense of, I didn't hear them say, here's where

20  the line gets drawn, beyond this, the hospital authority can't

21  go.

22      I know the Supreme Court has drawn that line.  I know the

23  Supreme Court, for example, in the *Midcal* case referred to the

24  gauzy cloak of state action.  I know the Supreme Court in the

25  *Ticor* case said, you cannot -- the state cannot grant Sherman

1   Act immunity by fiat.

2       And in the *Omni* case, in the *Omni* case that they cited to

3   you so many times this morning they said the same thing.  They

4   said, we're not overruling the Supreme Court precedent.  We're

5   not overruling a prior precedent that says you just can't wave

6   a magic wand of state action and call it state action.

7       And so we think that there has to be some inquiry into

8   the facts when in a case like this it is so far removed from

9   being in the purview of the Hospital Authority, where it's

10  quite clear, and, again, we'll demonstrate it to Your Honor

11  this afternoon, that Phoebe Putney planned this.  Phoebe

12  Putney negotiated it.  Phoebe didn't lobby the Hospital

13  Authority.

14      They put a document to be executed in front of the

15  Hospital Authority with a 17.5 million dollar bet that they'd

16  do it.  They put up $195 million, and they're going to take

17  the proceeds of that.  They're going to immediately, as soon

18  as that transaction closes, they're going to take control.

19      **THE COURT:**  There's argument suggesting, though, that

20  $195 million is really the Authority's money.

21      **MR. HASSI:**  Your Honor, I heard that argument, and I'd

22  like to show you this afternoon a document, it's PX-207.  It

23  was the offer letter that Phoebe Putney made to HCA -- HCA,

24  the owners of Palmyra -- and in that letter, and I'll show it

25  to you this afternoon, Phoebe Putney said, we have in cash and

1    cash equivalents over a quarter of a billion dollars and

2    that's where the money is coming from to buy this.

3        And that's why in the asset purchase agreement, that,

4    again, I'll show you this afternoon, that Phoebe Putney signed

5    that document, and HCA wanted Phoebe Putney on that document

6    because HCA wanted a guarantee of payment.  They wanted to

7    know where the money was coming from.

8        And I'll show you in that document where they said,

9    Phoebe Putney said, if you need to look to somebody for the

10   money, you look to us.  You don't have to go to the, quote,

11   unquote, buyer, the Hospital Authority.  Everybody knows the

12   Hospital Authority doesn't have any money.

13       The argument that we heard from Phoebe Putney is is that

14   money when the lease ends reverts back to the Hospital

15   Authority.  Right now the lease ends in 2049, and the plan is

16   they're going to put these two hospitals together, and they're

17   going to lease them out for another forty years.

18       So if they're allowed to in 2011 enter into another

19   40-year lease, we're out into 2051.  So that money becomes the

20   Hospital Authority's in 2051.

21       I don't see anything in the lease, the 1990 lease, that

22   gives the Hospital Authority unfettered right to call back

23   money from Phoebe Putney.  I don't think that Phoebe Putney

24   would get the bonds that they get from the rating agencies if

25   the rating agencies thought that the Hospital Authority could

1    say, you know what, we need 195 million.  They wouldn't get

2    it.

3         And by the way, and I'll show you this afternoon, Section

4    4.21 of that lease forbid the Hospital Authority from buying

5    other hospitals.  So when it came time on December 22nd, the

6    Hospital Authority had go to Phoebe Putney and had to ask

7    Phoebe Putney to waive that provision of the agreement, which,

8    of course, they wanted to do because Phoebe Putney wants

9    Palmyra.  But they had to get Phoebe Putney's permission to

10   execute that, otherwise they would have been -- the Hospital

11   Authority would have been in breach of the 1990 lease.

12        So, Your Honor, this transaction is a single integrated

13   acquisition.  As I said, it includes the asset purchase

14   agreement, the management agreement and lease, and it gives

15   Phoebe Putney the power to manage the day-to-day operations of

16   Palmyra, to negotiate health plan contracts for Palmyra, to

17   establish all rates and charges and services -- for services

18   at Palmyra.

19        Phoebe controls strategic plans, annual operating and

20   capital budgets that hire and fire all employees.  They

21   supervise purchasing, billing, collections, payables,

22   accounting, and other financial matters related to the

23   operation of Palmyra.  In other words, Your Honor, Phoebe

24   Putney will have total economic and decision making control

25   over Palmyra.

1    There were a lot of times this morning where the

2  defendants said, you know, the plaintiffs have no cases, the

3  plaintiffs no cases.  Here's one case they didn't mention.

4  *Hospital Corporation of America* -- that's the same HCA that's

5  the defendant in this case -- *versus the FTC*.  It's a Seventh

6  Circuit opinion by Judge Posner, who knows a thing or two

7  about antitrust.

8    And Judge Posner wrote in that case, said -- addressed

9  the issue of whether the FTC for purposes of a Clayton Act

10  Section 7 claim, just like the one we have here today, whether

11  an analysis could include hospitals that were managed,

12  managed, but not owned, not owned by HCA.

13    See, HCA had taken possession of a couple of hospital

14  systems, and within those hospital systems there were

15  hospitals that the hospital system management didn't own, and

16  the FTC was seeking to block that transaction.  And Hospital

17  Corporation of America said, you can't include the hospitals,

18  we don't own them, we just manage those, so those don't get

19  included for Section 7, for Section 7 of the Clayton Act

20  purposes.

21    And here's what Judge Posner wrote.  He said, the

22  manager, Hospital Corporation, sets the prices charged by the

23  managed hospitals, just as it sets its own prices.  Although

24  the pricing and other decisions that it makes in its

25  management role are subject to the ultimate control of the

1    board of directors of the managed hospital, there is

2    substantial evidence that the board usually defers to the

3    manager's decisions.  If it were not inclined to defer, it

4    would not have a management contract.  It would do its own

5    managing through officers hired by it.  A hospital managed by

6    Hospital Corporation is therefore unlikely to engage in

7    vigorous or perhaps in any price competition with Hospital

8    Corporation.  And so the Seventh Circuit said, you can include

9    it even if it's just managed and not owned.

10        So whether Your Honor goes to the step of the lease that

11   we spent a lot of time talking about this morning or just

12   looks at the management agreement that the Hospital Authority

13   has already approved, already approved that gives Phoebe

14   Putney control of Palmyra from day one, either way, under a

15   Seventh Circuit precedent under an opinion from Judge Posner,

16   that's a Clayton Act violation, Your Honor.

17        Your Honor, on another case that was mentioned quite a

18   number of times this morning, and that's the *Cine 42nd Street*

19   *Theater* case, the Second Circuit pointed out appropriately

20   that the Clayton Act is forward looking.  You don't have to

21   wait for something to happen.  As the Second Circuit said:  We

22   need not need wait for the future to find a Clayton Act

23   violation.  It is not necessary for future events to unfold to

24   regulate economic activity under the Clayton Act.

25        Your Honor, can look -- and understandably, what we do at

1    the FTC is make predictions, what's going to happen.  What's

2    going to happen if you give Phoebe Putney a monopoly over all

3    inpatient acute care in this town.  We can tell you what's

4    going to happen based on experience.  Prices are going to go

5    up.  Your Honor recognized that.  You can act now; you don't

6    have to wait.

7        Now, Your Honor, this is a slide we saw this morning,

8    Exhibit 19, Mr. Bondurant put up the slide show that on

9    December 21st was shown to the Hospital Authority.  And this

10   is a slide from that slide show.  And I realize it's a little

11   hard to read, and maybe, hopefully in the copy that's before

12   Your Honor you can read it.  But it's an organization chart

13   for the Phoebe Putney organization.

14       And so what you have at the very top in the center in the

15   red box is you have Phoebe Putney Health System.  They're over

16   all these other little boxes, and off to the left, you've got

17   Phoebe North, Inc.  That's who Phoebe Putney was telling the

18   Hospital Authority on December 21st, the day they approved the

19   transaction, they were telling them, that's the way this

20   hospital is going to be managed.  And right next to it, that's

21   Phoebe Putney Memorial, that's the hospital we already manage.

22       And you can see there's a solid line going up to Phoebe

23   Putney Health System, and there are dotted lines going up to

24   the Hospital Authority.  That's because Phoebe Putney Health

25   System controls those two hospitals, and there's a dotted line

1    relationship up to the Hospital Authority.

2        You'll also note that there's no dotted line relationship

3    between the Hospital Authority and Phoebe Putney Health

4    System.  That's because Phoebe Putney Health System by design

5    is independent of the Hospital Authority, and it was, by the

6    way, Phoebe Putney Health System, not Phoebe Putney Memorial

7    Hospital that negotiated this transaction.  Phoebe Putney

8    Health System, not Phoebe Putney Memorial Hospital, who is a

9    party to this transaction.

10       And the other thing I would point out, Your Honor, is

11   since this slide was drawn by Phoebe Putney and presented to

12   the Hospital Authority, one little thing has changed, and

13   that is, those two boxes within the circle, Phoebe North and

14   Phoebe Putney Memorial Hospital, they've been collapsed into

15   one.  Because the plan now isn't even to hold those assets

16   separate in a separate corporation, Phoebe North, Inc.  It's

17   going to be one lease, it's going to be one set of assets, all

18   managed by Phoebe Putney Health System.

19       So, Your Honor, the transaction will eliminate the

20   competition between Phoebe Putney and Palmyra.  It will create

21   a monopoly for inpatient general acute care services, even in

22   the broader six-county market around here.  It will increase

23   healthcare costs for local employers and residents, and it

24   will eliminate non-price competition as well.  It will

25   eliminate the competition that brought you the billboards

1    about who's got shorter wait times in the ER.  It'll eliminate

2    the quality of care competition that exists in this town

3    today.

4        **THE COURT:**  Now, I know that in a motion to dismiss we

5    are dealing essentially with the complaint, the pleadings,

6    with some other matters that can be taken into account under

7    the rules, and so that's what we are dealing with now with the

8    motion to dismiss.  However, the defendant, HCA, this morning

9    in argument set out what, I think for the first time the Court

10   is aware of, of what it thought were the benefits or the

11   justification for this transaction.  I guess it kind of goes

12   to the merits which ultimately doesn't have to be decided

13   here, but I thought in light of your suggesting to the Court

14   what the dangers are and the consequences are, what your

15   response would be to that, at least assertion of what might be

16   the good reasons for this being a good transaction.

17       **MR. HASSI:**  Well, if Your Honor will indulge me, I'll

18   give a short answer on that, and I'll turn it over to

19   Mr. Reilly this afternoon to talk about the merits of the

20   preliminary injunction.

21       **THE COURT:**  I hit you with the question without knowing

22   who is actually arguing it, so that's fine.

23       **MR. HASSI:**  And, no, and I'm happy to give sort of a

24   short answer, Your Honor.  And the short answer is this.  I

25   think the Hospital Authorities Law suggests what the state's

1    interests are.  And we cited to that in our brief.

2        There's a provision that -- and the defendants mentioned

3    it this morning -- that the Hospital Authority, if they were

4    to enter into a lease would have to meet.  And there are

5    really two prongs.

6        There are two things that the Hospital Authority has to

7    find to enter into a lease, and that is, they will either

8    bring new facilities to the community, or lower the cost of

9    healthcare.  Let me address those in turn.

10        New facilities?  Not a single additional bed.  They're

11   just buying an existing hospital.  There's not going to be one

12   bed added here.  In fact, what this buy-versus-build rationale

13   that they went through this morning, if they had to build,

14   they'd add additional facilities.  If they're just buying, not

15   a single additional bed.  They're just buying what already

16   exists in the community.

17        Now, let me go to lower costs.  I took the deposition of

18   one of the members of the Hospital Authority, and I'll talk

19   about that this afternoon, and I asked him under oath, did you

20   find, did you see any evidence on December 21st that this was

21   going to lower costs?  He said, no, we haven't seen anything

22   like that.  We hope it will.  We hope combining these two

23   hospitals will.  Hope's not good enough.

24        And let me address one other point on that is, Palmyra

25   right now is managed by Hospital Corporation of America.

1   They're no slouch when it comes to managing hospitals.  It's a

2   multi-billion dollar corporation.  They are not small.

3       The idea that they're going to be cost efficiencies by

4   combining these two hospitals and that the Phoebe Putney,

5   which is a David compared to the Goliath, HCA, is going to

6   somehow manage costs better?  We don't see it happening.

7       But there's no evidence of that before Your Honor, and

8   I'll turn the rest over to Mr. Reilly this afternoon to talk

9   about the merits, because we haven't seen it, and, in fact,

10  all we've heard -- I mean, this case is the result of an

11  investigation where we engage with the parties.

12      We asked them, talk to us about the merits, tell us why

13  we should approve this.  You know what we heard?  State

14  action, state action, state action.  That's all we ever heard.

15  Your Honor, we don't think state action applies here, and

16  that's why we're before Your Honor here today.

17      Now, Your Honor, for the state action defense to apply,

18  we think the defendants have to prove three things.  First

19  they have to demonstrate to you their claim that the

20  transaction is by the Hospital Authority and not by Phoebe

21  Putney.  The second thing they have to demonstrate is, is that

22  the Hospital Authority Law clearly articulated this

23  transaction.

24      And the third thing they have to demonstrate is, is that,

25  assuming Your Honor finds that there was a private party

1    involved, i.e., Phoebe Putney, that Phoebe Putney was actively

2    supervised.  And I want to address each of those.

3          Now, the state action defense, Your Honor -- and I'm on

4    Slide 13.  The state action defense is a narrow section of the

5    antitrust laws for anticompetitive conduct that's an act of

6    government.  That's from *Parker versus Brown*.

7          And I think I mentioned to you already this quote from

8    *Midcal*, but I think it's worth emphasizing:  "The national

9    policy in favor of competition cannot be thwarted by casting

10   such a gauzy cloak of state involvement over what is

11   essentially a private anticompetitive act."

12         In the *Crosby* case, I use the term rubber-stamped, and

13   that comes from the *Crosby* case which we heard a lot about

14   this morning, and I know Your Honor is familiar with this.  A

15   rubber stamp is not enough to make this a transaction by the

16   Authority and not by Phoebe Putney.

17         And so we think the central question before Your Honor

18   today is if this is not -- you asked about the limits.  Well,

19   if this isn't a case of the gauzy cloak of state action, if

20   this isn't a case of the rubber-stamp, then what is?  That's

21   exactly what this is, we think, Your Honor, and we think the

22   facts show that.

23         **THE COURT:**  How do you respond, though, to the analogy

24   that defendants have argued, that is that conspiracy itself,

25   which is not alleged here, conspiratorial actions that lead to

1    an antitrust impact have been approved, so how does the gauzy

2    cloak and conspiracy, where would conspiracy fall in

3    relationship to the gauzy cloak is what I guess I'm asking.

4        **MR. HASSI:**  Your Honor, the purpose of the state action

5    defense, the purpose of the state action immunity, is to

6    respect the state when the state is acting as sovereign, and

7    so the purpose, the rational behind the *Omni* case that that

8    decision comes from is to avoid -- as was pointed out a number

9    of times this morning -- deconstruction of the decision, where

10   you're satisfied that the state is acting, if you're satisfied

11   that it's the state acting you don't get behind that act of

12   the state.  You don't say, okay, why are they acting, what

13   were their motives, were they conspiring, because you'd be

14   looking into everything.

15       **THE COURT:**  Well, what, under the circumstances that

16   you recognize in the law, would be something that was

17   indicative that there was state action such that the Court

18   would not need to look further to see whether there was

19   supervision or anything else?  In other words, what would

20   distinguish the facts of this case as you argue them from

21   those situations?

22       **MR. HASSI:**  Certainly, Your Honor.  If the Hospital

23   Authority had in 1986, as it was indicated that they tried to

24   do then, if in 1986 the Hospital Authority back when it was

25   actually actively involved in managing Phoebe Putney had

1    decided to buy Palmyra and if the Hospital Authority was

2    involved in those negotiations, and the Hospital Authority had

3    decided we're going to -- you know, we're going to try and buy

4    Palmyra, and they were putting up their money and they were

5    involved in that negotiation, that may be a different set of

6    facts than what we have here, and that might be a set of facts

7    under which you find state action.

8         What you have here is you don't have any involvement by

9    the purported state actor.  You got this, yes, we voted in

10    favor of it on December 21st, but nothing before that.  And

11    you've got a clear record that I'd like to take Your Honor

12    through that demonstrates that it was set up that way, and it

13    was set up that way by Phoebe Putney, the private actor.

14        Your Honor, Phoebe Putney has described itself as a 450

15    pound hulk, and we're going to demonstrate to you this

16    afternoon that they unabashedly structured the transaction for

17    the exact purpose of avoiding antitrust scrutiny under the

18    state action defense.

19        Phoebe Putney used what they called Mr. Baudino's proven

20    method to insert the Authority into the transaction for the

21    purpose of avoiding antitrust review without even telling the

22    Authority it was doing so.  The Authority was not involved in

23    that decision.  The Authority was told at the last minute of

24    this transaction.

25        As Mr. Baudino explained, and he was the transaction's

1    architect, he said, instead of buying -- and this is a quote

2    from PX-207, Your Honor:  Instead of buying Palmyra directly,

3    Phoebe will structure the acquisition of Palmyra with the

4    Authority, and I quote, acquiring title to Palmyra at closing

5    so that the doctrine of state action immunity from antitrust

6    law compliance attaches to HCA's sale of Palmyra.

7        And then after the Authority, Mr. Baudino, quoting again,

8    says:  We'll lease Palmyra to a nonprofit corporation

9    controlled by PPHS.  That lease will be on substantially the

10   same terms as the Authority's existing lease of Phoebe Putney

11   Memorial Hospital, Inc.

12       In other words, this transaction wasn't a conspiracy with

13   the Hospital Authority.  They didn't know this was being done.

14   They structured this in a way to use the Hospital Authority as

15   a strawman, Your Honor.

16     THE COURT:  Isn't there a suggestion, though, from at

17   least, I think, one or two of the participants that there were

18   ongoing advice and consultation with individual members of the

19   Authority, outside of their meeting in their capacity on the

20   record as the Authority?

21     MR. HASSI:  And that is, as Your Honor pointed, that's

22   outside their capacity.  The Hospital Authority is a board of

23   nine individuals, and those individuals act in one particular

24   way.  They meet together, they make sure there's a quorum

25   there, and then a majority of that quorum decides to act.

1    There was no quorum ever before December 21st discussing this

2    transaction, none.

3         And, again, I asked Dr. Lingle when I took his

4    examination, I asked him, well, were you, when you had this

5    meeting -- in their depositions they said the meeting was on

6    October 21st.  They now say it was September 21st.

7         Whenever this meeting happened at which they got what

8    they referred to as informational updates, there was no power

9    delegated to them.  They weren't acting on behalf of the

10   Authority.  Nobody from the Authority, no quorum for the

11   Authority met and said, you guys go do this, go talk to Phoebe

12   Putney.  They weren't.  It was an ultra vires act, and the

13   defendants haven't addressed that.

14        **THE COURT:**  This is made -- There's a suggestion at

15   least that because confidentiality was an important factor to

16   be taken into consideration, particularly on behalf of HCA,

17   therefore to take it in a normal meeting circumstance for the

18   Authority would have made that confidentiality impossible.

19   What is your response to that?

20        **MR. HASSI:**  Well, my response to that is, as the

21   Hospital Authority well knows, they can go into closed

22   session.  They can discuss things in closed session, in

23   particular things like transactions.

24        In the summer of 2010, the Hospital Authority went into

25   closed session to discuss the acquisition of a piece of

property, I think it was 421 Society Avenue.  They know how to

go into closed session.  They know how to do things

confidentially.

They didn't do it here because they weren't even aware of

it.  I'll show you in the chronology where on November 4th the

Hospital Authority met.  They didn't discuss this transaction

because only three of the nine were even aware it was

happening, and at this point the transaction is well under

way.

So the decision was not made by them.  The decision to

keep this confidential was made by the effective decision

maker, it was made by Phoebe Putney.  Phoebe Putney and HCA

decided to keep this in a need-to-know group.  The

need-to-know group didn't include the Hospital Authority, Your

Honor.

Your Honor, Phoebe Putney conceived of this transaction.

They directed the negotiations from start to finish.  They

made the offer to purchase Palmyra.  They didn't share key

transactions documents with the Hospital Authority.  Some of

those documents were never shown to the Hospital Authority.

In the meantime, the Hospital Authority, as I said, didn't

meet, they weren't aware.  They weren't involved in the

transaction.

I want to take Your Honor through the chronology just

briefly.  As Your Honor knows, in part this starts in July

1    2008.  In July 2008, Palmyra, who is now a defendant along

2    with Phoebe Putney, sued Phoebe Putney in this court for

3    monopolization.  They were such rivals, they're such fierce

4    competitors that they're suing each other for monopolization.

5        And by the way, in terms of active supervision, the

6    Hospital Authority, they didn't even read that complaint.

7    Their hospital was being sued for acts of monopolization,

8    anticompetitive acts, and the Hospital Authority, the

9    supervisory body, they didn't read the complaint, Your Honor.

10   They didn't care.  That's not active supervision.

11       Here's what Palmyra, which now joins in this state action

12   defense, said.  They said "no rational explanation accounts

13   for defendants' conduct other than a desire to destroy

14   competition with Palmyra."  They said, in Paragraph 2 of their

15   complaint, "for years the defendants in this case have used

16   their monopolies in obstetrics, neonatology, and

17   cardiovascular care to foreclose competition and other

18   hospital services and to exclude Palmyra from the market.  As

19   a result defendants have been able to and do charge commercial

20   insurers, claim administrators, and commercial insured

21   patients more than a competitive marketplace would allow."

22       Even before this transaction, even before this

23   transaction is allowed to close, Palmyra has been accused of

24   charging monopoly prices and harming consumers.  It's only

25   going to get worse, and Palmyra recognized that in their

1    monopolization case.  They said:  The effects of defendants'

2    anticompetitive acts are devastating to Georgians.

3         That was before they were -- That was before they had the

4    monopoly power they would have now if they complete this

5    transaction.

6         Now, as Your Honor knows, in the Spring of 2010 the

7    Eleventh Circuit reinstated that case, and somewhere in the

8    Summer of 2010, it would appear that Phoebe Putney decided,

9    you know, rather than beat them, let's just buy them.  And

10   Mr. Wernick told Mr. Baudino, go and negotiate with HCA, see

11   if you can acquire Palmyra.  That was done without the

12   Hospital Authority's knowledge.

13        So Phoebe Putney in August 2010 retains Mr. Baudino and

14   his Sovereign Group to begin negotiations with HCA to acquire

15   Palmyra on behalf of Phoebe Putney.  And here, Your Honor,

16   this is from PX-135, this is the engagement letter between the

17   Sovereign Group and Phoebe Putney.

18        This wasn't shown to the Hospital Authority.  In fact,

19   when I took Mr. Lingle's deposition this spring, I asked him

20   questions about the Sovereign Group.  He'd never heard of

21   them.  He hadn't heard of them because Phoebe Putney hired

22   them.

23        Phoebe Putney didn't tell him what they were doing, and

24   here's what the engagement letter says.  It says that they're

25   going to represent PPHS -- PPHS, that's the entity that is not

1   supervised by the Hospital Authority.  It's above PPMH, the

2   supervised entity -- represent PPHS to conclude the

3   acquisition of all or substantially all of the assets and

4   operations of Palmyra.

5        On September 13th, 2010, Mr. Baudino got back and said,

6   you know, we spoke to HCA, and here's what they'd like.  And

7   at this point in time the Hospital Authority is not aware of

8   the transaction.

9        So here's his letter.  This is PX-58.  And he says:  At

10   your request Doug Lewis -- Doug Lewis is Mr. Baudino's partner

11   in the Sovereign Group -- has successfully opened

12   communications with HCA, Inc. for the acquisition of the

13   assets of Palmyra Park Hospital.

14        He goes on to say:  HCA will listen to an offer from

15   Phoebe Putney Health Systems for the purchase of Palmyra.  So

16   this is September 13th, unquestioned, Phoebe Putney is

17   negotiating to buy Palmyra.  It hasn't been discussed with any

18   member of the Hospital Authority.

19        Now, HCA, as I mentioned, and as Your Honor mentioned,

20   wanted absolute confidentiality and they also wanted no risk

21   of antitrust enforcement activity.  They didn't want to see

22   this transaction challenged, because they know, they're a big

23   sophisticated corporation, they know mergers to a monopoly

24   don't fly.

25        On October 6th, Phoebe Putney's management updated the

1   Board of Directors of Phoebe Putney Health System, the folks

2   that were really behind this transaction -- excuse me, this

3   was on October 6th, it was the finance committee.

4       They met with the finance committee, they talked to the

5   finance committee about the transaction, and they got the

6   approval to go to the full board.  At this point in time the

7   Hospital Authority, not involved.

8       October 7th, Phoebe Putney management updates their full

9   boards of directors.  Now, Mr. Wernick has testified in his

10  declaration that he treats the Hospital Authority the way he

11  would a board of directors.  Here he is having a meeting with

12  his real board of directors, and he hasn't told the Hospital

13  Authority yet.

14      And that's the contrast we're trying to draw here.  We're

15  not asking Your Honor to deconstruct the Hospital Authority's

16  motives, but we're asking Your Honor to look at who the real

17  actor is here, and we think it's clear from this set of facts.

18      And what the Board of Directors did, the PPHS Board of

19  Directors did at that meeting is they authorized an initial

20  offer to HCA for Palmyra, and I won't mention the amount in

21  open court.  But they authorized PPHS's Board authorized

22  PPHS's Management to negotiate to buy Palmyra.  Nothing about

23  the Hospital Authority in there.

24      On October 21st, we have the meeting we spoke about

25  earlier.  Now, maybe that was September 21st, maybe that was

1    October 21st, two members of the Hospital Authority.  And they

2    point to these meetings, and what they say is, well, these are

3    evidence that the Authority was involved in the transaction.

4        And as I said, you've got to act through a majority of a

5    quorum.  There was no majority of a quorum.  There was no

6    delegation of responsibility to Messrs. Lingle and Rosenberg.

7    They were there in their individual capacities.  Anything else

8    is ultra vires because the Hospital Authority has to act under

9    its bylaws based on a majority of a quorum, Your Honor.

10       Now, on November 4th, two things happened.  One,

11   Mr. Wernick, through his consultants, had heard back from HCA.

12   The number was too low.  They had to increase their offer.

13   And so he goes to a designated committee of his board of

14   directors, the PPHS board of directors.

15       They opted to designate three members to deal with this

16   transaction.  He goes to them, and he gets permission to

17   increase the sum that they're going to offer to buy Palmyra.

18       On that very same day, that very same day, the Hospital

19   Authority met, and you know happened related to this

20   transaction?  Nothing.  It wasn't mentioned.  The majority of

21   the Hospital Authority still was not aware this transaction

22   was in the works.  Because although they'd had these

23   informational sessions, whether on September 21st or October

24   21st, the majority of the Hospital Authority wasn't in the

25   need-to-know group.  HCA wants to keep this confidential,

1    don't tell the Hospital Authority, keep it confidential, no

2    need to know.

3        November 16th, this is when PX-207, which I referenced

4    earlier, gets sent, and this is a letter from Sovereign Group

5    to HCA.  And it's really three letters.  There's a letter from

6    the Sovereign Group to HCA setting out Phoebe Putney's offer

7    to buy Palmyra.  There's a letter from Mr. Baudino, who is

8    both a member of the Sovereign Group, and he's got the Baudino

9    Law Group, that explains how they're going to address state

10   action and how they're going to avoid antitrust risks.

11       And then there's a letter from Shattuck Hammond, and

12   Shattuck Hammond is Phoebe Putney's bankers and it's got a

13   balance sheet, and Phoebe Putney's bankers attest to the fact

14   that Phoebe Putney has a quarter of a billion dollars in cash

15   and cash equivalence that they can use to effect the purchase

16   of Palmyra.

17       So this next slide, this is an excerpt from PX-207.  And

18   I'll read it, it says:  "Sovereign Group is the exclusive

19   representative of and advisor to Phoebe Putney Health Systems

20   of Albany, Georgia with regard to negotiations surrounding the

21   potential acquisition by Phoebe from HCA of Palmyra Park

22   Hospital.  The purpose of this letter is to present an offer

23   to HCA for the acquisition by Phoebe of all of HCA's assets."

24       It doesn't mention the Hospital Authority, but PPHS's

25   board knew about it.  The letter goes on to say:  "Both

1    Sovereign and Phoebe understand the need for the highest level

2    of confidentiality, and we would propose immediately entering

3    into a mutual confidentiality agreement.  Sovereign and Phoebe

4    have undertaken appropriate actions at Phoebe to severely

5    limit those with a need to know of this proposal."  The need

6    to know group?  It didn't include the Hospital Authority.

7        They go on to say:  "Based on our discussions with our

8    client" -- this is Sovereign talking about discussions with

9    PPHS -- "Phoebe hereby makes a purchase price offer for

10   Palmyra of" -- and I won't say the number.  And they go on to

11   talk about the rationale of how they came up with that number.

12   Phoebe, paying for Palmyra.  Whose acquisition?  Phoebe's

13   acquisition.  Whose money?  Phoebe's money.

14       They go on to say:  "Payment of the purchase price will

15   be in cash and will not be contingent on financing.

16   Accompanying this letter is a letter from Phoebe's financial

17   advisor Shattuck Hammond Partners, a Division of Morgan Keegan

18   Company, Inc., indicating that Phoebe has approximately 255

19   million in unencumbered cash and cash equivalents available to

20   it within 48 Hours."

21       Then they explain how the Hospital Authority is involved

22   in this transaction.  "Phoebe will structure the acquisition

23   of Palmyra --"  "Phoebe will structure the acquisition of

24   Palmyra in the same manner that the Columbus Regional

25   Healthcare System, Inc. did to avoid any antitrust

1    Hart-Scott-Rodino pre-merger notification filing, or any

2    antitrust enforcement by the Federal Trade Commission."

3        They go on:  "Phoebe will guarantee the Authority's

4    payment of the purchase price and performance of the asset

5    purchase agreement.  Later Phoebe will lease Palmyra from the

6    Authority.  Following this proven format will avoid

7    Hart-Scott-Rodino pre-merger notification and filing of any

8    antitrust enforcement action by the Federal Trade Commission

9    and the United States Department of Justice."

10        **THE COURT:**  Do you believe this reference to Phoebe

11   leasing Palmyra in the future is sufficient enough to prevent

12   that from being just a future possibility as criticized by the

13   defendants?

14       **MR. HASSI:**  We think the facts together, Your Honor,

15   demonstrate that.  And I'll show you some more facts on that

16   point.  But, yes, Your Honor, we think it is crystal clear

17   that from the beginning the very purpose of this

18   transaction -- the Hospital Authority doesn't want this

19   hospital.  Phoebe wants this Hospital.  The Hospital Authority

20   wants to put it in Phoebe Putney's hands.  Buy versus build,,

21   capacity issues, every rationale given for this transaction.

22   It's not, this is a bargain, let's buy it, and see who we can

23   sell it to.  It's not, you know, we need to provide more

24   healthcare in this community and let's get somebody to manage

25   it.  They're buying this to put it in the hands of Phoebe.  No

1  question about it.

2      THE COURT:  Do you know what the outcome was in the

3  Columbus case?

4      MR. HASSI:  Your Honor, the Columbus case, I don't know

5  the facts of.  I do know from other documents in this that

6  they employed the same method.  They were represented by

7  Mr. Baudino, it was the Baudino-proven method.  They flew it

8  under the radar.  They used the Hospital Authority for state

9  action.  I don't know whether --

10     THE COURT:  Well, what I'm basically asking is, did

11  anybody raise a flag or make a complaint such that some court

12  or some agency addressed that as an issue?

13     MR. HASSI:  I'm not aware of it, no, Your Honor.

14     THE COURT:  All right.

15     MR. HASSI:  Your Honor, Phoebe closed in this PX-207 by

16  saying:  "In short Phoebe will close the acquisition of

17  Palmyra and pay the purchase price in 70 days or less on HCA's

18  acceptance of this offer."

19     This is a contract -- or an offer to make a contract.

20  This is an offer from Phoebe Putney to HCA to buy Palmyra, the

21  Hospital Authority not copied on it, the Hospital Authority

22  not made aware of it until later.

23     On December 2nd -- I talked about the contrast between

24  the way the Phoebe Putney Health System board was treated and

25  the Hospital Authority was treated, and here's a good example.

1    December 2nd, we have another meeting of the Phoebe

2    Putney Health System board of directors, and at that meeting

3    they discussed the transaction and the board of directors

4    approves the final terms between PPHS and HCA, agreeing to

5    guarantee a 195 million dollar payment.

6    And we have here, Your Honor, this is PX-92.  Those are

7    the resolutions from that meeting.  I realize they're a little

8    hard to read, but I'll read it.  It says:

9    "Management is authorized" -- that's PPHS management is

10   authorized by PPHS's board -- "to proceed with entering into

11   an asset purchase agreement whereby PPHS guarantees the

12   purchase to be made by the Authority in the amount of $195

13   million."

14   Now, here's an interesting thing that PPHS's management

15   did, again -- I mean, PPHS's board did in contrast.  Here's

16   what a board does.  They say:  "Management is instructed to

17   seek a lower purchase price before agreeing to the offer --

18   the figure offered by HCA and to consider the break-up fee in

19   the context of the negotiations, both the purchase price and

20   break-up fee being considered very high by the board."

21   So PPHS' board, they weren't thrilled at the price.  They

22   told management, go back and try to renegotiate.  There was no

23   such thing done by the Hospital Authority.  And, again, the

24   Hospital Authority as of December 2nd, you've got three

25   members of the Hospital Authority are aware, the rest are not.

1      When does the Hospital Authority become aware?  Well, in

2  the week of December 14th to December 20th, Mr. Wernick and

3  his lawyer meet with members of the Hospital Authority.  And

4  they meet with them in groups of three because they want to

5  avoid the Georgia Open Records Act.

6      They don't want this getting out.  They want to keep it

7  quiet.  And so they have these brief meetings with members of

8  the Hospital Authority, they talk to them about the

9  transaction, and that's within the week, within the week, that

10  they're presented with the final asset purchase agreement.

11      Now, on December 20th, Phoebe Putney and HCA, Phoebe

12  Putney and HCA enter into a termination agreement.  The

13  Hospital Authority is not a party to this agreement.  The

14  Hospital Authority, when we took Chairman Lingle's deposition,

15  he certainly wasn't aware of this agreement.

16      But they entered into an agreement whereby Phoebe Putney

17  agreed to pay HCA $17.5 million, $17.5 million, if HCA --

18  excuse me, if the Hospital Authority didn't approve this

19  transaction.  And not just didn't approve it, but didn't

20  approve it exactly, exactly as negotiated between Phoebe

21  Putney and HCA.

22      They weren't going to allow the Hospital Authority board

23  to sent them back and say, try to renegotiate this or change

24  that term.  It was approved either exactly as we negotiated,

25  we, HCA and Phoebe Putney, or you pay us $17.5 million, and we

1    walk away.

2        And here is at PX-226 the termination fee agreement, and

3    it was entered into by, as I indicated, Phoebe Putney Health

4    System and Palmyra Park Hospital.  The Hospital Authority is

5    not a party to this.  And as it says, in Section D:  As of the

6    date of this agreement -- this is on the recitals page -- as

7    of the date of this agreement -- this is December 20th.  This

8    is one day before the meeting at which the vote happened.

9        "As of the date of this agreement neither the form of the

10   asset purchase agreement nor the transactions contemplated

11   hereby has been presented to or approved by the Authority."

12       So one day before the vote, which is a vote, which is a

13   vote, which is a vote, they're conceding, the parties are

14   conceding:  Hospital Authority, not in the loop on this.

15       And what happens if they don't approve it?  This is on

16   Page 5 of PX-226:  If any one or more of the following shall

17   occur the agreement terminates and that triggers the 17.5

18   million dollar payment.

19       It says:  "If the Authority shall not have duly

20   authorized the asset purchase agreement in exactly the form

21   attached hereto as Exhibit A."

22       We're not giving this to the Hospital Authority to

23   consider and to go back and change.  This is an agreement

24   between Phoebe Putney and Palmyra.  We just need the Hospital

25   Authority to rubber-stamp it to set up the state action

1    defense.  And on December 21st, they do exactly that.

2        On December 21st, the Hospital Authority meets, and they

3    are asked to review documents they haven't seen before:  A

4    74-page asset agreement with 39 pages of exhibits; a 17-page

5    Management Services agreement, and that's the agreement that

6    gives Phoebe Putney on day one, day one, the power to control

7    Palmyra; 10 pages of resolutions to be passed; a 3-page Q and

8    A; and a 29-page PowerPoint presentation.  That's the one that

9    Your Honor saw this morning.

10        And I want to -- Pete, if you can bring that up for a

11   second.

12        Now, they did all this -- that's by my count 172 pages

13   that they reviewed in that meeting.  172 pages.  I used the

14   term rubber-stamp, Your Honor, and I want to back that up.

15   Rubber-stamp, and here's what Merriam Webster says of the

16   transitive verb, rubber-stamp.  "It's to approve, endorse, or

17   dispose of as a matter of routine or at the command of

18   another."  As a matter of routine.  That's what this was.

19        Mr. Bondurant this morning brought up the business

20   judgment rule.  I suggest to you, Your Honor, that under the

21   duty of care, under the business judgment rule, this wouldn't

22   pass muster.  Now, that's not what our case is about, but this

23   was not a decision by the Hospital Authority.  This was a

24   decision by Phoebe Putney.

25        This is a page that Your Honor was shown this morning

1   from the deck that was shown to the Hospital Authority, to the

2   Hospital Authority on December 21st.  And I'd ask Your Honor

3   to read that first line.  It says PPHS strategic decision.

4   Not Hospital Authority's strategic decision.  PPHS strategic

5   decision.

6        It goes on and it talks about "transaction has been

7   negotiated."  And, oh, by the way, in the middle, it says

8   "transaction structure as in past, Albany-Dougherty County

9   Hospital Authority is owner, in parentheses (purchaser) and

10  PPHS is lessee (operator).

11       So, again, you know, the idea that this lease is just

12  something that's contemplated about maybe in the future.  It

13  was right here.  But when they showed this slide deck, which

14  was by the way recycled from the December 2nd PPHS board

15  meeting, it says PPHS strategic decision at the top when

16  they're showing it to the Hospital Authority.  They don't even

17  have the courtesy to change the deck for the Hospital

18  Authority and say it's a Hospital Authority strategic

19  decision.  It's a PPHS strategic decision, Your Honor.

20       Now, if we go back to the Slide 51.  This is the asset

21  purchase agreement, Your Honor.  This is the one that

22  according to Phoebe Putney, there's no case in controversy

23  here.  Here in this asset purchase, which they asked Your

24  Honor to look to, it says:

25       PPHS will guarantee the financial obligations of buyer

1     and Phoebe North, Inc. under this agreement.

2          PPHS acknowledges that seller -- that's HCA -- would not

3     enter into this agreement but for PPHS's obligations under

4     Section 10.1 -- that's the guarantee -- and PPHS's financial

5     guarantee of the buyer's obligation under this agreement and

6     any ancillary documents hereto.

7          PNI -- that's Phoebe North -- acknowledges that seller

8     would not enter into this agreement but for Phoebe North's

9     offer of employment to all of seller's employees as

10    contemplated by this agreement.

11         In other words, HCA wanted to make sure that they were

12    going to get paid and that their employees were going to be

13    offered employment, not by the Hospital Authority, by Phoebe

14    Putney.

15         And they made in -- this is Slide 52, it's also PX-13.

16    This is Page 71 of the asset purchase agreement:  "PPHS hereby

17    unconditionally and absolutely guarantees the prompt payment

18    by Buyer and PNI and by any assignee by, through or under

19    Buyer or PNI of each and every financial obligation."

20         Phoebe Putney is buying this deal.  They go on to say:

21    Primary liability of PPHS is accordingly seller -- HCA, in

22    other words -- may enforce this guarantee against PPHS without

23    first making a demand on buyer, PNI, or any other person.

24         You don't have to go to the Hospital Authority for your

25    money.  If you've got a problem, you go to the person who's

1    really behind this transaction, Phoebe Putney.

2        And as I mentioned, Your Honor, the day after that vote,

3    on December 21st, Phoebe Putney waived the provision in its

4    1990 lease with the Authority that prevented the Authority

5    from entering into this transaction, because that was sort of

6    an inconvenient fact.

7        If you look at Section 4.21, what the 1990 lease said is:

8        Competition with hospital.  During the term of this

9    agreement transferrer shall not own, manage, operate, or

10   control, or be connected in any manner with the ownership,

11   management, operation, or control of any hospital or other

12   healthcare facility other than the hospital in Albany.

13       In other words, when they went into the -- when the

14   Hospital Authority created PPHS and PPMH and got out of the

15   business of managing hospitals, PPMH wanted to make sure that

16   the Hospital Authority was out of the business, and they got a

17   do-not-compete clause which they had to then waive for this

18   strawman effect to take place.

19       Now, on February 14th, this is after, again, after the

20   vote, the leadership of PPHS, including members of their board

21   of directors had meetings with the ratings agencies.  Now, the

22   ratings agencies, those are those very important folks that

23   issue the bonds that make sure the hospital has enough money

24   to operate.  And those are very important meetings, and

25   they're very careful about what they say and what they told

1    those folks in the meetings.

2        So I just want to show Your Honor a couple of slides from

3    the presentation.  This is PX-12.  This is the cover slide.

4    This is February 14th of this year, presentation to the

5    ratings agency.  There's Phoebe Putney Hospital, and on the

6    bottom in the red circle -- Pete, could you blow that up -- is

7    Palmyra Hospital.  Who's acquiring Phoebe -- Who's acquiring

8    Palmyra?  Phoebe Putney is.

9        And unless there be any question about that, here's what

10   they told the ratings agencies:  Successful new acquisitions

11   by PPHS.  There it is, second to last one, Palmyra Hospital.

12       So for them to come into this court and deny to Your

13   Honor that they're acquiring a hospital -- they told the

14   ratings agencies.  These are the folks that issue their bonds.

15   They do this -- They issue hundreds of millions of dollars in

16   bonds based on the representations they received from PPHS.

17   This is an important document.  They say -- Phoebe Putney

18   says, we're acquiring Palmyra.

19       They, around the same time, in February -- later in

20   February, Phoebe Putney was anxious to get moving on this

21   acquisition.  They want to go ahead and, you know, combine

22   these two hospitals so they hired a consultant.  They hired a

23   couple of consultants, but they hired this particular

24   consultant, and we've redacted the name because it's not

25   public who they hired.

1      But they entered into a contract, and this is signed by

2   the chief operating Officer at PPHS.  And it says:  "Phoebe

3   Putney plans to become the sole corporate member of Palmyra

4   Medical Center.  As Your Honor I'm sure knows, the sole

5   corporate member, that's the owner of a nonprofit corporation.

6   You don't have ownership per se.  You've got a member, you may

7   have more than one, but that's who controls the nonprofit

8   corporation.  Phoebe Putney is going to be it.

9      And, oh, by the way, they say, "we understand that

10  management's primary goal for the deal is to achieve greater

11  market scale and growth opportunities through reduced out

12  migration and increased admissions."  This is about growing

13  the monopoly that is Phoebe Putney.

14     Now, I talked -- we talked about the lease, and as I

15  said, Your Honor, we don't think that you have to find that a

16  lease is going to happen for you to find that under Section 7

17  of the Clayton Act this is an illegal acquisition, and it's an

18  acquisition by Phoebe Putney, but in case there were any

19  issue, on April 4th, on April 4th, just weeks before we filed

20  this complaint, the Hospital Authority met, and they adopted a

21  resolution approving the terms of a lease with Phoebe Putney.

22     As of April 4th they were still planning -- they were

23  still planning on leasing this hospital, these assets to

24  Phoebe Putney, and when I asked Vice-Chairman Lingle about

25  this, and I asked some questions -- he was appearing as

1   essentially a 30(b)(6) witness on those lease terms.  I asked

2   him:  And the acquisition is premised on there being a lease

3   to Phoebe, right?  Answer:  Yes, sir.  You would not have done

4   this acquisition but for the fact that there's going to be a

5   lease to Phoebe, right?  That's right.  And the Authority has

6   not considered any options other than leasing Palmyra to

7   Phoebe in connection with this transaction?  Not at this

8   point.  That was in March of this year.

9       No other consideration given.  They certainly didn't give

10  any other consideration on December 21st when they voted to

11  approve this.  This was a transaction, this was putting a

12  private actor, Palmyra, into the hands of the private actor,

13  Phoebe Putney and giving them control.

14      Your Honor asked a number of questions about cases with

15  facts like this.  In our view, Your Honor, this is a brazen

16  attempt, a brazen attempt -- there's nothing like this, either

17  Eleventh Circuit law or otherwise -- to avoid the antitrust

18  law.  It was, the transaction was structured that way, and it

19  was structured to allow Phoebe Putney, a private actor, not

20  the Hospital Authority, Phoebe Putney, to control Palmyra.

21      Phoebe conceived of the purchase.  They negotiated the

22  purchase.  They're paying $195 million.  They're going to

23  control Palmyra from day one.  They're going to lease Palmyra

24  under a long-term lease, and Phoebe is going to combine

25  Palmyra and PPMH and run the two hospitals as one.  The only

1    purpose for entering in this transaction is to put Palmyra

2    into Phoebe Putney Putney's hands.

3        And this is -- Your Honor asked about cases, this is the

4    *City of Columbia* case we heard so much about this morning.

5    And Your Honor asked about where you draw the line.  In the

6    *City of Columbia* case the Supreme Court said there is a line.

7    It's not that a state can do anything it wants.  It can't just

8    waive the magic wand of state action to make things happen.

9        Here's what they said in that same *City of Columbia* case

10   they talked so much about, like getting behind the motives and

11   deconstructing the process.  There's a limit.  What they said

12   is:  The states may not exempt private action, private action

13   from the scope of the Sherman Act.  We in no way qualify the

14   well-established principle that a state, a state does not give

15   immunity to those who violate the Sherman act by authorizing

16   them to violate it or by declaring that their action is

17   lawful.

18       You can't simply just vote in favor of this transaction

19   and say, now, it's okay under the Clayton Act because a state

20   actor voted.  The state can't do that.  Whether or not it's

21   the Hospital Authority board, you can't just waive a wand over

22   it and say this is state action, leave it alone, under the

23   Clayton Act, leave it alone under the antitrust laws.  There

24   is a limit to the state action immunity.

25       And I would ask it, again, based on these facts, if this

transaction is not the gauzy cloak and the rubber stamp that the Supreme Court and the Eleventh Circuit warned about, then what is?

Now, Your Honor mentioned the three prongs, and there was a lot of discussion about that this morning, about *Lee County* and the three prongs and the interpretation.  This is now the second issue, the legal issue of whether the legislature clearly articulated a right to do this.

And we agree, you know, we take no issue with the fact that the Authority is a political subdivision.  We take no issue that through statutes they're generally authorized to act, but we do take issue on the third prong of *Lee County*, and that is, that through statutes, the state has clearly articulated a state policy authorizing anticompetitive conduct.  We don't think that happened here, Your Honor, and I'll explain why.

Your Honor, under *Lee County* the defendants have the burden, and they acknowledged that this morning, of demonstrating that the anticompetitive act in question, here the events culminating in and including the transaction, is quote "the foreseeable result of the legislation."

In other words, for the defendants to prevail, the legislature must have reasonably anticipated, reasonably anticipated the conduct of the transaction now before the Cour.  And I would suggest to Your Honor they they've treated

1    this as nothing more than a speed bump that's reasonably

2    anticipated, and that's not what it is.

3         Now, we heard a lot of talk this morning about the 1941

4    Act, and I will confess I was not born in 1941 when Georgia

5    enacted this --

6         **THE COURT:**  Just for the record, nor was I, and I don't

7    think Mr. Bondurant was either.

8         **MR. HASSI:**  I was not going to ask, Your Honor.  But I

9    wasn't born, and I'm not going to pretend that I was there.

10   But let me tell you a few things I do know about this 1941

11   enactment of the Hospital Authorities Act.  I do know that at

12   that point in time no hospital authorities exist.  In fact,

13   Mr. Bondurant testified this morning -- or Mr. Bondurant,

14   excuse me, told us this morning that this Hospital Authority

15   was the first -- one of the first or I think he said the first

16   created in the State of Georgia.

17        So this legislation in 1941, it was creating hospital

18   authorities, and when it created hospital authorities, there

19   was no point in creating them unless it was going to give them

20   the power to do something.  So it had to give them the power

21   to acquire assets.

22        So they gave them, in 1941 they created the right in each

23   county, and there are 159 of them as I understand it.  They

24   created the right to create a hospital authority, and they

25   gave them the right to acquire assets.

1    Well, that's fine, but that doesn't suggest that they

2    expected them to acquire multiple assets.  It doesn't suggest

3    that they reasonably anticipated that they were going to

4    create monopolies.  And, in fact, if you look very carefully

5    at the Hospital Authority's brief, and Mr. Bondurant said it

6    this morning, he talked about this Act giving them the power

7    to acquire other hospitals as though these newly created

8    entities already owned entities.

9    Well, as we have here in Dougherty County, Dougherty

10   County created a Hospital Authority and that Hospital

11   Authority acquired Phoebe Putney.  They weren't acquiring

12   another hospital.  They weren't acquiring a second hospital.

13   They were acquiring their first asset, or there'd be no

14   purpose.

15   And it allows them to acquire projects, and the list of

16   projects is long, and I won't bore you with the entire list,

17   but it includes medical equipment, it includes dormitories, it

18   includes all kinds of facilities.  So the fact that it's

19   plural and allows acquiring additional things -- it's allowed

20   the Hospital Authority to acquire the tools to do their job,

21   but I would suggest to you it doesn't say anything about

22   displacing competition.

23   As we pointed out in our brief, and we don't think the

24   defendants have responded to this, they don't dispute that

25   their reading the Hospital Authorities Law would lead to

1    absurd results.  In other words, if you interpret the Hospital

2    Authorities Law the way they suggest that Your Honor should,

3    you could combine in one super hospital authority all 159

4    counties of Georgia and that super hospital authority could go

5    up and buy every healthcare asset in the State of Georgia.

6    I'm talking, hospitals, medical equipment, dormitories,

7    facilities, you name it, they could buy it, and they could

8    control it all.

9        That's what they think the law says.  We don't think

10   that's what the law says.  We don't think that that's what the

11   Georgia legislature reasonably foresaw in 1941.  That outcome

12   would be absurd, Your Honor, and we don't think you should

13   interpret the law in a way that leads to absurd results.

14       Now, the defense reading the statute also ignores the

15   basic tenants of statutory construction.  Whereas Your Honor

16   knows if a statute includes a particular language in one

17   section, but omits it in another section of the same Act, it

18   is generally presumed that the legislature act intentionally

19   and purposefully in the disparate inclusion or exclusion.  We

20   cite the Eleventh Circuit on that.

21       In 1993 the Georgia Legislature amended section -- added

22   Section 728.1 to the Hospital Authority Law, and what that

23   section allowed, it allowed certain mergers, and it allowed

24   mergers not of hospitals, but of hospital authorities.

25       So as Mr. Bondurant explained this morning, in some

1    counties you can have more than one hospital authority, and

2    what the Georgia legislature did in 1993 is they said, you can

3    merge those two hospital authorities together.  And they did

4    something that they didn't do in 1941.  They added a specific

5    grant of antitrust immunity to hospital authorities acting

6    pursuant to that section, and they wrote:

7         "It is declared by the General Assembly of Georgia that

8    in the exercise of the powers specifically granted to them by

9    this code section, hospital authorities are acting pursuant to

10   state policy and shall be immune from antitrust liability to

11   the same degree and extent as enjoyed by the State of

12   Georgia."

13        In other words, when the Georgia Legislature wants to

14   grant antitrust immunity, they sure know how to do it, and

15   they did it here.  They did it in 1993.  If they changed one

16   word -- one word in that section, if they changed section to

17   chapter, we wouldn't be here, Your Honor, because they would

18   have said that the Hospital Authority could do this, and you'd

19   have antitrust immunity, and there wouldn't be a problem.  But

20   they didn't say that.  They didn't say that.  They only used

21   the word section.

22        The defendants also in interpreting the section rely

23   primarily on three Eleventh Circuit cases.  And I know Your

24   Honor is familiar with these cases, and I won't spend a lot of

25   time going throw them because I know Your Honor has read them

1    before, you've written about them before, and I think you

2    understand them.  But I want to point out some differences,

3    because we don't think those three cases support the

4    defendants' claim.

5        And I want to start with *Lee County* because that, I think

6    everyone agrees is the most important one, and I think one of

7    the facts about *Lee County* that wasn't mentioned this morning

8    is *Lee County*, when the Lee County board was acting, Lee

9    County board hadn't leased out their hospital.

10       The Lee County board was actively, actively involved in

11   the matters at Lee Memorial Hospital.  They hadn't leased it

12   out, they hadn't delegated the authority, there was no private

13   actor involved the way there is here with Phoebe Putney.

14   There's no question of that in the *Lee County* case.

15       The other thing that's different about *Lee County* is it

16   was a very specific statute, a very specific statute.  In 1963

17   the Florida Legislature addressed that particular county, and

18   they gave Lee County, in that particular county, Lee County,

19   the power to acquire a monopoly.  And in 1987, they added to

20   that section, and they did that with the knowledge that they'd

21   already given Lee County the power to have a monopoly in that

22   section -- in that county, excuse me.

23       So they'd once given them monopoly, and they gave them

24   power, and they gave them power again to acquire additional --

25   the word they used was additional facilities.  And the

1    Eleventh Circuit points out the backdrop that existed at that

2    point in time.  The same Florida Legislature, the same Florida

3    Legislature that wrote this specific law addressing this

4    specific county, not the 159 counties you have Georgia

5    addressing in 1941 -- when they wrote that specific law, they

6    had just passed a certificate of need law.

7         So as Mr. Bondurant pointed out, they had artificially

8    limited competition in that county.  The Eleventh Circuit said

9    that the Florida Legislature was aware that Lee Memorial was

10   operating at 75 percent capacity.  And what that meant was

11   under the certificate of need law, when the Florida

12   Legislature said, you can acquire additional facilities, they

13   knew they couldn't build more because they wouldn't get a

14   certificate of need.

15        So the only way they could acquire additional facilities,

16   the only way they could enact -- carry out the power in that

17   statute was to acquire another hospital, one of the other

18   three hospitals that existed in that county.  And the Eleventh

19   Circuit said, yeah, it was reasonably foreseeable.  Sure, it

20   was reasonably foreseeable.  When you say with the

21   foreknowledge that the only thing you can do to carry out the

22   power we're giving you in this statute is to acquire one of

23   those three hospitals, we pretty much reasonably anticipate

24   that you're going to acquire one of those three hospitals.

25        Now, here, as I pointed out, in 1941 they were creating

1   hospital authorities for the first time.  Those hospital

2   authorities had no assets.  They did not.  The Georgia

3   legislature did not -- and I don't think Your Honor will find

4   that the Georgia legislature reasonably anticipated that

5   hospital authorities would acquire one hospital, lease it out

6   to a private actor, now acquire another hospital that would

7   give that private -- at the behest of that private actor, give

8   it to that private actor, and to give them a monopoly.  That's

9   not contemplated under this law, Your Honor, and that's the

10  difference with *Lee County*.

11       **THE COURT:**  There's some argument, though -- not

12  argument.  There's some contention that it does not have to be

13  explicit in saying reasonably anticipated, but does that

14  necessarily mean it doesn't have to be an explicit delegation?

15       **MR. HASSI:**  That's absolutely right, Your Honor.  And, in

16  fact, the second case I was going to talk to, the *Askew* case,

17  in *Askew* the Eleventh Circuit was dealing with Alabama law

18  where it was, in fact, explicit.  And here it's not, here's it

19  not explicit, that's right.  But it's got to be reasonably

20  foreseeable, and I think if you use common sense and think

21  about the purpose of the state action immunity, and if you

22  read the early cases -- I mean, it's about protecting.  It's

23  about protecting the people from anticompetitive acts, and

24  it's about making sure that when you say something is immune,

25  when you say something is a state act that the legislature

1   thought about it.  The legislature said we are purposefully

2   displacing competition.  Competition is the law of the land,

3   but in this case, in this case, we're going to displace

4   competition because there's a reason for it, because something

5   good will come of it if we displace competition.

6       And that's what the Florida legislature did in *Lee*

7   *County*.  They said, you know what, we're going to give you the

8   power to acquire additional facilities, and we know -- the

9   Eleventh Circuit found -- we know, and they can't build

10  additional facilities because of the certificate of need law,

11  so you're going to acquire one of those three hospitals that

12  exist in the county.  It was a very specific set of facts.

13      Not the case here, Your Honor.  I don't think that you

14  can say that the Georgia legislature reasonably anticipated

15  the set of facts that's before Your Honor today, and I don't

16  think when we get to the merits they're talking about this,

17  that you'll think any good is going to come from this

18  transaction with respect to the consumers or Dougherty County,

19  that's what this is about protecting.  That's what the state

20  action is about doing is making sure the state's interests are

21  fulfilled, lower prices, greater healthcare facilities.  No

22  lower prices here.  No greater healthcare facilities here.

23  This is not state action, Your Honor.  So *Lee County*, a far

24  cry from here.

25      *Askew*, we just talked about, specific grant of antitrust

1    immunity, much like the one that exists in another section of

2    this same chapter that was added in 1993, but does not exist

3    in the section that we're talking about.

4        And that leaves *Crosby*.  *Crosby*, as was pointed out this

5    morning, that's a peer review case, Your Honor.  A very

6    different set of facts.  It's not a merger case like the one

7    here.  It's not Clayton Act Section 7.  It was a peer review

8    case.

9        But the Eleventh Circuit found in *Crosby*, the Eleventh

10   Circuit found, as Your Honor I think pointed out this morning

11   that the Hospital Authority there was very involved.  They

12   used the words.  They said the hospital authority, in that

13   case, does not merely rubber-stamp the committee

14   recommendations.  Instead it conducts an independent,

15   meaningful review.

16       You can't have it both ways, Your Honor.  The Hospital

17   Authority has either got to be very involved -- they've got to

18   conduct independent, meaningful review.  They've got to do the

19   things that show they're protecting the consumers, that

20   they're acting in the best interest of the states, where they

21   can lease out their hospital, they can meet four times a year

22   to get reports and make sure things are going along, but you

23   can't do both.  You're not, you're not going to replace

24   competition with four meetings a year where you hear reports.

25   That's not going to work.  Prices are going to go up and

1    consumers are going to get harmed.

2        So the cases we think, Your Honor, those three that --

3    those three Eleventh Circuit cases they rely so heavily on, we

4    think they're all distinguishable.  We don't think that they

5    resolve this legal issue before the Court.

6        So I've talked about two legal issues, the first being

7    whether this is even state action.  The second being whether

8    it was reasonably foreseeable for the Georgia legislature in

9    1941, that you would be facing these set of facts here today.

10   And I think the third independent hurdle that the defendants

11   have to overcome that they have not overcome is active

12   supervision, Your Honor.

13       Now, they want, again, to wish active supervision away by

14   saying the state action defense, it's the state applying here,

15   it's the state, and so the Hospital Authority doesn't need to

16   be involved in active supervision because it's the state.

17       And, again, Your Honor, we think it goes back to this

18   touchstone of who was the actor here, who is the actor under

19   these facts.  Is the actor the Hospital Authority, is the

20   actor the state acting in the best interest of the consumers

21   of this county and of this state, or is the actor Phoebe

22   Putney.  And if the actor is Phoebe Putney, if it's a private

23   actor, then the active supervision prong applies.

24       You didn't hear about *Midcal* much this morning, but,

25   again, that's the case that set out this two-prong test.  And

1    the Supreme Court made clear that to obtain immunity from the

2    antitrust scrutiny, private actors like Phoebe Putney must

3    also prove that the policy was actively supervised by the

4    State.

5         What the Supreme Court said in 1988 in the *Patrick v.*

6    *Burget* case:  Active state supervision of private parties is

7    critical because, and I quote, when a private party is

8    engaging in the anticompetitive activity there is a real

9    danger a private party acts to further his or her own

10   interests rather than the governmental interest of the state.

11        And again, Your Honor, we think this should be just a

12   common sense test.  And that's this -- this second prong, it's

13   about an evidentiary rule, it's about helping the Court look

14   at this through a lens and say, whose interests are being

15   served here.  Whose interests are being served.  Is it the

16   people of Dougherty County, or is it Phoebe Putney.  Whose

17   interests are being served by this transaction?

18        And we'd suggest, Your Honor, that it's not the people of

19   Dougherty County whose interests are being served.  Prices are

20   going to go up, and they're not getting a single additional

21   hospital bed.  Whose interests are being served?  The private

22   actor, Phoebe Putney.  And if it's the private actor whose

23   interests are being served, then they've got to be actively

24   supervised.

25        But, again, the Hospital Authority, they got out of that

1    business.  They got of the business of supervision 20 years

2    ago by leasing the hospital out.  And that's fine, they're

3    allowed to do that under the law.  We don't contest for one

4    moment, for one moment the case that Mr. Bondurant brought up

5    from the Georgia Supreme Court, absolutely the Hospital

6    Authority is allowed to lease this out.  Absolutely they're

7    allowed to do what they have done.

8        What they're not allowed to do is then pretend that

9    they're active supervisors and that they're state actors for

10   purposes of this acquisition.  We think common sense should

11   tell Your Honor that.  This doesn't benefit, this doesn't

12   benefit the people of Dougherty County.  It benefits Phoebe

13   Putney.

14       So we're not asking this Court to deconstruct, to

15   deconstruct their decisions to get behind their motives, but

16   we are asking this Court to apply common sense to figure out

17   whose interests are being served.

18       This second prong, as I pointed out, Your Honor, the

19   Supreme Court said this in *Ticor*, it ensures that the state,

20   the state, not the private actor, is actually making the

21   critical decisions that affect competition.

22       And we think, Your Honor, in the merger context as we

23   have here that active supervision has to be ongoing, and it

24   has to be ongoing because the anticompetitive effects, if this

25   merger closes, the anticompetitive effects will continue for

so long as Phoebe Putney controls both assets, whether it's under a management agreement or a 40 year lease, Phoebe Putney will be setting the prices.

Phoebe Putney will have the monopoly power.  Phoebe Putney will be using that leverage to negotiate, to negotiate with private payers to make them pay more.  And absent some active supervision of that, there's going to be no check on their power.

Your Honor, the defendants don't dispute that this transaction eliminates competition.  They don't dispute that we've shown a likelihood of success on the merits of our motion for a preliminary injunction under Section 7 of the Clayton Act.  They want to say that the state action immunizes private conduct, but it should do so only if there's active supervision.

Now, they advance several factually and legally inaccurate arguments to suggest that despite these undisputed facts, no active supervision is needed here.  I want to address those.

First they claim the Hospital Authority is really in charge, that Phoebe Putney is merely an extension of the Authority.  And you heard that this morning where Mr. Van Voorhis, he's the lawyer for Phoebe Putney, seemed to suggest that their interests are completely aligned, that there's no real difference, there's no real space between the interests

1    of the Hospital Authority and Phoebe Putney.

2         And one wonders how Phoebe Putney has a 255 million

3    dollar war chest if that's the case.  You wonder why Phoebe

4    Putney is out there acquiring every bed in this county if

5    that's the case.

6         Twenty years ago the Hospital Authority got out of the

7    business of managing Phoebe Putney, and they, as they have

8    admitted, yielded total control over the establishment of all

9    rates and charges to PPMH, and they waived their right, they

10   waived their right as we saw in Section 4.21 of the lease of

11   acquiring other hospitals like Palmyra.

12        It's Phoebe Putney, not the Hospital Authority that

13   controls and operates PPMH.  The Authority since 1990 has

14   shown little interest in actively supervising PPMH, but we've

15   put a lot of evidence in on this point, Your Honor.  The

16   Authority's chairman said publically, the Authority really has

17   no authority as far as running PPMH.  He said he believed

18   pricing -- this is the Authority's chairman.  He said pricing

19   is the exclusive province of the hospital board, not the

20   Hospital Authority.

21        And as I indicated earlier, the defendants compare the

22   Authority to a board of directors, but they haven't been

23   treated like a board of directors, and, in fact, the lease

24   recognizes, the lease recognizes that the relationship is

25   really one of landlord and tenant.

1          The Hospital Authority, they've got no budget, no

2    employees, and although they're required by state statute to

3    limit PPMH's financial reserves, they've admitted they've

4    never done so.  Those financial reserves, that's that $255

5    million, that war chest that this hospital has for other

6    acquisitions.  How did they get so much money under active

7    supervision?  Good question.

8          And, Your Honor, and I believe the State of Georgia

9    attached this to their brief, the Dougherty County Commission,

10   the folks that appoint the Hospital Authority, in their board

11   book what it says about the Hospital Authority, it says

12   purpose; none.  That's what the Dougherty County Commission

13   thinks the Hospital Authority's purpose is.  They got out of

14   the business of managing hospitals.  They leased it away.

15         Your Honor, we have here a slide from PX-83.  This is a

16   brief that was filed by the Hospital Authority before Your

17   Honor, and here's what the Hospital Authority said.  They

18   said:  It is PPMH who controls all assets and operations at

19   Phoebe Putney.  They don't control it.  Phoebe Putney controls

20   it.

21         And here's what Palmyra said in that same litigation.

22   They said:  The Hospital Authority cannot countermand,

23   approve, or revise PPMH's decisions in these and other

24   management areas during the term of the lease.  PPMH, in

25   short, controls all assets and operations at Phoebe Putney.

1      That's an admission by HCA that should apply in this case.

2      There should be no doubt, Your Honor, that Phoebe Putney

3      operates and controls PPMH to advance a private interest.

4          Now, as I think I addressed, Your Honor, they seemed to

5      be saying, gee, we're a nonprofit, and since we're a nonprofit

6      you should take account of that fact that nonprofits are

7      different than for-profit corporations.

8          The Eleventh Circuit knocked that one down in the

9      *University Health* case, and we cited that in our brief.  They

10     said:  It would be irresponsible to treat nonprofits any

11     differently than for-profit corporations.  No one, no one --

12     We've talked to employers.  We've talked to insurers.  Nobody

13     has ever said, you know, Phoebe Putney, they leave money on

14     the table; they don't negotiate hard; they're not trying to

15     get the best rates available.

16         I don't think Phoebe Putney would deny, they fight hard

17     for every dime.  They fight hard to keep their prices high.

18     They charge what they think the market will bear, and if

19     they're monopolists, they will charge monopoly prices, and

20     that's why they have a quarter of a billion dollar war chest,

21     Your Honor.

22          Phoebe Putney made clear, Your Honor, that it was

23     pursing its interest in this transaction and not the interests

24     of the Hospital Authority.

25          And I want to show you, Your Honor, this is PX-21.  This

1    is a document drafted by the chief operating officer of PPHS.

2    And he set out on September 19th, he set out the reasons that

3    Phoebe Putney was going to acquire Palmyra.

4        Reason number one:  Avoid antitrust lawsuit.  That's the

5    lawsuit that's before Your Honor.  That's the lawsuit where

6    Palmyra is accusing Phoebe Putney of being a monopolist and

7    having too much power, even before this transaction.

8        Here's another reason:  Control all hospital beds in the

9    county.  Control all hospital beds in the county.  Next

10   reason:  Simplify, simplify certificate of need application

11   process.

12       As Your Honor is I'm sure aware, there's a longstanding

13   litigation between Phoebe Putney and Palmyra over who can get

14   a certificate of need on whether Palmyra can build an

15   obstetrics facility.  If you merge the two hospitals, all that

16   goes away.  Phoebe Putney has got all the power.  They make

17   all the decisions.  No need for competition anymore.  No need

18   for competition about who gets to offer what services and who

19   gets to offer better quality healthcare.

20       And here's a great reason:  Increase negotiation power

21   with all payers.  We have the only hospital in town, you want

22   healthcare, you come through us, and we control the prices,

23   we're monopolists.  Do those really sound, do those really

24   sound like the act of a state looking out for its consumers?

25   I don't think so, Your Honor.

1        Your Honor, another reason, another reason that the

2   defendants argue that you don't need to worry about active

3   supervision, and I confess it took me a long time to figure

4   this one out, is they have this point-in-time view of this

5   transaction.  I mean, they want, for example, with respect to

6   who the acquirer is, they want Your Honor to look at the lease

7   and look at the first paragraph to say, the Authority is

8   getting title, I don't need to analyze anymore, thank you very

9   much, I can go home now.

10       And they want to do the same thing, they want to do the

11   same thing with respect to active supervision.  They want to

12   say, okay, let's split this into two injunctions.  Let's

13   ignore the fact that the Clayton Act looks at, looks at it

14   altogether and looks at how economic power is transferred in

15   this transaction.  Ignore that, and let's split it up.

16       Okay.  Now, imagine we've just gotten past the point that

17   we talked about.  Now we're on injunction number two.  The

18   Hospital Authority they've got title.  Well, whatever they do

19   with this once they've got title, who cares?  The antitrust

20   laws don't touch that.  The antitrust laws don't go after a

21   single actor and what they're doing with their subsidiaries.

22       You know, if they split it up into Phoebe North and

23   Phoebe Memorial Health, we got no basis to complain if Phoebe

24   Memorial and Phoebe North were talking about prices or

25   agreeing to prices, et cetera.

 1    They say under *Copperweld* you don't have to worry about

 2    that.  And maybe that's true, but what the Supreme Court also

 3    said in *Copperweld*, they didn't think that the Clayton Act was

 4    the same speed bump that the defendants think.  They said --

 5    They said, as the Supreme Court said in *Copperweld*, a

 6    corporation's initial acquisition of control will always be

 7    subject to scrutiny under Section 7 of the Clayton Act.  So

 8    they said, let's look to the Clayton Act first.  That's what

 9    deals with it.  That's why we're here, Your Honor, is because

10    in this case economic power is going to go Phoebe Putney, and

11    the Clayton Act prevents that.

12    Finally, Your Honor, they talked about this contract

13    exception.  Active state supervision.  They seem to suggest

14    that, well, if there's a relationship between the state and a

15    private actor, particularly a relationship where there's a

16    contract, then there's no need for active state supervision.

17    That position would swallow the Supreme Court's second prong

18    in *Midcal* altogether.

19    Now, in the Eleventh Circuit case I spoke to earlier, *FTC*

20    *versus University Health*, the Eleventh Circuit rejected as

21    meritless the argument that mere inclusion of a hospital

22    authority eliminated the need for active supervision.  That's

23    what the Eleventh Circuit said.  That argument, meritless.

24    Now, Your Honor, I don't think those cases stand for the

25    proposition, and we'll go through *Cine 42nd Street* and

1    *Charley's Taxi*, but before we do, they also argue that the

2    Hospital Authority -- I'm sorry, Your Honor, I got this out of

3    order -- no, I'm sorry, they argue that the Hospital

4    Authority, in a switch here, that the Hospital Authority will

5    actively supervise, and they sort of switch gears, and say

6    we'll actively supervise, and they say that post transaction,

7    we'll be involved.

8         Now, they say that under threat of litigation, and that

9    would require Your Honor to ignore the backdrop that got us

10   here today.  In other words, it would require Your Honor to

11   ignore the lack of active supervision, which, you know, to be

12   fair, the Hospital Authority, they leased out PPMH, they got

13   out of that business, but they weren't involved in actively

14   supervising PPMH.  They weren't actively involved in

15   supervising this transaction, and there's no reason to believe

16   they'll be actively involved in the future.

17        As we indicated in the chronology, on April 4th, they

18   came up with a list of required lease terms.  Those are terms

19   the Hospital Authority would demand that Phoebe Putney have on

20   the lease.  Those are drafted, incidentally, by Phoebe

21   Putney's counsel, Mr. Baudino, the architect of this

22   transaction, who's got a pretty significant contingent fee

23   riding on this transaction closing.

24        But what the Vice-Chairman, Mr. Lingle acknowledged when

25   I asked him about the Authority's role after the transaction,

1    whether it would differ meaningfully from its current one, he

2    said the Authority plans to do, and I quote, whatever it takes

3    to make the wheels turn.

4        And I asked him a number of questions about the

5    supervision he would provide.  I asked him:  Suppose Phoebe

6    informs you that in the year 2012 they're going to be

7    renegotiating their contract with Blue Cross/Blue Shield.

8    Other than the fact that they're going to be renegotiating

9    their contract with that entity, what other information would

10   you as the Authority like to have?  He answered:  What the

11   outcome was.

12       I asked him:  Well, what prospective information, before

13   they enter into negotiations, what would you want?  And he

14   said:  Well, I wouldn't want to have anything.  That's their

15   bailiwick.  They handle that.

16       In other words, Phoebe Putney, they handle those

17   negotiations.  We.  The Hospital Authority don't want to know

18   about it.

19       I asked him:  Do you anticipate having any discussions

20   about how much Phoebe anticipates charging commercial payers

21   in the future?  Answer:  No.

22       Do you anticipate getting involved in the prices set to

23   those commercial payers at all?  Answer:  I hope not.

24       Question:  Do you anticipate the Authority playing any

25   role in the negotiations between Phoebe and commercial payers?

1    Answer:  Probably not.

2        I asked:  Does the Authority anticipate having any role

3    in reviewing the prices charged to commercial payers for the

4    contract details?  Answer:  Probably not.

5        Do you -- Does the Authority anticipate having any role

6    in evaluating the rate of return that Phoebe receives?

7    Answer:  Probably not.

8        Your Honor, Mr. Lingle was serving essentially as a

9    30(b)(6) witness on the lease terms, this lease that may or

10   may not happen according to the defendants, but it's pretty

11   clear from the transaction documents it was the very purpose

12   of this transaction.

13       And it's pretty clear that the Hospital Authority does

14   not intend to actively supervise Phoebe Putney.  You can't

15   have it both ways, Your Honor.  They can't say, we're a state

16   actor, we wave the magic wand of state action over this, and

17   we should have antitrust immunity.

18       Because, again, look to the reason that state action

19   exists.  It's about, has the state made a decision to displace

20   competition, and I suggest to you they haven't done that in a

21   case where control is just going to be handed over to a

22   private actor and that private actor is going to have

23   unfettered power to negotiate and set prices.

24       And that's if you look at their documents.  If you look at

25   Phoebe Putney's documents, that's what they want, increased

1   leverage with all payers.  They want to be able to set the

2   prices at whatever level they want, and the Hospital Authority

3   said, that's their bailiwick, we don't want to get involved in

4   that.  That's not active supervision, Your Honor.

5        So I mentioned, Your Honor, this contract issue in these

6   contract cases where the defendants essentially say, but, you

7   know, if there's a contract, like the lease, between the

8   Hospital Authority and a private party, well, that private

9   party is exempt too.

10       And the two cases that they cite in their briefs most

11  frequently on this are *Charley's Taxi* and *Cine 42nd Street*.

12  Now, in *Charley's Taxi*, in *Charley's Taxi*, there's no

13  discussion of active supervision.  In *Charley's Taxi*, the

14  Court was silent on active state supervision.  It didn't say

15  whether or not it was necessary, how rigorous it was, or

16  whether -- you know, who the private defendant was and how

17  they would be supervised.

18       What the Court said in that case, they rejected artful

19  pleading to circumvent state action through suits against

20  regulated private parties.  This isn't a regulated private

21  party, Your Honor.  Phoebe Putney is not regulated in the

22  sense of their prices with commercial payers, their prices

23  with the employers and individuals of Dougherty County, and

24  that's who we're concerned about here.

25       So I would suggest to Your Honor that *Charley's Taxi*

doesn't apply.  Now, in *Cine 42nd Street*, and that's a Second Circuit case that Mr. Bondurant mentioned where the Urban Development Corporation condemned a bunch of theaters, and then leased them out pursuant to a legislative scheme.

And they did that -- and I want to read what the Second Circuit said about the reasons for this, quote-unquote, contract exception for private parties that are involved in contracts with the state actor.

Here's what the Second Circuit said.  They said:  For the same reasons -- and this is the sum total of the Second Circuit's discussion of why they apply this quote-unquote contract exception to state action in this case.  This is all there is, I'd encourage Your Honor to look at the opinion.

But it says:  For the same reasons the private appellees acting in concert with the Urban Development Corporation are also entitled to state immunity.  This participation -- the participation by the third parties -- was actively encouraged by the legislature.  In fact, one of the fundamental goals of the act is to have the Urban Development Corporation -- and that's the state actor in this case -- attract private investors and developers.  When Urban Development Corporation accomplishes its goal in a protected manner in a participation of private third parties was reasonably contemplated by the legislature allowing successful tangential attacks on Urban Development Corporation's activities through suits against the

1    third parties would effectively block the efforts of the Urban

2    Development Corporation *(reading)*.

3         What we understand the Second Circuit to be saying here,

4    Your Honor, is the legislature said, go, condemn these

5    properties, take control of these properties, and lease them

6    out to somebody else.  And what the Second Circuit was saying,

7    when you lease them out to somebody else, we can't allow

8    lawsuits against the somebody else, the private actor, that is

9    leasing those assets from the Urban Development Corporation

10   because that would undo the very purpose the legislature

11   enacted that statute.

12        Now, here the statute we're talking about, the statute

13   that supposedly gives state action immunity here, all it says

14   is that hospital authorities can acquire projects.  It doesn't

15   say you can acquire projects with the intent of leasing them

16   out to private actors, and, oh, by the way if you do, those

17   private actors, they're immune, too.

18        It's a separate section on leasing, to be sure, but there

19   is no basis to suggest that in 1941 the legislature

20   anticipated that it would be, as we have in this case, the

21   private actor making a bid to buy another private actor and

22   running it through the State actor, the Hospital Authority, in

23   an effort to make the state action defense work.

24        That's not, that's not the exception that was created in

25   *Cine 42nd Street*.  In *Cine 42nd Street*, you could not do what

1   the legislature wanted to do unless that contract was entered

2   into.  Here, you sure as heck can.  Phoebe Putney -- excuse

3   me, the Hospital Authority when they created the Hospital

4   Authority in 1941, they did what the legislature expected,

5   they created the Hospital Authority, and then when they

6   acquired Phoebe Putney, they did what the legislature

7   expected.  They didn't have to enter into a separate contract

8   to then lease Phoebe Putney out to somebody else to do what

9   the legislature expected under the statute that the defendants

10  claim is the basis for their state action immunity here today.

11      And, finally, and I think Your Honor recognized this with

12  your questions, and so I won't beat a dead horse, but there

13  was a lot of talk about a conspiracy exception.  The word

14  conspiracy appeared nowhere in our complaint.  We're not

15  accusing the Hospital Authority of conspiring with Phoebe

16  Putney.  The Hospital Authority wasn't aware that Phoebe

17  Putney was doing what it was doing in the Hospital Authority's

18  name when it structured this transaction.

19      It's pretty clear, we think, Your Honor, on these facts,

20  we think it's pretty darn clear that what Phoebe Putney was

21  doing is Phoebe Putney is bidding to obtain control over

22  Palmyra.  We think it's pretty darn clear, particularly from

23  Exhibit 207, that's the offer letter, Your Honor, that lays

24  out the state action defense.  It lays out how they're going

25  to call it into question.  It's pretty clear that this

transaction was structured to use the Hospital Authority as a
strawman, and they didn't even tell the Hospital Authority
that that's what they were doing at that time.

So, Your Honor, that's not a conspiracy.  That's a
private act by a private actor acting in their private
interest, and that's why it's not state action, Your Honor,
not a conspiracy.

Your Honor recognized this is a motion to dismiss.  And,
Pete, I'm going to jump to Slide 104.  And I just want to
briefly review the allegations in the complaint here, because
if we're here on a motion to dismiss, I don't think we should
lose sight of the fact that we've made certain allegations, we
think we've backed up these allegations with facts, and to
dismiss this case on the defendants' motion, you have to find
that they accept these facts and they worked within these
facts.

Paragraph 85 of the complaint says:  The transaction is
motivated and planned exclusively by Phoebe Putney which acts
in its independent, private, and pecuniary interest.

We think that's backed up by the facts, and we think
that's a well-pled allegation in this complaint, Your Honor.

Paragraph 86:  The Authority engaged in no independent
analysis to determine whether the transaction would be in the
public interest.  Having no reasons for acquiring Palmyra
other than those advanced by Phoebe Putney, it authorized a

1    195 million dollar purchase of Palmyra using Phoebe Putney's

2    money without even considering the adverse effects of this

3    merger to monopoly would have on the healthcare pricing in the

4    community, the valuation of Palmyra, alternatives to leasing

5    Palmyra to Phoebe Putney, or who specifically from Phoebe

6    Putney would run Palmyra immediately after the transaction.

7        In other words, we allege, Your Honor, in this complaint

8    that the interests being served are Phoebe Putney's interests

9    and not the Hospital Authority's, not the interests of the

10   citizens of this citizens of this county.  And that, we allege

11   that the Hospital Authority was not actively involved in

12   supervising.

13       In Paragraph 87, we say:  Just as it played no

14   supervisory role in this transaction since at least 1990 when

15   the lease became effective, the Authority has not actively

16   supervised Phoebe Putney in any sense, including with respect

17   to strategic planning, pricing, and other competitively

18   sensitive affairs.  Rather, the Authority's oversight is

19   limited to conducting quarterly breakfast meetings, the

20   minimum required by statute, lasting approximately one hour.

21   The Authority chairman testified that he cannot remember a

22   time -- cannot remember, excuse me, an instance in which a

23   vote was less than unanimous, and he's never seen a price list

24   for the services provided by Phoebe Putney.

25       No supervision, Your Honor.  We allege that in the

1    complaint, and we think we've backed that up with the facts.

2        We go on to say:  By contracts beginning immediately

3    after the transaction Phoebe Putney will assume responsibility

4    for setting prices for the services furnished at Phoebe North,

5    the hiring and firing of Phoebe North employees, and other

6    competitively significant decisions necessary for the

7    operation of a hospital or a hospital annex.  The Authority's

8    vice-chairman does not expect any of that to change when it

9    officially leases Palmyra's assets to Phoebe Putney.

10       That's what we have alleged:  No active supervision in

11   the past, no active supervision in the future.

12       And, finally:  In sum, there is no state action here.

13   Rather it is the private, self-interested Phoebe Putney that

14   has agreed to purchase Palmyra and will exercise unfettered

15   and unchecked by the Authority or any hospital competitor

16   extraordinary market power gained through the transaction.

17       In other words, we allege Phoebe Putney is acquiring

18   total control over Palmyra, that this is an acquisition by

19   Phoebe Putney under the Clayton Act.  We allege that there

20   will be no active supervision and that there will be harm to

21   consumers, Your Honor.

22       And we don't think that they have met the burden on a

23   motion to dismiss, and we also don't think they have met their

24   burden on a motion for summary judgment.

25       Your Honor, when competition is eliminated consumers get

1   hurt.  Before you immunize this transaction, before you

2   immunize it, you have to find that it was an act of the state

3   displacing competition.  You have to find the defendants have

4   proved to your satisfaction three things:

5       One, that the transaction is an act of the state, not an

6   act by Phoebe Putney, the private actor.

7       Two, that the legislature put in place a clearly

8   articulated policy to displace competition.

9       And, three, that if competition is being displaced by the

10  private actor, Phoebe Putney, that they're going to be

11  activity supervised by the Hospital Authority.

12      We don't think the defendants meet any of these prongs,

13  Your Honor.  We think this is an acquisition by an

14  unsupervised Phoebe Putney.  We think it's illegal under the

15  Clayton Act, and we think it should be enjoined.  Unless Your

16  Honor has questions, I'm going to turn the podium over to Mr.

17  Sponseller on behalf of the Georgia Attorney General.

18      **THE COURT:**  All right.  I have no questions at this

19  time.

20      **MR. HASSI:**  Thank you, Your Honor.

21      **THE COURT:**  Let's take about 15 minutes, and then we'll

22  here the State's argument.  I wanted to put you all on notice,

23  I expect to complete this today.  So if we have to go into the

24  evening, we will do so.  We will be in recess 15 minutes.

25  *(RECONVENED; ALL PARTIES PRESENT)* All right, thank you.  First

1    of all, let me just say something to clarify for the record,

2    and to the degree the Court may have contributed to a little

3    bit of a mixup, I apologize.  But this morning when we were

4    getting seated and all the parties were being accommodated, I

5    understood the request to be for members of the board, and I

6    think lawyers who were participating in the case to have a

7    place to sit so they could observe the screen, because

8    unfortunately, the Court's system isn't working for the public

9    as it needs to operate.  And the Court was under the

10   impression that only participants in the case either by way of

11   party tangentially or an attorney would be sitting in the

12   space in the jury box.  And I think, and upon my observation,

13   I saw some people this afternoon I didn't recognize.  Some of

14   the board members did not return after lunch, and it appeared

15   to be they were members of the press.  And I don't have any

16   problem with them being here, obviously, but I believe sitting

17   inside the bar of the case, that's traditionally only

18   appropriate for those who are actually participating in the

19   case.  And, of course, we hope to get the system squared away

20   soon so that everybody will be able to see.

21       Also, for those members of the press who are here, to

22   accommodate you in light of our system failing to be

23   operational for your purposes, the clerk will make available

24   those documents that were entered on the record this morning

25   as part of the case to be available for you if you want to see

1    them at the end of the case.  So with that kind of

2    understanding, and I apologize for the mixup, we are ready to

3    continue.  All right.

4        **MR. SPONSELLER:**  If I may approach.

5        **THE COURT:**  Yes, sir.  All right.  Thank you.

6        **MR. SPONSELLER:**  Good afternoon, Your Honor.  I'm Alex

7    Sponseller with the Attorney General's Office on behalf of the

8    State of Georgia, and I'll be very brief.  I think the FTC did

9    a fantastic job of outlining the case for the State as well.

10   I will be very short.  I know it's been a long day, so I just

11   want to hit some of the points in the case.

12       And using the presentation in front of you, which is

13   mercifully only 17 pages long, and I'll probably skip over

14   some of these pages too.

15       So starting off, the State has also joined this action

16   for violations of the Clayton Act under it's *parens patriae*

17   authority, and that's under the federal law which allows

18   states to joint actions like this.

19       And the State joined this action for the same reasons the

20   FTC has initiated this action, and that is because the State

21   is concerned about the higher healthcare prices for the Albany

22   region, reduced consumer choice, and diminished quality due to

23   a monopoly created by Phoebe Putney and Palmyra.

24       **THE COURT:**  Is there a significance of the AG for

25   Georgia being in this case?  I think Mr. -- I guess you were

1    sitting there and your ears may have been burning when

2    Mr. Bondurant made it very clear that your being here was as a

3    lawyer only.  But I was getting at the idea that there are

4    some differences between the positions the State of Georgia is

5    taking in terms of what it believes the public purpose

6    interest is as opposed to what a political subdivision might

7    follow under the law as it perceives it.

8         **MR. SPONSELLER:**  Yes, Your Honor.  I think if you look

9    in our brief, we note that under the statutes and the Georgia

10   Constitution, the Attorney General is the chief law

11   enforcement officer of the state.

12        Now, they're saying that, you know, we're only an

13   executive branch agency, and that's correct, we are an

14   executive branch agency.  But, you know, either in litigation

15   or opinions that we issue it's -- we are considered persuasive

16   authority in state law matters.  There has been several times

17   when local governments will ask our advice, and we'll give

18   that to them.  So concerning state statutes, our position --

19        **THE COURT:**  Could this have been a situation where the

20   Authority could have asked for an opinion from the Attorney

21   General?

22        **MR. SPONSELLER:**  Yes, that is a possibility.  They --

23   and generally in litigation, you know, obviously if it's an

24   Article III type court like this court is, you know, they're

25   the ultimate deciders of what the law is, but in litigation of

1    the Attorney General's opinions, that's given persuasive

2    weight by the courts.  And we believe that the interpretation

3    of the statutes that the defendants have taken is incorrect.

4        **THE COURT:**  Just for my information, I'm sure you would

5    have pointed it out if it hadn't been otherwise, but I'm just

6    going to ask this just to be certain.  Has the Attorney

7    General ever issued an opinion previous to this case where it

8    described or set the parameters of what it believed to be the

9    applicable antitrust boundaries were for state authorities or

10   political subdivisions?

11       **MR. SPONSELLER:**  The Attorney General's Office has

12   issued opinions regarding Authorities Law, but not in

13   antitrust matters though, as far as I know.

14       **THE COURT:**  Thank you.

15       **MR. SPONSELLER:**  And one of the reasons for that is

16   because, you know, our office does not have an antitrust

17   division, and that's why we joined on this federal action

18   because we don't have our own special section dealing with

19   this type of issues.  And I just want to note, and I

20   understand you want to hear about the state action immunity

21   first, but since I'm only talking briefly in this proceeding,

22   I just want to note --

23       **THE COURT:**  You can proceed as you wish.  I just warned

24   everybody that I'll break it up with questions if I have one,

25   and sometimes it may not be consistent with the way you

1    present it, but you can proceed as you see fit.

2        MR. SPONSELLER:  Okay, thank you, Your Honor.  I just

3    want to note the procedural posture of this case and, you

4    know, what is to really be decided.  And, you know, the state

5    in this case, it's not part of the administrative proceeding

6    in Washington.  It's only here to ask the Court for a

7    preliminary injunction until the administrative case has

8    concluded.

9        Now, you know, the state is not a party in that

10   administrative proceeding.  It only asks that the acquisition

11   is halted until that can be determined by the administrative

12   court.  And one of the reasons that the state thinks that an

13   injunction is merited here, and it's only a preliminary

14   injunction, is, you know, the state would rather see the

15   acquisition stopped before it happens until -- if the

16   acquisition is allowed to close, and then say, for example,

17   the administrative proceeding finds that there should be a

18   divestiture, that causes more harm to the community because

19   then the combined entity will have to be divested, you know,

20   there will be -- you know, there could be turmoil in the

21   employment, in the facilities, there could be disruptions in

22   service.

23       So an injunction is favorable in this case because of,

24   you know, there will be one provider once the acquisition

25   closes in the entire community.  And if it's forced to break

1    up after-the-fact, then this will cause more problems.  So

2    that is why the state believes an injunction is -- a

3    preliminary injunction is favorable in this case.

4        Now, the only defense that the defendants raise is the

5    state action immunity defense.  They don't dispute at least

6    for this proceeding that there will be a monopoly, that there

7    will clearly be at least a 86 percent share of the market for

8    acute care services.  So really -- and you'll hear about that

9    when Mr. Reilly gives his presentation, but there's really no

10   dispute here that there will be a monopoly.

11       So if you look at that fact, you know, not even looking

12   at state action, that prima facie case of a Clayton Act

13   violation has been met.

14       And, briefly, if you turn to Page 3 of the presentation.

15   I'm going to refer to these pages just to hit the bullet

16   points so it can move along here.

17       It's notable that in FTC cases that the preliminary

18   injunction standard is more lenient than your typical Eleventh

19   Circuit preliminary injunction standard, and that's under 15

20   U.S. Code 53(b).  And that standard only requires that the FTC

21   has made a proper showing that weighing the equities and

22   considering the Commission's likelihood of ultimate success

23   that such action would be in the public interest.

24       So once a prima facie case has been shown, it's almost

25   like an -- automatically it favors, it's in the public

1    interest that the injunction should be issued.  And this was

2    outlined in the case of *FTC versus University Hospital*.

3        And what it did when it balanced the equities in that

4    case, after the Court found that there was a prima facie case

5    there would be a monopoly and a violation of the Clayton Act,

6    the Court stated:  The principal equity in weighing in favor

7    of issuance of an injunction is the public's interests in

8    effective enforcement of the antitrust laws.

9        So, you know, once it's been shown that there will be a

10   monopoly, the balance of the equities almost automatically

11   favors the FTC and the state.

12       **THE COURT:**  Is there any defense, I guess I can ask

13   them about this, too in the last response.  Is there any

14   defense lost to the defendants based on the ground of a

15   preliminary injunction?  I think you are saying basically once

16   the Court finds that equities weigh in a favor of an

17   injunction, it should be granted.  And, of course, they raised

18   the motion here, and do those matters otherwise survive on the

19   merits with the Commission?  I guess I should ask the

20   Commission that question.

21       **MR. SPONSELLER:**  I'm sorry, if the --

22       **THE COURT:**  What I'm saying is, you were basically

23   saying that there's a showing as a basis for a preliminary

24   injunction based on a weighing of the equities of the public's

25   interest and therefore it should go forward on the merits.  Do

1   those merits include the substantive defenses that are being

2   raised -- the procedural defenses that are being raised here?

3        **MR. SPONSELLER:**  Yes, I believe that -- and they can

4   speak -- the FTC can speak to that as well, but I believe --

5        **THE COURT:**  I'll listen to your -- and ask them that

6   again as well, but --

7        **MR. SPONSELLER:**  The state action immunity defense has

8   been raised in that proceeding as well.  Now, if you turn to

9   page 5, which is the next page.  I just want to address this

10  issue which is even before we get to the state action immunity

11  issue, and, you know, basically their whole argument is

12  saying, well, Phoebe is not acquiring the assets; it's the

13  Authority, and therefore it's not subject to the Clayton Act.

14       Now, I think Mr. Hassi did a really good job of -- about

15  describing why that's not the case, but, you know, the first

16  obvious reason is they -- you know, there was already a signed

17  management agreement, which gives Phoebe immediate control

18  over Palmyra once the transaction closes.

19       Number two is, you know, once the lease is executed,

20  that, you know, the antitrust laws say that even leases and

21  things like -- it's not just acquisitions, but the control

22  that the acquiring company will have after the merger.  So

23  leases themselves are subject to the Clayton Act.

24       And most importantly, you know, there's this whole

25  argument about, well, you know, this -- the lease will be

1   speculative, and that, you know, there's nothing to say now

2   why it should be enjoined because we don't know if it's going

3   to happen.

4        Well, I mean, there are several reasons why that's not

5   true, but most importantly is, you know, under the Clayton

6   Act, the whole purpose of the Clayton Act is to stop things

7   which will happen in the future.  So if -- I mean, basically

8   every single action under the Clayton Act could be defeated by

9   somebody just claiming, you know, having a shell corporation

10  and then saying later, we're going to lease it to another one

11  and saying, but that's speculative of the future.  I mean,

12  everything here could be defeated just by structuring a

13  transaction in that manner.

14       And, you know, the court in that *Cine 42nd Street Theater*

15  noted that "the unlawful conduct occurs not in the future, but

16  as soon as potential anticompetitive results can be detected.

17  As such, it is not necessary for future events to unfold to

18  regulate under the Clayton Act."

19       And that's exactly what's happening here.  You know, the

20  whole purpose, and I think you -- you know, we don't need to

21  go over the evidence again, but the whole point of this

22  transaction from the very beginning was for eventually the

23  Authority to lease the facility to Phoebe.  I mean, that was

24  the whole point of this transaction, and once that is

25  detected, then the Clayton Act comes into effect.

1    And there's also the statement that simply because Phoebe

2    Putney is a nonprofit that they're exempted out of the Clayton

3    Act, and that's not the case.  The court in, again, in

4    *University Health* stated that there is no exemption for

5    nonprofit hospitals under the Clayton Act.

6    And just -- I'm sorry, going back to Page 4, and I just

7    want to generally go over this just to apply it in the

8    context.  This is the application of this standard in the

9    *University Health* case, and what happened in that case was the

10   FTC moved for a preliminary injunction, just like in this

11   case, from -- to stop University Hospital from acquiring Saint

12   Joseph Hospital in Augusta.  And the result of that

13   acquisition would result in a 43 percent share of acute

14   services in the Augusta market.

15   The court found -- Well, actually the Southern District

16   denied the injunction.  It was appealed to the Eleventh

17   Circuit, and the Eleventh Circuit reversed, and they found the

18   FTC had made a prima facie case of Clayton Act violations.

19   And, again, you know, the court found in that case that,

20   you know, once a case has been made for the violation, the

21   equities almost automatically favor the FTC.  And you'll see

22   the quote here, what it says, "A decision not to issue the

23   injunction then would frustrate the FTC's ability to protect

24   the public from anticompetitive behavior."

25   Now, here in this case, and you'll see in the

1   presentation from the FTC, the defendants don't even really

2   dispute that the defendants will receive a 86 percent share of

3   acute care services in the Albany region.  That's double what

4   occurred in Augusta and in which the court in that case found

5   was anticompetitive and monopolistic.

6       So just based on the percentages alone, you know, there

7   is a case for Clayton Act violations.  Once that's found, the

8   equities almost automatically favors the FTC.

9       Now.  If you could skip to Page 6.  And you see here,

10  now, we'll talk about the state action immunity.  And, again,

11  I'm trying not to repeat what's already happened.  I'm trying

12  to be brief, but you'll see this chart here on Page 6, and

13  there's, really there's two parts to it.

14      Number one, you know, there's the local government

15  defendant, which is the Authority in this case.  You know,

16  number one, the Court -- to get immunity the Court must find

17  two things.  That, number one, it's a political subdivision of

18  the state; and, two, that they acted according to clearly

19  articulated and affirmatively expressed state policy.

20      Now, for the private defendant, and this has been shown

21  in many cases, is that, you know, is the private defendant is

22  immune only if they show the clearly articulated policy prong

23  and that their conduct was activity supervised by the state.

24      So really when it comes down to the immunity issue, the

25  Court must find two things for both the Authority and the

1    Phoebe defendants.  Number one, they have to find -- there's

2    really no dispute that the Authority is a political

3    subdivision of the state.

4        But, number one, the Court must find that there's a

5    clearly articulated policy allowing the conduct that occurred

6    in this case.  That's number one.  Number two, the Court must

7    also find that the Phoebe defendants were actively supervised,

8    and if the Court disagrees with one of those two, then their

9    motions should be denied.

10       **THE COURT:**  Is there anything other than what the FTC

11   plaintiffs said that indicates to you an explicit expression

12   of the law by the state when the Authority Law was enacted?

13       **MR. SPONSELLER:**  I'm sorry, I missed that.

14       **THE COURT:**  What I am asking is, because in the prior

15   argument counsel spent a great deal of time explaining to the

16   Court why it believed that that particular standard was not

17   met, that is, it was not expressly stated or reasonably stated

18   I believe in the argument, from a reasonable reading of the

19   law.  Is there anything in addition to what they have already

20   expressed that indicates to you that the law could reasonably

21   be read to include this transaction?

22       **MR. SPONSELLER:**  Yes, Your Honor, and I'll get to that

23   in one second.  But, you know, regarding the two elements

24   working together, the actively supervise for the Phoebe

25   defendants and the clearly articulated policy, it's important

1   to note that, you know, the Supreme Court itself has found,

2   you know, technically you don't even have to look at the

3   clearly articulated policy, because if you find that the

4   Phoebe defendants were not actively supervised, then it

5   doesn't matter.  I mean, you don't even have to get to that

6   element as long as you find that the Phoebe defendants were

7   not actively supervised in this case.  Now, if you turn the

8   page to --

9        **THE COURT:**  So it's your position, I think, and I've

10  kind of heard it argued both ways, was not the -- which active

11  supervision are you referring to, the supervision of the

12  transaction or supervision of their conduct in general?

13       **MR. SPONSELLER:**  Well, both.  I think you'll see when

14  we -- I'll get to that section with the actively supervised.

15  But the cases clearly state that you cannot just have a

16  potential for future supervision, you must have actually shown

17  in fact that you have done so.  And I think when you look at

18  the mountain of evidence in this case that that simply did not

19  occur.

20       So the Supreme Court cases say that, you know, it doesn't

21  matter if there's, you know, a possible future act of

22  supervision in, you know, the future.  It's really irrelevant.

23  What's important is what has been shown from the facts of the

24  case, and the facts of this case clearly show that there was

25  not active supervision.

1   So let me start with, you know, the clearly articulated

2   policy prong on the next page, on Page 7, Your Honor.

3   **THE COURT:**  All right.

4   **MR. SPONSELLER:**  And, you know, I'm trying to be short

5   again.  I feel like I'm not really being short, but --

6   **THE COURT:**  Maybe if I stop interrupting you, you might

7   be able to be short.

8   **MR. SPONSELLER:**  Oh, no, sir, not at all, Your Honor.

9   And I think we've already been through these cases.  The *Lee*

10  *County* case, the *Askew* case.  Now, particularly the *Lee County*

11  case, you know, I note here in the page, on Page 7, you know,

12  what happened in the *Lee County* case.  You know, number one,

13  the legislature there in Florida first passed a special act

14  just for *Lee County*, and as soon as that act was passed for

15  that specific county, the authority in that county acquired

16  the only hospital in the county.

17  Later, several years later and 20 years later, the

18  Florida legislature again passed a special act specifically

19  extending that board's, that authority's power to allow

20  operation of additional hospitals in *Lee County*.

21  And you'll see here the quote.  You know, what the court

22  in *Lee County* found was important was the intent of the

23  legislature when it enacted these laws.  And you'll see from

24  the quote here "If the legislature knew at the time in

25  expanding the board's acquisition powers in 1987 that a

1   monopoly had resulted from the 1963 legislation, the

2   legislature must have reasonably anticipated that further

3   acquisitions resulting from the 1987 legislation would

4   increase the board's market share in an anticompetitive

5   manner."

6       Now, that did not happen in this case.  The Hospital

7   Authorities Law, it was enacted in 1941.  It applied to the

8   entire state.  There was no specific authority that it applied

9   to.  So, you know, there might have been some authorities that

10  had multiple hospitals when they were created.  There might

11  have been some authorities where there was no hospitals there.

12  So it's not the same kind of intent that occurred in the *Lee*

13  *County* case which the Court found dispositive.

14      That's the main point of the *Lee County* case, that there

15  was a specific intent for that authority to have

16  anticompetitive -- that it was reasonably foreseeable that

17  there would be -- competition would be displaced by the

18  legislation.

19      Now, similarly in *Askew*, you know, I think, again, we've

20  been over this, but, you know, the Alabama statute had a

21  specific provision which stated that all of their activities

22  were immune from antitrust laws.  And, again, Georgia does not

23  have a statute that says that.

24      Now, if you turn to the next page, you know, on Page 8,

25  these are some of the key distinctions between the *Lee County*

1    *Askew* cases and Georgia.

2        Number one, again, the Georgia Hospital Authorities Law

3    has no blanket antitrust exemption for hospital authorities

4    and their activities.  There is no such exemption like in

5    *Askew*.  Number two, and this was mentioned by Mr. Hassi, that

6    the only -- there is an antitrust exemption for authorities

7    when they merge with other authorities.

8        So the only time that it truly applies is when one

9    authority acquires the other.  But that's not occurring here.

10   One authority is acquiring a facility.  It's not acquiring

11   another authority.

12       Now, as it says in this Section 31-7-72.1(E), that

13   statute was passed in 1993.  So the legislature at the time

14   had the intent to say, okay, we're going to exempt certain

15   acquisitions, but we're only going to exempt when authorities

16   acquire other authorities.  But that's not what happened in

17   this case.  It's an authority acquiring another facility, not

18   another authority.

19       I think another provision here, and this is the point

20   that I don't think Mr. Hassi mentioned.  In 31-7-11 -- now

21   this is in the same exact chapter as the Hospital Authorities

22   Law.  It's another section dealing with hospital charges and

23   fees.

24       The legislature here passed a law basically saying, it

25   mandates that hospitals disclose their charges, and the reason

1    for that is for consumers to make a choice, look at the

2    charges, see what charge is more reasonable, and go to the

3    facility that has the best charges.  But there's an obvious

4    problem when there is no other facility to go to.

5        So by this provision it's a further evidence of intent to

6    say what Georgia law favors is open disclosure of fees and

7    charges, and for the consumer to make the choice to go to the

8    facility that has the best charges for the consumer.

9        But that whole intent of that statute is defeated if

10   there was also the same intent to create these giant

11   monopolistic healthcare providers where the consumer has no

12   choice.  So if you construe these two sections together, if

13   you construe the authorized conduct in the Authorities Law

14   with this other statute in Chapter 7, there's obviously intent

15   for legislature to give -- to favor consumer choice.

16       And, you know, most importantly, you know, looking at the

17   *Askew* and *Lee County* decisions and the Hospital Authorities

18   Law, you know, there's -- you know, the Authorities Law

19   certainly in the antitrust context, there's really no intent

20   to show that an authority would just delegate all its

21   functions to a private actor, and then allow that actor to,

22   you know, acquire all these other facilities.  I mean,

23   that's not what the *Lee County* and *Askew* cases held.

24       And I would note that, I think Mr. Bondurant was talking

25   about the *Richmond County Authority* case, and that's a Georgia

1    Supreme Court decision.  And in that case, the Supreme Court

2    permitted an arrangement where an authority could lease a

3    facility to a private actor.

4        However, I would note that, you know, in the *Richmond*

5    *County* case, the authority was leasing the facility to the

6    University Health Hospital.  That was the same hospital that

7    was enjoined in the other case I mentioned.

8        Now, if you could please turn to Page 9.  Now, this is

9    getting to, you know, getting to the private parties' argument

10   regarding the active supervision requirement.  And I just want

11   to make a few points about Mr. Bondurant mentioned the *Parker*

12   case which is the original Supreme Court case talking about

13   how, you know, once, for example, the raisin growers, you

14   know, petitioned the state, and they granted them this

15   monopoly.  Well, I mean, the case is not saying what the

16   defendants are saying.  You know, most importantly, you know,

17   what we're saying in this case is, you know, the Authority was

18   just -- it was not an independent type government like the

19   other cases that have found what the defendants are saying.

20       You know, in the *Parker* case, for example, you know, it

21   was the state government, the state legislature that was

22   regulating raisin growing to give the growers a monopoly in

23   certain areas.

24       But, you know, here this is not a state agency with

25   employees and separate existence and independent funding and

1    things like that.  I mean, it's an authority of volunteers,

2    and, you know, it has no funds, no employees, and it really

3    has no independent existence besides -- you know, without

4    Phoebe, it could not simply exist.

5        So there's a clear difference between when you're talking

6    about the state itself or a state agency, I mean, there's a

7    clear distinction from those cases.

8        Now, you know, particularly the private party

9    distinction, it was applied in *Crosby* itself.  If you look at

10   the facts of that case and what the court held, you know,

11   number one, the plaintiff was a doctor, he was denied peer

12   review privileges.

13       He sued the Hospital Authority and committee members who

14   he thought were, you know, conspiring against him and to keep

15   him off the -- preventing him from getting staff privileges.

16       Now, what the Court found in that case was that, you

17   know, number one, the Hospital Authority is a political

18   subdivision.  And number two, you know they also found that

19   the individual physicians on the peer review committee were

20   also immune and not subject to the active supervision

21   requirement because they were agents of the Hospital

22   Authority.

23       Now, that's a very important finding, and the reason is

24   because -- the reasons why they found that, and if you look at

25   the quotes below, why were the agents mere agents -- I'm

1   sorry, why were the physicians mere agents of the authority

2   and not a private party subject to active supervision.  And

3   these are the reasons that it gave.

4        Number one, the authority had, you know, plenary review

5   of all credentialing decisions.  Number two, the authority did

6   not merely rubber-stamp the committee's recommendation,

7   instead it conducts an independent meaningful review.  The

8   authority had the power to modify, follow, or even disregard

9   the recommendations of staff committees and render its

10  decision only after a full hearing.

11       So the reason why the *Crosby* court found that the

12  individual physicians were not private parties and just kind

13  of went with the authority's immunity is because the authority

14  did these activities that the court noted.  And what we're

15  saying in this case is that simply did not happen.  And that's

16  why the Phoebe defendants cannot -- they are private parties,

17  and they are subject to the active supervision requirement.

18       And the court noticed -- you know, recognized the policy

19  of why this was the case, and has stated, "What is critical is

20  that the action be truly that of the state and not that of an

21  individual or private actor."

22       And if you turn the page to Page 10.  And besides the

23  *Crosby* case, you know there's been several other decisions in

24  other circuits which have found similar theories.  Now, in the

25  Eleventh Circuit it seems to be that if a private party is an

1    agent of the government entity, then it doesn't have to show

2    active supervision.

3        The other cases show -- they have different standards.

4    Number one is the Sixth Circuit, it's called the effective

5    decision maker, and it's basically the same thing, you know.

6        "If the private actor was the effective decision maker

7    due to the corruption of the decision making process, or

8    delegation of decision making authority, then it is not immune

9    unless it can show that it was actively supervised by the

10   state."  That's the Sixth Circuit standard.

11       The Second Circuit has what they call a standard called

12   the ultimate control theory, and that is, in this case, unless

13   the Hospital Authority maintains ultimate control over the

14   partial monopoly it created, the private defendants must show

15   that they were actively supervised.

16       And it was also applied recently in the Seventh Circuit

17   in a district court case, and in that case the district court

18   was presented with a motion to dismiss, just like here, and

19   the court stated here "because it is plausible that the

20   plaintiff could demonstrate that the private party was the

21   effective decision maker, the court denies the motion to

22   dismiss on the ground of state action immunity."

23       Now, if you turn to the next page, Your Honor, to Page

24   11.  This is the detailed application of the standard, and I

25   think this is a really good case because it's somewhat -- it's

1    very similar to what's going on here.

2         And that case is the *Electrical Inspectors* case in the

3    Second Circuit, 320 F.3d 110, and actually the defendants have

4    cited this same case.  And it's a very long opinion, but it's

5    important because it lays out how these rules work together.

6         In that case, the plaintiff was an inspection service,

7    and it sued a competing nonprofit inspection board which had

8    an inclusive municipal license for inspections in the Village

9    which is, you know, a town in New York.  The town gave this

10   exclusive license to this nonprofit inspection board.

11        And the plaintiff alleged that the nonprofit inspection

12   board would use its power of exclusive -- you know, being

13   exclusive provider to solely determine the price and the

14   quality of services.

15        Now, it's interesting because the defendants have used

16   this same case to say, well, we -- you know, Phoebe is going

17   to only sign a contract with the Authority.  So therefore once

18   they sign a contract, they're automatically immune because

19   they would become -- they would come under the umbrella of the

20   Authority.

21        But the Court in the *Electrical Inspectors* case did not

22   find that.  They found that with the allegation -- and these

23   are allegations that are in the plaintiff's complaint in this

24   case as well.  The board's continuing the monopolization of

25   the electrical inspection services, and the plaintiff's

1   assertion that the board is left free by the Village to use

2   its power of exclusivity to determine the price, terms,

3   quality of its service, the board must meet both parts of the

4   *Midcal* case, including active supervision by the Village to

5   warrant protection under the immunity doctrine *(reading)*.

6       And that's what the plaintiffs are saying in this case,

7   that, you know, if the Phoebe defendants are granted this

8   monopoly under the facts of this case, you know, fair enough,

9   however, they must be actively supervised under the test of

10  the immunity doctrine, and as you've seen in the facts of this

11  case that the plaintiffs contend that simply did not occur.

12      And if you turn the page to Page 12, Your Honor, you

13  know, these -- I don't want belabor the facts of this case.  I

14  think we've been through that in detail, but these are the

15  reasons why -- some of the reasons.  I mean, there's many

16  reasons, and Mr. Hassi did an excellent job of going through,

17  you know, why were the Phoebe defendants the effective

18  decision maker and the Authority was not.

19      The Authority in realty was more like the agent of

20  Phoebe, to be honest, and for that reason the plaintiffs

21  contend that the Phoebe defendants must be actively supervised

22  by a state entity.

23      Now, I would also note that, you know, there's been, in

24  filing their motions to dismiss and summary judgment, the

25  defendants have submitted several declarations in response to

1   the motion for preliminary injunction.  Now -- which disputes

2   some of the allegations of the complaint -- those declarations

3   are themselves disputed.  I think if you -- the key disputes

4   are, if you read the actual depositions of some of the

5   Authority members, you compare their sworn statements in the

6   depositions compared to their declarations, there's a

7   multitude of disputed facts.

8       I think it's important to note, you know, I'm sure Your

9   Honor has seen many cases, you know, what's more credible, is

10  it something that's just a mere affidavit, a declaration that

11  somebody's prepared, or is it testimony on a deposition.  I

12  think a deposition is certainly more credible than just an

13  affidavit that's prepared by an attorney.

14      In just noting the -- there was -- one of the statements

15  in the declaration was that the Phoebe defendants approached

16  some of the individual Authority members before the December

17  21st meeting individually.

18      Now, it's interesting because hospital authorities

19  specifically have an exemption from the Open Meetings Act, and

20  that's OCGA 31-7-75.2.  So they actually have a specific

21  statutory exemption where they can meet as a group, have a

22  quorum, and they can hear, you know, any presentation about

23  any type of acquisition.

24      Now, they did do that on the day that the acquisition was

25  approved, but there was no meeting at all which could have

1    been held under the statute prior to the acquisition day where

2    they signed the dotted line.  And it's -- The state contends,

3    you know, that's -- you know, if something of this magnitude

4    is going to happen, you know, there should be proper

5    procedures to have, you know, the Authority members to meet,

6    have a quorum, even if it's in closed session, and to discuss

7    an acquisition of this magnitude.

8         Now, if you could turn the page to Page 13, Your Honor.

9    Now, this is, you know, the main -- the defendants' main

10   response to the plaintiffs' assertion that the Phoebe

11   defendants were the effective decision makers, and that's the

12   *City of Columbia* and the *Noerr-Pennington* doctrine.  And, you

13   know, basically their whole case is saying this case is just

14   *City of Columbia*, and that's simply not the case.

15        You know, what the *City of Columbia*, what that was, you

16   know, it was the city council of *Columbia*, and a private

17   provider for billboard services came up to them and said, you

18   know, pass this zoning legislation.  You know, even assuming

19   that it just favors us, pass it, and, you know, our competitor

20   will be driven out of the market.

21        Now, you know, just going and petitioning somebody or

22   influencing or -- you know, that's not what we alleging in

23   this case.  What we're alleging in this case is that, you

24   know, the Phoebe defense completely controlled the Authority.

25   I mean, what they're saying is, you know, the Authority does

1    not act -- it doesn't exist independently from the Phoebe

2    defendants, and that is -- that's a distinction in this.

3        If you note that, you know, look at the facts of the *City*

4    *of Columbia* case, the billboard operator in that case did not

5    completely fund the Authority -- it didn't fund the city

6    council, it didn't house the city council, it didn't pay for

7    all its expenses.  You know, notably even in this litigation

8    itself, I mean, you know, it's a -- you know, who's paying for

9    the Authority's legal expenses in this case.  I think the

10   clear answer to that is the Phoebe defendants.  I mean, that's

11   the only entity that has the money to pay for the defense of

12   this case in the first place.

13       If you will turn to the next page, Page 14, and here's

14   just a list of bullet points of, you know, what's the

15   distinction between this case.  They also cite the *Bolt* case,

16   which is an Eleventh Circuit case which cited the *City of*

17   *Columbia* case.  And, you know, what's -- why is this

18   different.

19       And it is different.  You know, we're not, the plaintiffs

20   are not alleging, you know, that there's simply bad motivation

21   -- they're not alleging that it's bad motivations, that it's a

22   conspiracy.  It's, you know, who's actually making the

23   decision.  I mean, I think the facts of -- the abundant facts

24   of this case has shown the entire time the transaction was

25   planned, negotiated, the idea came up when they wanted to do

1    it after a certain point in time, that it was all Phoebe

2    driven, you know.  And only until the very last -- practically

3    the last day was -- you know, did the Authority really have

4    involvement in the transaction at all.

5        And I would note just, for example, in the *Bolt* case, you

6    know, there was -- they cite the *Bolt* case, but there was

7    other previously *Bolt* decisions which found that the

8    individual committee members in that case were private parties

9    and subject to active supervision, and they later withdrew

10   this defense in that proceeding.

11       And I think Mr. Hassi quoted the section from the *City of*

12   *Columbia* case where, you know, the *City of Columbia* decision

13   stated, you know, there can't be a -- there's no conspiracy

14   exception, the *Noerr*, you know, *Noerr-Pennington* doctrine

15   allows you to petition government.

16       However, again, the quote:  "States may not exempt

17   private action from the scope of antitrust laws.  We in no way

18   qualify the well-established principle that a state does not

19   give immunity to those who violate the antitrust laws by

20   authorizing them to violate it."  And that's what's we're

21   alleging in this case.

22       **THE COURT:**  So, in effect, then a private party could

23   conspire with a state entity that could supervise, while a

24   private actor who was not being supervised, would not have the

25   benefit of the immunity.  Is that a way to distinguish,

1    because the case they cite in *Columbia* what it says,

2    conspiracy is fine if the immunity applies.  So is your

3    argument that since there was no supervision here, it doesn't

4    matter what the nature of the petition was, because there was

5    sufficient supervision, therefore it could not meet all the

6    requirements of immunity?

7        MR. SPONSELLER:  Well, what we're saying is that, you

8    know -- what the defendants are saying is that, you know, that

9    the private, the Phoebe defendants, you know, cannot be

10   separated from the Authority's immunity.  They are like one

11   and the same.  And what the plaintiffs are saying is that's

12   not true because the Phoebe defendants were the effective

13   decision maker of this transaction and of the activities of

14   the Authority and the hospital facilities.

15       THE COURT:  Which means, you are saying, they're not in

16   concert with the -- they are not effectively acting in concert

17   with the Authority?

18       MR. SPONSELLER:  Well, and as Mr. Hassi noted, you

19   know, how can there be a conspiracy when the Authority members

20   didn't even know what was going on.

21       THE COURT:  That's what I'm asking you, is the critical

22   issue when it comes to immunity involving a private party

23   acting with a state agency, is the supervision of the active

24   involvement of the Authority as opposed to some other factor?

25       MR. SPONSELLER:  Yeah, and it's interesting because some

1    of the elements do kind of bleed into each other, but the

2    cases that, you know, we discussed, you know, the *Crosby* case,

3    the *Electrical Inspectors* case, the other circuit cases, you

4    know, what they say is, you know, if -- you can't, you know,

5    you can't have -- become one and get the state government's

6    authority unless, you know, there is some kind of control over

7    what's going on.  If the private party doesn't receive any

8    type of supervision, and it's just simply allowed to get the

9    immunity and take it and just, you know, that's the end of the

10   story, then, you know, what's the -- I mean, to be honest, you

11   know, what's the purpose of the active supervision

12   requirement.  Why does it even exist.  If you try to fit this

13   case into the box of the *City of Columbia*, then why -- when

14   would there ever be active supervision, why is that element

15   even there.  It doesn't -- It wouldn't make any sense.

16       I mean, let's think of a hypothetical for a second.  You

17   know, they could, for example, you know, the Authority in this

18   case, you know, they could, they could put in their bylaws to

19   say whatever the Phoebe Putney Health System board does we

20   automatically approve, and according to the defendants, that's

21   fine.  They could do that even though there's no -- there's no

22   analysis at all of what the Phoebe Board is doing, and the

23   defendants contend that would be immune as swell, and that

24   simply can't be the case.  That simply cannot be the answer

25   because why would there be an active supervision requirement?

1     The whole point of it is to say, okay, there's private actors

2     out there, you know, the state or, you know, a local

3     government has given them a certain authority to go out there

4     and, you know, have anticompetitive conduct.  That's fine, but

5     the state at the same time has to actively supervise that

6     conduct.  So that's why that prong exists.

7          Now, you know, what we're saying here is that prong does

8     exist, it does apply, and it didn't happen here, and that's

9     why, based on that reason alone, the motion should be denied.

10    Their motions to dismiss and for summary judgment should be

11    denied.

12         And if you could turn to Page 15, Your Honor, and this is

13    the other main defense against that theory, is they are saying

14    that, you know, assuming that, well, on one hand they're

15    saying the lease is speculative, but saying, you know, even if

16    they do sign the lease, that they're automatically immune, and

17    they cite the *42nd Street Theater* case and the *Charley's Taxi*

18    case, and what those cases, they are saying -- how they

19    characterized those cases are, you know, once you sign a

20    contract, then you're automatically immune, it doesn't matter.

21         And, you know, there's several reasons why that's not

22    true in this case.  You know, the allegations in the complaint

23    go well beyond just signing a contract from the Authority to

24    Phoebe defendants.  The complaint, specifically Paragraphs 57

25    through 84, it says, you know, the acquisition will result in

1    a complete monopoly, eliminate pricing constraints on Phoebe,

2    reduce the quality of healthcare in the region, create

3    barriers to entry for new providers.

4        Interesting, if you go back to that *Electrical Inspectors*

5    case, those are the exact type of allegations that occurred in

6    that case, and the Second Circuit said for allegations like

7    that the private defendant must be actively supervised.  And

8    the *Electrical Inspectors* case and the *LaFaro* case, 570 F.3d

9    471, they specifically came in later after the *42nd Street*

10   *Theater* case distinguished it, and found that once you raise

11   allegations, you know, beyond just signing a contract, then

12   that can survive a motion to dismiss and for summary judgment,

13   and that's what those cases held.

14       Now, so those defenses by saying it's just a contract,

15   it's just not good enough.  It doesn't automatically, as

16   Mr. Hassi said, wave the magic wand that makes the private

17   defendants not subject to the active supervision requirement.

18       Now turning to Page 17 -- I'm sorry, 16.  Now, this is,

19   what is the standard active state supervision, and, you know,

20   I think the Court has been clear, you know, number one, you

21   have to show the state officials have the power to supervise,

22   but also that those officials actually exercised that power to

23   review, particularly anticompetitive acts of private parties.

24       And, you know, I think just based on the lease agreement

25   alone, the existing lease agreement between Phoebe and the

1   Authority, that's simply not the case.  I mean, the Authority

2   can't even really review the prices and reject them.  I mean,

3   if Phoebe sets the prices, Phoebe manages the facilities, not

4   the Authority.

5        And, you know, the important quote that I mentioned

6   before is the *Ticor* case, and that's at 504, 621, and the

7   court stated here, "the mere potential for state supervision

8   is not an adequate substitute for a decision by the state."

9        So just because you might try to show in the future some

10   type of active state supervision is not adequate.  It must be

11   actually shown actual, in fact.  And in that case, you know,

12   in the *Ticor* case, the Supreme Court, you know, reviewed

13   different -- it actually, I think it reviewed like 30

14   different states' regulatory schemes.  It looked at how these

15   title insurance companies were monitored by the state.  And it

16   found that, you know, for almost all the states it wasn't --

17   from at least many of the states it wasn't sufficient.  And

18   the reason it didn't find it sufficient is because they didn't

19   show it in fact.  They didn't show in the facts of the case

20   that the state actually looked at the prices, that -- and the

21   anticompetitive conduct and could reject it.

22        And I also want to note, I think Mr. Bondurant talked

23   about there's the part in the Authorities Law, and it's Code,

24   Section 31-7-76, which is the petition to remove Authority

25   members, and basically what the defendants are saying, well,

1    this section, you know, shows a supervision type requirement

2    because, you know, if the people of Dougherty County don't

3    like the Authority, then they can remove them.

4        Well, the antitrust cases basically state that that's not

5    good enough.  I mean, that's not really active state

6    supervision.  Just because -- what they call it, they term it

7    a negative option.  You know, just by saying you can just

8    remove people or cancel something is not good enough; it's not

9    supervision.

10        So really if you -- if the Court looks at these rules,

11    you know, the great weight of the evidence in this case, I

12    think you'll find that the Phoebe defendants were not actively

13    supervised.

14        So turning to Page 17, just to wrap it up, and, of

15    course, I went way longer than I thought I would.  In sum, the

16    defendants, they do not dispute that, at least for this case,

17    that there's been violations of the Clayton Act and that the

18    FTC has made a prima facie case.  If there's a prima facie

19    case and if the equities automatically favor the plaintiffs,

20    the defendants' only defense is a state action immunity.

21        If the Court finds, number, one, that there is no clearly

22    articulated policy or that the Phoebe defendants were not

23    actively supervised, then their motion should be denied.  If

24    those motions are denied then the injunction should issue.

25    Thank you.

1    **THE COURT:**  All right.  I think that we've had a full

2    round on the -- except for rebuttal on the motion to dismiss.

3    I think the better way to proceed so we can kind of bring

4    everything together is to let the FTC proceed on its

5    presentation on the preliminary injunction.  So that would

6    mean that the defendants would not only give their rebuttal on

7    the motion to dismiss that they brought, but also their

8    response to the preliminary injunction at once.  All right.

9    **MR. REILLY:**  Good afternoon, Your Honor.  I talked to

10   you first thing this morning.  I'm Matt Reilly from the

11   Federal Trade Commission.  I'll be talking.  I won't promise

12   to be brief, but I hope I will be informative.  We have, of

13   course, unlike in the state action defense, we have the burden

14   under 13(b) of the FTC Act.  I'm sorry, sir, could you hand

15   those up?  I was going to do an hour and a half of opening

16   remarks before I got to the slides, so I didn't think we'd

17   need them right away.

18   **THE COURT:**  All right.

19   **MR. REILLY:**  I was joking.  We have the burden under

20   13(b) of the FTC Act, unlike in the state action defense where

21   the defendants have the burden.  So what I would like to do is

22   go through some of the evidence that we've already presented

23   to this Court and tell you how it fits in, what the standard

24   is under 13(b) of the FTC Act and what we're really asking for

25   from this Court today.

1    So we'll be presenting evidence this afternoon, we've

2    already submitted evidence to this Court that would support

3    the following findings:  That this transaction will result in

4    a merger to monopoly to general acute care inpatient hospital

5    services.  And I'll talk more about what those are.

6        We've mentioned this a couple of times now, but it's a

7    very important point.  The transaction will increase

8    healthcare cost.  This transaction will do that, and that's

9    indisputable.  And what that means is higher premiums, higher

10   co-pays, and higher out-of-pocket costs for local employers

11   and residents.

12       And as we mentioned a couple times before, the defendants

13   concede likelihood of success on the merits, meaning that they

14   don't challenge, they don't contest, they don't contradict the

15   great volume of evidence that we have submitted relating to

16   the competitive analysis of this transaction.

17       **MR. BONDURANT:**  Your Honor, I hate to interrupt, but as

18   I understood it, we do not contend that this transaction does

19   not eliminate competition.  The only two issues that remain

20   are public interest and balancing of the equities.  He's going

21   to spend an hour telling you how prices are going to be raised

22   and consumers are going to be hurt and so on.  That is not the

23   issue.  It's public interest and balancing of the equities.

24   Now, if you want to hear this, I am patient, and we will be

25   here as long as it takes.

1    **THE COURT:**  Well, of course, if it's not conceded, then

2    it's the burden of the government.

3    **MR. REILLY:**  Your Honor, and let's be clear, your order

4    on Wednesday said you wanted to hear about the public interest

5    and 13(b) of the FTC Act is a public interest standard with

6    two prongs:  Likelihood of success on the merits and balancing

7    and weighing the equities.

8    And the first prong, likelihood of success on the merits,

9    requires us with the burden to talk about the evidence and

10   talk about how prices are going up.  Mr. Bondurant talked this

11   morning about how the benefits to the community, how

12   healthcare access would increase, how all these efficiencies

13   would come about.  At the very least since we have the burden,

14   we would like to present what we believe is the evidence.

15   **THE COURT:**  All right.  Go ahead.  Go ahead.

16   **MR. REILLY:**  Thank you.

17   **THE COURT:**  To the extent that was an objection, it's

18   overruled.

19   **MR. REILLY:**  And I appreciate it.  I would have kept

20   talking if you didn't say that, Your Honor, so I appreciate

21   that.

22   Before we present a lot of the preliminary injunction

23   evidence in some detail, I would like to make it clear to this

24   Court what we're asking for today.

25   We're asking for a preliminary injunction to maintain the

1   status quo, and that's an important distinction.  We're not

2   asking for a preliminary injunction to stop conduct of Phoebe

3   or any of the defendants have been engaging in for years or

4   for months or for weeks.

5       We're asking this Court's assistance in preventing the

6   defendants from consummating the transaction in order to avoid

7   exorbitant rate increases that will result pending resolution

8   of the merits trial, and also what we call scrambling the

9   eggs, prevent service line cuts and consolidations and

10  preserve the Commission's ability to obtain full and effective

11  relief if warranted after the merits trial.

12      This is what happens when mergers are consummated, Your

13  Honor.  Back end functions are consolidated or eliminated.

14  Front end functions.  Those people who manage -- who negotiate

15  contracts.  IT is all consolidated.  The ability of the

16  Commission if we prove our case, if we prove our -- at the

17  merits trial the ability of the Commission to get full and

18  effective relief is hindered, significantly hindered if this

19  merger is consummated.

20      We're asking this Court's assistance in not allowing them

21  to consummate until the merits trial takes place.  And talking

22  about the merits trial, there has been a lot of criticism in

23  the past about how slow moving these merit trials are.  One

24  judge many years ago called the pace glacial, and they just

25  move very slowly.

1      And the Commission did something about that, and we have

2   proof of that.  They expedited the merits trial significantly.

3   There are now dates set for the opening statements in the

4   merit trial, September 19th, 2011, discovery is ongoing, it's

5   fast-moving, there will be three rounds of expert briefing,

6   witness lists have been exchanged.  These dates will not slip.

7      We made the exact same representation to Judge Katz in

8   the Northern District of Ohio on a hospital merger case this

9   year at a preliminary injunction.  We told him those dates

10  will not slip.  The discovery will occur just as we said as

11  set out on the schedule, and they have.

12      We had opening statement in that case May 31st, and that

13  case is ongoing, and it will be finished and completed by the

14  end of the year as we told Judge Katz.  There will be a

15  decision by Judge Chapel by April of 2011 in the merits case.

16  It is ongoing now.  And we're asking this Court to prevent --

17  delay a consummation until at least that merits trial takes

18  place.

19      We talked about this transaction will eliminate all

20  competition between Phoebe and Palmyra.  We don't think

21  there's any dispute on that.  To put it another way, the

22  transaction will eliminate Phoebe's only meaningful

23  competition.  Their only competition really.  There's no other

24  meaningful competition that Phoebe faces except Palmyra.

25      On the day that this transaction is consummated, if it

1    is, that competition will be eliminated completely, and it

2    creates a monopoly for inpatient general acute care services

3    even in a broad six-county geographic market.

4        Obviously these two hospitals are located in Dougherty

5    County, but they draw from the surrounding counties as well.

6    This will result in higher hospital prices for not only

7    residents of Dougherty County, but the surrounding counties as

8    well, and we'll show evidence that that is the case.

9        It will also increase healthcare costs for local

10   employers and residents, and this is an important point as

11   well, Your Honor, since it truly is a public interest

12   standard.

13       A lot of times defendants, especially when they're

14   nonprofit hospitals in hospital mergers come forward and say,

15   it's really the nonprofit hospital versus the for-profit

16   health plans.  The for-profit health plans are just worried

17   about their profits, worrying about paying smaller dividends

18   to their shareholders.  You shouldn't be worrying about a

19   merger, even a merger to a monopoly because the only folks

20   getting hurt are the for-profit health plans.

21       Your Honor, that is not true.  That is not the harm we're

22   alleging in this case, and that's not the harm that we will

23   demonstrate.  If healthcare rates, if hospital rates go up as

24   it will as a result of this acquisition, it will mean higher

25   premiums and higher healthcare costs for employers and

1    residents.

2         In fact, a very large percentage of employees in this

3    area work for employers who are self-insured.  And what

4    self-insured means is when there is an increase in healthcare

5    costs, those employers pay those costs immediately and

6    directly.  At the end of every month they get a bill for the

7    actual healthcare cost that their employees incurred, and they

8    pay that bill.  There's no pass through.  Higher healthcare

9    costs means higher cost for employers and residents.

10        This acquisition, this merger to monopoly, will also

11   eliminate important non-price competition, as we call it;

12   quality of care and service enhancement at Phoebe and Palmyra.

13        Mr. Hassi already mentioned the emergency room service

14   where Palmyra advertised across the county about their very

15   fast emergency room service, short waiting times, and those

16   are billboards targeted at Phoebe.  And there was other

17   competition as well.  Competition to add service lines, for

18   example, in obstetrics.

19        This non-price competition is an important dimension, but

20   not as important as the increased healthcare costs that will

21   arise from this transaction, but it's another dimension,

22   another dimension competition that has benefited consumers and

23   that too will be lost entirely because of this acquisition.

24        You mentioned, you asked in your Wednesday order about

25   the public interest standard, as has already been referenced

1   by myself and others, the public interest standard is the

2   standard which is used under 13(b) of the FTC Act in

3   determining whether an injunction should issue.  Is it in the

4   public interest.

5       And that has two elements, likelihood of success on the

6   merits and weighing of the equities.  And as has been

7   mentioned previously, the 13(b) PI standard is different from

8   the traditional four-part preliminary injunction test.

9       As the DC Circuit Court stated in *CC Holdings,* in 13(b)

10  proceedings, Congress demonstrated its concern that injunctive

11  relief be broadly available to the FTC.

12      *Whole Foods Market*, another DC Circuit 13(b) case, the

13  FTC, an expert agency acting on the public's behalf should be

14  able to obtain injunctive relief more readily than private

15  parties.

16      And finally *University Heath* in this circuit:  To obtain

17  a permanent injunction, the FTC need not satisfy the

18  traditional equity standard that courts impose on private

19  litigants.  The FTC need not prove irreparable harm.

20      And I think a question you asked this morning, Your

21  Honor, really got to why this is the case.  Unlike when

22  private parties come in seeking a preliminary injunction in

23  antitrust matters and merger matters, if a merger is

24  consummated that does end up resulting in immediate harm,

25  consumers, an entire broad base, broad group of consumers are

1  hurt and harmed immediately, and there's no way to compensate

2  them.

3        There's no way of two years later after a merits trial

4  there's some relief obtained.  Those consumers who are harmed

5  by the consummation of the transaction will be harmed, and

6  there will be no compensation, and a lot of times it is almost

7  impossible to restore competition fully after a merger is

8  consummated.

9        We face that problem all the time in what we call

10  non-reportable transactions where companies can consummate

11  before we even can do our investigation.  It is much more

12  difficult to get relief, and this is exactly why Congress

13  implemented this tool for the FTC to get an injunction before

14  the harm occurs.

15        So why are we here?  As we mentioned a few times, and the

16  Fourth Circuit said it very well in *Food Town*s, the only

17  purpose of a proceeding under Section 13(b) is to preserve the

18  status quo until the FTC can perform its function, and that's

19  what we're asking this Court to do.

20        In the *Hines* court in DC, also cited in *University Health*

21  in this Circuit wrote:  The district court is not authorized

22  to determine whether the antitrust laws have been or are about

23  to be violated.  That adjudicatory function is vested in the

24  FTC in the first instance.

25        The FTC is doing the merits trial, and it's ongoing now.

1   We are here today to get an injunction so the merits trial can

2   continue to proceed, and at the end of the day, if we prove

3   our case, get effective relief.

4       So what is our burden under likelihood of success on the

5   merits.  Well, this is indisputable as well.  This is the same

6   standard in this circuit and all the circuits.  The FTC meets

7   its burden of likelihood of success on the merits if the FTC

8   has raised serious and substantial questions.  That is the

9   standard.

10      If we have presented enough evidence to raise serious and

11  substantial questions, we have met the first prong of the PI

12  standard under 13(b) of the FTC Act.  And this is in

13  *University Health*, again, this circuit, and cited again in

14  *ProMedica*, a hospital merger case this year:

15      "The FTC meets its burden if it's raised questions going

16  to the merits so serious, substantial, difficult, and doubtful

17  as to make them fair ground for thorough investigation, study,

18  deliberation, and determination by the FTC in the first

19  instance and ultimately by the court of appeals."

20      That is the standard we have to meet, Your Honor, for the

21  first prong.

22      Precedents irrefutably teach that in this context

23  likelihood of success on the merits has a less substantial

24  meaning than in other preliminary injunction cases.  Again, *CC*

25  *Holdings*, a recent 13(b) case.

1          In *Warner Communications*, a 13(b) case from many years

2     ago:  "The court does not the resolve the conflicts in the

3     evidence, compare concentration ratios and effects on

4     competition in other cases, or undertake an extensive analysis

5     of the antitrust issues at the preliminary relief stage."

6          And so the context of that burden, the question that this

7     Court will have to ask and decide if we've met, is with all

8     the evidence we're presenting in terms of the structural harm,

9     the increasing concentration, the merger to monopoly, all the

10    parties' documents that colorfully talk about Phoebe's current

11    dominance -- this comes from both HCA and Phoebe,

12    self-proclaimed dominant, the ability for Phoebe currently,

13    even when they're facing competition from Palmyra, to get very

14    high, exorbitant rates now.

15         Based on all that evidence, the question for this Court

16    is, have we raised serious and substantial questions.  If we

17    have, we've met our likelihood of success on the merits under

18    13(b) of the FTC Act.

19         And we've talked a fair amount today about Clayton Act

20    Section 7.  I'm sure you're an expert on it by now, but I

21    wanted to mention a couple points that haven't been mentioned.

22         Even at the merits trial, the Clayton Act requires only a

23    showing that the effect of a transaction may be substantially

24    to lessen competition.  Not will.  Not will definitely, may

25    be.  And the reason why?  The famous *Brown Shoe* case, Supreme

1  Court, Congress used the words "may be" to indicate that its

2  concern was with probabilities, not certainties.

3  　　　And they also mentioned the incipiency standard earlier,

4  Your Honor, and this comes from the Supreme Court in *United*

5  *States versus Philadelphia National Bank:*  "A fundamental

6  purpose of amending Section 7 was to arrest the trend toward

7  concentration, the tendency to monopoly before -- before the

8  consumers' alternatives disappear through merger."

9  　　　And that is the exact incipiency standard you were

10  talking about earlier, that under the antitrust laws because

11  the harm from antitrust violations is so dramatic and causes

12  so much harm for a community, they want to arrest those harms

13  before they occur, not after they occur and try to figure out

14  if the harm occurred.

15  　　　And giving one last one from a recent 13(b) case:  "To

16  establish a violation of Section 7, the FTC need not show that

17  the challenged merger will lessen competition, but only that

18  the loss of competition is a sufficiently probable and

19  imminent result of the merger or acquisition.

20  　　　Turning to Slide 10.  This has been covered a fair

21  amount, and in the interest of time I'm just going to say a

22  couple, and I really will be brief, words on whether this

23  transaction is covered under Clayton Act Section 7.

24  　　　And you've seen these quotes before from probably both

25  sides, but as already been mentioned, Section 7 is concerned

1    with substance rather than form.  The question of Section 7 of

2    the Clayton Act asks is, what control now does one entity have

3    over another and how does that impact competition.

4         And here, I think it's undisputable, Your Honor, that

5    from day one, from day one, if this transaction is

6    consummated, Phoebe will have the ability to manage day-to-day

7    operations at Palmyra, negotiate health plan contracts with

8    Palmyra, establish all rates and charges for services at

9    Palmyra, in addition to other important functions as well.

10        I mean, in sum, Phoebe will entirely and completely

11   control its only meaningful competitor, Palmyra, from day one

12   as a result of this transaction.  That is covered under

13   Section 7 of the Clayton Act.

14        Slide 12.  Mr. Hassi mentioned *Hospital Corporation of*

15   *America versus FTC*, Judge Posner.  And I just want to point

16   out again that the set of facts in that case fit exactly,

17   exactly what's going on here in terms of, Judge Posner ruled,

18   the Court of Appeals ruled that when there was a management

19   agreement in place even though ultimate ownership and there

20   were summary version rights, the HCA had access and control to

21   the management agreement and managed the hospitals, under the

22   antitrust laws they controlled under Clayton Act Section 7

23   those hospitals.

24        There's a case from a very learned, respected antitrust

25   judge and other areas as well that is right on point here.

1    And it's interesting as they criticize our Clayton Section

2    Act -- Clayton Act Section 7 cases, saying some of them are

3    out of the circuit, some are tax cases, some involve private

4    mergers.  There's a lot of criticisms they mentioned.

5        It's important to point out that they haven't pointed to

6    one case, not one Clayton Act Section 7 case that has this set

7    of facts, this economic control of one entity of another that

8    isn't covered under Section 7 of the Clayton Act.  There are

9    no cases that support that point.

10       Turn to Slide 15.  So let me fairly briefly go through

11   the relevant markets.  That is a step we're required to do in

12   antitrust Section 7 cases.  You do that in order to see what

13   the market shares are.  What the changes in the market share

14   would be from an acquisition.

15       And so what you look for, and this is under the Supreme

16   Court in *Philadelphia National Bank*, is "an acquisition

17   violates Section 7 of the Clayton Act if it leads to undue

18   concentration in the market for a particular product in a

19   particular geographic area."  And this transaction easily

20   meets that standard.

21       The relevant product market that we alleged in the

22   complaint in this court and also the complaint in the merits

23   proceeding as well is inpatient general acute care services

24   sold to commercial health plans.

25       And while that's not the most eloquently worded set of

1    product market, Your Honor, that is a very standard, widely

2    accepted by the courts, it's basically the more -- the more

3    basic inpatient services, excluding tertiary services where

4    folks usually go -- travel a lot longer distances for tertiary

5    services, the more complicated services, for example, lung

6    transplant, you might go to the Cleveland Clinic for a lung

7    transplant because it's such a serious, important procedure.

8         But for the more basic inpatient procedures, they're

9    usually a much shorter, smaller geographic area that people

10   travel for, and that is the product market that we have

11   alleged.  What we are doing with private market, the entire

12   purpose of defining a private market is identifying the

13   overlapping services.  What services exactly do Palmyra and

14   Phoebe compete in that may have a reduction in competition and

15   result in higher prices.  That is the importance in the

16   function of identifying relevant product market.

17        And as I had mentioned, there is -- our product market

18   has been consistently recognized by courts, including the

19   Eleventh Circuit in hospital cases.  Typically there's little

20   debate in hospital mergers regarding product market.  I don't

21   think there will be any debate about what the relevant product

22   market is in this case.

23        I just do want to make one more point on product market

24   that the broad cluster market of inpatient services has over

25   500 DRGs, diagnosis related groups.  It's not just one

service.  It's not just a dozen services.  Under our complaint
and the evidence will support, there are over 500 separate
DRGs where there will likely be competitive harm as a result
of this transaction.

The next step is identifying a relevant geographic
market.  We have been, I would say, conservative.  We have
done it in a broad way.  We have said the six-county region
consisting of Dougherty, Terrell, Lee, Worth, Baker, and
Mitchell Counties in Georgia.  Again, the geographic market is
likely smaller, but we do not want to be too narrow in
identifying the geographic market.

You see under the first bullet, there are a lot of PXs in
there.  All the PXs starting with the number four are
affidavits.  We've accumulated for these proceeding affidavits
from health plans, virtually every health plan who services
this area, employers, big, small, medium-sized, other
third-party hospitals.

We've also put in an expert affidavit that supports the
allegations in our complaint and very consistent with the
story of harm and who will suffer from this transaction.

As I mentioned for these inpatient services, most
patients don't travel very far to get these.  Hopefully when
we're unfortunate enough to be admitted into a hospital, we
have family and friends who want to visit us, and that's why
choosing a hospital that has a favorable location, preferably

1    close to the house, is really important to patients, and

2    that's reflected in how long people travel in Southwest

3    Georgia to get to these hospital services.

4        In the ordinary course of business, Palmyra and Phoebe

5    look at and calculate a primary service area.  This primary

6    service area is consistent with our geographic market.  A

7    primary service area is where they draw the vast majority of

8    their patients.

9        So, again, looking at their original request documents

10   and what Phoebe and Palmyra do when their running their

11   business, this is the area they look at.  This is the area

12   where they compete against each other most vigorously, and

13   this is the area where they draw most of their patients.

14       One interesting fact is that in case the defendants get

15   up and claim that Phoebe in particular competes against

16   hospitals all across the State of Georgia and Florida and

17   Atlanta, Macon and Tallahassee, that they compete far and

18   wide, well, there's no evidence in the documents that's the

19   case for the primary and secondary services.  Maybe for some

20   tertiary services, they'll mention the documents about what

21   the Tallahassee hospitals are doing or the Macon hospitals are

22   doing or the Atlanta hospitals are doing.

23       And in fact, when you look at who Phoebe required

24   exclusivity from the health plans, it was just against

25   Palmyra.  That was the only competitor that they were

1    concerned about.  They had a laser focus on Palmyra.  They did

2    not want other health plans to include Palmyra in their

3    networks for a simple reason, if Palmyra was in the network,

4    patients would choose -- some patients would choose Palmyra

5    over Phoebe.

6         That shows closeness of competition.  And the reason for

7    that is simple, Your Honor, they are very close competitors

8    who compete across every dimension, not only price, not only

9    inclusion in health plan networks, but for the non-price

10   aspects as well, better services, higher quality, better

11   amenities.

12        Slide 20 is from their documents, from Phoebe's documents

13   showing their calculations of shares in the primary service

14   area.  You can see in the map that they're similar to ours in

15   the counties that they're identified in the light shade.  The

16   green ones are where they draw the tertiary from, the more

17   complicated services.

18        So, again, the point of this document, Your Honor,

19   created in the ordinary course is how they look at the market,

20   how they look at where they compete, and where they especially

21   compete against Palmyra is very similar to how we define the

22   relevant geographic market.

23        Now, another document, did the same thing.  They actually

24   calculate market share based on the primary service area.

25   Their market share that they calculated was 78 percent for

1    their primary service area.

2         And I think they make a point or they may make a point

3    when they're talking about the merits that this Court

4    shouldn't be concerned about this acquisition because Palmyra

5    share is pretty small.  It's not 30 percent, it's not 40

6    percent.  It's like 12 percent, 11, 12, 13 percent, depending

7    on how you define it.

8         And they may make the point that this Court should not be

9    concerned, we haven't raised serious and substantial issues

10   through the acquisition of an entity of a hospital who has

11   such a small share.  Your Honor, by their own calculation,

12   Phoebe has a 78 percent market share.

13        Market shares must add up to 100, I'm pretty sure about

14   that.  You wouldn't expect when you acquire someone, it's your

15   biggest competitor, when you acquire someone they have shares

16   of 30 percent when you have 78 percent market share.

17        So Phoebe's relatively -- excuse me, Palmyra's relatively

18   small share is not a defense to the antitrust laws.  Indeed

19   the Supreme Court said something quite differently.  In

20   *Philadelphia National Bank*, the Supreme Court said, "if

21   concentration is already great, the importance of preventing

22   even slight increases in concentration is correspondingly

23   great."

24        When you're a dominant hospital provider -- and dominant

25   is their word, and we agree with it, and HCA's word for

1    Phoebe.  When you're a dominant provider acquiring your

2    biggest competitor, even if that competitor only has 12

3    percent share, it creates significant antitrust and

4    competitive harm.

5        In addition to the ordinary request documents, the expert

6    affidavits -- the expert affidavit, excuse me, in looking at

7    travel patterns, health plans and employers have offered

8    testimony here that support the relevant geographic market we

9    put forward.

10       And on Slide 22 there are a couple of summaries.  The

11   health plan names have been omitted for confidentiality

12   reasons, but every health plan has submitted testimony saying

13   that you really can't have -- you cannot have a competitive

14   hospital network in Dougherty County without one of the

15   hospitals.  You need one of the hospitals, and that truly is

16   the crux of the harm here.

17       Before, and we'll talk about this later, the health plans

18   could somewhat play off Phoebe and Palmyra, to try to get

19   somewhat better rates by saying, we'll only have one for

20   certain services or the other.  Now, if you want to have a

21   commercially viable health plan network in this area, you must

22   accept Phoebe's rates.  There is no alternative, and

23   unfortunately, that is always the case with a merger to

24   monopoly.

25       Turn to Slide 23.  This is a map where the green outline

1    is our actual relevant geographic market.  This comes from

2    what's called the Dartmouth Health Service, HSA, which has

3    been determined independently to be an area where healthcare

4    services are obtained.

5        I just want to make an important point about this.  Our

6    market shares, our presumption that's created from this

7    acquisition is in no way sensitive to different geographic

8    markets.  You could do three counties, you could do six

9    counties, you could do nine counties.  The increase in

10   concentration, the market shares that result from this

11   acquisition are still exorbitant.  They still are.  They're

12   extraordinarily high.

13       And unless you decide that the geographic market goes to

14   Atlanta or Macon or Tallahassee, there will still be a strong,

15   strong presumption of competitive harm created from this

16   acquisition.

17       And there is no evidence in the record, none whatsoever,

18   that if you lived in, for example, Albany, and you had to go

19   to Atlanta or Macon for inpatient hospital services that that

20   be -- that would ever been acceptable to employees or

21   employers for commercial health plans.  There's no evidence in

22   the record to support a geographic market that far.

23       So after defining the relevant product market and the

24   geographic market, the next step is really estimating market

25   shares and seeing if there's a presumption of legality.  And

1    the presumption is very important in merger cases because once

2    we have created -- or once we've met a presumption of showing

3    there's a presumption, then the burden is on the defendants to

4    rebut that presumption.  And there are different, there are

5    different strengths of presumptions.  Some presumptions, as I

6    talked about, just barely make the presumption, others exceed

7    the presumption by a very wide margin as we do here.

8         The Supreme Court in *Philadelphia National Bank* stated

9    the reason for the presumption a little more eloquently than I

10   could:  "A merger that causes undue market share and

11   significantly increases concentration is so inherently likely

12   to lessen competition substantially that it must be enjoined

13   in the absent of evidence clearly showing that the merger is

14   not likely to have such anticompetitive effects."

15        That is the presumption, Your Honor, that once we show

16   undue market share and increase in the concentration, we're

17   entitled to a presumption against the transaction that the

18   defendants have the burden of rebutting.

19        And a recent 13(b) case made the same point.  "Once undue

20   concentration is shown, the FTC is entitled to a presumption

21   against the merger on the merits, and therefore does not need

22   detailed evidence of anticompetitive effect at this

23   preliminary phase."

24        A lot of times antitrust attorneys do a good job of

25   complicating fairly simple stories.  We'd like to talk about

1    fancy econometrics and economics, diversion ratios, critical

2    loss, elasticity of demand.  In this case, it struck me, the

3    best piece of evidence we have, the best piece of evidence is

4    really a common sense, intuitive approach.

5         If you look at a map, if you look at a map and you see

6    where Phoebe and Palmyra are located, and you see what's

7    around them, and you see, and you know how quickly you can

8    drive from one hospital to the other, five minutes or less,

9    and you see no other hospitals around, and you realize that,

10   of course, hospital location is critical when patients are

11   choosing hospitals in addition to quality and other things,

12   that there's the story.  These two hospitals competed

13   vigorously, head to head.  They have a laser focus on each

14   other and no one else, and as a result of this competition,

15   consumers benefited.

16        There are lower prices, discounts given if you include

17   one hospital and not the other.  There's better services,

18   better amenities, and there was competition, and this

19   competition benefited the community, and this acquisition

20   without dispute will eliminate completely and entirely that

21   competition.

22        So going back to the post transaction market share,

23   Phoebe now will have an 86 percent market share and again a

24   very broadly defined geographic market.  If we defined it more

25   narrowly their market share would be even higher.  And with an

1   86 percent post acquisition market share, that far exceeds the

2   presumption under the merger guidelines and under the case

3   law, including Supreme Court law.

4       This Court may be familiar with the Herfindahl-Hirschman

5   Index, HHI index.  I think you have done a merger case before,

6   Your Honor, but I can explain it to you hopefully fairly

7   simply at least with the levels needed for the presumption.

8       If the HHI exceeds 2500 of the merger guidelines with an

9   HHI increase of 200 -- and this is again measuring market

10  concentration and changes in market concentration -- then

11  there's a presumption against the merger, a presumption of

12  harm.

13      Here the market shares truly are extraordinary.  The post

14  transaction HHI is in the last column, 7,453.  That is

15  threefold, 300 percent larger than what is needed to get a

16  presumption, to be entitled to a presumption under the merger

17  guidelines.  The HHI increase, which measures changes in

18  concentration is 1675.  That is 800 percent, 800 percent more

19  than is needed for the FTC to be entitled to a presumption

20  against this transaction.

21      Again, at this stage, Your Honor, we have shown that

22  there is a strong presumption of harm here.  We could

23  literally sit down and not say another word and I think we'd

24  be entitled to an injunction because the defendants have to

25  rebut it, and there is no evidence to rebut such a strong

1    presumption.

2        Let me try to put this presumption and these market

3    shares in some historical context.  *Philadelphia National*

4    *Bank*, a Supreme Court case, combined share of the merging

5    parties, 30 percent.  That was enjoined.  Let me focus on the

6    two hospital merger cases here.  One in the Eleventh Circuit

7    and one just very recently litigated this year.

8        In *University Health*, 43 percent combined share.  The

9    Phoebe-Palmyra combined share is twice that.  *ProMedica*, this

10   from Ohio, 58 percent combined share.  The Phoebe-Palmyra

11   share is 50 percent higher than that.  These shares are

12   extraordinary.

13       But for the remainder of this presentation, Your Honor,

14   I'm going to present additional evidence really from the

15   mouths of the parties themselves and from testimony, from

16   health plans, employers and third-party hospitals that

17   bolster, that strengthen this already strong, strong

18   presumption.

19       Before HCA Palmyra joined hands with Phoebe and came into

20   this court and talked about the benefits that would result

21   from this acquisition, they had quite a different view, and

22   they expressed those views in filings in this court about

23   hospital competition, about competition with Phoebe, about

24   benefits from competition or harm from lack of competition,

25   and really the vigorous competition between Phoebe and

Palmyra.

And I'm quoting from filings that one of the defendants made in this court:  No rational explanation accounts for the defendants' conduct other than a desire to destroy competition with Palmyra.  As explained below, commercial insurers, claim administrators, and patients suffer from the lack of competition by having to pay more for their hospital care.

Those are the words coming directly from a defendant.

For years the defendants in this case have used their monopolies in obstetrics, neonatology, cardiovascular care, to foreclose competition in other hospital services and to exclude Palmyra from the market.

Well, let me pause there, Your Honor.  HCA used the word monopolies.  They used the word monopolies to describe services that Phoebe offers and Palmyra doesn't.  And that again offers strong support for our geographic market.

If indeed the geographic market reached Macon, Tallahassee, Atlanta, and beyond, Phoebe would not have a monopoly.  They would face a lot of competition for those services.

So HCA very recently agreed with that geographic market, that for those services that Palmyra does not offer, Phoebe has a monopoly, and they continue.

As a result, defendants have been able to and do charge commercial insurers, claim administrators, and commercially

1    insured patients more than competitive marketplace would

2    allow.

3        More words from HCA:  Palmyra, the only other hospital in

4    town has been willing and able to offer competitive prices for

5    cardiology, gastroenterology, and several other services.

6    Defendants have, however, consistently used their monopoly

7    power to prevent commercially insured residents of Dougherty

8    and the surrounding counties from being able to use Palmyra.

9        One more, Your Honor, from HCA, the words out of a

10   defendant's mouth:  "The effects of defendants'

11   anticompetitive actions are devastating to Georgians with only

12   two hospitals authorized for more than 200 beds in the

13   geographic market limited competitive alternatives are

14   available to residents seeking the tied products.  Defendants'

15   existence on exclusive agreements limits commercially insured

16   residents even more and rides roughshod over their physician

17   and other healthcare provider preferences and restricts

18   patients' ability to compare quality and pricing at the two

19   hospital."

20       Those are the words from HCA.  Your Honor, as we'll see

21   from the next several documents, Phoebe agrees.  Phoebe agrees

22   with HCA.  When Phoebe doesn't know or doesn't expect this

23   court to be watching or the FTC and the Attorney General's

24   Office to be watching, they agree that they are the dominant

25   healthcare provider in this area as we shall see.

1    Slide 32:  "Now, about our monopoly and why that

2    resonates with people.  Yes, Phoebe is the dominant player in

3    the market."  This comes from the vice president, executive

4    director of the Phoebe Foundation, a dominate player in the

5    market.  That's not the only time they refer to themselves as

6    dominant.

7    Slide 33:  Our acute care hospital is the dominant

8    provider of care, with only 40,0000 residents in the primary

9    service area, 620,000 in the tertiary area, consistently

10   capturing a market share of more than 70 percent.  They are,

11   in Phoebe's own words, the dominant provider, and this is

12   before, this is before they're proposing to acquire their only

13   competition.

14   A senior leadership retreat presentation.  Phoebe:  "What

15   are the steps to protect dominance?"  Again, there's no

16   ambiguity; Phoebe is a dominant provider, HCA believes that,

17   Phoebe believes that, and we agree as well based on the

18   evidence.

19   Slide 35.  This is reference to a very large health plan,

20   and Phoebe made the observation that this very large health

21   plan could not sell a commercial HMO business without Phoebe

22   and without Phoebe's services.  And that is by definition,

23   Your Honor, having an incredible market power and dominance

24   with a very large health plan.

25   And just so we're clear, dominance isn't just a -- some

1    colorful, yet meaningless term that we use when we're trying

2    to draft entertaining complaints that the parties throw around

3    and defendants throw around when they're trying to talk about

4    their size.

5         Phoebe's market dominance here has importance because it

6    is also undisputable based on all the evidence that Phoebe's

7    market dominance has led to significantly higher rates for

8    employers and residents in this area.  HCA has noted this and

9    several other witnesses have as well.

10        From HCA:  In and around Dougherty County, Georgia

11   healthcare costs are substantially higher than elsewhere in

12   the state and region.  Health insurance companies and

13   employers have recognized this problem.  Studies have

14   confirmed it.  Local government has sought in vain to address

15   it.

16        More words from HCA about Phoebe's significantly higher

17   rates:  By effectively confining commercially insured patients

18   in Southwest Georgia to a single local hospital option,

19   defendants have hindered competition and raised the hospital

20   costs that commercial insurers, employers, and patients must

21   pay.  Compounding the injury, these higher healthcare costs

22   restrain the growth or worse could force a relocation of

23   employers capable of providing solid middle-class jobs to the

24   region.

25        One more quote -- allegation in the complaint in this

1    court from HCA:  Defendants have been able to demand unusually

2    high reimbursement rates from commercial insurers and claim

3    administrators.  As a result the commercial insurers and claim

4    administrators must charge higher premiums than they otherwise

5    would, which the employers in and around Albany must pay or

6    pass along to their employees.

7        We're not just relying on HCA's observation that Phoebe

8    is able to charge exorbitant rates based on its market

9    dominance, local employers and health plans have confirmed

10   this as well.

11       One health plan declaration, PX-415:  This health plan

12   recently analyzed its costs for members' use of Albany area

13   hospitals and compared it with the costs associated with using

14   hospitals outside the Albany area.  This health plan found and

15   testified:  We found that Palmyra's rates were 7 percent lower

16   than the state hospital average, excluding Atlanta's

17   hospitals, while Phoebe's rates were 45 percent higher than

18   average for the study group.  Their current market power has

19   allowed them to charge very high rates.

20       Another health plan testified, PX-416:  Based on a

21   comparison of similar services we calculated that many of the

22   rates in the Palmyra Hospital agreement were between 20 and 70

23   percent less than the comparable rates in the Phoebe Hospital

24   agreement.  20 to 70 percent less.

25       And this health plan said that Phoebe's rates were among

1    the highest for all hospitals in Georgia on a case-mix-

2    adjusted basis.

3        Employers agreed as well and testified, PX-405:  Phoebe's

4    charges that appear on the bills have increased enormously

5    since 2004.

6        Another employer testified:  According to our broker and

7    based on my knowledge about increasing healthcare costs,

8    Phoebe Putney's increases in charges for medical services are

9    the main factor in these rate increases.  These rate increases

10   being up to 10 percent annual rate increases.

11       The next slide, I think, is probably the most telling of

12   all.  This comes from a very large employer who has

13   manufacturing sites throughout the entire United States,

14   PX-421.  And they testified:  In the past five calendar years,

15   Albany has been the only -- this company -- plant that

16   consistently has been in the company's top 10 high cost plan

17   locations for medical costs.

18       In fact, 2007, out of dozens, out of dozens of this

19   company's manufacturing sites, Albany was the costliest site

20   for medical services.  Not the top 10, not the top 5, Albany

21   was the most expensive out of all the US locations on

22   healthcare costs.

23       Another employee testified, PX-423:  Phoebe is already

24   the dominant hospital system in Southwest Georgia.  With no

25   competition, Phoebe Putney will be in a position to increase

1    hospital rates to even higher levels.

2        More evidence on how Phoebe's market dominance has led to

3    high rates even before they've eliminated their only

4    competitor.  A 2000 study by Milliman demonstrated that

5    hospital costs in the Albany area were 31.2 percent higher

6    than expected even though non-hospital costs, such as

7    physicians, were 25.3 percent lower than expected.  This came

8    from the Georgia Department of Community Health.

9        The same Department of Community Health continued:

10   Although the 2007 Milliman study concluded that the only

11   hospital outpatient costs higher than expected Palmyra

12   presented evidence that these high hospital costs were higher

13   than expected in part due to the higher than average pricing

14   at Phoebe.

15       And finally a 2008 report by Cleverely and Associates

16   found that Phoebe's are 25 percent higher above peer, and

17   Phoebe's return investment was about 35 percent above the US

18   median.

19       Your Honor, we respectfully suggest that when a

20   self-proclaimed dominant firm is able to charge such extremely

21   high prices, what this area needs is more competition, not

22   less.  We don't control competition, but we definitely when

23   there's a proposed acquisition that will eliminate Phoebe's

24   only competition, we are in here to present evidence saying

25   why that should be not allowed under Section 7 of the Clayton

1    Act.

2         I think it's not in dispute that Phoebe and Palmyra are

3    each other's closest competitors.  We have evidence from

4    Mr. Wernick's investigational hearing transcript, Mr. Rader's

5    investigational hearing transcript and other PX cites as well.

6    There's a lot of evidence on that.

7         As we mentioned before, as important as healthcare costs

8    are to a community and how when healthcare costs increase, it

9    really creates a hardship to the community, there are other

10   non-price benefits as well, as we talked about, shorter

11   emergency room wait times.  There are several PXs that refer

12   to that.  Private rooms.  One of the issues was when Palmyra

13   was attempting to get -- expand into OB services, they were

14   going to have private rooms, and Phoebe -- and Phoebe noticed

15   that and intended to respond if, in fact, Palmyra was

16   successful in getting CON application for that.

17        There's also significant evidence that the proposed

18   transaction will likely lead to higher prices.  On Slide 44,

19   we have lots of PXs that refer to higher prices, and, again,

20   affidavits from a broad array of witnesses that have testified

21   that they fully expect higher prices to be on top of already

22   high prices.  And there will be a reduction in quality service

23   as well.  There are several documents that support that as

24   well.

25        One possible defense that Phoebe might advance either in

1    the merits trial or here is they already have great market

2    power, they already have dominance, and Palmyra is

3    insignificant, why should this merger matter.

4         It's very rare that a defendant will come into court and

5    say, look, we already have monopoly power -- or we already

6    have incredible market power, this won't change anything.  But

7    I guess it's possible they may make that point.

8         But the truth of the matter is, Your Honor, Palmyra has

9    successfully competed against Phoebe.  For the last several

10   years they have taken share from Phoebe.  They took market

11   share in the Albany area.  This is coming from their own

12   documents, HCA documents.  You see Phoebe's market share going

13   down and Palmyra's market share going up.

14        Palmyra was competing successfully against Phoebe, and

15   Phoebe noticed.  Phoebe noticed because even after taking

16   share, Mr. Wernick sent in an e-mail that Palmyra is a wounded

17   animal who will do anything to gain market share.

18        They're concerned that Palmyra was continuing to focus on

19   gaining market share from Phoebe.  And so that when that --

20   when you have a company who's trying to take patients from

21   you, who's trying to compete more vigorously, there are really

22   two options to protect your market share.  One is to be

23   improve your pricing, improve your quality services, improve

24   your services and amenities, and the other is to acquire that

25   feisty head-to-head competitor.

1    When you improve your quality and your pricing, consumers

2    benefit.  When you acquire your only competitor, you acquire

3    that vigorous head-to-head competitor, consumers are harmed.

4    Again, when Palmyra was applying for the CON to get a --

5    to have an OB program, Phoebe was worried.  And they wrote in

6    an e-mail:  Palmyra has gotten the CON for an OB program.

7    Although we are fighting it, we will continue to exercise our

8    rights through the regulatory process.  If they do get the CON

9    application and if Palmyra is able to offer obstetrics to the

10   people in Albany and people of Dougherty and beyond, Phoebe

11   concluded, we are going to have to step up our program.

12   They're going to have to improve their program, maybe

13   look at private beds, find ways to compete more effectively

14   against Palmyra.  This competition, again, Your Honor, is lost

15   if this acquisition is consummated.

16   And HCA really minced no words in an e-mail between HCA

17   executives about what this transaction means.  They write:

18   Did we get a good price?  Since this will mean no competition

19   in Southwest Georgia, do you think that could hold up the

20   sale?

21   We'll find out later whether it will hold up the sale,

22   but I thought the word choice was pretty telling here, Your

23   Honor.  It wasn't this would mean less competition.  It wasn't

24   this would mean significantly less competition.  It did not

25   state that this would mean minimal competition.

1          The words from the HCA executive was "this acquisition

2    means no competition in Southwest Georgia."  This is written

3    in the ordinary course when they didn't realize that this

4    Court or the FTC or AG would have access to it.

5          We mentioned already what is sometimes called the

6    nonprofit hospital defense and the feeling that since Phoebe

7    is a nonprofit hospital, maybe they won't fully exercise their

8    market power.  I'm hoping at this point the evidence on their

9    current pricing and how high it is compared to the other

10   providers in the state, and other providers around here, that

11   it is clear that Phoebe fully exercises its market dominance

12   now.

13         As mentioned was by Mr. Hassi, there's no evidence that

14   they said those rates are too high, that's too much, let's

15   given some of it back; no, no, don't give us that much.  They

16   fully, fully get as much as they can from commercial health

17   plans.

18         And there's nothing wrong with that.  Third party

19   hospitals have testified, and you have it in the binders, that

20   they, too, try to get as much as they can from commercial

21   health plans.  We're not saying there's anything wrong with

22   that, but at the same time no one should take comfort and this

23   Court should not take comfort that because Phoebe is a

24   nonprofit hospital that -- when they already have the ability

25   to charge extremely high rates and they're going to acquire

1    their only competitor, there should be comfort or no issue

2    they won't fully exercise their market power.

3         And as one health plan said:  Phoebe is particularly

4    aggressive in seeking the highest rates possible.

5         Slide 50.  Testimony that's fully consistent with Phoebe

6    fully exercising it's market power and with the full

7    expectation that after the merger, after the acquisition, they

8    will continue to fully exercise their market power and get the

9    highest rates possible from employers and residents comes from

10   testimony listed in Slide 50.  There are two health plan

11   declarations in there, and a third party hospital, all saying

12   the same thing, all fully expecting Phoebe to fully exercise

13   their market power.

14        So what does this acquisition change?  In addition to

15   eliminating Phoebe's only competition, as I had mentioned,

16   Palmyra and Phoebe compete against each other in terms of

17   getting on health plans networks.  There has been a history of

18   exclusive contracting here, and that means for one very large

19   payer, if this very large payer excluded Palmyra at Phoebe's

20   insistence, this large health plan and all of its members and

21   employees got a significant discount worth millions of

22   dollars.  The existence of Palmyra resulted in millions of

23   dollars of discounts for this health plan and their employees

24   and members.

25         Other health plans who did not want to accept Phoebe's

1   high rates were able to contract with Palmyra and tell their

2   members, if Palmyra offers this service, you must go there.

3   If Palmyra doesn't offer a service, you can go to Phoebe and

4   get the network rate.  That's competition.  By using Palmyra

5   these health plans were modestly, modestly able to lower their

6   reimbursement for all their employers and their employees.

7       And health plans across the board, across the board,

8   fully expect -- there's uniformity in the testimony, Your

9   Honor -- the health plans fully expect that this acquisition

10  will have adverse effects, meaning higher rates for employers

11  and residents in the surrounding counties and Dougherty

12  County.

13      And I quote PX-415:  In this health plan's experience

14  competition from Palmyra has been the only factor that has in

15  any way constrained Phoebe's strong pricing power.

16      Another health plan, a different health plan:  Phoebe's

17  bargaining position vis-à-vis the health plan will increase

18  exponentially because the health plan will no longer have a

19  competing alternative hospital upon which to anchor a provider

20  network.

21      And more testimony from health plans as well, Your Honor:

22  The acquisition will eliminate that competitive pressure, the

23  pressure between Phoebe and Palmyra that it's imposed some

24  pricing constraints upon each hospital, another health plan

25  testimony.

1      And, again, Your Honor, there's no health plan testimony

2   in the record whatsoever that contradicts these predictions of

3   harm, these well-based predictions of harm.

4      In addition to health plans, local employers also

5   testified about the harm that will incur as a result of this

6   acquisition.  Taking out the employers' names, PX-405:  I am

7   concerned that Phoebe's acquisition of Palmyra will make a bad

8   situation worse in terms of paying higher healthcare costs.

9   If this employer is faced within higher healthcare costs, we

10  will have no choice but to pass them on to our employees.

11     And employer after employer on the record has made the

12  same point.  They hate to do it, but if healthcare costs

13  increase, they will either pass on part or a portion on to the

14  employees, which means higher premiums for employees, higher

15  out-of-pocket costs, and higher co-pays.  That is what will

16  result from this acquisition if it's consummated.

17     Slide 53, another employer, PX-420:  Our healthcare costs

18  have grown to such a size that any further increases will be

19  catastrophic for the company.

20     And PX-421 is the same, a very large employer who talked

21  about how high the hospital costs are now compared to all

22  their other plans in the United States and how this employer

23  expects healthcare costs to increase even more if this

24  acquisition is consummated.

25     Slide 54, there is more.  Of course, a financial hardship

1    to residents of Dougherty County and the surrounding counties

2    is bad enough.  This will have a real deleterious effect on

3    the quality of life, on their financial well-being, but it has

4    more of an impact as well, Your Honor.

5         What happens when healthcare premiums and healthcare

6    rates increase is many people can no longer afford insurance.

7    It happens.  Employers either have to eliminate insurance or

8    can no longer offer coverage for dependents or increase the

9    premiums to such a way that employees forego it.

10        Many times when the co-pays and out-of-pocket costs

11   increase residents forego important medical services.  That's

12   what happens.  This is what the employers have testified to.

13   And so not only is there a financial hardship, there is a

14   certain health impact too to the community from higher

15   healthcare costs.  And this is also a stake of healthcare

16   costs increase as a result of this acquisition.

17        We've already seen some testimony from employers that

18   when healthcare rates increase around this area and they

19   increase higher than in other areas, employers have a tough

20   time competing, creating jobs, hiring more people.  Healthcare

21   cost is such a drag on the employer's payroll, and they want

22   to offer their employees this, that is another impact to the

23   community, and that goes directly to the equities and the

24   public interest that this Court must do.

25        So, let me get finally to the transaction justifications

1    from the parties.  This was mentioned earlier by Mr. Bondurant

2    in particular, about all the potential efficiencies that may

3    arise from this transaction.

4        We do know that when Phoebe was going through the

5    benefits of this transaction one of the stated goals was

6    control all beds in Dougherty County, and that was one of the

7    advantages of the acquisition.

8        And the other efficiencies, we'll talk about what they

9    had mentioned at the time of the acquisition and what they're

10   saying now, that it's very important to note there is no

11   mention of meaningful costs savings synergies at the time

12   Phoebe was analyzing this deal.  No mention whatsoever of

13   improved quality of care.  And the capacity constraints that

14   have been talked about, I'm going to address later, they

15   should be given little to no weight.

16       And also I think they may claim that they'll be able to

17   provide better indigent care as a result of this acquisition.

18   Again, this is not in any documents we saw created around the

19   time the acquisition pros and cons were being analyzed.  It's

20   something that if mentioned and if advanced, they will be made

21   through this litigation.

22       I want to talk about the improved quality of care.  It is

23   rare the case that a hospital system doesn't come before the

24   FTC and say, we're acquiring an independent competitor and one

25   of the reasons why we're doing this deal is to improve the

1    quality of care at the acquired hospital.  It happens all the

2    time.

3        Hospital systems make this claim, and we take these

4    claims very seriously because better quality of care is

5    beneficial to the community.  In some it can save lives if the

6    quality of care is really improved, and so we hear about

7    better outcomes, higher scores, and important quality metrics,

8    fewer re-admissions, less unnecessary testing, shorter

9    hospital stays, because the right care is delivered right

10   away, and fewer complications.

11       In this acquisition we have heard none of those, Your

12   Honor.  In not one document does Phoebe pretend that there is

13   going to be improved quality of care.  It's not mentioned, and

14   that omission is important.

15       And based on the likely harm that's to occur here, the

16   merger to monopoly, the dominant market position that Phoebe

17   has now, the ability to charge very high pricing, the

18   elimination of all significant competition, under the case law

19   and the merger guidelines, Phoebe would have to show truly

20   extraordinary large efficiencies to ever offset or justify a

21   the competitive harm that's likely to increase here.  That's

22   in the case law, that's in the merger guidelines, and they

23   don't come close to meeting that burden.

24       Slide 56.  As had been mentioned previously, and this is

25   an important point on the capacity constraint:  The

1    acquisition does not increase capacity by one single bed for

2    Dougherty County.  It does not.  There is nothing in the

3    record.  There have been no affidavits submitted that's

4    saying, we will be able to increase, add services, healthcare

5    in this area, not one.

6         And, of course, if you acquire your only competitor, you

7    are going to increase -- Phoebe is going to increase their

8    capacity, but that's -- of course, happens.  It's a truism if

9    you acquire the hospital beds of your only competitor.

10        And also by acquiring Palmyra, through the CON process

11   Palmyra was aggressively attempting to expand its services and

12   service lines at the hospital.  They were the ones who were

13   trying to add obstetrics, thinking of improving or expanding

14   cardiology services, and they have now been acquired and

15   eliminated.

16        So in terms of who was trying to improve or increase

17   service lines, it was Palmyra, their proposal to acquire,

18   rather than Phoebe, and that competition would be lost.

19        And one thing, you know, it's sometimes difficult to

20   check really what the capacity constraints are, but one

21   beneficial piece of evidence that we have comes every month.

22   Phoebe submits monthly reports to CMS, the Centers for

23   Medicare and Medicaid Services.  And these reports are called

24   Percent of Occupancy by Department.

25        And we've looked at this monthly reports virtually every

1    month that we've had them, up until the most recent ones, and,

2    Your Honor, virtually for every department at Phoebe the

3    occupancy rates are not very high.  They're in the 40s, in the

4    50s, sometimes in the 60s.  There are some seasonal

5    exceptions, but looking at these occupancy rates, especially

6    based on the purported reason for the transaction, you

7    expected to see in the 80s, you expected to see in the 90s.

8        These are reports sent to CMS every month, and the tight

9    capacity constraints are not evidence at all in these reports

10   with one exception, for ICU, which I'll talk about.

11       So there may be a capacity constraint in the ICU

12   department, but based on a lot of the documents that they've

13   submitted to us and our review of them, it seems like these

14   capacity problems that Phoebe may have in ICU are

15   self-inflicted.

16       And the reason why we say that is because they have

17   estimated themselves that up to a very high percentage,

18   PX-136 -- we have blocked out the number here -- of Phoebe's

19   ICU beds are used improperly because of inefficiencies or

20   inaccurate diagnosis.

21       And PX-136 continues:  Before expanding our ICU capacity,

22   let's fix these inefficiencies.  That was the suggestion, the

23   recommendation.

24       Well, before they expand ICU capacity we agree they

25   should fix their internal inefficiencies.  They should

definitely apply even more, but before you acquire your only

competitor and claim that the reason why you're doing it is

because of capacity constraints in ICU, first, fix the

internal inefficiencies and increase your capacity that way.

They also mentioned in one of the slides Mr. Bondurant

put on this morning about how that the rehab beds are full and

that they're running out of capacity.  PX-142.  Phoebe cannot

even keep its inpatient rehab unit full now.  So, again,

contradicted by earlier request documents.

And let me just make an observation.  Phoebe has spent

tens of millions of dollars over the last several years on

worthwhile projects, I'm sure, on cancer centers, other

construction projects, and -- but nothing, nothing on

increasing capacity, no construction or big ticket items on

increasing capacity, and it's just, what you would expect if

they're really bursting at the seams, if capacity is such an

issue, and the increasing capacity, especially due to

construction takes a long time.

What we see is year one, money in the budget for

planning, getting licenses, getting the permits, drawing the

plans, doing all these things years in advance to make sure

you increase capacity.  It just seems very curious that part

of the reason for this transaction is that they're bursting at

the seams in capacity but they're not coming in here and

saying, we are about to break ground on a 300 million dollar

1    new hospital, the shovel is going in the ground, and we've got

2    to do this deal.

3         **THE COURT:**  What they're arguing, though, is that this

4    is a way to get that in the least expensive way.

5         **MR. REILLY:**  I understand least expensive way, but,

6    again, Your Honor, looking at the request documents that came

7    into the evidence, looking at CMS reports, and I'm not saying

8    if they decided today to build capacity, it could take five or

9    six years, and they would expect that.  The point I'm making

10   is if there are truly capacity constraints across major

11   departments, and they've been saying there have been capacity

12   constraints for a while, you would expect to have seen some

13   movement, some planning on, saying, let's put in our budget

14   for this big capacity issue.

15        So that's what I am pointing out there, that, again, it

16   is a truism if you acquire your only competitor you will

17   increase your capacity.  We have seen no evidence in the

18   record they're about to break ground on a hundred million, two

19   hundred million, three hundred million dollar new hospital,

20   new tower, or anything like that.

21        And, so, again, for the type of efficiencies, the

22   magnitude of efficiencies you would need here to justify a

23   merger to monopoly -- which has never been done.  No merger to

24   monopoly has been saved by efficiencies by any court.  They

25   have to be extraordinary, and they have to be well documented,

1  and that is the specific requirements to credit efficiencies

2  and they haven't even come close to meeting their burden

3  there.  They have the burden.  The defendants have the burden

4  of showing that these emergent specific efficiencies, cost

5  savings that would offset the very large harm that's likely to

6  occur here.

7      On the indigent care, I'll talk briefly about this.

8  Palmyra does have a good track record of providing indigent

9  care.  Anyone who goes to their emergency room must be

10  treated, regardless of ability to pay, and Phoebe has a good

11  track record as well, we're not saying otherwise.  But, again,

12  there's nothing in the documents that we've seen, the deal

13  documents or any other documents that implied that there was

14  some constraint on Phoebe's to provide more indigent care that

15  this merger would fix.

16      So we're not saying or criticizing anyone's level of

17  indigent care, but any claims that this merger would allow

18  them to provide more indigent care, more than Phoebe and

19  Palmyra combined, we have seen no support of that in the

20  record.

21      And we talked briefly about the equities, the second

22  elements of 13(b) of the FTC Act.  According to the Eleventh

23  Circuit in *University Health*, this is quoting from that case:

24  'We must afford private equitable concerns little weight less

25  we undermine Section 13(b)'s purpose.

1    In *CCC Holding*, a recent 13(b) case:  "The equities will

2    often weigh in favor of the FTC because effective enforcement

3    of the antitrust laws was Congress' specific public equity

4    consideration in enacting 13(b)."

5    And the Fourth Circuit, a 13(b) case from years ago

6    wrote:  "Private equities are not proper considerations for

7    granting or withholding injunctive relief under Section 13(b),

8    instead public equities are paramount."

9    What this means, Your Honor, is there's no doubt that

10   Palmyra wants to get this deal done.  They'll get a lot of

11   money if this deal is consummated.  There's no doubt Phoebe

12   wants to get these deal done.  They spent a lot of money on

13   consultants and others to get the deal done.  Those are

14   private equities.

15   The question for this Court on public equities is the

16   public interest standard.  Will the public benefit by allowing

17   this merger to be consummated?

18   And to show you what a burden they have, the defendants

19   really would need this Court to make history.  After we've

20   raised very substantial issues, which we have, we met our

21   likelihood of success on the merits, they would have to really

22   make history in order to prevail here.  Because no court has

23   denied relief to the FTC in a 13(b) proceeding in which the

24   FTC has demonstrated a likelihood of success on the merits,

25   and this is in a 2011 13(b) case *ProMedica*.

1    Once we have met a likelihood of success on the merits

2    because effective enforcement of the antitrust laws are so

3    important because of the harm that will occur if a merger is

4    consummated, a harm that can never be -- can be put back in a

5    bottle, this has been Congress's paramount public equity.

6    This is what they decided was the purpose of 13(b), to prevent

7    the interim harm and maintain the status quo.

8        So, Your Honor, this is why we're asking this Court to

9    provide preliminary relief, prevent Phoebe and Palmyra, this

10   transaction from being consummated for the period of time

11   while the merits trial is ongoing and fast-moving.

12       And what this would do is it would prevent dramatic and

13   immediate price increases, it would preserve Palmyra's service

14   lines, and to be clear we're not claiming that if this merger

15   is consummated Phoebe is going to start cutting and gutting

16   Palmyra because they might have to sell the hospital later.

17       We're not saying there's any unclean hands here.  It's

18   very common for two hospitals located so close together to

19   start moving service lines, and you could see once they're

20   allowed to consummate, they could move service lines from

21   Palmyra for maybe valid reasons, but the Commission's ability

22   to get effective relief later on will be significantly

23   hindered if that occurs.

24       And at the end of the day after the merits trial, if we

25   lose, then we won't be entitled -- losing the appeal, we will

1    not be entitled to relief.  But if we prevail in the merits

2    trial and on appeal, then the commission is entitled to get

3    full and effective relief, which means establishing Palmyra as

4    a full service community hospital with service lines and

5    employees in place and restoring the vigorous head to head

6    competition that Palmyra now offers to Phoebe that will be

7    completely eliminated after this acquisition.

8         And one last point mentioned this morning, that acquiring

9    Palmyra has been a consideration for decades, and so this has

10   been on the radar screen for a long time, and in terms of

11   looking at equities, to the extent that is the case, we're

12   just asking this acquisition to be delayed for a period of

13   time more.  We'll see what happens in the merits trial.  We're

14   not asking that this -- there's no financing restrictions

15   here.  Financing won't run out.  Phoebe has plenty of money to

16   pay for this.

17        This deal should be solidly in place after the

18   fast-moving merits trial, and if at that time Court wants to

19   revisit whether we met our burden and what we learned from the

20   merits trial in terms of a Section 7 violation, that is

21   perfectly fine with us.

22        That's what the Judge did in *ProMedica*, issued the

23   injunction for a period of time while seeing what happened as

24   the merits trial was unfolded.  So that's all I have right

25   now, unless you have any questions.

1      **THE COURT:**  All right.  Thank you.  I think we can take

2    a break here.  I think everybody could stand one.  Okay.

3    Let's make this one 15 minutes or thereabouts.  We will be

4    back to I think to hear from both the rebuttal and response to

5    preliminary request.

6      **MR. BONDURANT:**  We will combine them.

7      **THE COURT:**  Okay.  All right.  We will be in recess for

8    15 minutes.

9    *(RECONVENED; ALL PARTIES PRESENT)*

10     **THE COURT:**  All right.

11     **MR. LOWREY:**  Good evening, Your Honor.

12     **THE COURT:**  Good evening.

13     **MR. LOWREY:**  Your Honor, my name is Frank Lowery, and I

14   work at Emmet Bondurant's firm, and with him I have the

15   pleasure and privilege of representing the Hospital Authority.

16   I'm going to try to confine these remarks to things that I

17   think have emerged from the exchange you've heard primarily

18   about state action.

19     The first thing I want to talk about is clarifying the

20   role of two different lines of cases.  The AG and the FTC have

21   cited to you the active supervision cases.  We've cited to you

22   the *City of Columbia* lines of cases.  And it's very important

23   to keep those distinct.

24     Active supervision applies only where you've got private

25   parties who are going to engage in competition-reducing

1      conduct.  And the two example cases the FTC cites are the

2      *Midcal* case and the *Ticor* case, and in both of those cases you

3      had private parties meeting to agree on price, something

4      that's a felony unless you've got state action.

5          And the courts have held that if you have private parties

6      meeting to fix price, you better have active state involvement

7      supervising the results of their agreement, and that makes all

8      the sense in the world.  And that's the source of this gauzy

9      cloak quote that they love.

10         Now, here's what *Columbia* is about.  *Columbia* says that

11     you may not take the official action of a political

12     subdivision, re-characterize it as private action, and then

13     apply the active supervision test.  You cannot re-characterize

14     it and do that.

15         They are the ones who are the cloak throwers.  They want

16     to throw the cloak of private action over what is, in fact,

17     the act of an official -- an official act of a political

18     subdivision.  Those are the differences between the two lines

19     of cases that you have.

20         And one thing I want to spend a lit bit of time on is the

21     concept that you've heard, and you've heard perhaps half a

22     dozen different iterations of this argument from the

23     governments here.

24         But it is the idea that at some point the influence of a

25     private actor becomes so strong over the public actor that at

1    some point you fall outside of *Columbia*, some unidentified

2    point, you fall outside of *Columbia* and you fall outside of

3    state action, and I think if you go back to chambers, because

4    I'm sure you're still going to work tonight, and you pull your

5    *City of Columbia* case --

6         **THE COURT:**  You got it.

7         **MR. LOWREY:**  -- and you read it, you will find that the

8    text of *Columbia* does not admit of the kind of limitation

9    they're trying to impose on it.  *Columbia* didn't just say

10   conspiracies are irrelevant.  They also considered a proposed

11   exception for governmental corruption defined variously as

12   abandonment of public responsibilities to private interests.

13   Corrupt or bad faith decisions and selfish or corrupt motive.

14        Mr. Hassi pulled out his dictionary.  I don't have mine,

15   but I am pretty sure that corruption and bad faith are worse

16   than apathy.  But that's really what they're asking you to

17   believe, that a lack of motivation to review a proposal

18   brought to you by a private actor is so much worse than

19   actively conspiring with a private actor to limit competition,

20   that one of those is state action, the conspiracy, but the

21   mere apathy, the mere lack of review is not.  Wouldn't that be

22   a crazy rule?  That would be the opposite of where you would

23   draw the line if there was a line to be drawn.

24        And *Columbia* considered whether there should be a line,

25   and it held that this decision constitutes, quote, rejection

1    of any interpretation of the Sherman Act that would allow

2    plaintiffs to look behind the actions of state sovereigns,

3    close quote.

4        I also know what "any" means, even though I don't have my

5    dictionary.  If there's any doubt not any criminal bribery,

6    which is the ultimate corruption and abdication of public

7    responsibility to private interests, not even criminal bribery

8    the Supreme Court said would be enough to convert an official

9    act of a political subdivision into private conduct that has

10   to be actively supervised.  And yet the plaintiffs tell you

11   that mere inattention can do so, that approval, quote, as

12   matter of routine, to use Mr. Hassi's definition  is

13   apparently worse than criminal bribery.

14       Now, why is *Columbia* so broad?  The reason *Columbia* is so

15   broad is because the entire state action doctrine is rooted in

16   federalism and state sovereignty, and what the Supreme Court

17   said, quite correctly, is that once the federal courts go down

18   that road of asking why did politicians make the decisions

19   that they did and deconstructing the political process --

20       **THE COURT:**  Is this a question, though, of why did?

21       **MR. LOWREY:**  I'm glad.  That is exactly the paradox

22   that occurs to me.  They tell you it's about whether the

23   Authority decided to acquire Palmyra, but you can't believe

24   them.  Of course, these men cast their votes.  Yes, the

25   Authority voted, and there's no dispute about it.  They took a

 1    official quorum, procedurally proper, vote to acquire Palmyra.

 2    So when they tell you --

 3         **THE COURT:**  Wouldn't you agree, though, that the facts

 4    are in dispute -- I think each of you have a very strong

 5    position and a very strong view on what you believe are the

 6    facts.

 7         **MR. LOWREY:**  I actually have to respectfully disagree.

 8    We do not.  The facts are the facts.  That agreement says what

 9    it says.  Our board voted to do what it did.  What they want

10    to call a dispute of fact is really a dispute about why we did

11    what we did.  Did you approve it because you thought it was in

12    the best interest of the community?  Did you approve it

13    because you'll do anything that Phoebe asks?

14         That's the dispute they want you to do.  They want to get

15    you involved behind the political process and ask why and

16    whether we knew enough, and whether we thought about it

17    independently enough.  And let's think about it.

18         You asked Mr. Hassi, you asked FTC's counsel about the

19    line, where is the line, and FTC's counsel responded, if

20    you're satisfied that the state is acting, you don't look

21    behind those actions.  But that is completely circular,

22    because they want you to look behind our actions to find out

23    whether the state is acting in the first place.

24         And you asked for an example.  What would be an example

25    of something that would be on the safe side of the line?

1    FTC's counsel gave you the exact same acquisition that's going

2    on here, but changed the facts so that we made what the FTC

3    considers to be a sufficiently independent decision.  Same

4    transaction, but a more independent decision.  That's why, not

5    whether.

6        **THE COURT:**  Do you take the position then, as I think

7    as I understand it, that the only issue is the nature of this

8    agreement, the asset agreement?

9        **MR. LOWREY:**  That is correct.  We'd like to perform

10   that agreement.  They want you to tell us we can't.  And

11   doesn't that really put the true light?  I mean, here's an

12   easy test for whether we're acting.  They say we didn't act.

13   We aren't going to be the actor.  Yet they want to enjoin us

14   for acting.

15       Here's their first prayer for relief, it's on Page 31 of

16   their complaint.  The first thing they ask you to do is

17   temporarily restrain -- we're past that -- and preliminarily

18   enjoin defendant authority from acquiring Palmyra.

19       If we're not acquiring Palmyra, what are they seeking to

20   enjoin?  But what that reveals is that we really are acquiring

21   Palmyra, and everybody in the room knows it.

22       What they want to argue about is why we're acquiring it.

23   Did we make an independent decision?  Did we make a good

24   decision?  Did we think about it long enough?  Did we get an

25   independent opinion on the price?  Were there too many pages

1    to read?  172 pages of material.

2         I mean, those are the kind of attacks you're hearing, and

3    that's what this attack is about.  And I say "attack," I don't

4    mean that in such pejorative sense.  This collateral attack on

5    the transaction is really what I mean.

6         Entertaining an inquiry of that sort at all is contrary

7    to *Columbia* and to the way the Eleventh Circuit has

8    interpreted *Columbia*.  And I'm quoting from *Crosby* which was a

9    case involving a Hospital Authority.  And the Eleventh Circuit

10   told the courts of this Circuit, you "must neither deconstruct

11   the authorities mental processes nor probe its intent."

12        Look at what we voted to do, look at the contract we want

13   to enter, and if you start asking yourself why are they

14   entering it, what did they think about, what did they

15   consider, whose idea was it in the first place, you have

16   crossed the line into the forbidden territory.

17        Now, the state and the FTC offer several iterations of

18   the version that you have to look behind and test the state

19   action to be sure that the state actor exercised sufficient

20   independent judgment.  I think that's a fair summary of their

21   argument or at least a broad portion of it.  But --

22        **THE COURT:**  But your argument would be, though, any

23   time a state entity exercises its power under the law by a

24   decision of whatever its nature that ends the question?

25        **MR. LOWREY:**  No, Your Honor.  You'd have to go to the

1    third prong of *Lee County*, and I will get there.  There's a

2    three prong *Lee County* test:  Are we a political subdivision?

3    Yes.  Do we have the power to acquire?  Yes.  You still have

4    to go to that third prong and ask yourself, when the

5    legislature bestowed whatever power we're talking about in the

6    hypothetical case that comes up -- when the legislature

7    bestowed that power on the political actor, did it reasonably

8    foresee that there would be a reduction in competition.

9         So you'd have to go through that test no matter what.

10   But what you would never do would be to say, yes, I realize

11   this is an official resolution of the city council buying X

12   property or imposing this limitation, you would never look

13   behind that and say, however, they did this in collusion with

14   private interests.  This is really the interest of a private

15   party being represented here behind this resolution.  You

16   would never do that.  And they don't cite a single case where

17   any federal court applying the antitrust laws has done that.

18        **THE COURT:**  So I guess essentially you are saying all

19   the Court needs to decide here that's in real dispute is

20   whether the law reasonably anticipated the action?

21        **MR. LOWREY:**  The third prong of *Lee County*.  And when

22   get there I will explain to you why the Eleventh Circuit has

23   made this easy for you by deciding harder cases than the one

24   in your courtroom.

25        **THE COURT:**  You were going pretty good until you said

1 the Circuit made it easy for me.

2   **MR. LOWREY:** They've made it easy for you, Your Honor.

3 That have made it easy for you, and I will make it easy for

4 you by showing you that *Lee County* is here, and we are here.

5   So a few more points on this idea.  The Eleventh Circuit

6 has heard and rejected an argument very much like the one

7 they're raising here.  I can't really distinguish it.  And

8 that's the <u>Municipal Utilities of Albertville versus Alabama</u>

9 <u>Power</u> case.  And we cite that on Page 7 of the reply brief

10 that we filed on Thursday.

11   But in that case various cities, they were the plaintiffs

12 this time, and they filed antitrust challenges to agreements

13 that the two utilities reached.  These are your customers,

14 these are our customers, here's where we're going to draw the

15 line.  The kind of thing that's absolutely illegal under the

16 antitrust laws unless you've got state involvement.

17   And the cities say before you can grant summary judgment,

18 before you can dismiss our case, you need to know that when

19 the legislature approved these agreements they exercised,

20 quote, sufficient independent judgment and control so that the

21 details of these service area assignments were established as

22 a product of deliberate state intervention.

23   That was the argument that was made.  The Eleventh

24 Circuit's response?  This claim is patently meritless and

25 warrants no discussion.  The authority they cite?  *City of*

1     *Columbia*.  The Eleventh Circuit has this issue boxed in with

2     *Columbia*.

3         Tellingly, the Attorney General has to go to the Sixth

4     Circuit to find a case that applies this effective decision

5     maker analysis.  It's dictum even in that case because that

6     case affirms summary judgment in favor of state action.  But

7     not only is it dictum, it is dictum that is hopelessly

8     inconsistent with *Columbia* and hopelessly inconsistent with

9     Circuit precedent.  Because once you start asking who the

10    effective decision maker is, you've now step aside from asking

11    who the actual decision maker is, and what you're asking is

12    why did the political subdivision decide the way it did.  Was

13    it influenced, was it corrupted, was it bribed.  All of those

14    things could be true, and you'd still have state action.

15        I think it's significant that even very smart lawyers,

16    and there's no question that the government's lawyers are very

17    smart lawyers, but even they can't talk about their case

18    without lapsing into the language forbidden by *Columbia*.

19        Several times the FTC and the AG talked about quote "the

20    purpose" of the transaction, quote "the reasons" for the

21    transaction, quote, "the whole point" of the transaction.

22    You'll find all of those arguments in the transcript.

23        Those are no different than inquiring about, quote, the

24    motive of the transaction, or quote, the intent of the

25    transaction.  All of those words I just mentioned, they are

1    all synonyms, and the last two of them were used in Eleventh

2    Circuit decisions as things that you may not inquire into.

3        So if you can't inquire into the motive of the

4    transaction or the intent of the transaction, you can't

5    inquire into its purpose or its whole point or its reasons.

6    There's no way to draw a line there.  Those are synonyms.

7        Now, both of the government attorneys -- all of the

8    government attorneys have argued that the position we are

9    taking here is not really a 12(b)(6) motion to dismiss

10   position, that we're really asking you to get into the facts

11   and weigh the evidence, and that's simply not true.

12       Allegations of the complaint that are contradicted by the

13   asset purchase agreement you don't have to credit.  You can't

14   get pass 12(b)(6) by saying the contract says something it

15   doesn't.  It's black letter law.

16       All of the allegations in the complaint are either

17   contradicted by the asset purchase agreement or they are

18   absolutely irrelevant under the case law.  And I'll give you

19   an example.  I don't know that you need to necessarily pull it

20   up, but on Page 104, I believe this is Mr. Hassi's handout, he

21   pulls out Paragraph 85 of the complaint that says "the

22   transaction was motivated and planned exclusively by Phoebe

23   Putney."

24       Okay.  Well, we already know from Eleventh Circuit law

25   that you can't inquire into the motive of a hospital

1    authority.  So that's irrelevant as a matter of law.  Planned

2    exclusively.  How is that different than *Columbia?*  In

3    *Columbia* the 95 percent monopolist used its financial and

4    personal relationships with the city council to get a

5    protectionist bill when a new entrant tried to put up

6    billboards.  Are you telling me that was the city council's

7    independent idea?  Of course, not.  That's not what the jury

8    found in that case.  That's just what the Eleventh Circuit

9    said was irrelevant.

10        Page 105, the FTC pulled out Paragraph 86 of their

11   complaint.  And Paragraph 86 alleges:  The Authority engaged

12   in no independent analysis to determine whether the

13   transaction would be in the public's interest.  That's the

14   allegation.

15        What does the *City of Columbia* tell you?  It tells you

16   that "abandonment of public responsibility in favor of private

17   interests" isn't enough.  I mean, they're -- the allegations

18   of the complaint that they say prevent you from dismissing

19   this case are paraphrases of arguments that were rejected in

20   *Columbia* as being irrelevant.

21        The FTC read from a lot of letters before entry of the

22   APA characterizing the offer and characterizing the

23   transaction.  Well, there's no question that if you have a

24   letter before an asset purchase agreement, and you have an

25   asset purchase agreement, and there's any dispute about what

1   the asset purchase agreement actually says, you would start

2   with the asset purchase agreement, and that will tell you who

3   will own Palmyra, and it will tell you that we will own

4   Palmyra.  None of the Phoebe entities are taking title to

5   anything under the asset purchase agreement.  Letters can't

6   change what the contract says.

7       Well, to that, the FTC says, yes, okay, maybe you are

8   acquiring Palmyra, but it's just the first of a three part

9   transaction where the Authority acquires Palmyra and then

10  enters a management agreement with Phoebe, and then enters a

11  lease with Phoebe, and so you ought to push all that together,

12  they tell you.

13      They do not cite a single case that would allow you to

14  ignore that first step, which is a state actor buying

15  property.  And they say form over substance -- or substance

16  over form presumably is the argument they would make.  But in

17  the state action doctrine the identity of the actor is

18  substance.  It is the key substance.  Is the actor a political

19  subdivision of the state.  You can't look past that.  That's

20  like the quote about, other than that, Ms. Lincoln, how was

21  the play.

22      The fact that we are a state actor and that we are the

23  first step acquiring Palmyra, it's not something you can look

24  around, and they cite you no authority.  They cite you a tax

25  case that says you can collapse transactions between purely

1     private parties for tax purposes.  And they assure you, but

2     it's a routine proposition of law, you'll find it everywhere.

3          Well, if that's true, if it's so routine, why can't they

4     show it to you in an antitrust case involving state action, or

5     an antitrust case at all.  I can show you cases like that.

6          I can show you the lease cases we've cited where a

7     political subdivision enters what is alleged to be an

8     anticompetitive lease with a private actor, and the circuit

9     courts have held if the political subdivision has the right to

10    enter a lease like that under state law, the fact that there's

11    a private party on the other side of it doesn't change a

12    thing.  They are both entitled to immunity under the same

13    standards as the state actor.  Because otherwise it would be

14    -- you can't have a situation where it's legal for a state

15    actor to enter a contract, but it's illegal for anyone to

16    accept.  That's obviously not a workable standard.

17         To get a little bit more into that the Attorney General

18    talks about two Second Circuit cases, you remember we talked

19    about *LaFaro* and *Electrical Inspectors*.  And they cite these

20    cases for the proposition that entering a contract with a

21    political subdivision is not the end of the story.  I think

22    that's a fair summary of the argument they're making.

23         If you look at those cases, what those cases say, is that

24    you can't enjoin a private party from entering a contract with

25    a political subdivision, but if they go on beyond that

1    contract and do things that violate the antitrust laws, you

2    can reach those.  And that's very important.

3         So whatever is going to be enjoined under this line of

4    authority, it can't be the asset purchase agreement because

5    that's a contract -- that's our contract.  That's us.  We're a

6    party to that.  It can't be the management agreement between

7    Phoebe and the Hospital Authority, because, again, that's

8    nothing more than a contract between a private party and a

9    political subdivision.

10        It can't be a lease contract, because, again, that's a

11   contract between a political subdivision and a private party.

12   They've got to find some conduct that is going to be engaged

13   in here by a private party that's not entering a contract with

14   a political subdivision.  And I suppose if they do they could

15   ask you to enjoin that.  But what they can't do is ask you to

16   enjoin the contracts.  There's not a case that does that.

17        Merger to monopoly.  We heard merger to monopoly quite a

18   few times today.  The thing that I ask you remember about that

19   is, if it is true that the acquisition of Palmyra is a merger

20   to monopoly, then that will be true the instant the Hospital

21   Authority acquires Palmyra.

22        As soon as the Hospital Authority owns both Palmyra and

23   Phoebe, there's not going to be any more competition between

24   them, anymore than there's competition between two divisions

25   of the same company, or two subsidiaries of the same

1  corporation.

2      If we can enter that asset purchase agreement, if we can

3  buy Palmyra, nothing that happens after that concerns the

4  antitrust laws.  They say a lease is an acquisition, but that

5  misses the point.

6      If Phoebe enters a lease, they're going to be entering a

7  lease with us, not with another private party.  They're going

8  to be entering a lease or a management agreement with the

9  entity that already owns both hospitals.  That can't possibly

10  reduce competition.  As soon as we own both of them, whatever

11  competition that existed between them goes away, and the

12  antitrust laws lose interest.

13      Let me talk about *Lee County* now, and I want to go

14  straight to that third prong because I think it's been pretty

15  clearly conceded that the first two are not contested.  And

16  you don't have to pull this up.  I'm not asking you to pull

17  this up right now.

18      But on Page 67 of the government's presentation, they

19  interpret the third prong of *Lee County* as holding that the

20  legislature must have "reasonably anticipated" the conduct and

21  transaction now before the Court.  And the only part of that

22  that's quoted is the reasonably anticipated phrase, which I

23  certainly agree is in *Lee County*, but that is not an accurate

24  statement of what *Lee County* holds, and I hope you'll put a

25  red X beside that, because that's not the law.

1    The law is that the legislature must have reasonably

2    anticipated that anticompetitive conduct in general is a

3    foreseeable result of the power that it conferred.  The

4    inquiry is not:  Did the legislature think that a hospital

5    authority was going to lease its hospital to, you know, a

6    nonprofit and then acquire a hospital under these conditions

7    in these counties.  That's not the inquiry at all.

8    And as proof of that I'll offer *Bolt*, which is a

9    subsequent -- well, which is an Eleventh Circuit decision, and

10   the particular language that's important is at 980 F.2d 1388

11   through 89.  And sadly enough, there were not one, not two,

12   not three, but four *Bolt* opinions.  And this is *Bolt* Four.

13   *Bolt* Three bit the dust after *Columbia*.

14   The Eleventh Circuit initially ruled one way, finding

15   that there was no state action, and then *City of Columbia* came

16   around, and it ruled the other.  So this is the Eleventh

17   Circuit explaining what was wrong with its previous decision

18   after *Columbia*.

19   And they said:  The basic progression of our reasoning in

20   *Bolt* Three was as follows.  Although HHMC -- which was the

21   hospital authority in that case -- is authorized to regulate

22   the provision of medical care in its facility and although

23   suppression of competition is a foreseeable result of that

24   regulation, HHMC is not authorized to conspire with its peer

25   review committee to deny privileges upon a pretext or to act

1     in a manner inconsistent with the public good.

2          So that was the argument that the Eleventh Circuit bought

3     in *Bolt* Three.  But even though general anticompetitive

4     effects might flow, no one foresaw that a hospital authority

5     would conspire with private physicians to limit competition.

6          After *Columbia*, the Eleventh Circuit said we can't hold

7     that way anymore, they said, because *City of Columbia* rejected

8     the reasoning relied on by this Court in *Bolt* Three we find

9     that the authority is entitled to summary judgment with

10    respect to Bolt's allegations.

11         So *Columbia* was a game changer for the kind of arguments

12    they are making here.  *Lee County*, as I said, and I promised

13    to you, *Lee County* is a clearer -- I'm sorry, it's late.

14         This case is clearer and easier than *Lee County*.  This is

15    *Lee County*, plus an extra fact.  In *Lee County* you had a

16    general statute, and it's quoted on Page 17 of our PowerPoint

17    presentation, or at least the Eleventh Circuit's description

18    of it is.  You had a general statute that allowed the hospital

19    authority to operate and maintain hospitals.  It didn't say

20    anything about acquiring privately owned hospitals or other

21    hospitals.

22         The Eleventh Circuit inferred an acquisition power from a

23    statute that didn't even mention acquisition, and then from

24    that inferred power of acquisition reasoned that if you're

25    going to allow a hospital authority to acquire another

1   hospital in the same county, everyone knows that that might

2   reduce competition.

3        What's our case?  Our case involves an express

4   acquisition power.  And that's -- again, you have to put two

5   statutes together.  You put the statute together -- and these

6   are on Page 19 of our PowerPoint -- that says a hospital

7   authority may acquire by purchase projects.

8        What are projects?  They are the acquisition of hospitals

9   plural "S" more than one hospital, and not just hospitals, but

10  for the use under the supervision and control of the Hospital

11  Authority or for lease by the Hospital Authority for operation

12  by others.

13       Could there be a more clear statutory authorization to do

14  what we are doing?  There's no way that the Georgia General

15  Assembly in 1941 or today could say hospital authorities can

16  acquire other hospitals in the county where they operate

17  because they can't do anything outside the county.

18       So all these powers are things that could be exercised

19  only in the county and the legislature knew it, that no one

20  could authorize that without knowing in Georgia counties that

21  quite often, if not most often, you are talking about

22  acquiring the only other hospital or one of the three other

23  hospitals, a situation that would reduce competition.

24       They cannot possibly distinguish *Lee County* from our case

25  based on the statute.  Our statute is so much better than the

1    *Lee County* statute.

2        One of the arguments the AG makes is basically the

3    *expressio unius canon.*  I won't recite the whole Latin phrase

4    because I'd butcher it horribly.  But it's basically the idea

5    that in a 1993 statute the legislature included an express

6    antitrust immunity.

7        So what they want you to do is infer from the express

8    mentioned in a 1993 statute that the 1941 legislature in a

9    different statute must have thought about and meant to exclude

10   antitrust immunity.  And the cases we cite for you on Page 11

11   and 12 of Thursday's reply brief show why that's not true.

12       But, you know, it's common sense.  The *expressio unius*

13   doctrine is a common sense doctrine that says if someone is

14   mentioning one thing, logically they thought about something

15   close to that, but if they didn't mention it, it probably

16   means they meant to exclude it.

17       But you can't say that where a bunch of legislators in

18   1941 were silent, but we can somehow look to something that

19   was done in 1993, and it's going to shed some light on their

20   silence.  That's obviously not valid reasoning.

21       The other thing as I think there's no contest, on Page 12

22   of our reply brief, we show the Court that in *Lee County* there

23   was also a specific provision that expressly conferred

24   antitrust immunity.  It wasn't the one that the Eleventh

25   Circuit interpreted as allowing acquisition.  It was a

1    different statute.

2         So exactly the same statutory scheme was in place.

3    Antitrust immunity over here in a different hospital statute,

4    none here, nonetheless, summary judgment granted, affirmed in

5    favor of state action.

6         I'm winding down.  The FTC tells you you've got to make

7    history to deny this injunction, and I thought that was a

8    great phrase, but I don't think it's true, not at least in the

9    way that they meant it.

10        What history is the FTC asking you to rely on?  What case

11   do they offer you that would allow you to do what they're

12   asking you to do?  *Lee County* is our history.  *Columbia* is our

13   history.  What is their closest case?

14        As near as I can tell there's two cases that they say

15   that you ought to pay particular attention to.  One of them is

16   *HCA versus the FTC*, and this is Judge Posner's opinion, the

17   Seventh Circuit opinion.  And Judge Posner was talked up as an

18   antitrust expert, which, of course, he is.

19        But I think if Judge Posner were here he would say, my

20   case is different for two important reasons than the case

21   that's in front of Judge Sands.  He would say, first of all,

22   my case didn't involved state action.  Judge Sands' case does

23   involve state action.

24        The second thing that I think that Judge Posner would say

25   is that in that case the management agreement that was held to

be anticompetitive was a management agreement between two competitors.

One hospital that would ordinarily be a competitor of another said, hey, you can manage one of our hospitals.  Well, I'm not surprised that that was treated as tantamount to an acquisition.  But here you have something completely different.

If we're allowed to close on the contract that our board members approved, any lease, any management of that hospital will be entered between us, the owner of both hospitals and Phoebe.  There is nothing anticompetitive about a owner of two hospitals managing them however they want to.  The antitrust laws don't get involved in that.

*University Health* is the case the AG seems to suggest is the closest.  But *Lee County* itself distinguished that case. *University Health* was an Eleventh Circuit decision, I'm sorry, it came before *Lee County*, and *Lee County* expressly distinguished it, and *Lee County* said, the only state action issue in *University Health* was candidly the fairly -- well, the very weak argument that the mere existence of a certificate of need regulatory statute in Georgia indicates basically that there is no private hospital competition.

It was a real stretch, the state action argument that was rejected in *University Health*, and in *Lee County*, the Eleventh Circuit said this is different.  This is a public authority

1    buying a hospital.

2          The last point I want to make, down to one page.

3    The FTC emphasized how liberal a standard can be for granting

4    a 13(b) injunction.  What I want to emphasize is there's no

5    action that state action is a proper basis for you, the

6    District Court, to deny that injunctive relief because that's

7    exactly what was done in *Lee County*.  So there's no question

8    about that.

9          And any suggestion that this ought to just be pushed

10   along down the road for another day, we can decide this issue

11   later about state action, that does not fly.  The Eleventh

12   Circuit has been very clear that state action immunity is

13   supposed to be an immunity from being sued.

14         You may be somewhat familiar or more familiar because

15   there are more cases filed that involve this, with the idea of

16   qualified immunity, where a state official is supposed be free

17   from being sued.

18         The Eleventh Circuit has said same concept applies here.

19   Political subdivisions of the state, they are not supposed to

20   be sued at all under the antitrust laws.  This isn't a defense

21   like statute of limitations that you resolve later with no

22   harm to federalism or state sovereignty or subject matter

23   jurisdiction, for that matter.

24         If this case doesn't fall within the antitrust laws, you

25   know, we've spent a great day here together, but one that's

1    outside the Court's jurisdiction, outside the FTC

2    jurisdiction.

3         Last point.  The FTC assures you that they will be quick,

4    that they expect a decision from the administrative law judge,

5    which is the first step of the process, by April 2012.  We'd

6    still have to go through the review by the full Commission and

7    whatever proceedings would go after that.

8         This contract has a close date of December 31, 2011,

9    essentially 12 months after it was entered on December 21st,

10   2010.  Now, so when the FTC says, just put this off, what they

11   are asking you to do is put this off in favor of FTC

12   proceedings that even the FTC concedes will not be complete

13   before the close deadline.

14        So they're asking you to make a very serious decision to

15   do so in an area where you have no subject matter

16   jurisdiction, in an area where the Eleventh Circuit has

17   instructed the federal courts to ensure that political

18   subdivisions are not sued at all.

19        Your Honor, if you have any questions, I'm more than

20   happy to answer them, but I'm going to go out on a limb and

21   guess that you do not.

22        THE COURT:  No, I'm going to pass.  Thank you.  All

23   right.

24        MR. EGAN:  Your Honor, if you have any questions for

25   me, I'd be happy to answer them, I don't think I can have

1    anything to add to Mr. Lowery's eloquent summary.

2         **THE COURT:**  That's fine, thank you.

3         **MR. VAN VOORHIS:**  Same on behalf of HCA and Palmyra.

4         **THE COURT:**  All right.  I think, of course, that was

5    the response to both the preliminary injunction request and

6    the motion to dismiss.  I think the plaintiff would have the

7    right to respond last simply on the preliminary injunction

8    question.

9         **MR. REILLY:**  Very briefly, Your Honor.  Mr. Lowrey

10   didn't talk much about the merits, and I will keep my comments

11   to the merits.  Just one point he made at the very end about

12   the close date for the transaction and the initial ALJ opinion

13   expected and after that.

14        What again happened in *ProMedica*, the federal district

15   court judge there decided to see us again, revisit the

16   preliminary relief he entered into after the merits decision

17   was issued by the ALJ.

18        We have an end of November date on that.  So we're

19   talking about the appeal of the Commission, anything after

20   that, this Court has the discretion to decide if and when to

21   see us again, or issue the injunction for a certain period of

22   time to see how the merits trial is proceeding, see if the ALJ

23   issued an opinion, to see if I should change whatever relief

24   was ordered then.  That's my first point.

25        Second point.  It's my understanding, and I don't have

1    the exact number of times, but the closing date has changed

2    already at least one before.  We heard a different closing

3    date early on in the investigation.  Now I think it's the end

4    of December.  And this happens all the time.  Private parties,

5    HCA and Palmyra -- HCA and Phoebe can sit down and say, let's

6    extend the closing date for a couple more months and figure

7    out the terms that would make that acceptable.

8         So the fact that right now they're representing that they

9    have a closing date at the end of December and therefore the

10   merits trial is irrelevant, or you shouldn't even pay

11   attention to what's going on in the fast moving merits trial

12   is not true.

13        To the extent that the date now is before the ALJ will

14   issue their opinion in this, that date can easily be moved.

15   It happens all the time to private contracts.  That's all I

16   have, Your Honor.

17        **THE COURT:**  I do have a question for one or more of the

18   defendants.  Partly I was reminded of it by the FTC's last

19   comments.  If the Court is doing a balancing of harms or

20   interests, public versus the defendants here, what does the

21   defendants believe to be the harm that it would suffer from

22   the imposition of an injunction pending a proceeding that's

23   already been set that will go forward, whether the Court

24   grants a preliminary injunction or not?

25        **MR. BONDURANT:**  Your Honor, let me be very blunt.  If

1    the FTC has no jurisdiction, we have no business in this court

2    today, tomorrow, or the next day.

3        THE COURT:  I understand that.

4        MR. BONDURANT:  And the Eleventh Circuit has said the

5    purpose of the state action defense is to protect local units

6    of government from having to defend themselves at all against

7    federal antitrust claims.  So you never reach balancing unless

8    you are able to say you have jurisdiction and they have

9    jurisdiction.

10       THE COURT:  I'm asking hypotheticals.  That's why I'm

11   asking you hypothetically, you know.  Obviously if you are

12   correct, and the Court agrees with you, that will be the

13   result of that.

14       MR. BONDURANT:  That is correct.  Then, if you get to

15   balancing, the effect, and I think we have to say, if this

16   gets into balancing, we probably lose on that issue, on the

17   balancing.  But no Court has ever done what you are being

18   asked to do, which is to stop a state agency from performing a

19   duty expressly authorized by state law.

20       It does have consequences, but the question is

21   fundamentally one of jurisdiction.  Remember *Lee County* was,

22   guess what, a 13(b) case.  The FTC sought an injunction so

23   they could take their sweet time and go through an

24   administrative process to stop that transaction.  They lost

25   that injunction.

1        The last -- Mr. Riley's comment that this can take its

2    course is a death penalty to this transaction.  FTC under its

3    most optimistic views does not intend to have a ruling from

4    the administrative law judge, not an Article III judge, not an

5    Eleventh Circuit judge on whether the FTC has jurisdiction

6    until April of next year.  By that time, this transaction will

7    have been self-destructed.

8        You are probably a basketball fan, and you remember when

9    basketball teams could play the four corners offense, and you

10   run out the clock.  They're trying to run out the clock on us,

11   knowing that there will never be a merits ruling on our

12   jurisdictional issue unless you make it, because the FTC isn't

13   going to have to make it, this transaction is going to die,

14   and no appellate court from the FTC is going to have to make

15   it because this transaction is going to have to die.

16       And HCA can't live on life support of a hang fire

17   transaction for that long with Palmyra.  They're not going to

18   extend it, and we're not going to extend it.

19       So the transaction is what it is, and they can't say, you

20   have jurisdiction because the parties can extend this

21   transaction, because *Lee County* was very clear, the purpose of

22   the state action defense is to preserve principles of

23   federalism to avoid extending the antitrust laws where

24   Congress did not intend them to go into state action and to

25   protect local governmental units -- and that's almost a direct

1    quote out of *Lee County* -- from having to defend themselves

2    under the antitrust laws.  Thank you, Your Honor.

3        **THE COURT:**  All right.  Thank you all.  Well, of

4    course, is that it?  I think that takes the rounds but --

5        **MR. HASSI:**  Your Honor, it does, and I don't intend to

6    start arguing state action again.  I think we've all said

7    enough on that.  There are a couple housekeeping issues, first

8    and foremost, the most important, we are here on a temporary

9    restraining order.  That temporary restraining order was

10   extended with the defendants' consent until this hearing took

11   place.  Obviously Your Honor has indicated you're going to go

12   back and you're going to read these cases carefully, and we

13   encourage you to do that.  We want to make sure that Your

14   Honor gets a chance to rule, not just to have a hearing on

15   this, and I want to put the defendants on the spot if I may,

16   and have you ask them whether they'll give you consent to get

17   some time to work through this problem.

18       **THE COURT:**  Well, what is the position of the -- of

19   course, we've set this on a pretty fast course.  I think we

20   did a lot by phone.  The Court set the dates for the briefing,

21   gave a few short extensions for the parties, extended briefing

22   and all, and the Court in all seriousness intends to address

23   this quickly.  I think I agree the defense that's raised is a

24   substantial one that should be addressed by the Court in its

25   decision.  So I would expect the status quo would remain

1    pending that decision.  The Court indicated its readiness the

2    rule pretty shortly.

3         **MR. BONDURANT:**  Can Your Honor define pretty short?

4         **THE COURT:**  I didn't ask you all to give me a definite

5    date about -- I gave you guys a little bit of leeway, but I

6    would think that within two weeks I could get it out.  That's

7    my goal.

8         **MR. BONDURANT:**  On behalf of my client, we will agree

9    to an extension for two weeks, and I don't mean to be

10   unreasonable or put pressure on the Court, but this

11   transaction, because of its importance and because of its

12   impact on both my client and Palmyra and on HCA, I do not

13   believe that any of the three of us, candidly, Your Honor,

14   could agree to extend it beyond that date.

15        **THE COURT:**  All right.

16        **MR. VAN VOORHIS:**  The defendants agree.

17        **MR. LOWREY:**  HCA and Palmyra agree as well.

18        **THE COURT:**  Mr. Reilly?

19        **MR. HASSI:**  I'm Hassi, Your Honor, but we obviously

20   will -- we think Your Honor should have as much time as you

21   need, and we're not playing a four corners defense here, we're

22   just --

23        **THE COURT:**  Well, I'm going to do my best, and if it

24   turns out otherwise, I will reassemble you all.  But I just

25   remind you all that two weeks is less time than you all had

1    and you have a much bigger team than I do.

2        **MR. BONDURANT:**  And, Your Honor, on behalf of all the

3    parties, I think we want to thank you for your patience today

4    in hearing this as rapidly and, candidly, tolerating fools as

5    gladly as you have.

6        **THE COURT:**  Well, thank you.  I just want to say

7    obviously not all cases require or really should have

8    arguments, but obviously in this case the Court has benefitted

9    from the arguments.  I think the suggestion of argument was

10   good, and I appreciate it and, in fact, I think I do have a

11   clearer idea where everybody stands from having heard the

12   arguments, and, of course, in the briefing that you've already

13   done, so, but I think today, though it was long, was well

14   spent.  I apologize again to you all and to the public for our

15   failed system, but I think everybody got a pretty good handle

16   on what the presentations were for all their purposes.

17       **MR. BONDURANT:**  The only thing you need to arbitrate

18   now is how much the government owes us for using our little

19   projector.

20       **THE COURT:**  I guess you get to collect some time in the

21   future as a quid pro quo.

22       **MR. HASSI:**  Your Honor, can I beg your indulgence on

23   one more housekeeping issue, and that is, I know that the

24   Hospital Authority specifically moved things into evidence.

25   We've got have a list of things that were submitted.  I don't

1    know whether you want that on the record.

2         **THE COURT:**  It may be good to do that on the record

3    just to be sure.  That's one of the things I want to do to be

4    sure there is no dispute about that.  What I'm going to do,

5    I'm going to give you all a chance to go over that and just

6    leave the reporter here.  You all can announce those to the

7    record, and if there is something in dispute, I'll come back

8    and address that.

9         **MR. HASSI:**  Thank, Your Honor.

10        **THE COURT:**  Is that a fair way to do it?

11        **MR. HASSI:**  That's fine, Your Honor.

12        **THE COURT:**  Okay.  Thank y'all.  We're in recess unless

13   I need to return to address any disputes we might have.

14                    *(MOTIONS HEARING CONCLUDED)*

15   _____

16        *I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT*
     *TRANSCRIPT FROM THE RECORDING OF PROCEEDINGS IN THE*
17   *ABOVE-ENTITLED MATTER TO THE BEST OF MY ABILITY, THIS 27th DAY*
     *OF JUNE, 2011.*

18
         *TRANSCRIBER:*
19
         *s/ SALLY L. GRAY, USCR,*
20       *U.S. DISTRICT COURT-MIDDLE DISTRICT OF GEORGIA*

21

22

23

24

25